IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

---

JOHN F. KAMINSKI,

Plaintiff,

v.

CITY OF UTICA, *et al.,*

Defendants.

Civil Action No.
9:10-CV-0895 (TJM/DEP)

---

APPEARANCES: OF COUNSEL:

FOR PLAINTIFF:

JOHN F. KAMINSKI, *Pro Se*
1102 Albany Street #4
Utica, NY 13501

FOR UTICA DEFENDANTS:

HON. MARK CURLEY
Corporation Counsel City of Utica
One Kennedy Plaza
Utica, New York 13502

JOHN P. ORILIO, ESQ.
Asst. Corporation Counsel

FOR NEW YORK MILLS DEFENDANTS:

MORRIS, DUFFY LAW FIRM
2 Rector Street
New York, NY 10006

CARL S. SANDEL, ESQ.

FOR ONEIDA COUNTY DEFENDANTS:

KERNAN PROFESSIONAL GROUP, LLP
1310 Utica Street
P.O. Box 750
Oriskany, New York 13424

DAVID A. BAGLEY, ESQ.

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

Plaintiff John F. Kaminski, who is proceeding *pro se* and *in forma pauperis*, brings this action pursuant to 42 U.S.C. § 1983 alleging that his civil rights were violated in connection with an incident involving his arrest and subsequent confinement at the Oneida County Correctional Facility ("OCCF"). In his complaint, plaintiff alleges that police officers from the Village of New York Mills and City of Utica entered his apartment without a warrant and subjected him to excessive force to effect his arrest. Plaintiff also alleges that he was denied proper medical treatment for the injuries which resulted from the excessive use of force.

Currently pending before the court are two separate motions for summary judgment. The County of Oneida (the "County") has moved for summary judgment dismissing plaintiff's complaint on the grounds that 1) plaintiff has failed to identify any individual County officer or employee who

is alleged to have violated his rights; 2) plaintiff has failed to exhaust his administrative remedies; 3) plaintiff has failed to comply with the notice of claim requirements relative to any state law claims; and 4) in any event, the undisputed proof demonstrates that the County did not display deliberate indifference to plaintiff's serious medical needs. The City of Utica (the "City") has also moved for summary judgment, asserting that 1) the arresting officers were given consent to enter plaintiff's apartment; 2) plaintiff has failed to allege facts supporting an equal protection claim; 3) plaintiff has failed to establish that the City had in place a policy, practice, or procedure that resulted in the violation of his constitutional rights; and, 4) the use of force in association with plaintiff's arrest was reasonable. Having carefully considered the record now before the court, I recommend that both motions be granted, and that judgment be entered in favor of both the County and the City.

## II. BACKGROUND[1]

Although the facts central to plaintiff's claims appear to be vigorously contested, there is no dispute that the relevant events were set

[1] In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

in motion after plaintiff left the scene of an automobile accident, which resulted from his earlier attempt to evade police officers' unsuccessful efforts to stop a vehicle owned by an acquaintance of the plaintiff, Amanda Osborne, and driven by Kaminski. In the morning of November 24, 2007, a New York Mills police officer signaled for plaintiff to stop the vehicle. Utica Police Dep't Narrative (Dkt. No. 36-9); Transcript of Plaintiff's Deposition ("Tr.") (Dkt. No. 38) pp.32-36, 38-39. Instead of complying, plaintiff continued driving, drove through a red light, and struck another vehicle, causing injury to the operator of that car. *See id.* The collision left the vehicle plaintiff was driving inoperable, and he therefore fled the scene of the accident on foot to his apartment, located approximately one block away at 830 Oswego Street in Utica, with the police in pursuit.[2] *See* Tr. at pp. 41-43. It is at this juncture that parties' versions of the relevant events diverge.

Plaintiff maintains that upon arriving at his second floor apartment, where his friends Amanda Osbourne, Cherrin Roberts and Roberts' boyfriend, Walter Jones, were visiting, Kaminski advised them that they

---

[2] The police accident report states that plaintiff was issued a summons to appear in Utica City Court to answer charges for leaving the scene of an accident involving personal injury, and also notes that plaintiff had multiple charges pending in New York Mills court at the time. Orilio Aff. (Dkt. No. 41) Exh. A at p. 18.

would have to leave because he had been involved in an accident and did not know what was going to happen to him. Tr. at pp. 55-56. Plaintiff looked out the apartment window and observed police officers outside of the building, and Roberts voiced her concern that they would all be arrested. *Id.* at p. 58. Osbourne, Roberts and Jones all decided that they were going to leave the apartment. *Id.* at p. 63. As they did, plaintiff heard footsteps coming toward his apartment, and closed the door behind them. *Id.* According to Kaminski, a few moments later he put on a shirt and started to get his shoes on, when he heard police officers outside of the door directing him to come out. *Id.* Kaminski responded that he would be right out, and as he bent over to tie his shoes, he heard the door being broken off of its hinges and then saw three police officers dressed in riot gear and two German Shepard dogs enter the apartment. *Id.*

Plaintiff claims that he was struck on the back of the neck by a police officer while he was bent over.[3] *Id.* at pp. 64-65. Plaintiff further asserts that one of the officers put black gloves on, while defendant Toomey held down his face and pushed his fingers into Kaminski's eye sockets, and the police officer in the riot gear began pounding him in the

[3] At his deposition plaintiff testified that two of the officers involved appeared to be Utica police officers, and one was defendant Toomey. Tr. at p. 65.

face. *Id.* at p. 65. A third police officer, who was looking out of the window, directed the other two officers to stop beating the plaintiff because there were television cameras outside. *Id.* at p. 66. A Utica police officer then came up behind plaintiff and "dropped his whole body weight with his knee on [Kaminski's] lower spine and back", causing plaintiff to yell out and urinate on the floor "because [he] didn't know if [he] was gonna be alive after the pounding [he] was getting." *Id.* After he was beaten, the police officers allegedly dragged Kaminski down the stairs by his handcuffs, and placed him into a police sport utility vehicle ("SUV").

According to police reports prepared by Utica police officers responding to Kaminski's apartment at 830 Oswego Street, two police officers were dispatched to the area of Noyes Street in Utica relative to a vehicle pursuit in progress, and shortly after were advised that a foot chase had developed. Orilio Aff. (Dkt. No. 41) Exh. A at p. 11 of 27 (unnumbered). When arriving in the vicinity of plaintiff's apartment, the Utica police officers were informed by several bystanders and some other police officers that Kaminski had fled into the premises at 830 Oswego Street. *See id.; see also id.* at p. 13. Utica police officers assisted in securing the perimeter of the building. It is unclear from the reports how many officers were involved and what, if any, role they played in securing

plaintiff into police custody. One of the narrative reports prepared by a Utica police officer at the scene, however, indicates that Amanda Osbourne and Cherrin Roberts “came to the door” and advised that plaintiff was “upstairs with a knife.” Orilio Aff. (Dkt. No. 41) Exh. A at p. 11. That report further states that New York Mills police officers, including defendant Toomey, directed plaintiff to come out of the building and that Kaminski responded by cooperating, and was taken into custody. *See id.*

Another narrative report prepared by a Utica police officer states that while securing the perimeter of the building, after approximately twenty minutes had elapsed, several officers were observed bringing one white female and one black female out of 830 Oswego Street, and that approximately ten minutes later Kaminski was escorted out of the residence by several officers and placed in the rear of a New York Mills police vehicle. Orilio Afd. (Dkt. No. 41) Exh. A at p. 13. That report also reflects that Osbourne, Roberts, and Jones, who was brought out of the building last, were taken to the Oneida County Sheriff’s Department headquarters to provide statements. *See id.* There is no indication from any of the Utica Police Department narrative reports of any use of force to effect the arrest. After plaintiff was placed in the SUV, he had no further contact with any Utica police officer. Tr. at p. 72.

Plaintiff was transported to the OCCF where he was booked and admitted, and remained incarcerated until November 10, 2008. County's Rule 7.1(a)(3) Statement of Undisputed Material Facts (Dkt. No. 34-11) ¶ 3. Upon booking it was noted that plaintiff had bruises on the left side of his cheek and that he reported having suffered a broken jaw approximately one month earlier and complained of numbness. Liddy Aff. (Dkt. No. 34-9) Exhs. at pp. 4 and 8 of 46 (unnumbered); *see also* Plaintiff's Exh. B (Dkt. No. 40-4) at p. 3 of 22 (unnumbered). The day following his booking into the OCCF, on November 25, 2007, plaintiff signed an authorization for release of his medical records from the State University of New York Hospital at Upstate ("SUNY Upstate") in Syracuse, New York. Liddy Aff. (Dkt. No. 34-9) Exhs. at p. 14. On November 29, 2007, an X-ray of plaintiff's jaw was taken, showing evidence of a "known" left mandibular fracture extending to the roots of a tooth. *Id.* at p. 19. On or about November 30, 2007, plaintiff's records from SUNY Upstate were provided by OCCF medical personnel to Faxton-St. Luke's Hospital in New Hartford, New York, where plaintiff was seen for a consultation; plaintiff was advised to follow up with the ear, nose and throat doctor seen at SUNY Upstate when he injured his jaw. Liddy Aff. (Dkt. No. 34-9) Exhs. at pp. 21-24.

On December 7, 2007, Kaminski submitted a written inmate request to OCCF personnel for medical treatment, stating that he broke his jaw " a while back than [sic] it was reinjured" and requesting to have his jaw "fixed." Plaintiff's Exh. B (Dkt. No. 40-4) p. 12. Plaintiff was taken for an outpatient visit to see Dr. William D. Losquadro at SUNY Upstate on December 20, 2007. Additional Exhs. to Liddy Aff. (34-10) p. 1 of 49 (unnumbered). Dr. Losquadro's record of the visit observes that plaintiff "originally presented to the ER in August [2007] with left angle/body and right subcondylar fractures[,] . . . unfortunately failed to follow-up and now presents for interval evaluation." *Id.* Dr. Losquadro's report further describes plaintiff's jaw fractures as healed; the doctor ordered a CT scan for evaluation of plaintiff's jaw, and recommended that plaintiff follow up in two months for review of the result. *Id.* A CT scan was performed on January 15, 2008. Additional Exhs. to Liddy Aff. (Dkt. No. 34-10) pp. 5-7.

Plaintiff was seen at the SUNY Upstate ENT Clinic for a follow up visit on February 14, 2008, at which time it was noted that there was evidence of an old jaw fracture with mild occlusion for which plaintiff had failed to pursue recommended surgery. *Id.* at pp. 10-12. Plaintiff was advised to follow up again in three months, and was referred to a dentist for evaluation. *See id.* While it is not entirely clear, it appears from the

record before the court that plaintiff was seen by a dentist on or about March 20, 2008, and it was observed that he exhibited good function and normal opening of his jaw, though two cavities were noted; plaintiff was advised on that occasion to follow up with a dentist or orthodontist up his release from prison.[4] *Id.* at pp. 14-15. Plaintiff chose not to have his jaw repaired before his release from jail "because the after-care treatment is poor in the jails." Tr. at p. 103.

## III. PROCEDURAL HISTORY

Plaintiff commenced this action on July 21, 2010, naming the City of Utica, the City of Utica Police Department, the Town of New York Mills Police, Oneida County, and the Oneida County Jail as defendants. Dkt. No. 1. Upon initial review of plaintiff's complaint in conjunction with his application to proceed *in forma pauperis*, the court dismissed the City of Utica Police Department, the Village of New York Mills Police Department, and the Oneida County Jail as defendants and directed the clerk of the court to add Officer Toomey, of the Village of New York Mills Police Department, as a defendant. *See* Dkt. No. 5. Thereafter, plaintiff filed an amended complaint along with a request for leave to amend as of right.

---

4 While actual dental records have not been provided, an OCCF consultation/laboratory test request form completed by a facility physician seems to indicate that plaintiff was seen in the dental clinic at SUNY Upstate.

Dkt. Nos. 10, 11. Noting that plaintiff was apparently unable to identify the individual defendants employed by the named municipalities and involved in the incident, and in deference to his *pro se* status, the court granted plaintiff leave to amend and directed service of the amended complaint upon the City of Utica; John Doe Nos. 1 and 2, of the City of Utica Police Department; the Village of New York Mills; John Doe No. 3, of the Village of New York Mills Police Department; Officer Toomey, a Village of New York Mills Police Officer; Oneida County; and, John/Jane Does, Members of the OCCF jail staff. Dkt. No. 16. Thereafter, issue was joined by the filing of answers on behalf of Oneida County, Dkt. No. 21; the City of Utica and the City of Utica Police Department, Dkt. No 23; and, Officer Toomey and the Village of New York Mills, Dkt. No. 25.

Following the completion of discovery, summary judgment motions were filed on behalf of the County, Dkt. No. 34, and the City, Dkt. No. 36. In support of its motion, Oneida County argues that it is entitled to judgment as a matter of law on both procedural and substantive grounds. As to the former, the County contends that dismissal of the complaint is warranted because plaintiff did not first exhaust available administrative remedies and, with regard to any state law claims, has failed to file a notice of claim as required by New York General Municipal Law. On the

merits, defendant County asserts that plaintiff has failed to identify any individual officers responsible for the alleged constitutional violations, and cannot prove a claim of deliberate medical indifference under the Eighth Amendment.

In support of its request for summary judgment, the City argues that plaintiff's Fourth Amendment claim fails on the merits since the officers involved in plaintiff's arrest had consent to enter his residence and the force used to effect the arrest was reasonable, further contending that plaintiff has failed to even sufficiently allege an Equal Protection violation. The City also urges dismissal on the grounds that plaintiff has failed to show that the Utica Police Officers allegedly involved acted pursuant to a municipal policy, practice, or procedure that resulted in the violation of his constitutional rights.

Defendants' motions, both of which plaintiff has opposed, *see* Dkt. No. 40, are now ripe for determination and have been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).

## III. DISCUSSION

### A. Summary Judgement Standard

Summary judgment motions are governed by Rule 56 of the Federal

Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

A moving party seeking summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4, 106 S. Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83. In

the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). Summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S. Ct. at 2511 (summary judgment is appropriate only when "there can be but one

reasonable conclusion as to the verdict").

B. Legal Significance of Plaintiff's Failure to Properly Respond to Defendants' Local Rule 7.1(a)(3) Statements

While plaintiff has opposed defendants' motions, he has failed to fully comply with Local Rule 7.1(a)(3). Before turning to the merits of plaintiff's claims the court must address as a threshold matter the legal significance of his failure to properly respond to defendants' Local Rule 7.1(a)(3) Statements.

The consequences of this failure are potentially significant. By its terms, Local Rule 7.1(a)(3) provides that "[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y.L.R. 7.1(a)(3). Courts in this district have routinely enforced Rule 7.1(a)(3) and its predecessor, Rule 7.1(f), by deeming facts admitted upon an opposing party's failure to properly respond. *See*, *e.g.*, *Elgamil v. Syracuse Univ.*, No. 99-CV-611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2000) (McCurn, S.J.) (listing cases)[5]; *see also Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000) (discussing district courts' discretion to adopt local

[5] Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

rules like 7.1(a)(3)).[6]

Undeniably, *pro se* plaintiffs are entitled to some measure of forbearance when defending against summary judgment motions. *See Jemzura v. Public Serv. Comm'n,* 961 F. Supp. 406, 415 (N.D.N.Y. 1997) (McAvoy, C.J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the ramifications associated with a failure to comply with the local rules. *See Robinson v. Delgado*, No. 96-CV-169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J. & Hurd, M.J.); *Cotto v. Senkowski*, No. 95-CV-1733, 1997 WL 665551, at *1 (N.D.N.Y. Oct. 23, 1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian*, 980 F. Supp.106, 106-07 (N.D.N.Y. 1997). As another judge of this court has noted, "a *pro se* litigant is not relieved of the duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins*, No. 9:09-CV-308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011) (Mordue, C.J.) (citing *Nealy v. U.S. Surgical Corp.*, 587 F. Supp. 2d 579, 583 (S.D.N.Y. 2008) and *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003)). Where a plaintiff has been specifically notified of

---

[6] As to any facts not contained in the defendants' Local Rule 7.1(a)(3) statements, I will assume for purposes of this motion that plaintiff's version of those facts is true, as plaintiff is entitled to the benefit of all inferences at this stage. *Wright v. Coughlin*, 132 F.3d 133, 137 (2d Cir. 1998).

the consequences of failing to respond to a movant's Rule 7.1(a)(3) Statement but has failed to do so, and the facts contained within that statement are supported by the evidence in the record, the court will accept such facts as true. *Id.* (citing *Littman v. Senkowski*, 2008 WL 420011, at *2 (N.D.N.Y. 2008) (citing *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir.1996)).

With their motions the two moving defendants served notices specifically warning plaintiff of the consequences of his failure to properly respond to defendants' respective Local Rule 7.1(a)(3) Statements.[7] In conjunction with their motions, defendants served upon plaintiff a court-authorized form expressly warning of the consequences of failing to respond to defendants' respective summary judgment motions. That form advised the plaintiff that he must submit,

> [a] **response to the defendants' statement of material facts** that admits and or denies each of the defendants' assertions in matching number paragraphs, and that supports each denial with citations to the record evidence[.]

County's Motion (Dkt .No. 34-1); City's Motion (Dkt. No. 37-1) (emphasis

[7] Northern District of New York Local Rule 56.2 mandates that when summary judgment is sought against a *pro se* litigant, the moving party must notify that *pro se* litigant of the consequences of failing to respond to the motion. *See* N.D.N.Y.L.R. 56.2. The local rule also advises that a sample of such a notice can be obtained through the court.

in originals) (footnote omitted). That notification continued, as follows,

> **WARNING**: If you do not submit a proper response to the defendants' statement of material facts, **the Court may deem you to have admitted the defendants' factual statements.** If you do not submit copies of record evidence in support of your denials, **the Court may deem defendants' factual statements to be true.** If you do not submit a proper response memorandum of law, **the Court may deem you to have conceded the defendants' arguments.** If you do not respond to this motion properly (or at all), summary judgment may be entered against you, meaning that **SOME OR ALL OF YOUR CLAIMS MAY BE DISMISSED.**

*Id.* (emphasis in originals).

While Kaminski filed two separate documents characterized as responses to defendants' respective statements of material facts, they do not comport with Local Rule 7.1(a)(3). See Dkt. Nos. 40 and 40-1. In the first instance, plaintiff has not included statements which are numbered and directly correspond to defendants' respective numbered paragraphs setting forth undisputed facts. Plaintiff's response to defendant Oneida County's Rule 7.1(a)(3) Statement of Undisputed Material Facts, Dkt. No. 34-11, which includes seventeen separately numbered statements, sets forth an introductory paragraph followed by four numbered paragraphs and a conclusion. *See* Dkt. No. 40-1. Similarly, plaintiff's response to the defendant City's Rule 7.1(a)(3) Statement of Undisputed Material Facts includes five numbered paragraphs, while the City's sets forth eleven

statements of undisputed fact. More problematic is the difficulty in discerning which of defendants' respective fact assertions plaintiff disputes, since plaintiff's response is set forth in paragraph style without citations to documents in the record, with inclusion of argument and citation to case law.

In view of the foregoing, and despite plaintiff's *pro se* status, I recommend that the court accept defendants' assertions of facts as set forth in their respective Local Rule 7.1(a)(3) Statements as uncontroverted when reviewing the pending motions.

C. Municipal Liability

In support of their motions both the County and the City assert that plaintiff's claims against them fail because he has failed to identify any individual employee who violated his rights. It is well established that a municipality and its supervisory officials may not be held liable under section 1983 based on the theory of *respondeat superior*. *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691, 98 S. Ct. 2018 (1978). Rather, "[a] municipality may be liable under § 1983 only 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'" *Harris v. Buffardi*, No. 1:08-cv-

1322, 2011 WL 3794235, at *12 (N.D.N.Y. Aug. 24, 2011) (Sharpe, J.) (quoting *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694, 98 S. Ct. 2018 (1978)). In order to establish a municipal policy or custom, a plaintiff must demonstrate one or more of the following:

> (1) the existence of a formal policy officially endorsed by the municipality; (2) actions taken or decisions made by municipal officials with final decision making authority, which caused the alleged violation of plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom of which constructive knowledge can be implied on the part of the policymaking officials; or (4) a failure by policymakers to properly train or supervise their subordinates, amounting to "deliberate indifference" to the rights of those who come in contact with the municipal employees.

*Prowisor v. Bon–Ton, Inc.*, 426 F. Supp. 2d 165, 174 (S.D.N.Y.2006) (citation omitted); *see also Bruker v. City of New York*, 337 F. Supp. 2d 539, 556 (S.D.N.Y. 2004) (citing and quoting *Anthony v. City of New York,* 339 F.3d 129, 140 (2d Cir. 2003)).

To the extent that the County and City contend that to succeed on his section 1983 claims against them plaintiff must establish that an individual employee violated his rights, they paint with an unduly broad brush. The Second Circuit has recognized that "under *Monell* municipal liability for constitutional injuries may be found to exist even in the absence of individual liability...." *Barrett v. Orange Cnty. Human Rights*

*Comm'n*, 194 F.3d 341, 350 (2d Cir.1999). "Such an outcome can be the result of a jury's determination that the individual defendants violated the plaintiff's rights but enjoy qualified immunity, or of a finding that the plaintiff's injuries are not solely attributable to the actions of the named individual defendants." *McCoy v. City of New York*, No. CV 07-4143(RJD)(JO), 2008 WL 3884388, at *1 (E.D.N.Y. Aug. 13, 2008) (citing *Barrett* and *Curley v. Vill. of Suffern*, 268 F.3d 65, 71 (2d Cir. 2001)); *Sforza v. City of New York*, No. 07 Civ. 6122, 2009 WL 857496, at *9 n.11 (S.D.N.Y. Mar. 31, 2009) ( "Despite the City's argument, 'municipal liability for constitutional injuries may be found to exist even in the absence of individual liability, at least so long as the injuries complained of are not solely attributable to the actions of named individual defendants.'") (citing *Barrett*).

The court is in agreement with the proposition that there can be no municipal liability when a plaintiff has not shown that he or she suffered a constitutional violation at the hands of an individual actor. *See Curley*, 268 F.3d at 70-71. Nonetheless, it remains clear that municipal liability rests upon a claim that a municipal policy or custom has resulted in a violation of the plaintiff's constitutional rights. *Vasquez v. City of Bridgeport*, No. 3:07CV01865(DJS), 2009 WL 2372166, at * 3 (D.Conn.

Aug. 3, 2009) ("The rule ... articulated in *Barrett* applies where 'the combined acts or omissions of several employees acting under a governmental policy or custom may violate those rights.'") (quoting *Rutigliano v. City of New York*, 326 Fed. App'x 5, 9 (2d Cir. 2009)).

Broadly construed, plaintiff's complaint alleges that the County and the City are responsible for the acts of their employees based upon their failure to properly train or supervise those employees, or to put in place policies that would have prevented the alleged misconduct.

1. Failure To Train and/or Supervise

It is well-established that a single incident is generally insufficient to raise an inference of the existence of a custom or policy potentially giving rise to municipal liability. *Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir. 1993); *Birdsall v. City of Hartford,* 249 F. Supp. 2d 163, 173 (D.Conn. 2003) (citing *Dwares*); *but see Turpin v. Mailet*, 619 F.2d 196, 202 (2d Cir.), *cert. denied sub nom*, *Turpin v. City of West Haven*, 449 U.S. 1016, 101 S. Ct. 577 (1980) (noting that in the context of excessive police force claims, "a single, unusually brutal or egregious beating administered by a group of municipal employees may be sufficiently out of the ordinary to warrant an inference that it was attributable to inadequate training or supervision amounting to deliberate indifference or 'gross

negligence' on the part of officials in charge"). "[A] policy may be inferred from circumstantial proof that the municipality displayed a deliberate indifference to the constitutional rights of an individual by failing to train its employees or repeatedly failing to make any meaningful investigation into complaints of constitutional violations after receiving notice." *Harris*, 2011 WL 3794235, at * 11 (citing *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir.1991)).

Municipal liability may also attach under the theory that a municipality has failed to properly train its employees when the governmental agency acts with deliberate indifference in disregarding the risks that its employees will unconstitutionally apply its policies without the benefit of further training. *Amnesty America v. Town of West Hartford,* 361 F.3d 113, 129 (2d Cir. 2004) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387-90, 109 S. Ct. 1197, 1204-05 (1989)). In order to establish liability under this theory, however, a plaintiff must identify a particular deficiency in the municipality's training regimen which "'actually caused'" a constitutional deprivation. *Id.* (quoting *City of Canton*, 489 U.S. at 390-91, 109 S. Ct. at 1206))*; see also Birdsall*, 249 F. Supp. at 173 (citing *City of Canton*). As the Second Circuit has noted,

> [t]he elements of an identified training deficiency

> and a close causal relationship, which together require the plaintiffs to prove that the deprivation occurred as the result of a municipal policy rather than as a result of isolated misconduct by a single actor, ensure that a failure to train theory does not collapse into *respondeat superior* liability.

*Amnesty America*, 361 F.3d at 130.

Plaintiff's claim against the County is predicted upon an alleged Eighth Amendment violation – that is, deliberate medical indifference based upon a delay in treatment of his broken jaw while incarcerated at the OCCF. In response to the County's motion for summary judgment, plaintiff has failed to allege any facts that would support a *Monell* claim against the County. Instead, Kaminski suggests that he seeks to hold the County responsible under a theory of *respondeat superior* based upon the acts of unidentified individuals, and completely fails to identify even a single, specific inadequacy in the training protocols or supervision of the OCCF employees. Nor does he cite any municipal policy that led to the alleged constitutional violations. Moreover, plaintiff has failed to proffer any facts or evidence upon which an inference could be drawn that the County failed to properly train or supervise its subordinates, or was otherwise deliberately indifferent to his individual rights. *See Harris*, 2011 WL 3794235, at *12. For this reason, I recommend summary dismissal of

plaintiff's municipal liability claims against the County.

With respect to plaintiff's claims against the City, plaintiff similarly alleges in only general terms that the City is responsible for maintaining a policy or custom of deliberate indifference to civil rights, leading to the use of excessive force by Utica police officers. In opposing the City's motion, plaintiff has failed to come forward with any evidence of prior uses of excessive force demonstration ratification or endorsement of the conduct through a failure to discipline or train.

Plaintiff's reliance upon several newspaper articles regarding complaints against members of the Utica Police Department is unavailing. *Dockery v. Tucker*, No. 97-CV-3584, 2006 WL 5893295, at *23(E.D.N.Y. Sep. 6, 2006). In the first instance, the articles attached to plaintiff's papers discuss an array of police conduct unrelated to plaintiff's circumstances. *See generally* Plaintiff's Exh. E (Dkt. No. 40-7). As an example, one undated article submitted by the plaintiff discusses a challenge to the qualifications of the Utica police chief. Another article, dated April 19, 2010, which references 188 wide-ranging allegations made against the Utica police department in 2009, and also states that investigation of 93 those complaints resulted in disciplinary action, could not possibly support plaintiff's claim that the City's conduct evinced of

policy or custom of deliberate indifference two years earlier, in 2007. While three of the articles recount claims or lawsuits that were brought in 2007 against Utica police for excessive use of force, "no conclusion may reasonably be drawn from [these] cases as to the extent of any investigation by the [City] into the alleged misconduct or as to the existence of any disciplinary action." *Dockery*, 2006 WL 5893295, at *23. "For the purposes of plaintiff's *Monell* claim, [a] 'catalog of disquieting events [submitted by the plaintiff] is not sufficient to demonstrate a pervasive pattern of police officer indulgence in . . ..'' persistent use of excessive force to amount to tacit approval of the conduct by the City. *Id.* at *24 (quoting *Carter v. Dist. of Colombia*, 795 F.2d 116, 123 (D.C. Cir. 1986)) (alteration in original); *see also Carson v. Lewis*, 35 F. Supp. 2d 250, 267-68 (E.D.N.Y. Feb. 4, 1999) (collecting cases).

In sum, plaintiff has failed to establish a basis for finding municipal liability against either the County or the City based upon either a failure to supervise or failure to adequately train theory. Accordingly, I recommend that their respective motions be granted on this basis.

D. Failure to Exhaust Remedies

Based upon the record before the court, it appears undisputed that while incarcerated at the OCCF plaintiff did not file a grievance claiming

deliberate medical indifference with respect to the medical treatment he received for his jaw. County's Local Rule 7.1(a)(3) Statement of Undisputed Material Facts (Dkt. no. 34-11) ¶ 8. As a result, the County asserts, he has failed to exhaust his administrative remedies and is therefore precluded from bringing his claims against the County.

With an eye toward "reduc[ing] the quantity and improv[ing] the quality of prisoner suits[,]" *Porter v. Nussle*, 534 U.S. 516, 524, 122 S. Ct. 983, 988 (2002), Congress altered the inmate litigation landscape considerably through the enactment of the Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), imposing several restrictions on the ability of prisoners to maintain federal civil rights actions. An integral feature of the PLRA is a revitalized exhaustion of remedies provision which requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S. Ct. 2378, 2382 (2006); *Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007). This limitation is intended to serve the dual purpose of affording "prison officials an opportunity to resolve

disputes concerning the exercise of their responsibilities before being haled into courtl[,]" and to improve the quality of inmate suits filed through the production of a "useful administrative record." *Jones v. Bock,* 549 U.S. 199, 127 S. Ct. 910, 914-15 (2007) (citations omitted); *see Woodford,* 548 U.S. at 91-92, 126 S. Ct. at 2386; *see also Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir. 2004). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter*, 534 U.S. at 532, 122 S. Ct. at 992 (citation omitted).

In the event a defendant named in such an action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy*, No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford*, 548 U.S. at 94-95, 126 S. Ct. at 2387-88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford*, 548 U.S. at 95, 126 S. Ct. at 2388; *see also Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007) (citing *Woodford*).

While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias*, 495 F.3d at 43 (quoting *Johnson*, 380 F.3d at 697-98) (emphasis omitted).

In a series of decisions rendered since the enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *Macias*, 495 F.3d at 41; *see Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir. 2004). Under the prescribed algorithm, a court must first determine whether administrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. If such a remedy existed and was available, the court must next examine whether the defendants have forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it or whether, through their own actions preventing the exhaustion of plaintiff's remedies, they should be estopped from asserting failure to exhaust as a defense. *Macias*, 495 F.3d at 41; *Hemphill*, 380 F.3d at 686. In the event the proffered defense survives these first two

levels of scrutiny, the court lastly must examine whether special circumstances nonetheless exist and "have been plausibly alleged" to justify the plaintiff's failure to comply with the applicable administrative procedural requirements. *Macias*, 495 F.3d at 41; *Hemphill*, 380 F.3d at 686.[8]

New York requires that every local correctional facility establish, implement, and maintain a formal inmate grievance program. 9 N.Y.C.R.R. § 7032.1. Defendant County has shown that in accordance with this requirement the OCCF maintains a written directive, procedure and program for inmate grievances at the OCCF. County's Local Rule 7.1(a)(3) Statement (Dkt. No. 34-11) ¶ 4; *see also* Stanton Aff. (Dkt. No.34-7) ¶¶ 4-6 and County's Exh. D (Dkt. No. 34-6) Inmates' Handbook at pp. 26-28. Upon his or her admission into the OCCF each inmate is provided a copy of the inmate handbook, which explains the manner in which the OCCF is operated as well as the rules and regulations

---

[8] Whether the *Hemphill* test survives following the Supreme Court's decision in *Woodford* has been a matter of some speculation. *See, e.g., Newman v. Dunkin*, No. 04-CV-395, 2007 WL 2847304, at *2 n.4 (N.D.N.Y. Sept. 26, 2007) (McAvoy, S.J. and Homer, M.J.). As one court in this district recently observed, "[w]hile recognizing that the Supreme Court's decision in *Woodford* may cast some doubt on the continued viability of the *Hemphill* analysis, the Second Circuit has continued to scrutinize failure to exhaust claims with reference to these three prongs." *Hooks v. Howard*, No. 907-CV-0724, 2010 WL 1235236, at *4 (N.D.N.Y. Mar. 30, 2010) (McAvoy, S.J.) (citing *Ruggiero v. County of Orange*, 467 F.3d 170, 176 (2d Cir.2006)).

governing inmates; included within that handbook is the procedure for filing a grievance. County's Local Rule 7.1(a)(3) Statement (Dkt. No. 34-11) ¶ 5; *see also* Stanton Aff. (Dkt. No. 34-7) ¶ 6. The OCCF grievance procedure is comprised of a three-tiered process, under which an inmate must first complete a complaint/grievance form, which is then reviewed by the grievance coordinator. County's Exh. D (Dkt. No. 34-6) Inmates' Handbook at pp. 26-28; *see also Cisson v. Middaugh*, No. 9:09–CV–260, 2011 WL 2579800, at *3 (N.D.N.Y. Feb. 2, 2011) (Baxter, M.J.)*, report and recommendation adopted*, 2011 WL 2559568 (Jun. 27, 2011) (Scullin, S.J.). The procedure provides inmates with the opportunity to appeal adverse decisions of the grievance coordinator to the facility's chief administrative officer, and any adverse decision from that official may be appealed to the New York State Commission of Correction. *See id.* Inmates can also informally communicate a problem to housing unit officers, although if they are unable to resolve the issue, the inmate is then instructed to complete the complaint/grievance form, which is first reviewed by a tour supervisor, and unresolved complaint/grievance forms are forwarded to the grievance coordinator as part of the formal grievance process. *Cisson*, 2011 WL 2579800, at *3. The County has thus shown that plaintiff had available to him an administrative remedy to pursue his

claims that OCCF staff were deliberately indifferent to his medical needs, satisfying the first prong of the *Hemphill* test.

The second prong of the *Hemphill* analysis focuses upon "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (citations omitted). The third, catchall factor to be considered under the Second Circuit's prescribed exhaustion rubric focuses upon whether special circumstances have been plausibly alleged which, if demonstrated, would justify excusing a plaintiff's failure to exhaust administrative remedies.[9] *Hemphill,* 380 F.3d at 689; *see also Giano v. Goord,* 380 F.3d 670, 676-77 (2d Cir. 2004); *Hargrove,* 2007 WL 389003, at *10. The County has preserved the defense by raising it in its answer to the second amended complaint, *see* County's Answer (Dkt. No. 21) ¶ 32, and plaintiff has alleged no facts suggesting

---

[9] Included among the circumstances potentially qualifying as "special" under this prong of the test is where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable. *Giano v. Goord*, 380 F.3d 670, 676-77 (2d Cir. 2004); *see also Hargrove,* 2007 WL 389003, at *10 (quoting and citing *Giano*). In this instance, plaintiff makes no such claim.

that the County should now be estopped from relying on this defense, or that special circumstances exist to warrant excusing his failure to exhaust administrative remedies. To the contrary, plaintiff seemingly acknowledges his familiarity with the OCCF grievance process, and that he did not file a grievance complaining of the County's failure to provide timely medical treatment for his broken jaw. Tr. pp. 94-95 As an apparent explanation for his failure to file any grievance or complaint whatsoever regarding the claims alleged in this lawsuit, plaintiff claims that he did not receive a copy of the inmate handbook upon admission, and also that he made written requests for medical treatment with respect to his broken jaw.

Whether or not Kaminski actually possessed the handbook, he nowhere claims that he was unaware of the grievance procedures contained within it or that he did not understand those procedures, nor has he has alleged any facts suggesting that prison interfered with his ability to file a grievance. Accordingly, he has not presented facts sufficient to justify an exception to the administrative exhaustion requirement. *Ruggiero v. Cnty. of Orange*, 467 F.3d 170, 178 (2d Cir. 2006).

Plaintiff's reliance on his written requests for medical treatment is likewise unavailing. None of these requests complained about a delay or

lack of treatment for his jaw; moreover, even if they did they would be insufficient to satisfy the exhaustion requirement. *See Davis v. Torres*, No. 10 Civ. 00308(NRB), 2011 WL 3918098, at *5 (S.D.N.Y. Aug. 29, 2011) (citing *Woodford*, 548 U.S. at 93, 126 S. Ct. at 2387; *Scott v. Gardner*, 287 F .Supp.2d 477, 488 (S.D.N.Y.2003) ("Letters of complaint, regardless of the addressee, are not part of the grievance process and do not satisfy the exhaustion requirement."); *Suarez v. Kremer*, No. 03-CV-809, 2008 WL 4239214, at * 3 (W.D.N.Y. Sep. 11, 2008) (citing *Braham v. Clancy*, 425 F.3d 177, 183 (2d Cir. 2005) ("Simply sending letters to a variety of prison officials will not suffice to satisfy the exhaustion requirement.").

In sum, the record unequivocally discloses that despite remaining at the OCCF until November 10, 2008, long after events giving rise to his claims in this action occurred, the plaintiff failed to exhaust his administrative remedies, and has offered no basis to excuse that failure. I therefore recommend that the County's motion for summary judgment dismissing plaintiff's claims arising from his incarceration at the OCCF on this procedural basis be granted.

E. Failure to File a Notice of Claim

To the extent plaintiff's complaint can be interpreted as

encompassing a pendent claim for medical malpractice under New York common law, the County asserts that that claim is precluded as a result of plaintiff's failure to file a notice of claim.

New York General Municipal Law ("GML") § 50–e(1)(a) provides that "[i]n any case founded upon tort where a notice of claim is required by law as a condition precedent to the commencement of an action ... against a public corporation, ... the notice of claim shall ... be served ... within ninety days after the claim arises." N.Y. Gen. Mun. Law § 50–e; *see also Albertelli v. Monroe Cnty.*, No. 09–CV–6039 (MAT), 2012 WL 1883355, at * 8 (W.D.N.Y. May 22, 2012). The notice of claim requirement applies to claims for medical malpractice, and a court is without power to extend the time for a plaintiff to file a notice of claim once the ninety-day period has expired. *Benitez v. Bd. of Higher Educ. of City of N.Y. Univ. of N.Y.*, 308 A.D.2d 410, 765 N.Y.S.2d 22 (1st Dep't 2003).

Kaminski does not dispute that he did not serve a notice of claim upon the County. Instead, he asserts that he filed one with the New York Attorney General. Subdivision (3) of section 50-e of the GML requires that a notice of claim be served upon the County by delivering the notice, or copy thereof, to the person, officer, agent, clerk or employee, designated by law as a person to whom a summons in an action in the Supreme

Court issued against such party may be delivered. N.Y. Gen. Mun. Law § 50-e(3); *Daly v. Cnty. of Monroe*, 19 A.D. 2d 691, 241 N.Y.S.2d 732 (4th Dep't 1963). Under New York law, service upon a County is effected by serving the chair or clerk of the board of supervisors, clerk, attorney, or treasurer. N.Y. Civil Practice Law and Rules § 311(3). Having failed to properly serve the County with a timely notice of claim, plaintiff cannot be relieved of that deficiency by defective service upon the State of New York. *See Scantlebury v. New York City Health and Hosp. Corp.*, 4 N.Y.3d 606, 613, 830 N.E.2d 394, 399 (2005). I therefore recommend that the County's motion for summary judgment as to plaintiff's medical malpractice claim be granted on this basis.[10]

F. Medical Indifference

The County's final contention in support of its motion is that even if the court were to address the merits of plaintiff's medical indifference claim, the undisputed facts demonstrate that it did not act with deliberate

---

[10] As the County also contends, even if the failure to properly file and serve a notice of claim could be excused, any claim for medical malpractice would be barred as untimely since GML § 50-i requires commencement of an action within one year and ninety days of the event upon which the claim is based. *Derlicka v. Leo*, 281 N.Y. 266, 22 N.E.2d 367 (1939). Plaintiff was released from the OCCF on November 10, 2008 and did not commence this action until July 21, 2010. Accordingly, even if the statute of limitations on with respect to his medical malpractice claim did not accrue until the time of his release, the action would be untimely, having been commenced more than one year and ninety days after his release from the OCCF.

indifference to plaintiff's serious medical needs.

Claims that prison officials have intentionally disregarded an inmate's medical needs fall under the umbrella of protection from the imposition of cruel and unusual punishment afforded by the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S. Ct. 285, 290, 291 (1976). The Eighth Amendment prohibits punishment that involves the "unnecessary and wanton infliction of pain" and is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Id.; see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S. Ct. 1078, 1084 (1986) (citing, *inter alia, Estelle).* While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S. Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S. Ct. 2392, 2400 (1981)). To satisfy their obligations under the Eighth Amendment, prison officials must "ensure that inmates receive adequate food, shelter, and medical care, and must take reasonable measures to guarantee the safety of inmates." *Farmer*, 511 U.S. at 832, 114 S. Ct. at 1976 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27, 104 S. Ct. 3194, 3200 (1984)) (internal quotations omitted).

A claim alleging that prison officials have violated the Eighth Amendment by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements. *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly*, No. 07-CV-2634 (JFB/ARL), 2010 WL 889787, at *7-8 (E.D.N.Y. Mar. 8, 2010). Addressing the objective element, to prevail a plaintiff must demonstrate a violation sufficiently serious by objective terms, "in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). With respect to the subjective element, a plaintiff must also demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.'" *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). Claims of medical indifference are subject to analysis utilizing this Eighth Amendment paradigm. *See Salahuddin v. Goord,* 467 F.3d 263, 279-81 (2d Cir. 2006).

1. <u>Objective Requirement</u>

Analysis of the objective, "sufficiently serious," requirement of an Eighth Amendment medical indifference claim begins with an inquiry into "whether the prisoner was actually deprived of adequate medical care . . .", and centers upon whether prison officials acted reasonably in treating

the plaintiff. *Salahuddin*, 467 F.3d at 279. A second prong of the objective test addresses whether the inadequacy in medical treatment was sufficiently serious. *Id*. at 280. If there is a complete failure to provide treatment, the court must look to the seriousness of the inmate's medical condition. *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003). If, on the other hand, the complaint alleges that treatment was provided but was inadequate, the seriousness inquiry is more narrowly confined to that alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition. *Salahuddin*, 467 F.3d at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in treatment. . . [the focus of] the inquiry is on the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." *Id.* (quoting *Smith*, 316 F.3d at 185) (internal quotations omitted). In other words, at the heart of the relevant inquiry is the seriousness of the medical need, and whether from an objective viewpoint the temporary deprivation was sufficiently harmful to establish a constitutional violation. *Smith*, 316 F.3d at 186. Of course, "when medical treatment is denied for a prolonged period of time, or when a degenerative medical condition is neglected over sufficient time, the alleged deprivation of care can no longer be characterized as 'delayed

treatment', but may properly be viewed as a 'refusal' to provide medical treatment." *Id.* at 186, n.10 (quoting *Harrison v. Barkley*, 219 F.3d 132, 137 (2d Cir. 2000)).

Since medical conditions vary in severity, a decision to leave a condition untreated may or may not raise constitutional concerns, depending on the circumstances. *Harrison,* 219 F.3d at 136-37 (quoting, *inter alia, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998)). Relevant factors informing this determination include whether the plaintiff suffers from an injury or condition that a "'reasonable doctor or patient would find important and worthy of comment or treatment'", a condition that "'significantly affects'" a prisoner's daily activities, or "'the existence of chronic and substantial pain.'" *Chance,* 143 F.3d at 702 (citation omitted); *Lafave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *3 (N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.) (citation omitted).

2. <u>Subjective Element</u>

The second, subjective, requirement for establishing an Eighth Amendment medical indifference claim mandates a showing of a sufficiently culpable state of mind, or deliberate indifference, on the part of one or more of the defendants. *Salahuddin*, 467 F.3d at 280 (citing *Wilson v. Seiter*, 501 U.S. 294, 300, 111 S.Ct. 2321, 2325 (1991)).

Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S. Ct. at 1979; *Leach v. Dufrain,* 103 F. Supp. 2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.) (citing *Farmer*); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.) (same). Deliberate indifference is a mental state equivalent to subjective recklessness as the term is used in criminal law. *Salahuddin*, 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839-40, 114 S. Ct. 1970).

Here, plaintiff's claim is premised upon a delay of treatment for his "re-injured" jaw, and as such the focus of the court's Eighth Amendment analysis is upon the objective prong of the test. Plaintiff's medical records indicate that he was first seen in the emergency room at SUNY Upstate for a mandibular fracture on August 31, 2007, well prior to his arrest in November of that year. Liddy Aff. (Dkt. No. 34-9) Exh. G at p. 29. The record from that visit indicates that "reports from an outside facility shows a comminuted fracture of the right mandibular condyle and condylar next with inferior displacement" as well as a fracture of the left posterior

mandibular body towards the angle. *Id.* at pp. 29-32. At the time, it was recommended that plaintiff undergo operative repair, and he was released from the hospital with instructions to follow up in one week for surgery. *Id.* at p. 33. However, plaintiff apparently did not pursue the surgical repair. While Kaminski does not dispute the earlier fracture to his jaw, contrary to the medical evidence in the record, he claims that the injury occurred just one month before his arrest.

Initial medical screening notes completed upon his admission into the OCCF demonstrate that plaintiff, in fact, reported at the time that he was recovering from a broken jaw, which had occurred a month earlier, and for which he was supposed to have surgery. Liddy Aff. (Dkt. No. 34-9) Exh. G at p. 29. Though the initial medical screening notes reveal that plaintiff complained of numbness, there is nothing in that record showing that he claimed to have re-injured his jaw at the time of his arrest, or that he was complaining of pain. Indeed, there is no evidence in the record that Kaminski ever complained that he was suffering from pain in his jaw at or about the time of his arrest or booking at the OCCF. To the contrary, when asked at his deposition whether he complained of pain immediately after following arrest while in the SUV, plaintiff testified only that he told the officers that he needed medical attention and that his head hurt. Tr. at

p. 81. Plaintiff further testified that once he was taken to the OCCF, he was placed in a strip cell and waited several hours to be seen by a psychiatrist, but made no mention of having been in or complained of pain. *Id.* at 89.

Plaintiff's medical records reveal that plaintiff made few complaints of pain in his jaw and that he was provided timely, appropriate, and continuous treatment for his jaw in accordance with the recommendations of outside consultants. On November 20, 2007 plaintiff reported to OCCF medical personal that he had sustained a fracture to his jaw about a month earlier, was seen at SUNY Upstate, and was advised that he needed surgery. Liddy Aff. (Dkt. No. 34-9) Exh. G at p. 21. At the time, a request for plaintiff's medical records was sent via facsimile to SUNY Upstate. *Id.* Those records were received on November 30, 2007. The first complaint of pain in the jaw found in any of the medical records appears on the following day, on November 27, 2007, where it is noted that plaintiff complained of pain in his "'hips, back, jaw' pain a 8 on pain scale", and at that time an x-ray was ordered. Liddy Aff. (Dkt. No. 34-9) Exh. G at p. 16. That x-ray was taken two days later, on November 29, 2007, revealing the existence of the earlier fracture. Liddy Aff. (Dkt. No. 34-9) Exh. G at p. 19-20. Plaintiff was taken to Faxton-St. Luke's Hospital

on November 30, 2007. Plaintiff's Exh. B (Dkt. No. 40-4) pp. 4-5. The pre-existing jaw fracture was noted, and plaintiff was advised to follow up with SUNY Upstate, where he initially received treatment. *Id.*

The next complaint of jaw pain appears in nurses' notes of December 2, 2007, wherein it is stated, again, that the original fracture occurred approximately a month earlier and that plaintiff was complaining of pain in his jaw at a level of between six and seven on the pain scale. Liddy Aff. (Dkt. No. 34-9) Exh. G at p. 36. Notes of an infirmary visit on the following day indicate that plaintiff did not follow up with the recommended jaw surgery "due to his drinking" and that he "realizes his mistakes." *Id.*

On December 7, 2007, plaintiff made a written request for medical treatment, stating only, "I would like to have my 'jaw' fixed I had it broken awhile back than [sic] it was re-injured. I would apprictte [sic] if something can be done surrey? yes - no circle 1." *Id.* at p. 42. Conspicuously absent from plaintiff's written request, submitted just two weeks after entering the OCCF, is any complaint of pain or dysfunction of his jaw.

On December 20, 2007, less than one month after his admission into the OCCF, plaintiff was transported to SUNY Upstate for evaluation of his jaw, and was seen there by Dr. Losquadro. Additional Exhs. to Liddy

Aff. (Dkt. No. 34-10) p. 1. In a report of that visit Dr. Losquadro noted the following:

> The patient is a 44-year-old incarcerated gentleman who originally presented to the ER in August with left angle/body and right subcondylar fractures. He unfortunately failed to follow-up and now presents for interval evaluation. He reports some resolving left V3 hypethesia but continued malocclusion. Despite his malocclusion, he is able to chew and eat without much difficulty.

Additional Exhs. to Liddy Aff. (Dkt. No. 34-10) p. 1. Pursuant to Dr. Losquadro's recommendation, on the following day medical personnel at the OCCF ordered a maxil/facial CT scan. Additional Exhs. to Liddy Aff. (Dkt. No. 34-10) p. 1. That procedure was completed on January 15, 2008. *Id.* at pp. 6-7. Plaintiff submitted another written medical request on February 3, 2008, inquiring concerning the possibility of undergoing surgery for his fractured jaw. Additional Exhs. to Liddy Aff. (Dkt. No. 34-10) p. 1. Once again, no mention of pain or difficulty appears in plaintiff's request for treatment.

In accordance with Dr. Losquadro's instructions, plaintiff was again taken to SUNY Upstate for a further visit on February 14, 2008, at which time it was recommended that he follow up again in three months. Additional Exhs. to Liddy Aff. (Dkt. No. 34-10) p. 10. Plaintiff's jaw was evaluated again by OCCF medical personnel on March 20, 2008, and he

was referred to a dentist for an outside consultation. At the time, it was noted that plaintiff's jaw was functioning well and that he was "more comfortable", and he was advised to follow up with a dentist or orthodontist upon his release from prison. Additional Exhs. to Liddy Aff. (Dkt. No. 34-10) p. 14.

Contrary to plaintiff's unsupported assertions, there is no objective evidence tending to establish that his jaw was re-injured at the time of his arrest. In fact, when asked if he mentioned to OCCF personnel that his jaw was reinjured upon his initial medical screening, he could not state that he did. Tr. at p. 102. Of the ten written medical requests contained within the record, all of which were made by plaintiff while confined at the OCCF, only two even mention his jaw, making no reference to any pain, discomfort, or dysfunction, but instead merely inquiring as to the possibility of surgery. Even more telling is the fact that within two days of complaining of jaw pain, plaintiff received an x-ray, revealing only the old fracture, and the next day was taken to Faxton-St. Luke's, where again no pain or dysfunction was noted. Plaintiff's medical records are replete with notations to the effect that surgery was recommended to plaintiff after the occurrence of the fracture in August 2007. Kaminski did not follow up with that original recommendation, and readily acknowledges that he decided

not to have surgery while housed in the OCCF.

Based upon the record before the court, I have concluded that no reasonable juror could find that the County was deliberately indifferent to plaintiff's serious medical needs and unduly delayed in the treatment of his injured jaw. *See Thomas v. Nassau Cnty. Corr. Ctr.*, 288 F. Supp. 2d 333, 339 (E.D.N.Y.2003) (citation omitted) (noting that even if a prisoner is able to establish a delay in medical treatment, he must also show that his condition became worse or deteriorated as a result of the delay to establish deliberate indifference); *see also Hoover v. CCS Correct Care Solutions, Inc.*, No. 4:09-10910-SB-TER, 2010 WL 2985816, at *2 n.3 (D.S.C. Jul. 7, 2010) (recommending, in the alternative, summary judgment in favor of the defendants on plaintiff's medical indifference claim based upon delay in treatment of a nondisplaced fractured jaw where plaintiff was seen the day after complaining of pain and surgery was performed thereafter), *report and recommendation adopted*, 2010 WL 2933792, at *1 (D.S.C. Jul. 26, 2010). Contrary to plaintiff's assertion, the record shows that the medical personnel were attentive and responsive to plaintiff's medical needs. Accordingly, I further recommend a finding that medical personnel at OCCF did not act with deliberate indifference to plaintiff's serious medical needs, and that the County's motion for

summary judgment therefore be granted dismissing plaintiff's Eighth Amendment claim on the merits.

G. Equal Protection

To the extent that plaintiff's complaint can be interpreted to allege an equal protection claim against the City, that defendant now seeks summary judgment on the merits of that claim.[11]

The Equal Protection Clause directs state actors to treat similarly situated people alike. *See City of Cleburne, Texas v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254 (1985). To prove an Equal Protection deprivation, a plaintiff must demonstrate that he or she was treated differently than others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class. *See Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir.1995) (citing, *inter alia*, *McCleskey v. Kemp*, 481 U.S. 279, 292, 107 S. Ct. 1756, 1767 (1987)). The plaintiff must also show that the disparity in treatment "cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not reasonably related to [any] legitimate penological interests." *Phillips v. Girdich*, 408 F.3d 124, 129 (2d

[11] Although I do not read plaintiff's complaint to assert an equal protection claim, even when read with the utmost solicitude, I will address this issue since it is raised by the City in its motion.

Cir. 2005) (quoting *Shaw v. Murphy*, 532 U.S. 223, 225, 121 S.Ct. 1475 (2001) (internal quotation marks omitted)).

The City is correct in its assertion that the record is devoid of any evidence suggesting that Kaminski was singled out for treatment based upon his membership in a protected class or as a result of intentional or purposeful discrimination directed at an identifiable class. As a result, in the event that his complaint is deemed to include an Equal Protection claim, I recommend that the City's motion be granted as to that cause of action.

H. Fourth Amendment Claims

Plaintiff's complaint asserts two Fourth Amendment claims against the City of Utica Police Department, alleging that law enforcement officers illegally entered his home without a warrant and arrested him, and that he was subjected to the use of excessive force in conjunction with that arrest. The City contends that it is entitled to summary judgment on the merits of both of these claims.

1. Warrantless Entry

The Fourth Amendment protects individuals in their homes "against unreasonable searches and seizures." U.S. CONST. AMEND. IV. "A warrantless search is '*per se* unreasonable ... subject only to a few

specifically established and well-delineated exceptions.'" *United States v. Elliot*, 50 F.3d 180, 185 (2d Cir.1995) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). "To the Fourth Amendment rule ordinarily prohibiting the warrantless entry of a person's house as unreasonable *per se*, one jealously and carefully drawn exception recognizes the validity of searches with the voluntary consent of an individual possessing authority." *Georgia v. Randolph*, 547 U.S. 103, 109, 126 S. Ct. 1515, 1520 (2006) (quotations and citations omitted). Consent to entry may be obtained from "the householder against whom the evidence is sought, or a fellow occupant who shares common authority over the property, when the suspect is absent." *Randolph*, 547 U.S. at 109, 126 S. Ct. at 1520. "[T]he exception for consent extends even to entries and searches with the permission of a co-occupant whom the police reasonably, but erroneously, believe to possess shared authority as an occupant[.]" *Id.* (citing *Illinois v. Rodriguez*, 497 U.S. 177, 186, 110 S. Ct. 2793, 2800 (1974)). On the other hand, as the Supreme Court held in *Randolph*, when one occupant at the scene consents, and the other, who later objects to the entry, refuses to consent, the entry will be unlawful as to that objecting individual. *Id.* at 106, 126 S. Ct. at 1519-20.

Where there is consent of a co-occupant, if the person consenting to

the search had apparent authority, the validity of the search will turn on the reasonableness of the officers' belief in such authority. *Mangino v. Incorporation Village of Patchogue*, 739 F. Supp. 2d 205, 244 (E.D.N.Y. 2010) (citing *Rodriguez*). The determination of whether apparent authority existed "must be judged against an objective standard: would the facts available to the officer at that moment . . . 'warrant a man of reasonable caution in the belief' that the consenting party had authority over the premises." *Rodriguez*, 497 U.S. at 188, 110 S. Ct. at 2801 (quoting *Terry v. Ohio*, 392 U.S. 1, 21-22, 88 S. Ct. 1868, 1880 (1968)) (internal quotations omitted).

Relying on statements from Roberts and her boyfriend, Walter Jones, obtained following the plaintiff's arrest, the City contends that the entry into the plaintiff's apartment was justified by Roberts' consent. According to the City, Roberts arrived at the door of the residence, identified herself as a resident, and reported that plaintiff had a knife. In his opposition to the City's motion, plaintiff disputes that Roberts was a resident of the apartment, and asserts that she was merely an acquaintance who was there visiting with her boyfriend. This fact alone, however, would not necessarily defeat Roberts' consent if the entering officers reasonably believed that she had authority to give the consent.

*Rodriguez*, 497 U.S. at 186, 110 S. Ct. at 2800.

In support of its motion, the City proffers Ms. Robert's sworn statement dated November 24, 2007. *See* Roberts' Supporting Deposition (Dkt. No. 36-6). Ms. Roberts states that on November 23, 2007 she was at 830 Oswego Street, where she was renting a room, and that she was sleeping with her boyfriend, Walter Jones, when she awoke to find Kaminski standing over her with a knife in his hand. *See id.* Roberts further states that Kaminski said that he could not go outside because he had hit someone, and there were police everywhere. *See id.* Roberts states that she awakened Jones and told him that she was going to go downstairs and turn Kaminski in for whatever he did. *See id.* She further indicates that she went downstairs and reported to the police that Kaminski was in the apartment upstairs with a knife, at which time she was instructed by police to stay where she was, a directive that she obeyed. *See id.*

In a sworn statement given on the same date, Jones corroborates Roberts' statement. *See* Jones Supporting Deposition (Dkt. No. 36-7). Jones states that he had been staying at the apartment for three days and awoke to find Kaminski standing on a chair in the bedroom trying to move a piece of wood that was blocking a hole to get into the ceiling and

mumbling something about an accident. *See id.* According to Jones, Roberts left the room and went downstairs to admit the police into the apartment. *See id.* When Jones came out of the bedroom, he saw Kaminski holding a knife about eighteen inches long. *See id.* Jones told Kaminski to put the knife down, and Kaminski then shoved the knife under a cushion of the couch. *See id.* Jones further recounts that he advised Kaminski to go downstairs since the police were going to come into the apartment anyway. *See id.* Jones returned to the bedroom and heard the police enter with a dog. *See id.* Jones exited the apartment with his hands raised, as directed.

In light of the court's obligation to draw all reasonable inferences in favor of plaintiff on this motion, although it is a close call, I cannot conclude as a matter of law that the entry into plaintiff's apartment was based upon the officers' reasonable belief that Roberts had apparent authority to consent to that entry. In her statement Roberts does not indicate that she told police officers that she was a resident of the apartment with Kaminski, and he denies that she was. Nor does she expressly state that she gave police officers consent to enter the apartment. Additionally, there presently is no statement of any officer participating in the entry into the apartment indicating that he or she

believed that Roberts had apparent authority and consented to entry into plaintiff's apartment. For these reasons, I have concluded that questions of fact remain as to whether the entry into plaintiff's apartment was lawful, and therefore recommend denying the City's motion as to merits of the plaintiff's unlawful entry claim. *See Williams v. City of New York*, No. 10-CV-2676, 2012 WL 511533, at * 9 (E.D.N.Y. Feb. 15, 2012); *Martin v. Tatro*, No. 04-CV-800, No. 2005 WL 2489905, at * (N.D.N.Y. Oct. 7, 2005) (McAvoy, S.J.).

2. Excessive Force

Turning to plaintiff's claim that he was subjected to an unconstitutional use of force during his arrest, I note that it is well established that the use of force during an arrest is subject to the protections of the Fourth Amendment. *See Scott v. Harris*, 550 U.S. 372, 383, 127 S. Ct. 1769, 1778 (2007). In evaluating such use of force, the court's inquiry is informed by an objective reasonableness standard, *Graham v. Connor*, 490 U.S. 386, 395, 109 S. Ct. 1865, 1871 (1989), "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Id.* (citing *United States v. Place*, 462 U.S. 696, 703, 103 S. Ct. 2637 (1983)). Of course, "not every push or

shove occurring during an arrest constitutes excessive force within the meaning of the Fourth Amendment." *Martin*, 2005 WL 24809905, at *10 (citing *Graham*, 490 U.S. at 396, 109 S. Ct. at 1872). As the Supreme Court stated in *Saucier v. Katz*,

> Because "police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation," the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective.

533 U.S. 194, 205, 121 S. Ct. 2151, 2158 (2001) (quoting and citing *Graham*, 490 U.S. at 396). "Reasonableness is generally a question of fact." *McMahon v. Fura*, No. 5:10–CV–1063, 2011 WL 6739517, at *8 (Dec. 23, 2011) (Lowe, M.J.) (citing *McKelvie v. Cooper*, 190 F.3d 58 (2d Cir.1999) (reversing magistrate judge's grant of summary judgment to officers of Fourth Amendment excessive force claim)).

In the record before the court, there are differing renditions as to the amount of force, if any, that was applied in effectuating plaintiff's arrest. Plaintiff claims that while he was lying on the floor of his apartment, one of the police officers involved gouged his face while another pummeled him in the face, head, and jaw six times, and that he also felt something hard hit his head from the other side. Plaintiff claims that he was in such fear

that he would be beaten to death that he urinated on the floor. Plaintiff further alleges that he pleaded with the police officers to stop and was punched in the mouth hard, causing him to black out. In stark contrast, the police reports contained in the record make no mention of the use of force to effect plaintiff's arrest. Upon his admission into the OCCF, it was noted only that plaintiff had a bruise to the left side of his cheek and that he stated he was recovering from a broken jaw and complained of numbness. Yet, affording plaintiff the benefit of all favorable inferences that may be drawn from the evidence before the court, at this juncture, I am constrained to find that material questions of fact preclude summary dismissal of plaintiff's excessive force claim. I therefore recommend that the City's motion be denied with regard to this cause of action.

I. Failure to Identify and Serve Doe Defendants

While the issue has not been directly raised by the defendants in their motions, the court is empowered to *sua sponte* dismiss plaintiff's claims against the Doe defendants as a result of plaintiff's failure to serve those defendants. *Smith v. Greene*, No. 9:06-CV-0505, 2011 WL 1097862, at * 4 (N.D.N.Y. Mar. 22, 2011) (Suddaby, J.). Rule 4(m) of the Federal Rules of Civil Procedure requires that service of a summons and

complaint be made within 120 days of issuance of the summons.[12] "[W]here good cause is shown, the court has no choice but to extend the time for service, and the inquiry is ended." *Panaras v. Liquid Carbonic Indus. Corp.*, 94 F.3d 338, 340 (7th Cir. 1996). "If, however, good cause does not exist, the court may, in its discretion, either dismiss the action without prejudice or direct that service be effected within a specified time." *Id.* (citing Fed. R. Civ. P. 4(m)); *Zapata v. City of New York*, 502 F.3d 192, 196 (2d Cir. 2007) ("[D]istrict courts have discretion to grant extensions even in the absence of good cause."); *Romandette v. Weetabix Co., Inc.*, 807 F.2d 309, 311 (2d Cir. 1986); *see also Romand v. Zimmerman*, 881 F. Supp. 806, 809 (N.D.N.Y. 1995) (McAvoy, C.J.) (120-day period for service of a summons and complaint by a plaintiff under Fed. R. Civ. P. 4(m) applies to *pro se* plaintiffs as well as those represented by counsel); *Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 709 F. Supp.

---

[12] That rule provides that

> [i]f a defendant is not served within 120 days after the complaint is filed, the court–on motion or on its own after notice to the plaintiff–must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

Fed. R. Civ. P. 4(m). This court's local rules shorten the time for service from the 120 day period under Rule 4(m) to sixty days. *See* N.D.N.Y.L.R. 4.1(b).

1279, 1282 (S.D.N.Y. 1989) (citation omitted) (court lacks jurisdiction until defendants properly served with summons and complaint). When examining whether to extend the specified 120 day period for service, a district court is afforded ample discretion to weigh the "overlapping equitable considerations" involved in determining whether good cause exists and whether an extension may be granted in the absence of good cause. *See Zapata*, 502 F.3d at 197.

Inasmuch as the plaintiff has failed to identify and take steps to obtain jurisdiction over the Doe defendants, I recommend dismissal of his claims against them as well.[13] Plaintiff commenced this action nearly two years ago. Upon its initial review of plaintiff's complaint, the court advised plaintiff that the United States Marshals Service could not effect service upon the unnamed individual defendants, which the court considered as "John Doe" defendants, and that if he wished to pursue claims against those individuals he would have to first identify them by name. Decision and Order (Dkt. no. 5) pp. 6-7. Upon plaintiff's filing of an amended complaint, he was admonished for a second time that, although the court

---

[13] As a practical matter, a plaintiff who fails to identify "John Doe" defendants within the statute of limitations risks losing the opportunity to sue those defendants. *Barrow v. Wethersfield Police Dep't*, 66 F.3d 466, 469 (2d Cir. 1995); *Cole v. Miraflor*, No. 99 CIV 0977, 2001 WL 138765, at *4-5 (S.D.N.Y. Feb. 19, 2001).

would direct service upon the municipalities so as to allow plaintiff to conduct discovery to determine the identities of the John Doe defendants, he would have to take reasonable steps to identify those defendants and amend his complaint to include them by name. Decision and Order (Dkt. No. 16 ) pp. 3-4. In addition, Kaminski was specifically advised, "[i]f [you] fail[] to ascertain the identity of any Doe defendant so as to permit timely service of process this action will be dismissed against that individual." *Id.* at p. 4.

Issue was fully joined by the service of answers on behalf of the defendants by May 3, 2011. *See* Dkt. Nos. 21, 23, and 25. On that same date the court issued its mandatory pretrial discovery and scheduling ordering imposing a deadline of September 3, 2011 for the completion of discovery. *See* Dkt. No.26. The pending motions were filed more than two months after the expiration of that deadline.

Plaintiff has been provided ample opportunity to complete discovery in the action, including that necessary to ascertain the identities of the individual police officers involved in his arrest and medical treatment. In fact, plaintiff served and defendants have responded to interrogatories. In responses to plaintiff's questions, dated August 11, 2011, the County identified the names and dates of employment of every individual having

dealt with plaintiff in relation to his medical treatment. Bagley Reply Decl. (Dkt. No. 42) Exh. B, response to interrogatory no. 4. Though the City did not specifically identify the individuals involved in plaintiff's arrest, it responded to plaintiff's request by stating, "[t]he names of all persons, including Utica Police Officers, who witnessed or purport to have knowledge of the relevant facts of this incident are contained in various Police reports that were generated as a result of this incident. Copies of those Police Reports and documents have been provided to plaintiff." Orilio Reply Aff. (Dkt. No. 41) Exh. 4 at ¶ 7.

Plaintiff did not timely seek leave to amend his complaint to name the unidentified Doe defendants. Nor has he provided any explanation for his failure to do so. Indeed, even in opposing defendants' motions plaintiff has not identified the individuals involved, requested leave to amend the complaint, or provided any justification, let alone good cause, for his failure to act with diligence.

In view of the foregoing, I have concluded that plaintiff has received adequate notice that 1) his failure to name and/or serve the Doe defendants would result in dismissal; 2) the Doe Defendants, who have never been served or afforded the opportunity to conduct discovery in this matter, are likely to be prejudiced by a further delay; 3) the need to

alleviate congestion on the court's docket outweighs plaintiff's right to receive a further chance to be heard in this matter; and 4) I have considered all less-drastic sanctions and find them to be inadequate or inappropriate under the circumstances. For these reasons, I recommend that plaintiff's claims against the Doe defendants be dismissed without prejudice. *Smith*, 2011 WL 1097862, at * 4.

## III. CONCLUSION

This civil rights action arises out of plaintiff's arrest on November 24, 2007, during which he claims to have been beaten and to have suffered re-injury to his previously fractured jaw, and the purported failure to receive timely treatment for that injury while incarcerated at the OCCF. In his complaint, plaintiff asserts a variety of claims against both the municipal defendants and unidentified individuals in their employ. Though discovery is now complete and this action has been pending for more than two years, plaintiff has failed to adduce sufficient facts to support civil rights claims against the County or the City, and similarly has failed to identify any of the individual municipal employees involved in the alleged constitutional violations. Having concluded that plaintiff has not demonstrated a sufficient basis for liability against the County or the City under *Monell*, I have determined that plaintiff's claims against these

defendants should be dismissed as a matter of law. Additionally, I have found that the County is entitled to dismissal of the constitutional claims alleged against it due to plaintiff's failure to exhaust his administrative remedies, and that any common law claims are likewise subject to dismissal as a result of plaintiff's failure to properly file a notice of claim with the County. As to the merits of plaintiff's Fourth Amendment claims against the unidentified individual defendants, though I have concluded that material questions of fact preclude summary judgment, I have determined that plaintiff's claims against those defendants should be dismissed for failure to timely serve these Doe defendants.

Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motions for summary judgment, Dkt. Nos. 34 and 36, be GRANTED and that judgment be entered dismissing all claims against Oneida County and the City of Utica; and it is further

RECOMMENDED that plaintiff's complaint against all Doe defendants be DISMISSED due to plaintiff's failure to timely serve these defendants, without prejudice.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed

with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated: June 28, 2012
Syracuse, NY





Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.
**No. 99-CV-611 NPMGLS.**

Aug. 22, 2000.

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

***1** Plaintiff brings suit against defendant Syracuse University ("University") pursuant to 20 U.S.C. § 1681*etseq.* ("Title IX") claiming hostile educational environment, and retaliation for complaints of same. Presently before the court is the University's motion for summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are affected by plaintiff's failure to file a Statement of Material Facts which complies with the clear mandate of Local Rule 7.1(a)(3) of the Northern District of New York. This Rule requires a motion for summary judgment to contain a Statement of Material Facts with specific citations to the record where those facts are established. A similar obligation is imposed upon the non-movant who

> shall file a response to the [movant's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises.... *Any facts set forth in the [movant's] Statement of material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed an eleven page, twenty-nine paragraph Statement of Material Facts, replete with citations to the record in every paragraph. Plaintiff, in opposition, filed a two page, nine paragraph statement appended to her memorandum of law which failed to admit or deny the specific assertions set forth by defendant, and which failed to contain a single citation to the record. Plaintiff has thus failed to comply with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules are not suggestions, but impose procedural requirements upon parties litigating in this District." *Osier v. Broome County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a consequence, courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) FN1 by deeming the facts asserted in a movant's proper Statement of Material Facts as admitted, when, as here, the opposing party has failed to comply with the Rule. *See,e.g.,Phipps v. New York State Dep't of Labor,* 53 F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 (N.D.N.Y.1999); *Osier,* 47 F. Supp .2d at 317;*Nicholson v. Doe,* 185 F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Inc. v. Stewart and Stevenson Operations, Inc.,* 1998 WL 903629, at *1 n. 1 (N.D. N.Y.1998); *Costello v.. Norton,* 1998 WL 743710, at *1 n. 2 (N.D.N.Y.1998); *Squair v. O'Brien & Gere Engineers, Inc.,* 1998 WL 566773, at *1 n. 2 (N.D.N.Y.1998). As in the cases just cited, this court deems as admitted all of the facts asserted in defendant's Statement of Material Facts. The court next recites these undisputed facts.

FN1. Amended January 1, 1999.

BACKGROUND

***2** Plaintiff became a doctoral student in the University's Child and Family Studies ("CFS") department in the Spring of 1995. Successful completion of the doctoral program required a student to (1) complete 60 credit hours of course work; (2) pass written comprehensive examinations ("comp.exams") in the areas of research methods, child development, family theory and a specialty area; (3) after passing all four comp. exams, orally defend the written answers to those exams; (4) then select a dissertation topic and have the proposal for the topic approved; and (5) finally write and orally defend the dissertation. Plaintiff failed to progress beyond the first step.

Each student is assigned an advisor, though it is not uncommon for students to change advisors during the course of their studies, for a myriad of reasons. The advisor's role is to guide the student in regard to course selection and academic progress. A tenured member of the CFS department, Dr. Jaipaul Roopnarine, was assigned as plaintiff's advisor.

As a student's comp. exams near, he or she selects an examination committee, usually consisting of three faculty members, including the student's advisor. This committee writes the questions which comprise the student's comp. exams, and provides the student with guidance and assistance in preparing for the exams. Each member of the committee writes one exam; one member writes two. Two evaluators grade each exam; ordinarily the faculty member who wrote the question, and one other faculty member selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising duties, was the coordinator of exams for the entire CFS department. In this capacity, he was generally responsible for selecting the evaluators who would grade each student's comp. exam, distributing the student's answer to the evaluators for grading, collecting the evaluations, and compiling the evaluation results.

The evaluators graded an exam in one of three ways: "pass," "marginal" or "fail." A student who received a pass from each of the two graders passed that exam. A student who received two fails from the graders failed the exam. A pass and a marginal grade allowed the student to pass. A marginal and a fail grade resulted in a failure. Two marginal evaluations may result in a committee having to decide whether the student would be given a passing grade. In cases where a student was given both a pass and a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions independently of each other, and no indication of the student's identity was provided on the answer. [FN2] The coordinator, Roopnarine, had no discretion in compiling these grades-he simply applied the pass or fail formula described above in announcing whether a student passed or failed the comp. exams. Only after a student passed all four written exam questions would he or she be permitted to move to the oral defense of those answers.

FN2. Of course, as mentioned, because one of the evaluators may have written the question, and the question may have been specific to just that one student, one of the two or three evaluators may have known the student's identity regardless of the anonymity of the examination answer.

***3** Plaintiff completed her required course work and took the comp. exams in October of 1996. Plaintiff passed two of the exams, family theory and specialty, but failed two, child development and research methods. On each of the exams she failed, she had one marginal grade, and one failing grade. Roopnarine, as a member of her committee,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators; [FN3] as mentioned, Clawson, not Roopnarine, authored the exam question.

FN3. Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

***4** Plaintiff took the third research methods examination

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

[t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating. [FN4] Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

FN4. Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

***5** The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. *See* *Torres v. Pisano,* 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." *Danzer v. Norden Sys., Inc.,* 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, *see* *Norton v. Sam's Club,* 145 F.3d 114, 117-20 (2d Cir.), *cert. denied,* 525 U.S. 1001 (1998), "or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." *Danzer,* 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

*I. Hostile Environment*

Title IX provides, with certain exceptions not relevant here, that

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action. *See* *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, , 118 S.Ct. 1989, 1994 (1998) (citing *Cannon v. University of Chicago,* 441 U.S. 677 (1979) and *Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60 (1992)).

A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[FN5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. *See* *Davis,* 119 S.Ct. at 1675 (citing *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986), a Title VII case). *Accord* *Kracunas v. Iona College,* 119 F.3d 80, 87 (2d Cir.1997); *Murray v. New York Univ. College of Dentistry,* 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by *Gebser,* 118 S.Ct. at 1999.

FN5. In *Gebser,* 118 S.Ct. at 1999, and *Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, , 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the *respondeat superior* principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. *See, e.g.,* *Distasio v. Perkin Elmer Corp.,* 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

> and only then consider whether this conduct is actionable. *See,e.g.,Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *Seeid.*

***6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which is so “severe or pervasive” as to create an “ ‘objectively’ hostile or abusive work environment,” which the victim also “subjectively perceive[s] ... to be abusive.” *Richardson v. New York State Dep't of Corr. Servs.,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was “objectively” hostile. *Seeid.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment “so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities.” *Davis,* 119 S.Ct. at 1675.

Conduct that is “merely offensive” but “not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive” is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither “the sporadic use of abusive language, gender-related jokes, and occasional testing,” nor “intersexual flirtation,” accompanied by conduct “merely tinged with offensive connotations” will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *SeeOncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff “must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex.” *Id.* at 81 (alteration and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *SeeHarris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *Seeid.;Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either “frequent” or “severe,” *Osier,* 47 F.Supp.2d at 323, “isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive.” ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents “may alter the plaintiff's conditions of employment without repetition.” *Id.AccordKotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) (“[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.”).

***7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See,e.g.,Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) (“there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal.”). Moreover, the court notes that plaintiff has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See,e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. *SeeOsier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *Seeid.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

***8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressured to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. *SeeMeiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get of [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us," ' are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dayes v. Pace Univ.,* 2000 WL 307382, at *5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at *6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

B. Actual Knowledge / Deliberate Indifference

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *seesupra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. *SeeDavis,* 119 S.Ct. at 1671;*Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate

indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation."Id.* (Emphasis supplied). *Accord Davis,* 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d]' the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official gained actual knowledge of the harassment. *See Reese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murreel v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999). There is no serious contention that plaintiff can satisfy this requirement.

***9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[FN6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[FN7] *See Reese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

FN6. Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

FN7. As mentioned previously, *see supra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *See Murray,* 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[FN8] In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *See Murray,* 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Ohio State Univ.,* 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd,* 194 F.3d 1315 (6th Cir.1999).

FN8. As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.[FN9]

FN9. Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *SeeMurray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in [plaintiff's] case was inconsistent with these standards.").

CONCLUSION

***10** For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,2000.
Elgamil v. Syracuse University
Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.







Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Anthony ROBINSON, Plaintiff,

v.

Jane DELGADO, Hearing Officer and Lieutenant; and Donald Selsky, Director of Inmate Special Housing Program, Defendants.

No. 96-CV-169 (RSP/DNH).

May 22, 1998.

Anthony Robinson, Veterans Shelter, Brooklyn, for Plaintiff, Pro Se.

Hon. Dennis C. Vacco, Attorney General of the State of New York, Attorney for Defendants, Albany, Ellen Lacy Messina, Esq., Assistant Attorney General, of Counsel.

ORDER

POOLER, D.J.

***1** Anthony Robinson, a former inmate incarcerated by the New York State Department of Corrections ("DOCS"), sued two DOCS employees, alleging that they violated his right to due process in the course of a disciplinary proceeding and subsequent appeal. On September 9, 1997, defendants moved for summary judgment. Defendants argued that plaintiff failed to demonstrate that the fifty days of keeplock confinement that he received as a result of the hearing deprived him of a liberty interest within the meaning of the Due Process Clause. Plaintiff did not oppose the summary judgment motion, and Magistrate Judge David N. Hurd recommended that I grant it in a report-recommendation filed April 16, 1998. Plaintiff did not file objections.

Because plaintiff did not file objections, I "need only satisfy [myself] that there is no clear error on the face of the record in order to accept the recommendation." Fed.R.Civ.P. 72(b) advisory committee's note. After reviewing the record, I conclude that there is no clear error on the face of the record. After being warned by defendants' motion that he must offer proof in admissible form that his disciplinary confinement imposed an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," Robinson failed to offer any such proof. *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995). Consequently, he cannot maintain a due process challenge. *Id.* Therefore, it is

ORDERED that the report-recommendation is approved; and it is further

ORDERED that defendants' motion for summary judgment is granted and the complaint dismissed; and it is further

ORDERED that the Clerk of the Court serve a copy

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

of this order on the parties by ordinary mail.

HURD, Magistrate J.

REPORT-RECOMMENDATION

The above civil rights action has been referred to the undersigned for Report and Recommendation by the Honorable Rosemary S. Pooler, pursuant to the local rules of the Northern District of New York. The plaintiff commenced the above action pursuant to 42 U.S.C. § 1983 claiming that the defendants violated his Fifth, Eighth, and Fourteenth Amendment rights under the United States Constitution. The plaintiff seeks compensatory and punitive damages.

Presently before the court is defendants' motion for summary judgment pursuant to Fed R. Civ. P. 56. However:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P 56(e).

In addition, "[f]ailure to file any papers as required by this rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." L.R. 7.1(b)(3).

***2** The defendants filed their motion on September 9, 1997. The response to the motion was due on October 23, 1997. It is now five months beyond the date when the plaintiff's response was due, and he has failed to file any papers in opposition to defendants' motion.

Therefore, after careful consideration of the notice of motion, affirmation of Ellen Lacy Messina, Esq., with exhibits attached, and the memorandum of law; and there being no opposition to the motion; it is

RECOMMENDED that the motion for summary judgment be GRANTED and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(l), the parties have ten days within which to file written objections to the foregoing report. *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696(1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(l); Fed.R.Civ.P. 72, 6(a), 6(e); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of HHS,* 892 F.2d 15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Order and Report-Recommendation, by regular mail, upon the parties to this action.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

N.D.N.Y.,1998.

Robinson v. Delgado

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.





C
Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Marcus COTTO, Plaintiff,
v.
Daniel SENKOWSKI, Superintendent of Clinton Annex; T.J. Howard, Hearing Officer; J. Maggy, Sergeant; Byron Wind, Officer; Barry Rock, Officer; and Philip Coombe, Jr., Acting Commissioner, Defendants.
**No. 95-CV-1733 (RSP/DNH).**

Oct. 23, 1997.

Marcus Cotto, Plaintiff, pro se, Auburn Correctional Facility, Auburn, New York.

Hon. Dennis C. Vacco, Attorney General of the State of New York, Attorney for Defendants, Albany, New York, Darren O'Connor, Esq., Asst. Attorney General, of Counsel.

MEMORANDUM DECISION AND ORDER

POOLER, D.J.

***1** This matter comes to me following a report-recommendation by Magistrate Judge David N. Hurd, duly filed on the 29th of August, 1997. Following ten days from the service thereof, the Clerk has sent me the entire file, including any and all objections filed by the parties herein.

In his *pro se* complaint, Cotto alleges that in August 1995, he and some other inmates were attacked while incarcerated at Clinton Correctional Facility. Compl., Dkt. No. 1, ¶ 2. Cotto alleges that as a result of this incident he was charged with engaging in violent conduct and conduct which disturbed the order of the facility. *Id.* Although Cotto was found guilty of these charges and sentenced to a term of one year in the Special Housing Unit and loss of six months good time, his sentence was reversed on administrative appeal. *Id.* Cotto brought this action pursuant to 42 U.S.C. § 1983, alleging various violations of his rights under the Eighth and Fourteenth Amendments. *Id.*

By motion filed March 3, 1997, defendants sought summary judgment. Dkt. No. 17. Plaintiff filed no papers in opposition to the motion. In his report-recommendation, the magistrate judge recommended that I grant defendants' motion pursuant to Local Rule 7.1(b)(3), which provides that, absent a showing of good cause, failure to respond to a motion shall be deemed consent to the relief requested. Dkt. No. 19, at 2. Cotto has filed no objections to the report-recommendation.

After careful review of all of the papers herein, including the magistrate judge's report-recommendation, it is

ORDERED that the report-recommendation is hereby approved, and it is further

ORDERED that defendants' motion for summary judgement is GRANTED and the complaint against them dismissed in its entirety, and it is further

ORDERED that the Clerk of the Clerk serve a copy of this order on the parties by regular mail.

IT IS SO ORDERED.
DAVID N. HURD, United States Magistrate Judge.

*REPORT-RECOMMENDATION*

This matter was referred to the undersigned by the Honorable Rosemary S. Pooler, for

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Report-Recommendation pursuant to the Local Rules of the Northern District of New York.

Plaintiff commenced the above § 1983 action making various allegations regarding violations of his civil rights under the United States Constitution. Pursuant to Fed.R.Civ.P. 56, the defendants have moved for summary judgment alleging that there is no genuine issue as to any material fact and that as a matter of law they are entitled to judgment.

The defendants have filed a motion pursuant to Fed.R.Civ.P. 56 granting summary judgment in favor of the defendants on grounds including that there is no genuine issue as to any material fact, and that the defendant is entitled to judgment as a matter of law.

It is now more than ninety days beyond the date when the response papers were due, and the plaintiff has not filed any papers in opposition to the motion. "Failure to file any papers as required by this rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." Rules of U.S. Dist. Ct. for Northern Dist. of N.Y., L .R. 7.1(b)(3).

***2** NOW, upon careful consideration of the notice of motion, statement pursuant to Local Rule 7.1(F), with exhibits attached, and the memorandum of law submitted in support of the defendants' motion; and there being no opposition to the motion, it is

RECOMMENDED that the motion be granted and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(I), the parties have ten days within which to file written objections to the foregoing report. *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(I); Fed.R.Civ.P. 72, 6(a), 6(e); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of HHS,* 892 F.2d 15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation, by regular mail, upon the parties to this action.

N.D.N.Y.,1997.
Cotto v. Senkowski
Not Reported in F.Supp., 1997 WL 665551 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.





H

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Valery LATOUCHE, Plaintiff,

v.

Michael C. TOMPKINS, C.O., Clinton Correctional Facility; Dean E. Laclair, C.O., Clinton Correctional Facility; Jeffrey R. Ludwig, C.O ., Clinton Correctional Facility; Michael B. King, Sgt., Clinton Correctional Facility; D. Mason, C.O., Clinton Correctional Facility; B. Malark, C.O., Clinton Correctional Facility; John Reyell, C.O., Clinton Correctional Facility; Bob Fitzgerald, R.N., Clinton Correctional Facility; John Doe, C.O. (C.O. Gallery Officer Company Upper F–6); John Doe, C.O. (Mess Hall Supervising C.O.), Defendants.

No. 9:09–CV–308 (NAM/RFT).

March 23, 2011.

Valery LaTouche, Ossining, NY, pro se.

Eric T. Schneiderman, Attorney General for the State of New York, Krista A. Rock, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

NORMAN A. MORDUE, Chief Judge.

**INTRODUCTION**

***1** In this *pro se* action under 42 U.S.C. § 1983, plaintiff, an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), claims that defendants violated his Eighth Amendment rights as a result of a physical altercation. Defendants moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure (Dkt. No. 46) and plaintiff opposed the motion. (Dkt. No. 53). The motions were referred to United States Magistrate Judge Randolph F. Treece for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c).

Magistrate Judge Treece issued a Report and Recommendation (Dkt. No. 60) recommending that defendants' motion be granted in part and denied in part. Specifically, Magistrate Judge Treece recommended awarding summary judgment dismissing the following: (1) plaintiff's claims for monetary relief against all defendants in their official capacity; (2) plaintiff's claims of medical indifference against defendant Fitzgerald; and (3) plaintiff's allegations of verbal harassment by defendant Mason. Magistrate Judge Treece also recommended denying defendants' motion for summary judgment on plaintiff's excessive force claims against defendants Tompkins, LaClair, Mason, Malark and Reyell and plaintiff's failure to protect claims against defendants Ludwig and King.

Defendants filed specific objections to portions of the Report and Recommendation arguing: (1) that the Magistrate Judge erred in "overlooking" plaintiff's failure to comply with Local Rule 7.1(a) (3); (2) that the Magistrate Judge erred when he failed to apply the *Jeffreys* exception as plaintiff's testimony was incredible as a matter of law; and (3) plaintiff's excessive force claims against defendant Reyell are subject to dismissal for lack of personal involvement. (Dkt. No. 61). Plaintiff does not object to the Report and Recommendation. (Dkt. No. 62).

In view of defendants' objections, pursuant to 28 U.S.C. § 636(b) (1)(c), this Court conducts a *de novo* review of these issues. The Court reviews the remaining portions of the Report–Recommendation for clear error or manifest injustice. *See Brown v. Peters,* 1997 WL 599355, *2–3 (N.D.N.Y.), *af'd without op.,* 175 F.3d 1007 (2d Cir.1999); *see also Batista v. Walker,* 1995 WL 453299, at *1 (S.D.N.Y.1995) (when a party makes no objection to a portion of the report-recommendation, the Court reviews that portion for clear error or manifest injustice). Failure to object to any portion of a report and recommendation waives further judicial review of the matters therein. *See Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993).

**DISCUSSION**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**I. Local Rule 7.1(a)(3)**

The submissions of *pro se* litigants are to be liberally construed. *Nealy v. U.S. Surgical Corp.,* 587 F.Supp.2d 579, 583 (S.D.N.Y.2008). However, a *pro se* litigant is not relieved of the duty to meet the requirements necessary to defeat a motion for summary judgment. *Id.* (citing *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir.2003)). Where a plaintiff has failed to respond to a defendant's statement of material facts, the facts as set forth in defendant's Rule 7.1 statement will be accepted as true to the extent that (1) those facts are supported by the evidence in the record, and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment. *Littman v. Senkowski,* 2008 WL 420011, at *2 (N.D.N.Y.2008) (citing *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996)). [FN1]

FN1. Local Rule 7.1(a)(3) provides:

> Summary Judgment Motions
>
> Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits. It does not, however, include attorney's affidavits. *Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.*
>
> The moving party shall also advise *pro se* litigants about the consequences of their failure to respond to a motion for summary judgment. See also L.R. 56.2.
>
> The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. *The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.*

Local Rule 7.1(a)(3) (emphasis in original).

***2** The record herein contains few undisputed facts. Plaintiff and defendants disagree on many of the events that transpired and provide conflicting accounts of the circumstances surrounding the incident. In support of the motion, defendants properly filed a Statement of Material Facts pursuant to Local Rule 7.1 and notified plaintiff about the consequences of his failure to respond to the motion for summary judgment. Plaintiff does not dispute that he received such notification from defendants. Plaintiff responded with a handwritten "Statement of Facts", without citations to the record, and failed to specifically admit or deny defendants' factual statements as required by Local Rule 7.1. However, plaintiff also annexed a copy of his deposition transcript. In the deposition, upon questioning from defense counsel, plaintiff testified as follows:

> Q. ... Have you read the complaint?
>
> A. Yes, ma'am.
>
> Q. So, you are aware of its contents?
>
> A. Yes, ma'am.
>
> Q. Did anyone help you prepare the complaint?
>
> A. No, ma'am.
>
> Q. Are there any statements contained in the complaint that you now wish to change or modify?

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

A. I'm not sure.

Q. Well, let me ask you this: So, do you adopt this document under oath as true to the best of your knowledge?

A. Yes, ma'am.

Transcript of Plaintiff's Deposition at 13.

A verified complaint may be treated as an affidavit for the purposes of a summary judgment motion and may be considered in determining whether a genuine issue of material fact exists. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (the plaintiff verified his complaint by attesting under penalty of perjury that the statements in the complaint were true to the best of his knowledge). Based upon the aforementioned colloquy, the Court deems plaintiff's complaint to be "verified" and as such, will treat the complaint as an affidavit. *See Torres v. Caron,* 2009 WL 5216956, at *3 (N.D.N.Y.2009). While plaintiff has not formally and technically complied with the requirements of Local Rule 7.1(a)(3), his opposition to defendants' motion contains sworn testimony. In light of his *pro se* status and the preference to resolve disputes on the merits rather than "procedural shortcomings", to the extent that plaintiff's "Statement of Facts" and assertions in the complaint do not contradict his deposition testimony, the Court will consider those facts in the context of the within motion. *See Mack v. U.S.,* 814 F.2d 120, 124 (2d Cir.1987); *see also Liggins v. Parker,* 2007 WL 2815630, at *8 (N.D.N.Y.2007) (citing *Lucas v. Miles,* 84 F.3d 532, 535 (2d Cir.1996)). The Court has reviewed plaintiff's complaint and compared the allegations with the testimony presented at his deposition and adopts Magistrate Judge Treece's summary of the "facts" as presented by both parties.[FN2]

FN2. While the Court adopts Magistrate Judge Treece's recitation of defendants' and plaintiff's versions of the facts, the Court does not adopt the reasoning set forth in the Footnote 2 of the Report and Recommendation.

## II. *Jeffreys* Exception

Defendants argue that the Court should apply *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) and award summary judgment dismissing all claims of excessive force based upon plaintiff's implausible and contradictory claims.

***3** "It is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment' ". *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006) (citing *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997) (unfavorable assessments of a plaintiff's credibility are not "within the province of the court on a motion for summary judgment")). A narrow exception to this general rule was created by the Second Circuit in *Jeffreys:*

> While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether "the jury could reasonably find for the plaintiff," and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account. Under these circumstances, the moving party still must meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor.

*Id.* at 554 (internal citations and citations omitted).

Here, while plaintiff relies exclusively on his own testimony, for *Jeffreys* to apply, the testimony must also be "contradictory and incomplete". In this regard, defendants argue that plaintiff's allegations are contradicted by his prior accounts of the incident. Defendants cite to the record and argue that plaintiff told Fitzgerald that, "I hit the officer first" and that "I was hurt when I was subdued". Moreover, defendants point out that these statements were documented in an Inmate Injury Report executed by plaintiff.

Plaintiff does not deny making the aforementioned statements. However, in his deposition, plaintiff explained

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

those discrepancies and testified:

Q. —did Nurse Fitzgerald ask you any questions while he was examining you?

A. I think he asked me how am I feeling, how did this happen?

Q. And what did you say?

A. I told him I was nervous and that [sic] whatever officer D. Mason told me to tell him.

Q. What did you say?

A. I told him I was nervous and whatever officer D. Mason told me to tell him, which was that I got hurt being subdued—

Q. Which was—

A. —and that I started this.

Q. And is that the truth?

A. No.

Q. Why did you tell the nurse that?

A. Because I was being forced to.

Q. Forced to how?

A. By the officers that [sic] was there.

Q. Did you sign a form admitting that you hit the officer first and you were hurt when you were subdued?

A. Yes, ma'am.

Q. Why did you do that?

A. Because the [sic] officer D. Mason kept smacking me for me to do that.

Transcript of Plaintiff's Deposition at 53–54.

***4** In the Report and Recommendation, Magistrate Judge Treece concluded that plaintiff's "fear of retribution" was a plausible explanation for the discrepancies in his testimony. This Court agrees and adopts the Magistrate Judge's conclusions. *See* *Langman Fabrics v. Graff Californiawear, Inc.,* 160 F.3d 106, 112–13 (2d Cir.1998); *see also* *Cruz v. Church,* 2008 WL 4891165, at *5 (N.D.N.Y.2008) ("[t]he Court notes that ... it would be have difficulty concluding that [the][p]laintiff's statement of June 5, 2005, and his statement of June 16, 2005, are wholly irreconcilable, given his proffered explanation that he made the statement of June 5, 2005, out of fear of retribution by [the] [d]efendants).

Defendants also argue that plaintiff cannot identify which individuals participated in the attack; that plaintiff's injuries are consistent with the brief use of force as described by defendants to subdue plaintiff; and that plaintiff's version is contradicted by defendants' affidavits. Magistrate Judge Treece found that plaintiff was able to identify some individuals involved in the assault which, "stands in stark contrast to the plaintiff in *Jeffreys* who was unable to identify any of the officers involved in the alleged assault". Upon review of the record, as it presently exists, the Court agrees and finds that plaintiff's testimony is not wholly conclusory or entirely inconsistent to warrant application of the *Jeffreys* exception. *See* *Percinthe v. Julien,* 2009 WL 2223070, at *7 (S.D.N.Y.2009) (the court rejected the defendants' argument that the plaintiff's claims were subject to dismissal for implausibility as his injuries did not reflect the attack that he described and his description of the incident changed over time holding that the plaintiff's testimony, "[did] not reach the level of inconsistency and lack of substantiation that would permit the Court to dismiss on these grounds").

Magistrate Judge Treece provided an extensive summary of the record and applicable law and found that the evidence did not support deviating from the established rule that issues of credibility are not be resolved on summary judgment. On review, the Court agrees with the Magistrate's recommendations and concludes that the *Jeffreys* exception does not apply. Accordingly, the Court accepts and adopts the Report and Recommendation on this issue.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**III. Reyell's Personal Involvement**

Defendants argue that the Magistrate Judge erred when he failed to dismiss the complaint against Reyell on the grounds that he was not personally involved in the attack. Defendants claim that the "RRO erroneously cites plaintiff's declaration as stating that 'it was defendant Reyell and another officer who removed the shirt' ". Defendants claim that the declaration and complaint clearly state that, "Officer Rock orchestrated the removal of plaintiff's shirt" .[FN3] Defendants argue that the assertions in plaintiff's declaration (submitted in response to the motion for summary judgment) and complaint are contradicted by plaintiff's deposition testimony. Defendants claim that plaintiff testified that Reyell tried to cover up the incident by removing the shirt he was wearing.

FN3. Officer Rock is not a defendant herein.

***5** The Court has reviewed plaintiff's complaint, declaration and deposition transcript and finds defendants' summary of plaintiff's assertions to be inaccurate. In plaintiff's complaint, on page 8, plaintiff alleges:

> Feeling extremely weak the claimant responded with a shake of his head. Once this performance was over with Correctional Officer R. Rock, the individual who held on to the photograph camera and who is responsible for capturing the claimant's injuries [sic] photos pointed to the claimant's bloodly [sic] stain kitchen white colored uniform [ ] as co-workers....
>
> Correctional Officer D. Mason then roughly removed the article of clothing and with the help of on[e] other they discarded the item of clothings [sic].

In Paragraph 22 of plaintiff's declaration, he states:

> Officer Rock, the individual who held the photograph camera and was responsible for capturing LaTouche injuries pointed to LaTouche [sic] bloody kitchen white colored uniform to his coworker asking them to remove the article of clothing before he take [sic] any pictures. Mason then roughly removed the clothing and with the help of an other [sic] officer they discarded the items of clothing.

In his deposition, plaintiff testified:

Q. What about Defendant Reyell, why are you suing Reyell?

A. Because defendant Reyell, that's the officer that was holding the camera and he tried to cover up the incident.

Q. How so?

A. That's when him and the other officer that was there, when they was searching me, strip searching me they took my shirt and they kept screaming something about let's remove this bloodstained shirt, let's remove this bloodstained shirt, we can't have this for the camera.

* * *

Q. Reyell and another officer took your shirt off?

A. Yes, ma'am.

Q. Do you remember the other officer's name?

A. No, ma'am.

Transcript of Plaintiff's Deposition at 63–64.

Here, the Magistrate Judge stated that any inconsistency or discrepancy [in plaintiff's testimony], "go[es] to the weight ... accorded to plaintiff's testimony". The Court agrees. Any discrepancies or inconsistencies in plaintiff's testimony are for a jury to assess. In the Second Circuit case of *Fischl v. Armitage,* the plaintiff/inmate alleged that he was assaulted in his cell by other inmates. *Fischl,* 128 F.3d at 54. The district court dismissed the plaintiff's complaint as against one defendant based upon "inconsistent statements". *Id.* The Second Circuit vacated the judgment of the district court holding:

> [T]he district court apparently questioned whether there had been an attack on Fischl at all, principally because of inconsistencies in his accounts of the event, his failure to report such an attack to prison workers in the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

area on that morning, and the failure of those workers to notice any indications that he had been beaten. That skepticism, however, rests on both a negative assessment of Fischl's credibility and the drawing of inferences adverse to Fischl.

***6** Likewise, inconsistent statements by Fischl as to, for example, whether it was five, six, or seven inmates who attacked him, and as to what he observed or overheard just prior to the attack, go to Fischl's credibility. While inconsistencies of this sort provide ammunition for cross-examination, and they may ultimately lead a jury to reject his testimony, they are not a proper basis for dismissal of his claim as a matter of law. The jury might well infer, for example, that while Fischl was under siege he was understandably unable to take an accurate census of the number of inmates holding him and kicking him in the face.

*Fischl,* 128 F.3d at 56.

In this matter, without a credibility assessment of plaintiff, the record does not warrant an award of summary judgment. Accordingly, the Court adopts the Magistrate's recommendation and denies summary judgment on this issue.

**CONCLUSION**

It is therefore

**ORDERED** that the Report and Recommendation of United States Magistrate Judge Randolph F. Treece (Dkt. No. 60) is adopted; and it is further

**ORDERED** that for the reasons set forth in the Memorandum–Decision and Order herein, defendants' motion for summary judgment is granted in part and denied in part; and it is further

**ORDERED** that the Clerk provide copies of this Order to all parties.

**IT IS SO ORDERED.**

N.D.N.Y.,2011.

Latouche v. Tompkins
Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.





C

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Idris LITTMAN, Plaintiff,

v.

Daniel SENKOWSKI, Superintendent, Clinton Correctional Facility; D. Meier, Inmate Records Coordinator, Clinton Correctional Facility; John Doe # 1, Superintendent, Downstate Correctional Facility; and John Doe # 2, Inmate Records Coordinator, Downstate Correctional Facility, Defendants.

No. 9:05-CV-1104 (LEK/GHL).

Feb. 11, 2008.

Idris Littman, Dannemora, NY.[FN1]

> FN1. Although this is the address of record for Plaintiff on this action's docket, DOCS' online "Inmate Lookup" Service indicates (as of the date of this Report-Recommendation) that Plaintiff is currently incarcerated at Upstate Correctional Facility, P.O. Box 2000, 309 Bare Hill Road, Malone, N.Y. 12953.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Jeffrey M. Dvorin, Esq., Assistant Attorney General, of Counsel, Albany, NY.

***DECISION AND ORDER***

LAWRENCE E. KAHN, District Judge.

***1** This matter comes before the Court following a Report-Recommendation filed on December 31, 2007, by the Honorable George H. Lowe, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern District of New York. Report-Rec. (Dkt. No. 22).

Within ten days, excluding weekends and holidays, after a party has been served with a copy of a Magistrate Judge's Report-Recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations," FED. R. CIV. P. 72(b), in compliance with L.R. 72.1. No objections have been raised in the allotted time with respect to Judge Lowe's Report-Recommendation. Furthermore, after examining the record, the Court has determined that the Report-Recommendation is not subject to attack for plain error or manifest injustice.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 22) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that Defendants' Motion for summary judgment (Dkt. No. 18) is **GRANTED** and Plaintiff's claims against Senkowski and Meier are **DISMISSED with prejudice;** and it is further

**ORDERED,** that Plaintiff's claims against John Doe # 1 and John Doe # 2 be **DISMISSED** with prejudice due to the applicable statute of limitations (for the reasons set forth in Part III. A of the Report-Recommendation), or in the alternative, due to Plaintiff's failure to serve or even name those individuals, in violation of Fed. R. Civ. P 4(m), 16(f), and/or 41(b); and it is further

**ORDERED,** that any appeal taken from the Court's final judgment in this action would not be taken in good faith pursuant to 28 U.S.C.1915(a)(3); and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

***REPORT-RECOMMENDATION***

GEORGE H. LOWE, United States Magistrate Judge.

This action has been referred to me for a Report and Recommendation by the Honorable Lawrence E. Kahn, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c) of the Local Rules of Practice for this Court. Plaintiff Idris Littman ("Plaintiff"), while an inmate at

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Clinton Correctional Facility ("Clinton C.F."), commenced this *pro se* civil rights action pursuant to 42 U.S.C. § 1983.

Liberally construed, Plaintiff's Complaint alleges that four employees of the New York State Department of Correctional Services ("DOCS")-Clinton C.F. Superintendent Daniel Senkowski, Clinton C.F. Inmate Records Coordinator D. Meier, Downstate Correctional Facility Superintendent John Doe # 1, and Downstate C.F. Inmate Records Coordinator John Doe # 2-violated Plaintiff's rights under the Fourth, Eighth and Fourteenth Amendments when, between February of 2002 and September of 2002, they (1) negligently or perhaps recklessly miscalculated the "parole jail-time credits" to which he was entitled, resulting in his being incarcerated in DOCS two hundred and eighteen (218) days past his "maximum release date," and (2) negligently or perhaps recklessly refused to promptly correct the error once they were notified of it through the filing of Plaintiff's state habeas corpus proceeding on August 7, 2002, challenging the miscalculation. (*See generally* Dkt. No. 1 [Plf.'s Am. Compl.].)

***2** Currently pending before the Court is Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 18.) [FN2] Despite having been advised of the potential consequences of failing to respond to Defendants' motion, and having been given three extensions of the time by which to so respond, Plaintiff has not responded. For the reasons that follow, I recommend that Defendants' motion be granted. In addition, I recommend that the Court dismiss Plaintiff's claims against John Doe # 1 and John Doe # 2 for failure to serve.

> FN2. Defendants' motion for summary judgment is brought by Defendants Senkowski and Meier only. No indication exists on the docket that either John Doe # 1 or John Doe # 2 was ever named or served.

## I. LEGAL STANDARD GOVERNING UNOPPOSED MOTIONS

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [FN3] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.[FN4]

> FN3. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> FN4. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." [FN5] The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [FN6] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [FN7]

> FN5. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also* *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

> FN6. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ...."); *Matsushita,* 475 U.S. at 585-86; *see also* *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> FN7. *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N.Y. Mar.29, 2004) [internal quotations omitted] [emphasis added].

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

What this burden-shifting standard means when a plaintiff has failed to respond to a defendant's motion for summary judgment is that "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically." FN8 Rather, practically speaking, the Court must (1) determine what material facts, if any, are *disputed* in the record presented on the defendant's motion, and (2) assure itself that, based on those *undisputed* material facts, the law indeed warrants judgment for the defendant.FN9 However, the plaintiff's failure to respond to the defendant's motion for summary judgment lightens the defendant's burden on the motion.

FN8. *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996).

FN9. *See Champion,* 76 F.3d at 486 ("Such a motion may properly be granted only if the facts as to which there is no genuine dispute show that ... the moving party is entitled to a judgment as a matter of law.") [internal quotation marks and citation omitted]; *Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 232 (N.D.N.Y.2001) (Scullin, C.J.) (stating that, where a plaintiff has failed to respond to a defendant's motion for summary judgment, "[t]he Court must review the merits of Plaintiffs claims"). This requirement (that the Court determine, as a threshold matter, that the movant's motion has merit) is also recognized by Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court, which provides that "the non-moving party's failure to file or serve ... [opposition] papers ... shall be deemed as consent to the granting ... of the motion ... unless good cause is shown," *only where the motion has been "properly filed" and "the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein."* N.D.N.Y. L.R. 7.1(b)(3) [emphasis added].

More specifically, where a plaintiff has failed to respond to a defendant's statement of material fact contained in its Statement of Material Facts (a/k/a its "Rule 7.1 Statement"), the facts as set forth in that Rule 7.1 Statement will be accepted as true FN10 to the extent that (1) those facts are supported by the evidence in the record,FN11 and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment.FN12 Here, I note that Plaintiff was so advised by Defendants on or about July 14, 2007. (Dkt. No. 18, Part 1, at 1-2 [Defendants' Notice of Motion].) Clearly, Plaintiff was aware of these potential consequences since he requested (and was granted) *three* extensions of the response-filing-deadline. (Dkt.Nos.19-21.)

FN10. *See* N.D.N.Y. L.R. 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."* ) [emphasis in original].

FN11. *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243 (2d Cir.2004) ("[W]here the non-movant party chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.... If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [internal quotation marks and citations omitted]; *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2003) (Sharpe, M.J.) ("In this case, [the plaintiff] did not file a statement of undisputed facts in compliance with Local Rule 7.1(a)(3). Consequently, the court will accept the *properly supported* facts contained in the defendants' 7.1 statement.") [emphasis added]; *Adirondack Cycle & Marine, Inc. v. Am. Honda Motor Co., Inc.,* 00-CV-1619, 2002 U.S. Dist. LEXIS 4386, at *2-3, 2002 WL 449757 (N.D.N.Y. Mar. 18, 2002) (McAvoy, J.) ("Local Rule 7.1 requires a party opposing summary judgment to respond to the statement of undisputed material facts submitted by

the movant. To the extent such facts are not controverted, *the properly supported facts* will be taken as true.") [emphasis added; citation omitted]; *cf.* Fed.R.Civ.P. 83(a)(1) ("A local rule shall be consistent with ... Acts of Congress and rules adopted under 28 U.S.C. §§ 2072 and 2075 [which include the Federal Rules of Civil Procedure] ...."); Fed.R.Civ.P. 56(e) (requiring that, "if the non-movant does not ... respond [to a summary judgment motion], summary judgment, *if appropriate,* shall be entered against the non-movant," and requiring that, as a threshold matter, the motion for summary judgment must be "made *and supported* as provided in this rule") [emphasis added].

FN12. *See Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996); *cf.* N.D.N.Y. L.R. 56.2 (imposing on movant duty to provide such notice to *pro se* opponent).

***3** Similarly, where a plaintiff has failed to respond to a defendant's properly filed and facially meritorious memorandum of law (submitted in support of its motion for summary judgment), the plaintiff is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court. [FN13] Stated another way, where a defendant has properly filed a memorandum of law (in support of a properly filed motion for summary judgment), and the plaintiff has failed to respond to that memorandum of law, the only remaining issue is whether the legal arguments advanced in the defendant's memorandum of law are *facially meritorious.*[FN14] A defendant's burden in making legal arguments that are facially meritorious has appropriately been characterized as "modest." [FN15]

FN13. N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause be shown ."); N.D.N.Y. L.R. 7.1(a) (requiring opposition to motion for summary judgment to contain, *inter alia,* a memorandum of law); *cf.* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's *response* ... must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so *respond,* summary judgment, if appropriate, shall be entered against the adverse party.") [emphasis added]; *see, e.g., Beers v. GMC,* 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31, 1999 WL 325378 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.,* 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov.29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

FN14. *Hernandez v. Nash,* 00-CV-1564, 2003 U.S. Dist. LEXIS 16258, at *7-8, 2003 WL 22143709 (N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before a motion to dismiss may be granted under Local Rule 7.1[b][3], "the court must review the motion to determine whether it is *facially meritorious"* ) [emphasis added; citations omitted]; *accord, Topliff v. Wal-Mart Stores East LP,* 04-CV-0297, 2007 U.S. Dist. LEXIS 20533, at *28 & n. 43, 2007 WL 911891 (N.D.N.Y. March 22, 2007) (Lowe, M.J.); *Hynes v. Kirkpatrick,* 05-CV-0380, 2007 U.S. Dist. LEXIS 24356, at *5-6 & n. 2, 2007 WL 894375 (N.D.N.Y. March 21, 2007) (Lowe, M.J.); *Sledge v. Kooi,* 04-CV-1311, 2007 U.S. Dist. LEXIS 26583, at *28-29 & n. 40, 2007 WL 951447 (N .D.N.Y. Feb. 12, 2007) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 22458 (N.D.N.Y. March 28, 2007) (McAvoy, J.); *Kele v. Pelkey,* 03-CV-0170, 2006 U.S. Dist. LEXIS 95065, at *5 & n. 2, 2006 WL 3940592 (N.D.N.Y. Dec. 19, 2006) (Lowe, M.J.), *adopted by*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

2007 U.S. Dist. LEXIS 4336 (N.D.N.Y. Jan. 22, 2007) (Kahn, J.).

FN15. *See Ciaprazi v. Goord,* 02-CV0915, 2005 WL 3531464, at *8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") [citing *Celotex Corp. v. Catrett, Ml* U.S. 317, 323-324 (1986) ]; *accord, Saunders v. Ricks,* 03-CV-0598, 2006 WL 3051792, at *9 & n. 60 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.), *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at *17 & n. 109 (N.D.N.Y. Apr.24, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.); *cf. Race Safe Sys. v. Indy Racing League,* 251 F.Supp.2d 1106, 1109-1110 (N.D.N.Y.2003) (Munson, J.) (reviewing whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3] ); *Wilmer v. Torian,* 96-CV-1269, 1997 U.S. Dist. LEXIS 16345, at *2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule 7.1[b][3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 1997 U.S. Dist. LEXIS 16340, at *2 (N.D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95-CV-989, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.).

Implied in the above-stated standard is the fact that, where a non-movant fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute, even if that non-movant is proceeding *pro se.*[FN16] However, in the event the district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit.[FN17] Here, I note that Plaintiff's Complaint contains a verification pursuant to 28 U.S.C. § 1746. (Dkt. No. 1.) That having been said, to be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit must, among other things, not be conclusory. [FN18] An affidavit is conclusory if, for example, its assertions lack any supporting evidence or are too general.[FN19] Finally, even where an affidavit (or verified complaint) is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." [FN20]

FN16. *See Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432, 2004 WL 2309715 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4, 2006 WL 395269 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct.29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

FN17. *See Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922, 122 S.Ct. 2586, 153 L.Ed.2d 776 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted].

FN18. *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate v. Top Assoc.,* 425 F.2d 92, 97 (2d Cir.1970) (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

FN19. *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

FN20. *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-55 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb.15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 F. App'x 383 (2d Cir.2005) (unreported decision, cited not as precedential authority but merely to show the case's subsequent history, in accordance with Second Circuit Local Rule § 0.23).

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendants' Rule 7.1 Statement contains eleven paragraphs of factual assertions, each of which is supported by an accurate citation to the record. (*See generally* Dkt. No. 18, Part 2.) Plaintiff has failed to file a response to this Rule 7.1 Statement, despite having been specifically advised of the potential consequences of failing to file such a response. (Dkt. No. 18, Part 1, at 1-2 [Defendants' Notice of Motion].) FN21 As a result, I accept each of the factual assertions as true. *See* N.D.N.Y. L.R. 7.1(a)(3) ( *"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."* ) [emphasis in original].

FN21. As explained above in Part I of this Report-Recommendation, I note that, clearly, Plaintiff was aware of these potential consequences since he

requested (and was granted) *three* extensions of the response-filing-deadline. (Dkt.Nos.19-21.)

With a few modifications, I summarize these factual assertions below in a “chronology of material events.” These modifications are mainly due to an effort to summarize each of the material facts in one comprehensive chronology, and an effort to omit certain facts that I do not find to be material to Defendants' motion. Among the facts that I do not find to be material is any reference to Exhibit B to Defendants' motion, which is a “Certificate of Credited Jail Time” issued by the Albany County Sheriff's Department at some point in 1996. (Dkt. No. 18, Part 3, at 8 [Ex. B to Simone Affirm.] .) I find this document to be of no real relevance to Defendants' motion since the document regards a credit of pre-trial and post-trial jail time Plaintiff earned (with regard to his original conviction of burglary) in 1996, while Plaintiff's Complaint and Defendants' motion regard a credit of parole jail time Plaintiff earned (with regard to another violation) in 2000 and 2001. Moreover, this document is potentially confusing since it regards an amount of jail time credit that, coincidentally, equals the exact same amount of jail time credit at issue in this action, namely 253 days. As a result, I find that the following “chronology of material events” accurately summarizes the material facts established by the record on Defendants' motion:

***Chronology of Material Events***

| | |
|---|---|
| **11/01/96** | Received by DOCS for service of sentence of 3-to-6 years for burglary. |
| **02/17/00** | Conditionally released from incarceration for burglary conviction. |
| **09/14/00** | Arrested on charges of grand larceny and criminal mischief. Charged (on 09/20/00) with violating terms of conditional release. Convicted (on 01/08/01) of parole violation, which was deemed to occur on 09/14/00. |

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

| | |
|---|---|
| **09/14/00-05/24/01** (253-Day Period) | Served jail time. (At the time, this period of incarceration was deemed to be due to charges of grand larceny and criminal mischief.) |
| **05/24/01** | Released on pending charges of grand larceny and criminal mischief. |
| **05/25/01-08/02/01** (70-Day Period) | Served jail time due to parole violation. |
| **08/03/01** | Returned to DOCS custody as parole violator, in order to serve remainder of sentence for burglary. Received (on 08/06/01) Certificate from Division of Parole, crediting him with having already served **70 days** of "parole jail-time" based on incarceration between 05/25/01 and 08/02/01. |
| **03/26/02** | Pled guilty to crime of harassment. Though crime carried maximum of 15-days imprisonment, Plaintiff was sentenced to "time served." |
| **08/07/02** | Filed habeas corpus proceeding in state court, seeking additional "parole jail-time credit" of **253 days** with regard to remaining sentence for burglary, based on incarceration between 09/14/00 and 5/25/01, since his ultimate conviction of harassment carried only 15-day sentence. |
| **09/12/02** | Received decision by state court holding that he is entitled to additional "parole-time credit" of having already served 253 days based on incarceration between 09/14/00 and 5/25/01. |

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

| | |
|---|---|
| **09/13/02** | Received amended Certificate from Division of Parole, increasing "parole jail time credit" from 70 days to 323 days (i.e ., based on addition of 253 days of "parole jail-time credit"). |
| **09/16/02** | Discharged from DOCS because maximum release date had been 02/13/04 (216 days earlier) under new calculation. |
| **08/28/05** | Signed Complaint in the current action. |

**III. ANALYSIS**

**A. Statute of Limitations**

***4** Defendants argue that (1) the statute of limitations for claims arising under Section 1983 is three years, (2) here, Plaintiff's Section 1983 claims accrued more than three years before August 28, 2002, when Plaintiff mailed his Complaint to the Clerk of Court, and (3) therefore, Plaintiff's Section 1983 claims are time barred. (Dkt. No. 18, Part 4, at 4 [Defs.' Mem. of Law].)

Because Plaintiff does not respond to Defendants' statute-of-limitations argument in their properly filed motion for summary judgment, the sole issue before the Court is whether that argument has, at the very least, facial merit. *See, supra,* Part I of this Report-Recommendation (describing the legal standard governing unopposed motions for summary judgment). After reviewing Defendants' memorandum of law, Rule 7.1 Statement, and the governing law, I answer that question in the affirmative. Even if I were to subject Defendants' statute-of-limitations argument to more rigorous scrutiny, I would accept that argument as persuasive.

"The applicable statute of limitations for § 1983 actions arising in New York requires claims to be brought within three years ." *Pinaud v. County of Suffolk,* 52 F.3d 1138, 1156 (2d Cir.1995) [citations omitted]; *see also Connolly v. McCall,* 254 F.3d 36, 40-41 (2d Cir.2001) ("[Plaintiff's] federal constitutional claims, brought pursuant to 42 U.S.C. § 1983, are governed by New York's three-year statute of limitations for personal injury actions ....") [citations omitted]. Moreover, a claim arising under Section 1983 accrues "when the plaintiff knows or has reason to know of the harm that he seeks to redress." *Connolly v. McCall,* 254 F.3d 36, 41 (2d Cir.2001) [internal quotation marks and citation omitted], *accord, Pearl v. City of Long Beach,* 296 F.3d 76, 80 (2d Cir.2002) [internal quotation marks and citations omitted].

Here, on August 6, 2001, the New York State Division of Parole issued a "Parole Jail Time Certificate" that did not credit Plaintiff with the 253 days of "parole jail time" for the period of September 14, 2000, to May 24, 2001. [FN22] I have trouble finding that Plaintiff had "reason to know" of the omission of the 253-day credit when the Certificate was issued, since at that time the omission appears to have been entirely proper in that the 253-day period of incarceration was due to the pending charges of grand larceny and criminal mischief, which Plaintiff was facing.

FN22. (Dkt. No. 18, Part 3, at 10 [Ex. C to Simone Affirm.].)

However, I do find that Plaintiff had "reason to know" of the omission (of the 253-day credit from the Certificate) by March 26, 2002, when he pled guilty to the crime of harassment, which carried a maximum penalty of 15-days' imprisonment. This is because the 15-day maximum penalty effectively *changed* the 253-day period in question from a period of incarceration due to the charges of grand larceny and criminal mischief to a period of incarceration due to a parole violation, warranting his immediate release on the parole violation.[FN23] (I note that Plaintiff has also alleged that, during this time period, he started to experience injuries as a result of his continued incarceration, including the denial of an

opportunity to attend the funeral of a relative, giving him added reason to scrutinize the Certificate.) FN24 In any event, he certainly had *actual knowledge* of the omission (of the 253-day credit from the Certificate) by August 7, 2002, when he filed a habeas corpus proceeding in state court, seeking the 253-day credit at issue.FN25 Under either of these two scenarios, the three-year limitations period had expired by the time Plaintiff signed the Complaint in this action, on August 28, 2005.

> FN23. *See Littman v. Senkowski,* Index No. 02-940, Decision, at 3 (N.Y. Sup.Ct., Clinton County, filed Sept. 12, 2002) (Felstein, J.S .C.) ("This Court ... must ... attempt to understand the *implication* of [Plaintiff's] sentence [upon his conviction for the crime of harassment] in the present context [of parole jail-time credits].") [emphasis added] (attached as Ex. E to Simone Affirm., *see* Dkt. No. 18, Part 3, at 16).

> FN24. (Dkt. No. 1, ¶ III.)

> FN25. (Dkt. No. 18, Part 3, at 14 [Ex. E to Simone Affirm.].)

***5** I note that I am specifically persuaded by Defendants' argument that the three-year limitations period did *not* begin to run on September 12, 2002, when the state court issued its decision granting Plaintiffs habeas corpus petition. "The reference to 'knowledge of injury' [in the above-described standard] does not suggest that the statute [of limitations] does not begin to run until the claimant has received judicial verification that the defendants' acts were wrongful." *Veal v. Geraci,* 23 F.3d 722, 724 (2d Cir.1995) [citations omitted], *accord, Shannon v. Selsky,* 04-CV-1939, 2005 U.S. Dist. LEXIS 3823, *13, 2005 WL 578943 (S.D.N.Y. March 10, 2005); *see also Abbas v. Dixon,* 480 F.3d 636, 641 (2d Cir.2007) ("We have held ... that a plaintiff's pursuit of a state remedy, such as an Article 78 proceeding, does not toll the statute of limitations for filing a claim pursuant to section 1983.") [citations omitted], *accord, LeBron v. Swaitek,* 05-CV-0172, 2007 U.S. Dist. LEXIS 81587, at *7, n. 5, 2007 WL 3254373 (N.D.N.Y. Nov. 2, 2007) (Sharpe, J.).

As a result, I recommend that the Court dismiss Plaintiff's claims against all four Defendants as time barred.

**B. Failure to State a Claim**

Defendants Senkowski and Meier argue that they had no discretion or control over (1) the Department of Parole's decision to credit only 70 days parole jail time in Plaintiff's original Division of Parole "Parole Jail Time Certificate," issued on August 6, 2002,FN26 and (2) any "failure" by the Department of Parole to issue an Amended Certificate before September 13, 2002.FN27 (Dkt. No. 18, Part 4, at 4-5 [Defs.' Mem. of Law].) Again, because Plaintiff does not respond to this argument, the sole issue before the Court is whether the argument has, at the very least, facial merit. After reviewing Defendants' memorandum of law, Rule 7.1 Statement, and the governing law, I answer that question in the affirmative.

> FN26. (Dkt. No. 18, Part 3, at 10 [Ex. C to Simone Affirm.].)

> FN27. (Dkt. No. 18, Part 3, at 12 [Ex. D to Simone Affirm.].)

After carefully considering Defendants' lack-of-discretion argument, I have concluded that it is, at its core, an attack on the pleading sufficiency of Plaintiff's Complaint. (*See, e.g.,* Dkt. No. 18, Part 4, at 5 [Defs.' Mem. of Law, arguing, "Plaintiff merely offers conclusory allegations ..." and "[s]uch allegations hardly provide an adequate basis ..."].) As stated above, I liberally construe Plaintiff's Complaint as alleging (in a conclusory fashion) that Defendants Senkowski and Meier acted with negligence or perhaps recklessness when they assisted in miscalculation of, or failed to correct, Plaintiff's "parole jail-time credits." The problem is that Plaintiff has alleged no facts plausibly suggesting that, during the relevant time period, Defendants Senkowski and Meier acted with the sort of recklessness (or intent) necessary to state a constitutional claim.FN28

> FN28. *See, e.g., Farmer v. Brennan,* 511 U.S. 825, 827, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[S]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as interpreted in our cases, and we adopt it as the test for "deliberate indifference" under the Eighth Amendment.") *Franks v. Delaware,* 438 U.S. 154, 171, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) ("There must be allegations of deliberate falsehood or of reckless disregard for the truth [to state a claim under

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

the Fourth Amendment].”); *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) ( “The required state of mind [for a deliberate indifference claim under the Eighth Amendment], equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference.”) [internal quotation marks and citations omitted]; *Madiwale v. Savaiko,* 117 F.3d 1321, 1326-27 (11th Cir.1997) ( “[A] warrant affidavit violates the Fourth Amendment when it contains omissions made intentionally or with a reckless disregard for the accuracy of the affidavit.”) [internal quotation marks and citation omitted].

At most, Plaintiff has alleged facts plausibly suggesting that Defendant Meier may have exhibited a hint of negligence by not *somehow* persuading the Division of Parole to issue an Amended Certificate between March 26, 2002 (when Plaintiff pled guilty to the crime of harassment, which carried a maximum penalty of 15-days imprisonment), and September 12, 2002 (when the state court issued its decision requiring such an Amended Certificate).[FN29] I hasten to add that Plaintiff has alleged no facts plausibly suggesting precisely *how* Defendant Meier could have so persuaded the Division of Parole, especially given the legal issue created by the sentence of “time served” that Plaintiff received on March 26, 2002. In any event, even if Plaintiff had alleged such facts, such an allegation of negligence would not be actionable under 42 U.S.C. § 1983.[FN30]

FN29. I note that Plaintiff has alleged no facts plausibly suggesting that the individual who signed the original Parole Jail Time Certificate on August 6, 2001 (apparently “Kathleen Jack”) made any sort of mistake whatsoever. This is because it was only after Plaintiff pled guilty to harassment, which carried a maximum penalty of 15-days imprisonment, on March 26, 2002, that the 253-day period in question effectively changed from a period of incarceration due to the charges of grand larceny and criminal mischief to a period of incarceration due to a parole violation.

FN30. *See, e.g., Farmer,* 511 U.S. at 835 (“[D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence.”); *Daniels v. Williams,* 474 U.S. 327, 331-33, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (stating that “injuries inflicted by governmental negligence are not addressed by the United States Constitution” and rejecting § 1983 claim based on alleged due process violation under Fourteenth Amendment); *Hudson v. Palmer,* 486 U.S. 517, 531, 108 S.Ct. 1945, 100 L.Ed.2d 517 (1984) (“[T]he Due Process Clause of the Fourteenth Amendment is not violated when a state employee negligently deprives an individual of property ....”); *Franks,* 438 U.S. at 171 (“Allegations of negligence or innocent mistake are insufficient [to state a claim under the Fourth Amendment].”); *Riddick v. Modeny,* No. 07-1645, 2007 WL 2980186, at *2 (3d Cir. Oct.9, 2007) (“The protections afforded prisoners by the Due Process Clause of the Fourteenth Amendment are not triggered by the mere negligence of prison officials.”); *Billington v. Smith,* 292 F.3d 1177, 1190 (9th Cir.2002); (“The Fourth Amendment's ‘reasonableness' standard is not the same as the standard of ‘reasonable care’ under tort law, and negligent acts do not incur constitutional liability.”); *Myers v. Okla. County Bd. of County Com'rs,* 151 F.3d 1313, 1320 (6th Cir.1998) (“[A]ctions leading to a confrontation, such as the decision to enter the apartment, must be more than merely negligent to be “unreasonable” for purposes of the Fourth Amendment inquiry.”); *Madiwale,* 117 F.3d at 1326 (“Negligent or innocent mistakes do not violate the Fourth Amendment.”); *Sevier v. City of Lawrence, Kan.,* 60 F.3d 695, 699, n. 7 (10th Cir.1995) (“Mere negligent actions precipitating a confrontation [that was the subject of plaintiff's Fourth Amendment claim] would not, of course, be actionable under § 1983.”).

***6** As a result, I recommend that, in the alternative, the Court dismiss Plaintiff's claims against Defendants Senkowski and Meier based upon Plaintiff's failure to state a claim against them.

**C. Lack of Personal Involvement of Defendant Senkowski**

Defendants argue that, in the alternative, Plaintiff's claims against Defendant Senkowski should be dismissed because Plaintiff has neither alleged facts plausibly suggesting, nor adduced any evidence establishing, the personal involvement of Defendant Senkowski in any of the constitutional violations alleged. (*See* Dkt. No. 18, Part 4, at 5-6 [Defs.' Mem. of Law].) Again, because Plaintiff does not respond to this argument, the sole issue before the Court is whether the argument has, at the very least, facial merit. After reviewing Defendants' memorandum of law, Rule 7.1 Statement, and the governing law, I answer that question in the affirmative.

For the sake of argument, I will set aside the issue of whether the allegations in Plaintiff's Complaint give Defendant Senkowski "fair notice" of Plaintiff's claim against him, sufficient to state such a claim, under Fed.R.Civ.P. 8 and 12. Even if this were so, no rational fact finder could find, based merely on the sworn assertions in Plaintiff's Complaint, that Defendant Senkowski was personally involved in any constitutional violation.

Specifically, in his Complaint, Plaintiff offers sworn assertions that (1) Defendant Senkowski, *solely by virtue of his position as Superintendent of Clinton C.F. during the relevant time period,* was "fully aware and informed about the facts that form the basis of this complaint," (2) "[a]ll defendants [,] despite full awareness of the erroneous refusal/failure to give me credit for parole jail time herein[,] refused and failed to properly calculate and give me credit for parole jail time to which I was entitled," and (3) "[e]ach defendant was well aware of my illegal detention and refused to correct the erroneous time computation." (Dkt. No. 1, ¶¶ II.D.3., II.D.6., II.D.12.)

However, the simple fact that allegations are sworn does not convert them into admissible evidence sufficient to create a factual issue for purposes of a motion for summary judgment. As explained above in Part I of this Report-Recommendation, to be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit must, among other things, not be conclusory. An affidavit is conclusory if, for example, its assertions lack any supporting evidence or are too general.

Here, there are no facts asserted in Plaintiff's Complaint specifying *why* Defendant Senkowski was personally involved in the miscalculation of, or failure to correct, Plaintiff's parole time credits, other than his role as the supervisor of the prison. For example, Plaintiff does not assert that he ever wrote or spoke to Defendant Senkowski about his claim to the 253-day credit at issue, nor does Plaintiff attach to his Complaint any relevant parole documents bearing Senkowski's signature (nor are any such documents attached to Defendants' motion papers).

***7** As a result, I recommend that, in the alternative, the Court dismiss Plaintiff's claims against Defendant Senkowski based on his lack of personal involvement in the constitutional violations alleged.

**D. Qualified Immunity**

Because I have already concluded that adequate grounds exist upon which to base a recommendation of dismissal of Plaintiffs claims against Defendants Senkowski and Meier, I need not, and do not, reach the merits of Defendants' alternative argument in favor of dismissal, namely, their qualified immunity argument (*see* Dkt. No. 18, Part 4, at 6-7 [Defs.' Mem. of Law] ) other than to note that (1) their argument appears to have facial merit and (2) Plaintiff has failed to respond to that argument.

**E. Failure to Serve or Even Name "John Doe # 1" and "John Doe # 2"**

On September 1, 2005, Plaintiff filed his Complaint in this action, which asserted claims against, *inter alia,* "John Doe # 1" (i.e., the Superintendent of Downstate C.F. during the relevant time period) and "John Doe # 2" (i.e., the Inmate Records Coordinator of Downstate C.F. during the relevant time period). (Dkt. No. 1.)

On December 14, 2005, Judge Kahn ordered, *inter alia,* that (1) "the Clerk shall issue summonses and forward them, along with copies of the complaint, to the United States Marshall for service on the remaining defendants," and (2) "Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action." (Dkt. No. 6, at 3-4.) That same day, the Clerk's Office wrote Plaintiff a letter requesting him to complete USM 285 Forms for each of the remaining Defendants. (Dkt. No. 7.)

However, Plaintiff never returned a USM 285 Form for either John Doe # 1 (i.e., the Superintendent of Downstate C.F.) or John Doe # 2 (i.e., the Inmate Records Coordinator of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Downstate C.F.). (*See generally* Docket [reflecting no "Acknowledgment of Service" or "Summons Returned Unexecuted" for either of these two Defendants].) Nor did Plaintiff ever file, or even attempt to file, an Amended Complaint naming either of these two individuals. (*See generally* Docket.)

Because Plaintiff has not offered "good cause" for his failure to enable the Marshals Service to effect service on either John Doe # 1 (i.e., the Superintendent of Downstate C.F.) or John Doe # 2 (i.e., the Inmate Records Coordinator of Downstate C.F.), I find that Plaintiff has violated Fed.R.Civ.P. 4(m). Alternatively, I find that Plaintiff has violated Fed.R.Civ.P. 16(f) due to the fact that he violated Judge Kahn's Order of December 14, 2005, directing him to "comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action." (Dkt. No. 6, at 4.) Alternatively, I find that Plaintiff has violated Fed.R.Civ.P. 41(b) by failing to diligently prosecute his claims against John Doe # 1 and John Doe # 2.

As a result, should the Court decide for some reason not dismiss Plaintiff's claims against John Doe # 1 and John Doe # 2 based on the applicable statute of limitations (for the reasons described above in Part III.A. of this Report Recommendation), I recommend that, in the alternative, the Court dismiss Plaintiff's claims against John Doe # 1 and John Doe # 2 based on Plaintiff's failure to serve or even name them.

***8** I note that, under Fed.R.Civ.P. 4(m) and 16(f), the Court need not issue such an order only upon motion of defense counsel but may do so *sua sponte. See* Fed. R. Civ. 4(m) ("[T]he Court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time."); Fed. R. Civ. 16(f) ("[T]he judge, upon motion or the judge's own initiative, may make such orders with regard thereto as are just ...."). FN31 Furthermore, with regard to Fed.R.Civ.P. 41(b), which speaks only of a *motion* to dismiss on the referenced grounds, courts retain the "inherent power" to *sua sponte* "clear their calendars of cases that have remained dormant because of the inaction or dilatoriness of the parties seeking relief." *Link v. Wabash R.R. Co.,* 370 U.S. 626, 630, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962); *see also* *Saylor v. Bastedo,* 623 F.2d 230, 238 (2d Cir.1980); *Theilmann v. Rutland Hospital, Inc.,* 455 F.2d 853, 855 (2d Cir.1972). Indeed, Local Rule 41.2(a) recognizes this authority. *See* N.D.N.Y. L.R. 41.2(a) ("Whenever it appears that the plaintiff has failed to prosecute an action or proceeding diligently, the assigned judge *shall* order it dismissed.") [emphasis added].

FN31. In the event the Court were to base its dismissal of Plaintiff's claims against the John Doe Defendants on Fed.R.Civ.P. 4(m), this Report-Recommendation would serve as the requisite notice to Plaintiff.

**F. Failure to Notify Court of Change in Address**

On December 14, 2005, Judge Kahn ordered Plaintiff, *inter alia,* to keep the Clerk's Office apprised of his current address. (Dkt. No. 6, at 6.) Specifically, Judge Kahn advised Plaintiff that he ***"is also required to promptly notify the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to do so will result in the dismissal of this action."*** (*Id.*)

Moreover, Local Rule 10.1 imposes on a plaintiff a duty to promptly notify the Court of any change in his address. *See* N.D .N.Y. L.R. 10.1(b)(2) (imposing on plaintiffs a duty to **"immediately notify the Court of any change of address"**) [emphasis in original]. This duty has been found to also be imposed by Fed.R.Civ.P. 41(b).FN32

FN32. *See, e.g., Robinson v. Middaugh,* 95-CV-0836, 1997 U.S. Dist. LEXIS 13929, at *2-3, 1997 WL 567961 (N.D.N.Y. Sept. 11, 1997) (Pooler, J.) (dismissing action under Fed.R.Civ.P. 41[b] where plaintiff failed to inform the Clerk of his change of address despite having been previously ordered by Court to keep the Clerk advised of such a change); *see also* N.D.N.Y. L.R. 41.2(b) ("Failure to notify the Court of a change of address in accordance with [Local Rule] 10.1(b) may result in the dismissal of any pending action.").

Here, Plaintiff's current address of record in this action is "Clinton Correctional Facility, PO Box 2001, Dannemora, N.Y. 12929." (*See* Docket.) However, based on my review of the DOCS' online "Inmate Lookup" Service, it appears that Plaintiff's current address is Upstate Correctional Facility, P.O. Box 2000, 309 Bare Hill Road, Malone, N.Y. 12953.FN33 While I cannot determine when Plaintiff was apparently transferred

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

from Clinton C.F. to Upstate C.F., I note that Plaintiff's last filing in this action was dated September 11, 2007. (Dkt. No. 21.) I note also that in Plaintiff's filing dated July 3, 2007, his return address was not Clinton C.F. but was *Great Meadow C.F.* Thus, Plaintiff's failure to notify the Court of his current address appears to have persisted for some three to six months now. *Pro se* actions have been dismissed for failure to comply with a court order even where the failure was for four months. *See, e.g., Georgiadis v. First Boston Corp.,* 167 F.R.D. 24, 25 (S.D.N.Y.1996) (plaintiff had failed to comply with order directing him to answer interrogatories for more than four months).

FN33. *See* New York DOCS' "Inmate Lookup Service" http://nysdocslookup.docs.state.ny.us/GCA00P00/WIQ3/WINQ130 (last visited Dec. 31, 2007).

***9** As a result, I recommend that, in the alternative, the Court dismiss Plaintiff's Complaint for failure to notify the Court of his current address.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 18) be ***GRANTED*** for the reasons set forth above, and that Plaintiff's claims against Defendants Senkowski and Meier be ***DISMISSED*** **with prejudice;** and it is further

**RECOMMENDED** that Plaintiff's claims against John Doe # 1 and John Doe # 2 be ***DISMISSED*** **with prejudice** due to the applicable statute of limitations (for the reasons set forth above in Part III.A. of this Report-Recommendation), or, in the alternative, due to Plaintiff's failure to serve or even name those individuals, in violation of Fed.R.Civ.P. 4(m), 16(f), and/or 41(b); and it is further

**RECOMMENDED** that the Court certify in writing that any appeal taken from the Court's final judgment in this action would not be taken in good faith, for purposes of 28 U.S.C. § 1915(a)(3); and it is further

**ORDERED** that the Clerk's Office shall send a copy of this Report-Recommendation to Plaintiff at both (1) his address of record on the docket in this action and (2) Upstate Correctional Facility, P.O. Box 2000, 309 Bare Hill Road, Malone, N.Y. 12953.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2008.

Littman v. Senkowski
Not Reported in F.Supp.2d, 2008 WL 420011 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.





H

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Roger L. HARRIS, Plaintiff,

v.

Harry BUFFARDI, Individually and in his Official Capacity as Sheriff of the County of Schenectady; Gordon Pollard, Individually and in his Official Capacity as Undersheriff of the County of Schenectady; Timothy S. Bradt, Individually and as an Employee of the County of Schenectady; John Does, Being Unnamed Employees of the County of Schenectady; County of Schenectady; Ronald Walsh, Individually and in his Official Capacity as the President of the Schenectady County Sheriff's Benevolent Association, Local 3874/# 82; Schenectady County Sheriff's Benevolent Association, Local 3874/# 82; Kathleen Rooney, Individually and in her Official Capacity as Chief Executive Officer for the County of Schenectady; and Schenectady County Sheriff's Department, Defendants.

No. 1:08–cv–1322 (GLS/DRH).

Aug. 24, 2011.

Roger L. Harris, Schenectady, NY, pro se.

Goldberg, Segalla Law Firm, Latha Raghavan, Esq., Jonathan M. Bernstein, Esq., of Counsel, Albany, NY, for the Defendants County Defendants.

New York State Law Enforcement, Officers Union, Matthew P. Ryan, Esq., of Counsel, Albany, NY, for the Defendants Union Defendants.

***MEMORANDUM–DECISION AND ORDER***

GARY L. SHARPE, District Judge.

**I. *Introduction***

***1** Plaintiff Roger Harris commenced this action under 42 U.S.C. §§ 1981, 1983, and 1985 against defendants Harry Buffardi, Gordon Pollard, Timothy Bradt, John Does, County of Schenectady, Kathleen Rooney, Ronald Walsh, and Schenectady County Sheriff's Department (County defendants), and Schenectady County Sheriff's Benevolent Association, Local 3874/# 82 and Walsh in his capacity as Union President (Union defendants), alleging violations of his rights under the Fourteenth Amendment of the United States Constitution, Title VII of the Civil Rights Act of 1964,[FN1] the ADEA,[FN2] New York State Human Rights Law (N.Y.SHRL),[FN3] and New York State common law, including deprivation of property without due process, procedural due process and equal protection violations, race and age discrimination, bad faith inadequate investigation, fabrication of evidence, obstruction of justice, wrongful discharge and termination, intentional infliction of emotional distress (IIED), breach of duty of fair representation, interference with the right to make and enforce a contract, and conspiracy. (*See* 2d Am. Compl., Dkt. No. 33.) Pending are County defendants' motion for summary judgment, (Dkt. No. .55); Union defendants' motion for summary judgment, (Dkt. No. 57); Harris's cross-motion for summary judgment, (Dkt. No. 70); and Harris's untimely motion for declaratory and injunctive relief, (Dkt. No. 71). [FN4] For the reasons that follow, defendants' motions are granted, Harris's motions are denied, and the complaint is dismissed.

FN1. 42 U.S.C. § 2000e, *et seq.*

FN2. Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq* .

FN3. N.Y. EXEC. LAW § 296.

FN4. Additionally pending is Harris's February 11, 2011 letter motion requesting that the court take judicial notice of Sandy Naparty's January 12, 2011 arrest. (Dkt. No. 87.) Although unable to discern how Ms. Naparty's arrest is at all relevant to this matter, the court will nonetheless grant Harris's request.

**II. *Background***

On May 20, 2007, plaintiff Roger Harris, a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

62–year–old African–American male, was hired by the Schenectady County Sheriff's Department as a correction officer at the Schenectady County Jail. (*See* County Defs. SMF ¶ 3, Dkt. No. 55:2.) As a newly hired correction officer, Harris was considered probationary for his first year of employment. (*See id.* at ¶ 5.) During this probationary period, correction officers are expected to abide by the Sheriff's Department's Code of Conduct, which requires employees "to conduct themselves in a manner which brings credit to the department," "to represent themselves in the highest standards and traditions," "to conduct themselves in a professional manner at all times," not to "engag[e] in any criminal, infamous, dishonest, notorious or disgraceful conduct," and not to "use physical force or deadly physical force on any person except as defined by law." (Bernstein Aff., Ex. H, Code of Conduct, Dkt. No. 55:17.)

On September 28, 2007, Harris was involved in an off-duty altercation outside of McArthur's Pub in Schenectady, New York. (*See* County Defs. SMF ¶ 13, Dkt. No. 55:2.) As a result of his involvement in this altercation, members of the Schenectady City Police Department arrested Harris and charged him with assault in the third degree, N.Y. PENAL LAW § 120.00. (*See* Union Defs. SMF ¶¶ 14–15, Dkt. No. 57:1.) After being arrested, charged, and released, Harris's employment with the County was immediately terminated, (*see id.* at ¶ 16; County Defs. SMF ¶ 10, Dkt. No. 55:2), which was memorialized in a letter issued to Harris on September 28, 2007, by Undersheriff Gordon Pollard, (*see* Bradt Aff., Ex. J(a), Dkt. No. 55:25). Sheriff's Department Chief Timothy Bradt conducted an investigation into the alleged assault, during which he reviewed a video of the incident that had been recorded by MacArthur's Pub's surveillance camera. (*See* County Defs. SMF ¶¶ 12–13, Dkt. No. 55:2.) The video recording showed Harris assaulting an individual, Byron Lake, outside of McArthur's Pub. (*See* County Defs. June 23, 2010 Letter Exs., Dkt. No. 52; County Defs. SMF ¶ 13, Dkt. No. 55:2.) Ultimately, on March 15, 2010, after a jury trial in Schenectady City Court, Harris was found guilty of third-degree assault. (*See* County Defs. SMF ¶ 21, Dkt. No. 55:2; Bernstein Aff., Ex. K, Trial Tr. at 443–44, Dkt. No. 55:29.)

***2** On September 29, 2007, Harris contacted Ronald Walsh, President of the Schenectady County Sheriff's Benevolent Association, Local 3874, Council 82. (*See* Union Defs. SMF ¶ 17, Dkt. No. 57:1.) In response to Harris's questions regarding his termination, Walsh avers that he explained to Harris that, as a probationary employee, he "could be dismissed for any legitimate purpose including being arrested," that he was "not entitled to a hearing under the collective bargaining agreement challenging [his] termination," and that the Union "would not be filing a grievance on [his] behalf given the [Sheriff's Department's] broad power to terminate a probationary employee." (Walsh Aff. ¶¶ 4–6, Dkt. No. 57:7.) Walsh, however, did advise Harris that the Union—though not obligated to—would assist in paying the costs associated with Harris's criminal matter by paying for the assistance of criminal attorney Steven Kouray. (*See id.* at ¶¶ 8–9.)

In October 2007, Harris met with Walsh and attorney Ennio Corsi, General Counsel to Council 82, to review and discuss Harris's termination and evaluate whether any action could be taken to challenge it. (*See id.* at ¶ 12.) During this meeting, Harris was again advised that the Sheriff's Department could terminate his probationary employment simply based on his arrest. (*See id.*) Harris was further advised to seek a second opinion and that he had the right to contact or file a grievance with the New York State Division of Human Rights (DHR) and the Equal Employment Opportunity Commission (EEOC). (*See id.* at ¶ 14; Union Defs. SMF ¶ 23, Dkt. No. 57:1; Corsi Aff. ¶ 16, Dkt. No. 70:5.)

Shortly thereafter, on October 31, 2007, Harris filed a notice with the Sheriff's Department requesting a "name clearing hearing" on the grounds that his termination violated his Fourteenth Amendment rights because it was based on "false and manufactured information ... [that] the parties knew or should have known was false[ly] manufactured (video evidence) and bias [sic]." (*See* Ryan Aff., Ex. E, Dkt. No. 57:6.)

On March 5, 2008, Harris filed a verified complaint with the DHR, charging the Sheriff's Office with race-and age-based discrimination. (*See* Bernstein Aff., Ex. G, Dkt. No. 55:10.) After conducting an investigation, the DHR determined that no probable cause existed for Harris's claims, dismissed his complaint, and notified Harris that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

he may file an appeal with the New York State Supreme Court, which must be filed "within sixty (60) days," and that he may request a review of his complaint by the EEOC. (*See id.)* On November 13, 2008, the EEOC issued a decision adopting the DHR's findings and notifying Harris of his right to file a civil action under Title VI I in state or federal court. (*See* 2d Am. Compl., Ex. 1, Dkt. No. 33.)

Harris commenced this action on December 19, 2008, and thereafter amended his complaint, alleging a series of claims arising under the Fourteenth Amendment, Title VII, the ADEA, NYSHRL, and state common law. (*See* 2d Am. Compl., Dkt. No. 33.) Following discovery, County and Union defendants moved for summary judgment on Harris's claims. (*See* Dkt. Nos. 55, 57.) In response, Harris cross-moved for summary judgment, (*see* Dkt. No. 70), and moved for declaratory and injunctive relief, seeking to preclude the introduction of the DVD–R video recordings of the September 28, 2007 incident, (*see* Dkt. No. 71).

### III. *Standard of Review*

***3** The standard for the grant of summary judgment is well established and will not be repeated here. For a full discussion of the standard, the court refers the parties to its previous opinion in *Bain v. Town of Argyle,* 499 F.Supp.2d 192, 194–95 (N.D.N.Y.2007).

### IV. *Discussion*

#### A. *Declaratory and Injunctive Relief*

As an initial matter, Harris, by letter dated September 16, 2010, requests the court to declare inadmissible the two DVD–Rs submitted by County defendants. (*See* Harris Sept. 16, 2010 Letter Mot., Dkt. No. 71; *see also* County Defs. June 23, 2010 Letter & Exs.,[FN5] Dkt. No. 52.) Harris further seeks to enjoin defendants from using or distributing, among other things, the DVD–Rs and the County Sheriff's Investigation Report. (*See* Harris Sept. 16, 2010 Letter Mot., Dkt. No. 71; *see also* Bradt Aff., Ex. A, 55:25 .) Essentially, Harris contends that the DVD–Rs have been fabricated, altered, and contain dropped video frames, and that the Investigation Report is derivatively inadmissible as it was prepared in reliance on the contents of the DVD–Rs. (*See id.*)

FN5. As explained by defense counsel Jonathan Bernstein, the first DVD–R, which is marked "07–087 Harris," was obtained from Schenectady County; and the second DVD–R, which is marked "10124000 COA P.L. Exhibit 19," was obtained from the NYSDHR's files. (*See* Bernstein June 23, 2010 Letter, Dkt. No. 52.)

Having viewed the DVD–Rs, reviewed the Report, and considered the parties' arguments, the court denies Harris's motion for declaratory and injunctive relief. As defendants highlight, the testimony elicited during Harris's criminal trial abundantly supports the accuracy and consequent admissibility of both the DVD–Rs and the Report. (*See generally* Union Defs. Resp. Mem. of Law, Dkt. No. 73:1; *see also* County Defs. Reply Mem. of Law at 6, Dkt. No. 76:6; Bernstein Nov. 30, 2010 Letter, Dkt. No. 85.) As to the DVD–Rs, and pursuant to FED.R.EVID. 901, the footage was identified by the eyewitnesses to the event in question-namely, Sandra Naparty, (*see* Bernstein Aff., Ex. K, Trial Tr. at 167, Dkt. No. 55:28), and Byron Lake, (*see id.* at 271–77)—and authenticated by testimonial evidence regarding the camera's installation, activation, and operation, and the recording's chain of possession—specifically, the testimony of Michael Bump, (*see id.* at 115–32, Dkt. No. 55:27), Doug Hitchcock, (*see id.* at 150–51), Officer William Fennell, (*see id.* at 228, Dkt. No. 55:28), Sergeant Edward Barbagelata, (*see id.* at 239–40), and Assistant District Attorney John Healy, (*see* Healy Aff., Dkt. No. 55:33). As to the Report, and pursuant to FED.R.EVID. 803(6), Chief Bradt has affirmed that it was prepared and kept in the normal course of the Sheriff's Department's business.[FN6] (*See* Bradt Aff. ¶ 2, Dkt. No. 55:24.) Moreover, under FED.R.EVID. 803(8) and as discussed by the Second Circuit in *Gentile v. Cnty. of Suffolk,* 926 F.2d 142, 148 (2d Cir.1991), the Report is admissible as a product made in accordance with N.Y. COUNTY LAW §§ 650 and 652. (*See* Union Defs. Mem. of Law at 1, 8–9, Dkt. No. 73:1.) Therefore, since there is no viable question regarding the actual relevance of the content of the DVD–Rs and the Report, the court denies Harris's motion to preclude defendants' submission and the court's consideration of the DVD–Rs and the Report.

FN6. Even if the report was not excepted under FED.R.EVID. 803, the court concurs with Union

defendants' assertion that they offer the report not for the truth of the matter asserted but rather to show that Walsh and Local 3874 played no role in Harris's termination and that Harris's termination occurred for legitimate reasons. (*See* Union Defs. Mem. of Law at 8–9, Dkt. No. 73:1.)

**B.** ***Failure to Serve and File a Notice of Claim***

***4** "Notice of claim requirements are construed strictly by New York state courts. Failure to comply with these requirements ordinarily requires a dismissal for failure to state a cause of action." *Hardy v. N.Y.C. Health & Hosp. Corp.,* 164 F.3d 789, 793–94 (2d Cir.1999) (internal quotation marks and citations omitted); *see also* *Olsen v. Cnty. of Nassau,* No. CV 05–3623, 2008 WL 4838705, at *3–4 (E.D.N.Y. Nov. 4, 2008).

County defendants assert that this court lacks subject matter jurisdiction over Harris's state law claims as a result of Harris's failure to serve a notice of claim on the County in accordance with N.Y. COUNTY LAW § 52. (*See* County Defs. Mem. of Law at 18–19, Dkt. No. 55:1; *see also* Gardner Aff. ¶ 4, Dkt. No. 55:32 ("A search of the County's records reveals that a Notice of Claim was never served and filed by ... Harris with regard to any of the claims asserted in this action.").) In response, Harris has submitted a copy of his purported notice of claim dated December 20, 2007, and a series of certified mail receipts, (*see* Harris Ex. 19, Dkt. No. 70:4), to establish that he served a notice of claim upon the County, (*see* Pl. Resp. Mem. of Law ¶ 20, Dkt. No. 70). While the court has significant reservations regarding the individual County defendants' amenability to suit for failure to serve each of them with a notice of claim, (*see* County Defs. Mem. of Law at 18–19, Dkt. No. 55:1), the court nonetheless declines to dismiss Harris's claims on this basis in light of both his pro se status and the documents submitted by him which on their face suggest that he did file a notice of claim with the County.

**C.** ***Title VII, the ADEA, and NYSHRL***

Under Title VII, it is "an unlawful employment practice for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).

In analyzing claims of race discrimination, courts apply the burden-shifting rules first set forth in *McDonnell Douglas Corp. v. Green,* which place upon the plaintiff the initial burden of making out a prima facie case of discrimination. 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). A plaintiff must satisfy this burden by showing: "(1) membership in a protected class; (2) satisfactory job performance; (3) termination from employment or other adverse employment action; and (4) the ultimate filling of the position with an individual who is not a member of the protected class." *Farias v. Instructional Sys., Inc.,* 259 F.3d 91, 98 (2d Cir.2001). The fourth prong may be satisfied by demonstrating that "the discharge or adverse employment action occurred under circumstances giving rise to an inference of discrimination" based on the plaintiff's membership in a protected class. *Id.* The Second Circuit characterizes the plaintiff's prima facie burden as "minimal." *Woodman v. WWOR–TV, Inc.,* 411 F.3d 69, 76 (2d Cir.2005) (citations omitted).

***5** "A plaintiff's establishment of a prima facie case gives rise to a presumption of unlawful discrimination that shifts the burden of production to the defendant, who must proffer a 'legitimate, nondiscriminatory reason' for the challenged employment action." *Id.* at 76 (internal citations omitted). If the defendant proffers a legitimate, nondiscriminatory reason for the challenged employment action, the presumption of discrimination drops out of the analysis, and the defendant "will be entitled to summary judgment ... unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *James v. N.Y. Racing Ass'n,* 233 F.3d 149, 154 (2d Cir.2000).

Ultimately, once the burden shifts back to the plaintiff, the plaintiff must show, without the benefit of the presumption, "that the employer's determination was in fact the result of racial discrimination." *Holcomb v. Iona Coll.,* 521 F.3d 130, 138 (2d Cir.2008). The plaintiff must demonstrate by a preponderance of the evidence that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Tex.*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). This showing may be made "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.; see also Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1180–81 (2d Cir.1992). Thus, to avoid summary judgment, "the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Holcomb,* 521 F.3d at 138 (internal quotation marks and citation omitted).

"The ADEA makes it unlawful for employers to discriminate on the basis of age against employees age 40 or older." *Dist. Council 37 v. N.Y. City Dep't of Parks & Recreation,* 113 F.3d 347, 351 (2d Cir.1997) (citations omitted). Employers are prohibited from refusing to hire, discharging, or otherwise discriminating against an employee with regard to compensation, terms, conditions, or privileges of employment because of age. *See* 29 U.S.C. § 623(a).

ADEA cases operate under the same *McDonnell Douglas* burden-shifting framework. *See Holtz,* 258 F.3d at 76; *see also Gorzynski v. Jetblue Airways Corp.,* 596 F.3d 93, 105–06 (2d Cir.2010). Accordingly, the plaintiff bears the initial burden of establishing a prima facie case of age discrimination by showing that "(1) [he] was within the protected class; (2)[he] was qualified for the position; (3)[he] was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Leibowitz v. Cornell Univ.,* 584 F.3d 487, 498 (2d Cir.2009) (citations omitted). In turn, the defendant must come forward with evidence of a legitimate, nondiscriminatory reason for the challenged actions. *Id.* at 498–99. If the defendant articulates such a reason, "the burden shifts back to the plaintiff to demonstrate by competent evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* at 499 (internal quotation marks and citation omitted). In carrying this burden, the plaintiff "must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." *Gross v. FBL Fin. Servs., Inc.,* ––– U.S. ––––, ––––, 129 S.Ct. 2343, 2351, 174 L.Ed.2d 119 (2009) (citation omitted).

***6** "[C]laims brought under [NYSHRL] are analytically identical to claims brought under Title VI I. *Torres v. Pisano,* 116 F.3d 625, 629 n. 1 (2d Cir.1997) (citation omitted); *see also Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 n. 1 (2d Cir.2000) ("The identical standards apply to employment discrimination claims brought under Title VI I ... [and] New York Executive Law § 296 ....“ (citations omitted)). Likewise, NYSHRL claims are analyzed under the same standard as claims brought under the ADEA. *See id.* at 1304 n. 4; *see also Abrahamson v. Bd. of Educ. of Wappingers Falls Cent. Sch. Dist.,* 374 F.3d 66, 70 n. 2 (2d Cir.2004) ("Since the [NYSHRL] statute mirrors the requirements of the ADEA, violation of one necessarily implies violation of the other." (citations omitted)). However, unlike Title VII and the ADEA, it is also unlawful "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under [NYSHRL]." N.Y. EXEC. LAW § 296(6); *see also Feingold v. New York,* 366 F.3d 138, 158 n. 19 (2d Cir.2004). Thus, an individual defendant "who actually participates in the conduct giving rise to a discrimination claim may be held personally liable under [NYSHRL]." *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1317 (2d Cir.1995), *abrogated on other grounds, Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

Here, the court is not convinced that Harris can even make out a prima facie case of race-or age-based discrimination. Other than offering conjectural and unsubstantiated assertions that the County had a "racially discriminatory employment policy" and that certain individuals were "known" to be racists, had a history of fabricating evidence against African–American correction officers, or "display[ed] acts of racial prejudice," (*see* Pl. SMF ¶¶ 11, 13, 16, 22, 94–96, Dkt. No. 69:1), Harris has not provided any actual evidence, direct or circumstantial, showing that his discharge occurred under circumstances that could give rise to an inference of racial discrimination. And having scoured Harris's submissions, (*see generally* Pl. Exs. 1–74, Dkt. No. 70:1–20), the court

finds no allegation, let alone evidence, setting forth how Harris's age played a role in his discharge. Consequently, Harris's claims for unlawful termination based on his race and age are prima facie insufficient. Moreover, even if Harris could establish a prima facie case of race or age discrimination, there is nothing in the record to rebut or undermine the legitimate reason offered for his termination, namely his arrest for assault, the charges filed against him, and, ultimately, his conviction. Therefore, the court grants defendants' motions for summary judgment on Harris's Title VII, ADEA, and NYSHRL claims, and those claims are dismissed.

**D.** ***Wrongful Discharge and IIED***

"[A] common-law cause of action in tort for abusive or wrongful discharge based upon the termination of an at-will employment ... may not be maintained under New York law." *McEntee v. Van Cleef & Arpels, Inc.,* 166 A.D.2d 359, 359–60, 561 N.Y.S.2d 25 (1st Dep't 1990); *see also* *Murphy v. Am. Home Prods. Corp.,* 58 N.Y.2d 293, 301–03, 461 N.Y.S.2d 232, 448 N.E.2d 86 (N.Y.1983) (refusing to recognize a common-law cause of action for wrongful discharge of an at-will employee since "[t]o do so would alter [the] long-settled rule that where an employment is for an indefinite term it is presumed to be a hiring at will which may be freely terminated by either party at any time for any reason or even for no reason" (citation omitted)), *modified by statute,* N.Y. LABOR LAW § 740 (1984). Furthermore, since there is "no cause of action in tort in New York for abusive or wrongful discharge of an at-will employee, [a] plaintiff should not be allowed to evade that conclusion or to subvert the traditional at-will contract rule by casting his cause of action in terms of a tort of [IIED]." *Murphy,* 58 N.Y.2d at 303, 461 N.Y.S.2d 232, 448 N.E.2d 86 (citation omitted). In other words, absent the "rare instances" involving "significant battery, or improper physical contact," a claim for IIED will not lie in the employment context. *Curto v. Med. World Commc'ns, Inc.,* 388 F.Supp.2d 101, 112 (E.D.N.Y.2005) (internal quotation marks and citations omitted).

***7** Here, because there is no dispute that Harris, as a probationary correction officer, was an at-will employee, and in light of his allegations and the evidence on record, his claims for wrongful discharge and IIED are subject to dismissal as a matter of law.[FN7]

> FN7. As County defendants highlight, (*see* County Defs. Mem. of Law at 12–13, Dkt. No. 55:1), Harris's IIED claim would likely be subject to dismissal in the alternative under the one-year statute of limitations. *See* N.Y. C.P.L.R. § 215(3); *Patterson v. Balsamico,* 440 F.3d 104, 112 n. 4 (2d Cir.2006); *Jemison v. Crichlow,* 139 A.D.2d 332, 336, 531 N.Y.S.2d 919 (2d Dep't 1988).

The court also notes, and generally concurs with, defendants' contention that the DHR's findings and determination operate under the doctrines of res judicata and collateral estoppel to bar Harris from presenting here his wrongful discharge and IIED claims, NYSHRL claims, and several of his §§ 1981, 1983, and 1985 claims. (*See* County Defs. Mem. of Law at 2–6, Dkt. No. 55:1 (relying on, inter alia, *DeCintio v. Westchester Cnty. Med. Ctr.,* 821 F.2d 111, 118 & n. 13 (2d Cir.1987); *Joseph v. HDMJ Rest., Inc.,* 685 F.Supp.2d 312, 317 (E.D.N.Y.2009); *Reubens v. N.Y.C. Dep't of Juvenile Justice,* 930 F.Supp. 887, 889–90 (S.D.N.Y.1996); *Bolecek v. Bd. of Educ. of City of N.Y.,* 289 A.D.2d 328, 328–29, 734 N.Y.S.2d 494 (2d Dep't 2001)); Union Defs. Mem. of Law at 14–15, Dkt. No. 57:9.) Nonetheless, in consideration of Harris's pro se status and the somewhat confused, overlapping nature of his claims, the court has chosen to address his remaining constitutional challenges on their merits below—to the extent that is legally and factually possible.

**E.** ***Breach of Duty of Fair Representation***

A union, as the exclusive bargaining representative of all employees in the bargaining unit, is statutorily obligated "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967) (citation

omitted). "A union breaches its duty of fair representation if its actions can fairly be characterized as so far outside a wide range of reasonableness that they are wholly arbitrary, discriminatory, or in bad faith." *Spellacy v. Airline Pilots Ass'n–Int'l,* 156 F.3d 120, 126 (2d Cir.1998) (internal quotation marks and citations omitted). This duty, which "extends to both the negotiation of a collective bargaining agreement, and its enforcement and administration," *id .* at 126 (citations omitted), stands "as a bulwark to prevent arbitrary union conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law," *Vaca,* 386 U.S. at 182. Nonetheless, while a court's supervision of union action is vital, its review of such action "must be highly deferential, recognizing the wide latitude that [unions] need for the effective performance of their bargaining responsibilities." *Line Pilots Ass'n, Int'l v. O'Neill,* 499 U.S. 65, 78, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991) (citation omitted).

To establish a claim for breach of the duty of fair representation, a plaintiff must satisfy two elements. First, the plaintiff must demonstrate that the "union's conduct toward [him as] a member of the collective bargaining unit [was] arbitrary, discriminatory, or in bad faith." *Vaca,* 386 U.S. at 190 (citation omitted). Second, the plaintiff must demonstrate "a causal connection between the union's wrongful conduct and [the plaintiff's] injuries." *White v. White Rose Food,* 237 F.3d 174, 179 (2d Cir.2001) (internal quotation marks and citation omitted). Arbitrary conduct includes both intentional conduct and "acts of omission which, while not calculated to harm union members, may be so egregious, so far short of minimum standards of fairness to the employee and so unrelated to legitimate union interests as to be arbitrary." *NLRB v. Local 282, Int'l Bhd. of Teamsters,* 740 F.2d 141, 147 (2d Cir.1984) (internal quotation marks and citations omitted). For instance, "a union may not arbitrarily ignore a meritorious grievance or process it in perfunctory fashion." *Vaca,* 386 U.S. at 191; *see also* *Caputo v. Nat'l Ass'n of Letter Carriers,* 730 F.Supp. 1221, 1229 (E.D.N.Y.1990) ("[T]he failure to act does make out a claim ... because it is not the result of an error of judgment, given that it was not the result of a deliberative process, but rather an omission which is properly characterized as arbitrary."); *see, e.g., Moore v. Roadway Express, Inc.,* No. 07–CV–977, 2008 WL 819049, at *4–5 (E.D.N.Y. Mar. 25, 2008) (denying motion to dismiss where plaintiff alleged that the union failed to respond to and conduct any investigation into his complaints). Thus, a union has a "duty to perform some minimal investigation ... [and] must exercise special care in handling a grievance which concerns a discharge." *Evangelista v. Inlandboatmen's Union of Pac.,* 777 F.2d 1390, 1395 (9th Cir.1985) (citations omitted). However, "[t]actical errors are insufficient to show a breach of the duty of fair representation; even negligence on the union's part does not give rise to a breach." *Barr v. United Parcel Servs., Inc.,* 868 F.2d 36, 43 (2d Cir.1989). In other words, "courts cannot intercede on behalf of employees who may be prejudiced by rationally founded decisions which operate to their particular disadvantage." *Id.* at 44 (internal quotation marks and citations omitted).

***8** Harris's claim against Union defendants for breach of fair duty of representation cannot survive in light of the unrefuted testimony provided by both Walsh and Mr. Corsi establishing that they met multiple times with Harris, evaluated the merits of his claim, provided more than adequate advice and guidance, and offered to and actually assisted in paying the costs associated with Harris's criminal matter. Furthermore, both Walsh and Mr. Corsi aver that at no point in their conversations with Harris did he mention the possibility that race played a role in his termination. (*See* Walsh Aff. ¶ 13, Dkt. No. 55:31; Corsi Aff. ¶ 10, Dkt. No. 70:5.) These averments are corroborated by the contents of Harris's October 31, 2007 notice to request a "name clearing hearing," which alleges due process violations, fabrication of evidence, and slander, but does not contain any reference to race or discrimination. (*See* Ryan Aff., Ex. E, Dkt. No. 57:6.) And most importantly, the evidence—particularly when viewed in the light of the Code of Conduct, (*see* Bernstein Aff., Ex. H, Code of Conduct, Dkt. No. 55:17), and the Collective Bargaining Agreement, (*see* Walsh Aff., Ex. A, Dkt. No. 57:7)—overwhelmingly demonstrates that Harris's grievance had no merit. Therefore, the court grants Union defendants' motion for summary judgment on Harris's breach of duty of fair representation claim.

**F. *Section 1981***

Section 1981 protects each individual's right "to make and enforce contracts ... including the making,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(a)(b). "To establish a § 1981 claim, a plaintiff ... must show: (1) that [he] is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) that the discrimination concerned one or more of the activities enumerated in § 1981." *Lauture v. Int'l Bus. Machs. Corp.,* 216 F.3d 258, 261 (2d Cir.2000) (citation omitted). Claims under § 1981 operate under the same *McDonnell Douglas* burden-shifting framework as Title VII and ADEA claims do. *See Martin v. Citibank, N.A.,* 762 F.2d 212, 216–17 (2d Cir.1985). This is because "[m]ost of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981." *Patterson v. Cnty. of Oneida,* 375 F.3d 206, 225 (2d Cir.2004). Accordingly, "the factors justifying summary judgment dismissing [a plaintiff's] Title VII claim ... for termination of his employment equally support the summary dismissal of his claims for termination brought under 42 U.S.C. §§ 1981 and 1983." *Id.*

As to Harris's claims under § 1981 against County defendants, these claims are dismissed for the same reasons that warrant dismissal of his Title VII, ADEA, and NYSHRL claims. Likewise, for these reasons and those warranting dismissal of his breach of duty of fair representation claim, Harris's § 1981 claim against Union defendants—to the extent he is asserting one—is dismissed. *See Harmon v. Matarazzo,* 162 F.3d 1147, 1998 WL 639400, at *2 (2d Cir. Mar.27, 1998).

**G. *Section 1983***

**1. Deprivation of Property**

***9** Harris's first claim brought pursuant to § 1983—aside from the wrongful discharge claims, (*see* 2d Am. Compl. ¶¶ 351–62, 383–87, Dkt. No. 33), which have already been found subject to dismissal—appears to be that his termination constituted a deprivation of his property without due process, (*see id.* at ¶¶ 333–337). This claim fails on two fronts. First, Harris had no constitutionally protected property interest in his probationary position. *See Baron v. Port Auth. of N.Y. & N.J.,* 271 F.3d 81, 89 (2d Cir.2001) ( "[A]t-will employment is not a constitutionally protected property interest."); *see, e.g., Anderson v. State of N .Y., Office of Court Admin. of Unified Ct. Sys.,* 614 F.Supp.2d 404, 426 (S.D.N.Y.2009). And second, even if Harris did have a property right in his employment, he failed without excuse to pursue an Article 78 proceeding to challenge his termination. *See Gudema v. Nassau Cnty.,* 163 F.3d 717, 724 (2d Cir.1998) ("A deprivation of ... property through the conduct of a state [entity] whose acts are random and unauthorized ... does not constitute a procedural due process violation so long as the state provides a meaningful remedy thereafter." (citations omitted)); *Hellenic Am. Neighborhood Action Comm. v. City of New York,* 101 F.3d 877, 880 (2d Cir.1996) (same); *see also Vargas v. City of New York,* 377 F.3d 200, 208 (2d Cir.2004) ("[A]n Article 78 proceeding ... provides a meaningful remedy where violations of due process by a local governmental entity are alleged." (citing *Gudema,* 163 F.3d at 724–25)); *see, e.g., Longo v. Suffolk Cnty. Police Dep't,* 429 F.Supp.2d 553, 559–60 (E.D.N.Y.2006). Consequently, Harris's property deprivation claim is dismissed.

**2. Equal Protection**

Second, Harris asserts—though not clearly—that his equal protection rights were violated by defendants. (*See* 2d Am. Compl. ¶¶ 2, 5, 384, Dkt. No. 33.) "To prove a violation of the Equal Protection Clause ... a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination ... [and] that the disparity in treatment cannot survive the appropriate level of scrutiny ....“ *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) (citations omitted). As the court has already discussed, Harris has not proffered any direct evidence demonstrating or circumstantial evidence from which to infer that any of the defendants acted with a racial or otherwise impermissible animus. Equally important, Harris has failed to identify any similarly situated person or persons compared to whom he was selectively treated—which is not surprising in light of the uniqueness of his criminal conduct. As a result, Harris's equal protection claim cannot survive summary judgment.

**3. Collateral Estoppel**

The third set of § 1983 claims appears to implicate

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Harris's underlying criminal conviction. Specifically, these claims are based on alleged violations of his due process rights, fabrication of evidence, obstruction of justice, and bad faith inadequate investigation. (*See* 2d Am. Compl. ¶¶ 363–79, 388–91, Dkt. No. 33.) These claims also fail as they are barred by collateral estoppel.

***10** In New York, the doctrine of collateral estoppel "precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party, whether or not the tribunals or causes of action are the same." *Parker v. Blauvelt Volunteer Fire Co.,* 93 N.Y.2d 343, 349, 690 N.Y.S.2d 478, 712 N.E.2d 647 (N.Y.1999) (internal quotation marks and citations omitted). The doctrine applies when:

> (1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits.

*Liona Corp. v. PCH Assocs. (In re PCH Assocs.),* 949 F.2d 585, 593 (2d Cir.1991) (citations omitted). In accordance with these principles, an action for damages pursuant to § 1983 "for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid" can only be maintained if the plaintiff's "conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Heck v. Humphrey,* 512 U.S. 477, 486–87, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994).

It is undisputed that Harris was convicted for third-degree assault and that conviction has not been overturned, expunged, or otherwise invalidated. Accordingly, Harris's claims for violation of his due process rights, fabrication of evidence, obstruction of justice, bad faith inadequate investigation, and §§ 1983 and 1985 conspiracy—all of which are patent attacks on the validity of his conviction—are barred. *See, e.g., Channer v. Mitchell,* 43 F.3d 786, 787 (2d Cir.1994) (per curiam) (affirming dismissal of claims against police officers for perjury and coercion of witnesses as precluded by plaintiff's valid conviction); *Amaker v. Weiner,* 179 F.3d 48, 52 (2d Cir.1999) (holding that *Heck* also applies to claims challenging a plaintiff's conviction under §§ 1981, 1983, 1985, and 1986); *Jasper v. Fourth Ct.App.,* No. 08 Civ. 7472, 2009 WL 1383529, at *1 (S.D.N.Y. May 18, 2009) (dismissing claim of violation of due process right to a fair trial as precluded by plaintiff's valid conviction); *Perez v. Cuomo,* No. 09–CV–1109, 2009 WL 1046137, at *7 (E.D.N.Y. Apr.17, 2009) (same); *Fernandez v. Holzbach,* No. 3:04–CV–1664, 2007 WL 1467182, at *1 (May 15, 2007) (dismissing claims against judge, prosecutor, detectives, witnesses, and other state officials for perjury and fabrication of evidence as precluded by plaintiff's valid conviction); *Duamutef v. Morris,* 956 F.Supp. 1112, 1116–18 (S.D.N.Y.1997) (dismissing claims for false arrest, malicious prosecution, perjury, First Amendment retaliation, and § 1985 conspiracy—all of which formed the basis for plaintiff's overall claim that defendants conspired against him to frame him for a crime—as precluded by plaintiff's valid conviction). Therefore, Harris's remaining § 1983 claims are clearly barred in light of the factual grounds upon which they rest.

**H. *Conspiracy***

***11** In the absence of an underlying constitutional violation, Harris's charges of conspiracy under § 1983 or § 1985 cannot be maintained. *See Curley v. Vill. of Suffern,* 268 F.3d 65, 72 (2d Cir.2001); *Gray v. Town of Darien,* 927 F.2d 69, 73 (2d Cir.1991). Moreover, aside from a series of conclusory, general, and implausible allegations and suppositions that all of the defendants conspired to violate his rights, Harris has failed to offer any evidence demonstrating that any of the defendants entered into an agreement or reached an understanding to willfully deprive him of any rights protected by § 1983 or § 1985. *See United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott,* 463 U.S. 825, 828–29, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983) ("[T]o make out a violation of 42 U.S.C. § 1985(3) ... the plaintiff must [prove] four elements: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws; and (3) an

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States."); *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995) ("To sustain a conspiracy claim under 42 U.S.C. § 1983, a plaintiff must demonstrate that a defendant acted in a wilful manner, culminating in an agreement, understanding or 'meeting of the minds,' that violated the plaintiff's rights ... secured by the Constitution or the federal courts." (internal quotation marks and citation omitted)); *see also Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir.1983) (per curiam). Nor has Harris even alleged facts sufficient to enable the court to infer a conspiracy. Therefore, Harris's claims of conspiracy are dismissed.

**I. *Monell Liability and Personal Involvement***

A municipality may be liable under § 1983 only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't of Soc. Servs. of City of N.Y.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). To establish a municipal policy or custom, a plaintiff must allege:

> (1) the existence of a formal policy officially endorsed by the municipality; (2) actions taken or decisions made by municipal officials with final decision making authority, which caused the alleged violation of plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom of which constructive knowledge can be implied on the part of the policymaking officials; or (4) a failure by policymakers to properly train or supervise their subordinates, amounting to "deliberate indifference" to the rights of those who come in contact with the municipal employees.

*Prowisor v. Bon–Ton, Inc.,* 426 F.Supp.2d 165, 174 (S.D.N.Y.2006) (citation omitted). However, a municipality and its supervisory officials may not be held liable under § 1983 based on the theory of respondeat superior. *See Monell,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Moreover, "a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." *Ricciuti v. N.Y.C. Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991) (citations omitted); *see also City of Canton v. Harris,* 489 U.S. 378, 387, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Still, a policy may be inferred from circumstantial proof that the municipality displayed a deliberate indifference to the constitutional rights of an individual by failing to train its employees or repeatedly failing to make any meaningful investigation into complaints of constitutional violations after receiving notice. *See Ricciuti,* 941 F.2d at 123.

***12** Here, Harris appears to allege that the defendants should be subject to liability under *Monell* for negligently hiring, training, and retaining their employees and subordinates, for participating in some grandiose conspiracy to violate his rights, and for allowing a practice or unwritten policy to persist and thereby cause the violations alleged. However, Harris has failed to identify any policy or practice that any of the defendants endorsed or allowed to persist that led to or caused the violations alleged. Nor has Harris proffered any facts or evidence that would suggest that any defendant failed to properly train and supervise subordinates, or was otherwise indifferent to Harris's or any other individual's rights. And as to defendant Buffardi, Harris has failed to put forth any evidence demonstrating his personal involvement in the violations alleged. Consequently, while the court has already found dismissal of all claims warranted, Harris's *Monell* claims against each defendant are subject to dismissal.

**J. *State Actor Status***

"In order to state a claim under [42 U.S.C.] § 1983, a plaintiff must allege that he was injured by either a state actor or a private party acting under color of state law." *Ciambriello v. Cnty. of Nassau,* 292 F.3d 307, 323 (2d Cir.2002) (citation omitted). However, "[a] merely conclusory allegation that a private [individual] acted in concert with a state actor does not suffice to state a § 1983 claim against the private [individual]." *Id.* (citation omitted).

As to the Union and Walsh in his capacity as Union President, Harris has offered nothing beyond conjectural, conclusory allegations that they conspired with the County defendants and thereby qualify as state actors. Accordingly, Union defendants' motion for summary judgment on Harris's § 1983 claims against them is

granted on this alternative ground.

### V. *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that County defendants' motion for summary judgment (Dkt. No. 55) is **GRANTED;** and it is further

**ORDERED** that Union defendants' motion for summary judgment (Dkt. No. 57) is **GRANTED;** and it is further

**ORDERED** that Harris's motion for summary judgment (Dkt. No. 70) is **DENIED;** and it is further

**ORDERED** that Harris's motion for declaratory and injunctive relief (Dkt. No. 71) is **DENIED;** and it is further

**ORDERED** that Harris's February 11, 2011 letter motion for the court to take judicial notice of Sandy Naparty's January 12, 2011 arrest (Dkt. No. 87) is **GRANTED;** and it is further

**ORDERED** that Harris's complaint is **DISMISSED;** and it is further

**ORDERED** that the Clerk close this case provide a copy of this Memorandum–Decision and Order to the parties by regular and certified mail.

**IT IS SO ORDERED.**

N.D.N.Y.,2011.

Harris v. Buffardi
Not Reported in F.Supp.2d, 2011 WL 3794235 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.





H

Only the Westlaw citation is currently available.
United States District Court,

E.D. New York.
Roosevelt McCOY, Plaintiff,
v.
CITY OF NEW YORK, et al., Defendants.
No. CV 07-4143(RJD)(JO).

Aug. 13, 2008.

Rose M. Weber, Law Offices of Jon L. Norinsberg, New York, NY, for Plaintiff.

Jessica Talia Cohen, New York City Law Department, New York, NY, for Defendants.

**MEMORANDUM AND ORDER**

JAMES ORENSTEIN, United States Magistrate Judge.

***1** Plaintiff Roosevelt McCoy ("McCoy") has asserted that several individual police officers, only some of whom he has thus far identified by name, unlawfully deprived him of his civil rights; he further claims that the City of New York (the "City") is also liable for that deprivation of rights pursuant to *Monell v. Dept. of Social Services of City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). *See* docket entry ("DE") 1 (Complaint). The defendants now seek to bifurcate the trial so that the claims against the individual police officers are tried first, and those against the City tried only in the event the individual officers are first found liable; they further seek to stay discovery related exclusively to the *Monell* claims pending resolution of their anticipated motion for summary judgment. DE 20. McCoy does not agree that he can recover from the City only if he first proves the individual defendants' liability. Moreover, he argues that if the claims are bifurcated, they should be scheduled for immediately consecutive trials before a single jury. Under either scenario he contends that there is no good reason to stay *Monell* discovery. DE 21. For the reasons set forth below, I deny both aspects of the defendants' motion. I further direct the parties to submit, no later than August 22, 2008, a revised joint discovery plan that includes proposed deadlines for the completion of all discovery, including that related only to the *Monell* claims.

I. *Applicable Law*

A court has broad discretion to order separate trials on the basis of convenience, judicial economy, or avoiding prejudice. *See* Fed.R.Civ.P. 42(b) (authorizing bifurcation "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy"); *DeVito v. Barrant,* 2005 WL 2033722, at *11 (E.D.N.Y. Aug.23, 2005) (citing *Ismail v. Cohen,* 706 F.Supp. 243, 251 (S.D.N.Y.1989), *aff'd,* 889 F.2d 183 (2d Cir.1990)); *Busch v. City of New York,* 2002 WL 31051589, at *2 (E.D.N.Y. Sept.9, 2002). The moving party bears the burden of justifying bifurcation, and "separate trials are the exception rather than the rule." *Devito,* 2005 WL 2033722, at *11 (citing *Thrower v. Pozzi,* 2002 WL 91612, at *5 (S.D.N.Y. Jan.24, 2002)).

Courts often assess the factors of convenience and judicial economy together. In cases involving claims against both individual defendants and municipal entities, the argument routinely advanced for bifurcation is that separate trials "could lead to an earlier and less costly disposition." *Ricciuti,* 796 F.Supp. at 85. The basis for that argument is that finding that the plaintiff failed to establish liability on the part of any municipal employee would normally preclude a finding of liability against the municipality itself under *Monell;* as a result, a bifurcated trial of the claims against the individual defendants might, depending on the outcome, dispose of the entire case. *See City of Los Angeles v. Heller,* 475 U.S. 796, 798-99, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) (*per curiam* ) (municipal entities could not be held liable on plaintiff's unlawful arrest and excessive force claims where jury in bifurcated trial first found that individual officers inflicted no constitutional injury on plaintiff). This argument in favor of bifurcation glosses over an important fact: "under *Monell* municipal liability for constitutional injuries may be found to exist even in the absence of individual liability...." *Barrett v. Orange County Human Rights*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Comm'n,* 194 F.3d 341, 350 (2d Cir.1999). Such an outcome can be the result of a jury's determination that the individual defendants violated the plaintiff's rights but enjoy qualified immunity, or of a finding that the plaintiff's injuries are not solely attributable to the actions of the named individual defendants. *Id.; Curley v. Village of Suffern,* 268 F.3d 65, 71 (2d Cir.2001).[FN1] Therefore it is simply not an inevitability that a bifurcated trial will promote judicial economy or convenience, even if the individual defendants escape liability in the first trial.

> FN1. In *Heller,* the jury was not instructed on any affirmative defenses that might have been asserted by the individual officer. 475 U.S. at 797-98.

***2** Courts that grant bifurcation to avoid prejudice have expressed a concern about the potential unfairness to individual defendants in a joint trial that includes evidence relevant only to the *Monell* claims. *See, e.g., Carson,* 1993 WL 260676, at *3 (evidence of police officer's past misconduct would be admissible against City defendants to prove that they were negligent but would be inadmissible against that individual officer); *Universal Calvary Church v. City of New York,* 1997 WL 473539, at *2 (S.D.N.Y. Aug.19, 1997) (granting bifurcation to avoid prejudice to individual defendants arising from introduction against the City only of previous incidents involving the use of excessive force and unlawful arrests).

II. *Analysis*

The defendants base their motion for bifurcation on "optimis[m]" that the individual named defendants will prevail at the summary judgment stage, and the municipal claims will therefore be dismissed. *See* DE 20 at 2. To the extent the defendants therefore implicitly argue that bifurcation is warranted for purposes of convenience and judicial economy, I disagree for two reasons. First, the individual defendants have asserted a qualified immunity defense. *See* DE 13 (Answer) ¶ 86 (pleading qualified immunity as a ninth affirmative defense). To be sure, there have been cases in which courts have granted a request to bifurcate a trial of a *Monell* claim despite an individual defendant's assertion of qualified immunity. An example of such a decision is *Ricciuti*-although I note that in that case the court acknowledged that two trials would be necessary if the individual defendants prevailed on their immunity defense and that "at least some duplication of witnesses and evidence" would be inevitable. 796 F.Supp. at 86. I find more persuasive the decisions of courts that deny bifurcation where an individual defendant asserts a defense of qualified immunity that, if successful, would not obviate trial of the *Monell* claim. *See, e.g., Curley,* 268 F.3d at 71 ("*Heller* will not save a defendant municipality from liability where an individual officer is found not liable because of qualified immunity") (citations omitted). Second-although of lesser persuasive value in my view-it is unclear from the face of the Complaint whether the injuries that McCoy alleges are solely attributable to the actions of the named individual defendants. The Complaint attributes most of the actions at issue to the "defendants" collectively; in light of the fact that McCoy asserts his claims against several individual officers whom he has not yet sued in their true names (identified in the Complaint only as "P.O.s John and Jane Does # 1-10"), Complaint ¶ 9, it is entirely possible that a judgment in favor of the named officers will not preclude a finding of liability against the City. There is thus a real possibility that bifurcation will not obviate the need for a trial of McCoy's *Monell* claims even if the individual defendants avoid liability. *See Barrett,* 194 F.3d at 350.

***3** If the defendants seek bifurcation to avoid trial prejudice to the named individual officers, they have not said so or explained the basis for any such concern. I note in that regard that the Complaint lists several "occurrences of similar wrongful conduct" through which McCoy asserts the court can infer the existence of unconstitutional customs and policies that give rise to the City's *Monell* liability. Complaint ¶ 68 (listing five separate cases brought in this district). Because the defendants have made no argument based on that allegation, I infer from their silence that they currently have no reason to believe that, in a joint trial of all claims and defendants, McCoy will seek to offer any evidence of such "occurrences" that would prejudice the individual officers on trial. Should that circumstance change after discovery is completed, the defendants will of course be free to renew their motion on the basis of such new information.

In short, the defendants have offered no convincing argument that the bifurcation they seek will advance the

interests of the parties' convenience, judicial economy, or the avoidance of unfair prejudice to any party. I therefore deny the motion for bifurcation. I further deny the motion to stay discovery related to the *Monell* claims. I would reach that result even if I were to grant bifurcation, so as to preserve the ability of the assigned district judge to conduct both phases of a bifurcated trial before the same jury.

III. *Conclusion*

For the reasons set out above, I deny the defendants' motion for bifurcation and for a stay of discovery. I further direct the parties to submit, no later than August 22, 2008, a revised joint discovery plan that includes deadlines for the completion of all discovery.

**SO ORDERED.**

E.D.N.Y.,2008.

McCoy v. City of New York
Not Reported in F.Supp.2d, 2008 WL 3884388 (E.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.





Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Chris SFORZA, Plaintiff,

v.

CITY OF NEW YORK, et al., Defendants.

No. 07 Civ. 6122(DLC).

March 31, 2009.

West KeySummary **Federal Civil Procedure 170A 2491.5**

170A Federal Civil Procedure

170AXVII Judgment

170AXVII(C) Summary Judgment

170AXVII(C)2 Particular Cases

170Ak2491.5 k. Civil Rights Cases in General. Most Cited Cases

Genuine issues of material fact as to the amount of force used precluded summary judgment in an arrestee's § 1983 claim for municipal liability based on the use of excessive force during an arrest. The arrestee, a transgender woman, alleged that she was arrested after being attacked by a restaurant employee with a pipe in the restroom. The arrestee claimed that she was handcuffed too tightly, creating ongoing numbness in her hands, and that the police deliberately slammed her head twice into the roof of a police vehicle, causing bruises that remained for two months. The city was not entitled to summary judgment based on medical records that reflected injury only to the arrestee's arm, because bruising and other non-permanent injuries can be sufficient to prevail in an excessive force claim. 42 U.S.C.A. § 1983.

Rose M. Weber, Rose M. Weber Law Office, New York, NY, for Plaintiff.

Susan P. Scharfstein, New York City Law Department, New York, NY, for Defendants City of New York and individual City Defendants.

*OPINION AND ORDER*

DENISE COTE, District Judge.

***1** This lawsuit concerns allegations of civil rights violations stemming from plaintiff's arrest at a McDonald's restaurant and her treatment by the New York City Police following the arrest. Defendants the City of New York (the "City"), Officers Joseph Bonner, Dennis Morgano, Bryan Hanson, and Jordan Bistany, and Sergeants Liz Salinas, Michael McGovern, Christopher Newsom, Ralph Perfetto, John Adriano, and Luigi Pagano (collectively, the "City Defendants") have moved to dismiss plaintiff Chris Sforza's Third Amended Complaint under Rules 8(a), 12(b)(1), 12(b)(6), and 56, Fed.R.Civ.P. The motion is granted with the exception of the motion to dismiss the excessive force claim brought against the City.

BACKGROUND

Before addressing the parties' legal arguments, the plaintiff's allegations will be summarized and the relevant procedural history of this litigation will be set forth in some detail. The procedural history underlies the defendants' motion to dismiss all claims against the individual City Defendants.

1. July 11, 2006 Arrest

Plaintiff, a transgender female, alleges that she was attacked by a McDonald's employee wielding a metal pipe on July 11, 2006, while injecting herself with insulin in a bathroom at a Manhattan branch of the restaurant to treat her diabetes. Police officers soon arrived on the scene and allegedly arrested plaintiff without probable cause, telling the McDonald's employee that "I got you covered" and allowing him to hide the pipe in a back room at the restaurant. While taking Sforza into custody, the officers allegedly slammed her head onto the roof of a patrol car and handcuffed her too tightly, causing injuries that persist to the present day.[FN1]

FN1. At a December 17, 2007 initial conference, plaintiff's counsel explained that the plaintiff suffered no permanent physical injuries but remained traumatized by these events.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Sforza also claims that the officers refused to take her to the hospital for treatment, bringing her first to Manhattan South Precinct instead. She was later transported to the hospital and then returned to the precinct. There, plaintiff alleges, she was strip-searched in full view of male police officers and held in police custody for 24 hours. Sforza was subsequently prosecuted on two counts of assault in the third degree, one count of attempted assault in the third degree, and one count of harassment in the second degree. The charges were dismissed on October 26, 2006.

Sforza alleges that no probable cause for the prosecution existed and that defendants withheld exculpatory evidence and falsified evidence before the District Attorney. She also alleges that, following her release from custody, officers at the precinct refused to allow her to file charges against the McDonald's employee who she maintains assaulted her, despite repeated requests.

2. Delays in Initiating the Lawsuit

Sforza filed a complaint against the City, McDonald's Corporation, and unidentified employees of the New York City Police Department and McDonald's on June 29, 2007, bringing claims under 42 U.S.C. §§ 1983 (" § 1983") and 1985 (" § 1985") for deprivation of civil rights, false arrest, malicious prosecution, abuse of process, excessive force, conspiracy, violation of equal protection, and municipal liability against the City Defendants.[FN2] She also brought pendent state claims for false arrest, assault, battery, malicious prosecution, abuse of process, intentional or negligent infliction, prima facie tort, negligent hiring, training, supervision, and retention against McDonald's Corporation and its employees, as well as claims under the state and city Human Rights Laws against all defendants.

FN2. Sforza's conspiracy claims are brought against McDonald's and its employees as well.

***2** On July 19, defendant the City of New York requested and received a sixty-day extension, from July 23 to September 24, 2007, to respond to the complaint. The City, with plaintiff's consent, sought the extension because the plaintiff had named no individual defendants in the action, and the records of the incident, including police records, may have been sealed pursuant to New York Criminal Procedure Law § 160.50.[FN3] The City needed to review the records of the matter in order to respond to the complaint in compliance with its obligations under Rule 11, Fed.R.Civ.P., and it could not do so until plaintiff executed a consent and authorization releasing the records (the "release"). The City represented that it had forwarded to plaintiff the consent and authorization.

FN3. § 160.50 provides, in part, that

> [u]pon the termination of a criminal action or proceeding against a person in favor of such person ... unless ... such person or his or her attorney demonstrates to the satisfaction of the court that the interests of justice require otherwise ... the record of such action or proceeding shall be sealed ....

It took more than two months, three more letters to the Court from the City, and a Court Order to obtain the necessary release from the plaintiff so that the litigation could begin. The City wrote on September 7, 2007 to request, with plaintiff's and co-defendant McDonald's consent, an additional forty-five days to respond to the allegations of the complaint. The City stated that it had forwarded the release to plaintiff on July 24, 2007 and again on August 14, 2007, and that plaintiff's counsel, Rose Weber ("Weber"), had recently promised to produce the release by September 14. A September 11 endorsement granted the City's request for an extension to respond to the complaint until October 31, and adjourned the initial conference, which had been scheduled for October 5, to October 26.

By September 24, plaintiff had still not produced the release, and the City wrote to request a further adjournment of the initial conference and an Order requiring plaintiff to produce the release and warning plaintiff that she risked dismissal for failure to prosecute. Without the release, the City stated, it was unable to learn the identities of any of the police officers allegedly involved in the incident, as plaintiff had not named any in the complaint.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Plaintiff proceeded to file her first amended complaint two days later, substituting a different McDonald's entity, McDonald's Restaurants of New York, Inc. ("McDonald's"), as defendant. She also hand-delivered the release to the City. That same day, Weber wrote to the Court to apologize for the delay in providing the release. In her letter, Weber explained that she is a solo practitioner and was one of the lead attorneys in litigation arising from arrests during the 2004 Republican National Convention ("RNC"). Noting that "[t]hese cases have required a super-human effort on my part over the past several months," Weber admitted that "[i]t has, consequently, been difficult for me to pay proper attention to my non-RNC cases." Weber's letter was docketed and filed with an endorsement warning her that "further similar failures to comply diligently with discovery obligations in this case may result in dismissal." The endorsement also adjourned the initial conference to November 30, 2007.

***3** The City wrote again on September 28 to complain about plaintiff's September 26 letter, which it deemed "misleading and unfair." The release produced by plaintiff on September 26, the City explained, was not properly completed (it did not include docket or indictment numbers) and might not allow the City to access the necessary records.[FN4] As a result, the City would not have sufficient time to obtain the documents needed to respond to the amended complaint. In addition to a further 45–day extension of its time to respond to the complaint, the City requested that plaintiff be ordered to produce a properly completed release by a date certain.

FN4. The release form, attached by the City to its September 28 letter, requires little investment of effort on plaintiff's behalf. She needed only to provide the name of the criminal action terminated in her favor, its docket or indictment number, and her signature, and have the form notarized.

A telephone conference was held with the parties on October 5. The plaintiff was reminded of her responsibility to be diligent in the prosecution of the case. Following the conference, an Order of October 9 required plaintiff to provide a compliant release pursuant to New York Criminal Procedure Law § 160.50 by October 19 or submit a letter explaining why her efforts had been unsuccessful. The initial conference was rescheduled for December 7, and defendants were directed to answer the amended complaint by that date. The plaintiff finally produced the required release.

3. Delays in Conducting Discovery

At the initial conference on December 7, a schedule for the balance of the litigation was established, including a December 21, 2007 deadline for plaintiff to provide her medical releases to the defendants. Fact discovery was to close on June 27, 2008. Following expert discovery, a pretrial order or summary judgment motion was due on October 3, 2008.

About a month after the close of fact discovery, plaintiff's counsel wrote the Court on July 24, 2008 to request a 120–day extension (running from the date of the letter) of the fact discovery deadline.[FN5] She noted that defendant McDonald's consented to the extension, but that the City wanted the 120 days to run from the end of future settlement discussions, hoping to avoid the costs of discovery. Plaintiff also requested a conference to discuss outstanding discovery disputes and stated that the resolution of one of the disputes, involving the identities of officers at a New York City Police Department precinct, was likely to create the need for amendments to the complaint. Plaintiff explained that she had not yet amended her complaint to name any police officers because "[i]n order to avoid piecemeal, sequential amendments to the complaint, plaintiff has held off on amending the complaint until she can add all of the police officer defendants." The letter revealed that no depositions had been taken and that the plaintiff wanted to depose "several" police officers and some other witnesses, including an unknown number of McDonald's employees.

FN5. Weber had written a substantially similar letter on July 7, 2008 to the Magistrate Judge to whom the parties had been referred for settlement discussions.

A telephone conference with the parties was held on the record on July 31, 2008. At the conference, the delays and lack of diligence, especially on plaintiff's part, were

noted. Plaintiff had been warned about the possibility of dismissal for failure to prosecute ten months earlier, and the schedule set at the initial conference in December 2007 had been set to accommodate her needs. The parties had failed to have any settlement discussions before Magistrate Judge Dolinger, had not begun depositions, and did not mention any existing discovery disputes or request any extension of fact discovery until a month after they were supposed to have completed the process.

***4** The City noted that plaintiff had given only vague information regarding the visits to the precinct she made to attempt to file a complaint against the McDonald's employee. While the plaintiff had identified six or seven dates of visits to the precinct, she had given no names for the officers with whom she had spoken or even a general physical description of them, such as their gender, race, or height. The City explained that the assigned desk officer might not have been at the desk when plaintiff appeared at the precinct and that the plaintiff could not have a good-faith basis for naming an assigned desk officer as a defendant. Without descriptions from the plaintiff, the City was still not able to identify the officers with whom plaintiff may have interacted. Weber insisted that she was entitled to the names of the assigned desk officers in discovery and that their names were all she wanted to know.

Following the telephone conference, an Order of July 31, 2008 gave plaintiff five days to file an amended complaint "naming each of the police officers present at McDonald's restaurant on the date of the incident alleged." The Order also required the City to "identify the desk officers assigned at the times and dates specified by plaintiff" by August 29. Plaintiff was directed to amend her complaint further by September 5 to include any additional police officers, but warned that the complaint must be amended "consistent with [Weber's] obligations under Rule 11" and that "[t]here shall be no further amendment or joinder of additional parties after September 5, 2008." Additionally, the Order extended fact discovery to December 19 and set a March 27, 2009 due date for either a summary judgment motion or pretrial order.

4. The Second and Third Amended Complaints

Plaintiff amended her complaint for the second time on August 6, 2008, naming Officers Joseph Bonner, Dennis Morgano, Bryan Hanson, Jordan Bistany, and Sergeant Liz Salinas as defendants. She filed a Third Amended Complaint on September 5, adding Sergeants Michael McGovern, Christopher Newsom, Ralph Perfetto, John Adriano and Luigi Pagano. Neither the Second nor the Third Amended Complaints ties any of the ten officers to either the incident at McDonald's or the precinct where plaintiff alleges she was strip-searched and repeatedly denied the opportunity to file a complaint. The Third Amended Complaint lists all of the above individuals together in one paragraph and alleges that they were police officers. The allegations of wrongdoing found elsewhere in the complaint refer only to "defendant police officers," failing to identify any individual officer or even a group of officers, despite the fact that these officers were identified to plaintiff as present at either McDonald's or the precinct.

The filing of the Third Amended Complaint did not put an end to the disputes and delays. On August 18, the City wrote a letter stating that, while plaintiff had filed her Second Amended Complaint on August 6, she had not yet served the five individual defendants it named. The plaintiff was directed to serve the defendants named in the amended complaint by September 19, 2008.

***5** The City wrote again on September 23, representing that plaintiff had not properly served the defendants in compliance with Rule 4, Fed.R.Civ.P., because the delivered papers did not include a summons directed to each defendant. Instead, plaintiff had listed all of the individual City Defendants together on the summons and highlighted the name of the particular individual being served. Plaintiff refused to correct the defects in service and wrote a letter on September 24 contesting whether the Federal Rules require inserting each defendant's name into the "To:" section of a summons.

A telephone conference was held on the record on September 25 to discuss the parties' submissions. The conference opened with the Court noting the numerous delays that had thus far occurred. Both parties were heard on the summons issue. Following the conference, an Order of September 26 directed plaintiff to serve the individual

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

City Defendants by October 3 in accordance with Rule 4(a)(1)(B), Fed.R.Civ.P., which requires that a summons be "directed to" each defendant. Defendants were ordered to answer or otherwise respond by November 3.[FN6]

> FN6. Orders of October 24 and December 10 addressed the parties' disputes regarding access to the plaintiff's medical providers. *See Sforza v. City of New York,* No. 07 Civ. 6122(DLC), 2008 WL 4701313, at *3 (S.D.N.Y. Oct.24, 2008).

5. City Defendants' Motion to Dismiss or for Summary Judgment

On November 3, the City Defendants moved to dismiss or for summary judgment. A November 5 Order required plaintiff to oppose the motion by November 21 and the City Defendants to reply by December 5. Plaintiff wrote a letter on November 5, stating that she had "not yet had the opportunity to conduct any depositions whatsoever" and noting that "much of the paper discovery is still outstanding." She asked that the City be directed to withdraw its motion without prejudice for refiling at the close of discovery or that plaintiff be permitted to file her opposition papers at the close of discovery. In the alternative, she requested until December 5 to submit her opposition, stating that "[f]our weeks is the norm for opposition papers, and, as a solo practitioner with a very busy practice, I will need every minute of those four weeks." [FN7] City Defendants submitted a letter opposing plaintiff's requests. An Order of November 13 authorized plaintiff to file her opposition to the motion to dismiss by December 5, with City Defendants' reply due on December 19.

> FN7. In fact, Local Civil Rule 6.1(b) states that parties have ten business days to file opposition papers to most motions.

The parties next submitted a series of letters concerning various discovery disputes. On November 12, a letter was received from Weber listing ten discovery disputes and requesting a conference to address them. The requests concerned, *inter alia,* the City's refusal to provide information regarding whether the officers involved in the incident were using steroids, its insistence that any information regarding the individuals who had placed 911 calls regarding the incident at McDonald's must be accompanied by an attorneys'-eyes-only stipulation, as well as its refusal to provide various records and training documents relevant to the issue of municipal liability until after motion practice. Besides opposing the plaintiff's positions on these issues, the City requested a stay of depositions until its November 3 motion was resolved. At a December 2 conference held on the record, neither party objected to a stay of depositions pending resolution of City Defendants' motion. The parties were ordered to complete document discovery by December 19.

***6** Plaintiff submitted her opposition to the motion to dismiss or for summary judgment on December 5. That opposition included plaintiff's own declaration, which did not specifically identify any police officers. The motion was fully submitted on December 19.

DISCUSSION

The City Defendants' arguments that the Third Amended Complaint must be dismissed with respect to the claims brought against individual City Defendants will first be addressed, followed by analysis of claims against the City. A trial court considering a Rule 12(b)(6) motion must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 191 (2d Cir.2007). At the same time, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss." *Achtman v. Kirby, McInerney & Squire, LLP,* 464 F.3d 328, 337 (2d Cir.2006) (citation omitted).

A court considering a Rule 12(b)(6) motion applies a "flexible plausibility standard, which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Boykin v. KeyCorp,* 521 F.3d 202, 213 (2d Cir.2008) (citation omitted). "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient to raise a right to relief above the speculative level." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (citation omitted).

Under the pleading standard set forth in Rule 8(a)(2),

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

complaints must include a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). "[A] plaintiff is required only to give a defendant fair notice of what the claim is and the grounds upon which it rests." *Leibowitz v. Cornell Univ.,* 445 F.3d 586, 591 (2d Cir.2006). Rule 8 is fashioned in the interest of fair and reasonable notice, not technicality, and therefore is "not meant to impose a great burden upon a plaintiff." *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 347, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). No heightened or more specific pleading standard applies to claims brought under § 1983. *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); *Iqbal v. Hasty,* 490 F.3d 143, 153 (2d Cir.2007). § 1983 claims need not be plead with particularity, but may be averred generally. *Leatherman,* 507 U.S. at 168.

In *Wynder v. McMahon,* 360 F.3d 73 (2d Cir.2004), an employment discrimination claim also brought under § 1983, the court noted that "Rule 8 does not necessarily require ... that the complaint separate out claims against individual defendants." *Id.* at 80. Deciding that Wynder's complaint satisfied Rule 8, however, the court also noted that "each of the named defendants-appellees is explicitly tied to one or more of Wynder's allegations." *Id.* "[R]eading the complaint carefully, the individual defendants can discern which claims concern them and which do not." *Id.* The court ultimately found that plaintiff's complaint, which was "a model of neither clarity nor brevity," *id.* at 79, met the standard of Rule 8(a). The *Wynder* court noted, however, that a complaint which passed muster under Rule 8 might nonetheless be dismissed under Rule 12(b)(6) for failure to state a claim. Where "the complaint accuses *all* of the defendants of having violated *all* of the listed constitutional and statutory provisions," defendant may move to dismiss "those causes of action as to which no set of facts has been identified that support a claim against him." *Id.*

1. Claims Against Individual City Defendants

***7** 42 U.S.C. § 1983 provides in part that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

It is "well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) (citation omitted).

Sforza's pleading fails to allege personal involvement of any defendant in any of the actions which allegedly violated her rights. It does not attribute any of the actions giving rise to Sforza's allegations to any of the specific officers named, or to any group of the officers. Sforza offers no arguments explaining why she fails to identify any specific police officers or suggesting that the City failed to identify officers as present at either McDonald's or the precinct. Nor is it possible to infer from the list of police officers which ones were personally involved in which deprivations of Sforza's rights, whether it is the excessive use of force, an unlawful arrest, an abusive strip search, or a refusal to take a complaint.[FN8]

> FN8. Plaintiff's response in her opposition papers that the identity of the officers "is obvious" is not sufficient. It is not at all obvious from the statement in the complaint that "police officers" took certain actions against her which officers, and how many officers, should be held responsible for any of the enumerated violations of her rights.

The individual City Defendants have therefore not received fair notice regarding which of their actions gave rise to the claims upon which the complaint is based, because it is impossible to discern from the Third Amended Complaint why Sforza has named any of the police officers she lists as defendants. As such, the Third Amended Complaint fails to state a claim against any individual City Defendant and will be dismissed pursuant to Rules 8 and 12(b)(6), Fed.R.Civ.P.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Sforza has requested leave to amend her complaint to allege personal involvement in the event that the City Defendants' motion is granted on these grounds. The July 31, 2008 Order stated that Sforza would not be granted further leave to amend following her submission of the Third Amended Complaint.

Rule 16, Fed.R.Civ.P., governs leave to amend after a scheduling order has been entered. Rule 16 provides that a district court may enter a scheduling order that limits the time to amend the pleadings, and that "[a] schedule shall not be modified except upon a showing of good cause and by leave of the district judge." Fed.R.Civ.P. 16(b). Rule 16 "is designed to offer a measure of certainty in pretrial proceedings, ensuring that at some point both the parties and the pleadings will be fixed." *Parker v. Columbia Pictures Indus.,* 204 F.3d 326, 340 (2d Cir.2000) (citation omitted). Disregarding the instructions of a scheduling order "would undermine the court's ability to control its docket, disrupt the agreed-upon course of the litigation, and reward the indolent and the cavalier. Rule 16 was drafted to prevent this situation." *Id.* (citation omitted).

***8** "[A] district court does not abuse its discretion in denying leave to amend the pleadings after the deadline set in the scheduling order where the moving party has failed to establish good cause." *Id.* In determining whether a party has shown good cause, "the primary consideration" is whether the movant has been diligent. *Kassner v. 2nd Avenue Delicatessen Inc.,* 496 F.3d 229, 244 (2d Cir.2007). Another relevant factor is prejudice to the defendants. [FN9] *Id.* The Second Circuit has upheld the denial of a request seeking leave to amend under Rule 15 when the district court judge had earlier "expressly admonished the plaintiff, before the limitations period had expired, to discover the names of the individual officers and to amend his complaint to add them as defendants." *Soto v. Brooklyn Correctional Facility,* 80 F.3d 34, 37 (2d Cir.1996).

FN9. In addition to the burden placed on them by the plaintiff's neglect of her obligations to prosecute her claims diligently, the individual City Defendants contend that they have been prejudiced by the failure of the Third Amended Complaint to link them to specific unlawful acts. Specifically, they point out that they have been unable to craft the argument that they are entitled to receive qualified immunity from claims pressed in this lawsuit and to be dismissed as defendants. Given the plaintiff's lack of diligence it is unnecessary to reach this additional factor supporting dismissal.

Sforza has made no showing of diligence, nor has she attempted to do so. The City's correspondence, the conferences with the Court, and the Order of July 31, 2008 fully alerted her to the deficiencies in her pleading. Further, she had over a year from the initial filing of the complaint until the deadline set by the July 31 Order to craft an adequate pleading. *See Parker,* 204 F.3d at 340. The time for amendment having closed, further leave to amend shall not be granted.[FN10]

FN10. It is noteworthy that the plaintiff did not submit a proposed amended pleading with her opposition to the motion to dismiss demonstrating that she could cure the defects in her pleading while complying with the mandates of Rule 11, Fed.R.Civ.P.

Lest this seem an overly harsh result, it is worth pausing to note several examples of plaintiff's lack of diligence in pursuing amendment of the pleadings and discovery in this case. Plaintiff took over two months to return the release to the City, which required the barest of information and without which individual defendants could not be named, an answer could not be filed, and discovery could not begin. Plaintiff's counsel acknowledged in her September 26, 2007 letter that she had neglected to attend to Sforza's case properly, and her actions following the letter show similar signs of neglect.

The City included the identities of five police officers with its initial disclosures on December 7, 2007. Plaintiff did not attempt to amend her complaint for over eight months, until the Order of July 31, 2008 directed her to do so. Meanwhile, she conducted little, if any, fact discovery to attempt to learn information that would help her to meet her burden of proof, and did not contact Chambers to request an extension until a month after fact discovery should have been completed. Finally, after the extension

of fact discovery was granted, plaintiff waited over three months before noticing the depositions of the ten individual City Defendants, attempting to compress those ten depositions into a four-week timeframe (plaintiff was unavailable for one week of the remaining discovery period) that included the Thanksgiving holiday.

It is unfortunate that plaintiff's claims against the individual City Defendants will be dismissed before consideration of their merits. Plaintiff, however, had over a year to amend her pleading to state a claim against the individual City Defendants, was specifically directed to do so by the July 31 Order, and the issue was discussed with plaintiff's counsel in conferences before the Court on multiple occasions. She had an additional four months between the July 31 Order and the submission of her affidavit accompanying the opposition to the motion to dismiss, and still did not take that opportunity to identify any specific police officers. The pleading deficiencies were not the result of a single oversight, but rather the regrettable manifestation of a pattern of delay and neglect.

2. Municipal Liability

***9** Having dismissed Sforza's claims against the individual City Defendants, it is still necessary to consider defendants' arguments that claims against the City should be dismissed. Defendants assert that, because plaintiff cannot show that any individual City Defendant violated a constitutional right, her federal claims against the City must fail. City Defendants also state that Sforza's claims do not meet the municipal liability standards established in *Monell v. Department of Social Services.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), because she does not identify any policy, custom, or practice that violated her rights and impermissibly attempts to establish liability based on a single incident. Finally, the City argues that it is entitled to summary judgment on each of the claims. The City has shown that it is entitled to summary judgment on each of the plaintiff's claims except the claim for excessive force.

A municipality can be held liable pursuant to § 1983 only if its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell,* 436 U.S. at 694; *Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 128 (2d Cir.2004). A finding of municipal liability without finding a violation of constitutional rights by an individual is not permitted where 1) the municipal liability arises from the authorization of or a policy leading to the individual's alleged violation and 2) there is a finding that no individual violation occurred.[FN11] "[N]either *Monell v. New York City Dept. of Social Services,* nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm." *City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986). In *Heller,* a jury found that a police officer had not used excessive force (and therefore had not violated § 1983). *Id.* at 798. The Supreme Court held that the city could not be held liable under an alleged unconstitutional municipal policy of using excessive force during arrests. *Id.* at 799. The Court observed that "[i]f a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point." *Id.* (emphasis removed).

FN11. Despite the City's argument, "municipal liability for constitutional injuries may be found to exist even in the absence of individual liability, at least so long as the injuries complained of are not solely attributable to the actions of named individual defendants." *Barrett v. Orange County Human Rights Comm'n,* 194 F.3d 341, 350 (2d Cir.1999). In *Barrett,* the Second Circuit held that the Human Rights Commission could be liable for infringing Barrett's constitutional rights even though the most prominent members of the Commission, who were named as individual defendants, were found not to be liable. *Id.* The court reasoned that the Commission was a multi-member body whose decisions were made by a vote of all the members; therefore, its acts could be independent of two of its members and Barrett's alleged injuries were not solely attributable to the actions of the named defendants. *Id.*

Applying *Heller,* the Second Circuit has recognized that "a municipality cannot be liable for inadequate training or supervision when the officers involved in making an arrest did not violate the plaintiff's constitutional rights." *Curley v. Village of Suffern,* 268 F.3d 65, 71 (2d Cir.2001). *Curley,* like *Heller,* involved allegations that the conduct of specific individual police officers injured plaintiff, the complaint named all of those police officers as defendants, and there was "no question with respect to whether another officer violated plaintiff's rights for which the village might be liable." *Id.* The liability of the municipality for failure to train or properly supervise was therefore tied to the liability of the individual defendants. *Id.* As the jury had found no deprivation of plaintiff's rights with respect to the officers' alleged use of excessive force, the municipality could not be held liable, because it was "implicated in plaintiff's amended complaint only by way of the individual defendants' conduct." *Id.*

***10** More recently, the Second Circuit, citing *Heller,* declined to hold the City of New York liable under § 1983 because it found at the summary judgment stage that the individual police officer defendants had not violated the constitutional rights of a confidential informant whom they allegedly failed to protect from being assaulted by a drug dealer. *Matican v. City of New York,* 524 F.3d 151, 154 (2d Cir.2008). The police officers named as defendants were the three officers in whose sting operation plaintiff had assisted. *Id.* at 153. As in *Curley,* they were the entire group of officers who could have been responsible for the alleged violation of Matican's rights. Before finding that the individual officers had not violated plaintiff's right to substantive due process, the court framed the issue as follows, citing *Heller:* "[d]id the officers' actions violate Matican's constitutional rights? If they did not, then the City cannot be liable to Matican under § 1983, regardless of whether the officers acted pursuant to a municipal policy or custom." *Id.* (citation omitted).

Where claims against individual municipal defendants are dismissed without a finding on the merits, however, the *Monell* claim survives. For instance, the Second Circuit has held that granting an individual officer qualified immunity [FN12] does not dispose of the issue of municipal liability. *See* *Curley,* 268 F.3d at 71; *Prue v. City of Syracuse,* 26 F.3d 14, 19 (2d Cir.1994). The same is true here: where claims against the individual officers have been dismissed without reaching their merits, it is still possible for a jury to find a constitutional violation for which a municipality may, though its policies, practices, or customs, be liable.

> FN12. The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan,* ––– U.S. ––––, ––––, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009) (citation omitted).

Alternatively, the City argues that plaintiff has not stated a claim for *Monell* liability because she has not identified any policy, custom, or practice resulting in a violation of her rights, and her factual allegations describe only one incident purportedly involving wrongdoing, which is insufficient to support a *Monell* claim. The City relies on *Dwares v. City of New York,* 985 F.2d 94 (2d Cir.1993), which states that "[a] single incident alleged in a complaint, especially if it involved only actors below the policymaking level, generally will not suffice to raise an inference of the existence of a custom or policy." *Id.* at 100.

The plaintiff has adequately identified a municipal policy and practice for at least some of her claims. The Third Amended Complaint alleges that the

> customs, policies, usages, practices, procedures and rules of the City of New York and the New York City Police Department included, but were not limited to, *arresting and prosecuting individuals solely because they are transgender,* manufacturing false charges against such individuals, *using excessive force against such individuals, and allowing members of the opposite sex to search such individuals.*

***11** (Emphasis supplied).

The City's argument that plaintiff alleges only one incident in support of her *Monell* claim, and that one

incident is insufficient evidence of a City policy, is similarly unpersuasive. *Monell* liability may spring from a single violation, as long as the conduct causing the violation was undertaken pursuant to a City-wide custom, practice, or procedure. *See, e.g., DiSorbo v. Hoy,* 343 F.3d 172, 180–81 (2d Cir.2003) (city liable under *Monell* for excessive force in simultaneous arrest of two sisters); *Mandell v. County of Suffolk,* 316 F.3d 368, 385 (2d Cir.2003) (county held liable under *Monell* following the retaliatory discharge of an employee). *Dwares,* cited by the City, involved a complaint containing insufficient allegations of a custom or practice. *Dwares,* 985 F.2d at 97, 101. Plaintiff's *Monell* claim will therefore not be dismissed in its entirety on grounds that it either fails to allege a policy or is based entirely on single incidents.

A prerequisite to a *Monell* claim, of course, is a violation of plaintiff's constitutional rights. *Hartline v. Gallo,* 546 F.3d 95, 99–100 (2d Cir.2008). To address the City's motion, it is necessary to determine whether each of the § 1983 and § 1985 claims in the Third Amended Complaint 1) pleads a cause of action and 2) survives the summary judgment motion.

Sforza's opposition and November 5, 2008 letter to the court, discussed above, are peppered with assertions that a summary judgment motion is premature because discovery is not yet complete. Sforza has not, however, filed an affidavit pursuant to Rule 56(f) to explain that she cannot present facts in support of her opposition because of inadequate discovery.

"The nonmoving party must have had the opportunity to discover information that is essential to his opposition to the motion for summary judgment." *Hellstrom v. U.S. Dept. of Veterans Affairs,* 201 F.3d 94, 97 (2d Cir.2000) (citation omitted). "[S]ummary judgment is generally disfavored when the party opposing the motion has not obtained discovery." *Cable Science Corp. v. Rochdale Village, Inc.,* 920 F.2d 147, 152 (2d Cir.1990) (dicta). Rule 56(f), Fed.R.Civ.P., "sets forth a specific procedure by which a party lacking information necessary to oppose a summary judgment motion may seek further discovery." *Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc.,* 404 F.3d 566, 573 (2d Cir.2005) (per curiam).

> To request discovery under Rule 56(f), a party must file an affidavit describing: (1) what facts are sought and how they are to be obtained; (2) how these facts are reasonably expected to raise a genuine issue of material fact; (3) what efforts the affiant has made to obtain them; and (4) why the affiant's efforts were unsuccessful.

*Gualandi v. Adams,* 385 F.3d 236, 244 (2d Cir.2004). "The failure to file an affidavit under Rule 56(f) is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." *Di Benedetto v. Pan Am World Service, Inc.,* 359 F.3d 627, 630 (2d Cir.2004) (citation omitted). "A reference to Rule 56(f) and to the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for a Rule 56(f) affidavit." *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137 (2d Cir.1994). *See generally National Union Fire Ins. Co. of Pittsburgh, PA. v. Stroh Companies, Inc.,* 265 F.3d 97, 117 (2d Cir.2001) (requiring Rule 56(f) affidavit and denying request for additional discovery when party had several months to pursue discovery).

***12** Sforza may not, therefore, defeat the City's summary judgment motion by simply arguing that she requires more discovery. Even if it were appropriate to consider arguments presented solely in a memorandum, with a single possible exception, her memorandum has not focused her request for more discovery on the specific facts she needs, how she seeks to obtain them, and why they would make a difference.[FN13] Given that Sforza has had nearly a year for discovery, it would be especially important for her to indicate which arguments she can support with the discovery that has already occurred and which arguments will require depositions or other currently incomplete discovery for their support. To the extent, therefore, that a claim states a cause of action and the City has moved for summary judgment, the summary judgment motion shall be considered.

FN13. The single exception relates to her equal protection claim and her explanation that she needs to depose individual plaintiffs to discover their discriminatory motives.

Summary judgment may not be granted, however, unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the court must view all facts in the light most favorable to the non-moving party. *Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d 161, 169 (2d Cir.2006). When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" contained in the pleadings. Fed.R.Civ.P. 56(e); accord *Sista,* 445 F.3d at 169. That is, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Only disputes over material facts—facts that might affect the outcome of the suit under the governing law—will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Sforza asserts that the following claims constitute deprivations of her rights in violation of § 1983: false arrest, malicious prosecution, malicious abuse of process (in connection with her arrest); excessive force; failure to permit her to file charges against the McDonald's employee; violation of equal protection; and conspiracy to deprive Sforza of her constitutional rights (also brought under § 1985).[FN14] Her first claim, though, is for a general "Deprivation of Federal Civil Rights Under § 1983."

FN14. Sforza makes no explicit allegation of deliberate indifference to her medical needs, although the City's motion papers address this claim. Sforza notes in her opposition that her complaint does not include a cause of action for deprivation of medical care. Given this acknowledgment, the City's arguments on the issue of indifference to medical needs will not be considered.

3. "Deprivation of Federal Civil Rights"

Sforza's claim for "deprivation of federal civil rights" does not state of which rights she was deprived—only that the First, Fourth, Fifth, Eighth, and Fourteenth Amendments were involved—or provide any information on the deprivation she allegedly experienced. Defendants interpret this claim as possibly including claims for violations of procedural or substantive due process. Without any factual illumination of this claim, though, Sforza has failed to meet the Rule 12(b)(6) standard requiring her to "provide the grounds upon which [her] claim rests through factual allegations sufficient to raise a right to relief above the speculative level." *ATSI Commc'ns, Inc.,* 493 F.3d at 98. While plaintiff incorporates all of her factual allegations by reference into her "deprivation of civil rights" claim, the results of combining the myriad factual events described in the entirety of the complaint with the range of constitutional rights contained in this claim is that defendants do not have "fair notice of what the claim is and the grounds upon which it rests." *Leibowitz,* 445 F.3d at 591. Sforza's "deprivation of federal civil rights" claim will therefore be dismissed on Rule 8(a)(2) grounds.

4. False Arrest

***13** Sforza alleges that, when the police officers arrived on the scene at McDonald's, they refused to allow her to describe her confrontation with the manager and, relying on false statements given by a McDonald's employee that Sforza had attacked him, they falsely arrested and imprisoned her. The City moves for summary judgment on this claim, arguing that probable cause for Sforza's arrest existed, because the arresting officer was entitled to rely on the statements of the complaining witness, and that, in any event, the manager's statement was corroborated. In support of its argument, the City has submitted the complaint taken at McDonald's, in which the manager of McDonald's stated that Sforza did "strike [him] several times with a closed fist and kicked [him] in the legs," causing "bruising [and] swelling to [his] legs," as well as the arrest worksheet documenting the same. Plaintiff concedes that the McDonald's manager reported to police that plaintiff had assaulted him.

Allegations of unconstitutional false arrest are analyzed by "look[ing] to the law of the state in which the arrest occurred." *Jaegly v. Couch,* 439 F.3d 149, 151 (2d

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Cir.2006) (citation omitted). The elements of a claim for false arrest under New York law are that

> (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.

*Curry v. City of Syracuse,* 316 F.3d 324, 335 (2d Cir.2003) (citation omitted). A claim for false arrest or false imprisonment fails when the arresting officer had probable cause to make the arrest. *Jenkins v. City of New York,* 478 F.3d 76, 84 (2d Cir.2007).

The requirement of probable cause does not create a high bar for law enforcement. It exists where "the arresting officer has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *United States v. Delossantos,* 536 F.3d 155, 158 (2d Cir.2008) (citation omitted). "When information is received from a putative victim or an eyewitness, probable cause exists, unless the circumstances raise doubt as to the person's veracity." *Curley,* 268 F.3d at 70. Probable cause does not inquire into the arresting officers' subjective motivations, but rather asks "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them ." *Bryant v. City of New York,* 404 F.3d 128, 136 (2d Cir.2005) (citation omitted). "[ S] ummary judgment dismissing a plaintiff's false arrest claim is appropriate if the undisputed facts indicate that the arresting officer's probable cause determination was objectively reasonable." *Jenkins,* 478 F.3d at 88. A court deciding whether an arrest is reasonable "must examine the totality of the circumstances of a given arrest." *Delossantos,* 536 F.3d at 159. An officer is not "required to explore and eliminate every plausible claim of innocence before making an arrest." *Jaegly,* 439 F.3d at 153. "[A]n officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause." *Panetta v. Crowley,* 460 F.3d 388, 395–96 (2d Cir.2006).

***14** Plaintiff was arrested on suspicion of misdemeanor (third-degree) assault. A person is "guilty of assault in the third degree when: (1) with intent to cause physical injury to another person, he causes such injury to such person or to a third person ...." N.Y. Penal Law § 120.00. The statements of the McDonald's manager establish probable cause to arrest Sforza for assault, and Sforza has not offered evidence to raise a question of fact regarding that finding.

Sforza argues that the manager's statement was insufficient to establish probable cause for several reasons. Sforza first asserts that the manager's lack of injuries, contrasted with Sforza's condition ("bruised, bloodied, and missing teeth") contradicted the McDonald's employee's account of a fight instigated by Sforza. By not comparing the two parties' injuries, she argues, the police disregarded exculpatory evidence, negating a finding of probable cause. The possibility that both parties were injured may indicate the existence of probable cause to arrest the manager as well, but the manager's lack of severe injury does not indicate that no fight occurred or that the manager was not punched or kicked, and misdemeanor assault does not require serious physical injury. N.Y. Penal Law § 120.00. While Sforza contests whether the manager had any visible injuries at all, the arrest report and complaint show that the officers had the impression that he did. In any event, Sforza's own injuries and her belief that the manager was not injured do not constitute "plainly exculpatory evidence."

The Second Circuit case Sforza cites for the "plainly exculpatory evidence" exception to the establishment of probable cause by a complainant's statement is based on an Eighth Circuit case that listed "DNA evidence and a videotaped account of the crime that conclusively establish the suspect's innocence" as the kind of "plainly exculpatory" evidence negating a finding of probable cause. *Kuehl v. Burtis,* 173 F.3d 646, 650 (8th Cir.1999) (cited in *Panetta,* 460 F.3d at 395). That one participant in a fight is injured less than the other does not approach the "plainly exculpatory" level contemplated by *Kuehl.* Neither is the involvement of a witness in a confrontation enough to cast doubt on that witness's veracity and negate probable cause. *See Curley,* 268 F.3d at 69–70 (probable cause for plaintiff's arrest supported by testimony of witnesses involved in fight with plaintiff); *Ricciuti v. N.Y.C. Transit Authority,* 124 F.3d 123, 128 (2d Cir.1997)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

(probable cause supported by statement of witness identifying plaintiff as his assailant and witness's visible injuries, despite plaintiff's claims that he had acted in self-defense).

In addition, Sforza argues that on a motion for summary judgment "the Court must accept plaintiff's statement that she did not assault the manager in any way." The deference that her declaration of innocence receives at the summary judgment stage does not demonstrate a lack of probable cause for her arrest. Probable cause does not speak to the arrestee's ultimate guilt or innocence. While probable cause requires more than a "mere suspicion" of wrongdoing, its focus is on "probabilities," not "hard certainties." *Walcyk v. Rio,* 496 F.3d 139, 156 (2d Cir.2007) (citation omitted). The arresting officer need not be certain that the arrestee will be successfully prosecuted. *Curley,* 268 F.3d at 70; *see also* *Panetta,* 460 F.3d at 395 ("the fact that an innocent explanation may be consistent with the facts alleged does not negate probable cause"). Adopting Sforza's standard for false arrest, in which the innocence of the arrestee negates probable cause, would allow any person acquitted of a crime to bring charges for false arrest. Summary judgment is granted to the City on the false arrest claim.

5. Excessive Force

***15** Sforza has alleged excessive use of force during her arrest and detention. She claims that she was handcuffed too tightly, creating ongoing numbness in her hands, and that the police deliberately slammed her head twice into the roof of a police vehicle, causing bruises that remained for two months. Defendants assert that they are entitled to summary judgment because the medical records reflect injury only to plaintiff's left arm. They note that Sforza complained of pain to her arm and neck and did not report any head or wrist injuries or pain.

"[E]xcessive force claims must be analyzed under the rubric of the constitutional right that is most directly implicated by the facts giving rise to the claim." *Nimely v. City of New York,* 414 F.3d 381, 390 n. 7 (2d Cir.2005). Claims that law enforcement officers have used excessive force in the course of an arrest are analyzed "under the Fourth Amendment and its 'reasonableness' standard." *Kerman v. City of New York,* 261 F.3d 229, 238–39 (2d Cir.2001) (citation omitted). Police officers' application of force is excessive, in violation of the Fourth Amendment, if it is "objectively unreasonable in light of the facts and circumstances confronting them, without regard to the officers' underlying intent or motivation." *Jones v. Parmley,* 465 F.3d 46, 61 (2d Cir.2006) (citation omitted). Determining whether excessive force has occurred requires a court to weigh the "facts and circumstances of each particular case, including the crime committed, its severity, the threat of danger to the officer and society, and whether the suspect is resisting or attempting to evade arrest." *Id.* (citation omitted). A plaintiff need not demonstrate serious injury to prevail in an excessive force claim; bruising and other nonpermanent injuries are sufficient. *Maxwell v. City of New York,* 380 F.3d 106, 108 (2d Cir.2004); *Robison v. Via,* 821 F.2d 913, 924 (2d Cir.1987) ("If the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe").

The conflicting accounts of the amount of force used preclude entry of summary judgment. Granting summary judgment based on the hospital records would require that inferences be inappropriately drawn in the City's favor.

6. Malicious Prosecution

Defendants also seek summary judgment on the malicious prosecution claim. "To sustain a § 1983 claim of malicious prosecution, a plaintiff must demonstrate conduct by the defendant that is tortious under state law and that results in a constitutionally cognizable deprivation of liberty." *Kinzer v. Jackson,* 316 F.3d 139, 143 (2d Cir.2003). Put otherwise, a plaintiff must establish the elements of malicious prosecution under state law, and then show that her Fourth Amendment rights were violated after legal proceedings were initiated. *See* *Fulton v. Robinson,* 289 F.3d 188, 195 (2d Cir.2002) (citation omitted).

***16** In New York, a plaintiff bringing a malicious prosecution claim must show that a prosecution was initiated without probable cause to believe that it could succeed, that the prosecution was brought with malice, and that the prosecution terminated in plaintiff's favor. *Boyd v. City of New York,* 336 F.3d 72, 76 (2d Cir.2003). The existence of probable cause at the time of arrest may not

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

be sufficient to provide probable cause for a prosecution, as

> even when probable cause is present at the time of arrest, evidence could later surface which would eliminate that probable cause. In order for probable cause to dissipate, the groundless nature of the charge must be made apparent by the discovery of some intervening fact.

*Kinzer,* 316 F.3d at 144.

To show that her legal rights were violated after legal proceedings were initiated, plaintiff must show a seizure or other "perversion of proper legal procedures" implicating her rights under the Fourth Amendment. *Washington v. County of Rockland,* 373 F.3d 310, 316 (2d Cir.2004) (citation omitted). That deprivation must be "pursuant to legal process," as "[t]he essence of malicious prosecution is the perversion of proper legal procedures." *Singer v. Fulton County Sheriff,* 63 F.3d 110, 117 (2d Cir.1995) (citation omitted). Where the arrest was effected without a warrant, any post-arraignment deprivation of liberty constitutes the unlawful seizure. *See id.*

Sforza has offered no evidence that the probable cause that existed at the time of the arrest dissipated between the arrest and her prosecution. Without any evidence supporting the vitiation of probable cause, Sforza has raised no material issue of fact in support of her claim of malicious prosecution. Sforza has also submitted no evidence demonstrating malice or any post-arraignment deprivation of liberty. Summary judgment will be granted in the City's favor on this claim.

7. Malicious Abuse of Process

Defendants argue that Sforza has failed to present evidence supporting her claim for abuse of process. As with malicious prosecution, courts look to state law for the elements of a § 1983 claim based on the malicious abuse of process claim. *Cook v. Sheldon,* 41 F.3d 73, 80 (2d Cir.1994). New York recognizes a malicious abuse of process claim against "a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." [FN15] *Savino v. City of New York,* 331 F.3d 63, 76 (2d Cir.2003) (citation omitted). In addition, a plaintiff bringing an abuse of process claim must allege actual or special damages. *Bd. of Educ. v. Farmingdale Classroom Teachers Ass'n,* 38 N.Y.2d 397, 405, 380 N.Y.S.2d 635, 343 N.E.2d 278 (1975). "[L]egal process means that a court issued the process, and the plaintiff will be penalized if he violates it," such as an arraignment. *Cook,* 41 F.3d at 80 (citation omitted). *See also Shain v. Ellison,* 273 F.3d 56, 68 (2d Cir.2001).

> FN15. The City states that "it is unsettled in this Circuit whether abuse of process under state law is even the basis for a § 1983 claim," citing a civil commitment case, *Olivier v. Robert L. Yeager Mental Health Ctr.,* 398 F.3d 184, 189 n. 4 (2d Cir.2005). Numerous decisions in this Circuit have addressed § 1983 claims premised on abuse of *criminal* process. *See, e.g., Savino v. City of New York,* 331 F.3d 63, 76 (2d Cir.2003); *Shain v. Ellison,* 273 F.3d 56, 68 (2d Cir.2001).

***17** While a lack of probable cause is not explicitly an element of an abuse of process claim, the presence of probable cause negates a claim for abuse of process, particularly the second element. *See Rosen v. Hanrahan,* 2 A.D.3d 352, 768 N.Y.S.2d 818, 819 (1st Dep't 2003); *Berman v. Silver, Forrester & Schisano,* 156 A.D.2d 624, 549 N.Y.S.2d 125, 127 (2d Dep't 1989). Conversely, the lack of probable cause gives rise to an inference of malice, supporting a finding of "intent to harm." *Id.* at 126.

The "collateral objective" requirement, in turn, means that defendants must have an improper purpose or objective in instigating the action beyond the plaintiff's criminal prosecution; that defendants had an improper motive is not enough. *Savino,* 331 F.3d at 77. "A malicious motive alone does not give rise to a cause of action for abuse of process." *Id.* (citing *Curiano v. Suozzi,* 63 N.Y.2d 113, 117, 480 N.Y.S.2d 466, 469 N.E.2d 1324 (1984)). "[T]he basis of the tort lies in the use of the process to gain a collateral objective, the accomplishment of which the process in question was not intended to secure." *Pagliarulo v. Pagliarulo,* 30 A.D.2d 840, 293 N.Y.S.2d 13, 15 (2d Dep't 1968).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Sforza's abuse-of-process claim fails on multiple grounds. Her opposition to the City's motion does not attempt to address the point that her claim, based on a warrantless arrest, does not involve legal process. Moreover, Sforza has not demonstrated a collateral objective.[FN16] Summary judgment is therefore granted for defendants on the abuse of process claim.

FN16. Sforza argues that improper motive satisfies the collateral objective requirement. *Savino* clearly states the opposite. *Savino,* 331 F.3d at 77.

8. Violation of Equal Protection

The City submits that Sforza has failed to allege facts that would state a claim for a violation of the Equal Protection Clause of the Fourteenth Amendment to the Constitution, and moves dismissal of, rather than summary judgment on, the equal protection claim.[FN17] "The Equal Protection Clause requires that the government treat all similarly situated people alike." *Neilson v. D'Angelis,* 409 F.3d 100, 104 (2d Cir.2005) (citation omitted) (overruled on other grounds, *Appel v. Spiridon,* 531 F.3d 138, 140 (2d Cir.2008)). To prove a violation of the Equal Protection Clause, a plaintiff must demonstrate that she was treated differently "than others similarly situated as a result of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) (citation omitted). As the claims against the individual City Defendants shall be dismissed, Sforza's § 1983 claims are being considered here only to the extent that they give rise to *Monell* liability against the City, which requires that the conduct causing Sforza's injury be pursuant to "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell,* 436 U.S. at 694.

FN17. In its reply memorandum, the City shifts its focus to argue as if it has sought summary judgment on Sforza's equal protection claim, stating that Sforza has not demonstrated or proven differential treatment. Summary judgment arguments with regard to the equal protection claim will not be considered.

Sforza alleges that her right to equal protection of the laws was violated because, while individuals who are not transgender are permitted to file criminal complaints after they have been attacked, officers at the precinct did not allow Sforza to file a complaint against the McDonald's manager after her release from custody.[FN18] Her allegations concerning "policy or custom," meanwhile, identify "arresting and prosecuting individuals solely because they are transgender, manufacturing false charges against such individuals, using excessive force against such individuals, and allowing members of the opposite sex to search such individuals."

FN18. Sforza makes other allegations elsewhere in the complaint that implicate differential treatment based on her transgender status, but limits her equal protection claim to her attempts to file a complaint at the precinct. Her failure to name any of the officers with whom she interacted during her arrest, strip-search, detention, precinct visits, and prosecution makes it impossible to say whether these allegations concern any of the same officers. Sforza's opposition also disingenuously represents additional facts not in the complaint as facts alleged in support of her equal protection claim. These additional allegations will not be considered.

***18** Sforza has not alleged any policy or custom encouraging officers to reject transgender individuals' attempts to file complaints. Because her equal protection claim is premised on the precinct officers' rejection of her complaints, and she does not allege that the rejections occurred pursuant to municipal policy or custom, she has failed to state a claim against the City for violation of her right to equal protection.

9. Conspiracy

Sforza's final basis for § 1983 liability is a claim that all defendants conspired to deprive her of her constitutional rights and participated in overt acts in furtherance of the conspiracy by falsely arresting and maliciously prosecuting her. Among other arguments, defendants urge that plaintiff's conspiracy claims be

rejected (ostensibly on summary judgment grounds) because she has not proven any underlying violations of § 1983 that were the object of the conspiracy. Characterizing Sforza's conspiracy allegations as conclusory, they also seek to have them dismissed on this ground. Sforza also brings conspiracy claims against all defendants under § 1985, alleging the same facts.

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999). A conspiracy claim under § 1985, meanwhile, requires a showing of

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. A § 1985(3) conspiracy must also be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action.

*Cine SK8, Inc. v. Town of Henrietta,* 507 F.3d 778, 791 (2d Cir.2007) (citation omitted). A municipality may be held liable under § 1985 if it is involved in the conspiracy or if the aim of the conspiracy is to "influence the activity of" the municipality. *LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 427 (2d Cir.1997).

Sforza alleges malicious prosecution and false arrest as the underlying conspiratorial acts. As explained earlier in this Opinion, she has not raised an issue of fact with regard to either. She consequently fails to raise a genuine issue regarding the existence of any overt acts conducted in furtherance of the alleged conspiracies. Summary judgment is therefore granted in the City's favor on both conspiracy claims.

10. State Law Claims

Sforza's remaining claims thus include one federal claim for municipal liability based on the alleged use of excessive force against Sforza and twelve state-law claims. Two of those claims, alleging violations of New York's Human Rights Law, N.Y. Exec. L. §§ 292 and 296, and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8–107(1)(a) and 8–603(a), are brought against all defendants (the "Human Rights Claims"). Sforza brings her remaining ten state-law claims against McDonald's and its employees only. The City Defendants ask that the Court dismiss the Human Rights Claims brought against the City, or, in the alternative, that it decline to exercise supplemental jurisdiction over these claims.

***19** The Human Rights Claims accuse all defendants of violating provisions forbidding discrimination in public accommodations based on sexual orientation, as well as harassment and violence motivated by a victim's gender or sexual orientation. Sforza incorporates all of her factual allegations into each claim, which otherwise include only a recitation of the legal standard. Assuming that the public accommodation is the McDonald's Restaurant, it is impossible to discern which acts allegedly constituted the illegal discrimination, harassment, or violence, and whether each act in question was committed by McDonald's employees, individual City Defendants, or both. These conclusory allegations do not give the City fair notice of the basis for these two claims, and fail to meet the Rule 8(a) (2) pleading standard. They are therefore dismissed.

CONCLUSION

The City Defendants' November 3, 2008 motion to dismiss and for summary judgment against plaintiff's § 1983 and § 1985 claims is granted, except that it is denied with regard to plaintiff's claim for municipal liability based on the use of excessive force in violation of § 1983. Plaintiff's state law claims for relief under the New York Human Rights Law and New York Administrative Code are dismissed against the City Defendants.

A conference will be held with the parties to disucss the schedule for the remainder of the litigation and the issue of supplemental jurisdiction over the remaining state-law claims.

SO ORDERED:

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

S.D.N.Y.,2009.

Sforza v. City of New York
Not Reported in F.Supp.2d, 2009 WL 857496 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.





C

Only the Westlaw citation is currently available.

United States District Court,

D. Connecticut.

Orlando VASQUEZ, Plaintiff,

v.

CITY OF BRIDGEPORT, Defendant.

No. 3:07CV01865(DJS).

Aug. 3, 2009.

John R. Williams, Joseph M. Merly, Williams & Pattis, New Haven, CT, for Plaintiff.

Betsy Edwards, City of Bridgeport, Bridgeport, CT, John Patrick Bohannon, Jr., Fairfield, CT, for Defendant.

***MEMORANDUM OF DECISION AND ORDER***

DOMINIC J. SQUATRITO, District Judge.

***1** The plaintiff, Orlando Vasquez ("the Plaintiff") brings this action pursuant to 42 U.S.C. § 1983 and § 1988 against the defendant, the City of Bridgeport ("the Defendant"), alleging that the Defendant denied the Plaintiff access to the courts in violation of the First Amendment to the U.S. Constitution. The Plaintiff also alleges that the Defendant committed the state law tort of spoliation of evidence. The Defendant now moves for summary judgment on the First Amendment claim, and argues that if summary judgment is granted on First Amendment claim, the Court should not exercise jurisdiction over the state law claim. For the reasons that hereafter follow, the Defendant's motion for summary judgment on the First Amendment claim (**dkt.# 24**) is **GRANTED,** and the state law claim is **DISMISSED without prejudice to the Plaintiff bringing that claim in state court.**

**I. FACTS**

As seen from the parties' Local Rule Statements of Fact, the facts of this case are relatively brief and mostly undisputed. On October 22, 2003, in the City of Bridgeport, officers of the Bridgeport Police Department fired their weapons at the Plaintiff while in pursuit of another individual, Richard Daniels, who was eventually arrested. As a result of the incident, the Plaintiff wanted to file a Fourth Amendment civil rights lawsuit against the police officers.

The Plaintiff maintains that he made two separate attempts to ascertain the identities of the officers involved in the incident. The first attempt, the occurrence of which the Defendant does not admit, occurred sometime after the incident but before March 31, 2005. According to the Plaintiff, he visited the headquarters of the Bridgeport Police Department and spoke with a desk officer, who told him there was no record of the incident.

The second attempt, the occurrence of which the Defendant does admit, was a letter dated March 31, 2005 that the Plaintiff, though counsel, sent to the Chief of Police asking for records associated with the incident. Neither the Plaintiff nor his counsel received any verbal or written response to this letter. Nonetheless, neither the Plaintiff nor his counsel followed-up with any further requests for records, nor did they attempt to contact any representative of the City of Bridgeport after March 31, 2005.

**II. DISCUSSION**

The Plaintiff alleges that the Defendant violated the First Amendment by denying him access to the courts, and committed the state law tort of spoliation of evidence. The Defendant now moves for summary judgment on the denial of access to the courts claim. The Defendant also argues that if summary judgment is granted on the denial of access to the courts claim, then this Court no longer has jurisdiction over the state tort of spoliation of evidence. The Plaintiff refutes all of the Defendant's arguments, arguing that the Defendant is not entitled to summary judgment. The Court shall discuss the parties arguments seriatim.

A. SUMMARY JUDGMENT STANDARD

***2** A motion for summary judgment may be granted

"if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.' " *Am. Int'l Group, Inc. v. London Am. Int'l Corp.,* 664 F.2d 348, 351 (2d Cir.1981) (quoting *Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1319–20 (2d Cir.1975)).

A dispute concerning a material fact is genuine " 'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.1992) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). The Court must view all inferences and ambiguities in a light most favorable to the nonmoving party. *See Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Id.*

B. FIRST AMENDMENT DENIAL OF ACCESS TO THE COURTS

The First Amendment provides that "Congress shall make no law ... abridging ... the right of the people ... to petition the Government for a redress of grievances." U.S. Const. amend. I. "The right to petition, which has been recognized as one of the most precious of the liberties safeguarded by the Bill of Rights, ... extends to all departments of the Government, including the courts...." *City of New York v. Beretta U.S.A. Corp.,* 524 F.3d 384, 397 (2d Cir.2008) (internal citations and quotation marks omitted).

To prevail on a claim of denial of access to the courts, a plaintiff must first identify a "nonfrivolous," "arguable" underlying claim upon which relief could be granted. *Christopher v. Harbury,* 536 U.S. 403, 415–16 (2002) (requiring that the predicate claim "be described well enough to apply the 'nonfrivolous' test and to show that the 'arguable' nature of the underlying claim is more than hope"). "In order to establish a violation of a right of access to courts, a plaintiff must demonstrate that a defendant caused actual injury, ... *i.e.,* took or was responsible for actions that hindered [a plaintiff's] efforts to pursue a legal claim...." *Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997) (internal citations and quotation marks omitted). "The essence of a denial of access claim is that a plaintiff must have effectively lost (or was severely hampered in) the ability to file a lawsuit, typically by egregious or systemic violations of due process." *Pontervio v. Kaye,* No. 06 Civ. 6289(HB),2007 WL 141053, at *9 (S.D.N.Y. Jan. 22, 2007), *aff'd,* No. 07–4300–cv, 2009 WL 1024666 (2d Cir. April 16, 2009).

***3** The Plaintiff claims that the Defendant violated his constitutional right of access to the courts when he visited the headquarters of the Bridgeport Police Department and was told by the desk officer that there was no record of the incident in question, and when he received no reply to his letter dated March 31, 2005. The Plaintiff argues that without the police officers' names, he had no good faith basis to sue the entirety of the evening shift of the police department that night, nor could he have sued the Defendant itself under 42 U.S.C. § 1983 [FN1] because the Defendant is a municipality. Thus, he argues, he was effectively barred him from bringing suit, and the Defendant's actions denied him access to the courts.[FN2]

FN1. Title 42, Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983. "[Section] 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal

rights elsewhere conferred.' " *Graham v. Connor,* 490 U .S. 386, 393–94 (1989) (citing *Baker v. McCollan,* 443 U.S. 137, 144, n. 3 (1979)). "To prevail on a § 1983 claim, a plaintiff must establish that a person acting under color of state law deprived him of a federal right." *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999).

FN2. For the purpose of this analysis, the Court shall assume, as the Defendant has done, that the Plaintiff has pled a legally sufficient underlying claim under the Fourth Amendment.

The Court begins by touching upon the Plaintiff's argument that he could not have brought a constitutional § 1983 claim against the Defendant because the Defendant is a municipality. This is an odd argument for the Plaintiff to make because he has done this very thing in this case. The Plaintiff's First Amendment claim is brought pursuant to § 1983, yet he sued only the Defendant, not any individual officers or officials from the City of Bridgeport. He offers no explanation as to why he could bring a First Amendment claim pursuant to § 1983 directly against the Defendant, but could not bring a Fourth Amendment claim pursuant to § 1983 directly against the Defendant.

In fact, the Plaintiff's First Amendment claim is unsustainable. "[M]unicipalities [are] liable under § 1983 to be sued as 'persons' within the meaning of that statute, when the alleged unlawful action implemented or was executed pursuant to a governmental policy or custom." *Reynolds v. Giuliani,* 506 F.3d 183, 190 (2d Cir.2007) (citing *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 691, 694 (1978)). "In order to prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy [or custom] of the municipality caused the constitutional injury." *Roe v. City of Waterbury,* 542 F.3d 31, 36 (2d Cir.2008) (citing *Monell,* 436 U.S. at 690–91). "The fifth element—the 'official policy' element—can only be satisfied where a plaintiff proves that a 'municipal policy of some nature caused a constitutional tort.' " *Id.* (quoting *Monell,* 436 U.S. at 691). "[A] municipality may not be found liable simply because one of its employees committed a tort .... [and] a municipality cannot be made liable under § 1983 for acts of its employees by application of the doctrine of respondeat superior." *Id.* (internal citation and quotation marks omitted).

Here, the Plaintiff has not named any individuals as defendants. Thus, the Court assumes he is asserting that the Defendant can be liable for an alleged constitutional violation even in the absence of some individual liability. Although "a municipality may be found liable under § 1983 even in the absence of individual liability[,]" *Barrett v. Orange County Human Rights Comm'n,* 194 F.3d 341, 350 (2d Cir.1999), this is true "only in very special circumstances[,] *Rutigliano v. City of New York,* No. 08–0531–cv, 2009 WL 1174657, at *3 (2d Cir. May 01, 2009). "The rule ... articulated in *Barrett* applies where 'the combined acts or omissions of several employees acting under a governmental policy or custom may violate those rights.' " *Rutigliano,* 2009 WL 1174657, at *3 (quoting *Barrett,* 194 F.3d at 350).

***4** The Plaintiff presents no evidence or argument, nor did he even plead in his complaint, that the combined acts or omissions of several employees acting under a governmental policy or custom violated his First Amendment right. Without pleading this "special circumstance," the Plaintiff cannot sustain a § 1983 claim against only the Defendant; he must show some individual liability. Indeed, the Plaintiff could have named individual defendants in this case. At a minimum, he could have named the Chief of Police, or even possibly the above-reference desk officer with whom he spoke. He did neither. The Court does not see how the Plaintiff can maintain his § 1983 First Amendment claim against the Defendant without proving any individual liability.

In addition, the Plaintiff has provided no evidence that the Defendant had an official custom, policy, or practice that caused the alleged constitutional violation. Showing such a custom, policy, or practice is the *sine qua non* of a plausible *Monell* claim against a municipality under § 1983. Absent any evidence of a custom, policy, or practice that caused the alleged constitutional violation, the Plaintiff's First Amendment claim against the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Defendant fails.

Moreover, even if the Plaintiff's First Amendment claim did not fail for the above reasons, he would still have to prove that the Defendant "severely hampered" his efforts to bring the underlying Fourth Amendment claim. Some courts have taken this to mean that a plaintiff must have been "completely foreclosed" in his ability to bring the underlying claim. *See Broudy v. Mather,* 460 F.3d 106, 120–21 (D.C.Cir.2006). Regardless of whether the Court uses a "severely hampered" standard or a "completely foreclosed" standard, the Plaintiff's claim fails.

The Plaintiff argues that the unanswered March 31, 2005 letter to the Bridgeport Police Department, and the visit to the Bridgeport Police Department, where the desk officer told him there was no record of the incident, prevented him from being able to bring a lawsuit because he was not able to obtain the relevant officer's names. The Supreme Court, however, has noted that, "Federal Rule of Civil Procedure 8(a)(2) requires only a short and plaint statement of the claim showing that the pleader is entitled to relief. Specific facts are not necessary; the statement need only give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Erickson v. Pardus,* 551 U.S. 89, 93 (2007) (internal quotation marks omitted). "[A] complaint need not contain detailed factual allegations-such as the dates of misconduct and the names of 'each and every individual' involved in the misconduct...." *Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 192 (2008).

The inability to name defendants prior to the filing of a complaint is not a novel issue. In situations where plaintiffs do not know and cannot determine the names of individual defendants, the well-known standard practice is to file a claim against either John and/or Jane Doe defendants. *See Feliciano v. County of Suffolk,* 419 F.Supp.2d 302, 313 (E.D.N.Y.2005) ("While it is true that, as a general rule, the use of 'John Doe' to identify a defendant is not favored, courts have recognized that situations arise in which the identity of alleged defendants may not be known prior to the filing of a complaint. In such situations, the plaintiff should have an opportunity to pursue discovery ... to identify the unknown defendants.") (internal quotation marks omitted); *see also Valentin v. Dinkins,* 121 F.3d 72, 75–76 (2d Cir.1997); *Gillespie v. Civiletti,* 629 F.2d 637, 642 (9th Cir.1980). The Court sees no reason why the Plaintiff could not have filed a Fourth Amendment lawsuit against the City of Bridgeport and John Doe/Jane Doe police officers.

***5** Moreover, after a complaint is filed, the plaintiff has an opportunity to issue subpoenas to determine the identity of unknown defendants. The Plaintiff's contention that "one cannot sue the air," while true, is not relevant in this situation. Although a plaintiff may not subpoena the identity of unknown defendants if the underlying complaint is legally insufficient and subject to dismissal, *see Sony Music Entm't Inc. v. Does 1–40,* 326 F.Supp.2d. 556, 564–65 (S.D.N.Y.2004); *Columbia Ins. Co. v. seescandy.com,* 185 F.R.D. 573, 579 (N.D.Cal.1999), this is not the situation here. There is no indication that the Plaintiff could not have issued subpoenas for his Fourth Amendment claim because that claim was legally insufficient and subject to a motion to dismiss. If the Plaintiff were to say otherwise, he would essentially be admitting that his Fourth Amendment claim lacked merit. The Court discerns no reason why the Plaintiff could not have sued John Doe/Jane Doe police officers and then later subpoena the identities of those unknown officers. Therefore, the Court finds that the Plaintiff did not effectively lose, nor was he severely hampered in, the ability to file a Fourth Amendment lawsuit. Consequently, with regard to the Plaintiff's First Amendment claim, the motion for summary judgment is granted.

C. STATE LAW CLAIM

The Defendant next argues that if the Court grants summary judgment on the First Amendment claim, it should dismiss the Plaintiff's state law claim of spoliation of evidence. The Court points out that when all of a plaintiff's federal claims have been dismissed, it can decline to exercise supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(c) if it determines that exercising supplemental jurisdiction would not promote economy, convenience, fairness, and comity. *See Itar–Tass Russian News Agency v. Russian Kurier, Inc.,* 140 F.3d 442, 446 (2d Cir.1998). "Certainly, if the federal claims are dismissed before trial, even though not

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *Castellano v. Bd. Of Trs. Of the Police Officers' Variable Supplements Fund,* 937 F.2d 752, 758 (2d Cir.1991) (quoting *United Mine Workers v. Gibbs,* 383 U.S. 715, 726 (1966)). "If it appears that the federal claims ... could be disposed of on a motion for summary judgment under F.R.Civ.P. 56, the court should refrain from exercising pendent jurisdiction absent exceptional circumstances." *Kavit v. A.L. Stamm & Co.,* 491 F.2d 1176, 1180 (2d Cir.1974).

Since the federal claim of denial of access to the courts has been dismissed, this Court declines to exercise jurisdiction over the state law claim. The state law claim of spoilation of evidence is hereby **DISMISSED without prejudice to the Plaintiff bringing that claim in state court.**

## III. CONCLUSION

For the foregoing reasons:

(1) the Defendant's motion for summary judgment (**dkt.# 24**) is **GRANTED.** ***Judgment in favor of the Defendant, the City of Bridgeport, shall enter on the First Amendment claim of denial of access to the courts;***

***6** (2) the Court declines to exercise jurisdiction over the remaining state law claim. **Thus, the state law claim of spoliation of evidence is hereby DISMISSED without prejudice to the Plaintiff bringing that claim in state court;** and

(3) because the Court did not rely upon the Affidavit of Attorney Howlett in rendering this decision, the Plaintiff's motion to strike (**dkt.# 27**) is **DENIED as moot.**

The clerk shall close this file.

SO ORDERED.

D.Conn.,2009.

Vasquez v. City Of Bridgeport
Not Reported in F.Supp.2d, 2009 WL 2372166 (D.Conn.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.





Only the Westlaw citation is currently available.
United States District Court,

E.D. New York.
Jasper L. DOCKERY, Plaintiff,
v.
Nathan TUCKER, et al., Defendants.
No. 97-CV-3584 (ARR).

Sept. 6, 2006.

Jasper Lloyd Dockery, Atlanta, GA, pro se.

Gail A. Matthews, United States Attorneys Office, Brooklyn, NY, for Nathan Tucker.

E. David Woycik, Sanders Sanders & Block, P.C., Mineola, NY, for Defendants.

***REPORT AND RECOMMENDATION***

ROANNE L. MANN, United States Magistrate Judge.

***1** Currently pending before this Court, on a referral from the Honorable Allyne R. Ross, are two sets of defense motions to dismiss or for summary judgment with respect to the Third Amended Complaint ("3d Am. Compl.") of *pro se* plaintiff Jasper Dockery ("Dockery" or "plaintiff"). One set of motions was filed by Special Agent Nathan Tucker ("Tucker"), and the other by defendants the District of Columbia ("the District"), Pamela Reed ("Reed"), Phineas Young ("Young"), Alan Dreher ("Dreher"), and Larry Soulsby ("Soulsby") (collectively, "the D.C. defendants"). Plaintiff has cross-moved for summary judgment on all claims against both sets of defendants. For the reasons detailed below, this Court recommends that defendants' motions be granted in part and denied in part, and that plaintiff's cross-motions for summary judgment be denied in their entirety.

***PROCEDURAL HISTORY***

The present action arises out of two attempts by various law enforcement officers to arrest plaintiff and return him to the District of Columbia to face criminal charges. According to allegations in plaintiff's original complaint ("Orig.Compl."), on February 6, 1996, Special Agent Tucker of the Federal Bureau of Investigation ("FBI"), and Detectives Reed and Young of the Washington, D.C. Metropolitan Police Department ("D.C.Police"), wielding high powered guns and accompanied by dogs, "invaded plaintiff's family's [apartment] building" at 2127 Pitkin Avenue, Brooklyn, New York ("the Premises"), without announcing their presence, demanding admission, or presenting a warrant. Orig. Compl. ¶¶ IV(1-3). In the process of arresting plaintiff, the agent and officers allegedly cut padlocks off the door to the downstairs grocery store, broke down the building's main door with a sledgehammer, shot a dog with a tranquilizer gun, and broke into plaintiff's grocery store and apartment, as well as the apartments of three neighboring tenants. *Id.* ¶¶ IV(1-2). Plaintiff also claimed, among other things, that his arrest was false and "pretextual," *id.* ¶ IV(2, 4), and that, as a result of defendants' actions, he sustained property damage and loss of income and liberty, and his family suffered psychological damage. *Id.* ¶¶ IV(1-2, 4, 9). Plaintiff demanded damages in the amount of $5,000,000, plus $800 per day of his confinement. *Id.* ¶ IV(12).

After defendants Reed and Young filed answers and Tucker and several other defendants (since dismissed from the case) filed dispositive motions, plaintiff moved for leave to amend his original complaint. The first amended complaint ("1st Am. Compl." [# 21] ) FN1 concerned an earlier incident that took place on October 23, 1995, also at the Premises.FN2 That pleading alleged that during the earlier search, defendants Tucker, Reed, Young, and John Doe defendants-unnamed FBI agents, D.C. detectives, and police officers with the New York City Police Department ("NYPD")-engaged in an illegal search of the Premises. *See id.* ¶¶ 4-17. In particular, plaintiff asserted that the defendants: (1) searched the grocery store, plaintiff's apartment, and the other apartments in the Premises, from which assorted items were later found to be missing, *see id.* ¶¶ 9-16; (2) broke down doors, cut padlocks, and severely damaged walls, ceilings, electrical wiring, and plumbing throughout the Premises, *see id.;* (3) "set a

police attac[k] dog loose" in plaintiff's apartment, terrorizing plaintiff's family, *see id.* ¶ 11; (4) forced plaintiff's family out of their apartment during a four-hour search, *see id.* ¶ 13; (5) tear-gassed the property, *see id.* ¶ 17; and (6) intentionally left the Premises unsecured upon their departure, *see id. ad damnum* clause. Charging defendants with having perpetrated an illegal search (in violation of the Fourth Amendment), and having deprived plaintiff of his personal property without due process of law (in violation of the Fifth and Fourteenth Amendments), *see id.* ¶¶ 18-19, plaintiff sought, in his first amended complaint, a declaratory judgment, as well as $73,490 in property damage, $80,000 in damages from each defendant for his daughter's emotional distress, and $280,000 in punitive damages from each defendant. *See id. ad damnum* clause.

FN1. For clarity, court filings will be identified in this opinion by their corresponding numbers on the docket sheet. Where the parties have not paginated their submissions, citations will be to the page numbers assigned through Electronic Case Filing.

FN2. The first amended complaint vaguely asserted that the search occurred from "October through November of 1995." 1st Am. Compl. ¶¶ 3-10. The specific date-October 23, 1995-emerged in discovery and plaintiff has included that date in his third amended complaint ("3d Am. Compl." [# 154] ). *See* 3d Am. Compl. at 4-7; Transcript of 8/18/99 Deposition Testimony of Jasper Dockery ("Dockery Dep.") at 64-65 (submitted as Exhibit E to Declaration of Assistant U.S. Attorney Gail A. Matthews in Support of Agent Tucker's Motion to Dismiss or for Summary Judgment on All Claims in the Third Amended Complaint ("Matthews Decl." [# 219] ).

***2** On September 24, 1998, Judge Ross dismissed most of plaintiff's claims from the original complaint, including the false imprisonment and false arrest claims against Tucker, Reed, and Young. *See* 9/24/98 Opinion & Order [of Judge Allyne R. Ross] ("9/24/98 Op." [# 44] ) at 31-32. She also granted Tucker's motion for summary judgment on all claims against him. *See id.* at 32. Accordingly, "[t]he only remaining claims [from] plaintiff's original complaint are his Fourth Amendment claims against Detectives Reed and Young." *See id.* FN3

FN3. Plaintiff's three amended complaints added claims relating to the October 1995 search but did not replead the Fourth Amendment claims asserted in his original complaint and arising out of the February 1996 search. In allowing plaintiff to file his third amended complaint, the Court directed plaintiff to specify whether he still wished to pursue the only outstanding claim from his original complaint-his Fourth Amendment claim against Reed and Young for the 1996 search. 4/28/05 Memorandum and Order ("4/28/05 M & O" [# 207] ) at 15-16. On May 14, 2005, plaintiff wrote the Court requesting that this claim be considered in conjunction with his third amended complaint. *See* Notice to Court to Keep Claims against Reed and Young Active [# 221]. Accordingly, contrary to the D.C. defendants' assumption (*see* Memorandum of Law of Defendants District of Columbia, Pamela Reed, Phineas Young, Larry Soulsby and Alan Dreher in Support of their Motion to Dismiss or Alternatively for Summary Judgment ("D.C. Mem." [# 227] ) at 3), the illegal search claim against Reed and Young arising out of the events of February 1996 is still in the case.

In that same opinion, Judge Ross granted plaintiff permission to file his first amended complaint (concerning the events of October 23, 1995). *See id.* at 31-32. Following discovery, plaintiff submitted a proposed second amended complaint ("2d Am. Compl." [# 81] ), dated July 26, 1999, and sought permission to assert new claims on behalf of his children for damages that they allegedly suffered as a result of the searches. Plaintiff also requested leave to replead certain claims against Tucker, Reed, and Young, and to add several defendants to the action, including the District and D.C. police officials Dreher and Soulsby. *See generally* 2d Am. Compl. FN4 In an Opinion and Order dated June 18, 2003 ("6/18/03 Op." [# 152] ), Judge Ross adopted this Court's 3/26/03 Report and Recommendation ("3/26/03 R & R" [# 148] ) and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

granted plaintiff permission to amend his complaint to assert claims against the District, as well as against Dreher and Soulsby in their official capacities, and otherwise denied plaintiff's motion to further amend his complaint.

FN4. Dreher is the former Commander of the D.C. Police's Homicide Division; Soulsby is the former Chief of Police. D.C. Mem. [# 227] at 7.

Thereafter, this Court reopened discovery for the limited purpose of permitting plaintiff to serve discovery demands on Dreher and Soulsby. *See* 6/27/03 Memorandum and Order ("6/27/03 M & O" [# 155] ). Prior to the close of this supplemental discovery period, plaintiff moved to amend his complaint for a third time, and submitted a proposed third amended complaint, which, liberally construed, contains the following new allegations concerning the October 1995 search: (1) a demand for damages for loss of business income, *see* 3d Am. Compl. at 17-18 [# 154]; [FN5] (2) common law tort claims [FN6] against Tucker, Reed, Young, and the District, *see id.* at 8, 10; (3) claims against Dreher and Soulsby, in their individual capacities, for violations of the Fourth Amendment and plaintiff's due process rights, *see id.* at 1, 12-16; and (4) due process claims against Dreher and Soulsby in their official capacities and against the District, *see id.* at 13-14, 15-16. Plaintiff also sought to replead the claims already asserted in his first two amended complaints, concerning the 1995 search: his Fourth Amendment and his due process claims against Tucker, Reed, and Young, *see* 3d Am. Compl. at 9-12; his Fourth Amendment claim against the District pursuant to *Monell v. Department of Social Services,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), *see* 3d Am. Compl. at 12-15; and his Fourth Amendment official capacity claims against Dreher and Soulsby, *see id.* at 12, 14. All defendants opposed the filing of the proposed third amended complaint or portions thereof.[FN7]

FN5. Unless otherwise indicated, references to the third amended complaint are to pages, not paragraphs.

FN6. *See infra* note 13.

FN7. While plaintiff's motion to amend his complaint for the third time was still pending, plaintiff also filed multiple dispositive motions and applications against defendants with respect to their alleged discovery practices, all of which were denied by this Court. *See generally* 3/4/05 Report and Recommendation [# 200]; 3/7/05 Memorandum and Order [# 202]; 3/30/05 Memorandum and Order [# 206].

***3** On April 28, 2005, this Court granted plaintiff's motion to amend his complaint for the third time. Noting that defendants had not opposed several of plaintiff's proposed claims, the Court permitted plaintiff to proceed with his individual capacity claims against Dreher and Soulsby; tort claims against Tucker, Reed, Young, and the District; and due process claims against Dreher, Soulsby, and the District. The Court also permitted plaintiff to proceed with his claim for loss of business, over defendants' objection. *See* 4/28/05 M & O [# 207] at 9-15. In response to defendants' concern that plaintiff's loss of business claim would unduly prejudice the defense and prolong litigation through potentially costly discovery, the Court set a briefing schedule for dispositive motions with respect to those claims for which discovery was complete, and deferred discovery on the loss of business claims until the resolution of any dispositive motions related to the third amended complaint. *Id.* at 13, 19.[FN8]

FN8. During the pendency of plaintiff's motion to amend his complaint for the third time, the D.C. defendants filed a procedurally defective dispositive motion, which this Court declined to address; the D.C. defendants were granted leave to file a revised motion. *See* 4/28/05 M & O [# 207] at 16-19.

On May 27, 2005, Tucker again moved to dismiss or for summary judgment. *See generally* Defendant Special Agent Nathan Tucker's Memorandum of Law in Support of His Motion to Dismiss or in the Alternative for Summary Judgment on All Claims Asserted in the Third Amended Complaint ("Tucker Mem." [# 215] ). The D.C. defendants' motion to dismiss or for summary judgment was filed soon after, on May 31, 2005. *See generally* D.C. Mem. [# 227].[FN9] Plaintiff thereafter opposed the motions filed by Tucker and the D.C. defendants, adding

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

cross-motions for summary judgment against both sets of defendants. *See generally* Plaintiff Dockery's Opposition to Defendant Tucker's Motion for Summary Judgment and [ ] Cross-Motion for Summary Judgment on Complaint, filed 8/3/05 ("Pl.Mem.(Tucker)" [# 241] ); Plaintiff Dockery['s] Opposition to Defendants, District of Columbia[,] Larry Soulsby, Alan Dreher, Pamela Reed, and Phineas Young's Motion for Summary Judgment and Plaintiff['s] Cross-Claim against Adverse Party Defendants, for Summary Judgment, filed 8/18/05 ("Pl.Mem. (D.C.)" [# 246] ). On September 8 and 9, 2005, respectively, both sets of defendants replied to plaintiff's submissions. *See generally* Reply Memorandum of Defendants, District of Columbia, Pamela Reed, Phineas Young, Larry Soulsby and Alan Dreher to Plaintiff Dockery's Opposition Papers and in Further Support of their Motion to Dismiss or Alternatively for Summary Judgment, dated September 8, 2005 ("D.C. Reply" [# 257] ); Defendant Special Agent Nathan Tucker's Reply Memorandum of Law in Further Support of Motion to Dismiss or in the Alternative for Summary Judgment on All Claims Asserted in the Third Amended Complaint, dated September 9, 2005 ("Tucker Reply" [# 258] ).

FN9. The D.C. defendants' memorandum of law was submitted twice electronically and appears as docket entries # 227 and # 228.

On November 9, 2005, this Court provided plaintiff with a (second) copy of its Local Civil Rules and directed him to comply with Local Rule 56.1 by submitting statements of undisputed facts in response to those offered by Tucker and the D.C. defendants. *See* 11/9/05 Order [of Judge Mann] [# 261] at 3; Defendant Special Agent Nathan Tucker's Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 ("Tucker 56.1" [# 216] ); D.C. Defendants Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 ("D.C. 56.1" [# 224] ). Plaintiff submitted the requested Rule 56.1 Statements on December 9 and 22, 2005, respectively. *See* Plaintiff's Statement of Material Facts in Issue in Response to Statement of Material Facts to Which Defendant Tucker Contends There Is No Genuine Dispute, dated 11/28/05 ("Pl. 56.1 (Tucker)" [# 264] ); Plaintiff's Response to Statement of Material Facts as to Which DC[ ] Defendants Contend[ ] There Is No Genuine Issue and/or Undisputed Facts, dated 11/28/05 ("Pl. 56.1 (D.C.)" [# 265] ).

## *FACTUAL OVERVIEW*

### I. Defendants' Version

***4** Defendants proffer evidence of the following sequence of events. On August 12, 1995, D.C. Detective Phineas Young filed an affidavit in support of an arrest warrant alleging that plaintiff had obstructed justice by intimidating and threatening to kill the family of a grand jury witness who was expected to testify about plaintiff's involvement in the April 1995 murder of one Melvin Jones. *See* Affidavit of Phineas Young in Support of Motion to Dismiss ("Young Aff." [# 225] ) ¶ 2; Affidavit in Support of an Arrest Warrant [# 217] (submitted as Exhibit B to the Declaration of Special Agent Nathan Tucker in Support of Summary Judgment Motion ["Tucker Decl."] ). A warrant for plaintiff's arrest on this charge was issued by the D.C. Superior Court on August 12, 1995, and was reapproved on August 14, 1995. *See* Tucker 56.1 [# 216] ¶ 6; D.C. 56.1 [# 224] ¶ 2; Tucker Decl. [# 217] Ex. B.

On October 18, 1995, the FBI's Washington Field Office forwarded to the FBI's New York Division a lead referencing the obstruction of justice warrant and setting forth plaintiff's suspected whereabouts. *See* [FBI Lead] (Tucker Decl. Ex. A [# 217] ). The lead listed as enclosures a photograph of plaintiff and the 1995 warrant, and further advised that plaintiff "may be located in the vicinity of '3 Star Grocery,' 2127 Pitkin Avenue, Brooklyn, New York, telephone numbers 718-495-4730 and 800-881-4730." *Id.*

On October 23, 1995, on the basis of the lead and following a request by Detective Reed that the FBI conduct a "turn-up" for Dockery at the Brooklyn address on file (*see* Affidavit of Pamela Reed in Support of Motion to Dismiss ("Reed Aff." [# 226] ¶¶ 3-4; [Trial Testimony of Pamela Reed] (Ex. J. to Pl. Mem. (Tucker) [# 241] at 78)), an FBI Fugitive Task Force-comprised of seven agents including Tucker and Sam Alston-commenced surveillance at the Pitken Avenue address, "where Dockery was suspected of dwelling." Tucker Decl. [# 217] ¶ 7. Reed and Young deny that they were in New York. Reed Aff. [# 226] ¶ 4; Young Aff. [# 225] ¶ 4. During the course of this surveillance, Tucker claims to have seen plaintiff with a woman, later identified

as Denise Sutton, in the window of a second-floor apartment. *See* Tucker Decl. [# 217] ¶ 8; [Undated Excerpt of Testimony of Special Agent Nathan Tucker, D.C. Superior Court] (attached to Plaintiff's Motion in Opposing Defendant [L]egal [A]id Attorney Motion [....] ("Mot. Opposing Legal Aid" [# 32] )) at 222.

After announcing their purpose and authority and being denied entry by Sutton, the FBI Task Force forced entry into the building with a battering ram. Tucker Decl. [# 217] ¶ 9; Affidavit of Denise Sutton ("Sutton Aff.") (Matthews Decl. [# 219] Ex. H) ¶ 3. Upon entry, the agents encountered a pit bull and sought the assistance of the New York Police Department's Emergency Services Unit ("NYPD-ESU") in controlling the animal. Tucker Decl. [# 217] ¶ 9. NYPD-ESU officers thereafter commenced a search of the basement, grocery store, and residential apartments that comprised the Premises. *Id.* ¶ 10. During this search, the officers cut holes in the ceiling of a third-floor apartment and placed tear gas inside to render the area safe for inspection. *Id.* ¶ 11; [Undated Excerpt of Testimony of Special Agent Nathan Tucker, D.C. Superior Court] (Mot. Opposing Legal Aid [# 32] ) at 225-26. Inside the crawl space, the officers located identification belonging to plaintiff. Tucker Decl. [# 217] ¶ 11. Having failed to locate Dockery, the Task Force and NYPD-ESU discontinued their surveillance and search. *Id.* Prior to leaving the Premises, Tucker, accompanied by Agent Alston, entered the Premises for the first time to ensure that Dockery was not there. *Id.* ¶ 12.

***5** Following the search, the Task Force provided Sutton with padlocks and keys to replace the locks that had been removed from the grocery store's door by the NYPD-ESU, as well as a phone number with instructions stating how the landlord could report and make a claim for any damage to the property. *Id.* ¶ 13. Following the search, Michael Barrett, an acquaintance of Sutton's, replaced the front door of the building. Sutton Aff. ¶ 9 (Matthews Decl. [# 219] Ex. H). Defendants maintain that, as a consequence of the search, there was minimal damage to the front door and damage to the ceilings of a third-floor apartment. *See id.* ¶ 7; Tucker 56.1 ¶¶ 20, 23. Defendants deny that any other property was damaged or caused to be missing as a result of the conduct of law enforcement officers at the scene. Sutton Aff. ¶ 7; Tucker 56.1 [# 216] ¶¶ 65-67.

On February 6, 1996, another FBI Task Force, including Tucker, conducted surveillance of the Premises. Tucker Decl. [# 217] ¶¶ 15-16. Tucker observed plaintiff standing in the doorway, but Denise Sutton again refused to open the door. *Id.* ¶ 16. Following another forcible entry and search, plaintiff was eventually located in a hiding space beneath a dresser and carpet between the floorboards of the second floor and the ceiling of the first floor, and he was placed under arrest. *Id.* ¶¶ 17-18; *see* [Undated Excerpt of Testimony of Special Agent Nathan Tucker, D.C. Superior Court] (Mot. Opposing Legal Aid [# 32] ) at 231-34. Plaintiff was then taken to the FBI's Manhattan Office, where he was questioned by D.C. Detectives Reed and Young. *See* Reed Aff. [# 226] ¶ 5; Young Aff. [# 225] ¶ 5. Following plaintiff's arrest, the Clerk of the D.C. Superior Court was notified that the August 1995 warrant for plaintiff's arrest could be vacated. *See* Declaration of Assistant U.S. Attorney Kenneth Kohl in Support of Special Agent Tucker's Motion for Summary Judgment on the Third Amended Complaint ("Kohl Decl." [# 218] ) ¶ 14. The Clerk thereafter placed an "X" in red ink across the face of the warrant and wrote the word "VACATE" upon it. *Id.*

**II. Plaintiff's Version**

Plaintiff, relying in part on hearsay, disputes the defense version of events. He maintains that the warrant and the FBI lead on which defendants rely for the 1995 entry into and search of the Premises were either falsely obtained or fraudulently manufactured after the search. *See* Plaintiff['s] Affidavit in Support of Cross-Motion for Summary Judgment ("Pl. Aff." [# 242] ) ¶ 4; Pl. Mem. (Tucker) [# 241] at 10-11. Plaintiff further contends that he was not at the Premises during the 1995 incident and, thus, disputes that Tucker's sighting of him justified defendants' forcible entry. *See* Pl. 56.1 (Tucker) [# 264] ¶ 16; Dockery Dep. [# 219] at 45-46 (Matthews Decl. Ex. E). Dockery likewise challenges defendants' description of the search as one performed exclusively by the NYPD. Specifically, plaintiff argues that Tucker, Reed, and Young were personally involved in the 1995 forced entry into and search and destruction of the Premises, as evidenced by Reed and Young's own alleged admissions during a conversation with plaintiff following his arrest in

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

February 1996. *See* Pl. 56.1 (D.C.) [# 265] ¶ 11; 7/5/01 Affidavit of Plaintiff ("7/5/01 Pl. Aff." [# 241] ) at 2-3. While claiming not to have been present during the 1995 search, Dockery also disputes the degree of damage caused by the search, and contends that defendants broke several interior apartment doors and two toilets, and intentionally left the doors of the Premises unsecured, resulting in looting by third parties and the loss of plaintiff's personal and business property. *See* 3d Am. Compl. at 4-8. Dockery denies that Sutton was provided with keys and locks to secure the store. *See* Pl. 56.1 (Tucker) [# 264] ¶ 22.

***PENDING MOTIONS***

***6** Liberally construing plaintiff's third amended complaint, this Court has identified the following claims against Tucker, all relating to the 1995 incident: a common law tort claim; a claim for unauthorized search and seizure in violation of the Fourth Amendment; and a claim for deprivation of property without due process of law. *See* 3d Am. Compl. at 8-10. Tucker seeks dismissal of the tort and due process claims for failure to state a claim upon which relief may be granted and lack of subject matter jurisdiction, and seeks summary judgment on the Fourth Amendment claim.

Plaintiff also asserts a Fourth Amendment claim against Reed and Young for unauthorized search and seizure in connection with the events of 1996, [FN10] in addition to the following claims against the D.C. defendants for the events of 1995: common law tort claims against Reed, Young, and the District; claims under 42 U.S.C. § 1983 against Reed and Young for unauthorized search and seizure in violation of the Fourth Amendment; section 1983 claims against Reed and Young for deprivation of property without due process of law; and claims against Dreher and Soulsby (in both their individual and official capacities), and a *Monell* claim against the District, for deprivation of property without due process, and violations of the Fourth Amendment. *See* 3d Am. Compl. at 10-16. The D.C. defendants move for dismissal of the official capacity claims against Dreher and Soulsby; for dismissal or summary judgment on the *Monell* claims against the District; [FN11] and for summary judgment on the due process, Fourth Amendment, and common law tort claims against the individual D.C. defendants for the events of 1995.[FN12]

FN10. As previously noted, *see supra* note 3, the D.C. defendants erroneously assume that plaintiff has abandoned his claim pertaining to the 1996 search, and they thus have not moved against that claim.

FN11. Defendants seek dismissal or, in the alternative, summary judgment on the *Monell* claims against the District. *See* D.C. Mem. [# 227] at 8-13. As plaintiff cannot survive a motion for summary judgment on the *Monell* claims, *see infra* pp. 54-57, this Court will assume that those claims are adequately pled.

FN12. The D.C. defendants also argue that the Court lacks personal jurisdiction over them. *See infra* note 29.

***DISCUSSION***

**I. *Defendants' Motions to Dismiss***

In evaluating whether to grant a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must accept all material factual allegations in the complaint as true and draw all reasonable inferences therefrom in favor of the plaintiff. *See Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994). Dismissal is warranted "only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Allen v. Westpoint-Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991) (internal quotation marks and citation omitted). Where, as here, a *pro se* plaintiff alleges civil rights violations, "[t]his standard is applied with even greater force ...." *Hernandez,* 18 F.3d at 136.

**A. Tucker's Jurisdictional Defense**

Tucker moves for dismissal of the common law tort claims against him for lack of subject matter jurisdiction.[FN13] *See* Tucker Mem. [# 215] at 2-8. This Court agrees that the state law claims against Tucker should be dismissed on this basis.

FN13. As noted in this Court's 4/28/05 Memorandum and Order, these claims appear to be brought under three possible theories of tort liability: conversion, trespass to chattels and/or

trespass to lands. *See* 4/28/05 M & O [# 207] at 5-6 n. 5.

"Under the Federal Tort Claims Act [ ("FTCA"), 28 U.S.C. §§ 1346(b), 2401(b), 2671-2680], "Government employees enjoy absolute immunity against common law tort claims, and the only proper federal institutional defendant is the United States." *Marsden v. Fed. Bureau of Prisons,* 856 F.Supp. 832, 836 (S.D.N.Y.1994) (citing, *inter alia, United States v. Smith,* 499 U.S. 160, 161-65, 111 S.Ct. 1180, 113 L.Ed.2d 134 (1991)). In order to obtain the protection of absolute immunity, a federal employee must establish that, at the time of the alleged act, he "was acting within the scope of his office or employment ...." 28 U.S.C. § 2679(d)(1); *see also Smith,* 499 U.S. at 161. Here, plaintiff's pleading alleges that Tucker "was [an] employee and/or agent of the Federal Bureau of Investigation, at all times pertinent to the claims asserted ...," 3d Am. Compl. at 3, and that "[a]t the time Defendant Tucker committed [the alleged torts] ... [h]e was acting within the scope of his employment with[ ] ... the Federal Bureau of Investigation ...." *Id.* at 8. Thus, plaintiff should have brought his common law tort claims against the United States pursuant to the FTCA. *See Hightower v. United States,* 205 F.Supp.2d 146, 154 (S.D.N.Y.2002) ("Because the complaint expressly alleges that the individual defendants were each federal employees ... acting within 'the scope of their employment,' ... any state law torts claims based on their conduct would be cognizable, if at all, only as a suit against the United States under the FTCA.").[FN14]

FN14. The fact that plaintiff sued Tucker only in his individual capacity, *see* 3d Am. Compl. at 1, does not destroy Tucker's immunity under the FTCA because Tucker was alleged to have acted within the scope of his employment. *See Smith,* 499 U.S. at 163 n. 3 & 173 (FTCA was designed to prevent federal employees from being sued in their personal capacities for torts committed while acting within the scope of their employment); *accord Wilson v. Drake,* 87 F.3d 1073, 1076 (9th Cir.1996); *Konarski v. Brown,* 293 F.Supp.2d 70, 72 (D.D.C.2003); *Ramirez v. Obermaier,* No. 91 Civ. 7120(RPP), 1992 WL 320985, at *7 (S.D.N.Y. Oct.28, 1992); *Llarena v. Womble,* No. 90 CIV. 0592(JSM), 1990 WL 165738, at *2 (S.D.N.Y. Oct.18, 1990).

Nor does plaintiff's allegation that Tucker "committed an improper performance of his duties," 3d Am. Compl. at 8, deprive Tucker of the protection of the FTCA. "The question of whether the act was wrongful is a different one from whether the act occurred while the employee was acting within the scope of his employment." *Rivera v. United States,* 928 F.2d 592, 608 (2d Cir.1991). In language particularly apt here, the Second Circuit held in *Rivera* that, regardless of whether federal law enforcement officers "performed wrongful acts, such as entering unannounced to execute ... warrants or using excessively intrusive means of executing the warrants, the execution of the warrants was nonetheless within the scope of their employment." *Id.* at 608-09.

***7** As neither party disputes that Tucker was acting in the scope of his employment at the time of the alleged acts, *see* Tucker Mem. at 2-3; 3d Am. Compl. at 8, the Court should substitute the United States as the proper defendant to plaintiff's tort claims, *see* 28 U.S.C. § 2679(b)(1) (providing that suit against the United States under the FTCA is the exclusive damages remedy for common law torts committed by a federal employee acting within the scope of his employment); *Harbury v. Hayden,* Civil Action No. 96-438(CKK), 444 F.Supp.2d 19, 2006 WL 2212696, at *6 (D.D.C. Aug.1, 2006) ("[U]pon challenge or a *sua sponte* inquiry, the federal court may determine independently whether [an] employee acted within the scope of employment and, therefore, whether to substitute the federal government as the proper defendant."), and to dismiss these claims as against Tucker. *See Rivera v. Morris Heights Health Ctr.,* No. 05 Civ. 10154, 2006 WL 345855, at *2 (S.D.N.Y. Feb. 14., 2006); *Asto v. Mirandona,* 372 F.Supp.2d 702, 710-11 (E.D.N.Y.2005).[FN15]

FN15. Plaintiff's argument that Tucker waived his objection to subject matter jurisdiction (*see* Pl. Mem. (Tucker) [# 241] at 4-6) is without merit, as challenges to subject matter jurisdiction

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

may be raised at any time, and indeed may be raised by the Court *sua sponte. See* Fed.R.Civ.P. 12(h)(3).

Although plaintiff maintains that Tucker's actions were performed within the scope of his employment, he argues that his claim is, nevertheless, not governed by the FTCA because Tucker's actions fall outside the scope of the FTCA's "discretionary function exception" ("DFE") to liability. Pl. Mem. (Tucker) [# 241] at 9-12. Under the DFE, the United States cannot be found liable with respect to "[a]ny claim ... based upon the exercise or performance ... [of] a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a); *see United States v. Gaubert,* 499 U.S. 315, 322, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991).

Plaintiff misconstrues the DFE, which carves out an exception to governmental liability where the conduct complained of involved discretionary functions, but does not create liability on the part of federal officers for acts not encompassed within the DFE. Thus, even assuming that Tucker's acts were nondiscretionary or contrary to FBI policy, the unavailability of the DFE would merely remove one impediment to a claim against the United States, but would not allow a tort claim against Tucker himself. *See Berkovitz by Berkovitz v. United States,* 486 U.S. 531, 546-47, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988); *Leone v. United States,* 690 F.Supp. 1182, 1188 (E.D.N.Y.1988); *see also Wilson v. United States,* 959 F.2d 12, 15 (2d Cir.1992) (stating that, when an exception to the FTCA does not apply, "the *federal government* remains liable for the intentional torts of [its] officers.") (emphasis added).

Even allowing for this substitution, however, this Court lacks jurisdiction over the tort claim asserted here, given plaintiff's noncompliance with the exhaustion requirement of the FTCA. Federal law provides that an individual may not institute an action in tort against the United States based on the acts or omissions of a federal employee, "unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing." 28 U.S.C. § 2675; *see also* 28 U.S.C. § 2401 ("A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues ...."). "This requirement is jurisdictional and cannot be waived." *Celestine v. Mt. Vernon Neighborhood Health Ctr.,* 403 F.3d 76, 82 (2d Cir.2005) (citing *McNeil v. United States,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) (affirming the dismissal of a *pro se* plaintiff's complaint for failure to comply with the FTCA's exhaustion requirement), and *Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 510 (2d Cir.1994)); *see also Millares Guiraldes de Tineo v. United States,* 137 F.3d 715, 720 (2d Cir.1998).

Plaintiff does not (and indeed cannot) contend that he sought in writing and obtained an administrative disposition of his claim from the FBI before filing the instant action. *See generally* Declaration of Richard M. Walsh (Matthews Decl. [# 219] Ex. J). Thus, as this Court previously concluded (*see* 3/26/03 R & R [# 148] at 15-16), plaintiff cannot now maintain an action in tort against the United States.[FN16] Accordingly, plaintiff's tort claim against the United States, like that against Tucker, should be dismissed for lack of subject matter jurisdiction.[FN17]

FN16. Plaintiff complains that, following the 1995 search of the Premises, Tucker left inadequate instructions regarding plaintiff's administrative remedies. *See* Pl. Mem. (Tucker) [# 241] at 2. The burden is on plaintiff to plead and prove that he timely complied with the statutory exhaustion requirement. *See In re Agent Orange Prod. Liab. Litig.,* 818 F.2d 210, 214 (2d Cir.1987). Where, as here, the plaintiff invokes the doctrine of equitable tolling to excuse his dereliction, he must allege and establish (1) "extraordinary circumstances 'beyond his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

control' " that prevented him from timely filing his administrative claim, and/or (2) affirmative conduct on defendant's part that concealed defendant's status as a federal actor and thus the applicability of the FTCA. *See* *Valdez ex rel. Donely v. United States,* 415 F.Supp.2d 345, 349-50 (S.D.N.Y.2006); *Bowman v. U.S. Postal Serv.,* No. 02 Civ. 6138(SHS), 2003 WL 1395821, at *3-4 (S.D.N.Y. Mar.20, 2003); *see generally* *Celestine,* 403 F.3d at 83-84 (explaining the limited applicability of the equitable tolling doctrine in FTCA cases). Plaintiff's allegation of inadequate instructions is insufficient to warrant equitable tolling. *See, e.g.,* *Valdez,* 415 F.Supp.2d at 349-51 (rejecting plaintiff's claim for equitable tolling where plaintiff failed to set forth any facts in support of his claim that defendants fraudulently concealed or kept plaintiff from learning of his cause of action against them); *Van Eck v. Cimahosky,* 329 F.Supp.2d 265, 269 (D.Conn.2004) (holding that equitable tolling was not warranted on the basis of defendant's allegedly improper notice of administrative decision); *Bowman,* 2003 WL 1395821, at *4-5 (rejecting *pro se* plaintiff's claim that equitable tolling was warranted where (1) several agencies had failed to assist him with his claim; (2) he was unable to obtain certain medical records pertaining to his claim, and (3) he was blind in one eye); *see also* *Fuentes v. Park,* No. 03 Civ. 2660(RMB), 2005 WL 911442, at *2-3 (S.D.N.Y. Apr.18, 2005) (dismissing *pro se* plaintiff's claim for lack of subject matter jurisdiction where, due to his ignorance of exhaustion requirement, plaintiff had failed to exhaust his administrative remedies under the FTCA).

FN17. In 1988, Congress enacted the Federal Employees Liability Reform and Tort Compensation Act ("the Westfall Act"), Pub.L. 100-694, 102 Stat. 4563 (1988), which amended the FTCA to "expressly provide[ ] that while the administrative-exhaustion requirement would apply to all actions, *even those removed from state court,* plaintiffs would be given an opportunity, after the removal, to exhaust those remedies." *Celestine,* 403 F.3d at 83. Specifically, the Westfall Act provides, in relevant part, that where the United States is substituted as a defendant, the plaintiff has an additional 60 days to exhaust his administrative remedies, provided his "claim would have been timely had it been filed on the date the underlying civil action was commenced." 28 U.S.C. § 2679(d)(5).

As neither plaintiff nor Tucker has addressed whether the Westfall Act applies in non-removal cases and, if so, its impact on plaintiff's tort claims, those issues are not now before the Court. *See generally* *Rivera,* 2006 WL 345855, at *3 n. 1.

**B. Standing**

At least one aspect of plaintiff's Fourth Amendment claims is subject to dismissal. Liberally construing plaintiff's pleading, he appears to allege that the constitutional rights of third parties were violated by defendants' "unauthorized" entry into and search of the second-floor apartment of Ilma Davis (Apartment # 2R) [FN18] and ground-floor apartment of plaintiff's children (Apartment # 1RR). *See generally* 3d Am. Compl. at 6-7.[FN19] Citing this Court's Report and Recommendation of March 26, 2003 (*see* 3/26/03 R & R [# 148] at 5-7), Tucker contends that plaintiff lacks standing to assert the constitutional rights of others, including his children. *See* Tucker Mem. [# 215] at 11-12.

FN18. In his third amended complaint, plaintiff references Davis as "Elma Davis." 3d Am. Compl. at 7. In her affidavit, Davis identifies herself as "Ilma Davis." *See generally* Affidavit [of Ilma Davis] (Pl.Mem. (Tucker) [# 241] Ex. P).

FN19. For example, plaintiff states in his third amended complaint:

It is not known to Mr. Dockery what was missing from Ms. Davis['] apartment and the matter is left open for the parties to [ ] argue when Dockery provide[s] more evidence from

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Ms. Davis. Therefore any damage and loss of property from Ms. Davis['] apartment is not waive[d] by plaintiff, due [to] defendants['] conduct in leaving Ms. Davis['] front door unfix[ed] and unsecured.

3d Am. Compl. at 7.

***8** It is well established that "[t]he right of a third party not named in [an] arrest warrant to the privacy of his home may not be invaded without a search warrant[.]" *United States v. Underwood,* 717 F.2d 482, 484 (9th Cir.1983) (en banc) (citation and emphasis omitted). Importantly, however, "this right is personal to the home owner and cannot be asserted vicariously by the person named in the arrest warrant." *Id.* at 484; *accord* *Rakas v. Illinois,* 439 U.S. 128, 133-34, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) ("Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.") (internal quotation marks and citations omitted); *United States v. Haqq,* 278 F.3d 44, 47 (2d Cir.2002). Accordingly, plaintiff cannot assert Fourth Amendment claims on behalf of his children or Davis based on the entries into and searches of their apartments. *See also* 3/26/03 R & R [# 148] at 5-7 (non-attorney *pro se* party is not permitted to represent the interests of others, including his children). [FN20]

FN20. Plaintiff claims that, after he purchased the building with his own funds, title was transferred to his two daughters, but that he remained "the sole managerial agent of the aforesaid premises" and, as such, has standing to challenge all "unauthorized general searches and seizure[s] of the apartments ...." 3d Am. Compl. at 7. The Court need not resolve the separate question of whether plaintiff had a reasonable expectation of privacy in portions of the Premises other than his own apartment-for example, his children's apartment, Davis's apartment, the basement, and the newly renovated third-floor apartments-as the parties have not raised or briefed this issue.

### C. Official Capacity Claims Against Dreher and Soulsby

Plaintiff sues D.C. officials Dreher and Soulsby in their official capacities, as well as the District itself, for violations of plaintiff's Fourth Amendment rights in connection with the 1995 search. *See* 3d Am. Compl. at 12-15. Dreher and Soulsby seek dismissal of the claims against them on the ground that "a suit against them in their official capacities is akin to a suit against the [District] itself." D.C. Mem. [# 227] at 8.

"Official-capacity suits ... 'generally represent only another way of pleading an action against an entity of which an officer is an agent.' As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham,* 473 U.S. 159, 165-66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (quoting *Monell,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Thus, where both a municipality and an official in his official capacity are sued for the same acts under 42 U.S.C. § 1983, the claims are redundant, and the municipality may be substituted for the officials. *See* *Booker v. Bd. of Educ.,* 238 F.Supp.2d 469, 475 (N.D.N.Y.2002) (dismissing official capacity claims against individual defendants as redundant of *Monell* claims against municipality); *Snall v. City of New York,* No. 97-CV-5201 (ILG), 1998 WL 960296, at *4 (E.D.N.Y. Dec.7, 1998) (same); *Rini v. Zwirn,* 886 F.Supp. 270, 281-82 (E.D.N.Y.1995) (same); *Orange v. County of Suffolk,* 830 F.Supp. 701, 706-07 (E.D.N.Y.1993) (same). Here, plaintiff's official capacity claims against Soulsby and Dreher are coextensive with his municipal liability claims against the District. It is therefore appropriate to grant Dreher and Soulsby's request that the official capacity claims against them be dismissed.

## II. *Defendants' Motions For Summary Judgment*

***9** All of the defense motions for summary judgment concern the claims arising out of the October 1995 search. Each defendant moves for summary judgment on plaintiff's Fourth Amendment claim, as well as on plaintiff's demand for damages; Reed and Young and the District also move for summary judgment on plaintiff's common law tort claims.[FN21] Further, as each defendant also challenges plaintiff's due process claims, and consideration of evidence beyond the complaint is

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

necessary to resolve this matter, defendants' motions on these claims will be reviewed under the summary judgment standard. [FN22]

FN21. Defendants Soulsby and Dreher are not named in the common law tort claims.

FN22. Although the D.C. defendants move to dismiss plaintiff's due process claims and, in the alternative, seek summary judgment on them (*see* D.C. Mem. [# 227] at 14-18), Tucker inartfully articulates his challenge to these claims as a motion to dismiss, albeit citing extra-pleading materials. *See* Tucker Mem. [# 215] at 8-11; *but see id.* at 25. As plaintiff likewise relies upon evidence outside the pleadings, this Court will, for the purposes of the present inquiry, convert Tucker's motion into one for summary judgment, as permitted by Fed.R.Civ.P. 12(b).

**A. Summary Judgment Standard**

Summary judgment may be granted only where the pleadings and evidence in the record "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see* Fed.R.Civ.P. 56(c). Where, as here, a defendant seeks "summary judgment against [the] party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995); *see Celotex,* 477 U.S. at 323 ("The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."); *Nora Beverages, Inc. v. Perrier Group of America, Inc.,* 164 F.3d 736, 742 (2d Cir.1998). Once the moving party has made the requisite showing, the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby,* 477 U.S. 242, 249-50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted). In ruling on a motion for summary judgment, the Court must resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought. *See id.* at 255. Summary judgment "is properly granted only when no rational finder of fact could find in favor of the non-moving party." *Carlton v. Mystic Transp., Inc.,* 202 F.3d 129, 134 (2d Cir.2000).

**B. Due Process Claims**

Plaintiff's latest pleading alleges that, "[i]n breaking into Mr. Dockery's premises, apartments, grocery store, and basement[;] ... conduct[ing] an unauthorized search[ ] and seizure of private property[;] destr[oying] ... [his] private premises[;] and [causing a] loss of [his] business ... [Tucker] violated the Fifth Amendment to the United States Constitution. As a result of such violation, Mr. Dockery was denied his protected property interest an[d] [ ]appropriate level of process ...." 3d Am. Compl. at 9-10. The pleading similarly alleges that defendants Reed and Young violated plaintiff's right to due process under the Fifth Amendment [FN23] by breaking into and searching plaintiff's property, and by leaving it "unsecured, without door and locks," thereby depriving him of a "protected property interest." *Id.* at 11-12. Plaintiff further claims that Dreher and Soulsby are responsible for these due process violations, based on their having established a policy or practice of such misconduct and having failed to properly train and supervise their homicide officers. *Id.* at 13-16. While it is not clear whether these allegations are intended to support procedural or substantive due process claims, under either theory plaintiff's claims fail as a matter of law. Therefore, defendants' motions with respect to plaintiff's due process claims should be granted.

FN23. Plaintiff specifically alleges a denial of his "right to due process of law as protected by the *Fourteenth Amendment* ...." 3d Am. Compl. at 14 (emphasis added); *see also id.* at 11, 16. However, it is the Fifth (not the Fourteenth) Amendment that protects individuals from deprivations of property without due process by the District of Columbia and its employees. *See Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954) ("The Fifth Amendment ... is applicable in the District of Columbia ....").

**1. Procedural Due Process**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

***10** To state a procedural due process claim, a plaintiff must allege that he was deprived of a protected property or liberty interest by governmental action and that such deprivation occurred without adequate process. *See* *Rosa R. v. Connelly,* 889 F.2d 435, 438 (2d Cir.1989); *Parsons v. Pond,* 126 F.Supp.2d 205, 214-15 (D.Conn.2000). "When reviewing alleged procedural due process violations, the Supreme Court has distinguished between (a) claims based on established state procedures and (b) claims based on random, unauthorized acts by state employees." *Hellenic Am. Neighborhood Action Comm. v. City of New York,* 101 F.3d 877, 880 (2d Cir.1996).

If a plaintiff can successfully prove that the deprivation of his property was the result of an "established state procedure," liability for a procedural due process violation may attach, despite the existence of post-deprivation remedies to address the harm alleged. *Butler v. Castro,* 896 F.2d 698, 700 (2d Cir.1990) ("[T]he existence of independent state relief does not defeat a Section 1983 claim where the deprivation complained of results from the operation of established state procedures."). Where, however, the acts alleged are "random" and "unauthorized," pre-deprivation procedures are not required, "since the [government] cannot know when such deprivations will occur." *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (internal quotation marks omitted). Accordingly, a deprivation of property will "not constitute a violation of the procedural requirements of the Due Process Clause ... until and unless [the government] ... refuses to provide a suitable postdeprivation remedy." *Id.*

***a. Tucker***

The FTCA, which permits an action against the United States for torts cognizable under state law that are committed by federal employees acting within the scope of their employment, provides an adequate remedy for the property torts plaintiff alleges were committed by Tucker. 28 U.S.C. § 2679(b)(1). As plaintiff's property damage and seizure claims sound in conversion and trespass to chattels-causes of actions that are recognized under New York law, *see* *Mosseri v. Fed. Deposit Ins. Corp.,* 95 Civ. 723(BSJ), 97 Civ. 969(BSJ), 1999 WL 694289, at *20 (S.D.N.Y. Sept. 8, 1999) (noting the cognizability of a conversion cause of action under New York law)-plaintiff could have sought relief administratively and then under the FTCA. Having failed to avail himself of these procedures, plaintiff has not alleged and cannot establish a procedural due process violation. *See* *Ciambriello v. County of Nassau,* 292 F.3d 307, 323 (2d Cir.2002) ("[A] procedural due process violation cannot have occurred when the governmental actor provides apparently adequate procedural remedies and the plaintiff has not availed himself of those remedies.") (quoting *New York State Nat'l Org. For Women v. Pataki,* 261 F.3d 156, 169 (2d Cir.2001) (emphasis omitted)); *Estes-El v. New York,* 552 F.Supp. 885, 889 (S.D.N.Y.1982) (holding that New York procedures for remedies for governmental taking of property-including suits for common law torts such as trespass to property, "appear adequate"; "[u]ntil plaintiff can demonstrate that he has availed himself of these procedures, and that they do not provide due process, he cannot prove his property was taken without due process."). [FN24]

> FN24. Plaintiff acknowledges the existence of post-deprivation remedies for the injuries he alleges, but challenges the adequacy of such relief. *See* Pl. Mem. (Tucker) [# 241] at 1-2. Specifically, plaintiff contends that the information provided to him for making a damage report to the FBI was insufficient, in that the number provided by the agency went unanswered during several calls by plaintiff and Denise Sutton over a three-month period. *See id.* at 2. Plaintiff additionally denies that he or Sutton was provided with instructions about how to make a claim to the FBI (Pl. 56.1 (Tucker) ¶ 24) and thus claims that he was unaware of the requirements of the FTCA and his rights thereunder. Pl. Mem. (Tucker) at 2. Plaintiff does not aver that he ever filed a formal, written complaint with the FBI, the District of Columbia, the D.C. Police Department, or the individual defendants.
>
> Neither plaintiff's professed ignorance of the law nor the FBI's allegedly ineffective telephone contact information is sufficient to establish a procedural due process violation.

Plaintiff's unawareness of his post-deprivation remedies under federal and state tort law does not render the remedies inadequate to address the harms alleged. *See* *Fox v. Van Oosterum,* 987 F.Supp. 597, 605-06 (W.D.Mich.1997) (plaintiff failed to prove the inadequacy of post-deprivation remedies despite his "insufficient education, lack of knowledge of the law, indigency and incarceration"). In any event, because plaintiff failed to comply with the procedural requirements of the FTCA, which requires that a plaintiff submit *written* notice of claim to the relevant federal agency before commencing a civil action against the same, *see* 28 C.F.R. § 14.2 ("For purposes of the ... [FTCA], a claim shall be deemed to have been presented when a Federal agency receives from a claimant ... written notification of an incident, accompanied by a claim for money damages in a sum certain ...."), it is of no constitutional consequence that the FBI's telephone procedure, whatever its purpose, was inoperable or ineffective.

***b. D.C. defendants***

***11** Plaintiff similarly alleges that the D.C. defendants deprived him of due process through the intentional and malicious acts of Reed and Young, and the deliberate indifference of Soulsby and Dreher. *See* 3d Am. Compl. at 10-16.

As the State of New York, where the injury was allegedly inflicted, provides a remedy for such acts in the form of a common law tort action, *see* *Sch. of Visual Arts v. Kuprewicz,* 3 Misc.3d 278, 771 N.Y.S.2d 804, 807 (Sup.Ct. N.Y. County 2003); *Capital Distribs. Servs., Ltd. v. Ducor Express Airlines, Inc.,* No. 04 CV 5303(NG)(VVP), 2006 WL 2041574, at *10 (E.D.N.Y. July 21, 2006), plaintiff must seek relief through those state law remedies, not the federal due process clause. *See* *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990) (stating that in determining whether a violation of procedural due process has occurred, "it is necessary to ... examine ... any remedies for erroneous deprivations provided by statute or tort law."); *Parratt v. Taylor,* 451 U.S. 527, 544, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) ("Although the [state's tort] remedies may not provide the respondent with all the relief which may have been available if he could have proceeded under § 1983, that does not mean that the state remedies are not adequate to satisfy the requirements of due process. The remedies provided could have fully compensated the respondent for the property loss he suffered, and we hold that they are sufficient to satisfy the requirements of due process."), *overruled on other grounds by* *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Strong v. Torres,* No. 03 C 292, 2004 WL 626144, at *5 (N.D.Ill. Mar.26, 2004) ("[Plaintiff] has recourse within the Illinois State courts and, therefore, no federal claim."). Plaintiff does not contest the availability or adequacy of the post-deprivation remedies for the alleged misconduct of the D.C. defendants. Indeed, by adding common law tort claims against Reed, Young, and the District of Columbia to his third amended complaint, plaintiff acknowledges the existence of such remedies. *See* 3d Am. Compl. at 10-11.

Moreover, to the extent that plaintiff argues that a procedural due process violation resulted from the D.C. defendants' established "custom, policy, or practice" of permitting unauthorized and destructive searches by its employees, this claim is unsupported by the record. Despite his having requested and received discovery on the policies and practices of the District of Columbia, plaintiff points to no evidence that the injuries he alleges were the product of an official policy or custom. *See infra* pp. 54-57. In the absence of such evidence, plaintiff cannot prove a procedural due process violation.

**2. Substantive Due Process**

In the event that plaintiff is seeking to hold defendants liable under a substantive due process theory of liability, such a claim cannot survive, given the existence of an explicit textual source of constitutional protection-the Fourth Amendment-for the injuries plaintiff alleges. "[W]here another provision of the Constitution 'provides an explicit textual source of constitutional protection,' a court must assess a plaintiff's claim under that explicit provision and 'not the more generalized notion of "substantive due process." ' " *Conn v. Gabbert,* 526 U.S. 286, 293, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999) (quoting *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)); *see* *Boroff v. Van West*

*City Bd. of Educ.,* 220 F.3d 465, 471 (6th Cir.2000) ("[T]he Supreme Court has repeatedly emphasized that substantive due process is not to be used as a fallback constitutional provision when another provision or amendment ... directly addresses the subject.").

***12** Plaintiff's allegations that defendants destroyed and seized his property by unlawfully entering into and searching the Premises, and by "maliciously" and "intentionally" leaving the Premises unsecured, *see* 3d Am. Compl. at 8, 10, assert the kinds of harms that are cognizable under the Fourth Amendment, which protects against unreasonable searches and seizures by the government. U.S. Const. am. IV; *see Fox v. Van Oosterum,* 987 F.Supp. 597, 607 (W.D.Mich.1997) ("[W]here property damages are the result of a seizure by state officials, plaintiff may state a Fourth Amendment claim ....") (citing *Bonds v. Cox,* 20 F.3d 697, 702 (6th Cir.1994)). Even where a search is conducted pursuant to a valid warrant, "there exists a clearly established right not to incur unreasonable property damage during" the course of that search, *Foreman v. Beckwith,* 260 F.Supp.2d 500, 505 (D.Conn.2003); *see also Bonds,* 20 F.3d at 702 (plaintiff could assert claim under Fourth Amendment for property damage that occurred during execution of search warrant), and all searches are therefore "subject to judicial review as to [their] reasonableness." *Tarpley v. Greene,* 684 F.2d 1, 8 (D.C.Cir.1982) (citing *Dalia v. United States,* 441 U.S. 238, 258, 99 S.Ct. 1682, 60 L.Ed.2d 177 (1979)). Furthermore, since "[a] 'seizure' of property occurs when 'there is some meaningful interference with an individual's possessory interests in that property,' " *Soldal v. Cook County,* 506 U.S. 56, 61, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992) (quoting *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984)), damage to or destruction of property may constitute a seizure under the Fourth Amendment. *See Heidorf v. Town of Northumberland,* 985 F.Supp. 250, 257 (N.D.N.Y.1997) ("[T]here can be no question that the demolition of plaintiff's Church amounted to a seizure within the meaning of the Fourth Amendment."); *see also Fuller v. Vines,* 36 F.3d 65, 67 (9th Cir.1994) ("The destruction of property is meaningful interference constituting a seizure under the Fourth Amendment ....") (internal quotation marks and citations omitted); *Newsome v. Erwin,* 137 F.Supp.2d 934, 943 (S.D.Ohio 2000) (shooting of pet lioness could amount to unreasonable seizure under the Fourth Amendment).

Because plaintiff's destruction of property claims are cognizable under the Fourth Amendment, they should be analyzed under that constitutional provision, and not as substantive due process claims. *See Heidorf,* 985 F.Supp. at 257. Therefore, assuming that plaintiff seeks recovery under a substantive due process theory of liability, these claims should be dismissed. *See id.* (holding that because plaintiff's claim that the defendants unreasonably demolished his church "fits squarely within the contours of the Fourth Amendment[ ] ... his substantive due process claim must be dismissed.").

**C. Personal Involvement Requirement Under Section 1983 and *Bivens***

Claiming constitutional deprivations, plaintiff seeks relief from the District and the individual D.C. defendants under 42 U.S.C. § 1983, and from Tucker under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); *see* 3d Am. Compl. at 2, 11-16. In relevant part, section 1983 provides:

> ***13** Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

42 U.S.C. § 1983. "By its terms ... the statute creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere." *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality opinion); *accord Bartlett v. City of New York,* No. CV0319161CPS, 2005 WL 887112, at *5 (E.D.N.Y. Feb.11, 2005). Further, although the statute explicitly provides for relief against state or D.C. employees, it does not authorize suit against their federal counterparts. In recognition of this limitation, the Supreme Court held in *Bivens* that "victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

despite the absence of any statute conferring such a right." *Carlson v. Green,* 446 U.S. 14, 18, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980). "Though more limited in some respects ..., a *Bivens* action is the federal analog to suits brought against state officials under ... 42 U.S.C. § 1983." *Hartman v. Moore,* 547 U.S. 250, 126 S.Ct. 1695, 1700 n. 2, 164 L.Ed.2d 441 (Apr. 26, 2006).

In order to maintain an action against a federal or state officer or official under *Bivens* or section 1983, a plaintiff must establish specific facts demonstrating that defendant's personal involvement in the constitutional violations alleged. *See McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977) ("[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."); *Lonegan v. Hasty,* No. 04 CV 2743(NG)(VVP), 2006 WL 1707258, at *18 (E.D.N.Y. June 22, 2006) ("In an action seeking damages for a constitutional deprivation pursuant to *Bivens,* as in an action pursuant to Section 1983 of the Civil Rights Act, 42 U.S.C. § 1983, ... personal involvement is a prerequisite to liability."); *Grullon v. Reid,* No. 97 CIV. 7616(RWS), 1999 WL 436457, at *7 (S.D.N.Y. June 24, 1999).

A plaintiff may demonstrate the requisite personal involvement either by proof of the defendant's direct participation in the alleged violation, or by that defendant's having acted as a supervisory official who either: (a) failed to remedy the violation once it was reported to him; (b) created a policy or custom that gave rise to the constitutional violation or permitted it to endure; or (c) demonstrated gross negligence in managing the subordinates at whose hands the violation occurred. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citations omitted); *Moffitt v. Town of Brookfield,* 950 F.2d 880, 886 (2d Cir.1991) (quoting *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)). The Second Circuit has construed the phrase "direct participation" to include "personal participation by one who has knowledge of the facts that rendered the conduct illegal." *Provost v. City of Newburgh,* 262 F.3d 146, 155 (2d Cir.2001) (citations omitted). In this regard, liability may be found against "a person who, with knowledge of the illegality, participates in bringing about a violation of the victim's rights but does so in a manner that might be said to be 'indirect'...." *Id.* On review of a motion for summary judgment or judgment as a matter of law,[FN25] "the issue is whether, viewing the evidence in the light most favorable to [plaintiff], a reasonable juror could have concluded that [defendant's] conduct satisfied any one of [the enumerated] criteria." *Id.* at 154.

> FN25. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 135, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ("The standard for judgment as a matter of law under Rule 50 mirrors the standard for summary judgment under Rule 56.").

**1. Personal Involvement of Tucker**

***14** Tucker contends that he was not personally involved in the acts of which plaintiff complains. *See* Tucker Mem. [# 215] at 19. Specifically, Tucker avers that, during the October 23, 1995 search, "FBI Special Agent Sam Alston was the case agent for surveillance"-that is, Alston, not Tucker, was in charge of the October 1995 operation at the Premises. Tucker Decl. [# 217] ¶ 7. Tucker does, however, attest to his membership in the seven-agent FBI Task Force operating at the scene. *Id.* Without detailing his precise role in the surveillance, Tucker maintains that "Task Force agents observed Dockery and Denise Sutton through the second floor apartment window of the building[ ]" and that "[t]he agents announced their purpose and authority." *Id.* ¶ 8. He further attests that after waiting approximately twenty minutes for Sutton to open the door, "FBI agents forced the building door open with a battering ram [,]" *id.* ¶ 9, at which time NYPD Emergency Services Unit officers proceeded to search the Premises. *Id.* ¶¶ 9-10. After the NYPD's search, Tucker and Alston entered the building for the first time to verify that plaintiff was not inside. *Id.* ¶ 12.

While plaintiff concedes that Tucker may not have been the agent in charge of the October 1995 search, he argues that Tucker, acting with "numerous Federal Agent[s] conduct[ed] a General warrantless, nonexigent and nonconsensual entry" into the building. Pl. 56.1 (Tucker) [# 264] ¶ 18. Citing Tucker's testimony at Dockery's criminal trial, plaintiff argues that Tucker was in fact involved in the search.[FN26]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN26. Tucker testified at trial: "We searched ... the location from room to room and we looked at all the obvious hiding places, and we didn't have any luck in discovering him." Pl. 56.1 (Tucker) [# 264] ¶ 21 (citing [7/30/98 Testimony of Special Agent Nathan Tucker, D.C. Superior Court] at 711 (attached as Ex. 5 to Plaintiff Dockery's Memorandum of Points and Authorities in Opposition to Defendant Tucker's Memorandum Opposing Plaintiff's Third Amended Complaint to Conform with His Evidence, dated 9/9/03 [# 172] )); *see also* [Undated Excerpt of Testimony of Special Agent Nathan Tucker, D.C. Superior Court] (attached to Mot. Opposing Legal Aid [# 32] ) at 223 (conceding that he entered the building and "found a pit bull when we got inside the main entrance ...."); [Undated Excerpt of Testimony of Special Agent Nathan Tucker, D.C. Superior Court] (attached to Pl. Mem. (Tucker) [# 241] as Ex. 221) at 224 ("Well, after speaking with [Denise Sutton] repeatedly and trying to get her to open the door, we had no choice but to knock it down.").

Even accepting Tucker's contention that his role in the search was secondary to that of the NYPD and Agent Alston, his admitted participation in the FBI Task Force and his descriptions at trial of the acts at the scene are sufficient evidence upon which a reasonable juror could conclude that Tucker was personally involved, even if indirectly, in the search that is the subject of plaintiff's claims.[FN27] *See Ricciuti v. New York City Transit Auth.,* 124 F.3d 123, 129-30 (2d Cir.1997) (reversing an award of summary judgment where material issue of fact remained as to defendant's personal involvement in fabrication of confession); *but cf. Djonbalic v. City of New York,* No. 99 CIV. 11398 SHSAJP, 2000 WL 1146631, at *11 (S.D.N.Y. Aug.14, 2000) (granting summary judgment based on lack of personal involvement where defendant agent "was not inside the building and therefore was not in a position to 'remedy the wrong' alleged ....") (citation omitted); *Howard v. Schoberle,* 907 F.Supp. 671, 681 (S.D.N.Y.1995) (granting summary judgment to an FBI officer; "[a]lthough [defendant] accompanied the search team, she was not involved to any substantial degree with either Plaintiffs' arrests or the apartment search."). Therefore, Tucker is not entitled to summary judgment for lack of personal involvement in the search complained of.

FN27. Indeed, Tucker's testimony at Dockery's criminal trial could be construed to indicate his direct involvement in the search.

**2. Personal Involvement of Reed and Young**

***15** Plaintiff also seeks to hold Reed and Young liable for their alleged violation of plaintiff's Fourth Amendment rights through their participation in the search of the Premises on October 23, 1995. Reed and Young deny that they were present in New York during the 1995 search and thus deny responsibility for any violations related to the events in question. *See* Reed Aff. [# 226] ¶ 4; Young Aff. [# 225] ¶ 4.

In support of his claim, plaintiff provides an affidavit summarizing a conversation he claims to have had with Reed and Young in which they allegedly admitted their participation in the 1995 search.[FN28] Whatever the implausibility of Dockery's assertion, the Court is constrained, on this motion for summary judgment, to construe the facts in the light most favorable to the non-moving party. Viewed through this lens, the alleged admissions by defendants Reed and Young create a material issue of fact with respect to their personal involvement in the events of October 1995. *See Ricciuti,* 124 F.3d at 129-30. Accordingly, they are not entitled to summary judgment on this ground.[FN29]

FN28. Plaintiff states, in pertinent part, that, during his interrogation by Reed and Young following his arrest on February 6, 1996, "Reed and Young expressed their knowledge, and concern that, they too were inside the Three Star[ ] Grocery Store and the apartments helping the FBI and New York City police officers looking for Dockery." 8/18/05 Pl. Aff. (attached to Pl. Mem. (D.C.) [# 246] ) ¶ 5. In another affidavit, plaintiff elaborates: "Reed expressed her knowledge of being inside the Three Star [ ] Grocery Store and the apartments looking for

Mr. Dockery, because agents who she was with said they thought they saw Dockery inside the second floor window, so ... Reed and the FBI searched the entire premises, but Dockery was lucky he escaped that time." 7/5/01 Pl. Aff. (attached to Pl. Mem. (Tucker) [# 241] ) at 2.

> Plaintiff has also submitted excerpts from Reed's testimony at plaintiff's criminal trial. In particular, plaintiff cites Reed's statement that prior to Dockery's arrest in February 1996, she had, on an earlier occasion, requested "a turn-up to locate Mr. Dockery at an address in Brooklyn." [Trial Testimony of Pamela Reed] (Ex. J. to Pl. Mem. (Tucker) [# 241] ) at 78. Contrary to plaintiff's assumption, a request by a police officer for law enforcement assistance outside his or her geographic jurisdiction does not, without more, establish the requesting officer's personal involvement in alleged misconduct occurring in the other jurisdiction.

FN29. The D.C. defendants alternatively assert that this Court lacks personal jurisdiction over them with respect to the 1995 search of the Premises because they "did not have any contact with the State of New York on the subject date." D.C. Mem. at 5. Plaintiff argues that the D.C. defendants have waived their challenge to the Court's jurisdiction by failing to interpose this defense in their earlier answers and moving papers. *See* Pl. Mem. (D.C.) at 3-4 (citing Fed.R.Civ.P. 12(g)).

> Although the D.C. defendants previously moved against the third amended complaint, the defendants' earlier motion was not accepted, as it was procedurally defective. *See* 4/28/05 M & O [# 207] at 16-19. Thus, the instant motion, which (like their answer to the first amended complaint) includes an objection to personal jurisdiction as to each of the D.C. defendants, is the D.C. defendants' first responsive motion or pleading to the operative complaint. *See* D.C. Mem. at 5-6; D.C. Reply Mem. at 4-7. Accordingly, the D.C. defendants have not waived their challenge to personal jurisdiction.
>
> Nevertheless, Reed and Young are not entitled to summary judgment on this ground, as the very basis of their defense-that they were not present in New York during the 1995 entry and search-is disputed by the parties. *See* D.C. 56.1 [# 224] ¶ 11; Pl. 56.1 (D.C.) [# 265] ¶ 11; Pl. Aff. (attached to Pl. Mem. (Tucker) [# 241] ) at 2-3. Accordingly, as with Reed and Young's claim that they were not personally involved in the acts at the Premises for purposes of section 1983, the Court cannot determine whether Reed and Young had sufficient contacts with New York to establish personal jurisdiction over them.
>
> As will be established, however, Dreher and Soulsby are entitled to dismissal of the claims against them, in light of plaintiff's failure to prove that they created or enforced a municipal policy or custom with respect to the 1995 acts. *See infra* pp. 37-39, 54-57. Because plaintiff fails to adduce any other facts to establish that Dreher and Soulsby had sufficient contacts with New York to justify personal jurisdiction over them, *see, e.g., Ashi Metal Indus. Co. v. Superior Ct. of Cal.,* 480 U.S. 102, 108-09, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (O'Connor, J., plurality); *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 471-78, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), plaintiff's claims against these defendants should also be dismissed for lack of personal jurisdiction.

**3. Personal Involvement of Dreher and Soulsby**

Plaintiff's Fourth Amendment claims against defendants Dreher and Soulsby, in their individual capacities, stand on a different footing.[FN30] Dreher and Soulsby challenge these claims on the ground that a suit against them in their individual capacities must be interpreted in this case as a claim against them in their official capacities, and thus, as against the District. D.C. Mem. [# 227] at 7; D.C. Reply [# 257] at 8-9. Citing

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Monell* as authority, Dreher and Soulsby thus maintain that plaintiff's individual capacity claims should be dismissed.

> FN30. As mentioned in this Court's Report and Recommendation of March 26, 2003, "[s]ince neither the original complaint nor the first amended complaint named Soulsby or Dreher, a suit against them in their individual capacities under 42 U.S.C. § 1983, would be time-barred by the ... three-year statute of limitations ...." 3/26/03 R & R at 16 n. 17. However, as Dreher and Soulsby failed to interpose a statute of limitations defense in either their opposition to plaintiff's motion to amend his complaint for the third time or in their pending motions, *see, e.g.,* 4/28/05 M & O [# 207] at 8-9, the Court will not raise that defense *sua sponte.*

In *Kentucky v. Graham,* the Supreme Court clarified that while claims against a government officer in his official capacity "generally represent only another way of pleading an action against an entity of which the agent is an officer," 473 U.S. 159, 165-66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (quoting *Monell,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)), a suit against an officer in his personal or individual capacity is distinct in that relief comes not from governmental assets but instead from the officer's own personal assets. *Kentucky v. Graham,* 473 U.S. at 166. Because plaintiff seeks through his individual capacity claims against Dreher and Soulsby to hold these officials personally liable for actions they allegedly took under the color of D.C. law, plaintiff's claims are not, in a legal sense, duplicative of his official capacity claims against the officers or of his claims against the District of Columbia.

Defendants' argument is, however, not without force. Under section 1983, a plaintiff may establish individual liability against an official by showing that "the official, acting under the color of state law, caused the deprivation of a federal right." *Kentucky v. Graham,* 473 U.S. at 166 (citing *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961)). In the instant case, plaintiff fails to establish that Dreher and Soulsby "caused the deprivation" of his Fourth Amendment rights: plaintiff provides no admissible evidence that creates a material issue of fact with respect to whether Dreher and Soulsby (1) were directly involved in the acts alleged; (2) "failed to remedy the wrong[s]" after being informed of them; (3) "created a policy or custom under which constitutional practices occurred, or allowed the continuance of such a policy or custom"; (4) were "grossly negligent in supervising subordinates"; or (5) demonstrated "deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring." *Colon,* 58 F.3d at 873 (internal quotation marks and citations omitted).

***16** Plaintiff does not and cannot claim that Dreher and Soulsby were directly involved in the 1995 search or that they even had knowledge of the events at issue, either before or after they occurred. Instead, plaintiff alleges that Dreher and Soulsby "established a Municipal policy, practice, or custom that violate[d] the Fourth Amendment ...." 3d Am. Compl. at 12, 14-15. However, as detailed in the section of this opinion addressing his *Monell* claims,[FN31] plaintiff produces no admissible proof of the existence or creation of such a policy.[FN32] Because plaintiff thus presents no material issue of fact with respect to the individual liability of Dreher and Soulsby, their motion for summary judgment on plaintiff's constitutional claims should be granted. *See, e.g., Tricoles v. Bumpus,* No. 05CV3728(JFB)(JO), 2006 WL 767897, at *4 (E.D.N.Y. Mar. 23, 2006) (dismissing as "too vague and conclusory to state a claim" plaintiff's allegations that the Commissioner of the N.Y.S. Office of Children and Family Services had failed to train/supervise subordinates and/or established a custom/policy that caused plaintiff's injury, where plaintiff offered "no specific allegations of personal involvement by the Commissioner"); *Lewis v. Meloni,* 949 F.Supp. 158, 163-65 (W.D.N.Y.1996) (granting summary judgment in favor of Sheriff where plaintiff had failed to demonstrate the existence of material issues of fact with respect to the defendant's failure to supervise or train his subordinates, or defendant's deliberate indifference to the false arrests alleged); *Washington Square Post No. 1212 v. City of New York,* 720 F.Supp. 337, 345-47 (S.D.N.Y.1989) (granting summary judgment in favor of Police Commissioner in the absence of proof of personal involvement in warrantless and allegedly illegal search), *rev'd on other grounds,* 907 F.2d 1288 (2d Cir.1990).

> FN31. *See infra* pp. 54-57.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN32. Indeed, plaintiff does not purport to have specific facts linking Dreher and Soulsby to the acts in question and asserts only that "[t]he identification of [a] municipal policymaker is solely a question of law for the Court." Pl. Mem. (D.C.) [# 246] at 12.

**D. Unlawful Entry and Destruction of Property in 1995**[FN33]

FN33. Claims against Tucker arising out of the February 1996 incident were previously dismissed, and Reed and Young have not moved against the original complaint, which contains the claims relating to 1996. *See supra* note 3.

Plaintiff alleges that in entering the Premises on October 23, 1995, defendants lacked the authority of an active warrant and, thus, violated plaintiff's Fourth Amendment rights by unlawfully entering (1) the apartment building, (2) the basement, (3) plaintiff's grocery store, (4) plaintiff's second-floor apartment (Apartment # 2F), (5) the Davis apartment (Apartment # 2R), (6) the apartment of plaintiff's daughters (Apartment # 1RR), and (7) two newly renovated apartments (Apartments # 3F and 3R). *See* 3d Am. Compl. at 5-7, 9, 11. Plaintiff additionally claims that defendants unreasonably destroyed entryways and fixtures in the building, and caused the loss of personal and business property by intentionally leaving the Premises unsecured, all in violation of the Fourth Amendment. *See id.* at 5-9, 11. The Court will first consider whether the entry was authorized by a valid warrant and will then examine the reasonableness of the 1995 search under the Fourth Amendment.

**1. Validity of the August 1995 Arrest Warrant**

***17** Consistent with the Fourth Amendment, the arrest of an individual in his home must be supported by "either: 1) a warrant; or 2) the existence of both probable cause and an exception to the warrant requirement." *Hogan v. Caputo,* No. 02-CV-1040(LEK/RFT), 2004 WL 1376395, at *6 (N.D.N.Y. June 21, 2004) (citing *Payton v. New York,* 445 U.S. 573, 576, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), and *Anthony v. City of New York,* 339 F.3d 129, 135 (2d Cir.2003)). When an officer has reason to believe that a suspect is at the suspect's residence,[FN34] an arrest warrant, like a search warrant, is sufficient to authorize the officer's entry into the suspect's home to effect his arrest. *See United States v. Lauter,* 57 F.3d 212, 214 (2d Cir.1995) (citing, *inter alia, Payton,* 445 U.S. at 603); *see also Steagald v. United States,* 451 U.S. 204, 214 n. 7, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981) ("Because an arrest warrant authorizes the police to deprive a person of his liberty, it necessarily also authorizes a limited invasion of that person's privacy interest when it is necessary to arrest him in his home.").

FN34. *See* cases cited *infra* pp. 45-46.

In the instant case, plaintiff contends that the August 1995 arrest warrant on which defendants rely in support of their motion is a forgery, and that the other defense evidence concerning the warrant is either unverified or falsely manufactured. *See* Plaintiff['s] Affidavit in Support of Cross-Motion for Summary Judgment ("Pl. Aff." [# 242] ) ¶ 4; Pl. Mem. [# 241] at 10-11.

The validity and active nature of the warrant in question have already been judicially determined, albeit in a different action.[FN35] As the D.C. Superior Court upheld the 1995 arrest warrant in connection with plaintiff's underlying criminal case,[FN36] plaintiff is collaterally estopped from relitigating this issue. *See Doe v. Pfrommer,* 148 F.3d 73, 80-81 (2d Cir.1998) (upholding a court's right to invoke collateral estoppel *sua sponte* in the interest of the "strong public policy in economizing the use of judicial resources by avoiding relitigation ....").

FN35. Tucker argues that this issue was determined by Judge Ross in a prior opinion in this case. However, in the decision in question, dated September 24, 1998, Judge Ross reviewed the four warrants outstanding at the time of the *1996* search of the Premises, noting that "there is no question as to [the warrants'] validity," 9/24/98 Op. [# 44] at 23, but cautioning that "the active nature of one of the warrants is open to debate ...." *Id.* at 22. The referenced arrest warrant, dated August 12, 1995 and reapproved on August 14, 1995, "bears a large 'X' on its face, accompanied by the word 'VACATE'

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

without any indication of when it was vacated." *Id.* at 22 n. 11. Thus, while concluding that the 1996 entry was authorized, Judge Ross did not rule that the August 1995 warrant was active at the time of the 1995 search. *See id.* at 22, 23 & n. 11.

FN36. *See* 1/14/02 Memorandum Opinion and Order Denying § 23-110 Motion ("1/14/02 Mem." [# 270] ), *United States v. Jasper Dockery,* Docket No. F-536-96.

Under the Full Faith and Credit Act, 28 U.S.C. § 1738, the decisions of any state court "shall have the same full faith and credit in every court within the United States ... as they have by law or usage in the courts of such State ... from which they are taken." 28 U.S.C. § 1738.[FN37] Accordingly, pursuant to D.C. law, the Court in this action may not consider an issue previously presented to the D.C. court where that issue is "one that was actually litigated and decided in the prior case, by a final and valid disposition on the merits, after a full and fair opportunity for litigation by the same parties or their privies, [and] where the issue was necessarily decided in disposing of the first action, and not mere dictum." *Smith v. Jenkins,* 562 A.2d 610, 617 (D.C. Ct. of App.1989) (citing WRIGHT, MILLER & COOPER, *FEDERAL PRACTICE & PROCEDURE: JURISDICTION,* § 4416 (1981)); *see also Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 81, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984) ("It is now settled that a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered."). "Principles of collateral estoppel may bar relitigation in a subsequent civil rights action in federal court of an issue that was determined in a state court criminal proceeding." *Owens v. Trader,* 873 F.2d 604, 606 (2d Cir.1989).

FN37. The District of Columbia is considered a state for purposes of section 1738. *See* 28 U.S.C. § 1738 (referencing the judicial proceedings and legislative acts of "any State, Territory, or Possession of the United States"); *Synanon Church v. United States,* 579 F.Supp. 967, 974 (D.D.C.1984), *aff'd,* 820 F.2d 421 (D.C.Cir.1987); *Washington Gas Light Co. v. Hsu,* 478 F.Supp. 1262, 1263-64 (D.Md.1979).

***18** Plaintiff's challenge to the 1995 warrant, which he presented to the D.C. Superior Court through a collateral attack on his criminal conviction, has already been litigated and decided. Specifically, plaintiff asserted that his trial counsel was ineffective in having failed to move to suppress testimony concerning the 1995 search of the Premises.[FN38] D.C. Superior Court Judge Mary Ellen Abrecht rejected Dockery's ineffectiveness claim. *See* 1/14/02 Mem. [# 270] at 5-6. The court held that Dockery had "proffer[ed] no reason for the Court to have found the October search unlawful, *given the existence at the time of a valid felony arrest warrant for obstruction of justice ....*" *Id.* (emphasis added). The D.C. court also rejected Dockery's claim that Tucker and the D.C. officers had lied at plaintiff's criminal trial about the existence of the warrant and of National Crime Information Center ("NCIC") records documenting its issuance. *Id.* at 17-19. Specifically, Judge Abrecht explained, "Superior Court records corroborate [Reed and Tucker's] testimony about the existence of an obstruction of justice warrant before the October 1995 search .... No confusion or absence of record keeping over faxes or NCIC printouts ... erases the fact that law enforcement officials had been commanded by the Superior Court to arrest Dockery." *Id.* at 20.

FN38. Plaintiff's motion before the D.C. Superior Court is referenced in that court's opinion but is not part of the record in the instant action.

Thus, the validity and active nature of the August 1995 warrant were actually litigated and decided in the post-conviction proceeding, at which plaintiff had a full and fair opportunity to press the argument.[FN39] In these circumstances, the ruling is entitled to preclusive effect under D.C. law. *See District of Columbia v. Gould,* 852 A.2d 50, 55 (D.C. Ct. of App.2004) ( "Under the doctrine of collateral estoppel ... once an issue of fact or law has been actually and necessarily determined against a party by a court of competent jurisdiction, that determination is conclusive on that party in any subsequent proceeding against that party based on a different cause of action."). *A fortiori,* plaintiff is collaterally estopped from relitigating in federal court his challenge to the 1995

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

warrant, notwithstanding his *pro se* status. *See* *Conte v. Justice,* 996 F.2d 1398, 1400 (2d Cir.1993); *Bonilla v. Brancato,* No. 99 Civ. 10657 LTSJCF, 2002 WL 31093614, at *5 (S.D.N.Y. Sept.18, 2002) ("A plaintiff's status as a *pro se* litigant does not, by itself, preclude barring a claim under the doctrine of collateral estoppel, but it is relevant to a determination of the fairness of his prior opportunity to be heard.").[FN40]

FN39. Judge Abrecht's decision is a final one, as Dockery filed a notice of appeal to the D.C. Court of Appeals but then failed to perfect it. *See* *Dockery v. United States,* 853 A.2d 687, 691 n. 5 (D.C. Ct. of App.2004) (reviewing plaintiff's three consolidated appeals).

FN40. Judge Ross previously declined to give preclusive effect to a different ruling by the D.C. Superior Court, concerning the validity of a 1996 bench warrant. However, there the status of the 1996 warrant was not central to the D.C. court's resolution of the matter at hand-to wit, a motion to dismiss the indictment for lack of jurisdiction. *See* 9/24/98 Op. [# 44] at 18-19. Here, by contrast, the determination of the validity of the 1995 warrant was necessary to the resolution of Dockery's ineffective assistance of counsel claim predicated on his attorney's failure to challenge the October 1995 search. *See* *Bigelow v. Knight,* 737 F.Supp. 669, 671 (D.D.C.1990) (plaintiff's motion alleging ineffective assistance of trial counsel was entitled to preclusive effect in subsequent federal action).

Even assuming it did not merit preclusive effect, Judge Abrecht's decision, together with other evidence in the record, establishes that the August 1995 warrant was both valid and active at the time of the October 1995 search. Specifically, Tucker proffers the declaration of Assistant United States Attorney Kenneth Kohl, who participated in the preparation of the August 1995 warrant. *See generally* Kohl Decl. [# 218]. Kohl attests that the warrant was not vacated until after Dockery's arrest in February 1996,[FN41] at which time the clerk of the D.C. Superior Court was notified that it could be withdrawn and thereafter marked an "X" and the word "VACATE" on the face of the warrant. *Id.* ¶ 14. Additionally, Tucker produces an FBI lead, dated October 18, 1995-five days before the challenged 1995 search-that bears the words "ARMED AND DANGEROUS" and states, in pertinent part, that "[a]n arrest warrant was issued for captioned subject [Dockery] by the District of Columbia Superior Court on 8/14/05, for Obstruction of Justice." Tucker Decl. Ex. A [# 217] at 1. The lead lists as enclosures a copy of the August 1995 arrest warrant and a photograph of Dockery. *Id.* This evidence supports Tucker's contention that the warrant was active at the time of the October 1995 search.

FN41. It is undisputed that plaintiff was arrested by an FBI Fugitive Task Force at the Premises on February 6, 1996.

***19** Plaintiff's challenge to this evidence is unavailing. As support for his suggestion that the 1995 warrant was fraudulently manufactured after the October 1995 search, plaintiff offers a printout from the NCIC, dated March 15, 2000, that lists no warrant dated August 12, 1995, and, for the years 1995 and 1996, includes only a bench warrant dated February 2, 1996. *See* [NCIC Report] (attached to Pl. Mem. (Tucker) [# 241] as Ex. 29). Plaintiff erroneously assumes that the NCIC database is a cumulative record of every warrant ever in existence for a particular individual. *See* Pl. Mem. (Tucker) [# 241] at 13-14. In fact, warrants are regularly removed from the database once they have been satisfied or when other official law enforcement action has been taken in a case. *See* *Arizona v. Evans,* 514 U.S. 1, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995) (reviewing a defense motion to suppress evidence on the ground that the evidence was seized through an unlawful arrest based on a quashed warrant that had erroneously remained in the computerized database of the Sheriff's Office); *id.* at 26 (Ginsburg, J., dissenting) (discussing NCIC database). Consequently, a warrant that was satisfied and vacated in February 1996 would ordinarily not appear on an NCIC printout from March 2000.

With the exception of the NCIC printout, plaintiff provides only conclusory allegations of the arrest warrant's invalidity. In light of the defense's factual showing, these allegations do not present a material issue of fact as to the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

existence of a valid active warrant for plaintiff's arrest at the time of the October 1995 search. *See Kia P. v. McIntyre,* 235 F.3d 749, 763 (2d Cir.2000) ("A plaintiff may not survive a properly asserted motion for summary judgment on the basis of conclusory allegations alone.").

**2. Reasonableness of the 1995 Entries**

The inquiry does not end here. It is well settled that a law enforcement officer seeking to enter a suspect's home pursuant to an arrest warrant must have "reason to believe that the suspect is present." *Lauter,* 57 F.3d at 215; *accord United States v. Lovelock,* 170 F.3d 339, 344 (2d Cir.1999); *United States v. Big Apple Bag Co.,* 317 F.Supp.2d 181, 186 (E.D.N.Y.2004) (stating that the reasonable belief standard "has been interpreted to 'require[ ] a two-part inquiry: first, there must be a reasonable belief that the location to be searched is the suspect's dwelling, and second, the police must have 'reason to believe' that the suspect is within the dwelling.' ") (quoting *United States v. Magluta,* 44 F.3d 1530, 1533 (11th Cir.1995)). This standard has been interpreted in this Circuit as "less stringent than a probable cause standard." *Bartlett,* 2005 WL 887112, at *5 (citing, *inter alia, Lauter,* 57 F.3d at 215). Importantly, an officer's belief, although reasonable, need not be correct; thus, reasonable mistakes as to a suspect's presence or address will not give rise to a Fourth Amendment violation. *See Anderson v. United States,* 107 F.Supp.2d 191, 196 (E.D.N.Y.2000) (citing *Maryland v. Garrison,* 480 U.S. 79, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987), and *Lovelock,* 170 F.3d at 342).

***20** Tucker contends that, at the time of the October 1995 search, he had a reasonable belief both that plaintiff resided in the Premises and that plaintiff was then present at the scene. *See* Tucker Mem. [# 215] at 14-16. Reed and Young, who deny that they were at the Premises at the time of the search, argue, in the alternative, that even assuming they were at the Premises, their behavior-like that of Tucker-would have been both reasonable and lawful. D.C. Mem. [# 227] at 4.[FN42] Accordingly, in reviewing the reasonableness of the October 1995 entry and search, this Court will assume that Tucker's beliefs were shared by Reed and Young.

FN42. Those three defendants also assert a defense of qualified immunity from liability for any violations of the Fourth Amendment. Tucker Mem. [# 245] at 21-24; D.C. Mem. [# 227] at 17-18. The qualified immunity defense is discussed *infra* pp. 51-54.

Tucker attests that he was aware of an August 1995 FBI lead that advised that plaintiff "may be located in the vicinity of '3 Star Grocery,' 2127 Pitkin Avenue, Brooklyn, New York," and that provided two telephone numbers for him. Tucker Mem. [# 215] Ex. A at 1.[FN43] Tucker further attests that surveillance was commenced at the Premises, "where Dockery was suspected of dwelling." Tucker Decl. [# 217] ¶ 7. Additionally, in connection with plaintiff's criminal prosecution in the D.C. Superior Court, Tucker testified that, prior to the search, he had learned that plaintiff owned the building at 2127 Pitkin Avenue and, moreover, believed that plaintiff's apartment was located on the second floor, "but it could have been anywhere in the building since he was the owner." [Testimony of Special Agent Nathan Tucker, D.C. Superior Court] [FN44] (Ex. 6 to Plaintiff's Motion with New Facts for Appointment of Counsel ("Mot. to Appoint Counsel") [# 141] ) at 732; *see* attachment to Mot. Opposing Legal Aid [# 32] at 220) (testifying that plaintiff's residence was "the entire building"). According to Tucker, before entering the building to serve the arrest warrant, he determined which apartment was plaintiff's residence "by seeing him in the window on the second floor." Mot. to Appoint Counsel, Ex. 6 [# 141] at 732.

FN43. Multiple portions of the FBI lead submitted by Tucker have been redacted.

FN44. The Court is unable to ascertain whether the excerpted transcript is from plaintiff's criminal trial or from a related hearing.

If credited, the information in Tucker's affidavit and his trial testimony would ordinarily be sufficient to establish Tucker's reasonable belief that plaintiff resided in Apartment # 2F and that he could be found there upon entry. However, while plaintiff admits, in various sworn statements, that he resided in the building in Apartment # 2F, he denies that he was on the Premises at the time of the October 1995 entry and search, and he thus disputes

that Tucker saw him in the window of a second-floor apartment. *See* Dockery Dep. (Matthews Decl. [# 219] Ex. E) at 45. Apart from the disputed fact of Dockery's sighting in an apartment window, the defense cites no other evidence of plaintiff's suspected presence at the Premises. While plaintiff's denial is dubious at best,[FN45] the Court nevertheless must, for purposes of this summary judgment motion, construe the facts in the light most favorable to plaintiff as the non-moving party. Even assuming that defendant reasonably believed that plaintiff resided somewhere on the Premises, a material issue of fact exists with respect to the reasonableness of Tucker's belief that plaintiff would be found there at the time of the October 1995 search.

FN45. That plaintiff was probably hidden in the Premises may be inferred from the fact that his identification was found in a crawl space during that search and that, in February 1996, he was located in the Premises, concealed in a specially constructed shelter between the floorboards of the second floor and the ceiling of the first floor. *See* Mot. Opposing Legal Aid [# 32] at 231-34.

***21** In the absence of uncontested evidence suggesting plaintiff's presence at the Premises, this Court cannot conclude that the ensuing entries alleged by plaintiff-to wit, Tucker's entry into the second-floor apartment in which plaintiff concededly resided, the basement, the grocery store, the two newly renovated apartments, and plaintiff's children's apartment-were reasonable as a matter of law.[FN46] *See* *Washington Square Post,* 720 F.Supp. at 351 n. 10 ("[I]f the entry was illegal, the subsequent searches ... would be tainted by this illegal entry.").

FN46. Relying on *Maryland v. Buie,* 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), the defense contends that law enforcement officers "had the right, based on the authority of the arrest warrant, to search anywhere in the house that [the suspect] might have been found ...." Tucker Mem. [# 215] at 16 (quoting *Buie,* 494 U.S. at 330); *see* D.C. Mem. [# 227] at 17. However, in *Buie,* in contrast to this case, the lawfulness of the entry itself was not in issue, as a police department secretary had verified, by calling Buie's house, that Buie was present. *See* *Buie,* 494 U.S. at 328.

Moreover, in affirming the authority of the police, armed with an arrest warrant, "to search anywhere in [the suspect's] house" to effect his arrest, the Supreme Court in *Buie* did not address the authority of the police to search an entire multi-unit dwelling. Presumably, a judicial determination as to the reasonableness of police entries into different units of an apartment building would involve a series of separate analyses. In this case, the only stated basis for Tucker's belief that plaintiff was then on the Premises is the disputed proof of Tucker's having spotted Dockery in the window; hence, the Court need not address whether a showing short of "reasonable basis" would be sufficient to justify the police entry into portions of the Premises that were not Dockery's personal residence. It bears noting, however, that the level of justification mandated under *Payton* with respect to police entries into spaces other than a suspect's own residence "can be no greater than the 'reasonable basis' that would have been required had [the officers] arrested [the suspect] in his own home." *Big Apple Bag Co.,* 317 F.Supp.2d at 186 (Garaufis, J.) (citing *Payton,* 445 U.S. at 583-89 (discussing the sanctity of the home in contrast to other spaces), and *United States v. Hagq,* 278 F.3d 44, 54 (2d Cir.2002) (Meskill, J., concurring) ("While we are protected from unreasonable government intervention in our business, automobiles and in public, the protection we enjoy in these situations is far less than the ultimate protection we receive in our homes.")); *accord* *United States v. Elkins,* 300 F.3d 638, 646 (6th Cir.2002).

Whether plaintiff had a reasonable expectation of privacy in areas other than his own apartment is an issue not before this Court. *See* *supra* note 20.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**3. Destruction of Property Claims**

Plaintiff contends that defendants engaged in an unreasonable search in violation of the Fourth Amendment by destroying fixtures in and portions of the Premises and by failing to secure the doors thereto, thus enabling looting by third parties. *See* 3d Am. Compl. at 5-9, 11. Plaintiff claims damages and losses in the amount of: $27,650 in missing personal property belonging to plaintiff, his children and his common-law wife; $32,300 in lost grocery stock; $2,300 in missing cash; $7,940 in damage to various doors; $5,600 in damage to the structure of the building and various fixtures; and $5,800 in missing electrical parts, supplies and wiring. *See id.* at 5-8. Tucker maintains that the search was reasonable under the Fourth Amendment and, moreover, that his conduct was consistent with 18 U.S.C. § 3109, which authorizes law enforcement officers to force entry under certain circumstances. Tucker Mem. [# 215] at 16-19. Reed and Young disclaim involvement in the entry into and search of the Premises, but again, in the alternative, adopt the version of events stated by Tucker. D.C. Mem. [# 227] at 5-6, 14-18.

Congress has recognized that in certain circumstances, law enforcement officers, in the course of their duty, may be constrained to force entry into various dwellings and spaces in order to execute warrants. Thus, pursuant to section 3109 of Title 18 of the United States Code, an officer is authorized to "break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance ...." 18 U.S.C. § 3109; *see also Cody v. Mello,* 59 F.3d 13, 16 (2d Cir.1995) ("[I]t is well recognized that 'officers executing search warrants on occasion must damage property in order to perform their duty.' ") (quoting *Dalia v. United States,* 441 U.S. 238, 258, 99 S.Ct. 1682, 60 L.Ed.2d 177 (1979)). While explicitly referencing only search warrants, the statute has been interpreted to apply to a "valid arrest pursuant to an arrest warrant in a residence ...." *Bartlett v. City of New York,* No. CV031961CPS, 2005 WL 887112, at *7 (E.D.N.Y. Feb.11, 2005) (quoting *United States v. Alejandro,* 368 F.3d 130, 133 (2d Cir.2004)) (other citations omitted). Importantly, contrary to Tucker's suggestion (*see* Tucker Mem. [# 215] at 17-18), an officer's compliance with section 3109 in effecting a forced entry does not guarantee that the scope of the ensuing search will be deemed reasonable: "The general touchstone of reasonableness which governs Fourth Amendment analysis governs the method of execution of the warrant. [Accordingly,] [e]xcessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment, even though the entry itself is lawful ...." *United States v. Ramirez,* 523 U.S. 65, 71, 118 S.Ct. 992, 140 L.Ed.2d 191 (1998) (internal citations omitted). [FN47]

FN47. *See* cases cited *supra* pp. 28-29.

***22** As previously discussed, the reasonableness of Tucker's entry turns on a material issue of fact with respect to plaintiff's presence on the day of the search.[FN48] This same disputed fact is also key to determining the reasonableness of the scope and manner of the resulting searches and any attendant destruction of property.[FN49] Accordingly, a material issue of fact exists as to whether the manner of executing the search violated the Fourth Amendment.[FN50]

FN48. *See supra* pp. 45-49.

FN49. For example, it appears that Tucker's claim that he saw Dockery through the window constitutes the defense justification for breaking down the door and for cutting holes in ceilings within the Premises.

FN50. In light of his claim that he was not present at the time of the 1995 search, and thus his resulting lack of personal knowledge regarding the condition of the Premises following the search, plaintiff will likely face an uphill battle in substantiating most of his alleged damages. Plaintiff belatedly proffers affidavits from various individuals concerning the alleged property damage. *See, e.g.,* Affidavit [of Ilma Davis], dated 2/22/00; Affidavit [of Everton Agustos], dated 11/10/03; Affidavit of George Crawford, dated 3/3/04; Affidavit [of Geanette Dunning], dated 6/19/04; Affidavit [of Creola Dunning], dated 6/26/04; and Affidavit of Tiara Bullock, dated 3/26/05 (all attached as exhibits

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

to Pl. Mem. (Tucker) [# 241] ); [Affidavit of Harris A. Harding], dated 6/14/01 (Ex. B5 to [Plaintiff's 9/5/05 Letter to Judge Mann] [# 259] ). Notably, however, several of these affidavits were submitted after the close of discovery, thereby unfairly depriving the defense of an opportunity to depose the affiants. *See* Tucker Reply [# 258] at 11-13. Others were submitted by individuals who, like plaintiff, lack personal knowledge of defendants' involvement in the acts alleged, as they were not present at the Premises. The Court need not now resolve defendants' motion to strike those affidavits; even if the challenged affidavits are disregarded in connection with the pending dispositive motions, the defense is not entitled to summary judgment on the Fourth Amendment claims. The admissibility of the affiants' testimony at trial may, however, be an appropriate subject for an *in limine* motion.

**4. Qualified Immunity**

Tucker and the D.C. defendants further argue that even if a Fourth Amendment violation had occurred in connection with the 1995 search, they are entitled to summary judgment on qualified immunity grounds. Specifically, they contend that they may not be held liable because a reasonable officer at the scene would have viewed a forced entry and unannounced search of the Premises as objectively reasonable in light of the circumstances then confronting him. *See* Tucker Mem. [# 215] at 23-24; D.C. Mem. [# 227] at 14-18.[FN51]

FN51. In *Harlow v. Fitzgerald,* the Supreme Court announced the often-invoked standard for qualified immunity. The Court explained that qualified immunity protects "government officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "Under the *Harlow v. Fitzgerald* standard, a government official sued in his individual capacity is entitled to qualified immunity in any of three circumstances: (1) if the conduct attributed to him is not prohibited by federal law; or (2) where that conduct is so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time of the conduct; or (3) if the defendant's action was 'objective[ly] legal[ly] reasonable[ ] ... in light of the legal rules that were clearly established at the time it was taken.' " *X-Men Sec., Inc. v. Pataki,* 196 F.3d 56, 65-66 (2d Cir.1999) (alterations in original) (quoting *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)) (other internal citations omitted).

In reviewing a summary judgment motion, a court should ordinarily grant the motion based on qualified immunity where " 'no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendant[ ]' to believe that he was acting in a fashion that did not clearly violate an established federally protected right." *Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir.1995) (alteration in original) (quoting *Robison v. Via,* 821 F.2d 913, 921 (2d Cir.1987)); *see also Bartlett,* 2005 WL 887112, at *10. Summary judgment based on qualified immunity should not be granted, however, where material issues of fact frustrate the Court's review of the reasonableness of the actions in question. *See, e.g., Breen v. Garrison,* 169 F.3d 152, 153 (2d Cir.1999) (per curiam) (reversing finding of qualified immunity in light of material differences in the parties' versions of the facts regarding plaintiff's excessive force claim); *Armstead v. Township of Upper Dublin,* No. Civ.A. 03-CV-3608, 2004 WL 2743451, at *4 (E.D.Pa. Nov.23, 2004).

"The question of qualified immunity is independent from the merits of the underlying action and must be examined independently of the underlying claims." *Bartlett,* 2005 WL 887112, at *9 (citing *Saucier v. Katz,* 533 U.S. 194, 207, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). Accordingly, this Court's earlier determination that a material question of fact exists as to the lawfulness of the 1995 search does not necessarily foreclose entry of summary judgment based on qualified immunity. Nevertheless, such relief is inappropriate in the instant

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

case, as the qualified immunity defense is based upon the same disputed facts as the defense to the underlying Fourth Amendment claims.

The defendants do not dispute that the Fourth Amendment law governing plaintiff's unlawful entry and destruction of property claims was clearly established at the time of the October 1995 search. To the contrary, the defense argues that the search of the Premises-even if forced and destructive to plaintiff's property-was lawful in light of the attendant circumstances. *See* Tucker Mem. [# 215] at 23-24. However, contrary to the premise of the defense motion, defendants' argument is predicated on a set of facts that in fact are disputed by plaintiff. Indeed, because a material issue of fact exists as to whether plaintiff was seen at the Premises just before the entry, it cannot be determined whether a reasonable officer in Tucker's position would have believed that urgent and forcible action was necessary to prevent plaintiff's escape. Accordingly, summary judgment on the basis of qualified immunity is not appropriate in this case. *See* *Breen,* 169 F.3d at 152; *Arum v. Miller,* 331 F.Supp.2d 99, 110-11 (E.D.N.Y.2004) (denying qualified immunity to police officers on plaintiff's excessive force claim in light of the "significant dispute" as to the conduct of the officers during the arrest); *see also* *Hudson v. New York City,* 271 F.3d 62, 66 (2d Cir.2001) (noting that Judge Ross had properly denied a defense motion for summary judgment on qualified immunity grounds where "the key facts surrounding the question of whether there was sufficient basis upon which a reasonable officer might find probable cause to enter [plaintiff's] apartment [ ] remain in dispute.").

**E. *Monell* Claims**

***23** In his *Monell* claims, plaintiff seeks to hold the District liable for the actions of Reed and Young based on an alleged "Municipal policy, practice or custom that violated the Fourth Amendment ...," and on the District's alleged "failure to adequately train, d[i]scipline and supervise [ ] its homicide Officers in matters of extrajurisdictional searches, seizure, and arrest[.]" 3d Am. Compl. at 12-13; *see id.* at 14-15. Plaintiff also asserts *Monell* claims based on the District's alleged violation of plaintiff's due process rights.3d Am. Compl. at 13-14, 15-16.[FN52] Plaintiff's *Monell* claims should not be permitted to survive summary judgment.

FN52. Plaintiff's due process claim against Reed and Young is discussed *supra* pp. 26-30.

In recognition of the unique burdens that litigation poses to municipalities, whose liability for damages is paid by taxpayer dollars, the Supreme Court has limited municipal liability to those cases in which the government officials or officers may be said to have been executing municipal custom or policy that "actually caused" the alleged violations. *City of Canton v. Harris,* 489 U.S. 378, 385-91, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Thus, a plaintiff may sustain a claim against a municipality under section 1983 if she proves the existence of a municipal custom or policy the enforcement of which was "the moving force behind the constitutional violation." *Id.* at 389 (internal quotation marks omitted).

Dockery alleges that the District is liable for his injuries on account of its failure to train, discipline and supervise its homicide officers.3d Am. Compl. at 12-14. Even assuming *arguendo* that plaintiff's allegations have been adequately pled, *see generally* Fed.R.Civ.P. 8(a)(2); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 167-68, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); *Walker v. City of New York,* 974 F.2d 293, 297-99 (2d Cir.1992), they have not been substantiated by admissible evidence. Despite having obtained discovery from the District,[FN53] plaintiff fails to point to a specific policy, custom, practice, decision or ordinance, or any training or supervising deficiency, that caused his constitutional rights to be violated. *See, e.g.,* *Monell,* 436 U.S. at 694; *City of Canton,* 489 U.S. at 388 (a mere failure to supervise employees or to provide proper training is not actionable unless the failure is so severe as to constitute "deliberate indifference" to the deprivation of plaintiff's rights). Instead, plaintiff relies upon an array of newspaper articles and judicial decisions discussing general police misconduct, and he assumes from this that there existed a pattern of misconduct that was or should have been "so obvious" to the District as to put it on notice that future violations were likely to occur absent remedial action. Pl. Mem. (D.C.) [# 246] at 14-22; *see* *City of Canton,* 489 U.S. at 390 n. 10. Plaintiff misconstrues the value and admissibility of the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

information proffered.

FN53. Earlier in this case, this Court bifurcated discovery and trial on plaintiff's *Monell* claims against the District. *See* 1/27/00 Memorandum and Order [# 120] at 6-7. The District nevertheless did not object to plaintiff's discovery demands regarding municipal policies and training programs, and instead provided the disclosure sought. *See, e.g.,* Defendants Pam Reed's and Phineas Young's Response [to] Plaintiff's First Set of Request[s] for the Production of Documents (attached as Ex. D to Pl. Mem. (D.C.) [# 246] ). In light of this exchange, the Court reopened discovery on June 27, 2003 "for the limited purpose of allowing plaintiff to serve discovery demands on defendants Soulsby and Dreher." 6/27/03 M & O [# 155]. As plaintiff sought and obtained discovery on his *Monell* claims, he will not be unfairly prejudiced by the Court's consideration of the District's challenge to those claims.

The cases upon which plaintiff relies address a wide range of police conduct, from car ride-alongs and stops to false arrest, the majority of which is inapposite to the conduct at issue in this case. *See* Pl. Mem. (D.C.) [# 246] at 15-17. Further, although plaintiff maintains that the very existence of the cited cases demonstrates the District's failure to investigate claims made against its officers, *see id.* at 17-18, no conclusion may reasonably be drawn from most of the cases as to the extent of any investigation by the District into alleged misconduct or as to the existence of any disciplinary action. Plaintiff erroneously assumes from the facts alleged by the plaintiffs in those cases that the police engaged in misconduct. In fact, the existence of the lawsuits cited by plaintiff establishes "no more than notice to the city that allegations had been made." *Carter v. District of Columbia,* 795 F.2d 116, 123 (D.C.Cir.1986). Plaintiff's reliance on a *Washington Post* newspaper article, *see* Unmarked Ex. to Pl. Mem. (D.C.) [# 246], which described a suit charging police misconduct in connection with mass arrests of protesters at a demonstration in 2002, is likewise unavailing, as the alleged misconduct bears no resemblance to the allegations in this case and, moreover, occurred more than six years after the events at issue here.

***24** For purposes of a *Monell* claim, the "catalog of disquieting events [submitted by plaintiff] is not sufficient to demonstrate a pervasive pattern of police officer indulgence in [unreasonable searches and seizures], persisting in the District because of the [D.C. Police Department's] tacit approval." *Carter,* 795 F.2d at 123. Indeed, "[i]f the evidence plaintiff [ ] presented here were adequate to make out a § 1983 case, then practically every large metropolitan police force, it would seem, could be targeted for such liability." *Id.; see generally Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 129 (2d Cir.2004) (affirming grant of summary judgment where plaintiffs, in an action against a town for failure to train its police force, had "neglected to offer any evidence ... as to the purported inadequacies in the Town's training program and the causal relationship between those inadequacies and the alleged constitutional violations."); *Hudson,* 271 F.3d at 66, 67 n. 6 (affirming Judge Ross' granting of defense motion for summary judgment on *Monell* claim on the ground that plaintiff "had not adduced evidence that any of the City's practices or policies contributed to, or caused, the allegedly unconstitutional search."); *Sagendorf-Teal v. County of Rensselaer,* 100 F.3d 270, 276-77 (2d Cir.1996) (affirming grant of summary judgment in favor of County where "the trial court was not presented with any evidence or allegation of an official policy" pursuant to *Monell* ); *Washington Square Post,* 720 F.Supp. at 343-45 (granting the City summary judgment on *Monell* claims).

As plaintiff has failed to present any evidence from which a reasonable juror could conclude that the District was the moving force behind any violation of his constitutional rights, the District's motion for summary judgment on the *Monell* claims should be granted.

**F. Tort Claims against Reed, Young, and the District for 1995 Search**

Plaintiff alleges that, following their unreasonable and unauthorized search of the Premises, Reed, Young and the District "intentionally and maliciously" failed to replace doors and locks to the Premises, thereby causing the "loss of [plaintiff's] business and private property." 3d Am. Compl. at 10. Liberally construing plaintiff's complaint, he appears to assert common law claims against those D.C.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

defendants based on the tort theories of trespass to chattels, trespass to land, and conversion. *See id.;* 4/28/05 M & O at 5-6 n. 5. The D.C. defendants seek summary judgment on these claims, on the ground that plaintiff fails to establish any wrongful conduct on their part, falsely alleges that defendants left the Premises unsecured, and, further, cannot prove "the origin or value of the allegedly lost property." D.C. Mem. [# 227] at 18-20.

Under New York law, which would appear to apply to plaintiff's common law tort claims arising out of acts occurring in New York,[FN54] a plaintiff may establish trespass to land where he proves "an unauthorized entry upon private property." *Rager v. McCloskey,* 305 N.Y. 75, 79, 111 N.E.2d 214 (1953). "To state a claim for trespass to chattels under New York law, plaintiffs must establish that defendants 'intentionally, and without justification or consent, physically interfered with the use and enjoyment of personal property in [plaintiffs'] possession,' and that plaintiffs were thereby harmed." *In re Jetblue Airways Corp. Privacy Litig.,* 379 F.Supp.2d 299, 327 (E.D.N.Y.2005) (citing *Kuprewicz,* 771 N.Y.S.2d at 807). Finally, " '[c]onversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights.' " *Thyroff v. Nationwide Mut. Ins. Co.,* 460 F.3d 400, 2006 WL 2391162, at *3 (2d Cir. Aug.21, 2006) (quoting *Vigilant Ins. Co. of Am. v. Hous. Auth.,* 87 N.Y.2d 36, 44, 637 N.Y.S.2d 342, 660 N.E.2d 1121 (1995) (internal quotation marks omitted)).

FN54. New York is the state with the strongest interest in adjudicating alleged torts committed against its citizens within the state's boundaries. *See AroChem Int'l, Inc. v. Buirkle,* 968 F.2d 266, 270 (2d Cir.1992) ("In tort actions [presenting choice of law questions], New York applies a so-called interest analysis .... Under such an analysis, the law of the jurisdiction having the greatest interest in the litigation applies.") (internal citations omitted). "[T]he significant factors for this analysis are the parties' domiciles, and the locus of the tort." *Lee v. State of New York Dep't of Corr. Servs.,* No. 97 Civ. 7112(DAB), 1999 WL 673339, at *3 (S.D.N.Y. Aug.30, 1999).

***25** In the present case, for the same reasons that apply to the Court's Fourth Amendment analysis of the reasonableness of defendants' entries into and searches of the Premises,[FN55] summary judgment is inappropriate with respect to plaintiff's tort claims against Reed, Young and the District. Because the parties' dispute over plaintiff's presence at the Premises poses material issues of fact as to the lawfulness of defendants' entry, the Court cannot find as a matter of law that defendants' forced entry and search, which resulted in damage to plaintiff's real property, was "authorized" and, thus, was not a trespass. *See Voskerchian v. United States,* No. 98-CV-0335E(M), 1999 WL 66709, at *4 (W.D.N.Y. Feb.10, 1999) ("New York cases support the proposition that a law enforcement officer's privilege [to trespass pursuant to a warrant] remains limited to constitutional searches and seizures.") (citing *1090 Jericho Corp. v. Elias,* 164 A.D.2d 852, 559 N.Y.S.2d 358, 361 (2d Dep't 1990) (affirming the denial of law enforcement officers' motion to dismiss trespass claim premised upon a search executed pursuant to an allegedly invalid warrant), and *People v. Johnson,* 66 N.Y.2d 398, 414, 497 N.Y.S.2d 618, 488 N.E.2d 439 (1985) (Titone, J., concurring)).[FN56] Summary judgment dismissing the tort claims against these defendants is thus inappropriate at this juncture.[FN57]

FN55. *See supra* pp. 45-51.

FN56. However, as discussed in the next section of this opinion, plaintiff's tort claims and constitutional claims all suffer from the same flaw with respect to plaintiff's demand for damages for loss of business. In addition, because real property and the fixtures attached thereto cannot properly be characterized as chattels or personal property, *see Roemer & Featherstonhaugh, P.C. v. Featherstonhaugh,* 267 A.D.2d 697, 699 N.Y.S.2d 603 (3d Dep't 1999) ("[Where] the property claimed to have been converted is real property ... conversion will not lie."), plaintiff cannot state a claim for either trespass to chattels or conversion with respect to the damage he alleges was caused to the doors and ceilings of his building, or to other fixtures.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN57. As defendants have neither raised nor briefed the issue, the Court will not here opine on the cognizability of a tort claim against defendants for the criminal acts of third parties in allegedly looting the Premises.

**G. Damages for Loss of Business**

In his third amended complaint, plaintiff suggests that defendants caused a loss of business profits by unlawfully entering and searching his grocery store, and by leaving the entrance doors to it unreplaced, thereby allowing looting by third parties and damage to plaintiff's business. *See* 3d Am. Compl. at 5, 17-18. Plaintiff estimates his losses at $563,942 in past profits and $1,800,000 in future profits. *See id.*[FN58] Defendants challenge plaintiff's demand for damages, denying that their conduct was tortious or unlawful and further asserting that plaintiff has failed to provide any evidence in support of his claim for damages. *See* Tucker Mem. [# 215] at 19-21; D.C. Mem. [# 227] at 18-19.[FN59] Even assuming that plaintiff could prove that defendants' conduct was unlawful, he still could not recover damages for lost profits, as the losses he alleges are entirely speculative.[FN60]

FN58. Plaintiff's pleading asserts that the loss of "private property and destruction of private premises" totals $40,800 for the grocery store and $37,690 for "the premises and apartments ...." 3d Am. Compl. at 18. Plaintiff miscalculates the sum of these figures as $78,690 in damages for loss of property.

FN59. Defendants maintain in the alternative that if plaintiff's lawsuit is permitted to proceed, additional discovery in the form of records from the State of New York will be required to verify plaintiff's ownership of the Three Star Grocery store. *See* Tucker Mem. [# 215] at 18; [D.C.'s] Affirmation in Opposition to Plaintiff's Motion for Third Amended Complaint to Conform with Evidence [# 169] at 6-7; 4/28/05 M & O [# 207] at 13.

FN60. To the extent that plaintiff attempts to base his demand for lost profits on his continued imprisonment, this demand is futile, as plaintiff may not challenge his conviction and prison sentence in this proceeding.

A plaintiff who seeks to recover for lost profits or business income must first demonstrate that the damages alleged "result as the natural consequences of a breach of contract or the commission of a tortious act." *Levine v. Am. Fed. Group, Ltd.,* 180 A.D.2d 575, 580 N.Y.S.2d 287, 288 (1st Dep't 1992) (citation omitted); *see Merlite Indus., Inc. v. Valassis Inserts, Inc.,* 12 F.3d 373, 376 (2d Cir.1993) (citing *Kenford Co. v. County of Erie,* 67 N.Y.2d 257, 260, 502 N.Y.S.2d 131, 493 N.E.2d 234 (1986)); *Media Logic Inc. v. Xerox Corp.,* 261 A.D.2d 727, 689 N.Y.S.2d 762, 766 (3d Dep't 1999) ("[Plaintiff's] ... failure to prove the causal relationship between defendant's conduct and the alleged damage necessitated a dismissal of this damage claim.") (internal citations omitted). Additionally, the plaintiff must prove damages with "sufficient certainty," such that damages are not merely "speculative or contingent." *Levine,* 580 N.Y.S.2d at 288; *see Kenford,* 67 N.Y.2d at 261, 502 N.Y.S.2d 131, 493 N.E.2d 234 (reviewing a breach of contract claim and stating that damages alleged must not be "speculative" and must be calculated with "reasonable certainty"); *Caulfield v. Barristers Abstract Corp.,* No. 91 CV 5155, 1996 WL 382633, at *1 (E.D.N.Y. July 2, 1996) (declining to award damages to plaintiff under the federal RICO statute, 18 U.S.C. § 1964(c), "[b]ecause plaintiff ha[d] not furnished the Court with any evidentiary support for the Court to begin calculating any damage award ...."); *Ashland Mgmt. v. Janien,* 82 N.Y.2d 395, 403, 604 N.Y.S.2d 912, 624 N.E.2d 1007 (1993) ("The law does not require that [damages] be determined with mathematical precision. It requires only that damages be capable of measurement based upon known reliable factors without undue speculation."). As part of this burden, a plaintiff must also provide a reasonable means of and basis for calculating damages. *See Mehta v. New York City Dep't of Consumer Affairs,* 162 A.D.2d 236, 556 N.Y.S.2d 601, 602 (1st Dep't 1990). New businesses face a "higher evidentiary burden in satisfying this standard 'for the obvious reason that there does not exist a reasonable basis of experience upon which to estimate lost profits with the requisite degree of reasonable certainty.' " *Kidder, Peabody & Co. v. IAG Int'l,* 28 F.Supp.2d 126, 131 (S.D.N.Y.1998) (quoting *Kenford,* 67 N.Y.2d at 261, 502 N.Y.S.2d 131, 493 N.E.2d 234). Indeed, New York courts have held that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

lost profits ordinarily will not be awarded unless the business is "firmly established and in operation for a definite period of time." *Sam & Mary Housing Corp. v. Jo/Sal Mkt. Corp.,* 121 Misc.2d 434, 468 N.Y.S.2d 294, 301 (Sup.Ct. Queens County 1983).

***26** In the instant case, plaintiff arrives at his lost past and future profits by extrapolating from the $18,877 in profits he allegedly earned during the first six months of the store's operation in 1994.3d Am. Compl. at 17. Plaintiff further calculates a 10 percent rate of growth from his estimated yearly profit totals to state annual profits ranging from $41,529 to $89,021 for the years 1995 through 2003. *Id.* As the sole evidence in support of his proposed method of calculation, plaintiff submits a tax return for 1994 stating his profits as $18,877. *See* [1994 Tax Return] (attached to 3d Am. Compl. [# 154] ).[FN61] Plaintiff fails, however, to prove that his loss was the "natural consequence[ ]" of defendants' constitutional or common law torts. *Levine,* 580 N.Y.S.2d at 288.

FN61. As pages of the transcript from plaintiff's deposition have been omitted from Tucker's submissions to this Court, it is unclear from the record whether this tax return was filed with the Internal Revenue Service.

In calculating his lost profits, plaintiff ignores the fledgling nature of his business. Because plaintiff's store-which at most reported only six months of profits in 1994 and apparently no profits in 1995 [FN62]-can in no way be deemed "firmly established," plaintiff cannot meet the high evidentiary burden that attends his demand for lost profits. *Sam & Mary Housing Corp..,* 468 N.Y.S.2d at 301; *see Kenford,* 67 N.Y.2d at 261, 502 N.Y.S.2d 131, 493 N.E.2d 234. Indeed, the conclusion that the store's profits are incapable of prediction with "reasonable certainty" is supported by plaintiff's own submissions. For example, plaintiff testified at his deposition that he closed the store for at least part of 1995 while he applied for business licenses and insurance, and addressed other problems. *See* Dockery Dep. [# 219] at 34, 80-81 (Matthews Decl. Ex. E); *see also* 8/18/05 Pl. Aff. [# 246] ¶ 3 ("On October 23, 1995, the Three Star[ ] Grocery Store was operable, but it was closed to the public when the police [broke in], because ... plaintiff had to go and take care of other business."). This interruption in business is not, however, reflected in plaintiff's lost profits estimate. Even more importantly, in forecasting the store's earnings, plaintiff overlooks the potentially detrimental impact of his extended incarceration and absence from the store, to say nothing of market conditions or competition.[FN63]

FN62. Although the 1995 search did not occur until the end of October, plaintiff has proffered no evidence as to the store's profits during the first nine months of that year.

FN63. Contrary to defendants' characterization of the record, plaintiff acknowledges the existence of various receipts for stock and purchases related to his grocery store. *See* Pl. Dep. [# 219] at 80-81. Plaintiff maintains, however, that he cannot provide defendants with these receipts, as they were seized by law enforcement officers during an August 1995 search of plaintiff's Maryland residence. *Id.;* 7/5/01, 699 N.Y.S.2d 603 Pl. Aff. (attached as Ex. L to Pl. Mot. Appt. of Counsel [# 141] ) at 1 ("On August 10, 1995, numerous FBI agents, D.C. police officers and Maryland State Police conducted a search at 4165 Southern Avenue, Apt # T2, and seized all [of plaintiff's] personal business documents for his Three Star[ ] Grocery Store .... [Plaintiff] ... made numerous motions in Court [seeking the] return of his property business documents, but all his efforts were without success."). Because the disputed receipts and business documents would not alter the Court's conclusion that the grocery store has an insufficient record of past earnings from which to calculate lost profits, the Court need not address plaintiff's contention that potential documentary evidence was wrongfully seized from him.

On this record, no rational fact-finder could calculate with "reasonable certainty" the profits that would be owed to plaintiff as a result of any wrongful conduct by defendants. Accordingly, this Court recommends that defendants be granted summary judgment with respect to plaintiff's damages claim for lost profits. *See Schonfeld v. Hilliard,* 218 F.3d 164, 172-73 (2d Cir.2000) (affirming

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

the district court's granting of summary judgment against plaintiff in a breach of contract action where lost profits could not be determined with "reasonable certainty").

**III.** ***Plaintiff's Cross-Motions for Summary Judgment***

Plaintiff, without legal argument, cross-moves, in the concluding paragraphs of his opposition papers, for summary judgment on all claims asserted in his third amended complaint. *See* Pl. Mem. (Tucker) [# 241]; Pl. Mem. (D.C.) [# 246]. Although plaintiff was not required to provide further affidavits in support of his cross-motion,[FN64] he submitted two additional affidavits summarizing his version of the events in question. *See* 8/18/05 Affidavit of Jasper Dockery in Support of Cross Motion for Summary Judgment on Complaint (unmarked exhibit to Pl. Mem. (D.C.)); 8/3/05 Plaintiff Affidavit in Support of Cross-Motion for Summary Judgment (unmarked exhibit to Pl. Mem. (Tucker)). These affidavits are largely redundant of plaintiff's earlier submissions in this case and add little, if anything, to the record before the Court. Moreover, when read in tandem with plaintiff's briefs opposing defendants' dispositive motions, plaintiff's affidavits merely underscore the disputed nature of the material facts underlying his Fourth Amendment and common law tort claims.

> FN64. *See* Fed.R.Civ.P. 56(a) ("A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may ... move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.").

***27** Most importantly, each of the claims that are the subject of plaintiff's cross-motion have already been addressed in this opinion and are either without merit, are worthy of summary judgment in favor of defendants, or are attended by material issues of fact that preclude summary judgment in favor of either party. For the aforesaid reasons, plaintiff's cross-motions should be denied in their entirety.

***CONCLUSION***

For the reasons set forth above, it is the recommendation of this Court that defendants' motions to dismiss and for summary judgment on plaintiff's third amended complaint be granted in part and denied in part, and that plaintiff's cross-motions for summary judgment be denied in their entirety.

Specifically, this Court recommends dismissal of plaintiff's tort claim against Tucker, his claims concerning the constitutional rights of his children and Ilma Davis, and his official capacity claims against Dreher and Soulsby. This Court further recommends that defendants be granted summary judgment with respect to plaintiff's due process claims, his demand for lost profits, his individual capacity claims against Dreher and Soulsby, and his *Monell* claims, but that defendants be denied summary judgment with respect to plaintiff's Fourth Amendment claims against Tucker, Reed, and Young, and the common law tort claims against Reed, Young and the District. Finally, plaintiff's cross-motions should be denied in their entirety.

Any objections to the recommendations contained herein must be filed with the Honorable Allyne R. Ross on or before September 19, 2006. Failure to file objections in a timely manner may waive a right to appeal the District Court order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989).

The Clerk is directed to docket and file this Order via ECF, and to mail a copy to plaintiff (# 39631053) at U.S. Penitentiary, P.O. Box 2099, Pollock, LA 71462.

**SO ORDERED.**

E.D.N.Y.,2006.

Dockery v. Tucker
Not Reported in F.Supp.2d, 2006 WL 5893295 (E.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.





Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Wayne HARGROVE, Plaintiff,
v.
Sheriff Edward RILEY; Nassau County Correctional Facility, et al; Nassau County University Medical Staff and Nassau County Correctional Facility, Defendants.
**Civil Action No. CV-04-4587 (DGT).**

Jan. 31, 2007.

Wayne Hargrove, Ossining, NY, pro se.

Alexander V. Sansone, Troy & Troy, Lake Ronkonkoma, NY, Joseph Carney, Mineola, NY, for Defendants.

*MEMORANDUM AND ORDER*

TRAGER, J.

***1** Inmate Wayne Hargrove ("Hargrove" or "plaintiff") brings this *pro se* action pursuant to 42 U.S.C. § 1983 against the Nassau County Sheriff, Nassau County Correctional Facility ("NCCF") and NCCF's medical staff, (collectively, "defendants"), seeking damages for injuries allegedly caused by defendants while he was incarcerated at NCCF. Defendants now move for summary judgment pursuant to Fed.R.Civ.P. 56 arguing, *inter alia,* that Hargrove's claims should be dismissed because he failed to exhaust administrative remedies, as required by the Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e. For the following reasons, defendants' motions for summary judgment are granted.

**Background**

On August 27, 2004,[FN1] Hargrove filed a complaint, alleging that defendants violated his civil rights when they forcibly administered purified protein derivative skin tests ("PPD test") to test for latent tuberculosis ("TB") in April 2002, 2003 and 2004 while he was incarcerated at NCCF. Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A. Hargrove named Nassau County Sheriff Edward Reilly ("Reilly"), NCCF and Nassau County University Medical Staff [FN2] as defendants.[FN3] On November 22, 2004, after discovery, County Defendants and NHCC Defendants filed separate motions for summary judgment pursuant to Fed.R.Civ.P. 56. Both defendants properly filed a Local Rule 56.1 Statement and served Hargrove a Notice to *Pro Se* Litigant Opposing Motion for Summary Judgment, pursuant to Local Civil Rule 56.2.

FN1. Hargrove signed the complaint August 27, 2004. The *pro se* clerk's office received and filed the complaint on September 20, 2004. Under the prison mail-box rule, a *pro se* prisoner's complaint is deemed filed when it is delivered to prison authorities. *See, e.g., Walker v. Jastremski,* 430 F.3d 560, 562 (2d Cir.2005)(deeming *pro* se prisoner's § 1983 action filed on date complaint was handed to prison officials). There is no evidence in the record as to when Hargrove handed the complaint to prison officials. However, it is clear the operative date is between August 27, 2004 and September 20, 2004. As discussed, *infra,* both of these dates occur before Hargrove properly exhausted the administrative remedies available to him at NCCF.

FN2. The Nassau County University Medical Staff are employed by the Nassau Health Care Corporation ("NHCC"). Pursuant to the Correctional Center Health Services Agreement between the County of Nassau and NHCC, dated September 24, 1999, NHCC provides medical services for inmates at NCCF. County Defs.'s

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not. of Motion, Decl., at 1.

FN3. Reilly and NCCF are represented separately from NHCC. Accordingly, when a distinction is necessary, Reilly and NCCF will be referred to as "County Defendants" and Nassau County University Medical Staff and NHCC will be referred to as "NHCC Defendants."

**(1)**

**Tuberculosis Testing at NCCF**

Upon entering NCCF, new prisoners must first go through medical intake. Aff. of Kim Edwards, ("Edwards Aff.") ¶ 3. This standard process usually takes seventy-two hours. Edwards Aff. ¶ 4. During medical intake, NCCF tests inmates for TB. Aff. of Getachew Feleke ("Feleke Aff.") ¶ 3. NCCF generally uses a PPD test to detect latent TB. Feleke Aff. ¶ 3. However, if an inmate has previously tested positive for TB, it is NCCF's policy to test for TB using an x-ray instead.[FN4] Feleke Aff. ¶ 3. As part of its Infectious Disease Program, NCCF re-tests inmates for TB each year, beginning after they have been housed in that facility for one year. Edwards Aff. ¶ 5.

FN4. According to WebMD, "[a] tuberculin skin test should not be done for people who have a(1) Known TB infection [or a] (2) Positive tuberculin skin test in the past. A second test may cause a more severe reaction to the TB antigens." Jan Nissl, RN, BS, *Tuberculin Skin Tests,* WEBMD, http://www.webmd.com/hw/lab_tests/hw203560.asp (last visited Jan. 31, 2007).

**(2)**

**Hargrove's Tuberculosis Testing at NCCF**

On March 15, 2002, Hargrove was incarcerated at NCCF. NHCC Defs.' 56.1 Statement ¶ 1. Before entering the general population, Hargrove was processed through medical intake. NHCC Defs.' 56.1 Statement ¶ 2. The NCCF Medical Intake Chart for Hargrove, dated March 15, 2002 ("3/15/02 Chart"), shows that Hargrove informed medical staff that he had previously been exposed to tuberculosis. NHCC Defs.' Notice of Mot., Ex. C, at 1; NHCC Defs.' 56.1 Statement ¶ 2. The 3/15/02 Chart also shows that Hargrove reported testing positive to a prior PPD test and that he had been treated for TB in 2000. NHCC Defs.' Notice of Mot., Ex. C, at 1. Hargrove alleges that he was exposed to and treated for TB in 1997. Hargrove's Aff. in Opp. to Mot. for Summary Judgment, ("Aff. in Opp."), Ex. A at 1-2. Defendants contend that Hargrove was given an x-ray during the medical intake process because of his reported positive PPD test, and that the x-ray was negative, showing no active TB infection. NHCC Defs.' 56.1 Statement ¶ 2; Edwards Aff. ¶ 3. Without specifying a date, Hargrove generally states that his "request to be x-rayed was denied." Aff. in Opp. at 3.

***2** Pursuant to NCCF's Infectious Disease Program, after being incarcerated in NCCF for a year, Hargrove was scheduled to be re-tested for TB. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. On May 24, 2003, Hargrove was given a PPD skin test. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. This test was negative. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. According to Hargrove, he requested an x-ray instead of a PPD test because of his previous exposure to TB, but was forced to submit to the PPD test. He also alleges that defendants threatened to put him in "keep lock" or "lock up" unless he submitted to the PPD test.[FN5] Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A.

FN5. Hargrove has made contradictory statements about being placed in "keep lock" or "lock up". It is unclear whether he is alleging that defendants threatened to place him in "lock up" unless he submitted to the PPD test or whether he was actually placed in "lock up" until such time that he agreed to submit to the PPD tests. For example, in his complaint, Hargrove states that when he "refused to submit to another [PPD] test, the Correctional Authorities were brought in and placed [him] in lock up." Complaint ¶ 4. In a hearing before Magistrate Judge Bloom on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

January 31, 2005, Hargrove stated that he took the PPD tests because he was told that he would be placed in "lock up" until he submitted to the test. Hr'g Tr. 6:1-18; 9:5-10:10. In Exhibit B to his complaint, Hargrove alleges both that he was given an unwarranted TB shot and that when he refused the same shot he was placed in "keep lock." Complaint, Ex. B. There is no evidence in the record that Hargrove was ever segregated from the general population while housed at NCCF, outside of the seventy-two hour initial medical intake period. Aff. of Sgt. Neumann ("Neumann Aff.") at 1-2 (referring to prison records showing Hargrove's holding locations which demonstrate that he was never placed in "lock up"); NCCF 56.1 Statement ¶ E. Whether or not Hargrove was actually placed in "lock up" is not a material fact for purposes of this motion; as explained in detail, *infra,* Hargrove's failure to exhaust administrative remedies under the PLRA precludes a consideration of the merits of his Section 1983 claim.

The following year, in June of 2004, Hargrove was scheduled to be retested. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Because of the contradiction between the negative May 2003 PPD test and his reported positive history, NCCF contacted the Infectious Disease Department of the Nassau County Medical Center. Edwards Aff. ¶ 6. It was suggested that Hargrove be given a two-step PPD test, administered fifteen days apart. Feleke Aff. ¶ 4; Edwards Aff. ¶ 6. Hargrove was given these two PPD skin tests in June 2004. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Again, Hargrove alleges that these tests were administered against his will and under threat of being placed in quarantine. Complaint, Exs. A, B; Aff. in Opp., Ex. A.

On December 3, 2004, Hargrove was seen by a physician's assistant. NHCC Defs.' 56.1 Statement ¶ 6. During this meeting, Hargrove complained of a dry cough and that the site on his forearm where the June 2004 PPD tests had been administered was red and swollen. NHCC Defs.' 56.1 Statement ¶ 6; 11/28/04 Sick Call Request.

Hargrove's December 18, 2004 chart notes a positive PPD test and an order was placed in the chart that Hargrove not be submitted for future PPD tests. Edwards Aff. ¶ 7; NHCC Defs.' 56.1 Statement ¶ 8. *See also* 11/19/2004 Grievance.

Hargrove alleges that the following physical ailments were caused by the PPD tests: chronic coughing, high blood pressure, chronic back pain, lung infection, dizzy spells, blurred vision and a permanent scar on both his forearms. Complaint, Ex. C; Aff. in Opp. at 3-4.

**(3)**

**NCCF's Inmate Grievance Procedure**

NCCF has had an inmate grievance program ("IGP") in place since 2001. Aff. of Kenneth Williams, ("Williams Aff."), at 2. NCCF's IGP is carried out in conformance with the New York State Commission of Corrections Minimum Standards and Regulations for Management of County Jails and Penitentiaries ("Minimum Standards"). *Id.*

The IGP is designed to resolve complaints and grievances that an inmate may have regarding the inmate's care and treatment while incarcerated at NCCF. Williams Aff. at 2. Upon entering NCCF, all inmates receive a copy of the NCCF inmate handbook, which outlines the IGP. *Id.*

***3** The record does not include an actual copy of NCCF's IGP, but the NCCF's IGP is detailed in the affidavit of NCCF Investigator Kenneth Williams. [FN6] The IGP encourages inmates to resolve their grievances informally with the staff member assigned to the inmate housing unit first. *Id.* If an acceptable resolution cannot be reached, inmates must then proceed through the formal three-step process set out in the IGP. *Id.* at 3.

FN6. Hargrove does dispute any statements made by Investigator Williams regarding the inmate grievance procedure, time limits or its availability to him. Furthermore, Hargrove does

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

not dispute that he received a handbook outlining the IGP.

The first step requires an inmate to submit his grievance form [FN7] to the Inmate Grievance Unit by placing it in a locked box located in each housing area, "within five days of the date of the act or occurrence giving rise to the grievance." [FN8] *Id.* at 2-3. NCCF indexes all grievance forms filed by inmates in a log book and in a computer system. *Id.* at 1, 3. Once a grievance form is received by the Inmate Grievance Unit, the grievance is investigated and the inmate will receive a written determination of the outcome from the Inmate Grievance Coordinator in Section II of the grievance form. [FN9] *Id.* at 3. The inmate is then given a choice to accept or appeal the decision by checking the desired selection and signing his name in Section III of the grievance form. *See, e.g.,* 11/19/2004 Grievance form. If the inmate is not satisfied with the decision of the Inmate Grievance Coordinator, the inmate may appeal the determination to the Chief Administrative Officer. Williams Aff. at 3. Finally, if the inmate is not satisfied with the Chief Administrative Officer's determination, the inmate may appeal to the New York State Commission of Correction Citizen's Policy and Complaint Review Council ("Council"). *Id.* at 3. The Council will then render a final determination. *Id.* at 3.

FN7. The grievance forms contain four sections to be utilized throughout all three steps of the IGP. Section I provides space for the inmate to explain his complaint and the actions he requests as relief. Section II is for the decision of the Inmate Grievance Coordinator. Section III is titled "Acceptance/Appeal of Grievance Coordinator's decision" and contains two mutually exclusive options in which the inmate must choose one or the other: "I have read and accept the Grievance Coordinator's decision," or "I have read and appeal the Grievance Coordinator's decision." Section IV provides space for the decision of the Chief Administrative Officer.

FN8. Hargrove has not argued that he was unaware of this five-day deadline.

FN9. There is no evidence in the record specifying the how long an inmate has to appeal inaction by the Inmate Grievance Unit.

**(4)**

**Authenticity of the Grievance Forms and Other Documents Submitted by Hargrove**

In support of his allegations that he continuously informed defendants that he had been exposed to TB and, therefore, should not have been given PPD tests, Hargrove submitted three letters with his complaint, two of which were addressed to the Inmate Grievance Committee and one of which was addressed to "To whom this may concern." Complaint, Exs. A-C. He also submitted five complaint letters written to Sheriff Reilly, seventeen sick call requests and nine grievance forms during discovery and with his Affidavit in Opposition to Defendants' Motion for Summary Judgment, explaining that some of the medical records and notarized letters were "missing." Aff. in Opp, Ex. A at 2. Defendants call the authenticity of most of these documents into question, contending that Hargrove never submitted any grievance form or complaint letter before he filed his complaint. County Defs.' Mem. of Law at 16-21; County Defs.' 56.1 Statement at ¶ ¶ B2, C3, D3.

Kenneth Williams, an investigator at NCCF in the Inmate Grievance Unit, testified that he reviewed all of the grievance forms, complaint letters and sick call requests annexed to Hargrove's Complaint and to Hargrove's Affidavit in Opposition to Defendants' Motion for Summary Judgment. Williams Aff. at 2. Williams testified that he examined the grievance records at NCCF and searched "for any grievances by plaintiff/inmate Hargrove" and found "only two." [FN10] Williams Aff. at 1. The first grievance, dated November 19, 2004, complained that the medical staff continued "forcing [Hargrove] to take a T.B. shot while [he] keep[s] telling them that [he] has been exposed to T.B." 11/19/2004 Grievance; Williams Aff. at 1. In response to this grievance, Hargrove's "positive" TB status was noted in his medical records and an order was placed in Hargrove's medical chart, stating that Hargrove not be subjected to future PPD tests. 11/19/2004 Grievance, Section II;

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Williams Aff. at 1; NHCC Defs.' 56.1 Statement ¶ 8; Edwards Aff. ¶ 7. In Section III of the 11/19/2004 Grievance, Hargrove acknowledged that he had read the Grievance Coordinator's decision, and that he chose to accept the decision instead of appealing it. 11/19/2004 Grievance. The other grievance received by the Grievance Unit, dated May 11, 2005, complained of an unrelated matter. 5/11/2005 Grievance (complaining of back problems and requesting the return of his medical shoes); Williams Aff. at 1. Thus, Williams concluded that, beside the 11/19/2004 and 5/11/2005 Grievance Forms, none of the other documents were "received by the grievance unit, and, given the locked box system, the grievance-forms were never submitted by plaintiff/inmate." Williams Aff. at 2.

FN10. It is NCCF's procedure to forward to the attention of the Grievance Unit all official grievance forms and complaint letters-even ones not specifically addressed to the Grievance Unit. Williams Aff. at 3.

***4** A visual examination of the grievance forms Hargrove submitted in support of his claims suggests forgery. Five of the nine grievance forms were requests to stop PPD testing. *See* April 19, 2002 grievance; April 28, 2002 grievance; April 20, 2003 grievance; April 28, 2003 grievance; November 19, 2004 grievance. The remaining grievance forms concerned Hargrove's requests for medical shoes. *See* March 18, 2002 grievance; July 6, 2002 grievance; February 20, 2003 grievance; May 11, 2005 grievance. Of the grievance forms complaining of unwanted PPD tests, the April 28, 2002 grievance form is a patent photocopy of the April 19, 2002 grievance form, and the April 28, 2003 grievance form is a patent photocopy copy of the April 20, 2003 grievance form, with only the handwritten dates changed. The only potentially authentic grievance forms relating to Hargrove's complaint about the PPD testing are dated April 19, 2002, April 20, 2003, and November 19, 2004. Of these grievance forms, only the November 19, 2004 has been authenticated by NCCF personnel. *See generally* Williams Aff. at 1-4.

Turning to the complaint letters addressed to Reilly, many contain notary stamps cut from the bottom of unrelated documents and photocopied onto the bottom of the complaint letters. *See* County Defs.' Mem. of Law at 18-21. C.O. Thomas McDevitt and C.O. Paul Klein, both of whom perform notary services for prisoners at NCCF, have submitted sworn affidavits, stating that they kept individual Notary Log Books covering all dates relevant to this litigation. Aff. of C.O. Klein, ("Klein Aff."), at 1; Aff. of C.O. McDevitt, ("McDevitt Aff."), at 1. McDevitt's Notary Log Book shows that he notarized only one document for Hargrove. This document, dated May 13, 2002, was a motion related to Hargrove's criminal trial. McDevitt Aff. at 1-2. Hargrove signed the Notary Log Book acknowledging receipt of that notarized motion. McDevitt Aff. at 2. McDevitt states that he never notarized any other documents for Hargrove. McDevitt Aff. at 2. However, McDevitt's stamp and signature dated May 13, 2002 (the date of the legitimate notarization) appear on Hargrove's letter to Sheriff Reilly dated May 10, 2002. County Defs.' Not. of Motion, Ex. A.

These facts repeat themselves in regard to the documents bearing the notary stamp and signature of Klein. Klein had performed several legitimate notarizations for Hargrove in connection to Hargrove's criminal trial. Klein Aff. at 1-2. Hargrove signed Klein's Notary Log Book acknowledging receipt of those notarized documents. Klein Aff. at 2. However, Klein states that he never notarized any of Hargrove's letters addressed to Sheriff Reilly that bear Klein's stamp and signature. Klein Aff. at 2. On all of the documents that Hargrove submitted bearing Klein's stamp and signature, the dates and signatures of Klein match identically to the dates on which he had performed legitimate notarizations for Hargrove in connection with his criminal trial. Defendants argue it is clear that the documents bearing the stamps and signatures of McDevitt and Klein were not actually notarized by these notaries. County Defs.' Mem. of Law at 17-22.

***5** Hargrove does not deny these allegations. Instead, he resubmits the documents that McDevitt and Klein testify they did not notarize with his Affidavit in Opposition and insists that the documents "refute[ ] the assertions put forth by the defendants." Aff. in Opp. at 2.

**Discussion**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(1)**

**Summary Judgment Standard**

A motion for summary judgment is granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court ruling on a summary judgment motion must construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *See* *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Williams v. Metropolitan Detention Center,* 418 F.Supp.2d 96, 100 (E.D.N.Y.2005). Defendants, the moving party in this action, bear the burden of demonstrating the absence of a genuine issue of material fact. *Baisch v. Gallina,* 346 F.3d 366, 371 (2d Cir.2003).

As Hargrove is proceeding *pro se,* his complaint must be reviewed carefully and liberally, and be interpreted to "raise the strongest argument it suggests," *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001), particularly when civil rights violations are alleged, *see, e.g.,* *McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). Plaintiff's complaint does not specify the legal theories upon which it relies, but, in construing his complaint to raise its strongest arguments, it will be interpreted to raise claims under 42 U.S.C. § 1983. *See, e.g.,* *Dufort v. Burgos,* No. 04-CV-4940, 2005 WL 2660384, at *2 (E.D.N.Y. Oct. 18, 2005) (liberally construing plaintiff's complaint, which failed to specify the legal theory or theories upon which it rested, as, *inter alia,* a claim under 42 U.S.C. § 1983); *Williams,* 418 F.Supp.2d at 100 (same).

**(2)**

**Prison Litigation Reform Act**

**a. Purpose of the Prison Litigation Reform Act**

The PLRA was intended to "reduce the quantity and improve the quality of prisoner suits." *Woodford v. Ngo,* --- U.S. ----, 126 S.Ct. 2378, 2387 (2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 524 (2002)). It seeks to eliminate unwarranted interference with the administration of prisons by federal courts, and thus " 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Woodford,* 126 S.Ct. at 2387 (quoting *Porter,* 534 U.S. at 525).*See also* *Booth v. Churner,* 532 U.S. 731, 739 (2001). Formal grievance procedures allow prison officials to reconsider their policies, implement the necessary corrections and discipline prison officials who fail to follow existing policy. *See* *Ruggiero v. County of Orange,* 467 F.3d 170, 177-78 (2d Cir.2006).

**b. The Exhaustion Requirement**

The PLRA's "invigorated" exhaustion provision, 42 U.S.C. § 1997e(a), provides the mechanism to reduce the quantity and improve the quality of prisoners' suits by requiring that prison officials have the opportunity to address prisoner complaints through internal processes before allowing a case to proceed in federal court. *Woodford,* 126 S.Ct. at 2382 (citing *Porter,* 534 U.S. at 524).Section 1997e(a) provides that:

> ***6** [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983. *Woodford,* 126 S.Ct. at 2383;*Ruggiero,* 467 F.3d at 174;*Williams,* 418 F.Supp.2d at 100-01. The exhaustion provision is applicable to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings, as long as other forms of relief are obtainable through administrative channels. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004); *see also* *Woodford,* 126 S.Ct. at 2382-83 ("[A] prisoner must now exhaust

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.") (citing *Booth,* 532 U.S. at 734).

In June 2006, the Supreme Court held that the PLRA requires "proper exhaustion" before a case may proceed in federal court. *Woodford,* 126 S.Ct. at 2387. "Proper exhaustion" requires a prisoner to use " 'all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2385 (emphasis in original)). Although the level of detail necessary to properly exhaust a prison's grievance process will vary from system to system, *Jones v. Bock,* 127 S.Ct. 910, 2007 WL 135890, at *12 (Jan. 22, 2007), "proper exhaustion" under the PLRA " 'demands compliance with [that] agency's deadlines and other critical procedural rules.' " *Ruggiero,* 467 F.3d at 176 (quoting *Woodford,* 126 S.Ct. at 2386). Thus, the PLRA's exhaustion requirement is not satisfied by "untimely or otherwise procedurally defective attempts to secure administrative remedies." *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2382).

**(3)**

**Exhaustion Analysis: Hargrove did not Exhaust the Administrative Remedies Made Available by NCCF prior to Bringing Suit**

Section 1997e(a) of the PLRA applies to Hargrove's complaint; Hargrove was and continues to be confined in a correctional facility, *see* *Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004), and Hargrove's claim is about a "prison condition" within the meaning of the PLRA, *see* *Williams,* 418 F.Supp.2d at 101. *See also* *Sloane v. W. Mazzuca,* No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) (recognizing PLRA's application to complaint alleging retaliation by prison officials for plaintiff's refusal to consent to a PPD test). Accordingly, the merits of Hargrove's Section 1983 claims can only be addressed if it is first determined that Hargrove properly exhausted each claim under Section 1997e(a) of the PLRA before filing his complaint in federal court.

***7** Hargrove has submitted both forged [FN11] and authentic grievance forms in opposing defendants' motions for summary judgment. Excluding, for the moment, the forged documents, NCCF's records reflect that Hargrove did not submit his first grievance until after he filed the instant complaint. Williams Aff. at 1. Hargrove's first grievance complaining of unwanted PPD testing is dated November 19, 2004, Williams Aff. at 1, two to three months after Hargrove filed his complaint. Additionally, this first grievance, dated November 19, 2004, was submitted five months after the last PPD test was administered to him in June 2004. NHCC Defs.' 56.1 Statement ¶¶ 5,6. This five-month period far exceeds the five-day window provided by NCCF's IGP. Since Hargrove failed to comply with the IGP's deadlines, he did not properly exhaust the available administrative remedies. *Ruggiero,* 467 F.3d at 176 (" 'untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement.' ") (quoting *Woodford,* 126 S.Ct. at 2382).

FN11. Based on an examination of the documents themselves, as well as the uncontradicted testimony of the notaries performing services for prisoners at NCCF, *see generally* Klein Aff.; McDevitt Aff., and of the investigator in the Inmate Grievance Unit, *see generally* Williams Aff., it appears that many of the documents submitted by Hargrove are forgeries. However, in order to view the facts in the light most favorable to Hargrove, and so as to avoid making findings of fact in a summary judgment motion, for the purposes of the exhaustion analysis, all of the documents will be considered to be authentic. However, for purposes of the sanctions analysis, the documents will be explored and the consequences of Hargrove's misrepresentations will be addressed.

Furthermore, even if the falsified grievance forms Hargrove submitted in support of his claim are considered authentic, they are still untimely. The diagnostic TB tests (whether x-ray or PPD tests) were given to Hargrove on March 15, 2002, May 24, 2003 and in June of 2004, but the grievance forms Hargrove submitted complaining of unwanted PPD tests are dated April 19, 2002, April 28, 2002, April 20, 2003, April 28, 2003 and November 19,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

2004. None of these grievances were filed "within five days of the of the date of the act or occurrence giving rise to the grievance." Williams Aff. at 3. There is no evidence in the record suggesting that NCCF's IGP allows for a tolling of the five-day time limit in which to file a grievance.[FN12]

FN12. Even if the submitted grievances had been filed within the proscribed time period, they only show that Hargrove's grievances reached an Inmate Grievance Coordinator, the first formal step of NCCF's three-step administrative grievance process; Hargrove never appealed to the Chief Administrative Officer. By failing to take the next available step in NCCF's IGP, Hargrove failed to satisfy the mandatory exhaustion requirement. *See, e.g., Williams,* 418 F.Supp.2d at 101, 102 (dismissing *pro se* complaint where plaintiff could only show he exhausted two of the four-step process mandated by prison's administrative process).

While the letters to Reilly and sick call requests show that Hargrove attempted to bring his complaints about the PPD testing to the attention of the prison staff, *see, e.g.,* Aff. in Opp., Exs. A-D, NCCF's IGP requires use of formal grievance forms. Thus, writing complaint letters and submitting sick call requests did not properly exhaust NCCF's available administrative remedies. *See, e .g., Hernandez v. Coffey,* No. 99-CV-11615, 2006 WL 2109465, at *4 (S.D.N.Y. July 26, 2006) (holding letters did not satisfy plaintiff's exhaustion obligation); *Williams,* 418 F.Supp.2d at 101 (holding that because plaintiff's efforts to convey his medical condition through letters and conversations with the warden and medical staff did "not include the required steps of the PLRA's administrative remedy process," plaintiff failed to exhaust); *Mills v. Garvin,* No. 99-CV-6032, 2001 U.S. Dist. LEXIS 3333, at *8 (S.D.N.Y. Mar. 2, 2001) ("letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA").

As Hargrove failed to properly exhaust his administrative remedies, this action is precluded by 42 U.S.C. § 1997e(a) unless Hargrove can establish excuse for his failure to exhaust.

**(4)**

**No Grounds to Excuse Plaintiff's Failure to Exhaust**

***8** Exhaustion is an affirmative defense that defendants have the duty to raise. *Jones,* 2007 WL 135890, at *8-11; *Sloane,* 2006 WL 3096031, at *4; *Williams,* 418 F.Supp.2d at 101. Once argued by the defendants, a plaintiff has an opportunity to show why the exhaustion requirement should be excused or why his failure to exhaust is justified. *See Ruggiero,* 467 F.3d at 175; *Collins v. Goord,* 438 F.Supp.2d 399, 411 (S.D.N.Y.2006) ("[T]he Second Circuit has cautioned that 'while the PLRA's exhaustion requirement is 'mandatory,' certain caveats apply.' ")(internal citations omitted). Thus, before concluding that a prisoner failed to exhaust available administrative remedies as required by Section 1997e(a) of the PLRA, the following three factors must be considered: (1) whether administrative remedies were actually available to the prisoner; (2) whether defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; and (3) whether special circumstances, such as a reasonable misunderstanding of the grievance procedures, exist justifying the prisoner's failure to comply with the exhaustion requirement. *Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).[FN13]

FN13. Courts in the Second Circuit have questioned what effect, if any, the Supreme Court's recent decision in *Woodford* requiring "proper exhaustion" may have on the three-step *Hemphill* inquiry. The Second Circuit has yet to address this issue. *See Ruggiero,* 467 F.3d at 175-76 (declining to "determine what effect *Woodford* has on our case law in this area ... because [plaintiff] could not have prevailed even under our pre-*Woodford* case law). To date, district courts have acknowledged the tension, but resolved to apply *Hemphill* to exhaustion claims until instructed otherwise by the Second Circuit. *See, e.g., Larkins v. Selsky,* 04-CV-5900, 2006 WL 3548959, at *9, n. 4 (S.D.N.Y. Dec. 6,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

2006) (applying the current law of the Second Circuit to exhaustion claims); *Sloane,* 2006 WL 3096031, at *5 ("Until such time as the Court of Appeals considers the impact of *Woodford,* if any, on its prior rulings, this Court must follow the law of the Second Circuit. The Court will therefore apply the current law of this circuit to the exhaustion claims."); *Collins v. Goord,* 438 F.Supp.2d at 411 n. 13 (acknowledging that *Woodford* and *Hemphill* may be in tension, but deciding exhaustion claims under *Hemphill* inquiry); *Hernandez v. Coffey,* No. 99-CV11615, 2006 WL 2109465, at *3 (S.D.N.Y. July 26, 2006) (same). Here, Hargrove does not prevail under *Hemphill;* therefore, there is no occasion to address the potential effect *Woodford* may have had in his case.

**a. Whether administrative remedies were "available" to Hargrove**

The first step in the *Hemphill* inquiry requires a court to determine whether administrative remedies were available to the prisoner. *Hemphill,* 380 F.3d at 686. The test for assessing availability is an "objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Id.* at 688 (internal quotation marks omitted). In making this determination, "courts should be careful to look at the applicable set of grievance procedures." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). Exhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, *Ruggiero,* 467 F.3d at 179, or where defendants' behavior prevents plaintiff from seeking administrative remedies,[FN14] *Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004).

FN14. Case law does not clearly distinguish between situations in which defendants' behavior renders administrative remedies "unavailable" to the plaintiff and cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense because of their behavior. As such, there will be some overlap in the analyses.

Here, Hargrove has not claimed that NCCF's administrative grievance procedure was unavailable to him. In fact, Hargrove demonstrated his access to and knowledge of NCCF's IGP by filing proper grievances on November 19, 2004 and on May 10, 2005. Hargrove did not dispute any part of Investigator Williams's affidavit detailing the IGP and its availability to inmates since 2001. Specifically, Hargrove did not dispute, upon entering the facility, that he received a copy of the inmate handbook outlining the IGP. He has not claimed that he is unfamiliar with or unaware of NCCF's IGP. Hargrove has not alleged that prison officials failed to advance his grievances [FN15] or that they threatened him or took any other action which effectively rendered the administrative process unavailable.

FN15. Although not specifically alleged, interpreting the evidence to "raise the strongest argument," Hargrove may be arguing that NCCF's IGP was not available to him because the Grievance Coordinator failed to respond to his grievances. In the single grievance regarding PPD tests that defendants concede is authentic, Hargrove writes, "[n]ow for the third time your office refused to answer my grievances so please look into this matter because the T.B. shot is [sic] effecting my health." 11/19/04 Grievance. This language implies that Hargrove filed grievances in the past and received no response from the Inmate Grievance Coordinator. Furthermore, Hargrove wrote on one of the submitted copies of the November 19, 2004 grievance that "[t]his is the only accepte[sic] that Plaintiff got back from all grievances and letters that the Plaintiff sent to Sheriff Riley and his medical staffs about his staff making [sic] take T.B. test for 3 year[s]." County Defs.' Not. of Motion, Ex. A, 11/19/2004 grievance.

First, it must be reiterated that filing of the initial grievances was untimely. However, even assuming *arguendo* that the original grievances had been timely filed, district courts in the Second Circuit have held that the "lack of a response from the [Inmate Grievance Review Committee] does not excuse an inmate's obligation to exhaust his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

remedies through available appeals." *Hernandez v. Coffey,* 2006 WL 2109465, at *3-5. *See also* *Hemphill,* 380 F.3d. at 686 ("Threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system"); *Acosta v. Corr. Officer Dawkins,* No. 04-CV-6678, 2005 WL 1668627, at *3 (S.D.N.Y. July 14, 2005) (inmate required to appeal lack of response to exhaust administrative remedies); *Mendoza v. Goord,* No. 00-CV-0146, 2002 U.S. Dist. LEXIS 22573, at *6 (S.D.N.Y. Nov. 21, 2002) ("If, as a result of a negligent error by prison officials-or even their deliberate attempt to sabotage a prisoner's grievance-the prisoner [does not receive a response] on his complaint, he is not thereby forestalled from appealing"). Hargrove did not assert or offer evidence suggesting that he appealed the unresponsiveness or that those appeals were not advanced.

***9** Additionally, Hargrove's transfer from NCCF to Sing Sing Correctional Facility ("Sing Sing") in July 2005 did not excuse his previous failure to properly exhaust. *See, e.g., Sims v. Blot,* No. 00-CV-2524, 2003 WL 21738766, at *4 (S.D.N.Y. July 25, 2003) (determining that failure to exhaust administrative remedies is not excused by transfer to another facility); *Santiago v. Meinsen,* 89 F.Supp.2d 435, 440-41 (S.D.N.Y.2000) (determining that plaintiff should not be "rewarded" for failing to participate in grievance procedure before being transferred). Hargrove had ample opportunity to properly file his grievances and to appeal their results as required by NCCF's procedures while he was imprisoned at NCCF. The last PPD test Hargrove complains of was given in 2004; therefore, Hargrove had until June or July of 2004 to timely file his grievance in accordance with NCCF's IGP. Hargrove was not transferred to Sing Sing until July 2005. County Defs.' Mem. of Law at 2. Thus, Hargrove's transfer cannot excuse his previous failure to properly exhaust.

**b. Estoppel**

The second step of the inquiry asks whether defendants are estopped from raising exhaustion as a defense. Specifically, "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (internal citations omitted).

Here, Hargrove has not made any statements that would permit a finding that defendants should be estopped from raising the affirmative defense of exhaustion or that defendants waived the right to raise the defense. Defendants first raised the PLRA's exhaustion requirement as an affirmative defense in their respective answers. *See* County Defs.' Am. Answer at 3; NHCC Defs.' Answer at 1. County Defendants raised it again in their motion for summary judgment. *See* County Defs.' Mem of Law at 15-23. Thus, defendants are not estopped from raising the affirmative defense now. *See, e.g., Sloane,* 2006 WL 3096031, at *8 (exhaustion defense not waived where defendants first raised it in their motion to dismiss).

Additionally, defendants have not threatened Hargrove or engaged in other conduct preventing him from exhausting the available administrative remedies. *Cf. Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004) (holding defendants were estopped from asserting non-exhaustion because of prison officials' beatings, threats and other conduct inhibiting the inmate from filing proper grievances); *Feliciano v. Goord,* No. 97-CV-263, 1998 WL 436358, at *2 (S.D.N.Y. July 27, 1998) (holding defendants were estopped from asserting non-exhaustion where prison officials refused to provide inmate with grievance forms, assured him that the incidents would be investigated by staff as a prerequisite to filing a grievance, and provided prisoner with no information about results of investigation). Hargrove has not argued otherwise. *See Ruggiero,* 467 F.3d at 178 (holding defendants were not estopped from asserting a failure to exhaust defense where plaintiff pointed to no affirmative act by prison officials that would have prevented him from pursing administrative remedies); *Sloane,* 2006 WL 3096031, at *8 (finding no estoppel where plaintiff did not argue that defendants prevented him from pursuing the available administrative remedies); *Hernandez,* 2006 WL 2109465,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

at *4 (finding no estoppel where plaintiff did not argue that any threats or intimidation prevented him from pursuing his appeals). Thus, for the same reasons that administrative remedies were not deemed unavailable to Hargrove, defendants are not estopped from raising a failure to exhaust defense.

**c. Special circumstances**

***10** Even where administrative remedies are available and the defendants are not estopped from arguing exhaustion, the court must "consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " *Hemphill,* 380 F.3d at 688 (quoting *Giano,* 380 F.3d at 676). For example, plaintiff's reasonable interpretation of regulations differing from prison official's interpretation has been held to constitute a "special circumstance." *Giano,* 380 F.3d at 676-77. No special circumstances have been alleged that would excuse Hargrove from availing himself of administrative remedies. *See Sloane,* 2006 WL 3096031, at *8;*Freeman v. Goord,* No. 02-CV-9033, 2004 U .S. Dist. LEXIS 23873, at * 9-10 (S.D.N.Y.2004) (granting motion to dismiss where "there is no evidence in the record ••• of any 'special circumstances' in this action.")

**(5)**

**Hargrove's Failure to Exhaust, in Addition to his Fraud on the Court, Warrants Dismissal with Prejudice**

Hargrove has not sufficiently rebutted the defendants' assertion of failure to exhaust, and a liberal reading of his submissions does not reveal any grounds to excuse that failure.

Because Hargrove filed a complaint in federal court before filing a grievance, permitting his unexhausted and unexcused claim to proceed would undercut one of the goals of the exhaustion doctrine by allowing NCCF to be haled into federal court without the "opportunity to correct its own mistakes with respect to the programs it administers." *Woodford,* 126 S.Ct. at 2385. *See also Ruggiero,* 467 F.3d at 178 (citing *Porter,* 534 U.S. at 525). Thus, his complaint must be dismissed.

In general, dismissal without prejudice is appropriate where plaintiff has failed to exhaust but the time permitted for pursuing administrative remedies has not expired. *Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004). Dismissal with prejudice is appropriate where "administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust." *Berry,* 366 F.3d at 88. Here, Hargrove's administrative remedies were available to him during his entire period of confinement at NCCF. He remained incarcerated in NCCF throughout the time period in which he alleges the PPD tests were given. He could have exhausted remedies for his grievances at any time. Therefore, Hargrove had ample opportunity to seek administrative remedies but failed to do so. Because there is no evidence in the record that administrative remedies are still available to Hargrove, as the five-day time period had run, and because Hargrove has alleged no special circumstances justifying his failure to exhaust, his complaint is accordingly dismissed with prejudice. *Berry,* 366 F.3d at 88 (upholding dismissal with prejudice where plaintiff had no justification for his failure to pursue administrative remedies while they were available.)

***11** Additionally, defendants' have moved for sanctions based on Hargrove's alleged submission of falsified evidence. If a party commits a fraud on the court, the court has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process. *Shangold v. The Walt Disney Co.,* No. 03-CV-9522, 2006 WL 71672, at *4 (S.D.N.Y. January 12, 2006) (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44 (1991)). Fraud upon the court has been defined as "fraud which seriously affects the integrity of the normal process of adjudication." *Gleason v. Jandrucko,* 860 F.2d 556, 559 (2d Cir.1988); *McMunn v. Mem'l Sloan-Kettering Cancer Center,* 191 F.Supp.2d 440, 445 (S.D.N.Y.2002). In order for a court to grant sanctions based upon fraud, it must be established by clear and convincing evidence that a party has "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by ... unfairly hampering

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

the presentation of the opposing party's claim or defense." *McMunn,* 191 F.Supp.2d at 455 (quoting *Aoude v. Mobil Oil Corp.,* 892 F.2d 1115, 1119 (1st Cir.1989).

After carefully reviewing the allegedly fraudulent documents, it must be concluded that Hargrove consciously falsified these documents. *See, e.g., Shangold,* 2006 WL 71672, at *1, *3 (finding clear and convincing evidence of fraud where plaintiffs fabricated a timeline and plot outlines to advance their claims); *McMunn,* 191 F.Supp.2d at 446 (finding clear and convincing evidence of fraud where plaintiff edited audio tapes and represented that they were unedited during discovery). The notaries performing services for prisoners at NCCF testify that they never notarized many of the documents supplied by Hargrove. *See* Klein Aff.; McDevitt Aff. Furthermore, a visual examination of the documents themselves makes it clear that many of the documents submitted by Hargrove are forgeries.

In considering what sanction to impose, courts consider the following five factors: (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the plaintiffs; (iii) whether there was a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future. *Scholastic, Inc. v. Stouffer,* 221 F.Supp.2d 425, 444 (S.D.N.Y.2002) (citing *McMunn,* 191 F.Supp.2d at 461).

Here, Hargrove's deception was not an isolated instance; he fabricated the dates on many grievance forms, in addition to improperly duplicating notary stamps on complaint letters to make them look authentic. Klein Aff. at 2; McDevitt Aff. at 2; County Defs.' 56.1 Statement ¶¶ C3, D3. He submitted these forgeries to defendants during discovery and again as exhibits to his Affidavit in Opposition to Defendant's Motion for Summary Judgment. A severe sanction is warranted as Hargrove's forgeries were intentional, he never corrected them once their authenticity was challenged and he continues to insist on their veracity. Aff. in Opp. at 1-4. Given that there is clear and convincing evidence that Hargrove has continuously and consciously perpetrated a fraud on the court through his submission of fraudulent documents and sworn affirmations of those documents' authenticity, dismissal with prejudice is especially appropriate. *See, e.g., Shangold,* 2006 WL 71672, at *5 (dismissing with prejudice where plaintiffs fabricated evidence to advance their claims); *Scholastic,* 221 F.Supp.2d at 439-444 (dismissing with prejudice where plaintiff produced seven pieces of falsified evidence); *McMunn,* 191 F.Supp.2d at 445 (dismissing with prejudice where plaintiff "lie[d] to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process").

**Conclusion**

***12** Because Hargrove did not satisfy the exhaustion requirement under the PLRA, defendants' motions for summary judgment are granted. Further, considering the fraud Hargrove perpetrated on the court, the claims are dismissed against all defendants with prejudice. The Clerk of the Court is directed to close the case.

SO ORDERED:

E.D.N.Y.,2007.
Hargrove v. Riley
Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.





C
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
James PETTUS, Plaintiff,
v.
Jospeh McCOY, Superintendent, Deputy Ryan,
Defendants.
**No. 9:04-CV-0471.**

Sept. 13, 2006.

James Pettus, Comstock, NY, pro se.

Charles J. Quackenbush, New York State Attorney General, The Capitol Albany, NY, for Defendants.

***DECISION and ORDER***

THOMAS J. McAVOY, Senior District Judge.

***1** Plaintiff commenced the instant action asserting various violations of his constitutional rights arising out of his placement at the Southport Correctional Facility. In his Complaint, Plaintiff alleges that he was improperly sent to the Special Housing Unit ("SHU") at a maximum security facility and that being in SHU has put his life in jeopardy. Currently before the Court is Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56 seeking dismissal of the Complaint in its entirety for failure to exhaust administrative remedies.

**I. FACTS**[FN1]

FN1. The following facts are taken from Defendants' statement of material facts submitted pursuant to N.D.N.Y.L.R. 7.1(a)(3). These facts are deemed admitted because they are supported by the record evidence and Plaintiff failed to submit an opposing statement of material facts as required by Rule 7.1(a)(3). Plaintiff was specifically advised by Defendants of his obligation to file an opposing statement of material facts and to otherwise properly respond to the motion for summary judgment.

Plaintiff is an inmate in the custody of the New York State Department of Correctional Services. Plaintiff signed the instant Complaint on April 7, 2004. On his Complaint form, Plaintiff indicated that there is a grievance procedure available to him and that he availed himself of the grievance procedure by filing a complaint with the IGRC [FN2], followed by an appeal to the superintendent of the facility, and then to the Central Office Review Committee in Albany. The Complaint indicates that Plaintiff is "waiting for response from Albany." The Complaint was filed on April 27, 2004.

FN2. Inmate Grievance Review Committee.

On April 12, 2004, prior to the filing of the instant Complaint, Plaintiff filed a grievance relating to the issues presented in this case. On April 19, 2004, the IGRC recommended that Plaintiff's grievance be denied. Plaintiff then appealed that decision to the facility Superintendent. In the meantime, on April 27, Plaintiff commenced the instant litigation. On May 3, 2004, after Plaintiff filed the Complaint in this case, the Superintendent denied Plaintiff's grievance. On May 5, 2004, Plaintiff appealed the decision to the Central Office Review Committee in Albany. On June 23, 2004, the Central Office Review Committee denied Plaintiff's appeal. Plaintiff did not file any other grievances in connection with the matters raised in this lawsuit.

Defendants now move to dismiss on the ground that Plaintiff commenced the instant action before fully exhausting his available administrative remedies.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**II. DISCUSSION**

The sole issue presented is whether Plaintiff was required to complete the administrative process before commencing this litigation. This issue has already been addressed by the Second Circuit in *Neal v. Goord,* 267 F.3d 116 (2d Cir.2001). The issue in that case was "whether plaintiff's complaint should have been dismissed despite his having exhausted at least some claims during the pendency of his lawsuit." *Id.* at 121. The Second Circuit held that "exhausting administrative remedies after a complaint is filed will not save a case from dismissal." *Id.*

In this case, Defendants have established from a legally sufficient source that an administrative remedy is available and applicable. *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003); *see also* 7. N.Y.C.R.R. § 701.1, *et seq.* Plaintiff's Complaint concerns his placement in SHU at a maximum security facility. These are matters that fall within the grievance procedure available to NYSDOCS inmates and are required to be exhausted under the Prison Litigation Reform Act, 42 U.S.C. § 1997e. Plaintiff has failed to demonstrate any applicable exception to the exhaustion requirement. Because Plaintiff commenced the instant litigation prior to fully completing the administrative review process, the instant Complaint must be dismissed without prejudice. *Neal,* 267 F.3d 116.

**III. CONCLUSION**

***2** For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and the Complaint is DISMISSED WITHOUT PREJUDICE. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

N.D.N.Y.,2006.
Pettus v. McCoy
Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.





C
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
LaCream NEWMAN, Plaintiff,
v.
George B. DUNCAN, Superintendent of Great Meadow Correctional Facility; David Carpenter, Deputy Superintendent; Patrick Vanguilder, Deputy Superintendent of Security; William Mazzuca, Superintendent of Fishkill Correctional Facility; R. Ercole, Deputy Superintendent of Security; J. Conklin, Corrections Sergeant; and John Doe, Corrections Officer, Defendants.
**No. 04-CV-395 (TJM/DRH).**

Sept. 26, 2007.

LaCream Newman, Auburn, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Charles J. Quackenbush, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior United States District Judge.

**I. INTRODUCTION**

***1** This *pro se* action brought pursuant to 42 U.S.C. § 1983 was referred to the Hon. David R. Homer, United States Magistrate Judge, for a Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). No objections to the Report-Recommendation and Order dated September 6, 2007 have been filed. Furthermore, after examining the record, this Court has determined that the Report-Recommendation and Order is not subject to attack for plain error or manifest injustice. Accordingly, the Court adopts the Report-Recommendation and Order for the reasons stated therein.

It is therefore,

**ORDERED** that

(1) Defendants' motion for summary judgment (Docket No. 36) is **GRANTED** as to defendants Duncan, Carpenter, VanGuilder, Mazzuca, Ercole, and Conklin and as to all of Newman's causes of action;

(2) The complaint is **DISMISSED** without prejudice as to defendant John Doe; and

(3) This action is **TERMINATED** in its entirety as to all defendants and all claims.

**IT IS SO ORDERED**

**REPORT-RECOMMENDATION AND ORDER**[FN1]

FN1. This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, U.S. Magistrate Judge.

Plaintiff pro se LaCream Newman ("Newman"), an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, seven DOCS employees, violated his constitutional rights under the Eighth and Fourteenth Amendments. [FN2] *See* Compl. (Docket No. 1). Presently pending is defendants'

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

motion for summary judgment pursuant to Fed.R.Civ.P. 56. Docket No. 36. Newman opposes the motion. Docket No. 41. For the following reasons, it is recommended that defendants' motion be granted.

FN2. Newman's Fourteenth Amendment claims were previously dismissed. *See* Docket No. 28.

**I. Background**

The facts are presented in the light most favorable to Newman as the non-moving party. *See* *Ertman v. United States,* 165 F.3d 204, 206 (2d Cir.1999).

On October 23, 2002, Newman was being transferred from Great Meadow Correctional Facility ("Great Meadow") to Fishkill Correctional Facility's ("Fishkill") Special Housing Unit ("SHU").[FN3] *See* Pelc. Aff. (Docket No. 36), Ex. B. Before arriving at Fishkill, Newman was temporarily housed at Downstate Correctional Facility ("Downstate"). *Id.* While being housed at Downstate, an inmate attempted to sexually assault Newman. *See* Compl. at ¶ 7. On October 24, 2002, Newman was transferred from Downstate to Fishkill. *See* Pelc. Aff., Ex. B. Upon arrival at Fishkill, Newman was assigned to a double occupancy cell. *See* Compl. at ¶ 10. On October 29, 2002, an inmate again attempted to sexually assault Newman. *See* Compl. at ¶ 12; *see also* Harris Aff. (Docket No. 36) at Ex. A. On November 15, 2002, Newman was transferred to Clinton Correctional Facility ("Clinton"). *See* Pelc. Aff., Ex. B. This action followed.

FN3. SHUs exist in all maximum and certain medium security facilities. The units "consist of single-or double-occupancy cells grouped so as to provide separation from the general population ...." N.Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b) (2004). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

**II. Discussion**

Newman asserts six causes of action, each alleging that defendants' failure to house Newman in a single occupancy cell constituted cruel and unusual punishment under the Eighth Amendment. Defendants seek judgment on all claims.

**A. Standard**

***2** A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223-24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988). When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *Id.; see also* *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U .S. at 247-48.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**B. Exhaustion**

Defendants contend that Newman has failed to demonstrate any reasonable excuse for failing to exhaust his administrative remedies as to his Eighth Amendment claim. *See* Defs. Mem. of Law (Docket No. 36) at 6-11. Newman contends that he failed to exhaust his administrative remedies after the attempted sexual assaults because (1) he was threatened by John Doe; (2) he was in transit between DOCS facilities; and (3) he was dealing with the mental and emotional effects of the attempted assaults. *See* Pl. Reply Mem. of Law (Docket No. 41) at 1-3.

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), subjects suits concerning prison conditions brought under federal law to certain prerequisites. Specifically, the PLRA dictates that a prisoner confined to any jail, prison, or correctional facility must exhaust all available administrative remedies prior to bringing any suit concerning prison life, " 'whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' " *Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004) (quoting *Porter v. Nussle,* 534 U.S. 516, 532 (2002)); *see also Jones v. Bock,* 127 S.Ct. 910, 918-19 (2007) ( "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court.") (citation omitted)); *Woodford v. Ngo,* 126 S.Ct. 2378, 2382-83 (2006). Administrative remedies include all appellate remedies provided within the system, not just those that meet federal standards. *Woodford,* 126 S.Ct. at 2382-83. However, the Second Circuit has recognized three exceptions to the PLRA's exhaustion requirement: [FN4]

FN4. It is unclear whether *Woodford* has overruled the Second Circuit's exceptions to the exhaustion requirement. *See Miller v. Covey,* No. Civ. 05-649 (LEK/GJD), 2007 WL 952054, at *3-4 (N.D.N.Y. Mar. 29, 2007). However, it is not necessary to determine what effect *Woodford* has on the Second Circuit's exceptions to the exhaustion requirement because Newman's contentions cannot prevail even under pre-*Woodford* case law. *See Ruggiero v. County of Orange,* 467 F.3d 170, 176 (2d Cir.2006)

***3** when (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement.

*Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004))

"The PLRA's exhaustion requirement is designed to 'afford [ ] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004) (quoting *Porter,* 534 U.S. at 524-25)). " '[A] grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought.' " *Id.* (quoting *Strong v. David,* 297 F.3d 646, 650 (7th Cir.2002)). Inmates must provide sufficient information to "allow prison officials to take appropriate responsive measures." *Id.*

DOCS has established a grievance procedure which includes a three-stage review and appeal process. *See* N.Y. Correct. Law § 139 (McKinney 2003); N.Y. Comp.Codes R. & Regs. tit. 7, § 701.1-.16 (2003); [FN5] *Hemphill,* 380 F.3d at 682-83. When an inmate files a grievance, it is investigated and reviewed by an Inmate Grievance Resolution Committee ("IGRC"). If the grievance cannot be resolved informally, a hearing is held. The IGRC decision may be appealed to the Superintendent of the facility. Finally, an inmate may appeal the Superintendent's decision to the Central Office Review Committee ("CORC"). N.Y. Comp.Codes R. & Regs. tit.7, § 701.7(c).

FN5. The Court is aware that the sections governing the Inmate Grievance Program procedures in the Official Compilation of Codes, Rules & Regulations of the State of New York were re-numbered in June 2006. *See Bell v. Beebe,* No. Civ. 06-544 (NAM/GLD), 2007 WL 1879767, at *3 n. 4 (N.D.N.Y. June 29, 2007). However, in the interests of clarity, the Court will cite the section numbers of the provisions

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

that were in effect at the time Newman filed his complaint.

Here, it is undisputed that Newman's first attempt to file a grievance regarding the alleged sexual assaults did not occur until September 21, 2003, nearly one year after the alleged assaults. *See* Pl. Reply Statement of Material Facts (Docket No. 41) at Ex. 2; *see also* Newman Dep. (Ullman Decl. at Ex. 1, Docket No. 36) at 85-87. In his complaint, Newman contends that he failed to file a timely complaint due to "fear." *See* Pl. Reply Statement of Material Facts at Ex. 2. However, the Inmate Grievance Program ("IGP") supervisor at Clinton rejected Newman's attempt to file his complaint as a grievance because Newman failed to "expand on what/who caused the 'fear.' " *Id.* The IGP supervisor also noted that Newman had been housed at Clinton for the previous nine months and, thus, had "ample opportunity to file [his] complaint before [September 2003]." *Id.* Newman attempted to file an appeal of the IGP supervisor's decision to the Superintendent, but the supervisor advised Newman "[t]here is no provision to appeal the IGP Supervisors decision (to not accept a grievance) to the Superintendent. You may file a separate grievance on the determination by submitting it to the IGRC office." *Id.*

***4** On or about October 15, 2003, Newman filed a grievance requesting that the October 10, 2003 decision of the IGP supervisor be reversed. *See* Ullman Decl. (Docket No. 36) at Exs. 5 & 6. Newman alleged that the following "mitigating circumstances" prevented him from filing a timely grievance regarding the October 2002 sexual assaults: "1. I was in transit within the 14 days of the incident; to a number of correctional facilities; in addition to MHU within NYS DOCS; 2. I was confronted with fear (threats); which was made by CO's at Fishkill SHU 200 which I wasn't to make mention of the situation and that he could cause me to be placed in the same situation again and no on[e] would help me." *Id.* The IGRC denied Newman's grievance, finding that "[Newman] has been in [Clinton] since Dec. 2002 which gave him adequate time to file complaint which would have been accepted if filed then. Grievant did not provide mitigating circumstances to warrant the acceptance of complaint." Ullman Decl., Ex. 5 at 4. The Superintendent and CORC both denied Newman's appeals, finding that Newman had failed to present mitigating circumstances to excuse his delay in submitting the complaint. *See* Ullman Decl, Exs. 7 & 8.

In claiming that his non-exhaustion should be excused, Newman makes three arguments. First, he contends that a corrections officer at Fishkill (John Doe) threatened him, warning that if Newman reported the October 29, 2002 sexual assault then he would be placed back in the "same predicament" he was in before. *See* Newman Dep. at 83. However, Newman was transferred to Clinton in November 2002 and, thus, could have immediately filed a grievance now that he was separated from the officer who threatened him. *See* Pelc Decl. (Docket No. 36) at Ex. B. Further, Newman testified that he felt "safe" while at Clinton, demonstrating that any fear he may have had surrounding the filing of a grievance was left behind at Fishkill. *See* Newman Dep. at 66. Moreover, Newman ultimately did file a grievance while at Clinton. *See* Ullman Decl., Exs. 5 & 6. Thus, Newman's first argument for failure to properly exhaust is not persuasive.

Second, Newman contends that his frequent transfers between DOCS facilities within fourteen days of the sexual assaults prevented him from timely filing a grievance. However, this argument is not persuasive because DOCS regulations state that "[e]ach correctional facility housing a reception/classification/transit inmate population shall insure all inmates access to the IGP." N.Y. Comp.Codes R. & Regs. tit.7, § 701.14. Further, Newman arrived at Clinton on November 15, 2003 and was not moved to another DOCS facility until November 19, 2003, thus affording him nearly a year where he was not "in transit." *See* Pelc. Decl. at Ex. B.

Third, Newman contends that this Court should apply the "special circumstances" exception under *Hemphill* because he was dealing with the mental and emotional effects of the sexual assaults, thus preventing his filing of a grievance. *See* Newman Dep. at 83-84; Pl. Reply Mem. of Law at 2-3; *see also* *Hemphill,* 380 F.3d at 686. However, the special circumstances exception under *Hemphill* concerned an inmate's justifiable confusion regarding the proper DOCS procedure for filing an expedited grievance, not an inmate's mental or emotional condition. *See* *Hemphill,* 380 F.3d at 689-91. Thus, absent any documented mental illness that prevented Newman from filing a grievance, his third argument excusing his failure to timely exhaust his administrative remedies is not persuasive.[FN6]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN6. Moreover, shortly after the second assault, Newman wrote a letter to his counselor requesting that he be able to correspond with another inmate. *See* Newman Dep. at 42-43. Thus, in light of his ability to correspond with his counselor shortly after the incident, Newman's contention that he was too emotionally distraught to file a grievance is without merit.

***5** Therefore, it is recommended that defendants' motion on this ground be granted.

### C. Eighth Amendment[FN7]

FN7. In his complaint, Newman contends that defendants' conduct constituted cruel and unusual punishment in violation of the Eighth Amendment because their failure to comply with DOCS regulations "facilitated ... the cause for the incident of attempted rape/physical assault that occurred to plaintiff therein at Fishkill SHU 200, on or about 10/29/02." Compl. at ¶¶ 15, 17, 19, 21, 23. Therefore, Newman's cause of action is best addressed under the Eighth Amendment's failure to protect standard.

Newman contends that defendants knew or should have know that he was a homosexual and that his placement in a double occupancy cell "facilitated ... the cause for the incident of attempted rape/physical assault that occurred to plaintiff therein at Fishkill SHU 200, on or about 10/29/02." Compl. at ¶¶ 15, 17, 19, 21, 23.

Prison officials have a duty to protect inmates from violence by other inmates. *See* *Farmer v. Brennan,* 511 U.S. 825, 833 (1994). When asserting a failure to protect claim, an inmate must establish that he was "incarcerated under conditions posing a substantial risk of serious harm" and that the defendants acted with deliberate indifference to the inmate's safety. *Id.* at 834. Deliberate indifference is established when the official knew of and disregarded an excessive risk to inmate health or safety. *Id.* at 837. However, "the issue is not whether [a plaintiff] identified his enemies by name to prison officials, but whether they were aware of a substantial risk of harm to [him]." *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 621 (2d Cir.1991).

Here, Newman contends that on two separate occasions, fellow inmates "attempted to rape/physical[ly] assault" him. *See* Compl. at ¶¶ 7, 11, 15, 17, 19, 21, 23. However, it is undisputed that Newman did not suffer any actual injury [FN8] from these attempted assaults. *See* Defs. Statement of Material Facts (Docket No. 36) at ¶¶ 71-76; Pl. Reply Statement of Facts at ¶¶ 71-76; *see also* Newman Dep. at 31-32, 35-37, 41-42, 68-74, 95-96; Harris Aff. at Ex. A. The law is clear that an inmate must demonstrate an "actual injury" when alleging a constitutional violation. *See* *Brown v. Saj,* No. Civ. 06-6272(DGL), 2007 WL 1063011, at *2 (W.D.N.Y. Apr. 5, 2007) (citing *Lewis v. Casey,* 518 U.S. 343, 349 (1996)). These two isolated incidents, coupled with Newman's failure to allege any injury resulting from the attempted sexual assaults, fail to demonstrate a constitutional violation under the Eighth Amendment. *See* *Boddie v. Schnieder,* 105 F.3d 857, 861-62 (2d Cir.1997) (holding that isolated incidents of sexual assault, without any injury, fail to state an Eighth Amendment claim); *see also* *Brown,* 2007 WL 1063011, at *2 (dismissing inmate's failure to protect claim for failure to demonstrate an actual injury).

FN8. To the extent that Newman contends that the attempted assaults caused him any mental or emotional injury, this claim must fail because "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e) (2003); *see also* *Thompson v. Carter,* 284 F.3d 411, 417 (2d Cir.2002) (holding that § 1997e(e) "applies to claims in which a plaintiff alleges constitutional violations so that the plaintiff cannot recover damages for mental or emotional injury for a constitutional violation in the absence of a showing of actual physical injury").

Therefore, in the alternative, it is recommended that

defendants' motion on this ground be granted.

**D. Qualified Immunity**

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability insofar as their conduct does not violate clearly established constitutional law of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229 (N.D.N.Y.2002), *aff'd,* 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003). A court must first determine that if plaintiff's allegations are accepted as true, there would be a constitutional violation. Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, as discussed *supra,* accepting all of Newman's allegations as true, he has not shown that defendants violated his constitutional rights.

***6** Therefore, in the alternative, defendants' motion for summary judgment on this ground should be granted.

**E. Failure to Serve Defendant John Doe**

Newman's complaint asserts a claim against John Doe, a defendant who has neither been identified nor served with the complaint. Rule 4(m) of the Federal Rules of Civil Procedure requires that service of process be effectuated within 120 days of the date of the filing of the complaint. *See also* N.D.N.Y.L.R. 4.1(b). Because defendant John Doe has not been identified by Newman or timely served with process, it is recommended that the complaint be dismissed without prejudice against this defendant.

**III. Conclusion**[FN9]

FN9. Defendants also contend that Newman failed to demonstrate that they were personally involved in the alleged constitutional violations. *See* Defs. Mem. of Law at 11-14. However, it is recommended herein that defendants' motion should be granted as to all of Newman's claims on other grounds. Thus, this argument need not be addressed.

For the reasons stated above, it is hereby

**RECOMMENDED** that:

1. Defendants' motion for summary judgment (Docket No. 36) be **GRANTED** as to defendants Duncan, Carpenter, VanGuilder, Mazzuca, Ercole, and Conklin and as to all of Newman's causes of action;

2. The complaint be **DISMISSED** without prejudice as to defendant John Doe; and

3. This action therefore be **TERMINATED** in its entirety as to all defendants and all claims.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2007.
Newman v. Duncan
Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.





Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
William E. HOOKS, Plaintiff,
v.
T. HOWARD, Correctional Officer, Upstate Correctional Facility; Mr. Mcgaw, Correctional Officer, Upstate Correctional Facility; Galiger, Correctional Officer, Upstate Correctional Facility; Mr. Green, Correctional Officer, Upstate Correctional Facility; Mr. Willette, Defendants.
No. 907-CV-0724 (TJM/RFT).

March 30, 2010.
William E. Hooks, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Christopher W. Hall, Esq., of Counsel, Albany, NY, for Defendants.

***MEMORANDUM-DECISION and ORDER***

THOMAS J. McAVOY, Senior District Judge.

***1** *Pro se* Plaintiff William E. Hooks brings this civil rights action pursuant to 42 U.S.C. § 1983 alleging that the defendants violated his constitutional rights during his confinement at Upstate Correctional Facility ("Upstate"). Dkt. No. 1. Defendants have filed a motion for summary judgment under Federal Rule of Civil Procedure 56 dismissing the complaint in its entirety. Dkt. No. 49. Plaintiff has submitted papers in opposition. Dkt. No. 51. For the reasons set forth herein, defendants' motion for summary judgment is granted in part and denied in part. With the exception of plaintiff's claims against defendants McGaw, Willette, Galiger and Green arising out of the alleged use of excessive force against plaintiff on August 7, 2006, all of plaintiff's claims are dismissed. In light of the foregoing, defendant C.O. Howard is dismissed as a defendant in this action.

**I. BACKGROUND**

At all relevant times concerning this action, plaintiff was an inmate at Upstate in the custody of the New York State Department of Correctional Services ("DOCS"). Plaintiff filed his complaint on July 12, 2007. Dkt. No. 1. Plaintiff alleges that defendants, Correction Officers Howard, McGaw, Galiger, Green and Willette, engaged in misconduct in violation of his constitutional rights on eleven separate occasions during the period 2005-2007, each of which is addressed in defendants' summary judgment motion.

Defendants argue that plaintiff's claims with respect to eight of the eleven incidents complained of are subject to dismissal because plaintiff failed to exhaust his administrative remedies as required under law. Dkt. No. 49. In support of their motion, defendants rely upon the supporting affidavits of Christine Gregory, Inmate Grievance Program ("IGP") Supervisor at Upstate ("Gregory Aff." and "Gregory Supp. Aff."), and Karen R. Bellamy, Director of DOCS IGP ("Bellamy Aff."). Bellamy is the custodian of records maintained by the Central Office Review Committee ("CORC"). Bellamy Aff. ¶ 2. As to the three exhausted claims, defendants argue that those claims must be dismissed because the facts alleged by plaintiff are not sufficient to state claims for the violation of his constitutional rights upon which relief may be granted by this Court. Defendants have submitted a statement of material facts as required by Local Rule 7.1 ("Defs.Stmt."), and a supporting memorandum of law ("Defs.MOL").

Plaintiff has responded in opposition to defendants' motion. Dkt. No. 51. In that response, plaintiff admits that five of his claims are unexhausted, but argues that he properly exhausted his administrative remedies with respect to three of the claims on which defendants seek summary judgment. Plaintiff has not responded to defendants' arguments in support of the requested dismissal of plaintiff's three exhausted claims. Plaintiff has submitted a statement of material facts as required by Local Rule 7.1 ("Pl.Stmt ."), and a supporting

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

memorandum of law ("Pl.MOL").

## II. DISCUSSION

### A. Summary Judgment Standard

***2** Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under Rule 56, the entry of summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that there is no genuine issue of material fact to be decided with respect to any essential element of the claim in issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In meeting this burden, the moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323 (quoting Fed.R.Civ.P. 56(c)).

In the event this initial burden is met, the nonmoving party must produce evidence demonstrating that genuine issues of material fact exist. *Celotex,* 477 U.S. at 324; *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006). Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Thus, the opposing party must proffer admissible evidence that "set[s] out specific facts" showing a genuinely disputed factual issue that is material under the applicable legal principles. Fed.R.Civ.P. 56(e); *see, e.g., Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir.2004).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all justifiable factual inferences in favor of the nonmoving party. *Major League Baseball Properties, Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008); *Jeffreys,* 426 F.3d at 553. The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507-08 (2d Cir.2002); *see also Anderson,* 477 U.S. at 250 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. Exhaustion of Administrative Remedies

***3** The Prisoner Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under [§ 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997(e)(a). This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

"Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford v. Ngo,* 548 U.S. 81, 95, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006); *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ). The Supreme Court explained in *Woodford* that the PLRA requires "proper exhaustion," which " 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Woodford* 548 U.S. at 90 (quoting *Pozo v. McCaughtry,* 286 F.3d 1022, 1024 (7th Cir.2002)). While placing prison officials

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense," an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the established grievance system in order to satisfy the PLRA. *Macias,* 495 F.3d at 43 (quoting *Johnson v. Testman,* 380 F.3d 691, 697-98 (2d Cir.2004)) (emphasis omitted).

The New York State Department of Correctional Services (DOCS) has created a three-step grievance process known as the Inmate Grievance Program (IGP). *See* *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004).[FN1] First, the inmate must file a grievance complaint with the facility's IGP Clerk within twenty-one (21) calendar days of the incident. If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. The grievance complaint is then submitted to the Inmate Grievance Resolution Committee (IGRC), which has sixteen (16) calendar days from receipt to informally resolve the issue or conduct a hearing.[FN2] The IGRC must issue a written decision within two (2) working days of the conclusion of the hearing. Second, the inmate may appeal the IGRC decision to the Superintendent within seven (7) calendar days of receipt of the IGRC's decision. The superintendent is to issue a written decision within twenty (20) calendar days of receipt of the appeal. Third, the inmate may appeal to CORC within seven (7) calendar days of receipt of the superintendent's written decision. CORC is to render a final administrative determination within thirty (30) calendar days of receipt of the appeal. It is important to note that any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, in order to complete the grievance process. Upon the completion of all three steps, "a prisoner may seek relief pursuant to 42 U.S.C. § 1983 in federal court." *Colon v. Harvey,* 344 F.Supp.2d 896, 897 (W.D.N.Y.2004) *(citing* *Neal v. Goord* 267 F.3d 116, 122 (2d Cir.2001)).

FN1. The provisions of the grievance procedure established by DOCS are set forth in 7 N.Y.C.R.R. §§ 701.1 *et seq.*

FN2. Allegations of employee misconduct bypass the IGRC and go directly to the superintendent for review. If the superintendent determines that the grievance is "a bona fide harassment issue," the superintendent assumes responsibility for the matter. If not, the grievance is returned to the IGRC for normal processing.

***4** The Second Circuit has suggested a three-pronged inquiry when the inmate plaintiff opposes a defendant's assertion that the inmate failed to exhaust his or her available administrative remedies. In *Hemphill v. New York,* 380 F.3d 680 (2d Cir.2004), the Second Circuit stated:

> Depending on the inmate's explanation for the alleged failure to exhaust, the court must ask whether administrative remedies were in fact "available" to the prisoner. *Abney v. McGinnis,* 380 F.3d 663, [667-68 (2d. Cir.2004) ]. The court should also inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, *Johnson v. Testman,* 380 F.3d 691, [695 (2d. Cir.2004) ], or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense, *Ziemba* [v. *Wezner,* 366 F.3d 161, 163 (2d Cir.2004) ]. If the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether "special circumstances" have been plausibly alleged that justify "the prisoner's failure to comply with administrative procedural requirements." *Giano v. Goord,* 380 F.3d 670, [675 (2d Cir.2004) ] (citing *Berry v. Kerik,* 366 F.3d 85, 88 (2d Cir.2003)[.]

*Hemphill,* 380 F.3d at 686. While recognizing that the Supreme Court's decision in *Woodford* may cast some doubt on the continued viability of the *Hemphill* analysis, the Second Circuit has continued to scrutinize failure to exhaust claims with reference to these three prongs. *See* *Ruggiero v. County of Orange,* 467 F.3d 170, 176 (2d Cir.2006) ("We need not determine what effect *Woodford*

has on our case law in this area, however, because [plaintiff] could not have prevailed even under our pre-*Woodford* case law."); *Reynoso v. Swezey,* 238 Fed.Appx. 660, 662 (2d Cir.2007), *cert. denied,* 552 U.S. 1207, 128 S.Ct. 1278, 170 L.Ed.2d 109 (2008) (noting that *Hemphill* recognized "nuances in the exhaustion requirement," the Court found that "[b]ecause we agree with the district court that [plaintiff] cannot prevail on any of these grounds, we have no occasion to decide whether *Woodford* has bearing on them."); *Macias,* 495 F.3d at 43 n. 1 (we need not decide what effect *Woodford* has on *Hemphill's* holding that where administrative procedures are confusing "a reasonable interpretation of prison grievance regulations may justify an inmate's failure to follow procedural rules to the letter."). As has the Second Circuit, as well as the other district courts in this Circuit, this Court will apply the *Hemphill* three-part inquiry to the exhaustion claims. *See e.g., Butler v. Martin,* 07-CV-521 (FJS/GHL), 2010 WL 980421, *1 (N.D.N.Y. Mar. 15, 2010) (the magistrate judge "correctly applied the Second Circuit's three-part inquiry" for analyzing claims of non-exhaustion); *Winston v. Woodward,* 05 Civ. 3385, 2008 WL 2263191, *6 (S.D.N.Y. May 30, 2008) (collecting cases).

***5** To be "available" for purposes of the PLRA, an administrative remedy must afford "the possibility of some relief for the action complained of." *Booth v. Churner,* 532 U.S. 731, 738, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001). In addition, a court deciding this issue must apply an objective test and determine whether a similarly situated person of ordinary firmness would have deemed the administrative remedy available. *Hemphill,* 380 F.3d at 688.

"A plaintiff's failure to exhaust ... may be excused on the grounds of estoppel where the plaintiff was misled, threatened, or otherwise deterred from fulfilling the requisite procedures." *Winston,* 2008 WL 2263191 at *9 (citing *Hemphill,* 380 F.3d at 688-89) (other citation omitted). However, alleged intimidation will provide a basis to excuse the filing of a grievance only against the person alleged to have engaged in the intimidation. *Snyder v. Whittier,* 05-CV-1284 (TJM/DEP), 2009 WL 691940, *9 (N .D.N.Y. Mar. 12, 2009); *Larry v. Byno,* 01-CV-1574 (TJM), 2006 WL 1313344, ----3-4 (N.D.N.Y. May 11, 2006).[FN3]

FN3. Conclusory allegations of intimidation are not sufficient. In *Veloz v. New York,* the prisoner claimed that he placed his grievances in the mail, "but that his grievances were either misplaced or destroyed." 339 F.Supp.2d 505, 514 (S.D.N.Y.2004), *aff'd,* 178 Fed. Appx. 39 (2d Cir.2006). The Court found it significant that plaintiff "offers no evidence that any particular officer thwarted his attempts to file [the grievances] ... His allegations 'stand alone and unsupported.' " *Id.* at 516 (quoting *Nunez v. Goord,* 172 F.Supp.2d 417, 429 (S.D.N.Y.2001)); *see also Winston,* 2008 WL 2263191, *10 (rejecting assertion that plaintiff failed to exhaust administrative remedies due to mail tampering because plaintiff failed "to put forth any corroborating evidence, either direct or circumstantial").

In addition, the Court must also consider whether "special circumstances" have been plausibly alleged, that justify "the prisoner's failure to comply with administrative procedural requirements." *Giano v. Goord,* 380 F.3d 670, 676 (2d Cir.2004). Justification "must be determined by looking at the circumstances which might understandably lead usually uncounselled prisoners to fail to grieve in the normally required way." *Id.* at 678. Special circumstances may be found to exist, for example, where prison officials "inhibit an inmate's ability to utilize administrative grievance procedures;" where the prisoner received a favorable disposition from his grievance but the time to appeal had expired and no relief was forthcoming; and where all appeals were undertaken but prison officials did not respond within the required time period. *Id.* at 677. The effect of a plaintiff's justification as to why there was no exhaustion "is that, though the administrative remedies are no longer available for reasons of timing or other procedural restrictions, such restrictions cannot serve to keep the plaintiff's suit from proceeding." *Id.* at 676.

Here, it is undisputed that administrative remedies were available to plaintiff through the Upstate IGP, which plaintiff has acknowledged and, in fact, utilized by filing numerous grievances. *See Mingues v. Nelson,* 96 CV

5396, 2004 WL 324898, *4 (S.D.N.Y. Feb.20, 2004) (the record is unmistakably clear "that an appropriate administrative procedure was available" to plaintiff who did not deny knowledge of the IGP). It is also clear that defendants have not forfeited the administrative remedy defense in this action. Defendants asserted plaintiff's failure to exhaust in their answer to the complaint. Dkt. No. 16 at 2.

Accordingly, the Court will consider whether plaintiff exhausted his administrative remedies with respect to the eight claims identified by defendants in their motion and, if not, whether defendants are estopped from asserting this defense or whether any "special circumstances" exist which might excuse plaintiff's failure to exhaust. These issues are addressed with respect to each of the eights claims, proceeding in chronological order by date of the underlying incident.[FN4]

> FN4. For purposes of the pending summary judgment motion, the facts are related in a light most favorable to plaintiff, as the non-moving party, with all inferences drawn in his favor. *Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998).

***6 February 15, 2005:** Plaintiff claims that on this date C.O. Howard threw "hot coffee" at plaintiff's cell slot. Compl. (Facts) at 3.

Defendants maintain that this incident is unexhausted because plaintiff did not file a timely grievance. Defs. MOL at 7. The first grievance filed by plaintiff in 2005 and recorded by the Upstate IGP was Grievance UST 23622-05, which was dated May 19, 2005, more than one month later. Gregory Aff. ¶¶ 7-8 and exs. A and B.[FN5] There is no record in the CORC database "of such an incident ever being appealed as a grievance to CORC." Bellamy Aff. ¶ 10.

> FN5. Exhibit A is a copy of the computer printout of plaintiff's grievance records at Upstate for the years 2005-2007. In Grievance UST 23622-05, plaintiff describes the hot coffee incident as follows: "[C.O. Howard] threw the contents at my cell mate's face (hot coffee)." Gregory Aff. ex. B. Plaintiff goes to state that "[m]y cell mate and I have both been advised that our complaints were never received, and time was allowed to expire!" *Id.*

According to plaintiff, he filed a complaint regarding the "hot coffee" incident on February 15, 2005, which "was held by staff" and "did not make it to the IGRC in time for processing at no fault of plaintiffs." Pl. Stmt. ¶¶ 2, 4. Plaintiff relies on a memorandum dated April 7, 2005 addressed to plaintiff from "L. Peary-Inmate Grievance Program." Pl. Stmt. ex. A. In this memorandum, Peary acknowledged that plaintiff submitted a complaint "dated 2/15/05" and advised plaintiff that the complaint was not processed as a grievance because it was received "outside the time frames for filing a grievance." *Id.* The memorandum goes on to state that if plaintiff provided "proof of mitigating circumstances within 7 days of the date of this correspondence," his complaint would be processed in accordance with the grievance procedures. *Id.* Plaintiff does not claim to have made a further submission as Peary advised. Rather, plaintiff states only that he "could not however appeal complaint due to being [an ongoing subject] of harassment." Pl. Stmt. ¶ 3.

Here, the record reflects that plaintiff did not file a timely grievance regarding the hot coffee incident and moreover, despite having been afforded an opportunity to mitigate his late filing, elected not do so. Plaintiff's unsupported assertion that he could not pursue his grievance remedies because he was being harassed by unidentified corrections personnel does not provide a basis for a finding of estoppel. *See Snyder,* 2009 WL 691940, *9. The record does not disclose a realistic fear of retribution on plaintiff's part sufficient to estop defendants from asserting the defense of non-exhaustion or otherwise justifying plaintiff's failure to exhaust.

Based upon the record before this Court, plaintiff did not file a timely grievance regarding the "hot coffee" incident, and there is no basis upon which to excuse that failure or to estop defendants from asserting that affirmative defense. This claim is dismissed.

**May 10, 2005:** Plaintiff claims that on this date C.O. Howard "took family photos, and magazines out of

[Plaintiff's] cell." Compl. (Facts) at 3.

Defendants urge dismissal of this claim as unexhausted because the records maintained at Upstate do not reflect a grievance from plaintiff regarding this incident, and no grievance appeal appears in the CORC records corresponding to either the date or the nature of the incident. Defs. MOL at 7; Gregory Aff. ¶ 8 and ex. A; Bellamy Aff. ex. A.[FN6]

> FN6. Exhibit A to the Bellamy Affidavit is a copy of the computer printout of plaintiff's grievance records at CORC for the years 2005-2008.

***7** Plaintiff admits that he did not file a grievance (or a grievance appeal) regarding this incident. Pl. Stmt. ¶¶ 5-7. Plaintiff does not contend in his motion opposition papers that defendants should be estopped from raising the issue of exhaustion or that special circumstances exist which justify his failure to exhaust his administrative remedies.

Based upon the foregoing, this claim is unexhausted and is dismissed.

**May 19, 2005:** Plaintiff claims that on this date C.O. Howard engaged in "harassment, threats and misconduct." Compl. (Facts) at 3. Plaintiff filed Grievance UST 23622-05 dated May 19, 2005. Gregory Aff ex. B. In that grievance, plaintiff complained that C.O. Howard "badgered" him and, after first letting the juice containers fall off of the flap, "stacked the juice containers up 3 high so they could not fit [sic] throw cell slot." *Id.* Grievance UST-23622-05 was denied by the Superintendent on June 6, 2005. Gregory Aff. ¶ 9 and ex. B.

Defendants maintain that this claim is unexhausted because plaintiff did not appeal the denial of his grievance to CORC. Defs. MOL at 8; Bellamy Aff. ¶¶ 8-9 and ex. A.

Plaintiff admits that he did not appeal the denial of grievance UST 23622-05 to CORC. Pl. Stmt. ¶¶ 8-10. Plaintiff does not contend in his motion opposition papers that defendants should be estopped from raising the affirmative defense of non-exhaustion or that his failure to exhaust his administrative remedies is justified by special circumstances.

This claim is unexhausted and is dismissed.

**April 7, 2006:** Plaintiff claims that on this date C.O. Howard was verbally abusive to him during a pat frisk and denied him a telephone call concerning the death of a family member. Compl. (Facts) at 3. Plaintiff states that he "notified the Inspector General's Office" about this incident. *Id.*

Defendants seek dismissal of this claim on the ground that plaintiff did not exhaust his administrative remedies regarding this incident. Defs. MOL at 8. The grievance records at Upstate do not include a grievance from plaintiff regarding this incident. Gregory Aff. ¶ 11 and ex. A. There is no record in the CORC data base "of such an incident ever being appealed as a grievance to CORC." Bellamy Aff. ¶ 11 and ex. A.

Plaintiff opposes summary judgment, relying on a letter of complaint regarding the April 7, 2006 incident which he sent to DOCS Commissioner Goord on April 7, 2006. Pl. Stmt. ¶¶ 11-12 and ex. C. In that letter, plaintiff complained about this incident and stated that C.O. Howard had been engaged in ongoing harassment of plaintiff. The letter was assigned # 083650. Pl. Stmt. ex. C. Plaintiff does not claim to have received a response to this letter. Plaintiff does not claim to have taken any further actions to exhaust his administrative remedies, nor does he claim that C.O. Howard "misled, threatened, or otherwise deterred" him from utilizing the IGP. *See* *Winston,* 2008 WL 2263191, at *9. Plaintiff admits that there was no appeal to CORC. Pl. Stmt. ¶ 13.

***8** Upon review, the Court finds that this claim is unexhausted. After *Woodford,* notice alone of an inmate's complaint is insufficient because "[t]he benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance" and "[t]he prison grievance system will not have such an opportunity unless the grievant complies with the system's critical procedural rules." *Woodford,* 548 U.S. at 95; see *Snyder,* 2009 WL 691940, * 10 (plaintiff's complaints which led to investigation by DOCS Inspector

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

General, "while perhaps constituting substantive exhaustion, does not satisfy the PLRA's procedural exhaustion requirement."). Under *Woodford,* plaintiff cannot satisfy the PLRA's exhaustion requirement by filing a complaint with the superintendent. *Macias,* 495 F.3d at 44.

Because plaintiff did not comply with the established grievance protocol of the IGP, and in the absence of evidence demonstrating that defendants should be estopped from asserting non-exhaustion or that special circumstances exists which justify the failure, this claims is unexhausted and is hereby dismissed.

**August 7, 2006:** Plaintiff claims that on this date C.O. McGaw and C.O. Willette used excessive force against him during a strip search, causing serious injury. Plaintiff claims that C.O. Galiger and C.O. Green failed to intervene and protect him from the assault. Compl. (Facts) at 4-5. Plaintiff filed Grievance UST 27819-06 regarding this incident. *Id.* Grievance UST 27819-06 was denied by the Superintendent on September 13, 2006. Gregory Aff. ¶ 12 and ex. C.

Defendants seek summary judgment dismissing this claim as unexhausted. Defs. MOL at 8. There is no record that plaintiff appealed the denial of this grievance to CORC. Bellamy Aff. ¶¶ 8-9 and ex. A.

In response, plaintiff claims that he timely appealed the denial of his grievance to CORC on September 18, 2006. Pl. Stmt. ¶¶ 14-16; Pl. MOL at 5, 12-13. Plaintiff relies on a copy of the Superintendent's response to Grievance UST 27819-06 which includes plaintiff's "Appeal Statement" dated September 18, 2006. Pl. Stmt. ex. B. Hand-written on that document (presumably by plaintiff) is the following: "Received on 9/18/06 filed on 9/18/06 CORC." *Id.* Plaintiff states that he could not place his appeal in "the designated grievance mail box" because at that time inmates at Upstate (a Special Housing facility) had no direct access to a grievance "mail box" but, rather, had to hand their grievance documents to a correction officer and rely on that person to physically place the documents in the box, which is what plaintiff did. Pl. Stmt. ¶ 16; Pl. MOL at 5. Plaintiff has also submitted a copy of a letter dated August 6, 2007 addressed to IGP Director "Tomas G. Baben," regarding his appeal of Grievance UST 27819-06. Pl. Stmt. ex. B. Plaintiff stated in that letter that he had not received confirmation that his appeal of Grievance UST 27819-06 was received by CORC and expressed concern that the appeal might have been "intercepted by staff and never processed." *Id.* On the basis of these documents, plaintiff argues summary judgment dismissing this claim as unexhausted is unwarranted. Pl. MOL at 9-10.

***9** Defendants have not replied.

In *Finch v. Servello,* 06-CV-1448 (TJM/DRH), 2008 WL 4527758 (N.D.N.Y. Sept. 29, 2008), this Court denied the defendants' motion for summary judgment dismissing the plaintiff's claim on the ground of non-exhaustion, in light of the plaintiff's sworn statement that he requested his housing officer to send a letter to his superiors attesting to plaintiff's repeated efforts to file a grievance. This Court adopted the Report-Recommendation issued by Magistrate JudgeDavid R. Homer, which included the following analysis of the issue presented by the defendants' summary judgment motion:

> Nevertheless, although implausible, Finch's testimony on this issue requires a determination of credibility, a determination that cannot be made on a motion for summary judgment. *See Dillon v. Morano,* 497 F.3d 247, 254 (2d Cir.2007); *Reeves v. Johnson Controls World Servs., Inc.,* 140 F.3d 144, 157 (2d Cir.1998) ("To the extent that these inconsistencies can only be resolved based upon credibility determinations, such questions of witness credibility are to be decided by the jury."); *United States v. Rem,* 38 F.3d 634, 644 (2d Cir.1994) ("Resolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment.").

*Finch,* 2008 WL 4527758 at ----7-8; *see also, Ross v. Wood,* 05-CV-1112 (FJS/GHL), 2009 WL 3199539, *11 (N.D.N.Y. Sep. 30, 2009) (issues of fact raised by plaintiff in opposition to summary judgment, to which defendants did not reply, preclude summary judgment on issue of exhaustion).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Here, plaintiff has submitted evidence regarding his appeal of the grievance to CORC sufficient to demonstrate that genuine issues of material fact exist such that summary judgment on this claim must be denied.

**September 14, 2006:** Plaintiff alleges that on this date C.O. Howard used excessive force against him, twisting the handcuffs on plaintiff's wrists in a way that caused him "to scream out in pain." Compl. (Facts) p. 7. Plaintiff submitted Grievance UST 28206-06. *Id.* This grievance was denied by the Superintendent on November 2, 2006. Gregory Aff. ¶ 13 and ex. D.

Defendants maintain that this claim is unexhausted because plaintiff did not appeal the denial of Grievance UST 28206-06 to CORC. Defs. MOL at 8; Gregory Aff. ¶ 13; Bellamy Aff. ¶ 9.

Plaintiff admits that he did not appeal the denial of Grievance UST 28206-06 to CORC. Pl. Stmt. ¶¶ 17-19. Plaintiff does not contend in his motion opposition papers that defendants should be estopped from raising this issue of exhaustion or that special circumstances justify his failure to exhaust his administrative remedies.

In light of the foregoing, this claim is unexhausted and is therefore dismissed.

**December 20, 2006:** Plaintiff alleges that on this date C.O. McGaw and C.O. Willette allegedly harassed plaintiff, and "denied meals, and or supplies." Compl. (Summary of Facts). Plaintiff filed Grievance UST 29243-06 regarding this incident. *Id.*

***10** Defendants argue that plaintiff's claims regarding this incident are unexhausted because Grievance UST 29243-06 does not relate to the incident described in the complaint but, rather, relates to an entirely different incident which allegedly occurred on December 14, 2006 and which involved alleged verbal abuse by Officer "Waults and a refusal to provide Plaintiff with a broom for cell clean up." Defs. MOL at 9; *see* Gregory Aff. ¶ 16 and ex. E. Grievance UST 29243-06 was denied by the Superintendent on January 16, 2007. *Id.* There is no record that plaintiff appealed the denial of Grievance UST 29243-06 to CORC. Bellamy Aff. ¶¶ 8-9 and ex. A.

Plaintiff admits the facts as outlined above. Pl. Stmt. at ¶¶ 23-26. Plaintiff does not contend in his motion opposition papers that defendants should be estopped from raising the issue of exhaustion or that special circumstances justify his failure to exhaust his administrative remedies.

Based upon the foregoing, this claim is unexhausted and is dismissed.

**March 15, 2007:** Plaintiff claims that on this day C.O. McGaw denied plaintiff his "diet tray" at the evening meal. Compl. (Summary of Facts). Plaintiff filed Grievance UST-30148-07. *Id.*

Defendants seek summary judgment dismissing this claim as unexhausted. Defs. MOL at 10. Defendants note that Grievance UST-30148-07 is dated February 7, 2007, and complains that C.O. McGaw denied plaintiff his evening meal on February 5, 2007-not March 15, 2007. *Id.; see* Gregory Aff. ¶ 17 and ex. F. Grievance UST-30148-07 was denied by the Superintendent on March 29, 2007. Gregory Aff. ¶ 17 and ex. F. There is no record that plaintiff appealed the denial of this grievance to CORC. Bellamy Aff. ¶ 9 and ex. A. Defendants argue that summary judgment is appropriate because claims arising out of the March 15, 2007 incident were not exhausted and, moreover, because even if plaintiff intended to refer in his complaint to an incident which occurred on February 5, 2007, that claim is also unexhausted because plaintiff did not appeal the denial of Grievance UST-30148-07 to CORC. Defs. MOL at 10.

In response, plaintiff admits the facts outlined above. Pl. Stmt. ¶¶ 27-30. Plaintiff does not contend in his motion opposition papers that defendants should be estopped from raising the issue of exhaustion or that special circumstances justify his failure to exhaust his administrative remedies.

Based upon the foregoing, this claim is unexhausted and is dismissed.

**(C) Merits of Plaintiff's Exhausted Claims**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

In addition to the matters discussed above, the complaint asserts claims arising out of three additional incidents. Complaint (Facts) at 3, 8; (Summary of Facts). Defendants acknowledge that plaintiff exhausted his administrative remedies with respect to these three claims. Defs. MOL at 9. Defendants nevertheless seek summary judgment dismissing these claims for failure to state a claim upon which relief may be granted for the violation of plaintiff's constitutional rights. *Id.* at 9-12.

***11** Plaintiff's remaining claims arise out of the following three incidents.[FN7]

FN7. Plaintiff admits the relevant facts regarding these three incidents as set forth herein. Pl. Stmt. ¶¶ 32-43. Plaintiff has not set forth legal arguments in opposition to this aspect of defendants' motion for summary judgment.

**October 26, 2005:** Plaintiff claims that on this date C.O. Howard harassed and threatened him. Compl. (Facts) at 3. Plaintiff filed Grievance UST-25150-05 complaining that C.O. Howard intentionally "shoved" 2 containers of juice and 4 containers of milk through the feed slot of Plaintiff's cell, followed by a feed up tray, "purposely knocking them to the floor inside the cell." Gregory Supp. Aff. ex. G. The grievance also accused C.O. Howard of stating to plaintiff: "I bet you wont beat my next ticket." *Id.* Plaintiff complained that C.O. Howard's behavior was "unprofessional" and asked that he not be "harassed, set up, or verbally abused nor threaten by Officer Howard." *Id.* at 4, 6.

**August 16, 2006:** Plaintiff claims that on this date "Mr Willette have harassed, denied MEALS, and or supplies to the plaintiff." Compl. (Summary of Facts). Plaintiff filed Grievance UST-27855-06 complaining that a corrections officer identified as "Waults" (but said to be the officer who allegedly assaulted plaintiff on August 7, 2006; *i.e.* C.O. Willette) "refused to issue requested claims forms and grievances forms per his duty. ... I was also denied the morning meal during feed up by this Officer and Officer Allen." Gregory Supp. Aff. ex. H. Plaintiff asked in the grievance to be "assured of his safety" and to have the officer "reprimanded and told not to spit in peoples food." *Id.*

October 14, 2006: Plaintiff claims that on this date, during an escort to the visitor area, C.O. Howard "boasted" about his involvement in the alleged assault on plaintiff on August 7, 2006, and attempted to provoke plaintiff to violence by making racially offensive remarks. Compl. (Facts) at 8.[FN8] Plaintiff filed Grievance UST-28590-06 complaining that C.O. Howard "crossed the line yet again." Gregory Supp. Aff. ex. I. Plaintiff asked for an "order of protection" and for C.O. Howard to be fired or reassigned. *Id.*

FN8. According to plaintiff. C.O. Howard made statements such as "go ahead take a shot," "we've got a boy coming through," and "come on bitch take a swing." *Id.*

Defendants characterize plaintiff's claims as arising under the Eighth Amendment, and argue that summary judgment should be granted dismissing these claims because they fail to state claims upon which relief may be granted. Defs. MOL at 10-12.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *see also* *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). The Eighth Amendment "imposes duties on these [prison] officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " *Farmer,* 511 U.S. at 832 (citation omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

***12** A claim alleging that the plaintiff's conditions of confinement violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference." *Wilson v. Seiter,* 501 U.S. 294, 297-98, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

It is well-settled that words alone, however violent, are not held to amount to an assault, or to constitute cruel and unusual punishment under the Eighth Amendment. *Johnson v. Glick,* 481 F.2d 1028, 1033 n. 7 (2d Cir.1973), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)). In other words, § 1983 is "not designed to rectify harassment or verbal abuse." *Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003) (citing *Alnutt v. Cleary,* 913 F.Supp. 160, 165-66 (W.D.N.Y.1996)). Accordingly, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Moncrieffe v. Witbeck,* 97-CV-253 (NAM/DRH), 2000 WL 949457, *3 (N.D.N.Y. Jun. 29, 2000) (quoting *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998)); *see also Cossey v. Killacky,* 04-CV-6305CJS(P), 2004 WL 1960163, *2 (W.D.N.Y. Aug.16, 2004) (citing cases).[FN9]

FN9. A prisoner can state a claim under the Eighth Amendment against a corrections officer who spreads malicious rumors about him if the rumors "incited other inmates to assault [the plaintiff] ..., thereby placing him at grave risk of physical harm." *Young v. Coughlin,* 93 Civ. 262, 1998 WL 32518, *7 (S.D.N.Y. Jan.29, 1998). However, if the plaintiff fails to allege-with concrete facts, not conclusory assertions-that he has suffered an objectively "sufficiently serious" injury or that the corrections officer acted with a "sufficiently culpable state of mind," the claim must be dismissed. *Dawes v. Walker,* 239 F.3d 489, 494 (2d Cir.2001) (references to prisoner as "informant" or a "rat" in conversations with other inmate not sufficient to give rise to an inference that plaintiff actually faced a substantial risk of serious harm from other inmate); *see Bouknight v. Shaw,* 08 Civ. 5187, 2009 WL 969932, *4 (S.D.N.Y. Apr.6, 2009) (where plaintiff has not alleged any facts that, if proven, would establish that he ever faced actual or imminent harm, court will not assume that a serious risk existed merely because corrections officer spread rumors about him). Plaintiff makes no such claim in this action.

Actions which may reasonably be understood to been taken for purposes of harassment and abuse, but which did not pose a substantial risk of serious harm to the inmate, may also fall short of the requirement for a viable Eighth Amendment claim that the harm be, objectively "sufficiently serious." *See, e.g., Benitez v. Locastro,* 04-CV-423 (NAM/RFT), 2008 WL 4767439, *5 (N.D.N.Y. Oct. 29, 2008) (allegation that officers threw dirty mop water into plaintiff's cell and overflowed his toilet, even if true, constitute no more than *de minimis* actions best described as harassment, not cruel and unusual punishment); *McFadden v. Solfaro,* 95 Civ. 1148, 1998 WL 199923, ----2, 13 (S.D.N.Y. Apr.23, 1998) (prisoner's claim that a corrections officer regularly threw coffee, juice, and water into his cell and placed hair in his food tray was not a triable cause of action under the Eighth Amendment); *see also Samuels v. Hawkins,* 157 F.3d 557, 558 (8th Cir.1998) (prison guard's actions of throwing a liquid at plaintiff that did not harm him in any way were *de minimis* ).[FN10]

FN10. Similarly, a *de minimis* use of force will rarely suffice to state a constitutional claim. *See Hudson,* 503 U.S. at 9-10; *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.").

In this case, plaintiff claims that on two occasions, separated in time by nearly one year, C.O. Howard was verbally abusive to him.[FN11] Plaintiff also claims that on one of those occasions, C.O. Howard needlessly shoved his food through the feed up slot so that it fell to the floor of his cell. Plaintiff does not allege, nor are there any facts

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

in the record which even suggest, that C.O. Howard's actions actually harmed plaintiff or posed a substantial risk of serious harm. Rather, the undisputed facts show that C.O. Howard engaged in conduct which, if true, was inappropriate and unprofessional, but which did not violate plaintiff's constitutional rights. Accordingly, the Court finds that plaintiff's claims against C.O. Howard arising out of the incidents on October 26, 2005 and October 14, 2006, do not state a claim upon which relief may be granted pursuant to § 1983 and are, therefore, dismissed.

FN11. Plaintiff also alleges in his complaint that C.O. Willette "harassed" him on August 16, 2006. This claim is without factual support of any kind in either in the complaint or in Grievance UST-27855-06. Moreover, as noted above, plaintiff has not addressed the sufficiency of this claim in response to defendants' motion for summary judgment and it is, therefore, dismissed.

***13** Plaintiff claims that on August 16, 2006, C.O. Willette denied him meals and supplies. Compl. (Summary of Fact). In Grievance UST-27855-06, plaintiff complained that he was "denied the morning meal," and was refused "claims forms and grievances forms." Gregory Supp. Aff. ex. H. Such deprivations, alleged by plaintiff to have occurred only on one occasion, while not to be condoned, are nonetheless *de minimis* and do not rise to a level of constitutional significance. *See* *Parker v. Peek-Co,* 06-CV-1268 (GLS/DEP), 2009 WL 211371, *4 (N.D.N.Y. Jan. 27, 2009) (plaintiff's claim that he was "deprived of two meals on that date is *de minimis* and does not rise to a level of constitutional significance."); *Cagle v. Perry,* 04-CV-1151 (TJM/GHL), 2007 WL 3124806, * 14 (N.D.N.Y. Oct. 24, 2007) (deprivation of two meals is "not sufficiently numerous, prolonged or severe to rise to the level of an Eighth Amendment violation."); *see also* *Cruz v. Church,* 05-CV-1067 (GTS/DEP), 2008 WL 4891165, ----2, 12 (N.D.N.Y. Nov. 10, 2008) (summary judgment granted where plaintiff failed to allege food deprivation of sufficient proportions to support an Eighth Amendment claim).

Mindful of its obligation to construe the allegations of the *pro se* complaint broadly to detect the strongest claim which, based upon the circumstances alleged, could be asserted by the plaintiff, *Diaz v. United States,* 517 F.3d 608, 613 (2d Cir.2008), the Court has considered whether the allegations of plaintiff's complaint that C.O. Willette denied him grievance forms and claim forms are sufficient to state a claim for the violation of plaintiff's First Amendment right to petition government for the redress of grievances.

It is well-established that a prison inmate has no constitutional right of access to an internal prison grievance process. *See* *Harnett v. Barr,* 538 F.Supp.2d 511, 522 (N.D.N.Y.2008); *Chadwick v. Mondoux,* 05-CV-975 (GLS/GJD), 2007 WL 2891655, *6 (N .D.N.Y. Sep. 28, 2007); *Rhodes v. Hoy,* No. 05-CV-836, 2007 WL 1343649, *6 (N.D.N.Y. May 5, 2007) (Scullin, J.) (noting that inmates have "no constitutional right of access to the established inmate grievance program"). Accordingly, plaintiff's allegations that C.O. Willette refused to provide him with grievance and/or claim forms on August 16, 2006, even if true, do not state a cognizable claim for the violation of plaintiff's First Amendment rights and this claim is dismissed. *See* *Graham v. Coughlin,* 86 CIV. 163, 2000 WL 1473723, *7 (S.D.N.Y. Sep.29, 2000) (the "occasional failure of prison personnel to provide plaintiff with grievance forms does not constitute a cognizable claim under § 1983"); *Harnett,* 538 F.Supp.2d at 522 (the refusal to process a grievance or the improper handling of a grievance does not rise to the level of a constitutional violation).

### III. CONCLUSION

For the reasons stated herein, defendants' motion for summary judgment is granted in part and denied in part. All of plaintiff's claims are dismissed with the exception of his claims against defendants McGaw, Willette, Galiger, and Green arising out of the alleged use of excessive force against plaintiff on August 7, 2006 (the "excessive force claims"). Defendants' motion for summary judgment dismissing the excessive force claims is denied because plaintiff has adduced evidence sufficient to show that a reasonable trier of fact could conclude that plaintiff exhausted his administrative remedies with respect thereto. Accordingly, it is hereby

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

***14** ORDERED that defendants' motion for summary judgment (Dkt. No. 49) is **granted in part and denied in part** as set forth above; and it is further

ORDERED that defendant C.O. Howard is dismissed as a defendant in this action; and it is further

ORDERED that this matter is remanded to the assigned magistrate judge for a final pretrial conference on the excessive force claims, and it is further

ORDERED, that the Clerk of the Court serve a copy of this Decision and Order on the parties.

IT IS SO ORDERED.

N.D.N.Y.,2010.

Hooks v. Howard
Not Reported in F.Supp.2d, 2010 WL 1235236 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.





Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Jerome CISSON, Plaintiff,

v.

Daniel MIDDAUGH, Oneida County Sheriff; and Edna Hobbie, Oneida County Jail Law Librarian, Defendants.

No. 9:09–CV–260 (FJS/ATB).

Feb. 2, 2011.

Jerome Cisson, Malone, NY, pro se.

Bartle J. Gorman, Gorman, Waszkiewicz Law Firm, Utica, NY, for Defendants.

**REPORT–RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.

***1** This matter has been referred by Senior District Judge Frederick J. Scullin, Jr., for Report–Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).[FN1] This civil rights action arises from plaintiff's incarceration in the Oneida County Jail (Oneida) in 2008. (Am.Compl.¶¶ 5–15). The amended complaint alleges that Sheriff Middaugh and Law Librarian Hobbie conspired to deny plaintiff access to courts, in violation of the First and Fourteenth Amendments.[FN2] (Am.Compl.¶ 1). Plaintiff seeks declaratory relief and significant monetary damages. (Compl. p. 4).[FN3]

FN1. The case was originally referred to Magistrate Judge George H. Lowe, but was re assigned to me on November 2, 2010. (Dkt. No. 52).

FN2. Plaintiff also cites the Privileges and Immunities Clause of Article IV of the U.S. Constitution, as well as 42 U.S.C. sections 1983 and 1985. (Am.Compl.¶ 1.)

FN3. Plaintiff began numbering the paragraphs in his amended complaint, but did not continue to the end of the pleading. When it is possible, the court will cite to paragraphs by number; otherwise, as in this instance, the court will cite to the appropriate page.

Presently before this court is defendants' motion for summary judgment (Defs.' Mot.), requesting dismissal of the entire complaint. (Dkt. No. 45). As part of defendants' motion, they filed a statement of material facts, which plaintiff did not dispute. (Dkt. No. 45–6). Plaintiff has responded in opposition to defendants' motion (Pl.'s Resp.). (Dkt. No. 47). Defendants filed a reply to plaintiff's opposition. (Dkt. No. 49). For the following reasons, this court recommends granting defendants' motion.

**DISCUSSION**

**I. *Facts***

Plaintiff alleges that from February to November 2008, defendants conspired to deprive him of "adequate access" to the courts and law library at Oneida. (Am.Compl.¶ 5). In February 2008, plaintiff alleges that he informed the defendants that he did not have an attorney, was proceeding pro se, and was "entitled to adequate access to the law library." (Am.Compl.¶ 7). Plaintiff alleges that law librarian Hobbie's actions rendered plaintiff "unable to prepare and file meaningful legal documents" for his criminal trial, and Sheriff Middaugh "failed to adequately supervise his subordinate" Hobbie. (Am.Compl.¶ 10–11).

Oneida has a grievance policy and procedure. (Dkt. No. 45–2 pp. 4–7). [FN4] Plaintiff submitted a grievance dated September 9, 2008, in compliance with the grievance procedure. (Dkt. No. 45–2 p. 13). The grievance form indicates that plaintiff later spoke with Sergeant Zurek and the "problem [was] resolved." (Dkt. No. 45–2 p. 13). There is a check mark next to the choice "I accept this resolution," and plaintiff signed the form on October 1, 2008. (Dkt. No. 45–2 p. 13).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN4. Defendants submitted affidavits and exhibits with their motion for summary judgment. Multiple exhibits are titled "Exhibit A," because defendants named their exhibits according to the affidavit to which they refer, rather than naming them sequentially as exhibits to their motion for summary judgment. To avoid confusion, the court will refer to them by docket number. In addition, many of the affidavits and exhibits do not have page numbers, thus the court will refer to them by the page number assigned by the case management/electronic court files (CM/ECF) system.

During his time at Oneida, plaintiff made numerous law library requests and requests for notary service. (Dkt. No. 45–3 pp. 21–83). With the exception of three [FN5] Inmate Request Forms, all are signed by plaintiff, indicating that the requests were answered. (Defs.' Stmt. of Mat. Facts ¶ 4; *see* Dkt. No. 45–3 pp. 21–83). Defendant Middaugh alleges that he had no personal contact with plaintiff. (Defs.' Stmt. of Mat. Facts ¶ 5).

FN5. The Inmate Request Forms at Dkt. No. 45–3 pp. 31, 33, and 78 are not signed.

**II. *Summary Judgment***

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. Fed.R.Civ.P. 56 [FN6]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion. *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

FN6. Rule 56 was extensively amended, effective December 1, 2010. As the Advisory Committee Notes indicate, "the standard for granting summary judgment remains unchanged." The revised rule explicitly adopts procedures relating to summary judgment motions "consistent with those already used in many courts."

***2** In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of " 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c)(1)(A). Where the nonmovant bears the burden of proof at trial, the moving party may show that he is entitled to summary judgment by either (1) pointing to evidence that negates the nonmovant's claims or (2) identifying those portions of the nonmovant's evidence that demonstrate the absence of a genuine issue of material fact. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006) (citing *Celotex Corp.,* 477 U.S. at 323); Fed.R.Civ.P. 56(c) (1). The second method requires the movant to identify evidentiary insufficiency, not merely to deny the opponent's pleadings. *Id.*

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.* "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude summary judgment." *Salahuddin v. Coughlin,* 674 F.Supp. 1048, 1052 (S.D.N.Y.1987) (citation omitted). A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [fact finder] could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

**III. *Exhaustion of Administrative Remedies***

Defendants argue that plaintiff's has failed to exhaust his administrative remedies regarding any claims that defendants denied plaintiff access to the courts. (Defs.'

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Mot. p. 3–4). Under the Prison Litigation Reform Act, ("PLRA"), inmates must exhaust all available administrative remedies before bringing a federal action. 42 U.S.C. § 1997e(a). Exhaustion is a requirement that applies to all actions about prison life, whether they involve general circumstances or particular episodes and regardless of the claim's subject matter. *See, e.g., Giano v. Goord,* 380 F.3d 670, 675–76 (2d Cir.2004).

In *Jones v. Bock,* the Supreme Court held that in order to properly exhaust administrative remedies, an inmate must complete the administrative review process in accordance with the applicable state rules. 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (citing *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)). In *Woodford,* the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules as a prerequisite to bringing a suit in federal court. 548 U.S. at 90–103. However, the Court in *Jones* held that proper exhaustion does not necessarily include a requirement that an inmate name all the defendants, unless the state procedure required it. 549 U.S. at 218.

***3** At Oneida County Correctional Facility, the grievance procedure is a tiered process, with inmates first filling out a "Complaint/Grievance Form" to be reviewed by the Grievance Coordinator. (Defs.' Ex. A p. 2). Inmates may appeal adverse decisions of the Grievance Coordinator to the facility's Chief Administrative Officer. (Defs.' Ex. A p. 2). Adverse decisions at the Chief Administrative Officer level may be appealed to the New York State Commission of Correction (N.Y.SCOC). (Defs.' Ex. A p. 3). Inmates can also informally communicate problems to Housing Unit Officers, but if they are unable to resolve the issue, the inmate is then instructed to fill out the "Complaint/Grievance Form," which is first reviewed by a Tour Supervisor, and unresolved Complaint/Grievance Forms are forwarded to the Grievance Coordinator as part of the Formal Grievance Process. (Defs.' Ex. A p. 2).

When determining whether an inmate has fulfilled the exhaustion requirement, the Second Circuit utilizes a "three part inquiry." *See Brownell v. Krom,* 446 F.3d 305, 311–12 (2d Cir.2006) (citing *Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004)). This inquiry examines (1) whether administrative remedies were available; (2) whether defendants' own actions estops them from raising exhaustion as an affirmative defense; and (3) whether special circumstances excuse the inmate's failure to exhaust. *Id.*

As described above, Oneida has a grievance process, and plaintiff acknowledges its existence. (Pl.'s Resp. p. 4). Plaintiff's only formal grievance was resolved on October 1, 2008, as evidenced by his signature. (Doc. No. 45–2 p. 5). Because his grievance was resolved, there was no need for plaintiff to seek further administrative review. Plaintiff, therefore, did not appeal the grievance to the next level in compliance with Oneida's grievance policy.

Plaintiff argues that he was "threaten[ed] and had no choice" but to sign off on the grievance. (Pl.'s Resp. p. 5). Plaintiff also claims that he was "threaten[ed] to be put in the box" if he submitted grievances. (Pl.'s Resp. p. 4). However, plaintiff then states that he somehow submitted fifteen complaints that were never resolved or returned. (Pl.'s Resp. p. 4). Plaintiff does not specify how or to whom he submitted these grievances. Plaintiff did not include copies of these grievances or proof of his compliance with applicable procedures, although he claims he kept "copies of everything." (Pl.'s Resp. p. 4). It does not appear that plaintiff was in fact, deterred from pursuing all grievances, given that he admittedly pursued numerous complaints or grievances, despite the alleged threats.

The second inquiry under *Hemphill* requires the court to determine if defendants took some affirmative action to prevent the plaintiff from using the grievance procedure, such as beating, denying grievance forms and writing implements, or threatening retaliation. *See Ruggiero v. County of Orange,* 467 F.3d 170, 178 (2d Cir.2004) (citations omitted). Defendants do not respond to plaintiff's allegations of threats of retaliation for filing grievances. Although plaintiff's claims of threats appear suspect, resolving all inferences in the plaintiff's favor, this court cannot find at a matter of law that plaintiff was not threatened with retaliation for pursuing grievances. Accordingly, the court cannot grant summary judgment based on a failure to exhaust on the current record.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**IV. *Conspiracy***

***4** The amended complaint alleges that defendants conspired to violate plaintiff's constitutional rights. (Am.Compl.¶ 1). Construing the facts in the light most favorable to plaintiff, he has failed to advance anything more than conclusory allegations, which are inadequate to sustain any of his claims of conspiracy.

**A. Section 1983**

In order to support a claim for conspiracy pursuant to section 1983, there must be "(1) an agreement ...; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. County of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002); *Cusamano v. Sobek,* 604 F.Supp.2d 416, 468 (N.D.N.Y.2009). An agreement must be proven with specificity, as bare allegations of a conspiracy supported only by allegations of conduct easily explained as individual action are insufficient. *See Iqbal v. Hasty,* 490 F.3d 143, 177 (2d Cir.2007); *see also Gyadu v. Hartford Ins. Co.,* 197 F.3d 590, 591 (2d Cir.1999). Thus, plaintiff must "make an effort to provide some details of time and place and the alleged effects of the conspiracy ... [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Warren v. Fischl,* 33 F.Supp.2d 171, 177 (E.D.N.Y.1999) (citations omitted). Conclusory, vague, and general allegations are insufficient to support a conspiracy claim. *Ciambriello,* 292 F.3d at 325.

Plaintiff claims that defendants Middaugh and Hobbie "entered into an unlawful agreement and conspiracy to deprive plaintiff adequate access to the courts and law library." (Am.Comp.¶ 5). However, plaintiff fails to show specifically when, where, or how defendants agreed to execute this purported conspiracy. No evidence has been proffered relating to agreements, or even communications, between the defendants. Other than her employment at Oneida, plaintiff never alleges law librarian Hobbie had any specific contact with Sheriff Middaugh. Rather, plaintiff merely points to actions by law librarian Hobbie that plaintiff alleges denied him access to the courts, but which support no inference of concerted conduct with Sheriff Middaugh.

**B. Section 1985**

"Section 1985 prohibits conspiracies to interfere with civil rights." *Davila v. Secure Pharmacy Plus,* 329 F.Supp.2d 311, 316 (D.Conn.2004). To state a claim for relief under Section 1985(3), a plaintiff must show:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott,* 463 U.S. 825, 828–29, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983); *see also Iqbal,* 490 F.3d at 176. To demonstrate that a conspiracy existed, "the plaintiff must prove a mutual understanding or meeting of the minds to violate [his or] her civil rights." *Salgado v. City of N.Y.,* No. 00–CV–3667, 2001 WL 290051, at *8 (S.D.N.Y. Mar.26, 2001) (citations omitted). "In addition, the conspiracy must be motivated by some class-based animus." *Iqbal,* 490 F.3d at 176.

***5** As demonstrated above, plaintiff's allegations of conspiracy are wholly conclusory and, therefore, insufficient to state a claim. *See X–Men Sec., Inc. v. Pataki,* 196 F.3d 56, 71 (2d Cir.1999). Moreover, there is no evidence that any alleged conspiracy was motivated by racial- or class-based animus. Accordingly, defendants' motion for summary judgment dismissing plaintiff's claims of conspiracy should be granted.

**V. *Personal Involvement***

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). In *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id. See also Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873) (2d Cir.1995)), *rev'd on other grounds,* ––– U.S. ––––, 129 S.Ct. 1937, 173 L.Ed.2d 868 (U.S.2009).

Plaintiff did not oppose defendants' statement of material facts or Sheriff Middaugh's affidavit, asserting that Sheriff Middaugh had no personal contact with plaintiff while he was housed at Oneida County Jail. (Defs. Stmt. of Mat. Facts ¶ 5, Middaugh Aff. ¶ 3). Additionally, as stated above, plaintiff's conspiracy claims are completely insufficient. Instead, plaintiff argues that Sheriff Middaugh "is legally responsible for his subordinates['] actions which come from a doctrine known as respondeat superior[,] which permits [a] supervisor to held liable whether or not he had actual knowledge." (Pl.'s Resp. pp. 1–2). As explained above, respondeat superior does not establish liability in a section 1983 case. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003).

Plaintiff also argues that he "complain[ed] to Daniel Middaugh and to the Inspector General on the same date." (Pl.'s Resp. p. 2). Plaintiff appears to reference a document notarized on September 5, 2008, and entitled "Formal Complaint" that is addressed to both Sheriff Middaugh and the New York State Inspector General. (Dkt. No. 45–2 p. 16). Defendants included plaintiff's mail log, which gives no indication that a letter was sent to Sheriff Middaugh *or* the Inspector General. (Dkt. No. 45–4 p. 18–24). Plaintiff did *receive* a letter from the Inspector General on September 7, 2008. (Dkt. No. 45–4 p. 15).

***6** It is well-settled that the receipt of a letter, without more, cannot establish personal involvement. *See Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002) ("[I]f mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose respondeat superior liability.") In addition, plaintiff argues that he was unable to timely file suppression motions and meet the filing deadline for his motion to dismiss the indictment. (Am.Compl.¶ 12). Plaintiff indicated on one of his Inmate Request Forms that his trial was August 4, 2008. (Dkt. No. 45–3 p. 42). The letter addressed to Sheriff Middaugh was dated more than a month after plaintiff's trial began, which would have been after any suppression motion or motion to dismiss would have been resolved. At the point Sheriff Middaugh would have received the letter, if he did ever receive it, he would have been unable to do anything to correct any problem plaintiff was having filing a suppression motion or motion to dismiss. Because Sheriff Middaugh was not in a position to remedy the wrong, even assuming he received plaintiff's letter, plaintiff has failed to establish personal involvement on the part of Sheriff Middaugh. Accordingly, summary judgment should be granted and plaintiff's claims against Sheriff Middaugh should be dismissed for lack of personal involvement.

**VI. Access to the Courts**

It is well-settled that inmates have a constitutional right to "meaningful" access to the courts. *Bounds v. Smith,* 430 U.S. 817, 823, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). The Supreme Court held in *Bounds* that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." 430 U.S. at 828. The Supreme Court later clarified that "[b]ecause *Bounds* did not create an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Lewis v. Casey,* 518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). The *Lewis* court explained, "the inmate therefore must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

hindered his efforts to pursue a legal claim." *Id.*

"Mere 'delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation.' " *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995). In addition, "to establish a constitutional violation based on a denial of access to the courts, a plaintiff must show that the defendant's conduct was deliberate and malicious, and that the defendant's actions resulted in actual injury to the plaintiff." *Collins v. Goord,* 581 F.Supp.2d 563, 573 (S.D.N.Y.2008).

***7** Here, plaintiff argues that he was unable to timely file suppression motions and meet the filing deadline for his motion to dismiss the indictment. (Am.Compl.¶ 12). Plaintiff does not clarify his allegations, and does not explain exactly how defendants' actions prevented him from filing motions, if he was unable to obtain extensions, how his motions were otherwise meritorious, or if he lost the motions by default. Plaintiff gives some explanation through documents styled as complaints, but that were apparently not filed as part of the formal grievance system at Oneida. One document states:

> The library don't notirize [sic] my document[s] on time, motion[s] have to be sent out on a time limit, I can't mail my documents out. The only way is to place it in property, but if it is not notirize [sic], then I can't send it out. The law library knows this, so [the law librarian] don't [sic] call me out or come on time so I can send it out thr[ough] visit.

(Dkt. No. 45–5 p. 10). Another document, titled "Complaints # 2," states that "several complaints about the law library and my personal mail that I [placed] in my property for Candida Morton to pick up ... were not complete when she arrive[d] to pick [them] up." (Dkt. No. 45–5 p. 5). [Law Librarian] Hobbie takes my legal document[s] and lose[s] them on the elevator, misplace[s] them ..." (Dkt. No. 45–5 p. 5).

Plaintiff was apparently trying to send out legal documents by giving them to his visitors to mail, rather than by using the Oneida mail procedure. In the response from Sergeant Zurek, plaintiff was reminded that sending out legal materials by giving them to visitors to mail was "not allowed," and that Oneida was "not responsible for [your legal work] if you do not follow [the Oneida mail] procedure." (Dkt. No. 45–5 p. 4). Plaintiff concludes that due to defendants' actions, he was unable to adequately defend himself at trial, where he was proceeding *pro se,* and was therefore convicted. (Pl.'s Resp. p. 7).

Defendant Hobbie is a Correctional Services Aid at Oneida, and plaintiff's facility complaints further illuminate his claim against her. (Dkt. No. 45–3 p. 1). For example, in a typewritten document entitled "Formal Complaints," plaintiff states that "[Law Librarian Hobbie] alone can not supply the demands for legal documents that is require[d] for the inmates here at this facility." (Dkt. 45–2 p. 18). As explained above, a delay in working on a legal action or in communicating with the courts is not a constitutional violation. *See Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003). Plaintiff's blanket allegation that he was unable to adequately defend himself in court is inadequate when considered in light of the evidence on the record. Defendant Hobbie affirms that she "complied with request slips." (Dkt. No. 45–3 p. 1). Plaintiff was trying to circumvent Oneida's mail system and was unhappy when defendant Hobbie was not performing duties as law librarian on plaintiff's time schedule.[FN7] Plaintiff also states that he told the judge presiding over his criminal court that he was having problems with access to the court. (Dkt. No. 47 p. 10). If plaintiff was able to communicate this to the trial judge, who would thereby be made aware of the reason for any delay, it is unclear how defendant Hobbie was responsible if the trial judge did not accept plaintiff's excuses.

> FN7. Plaintiff was reminded by Sgt. Zurek, "Ms. Hobbie is not your legal secretary.... If you do not have your items in on time they will not get back to you in time." (Dkt. No. 45–5 p. 4).

***8** No reasonable fact finder would credit plaintiff's claim that he was unable to complete motions on time, due to an alleged general denial of access to the courts, when it is clear from the record that he was receiving materials from the law library by submitting Inmate Request Forms [FN8] and he was sending and receiving mail. Plaintiff's mail log indicates he received mail each month between

February and November 2008 and sent out mail through the Oneida mail service each month between March and November 2008. (Dkt. No. 45–4 pp. 4–24).[FN9]

FN8. Plaintiff signed off on the following Inmate Request Forms, indicating they were completed: One in February 2008, six in March 2008, two in April 2008, two in May 2008, five in June 2008, three in July 2008, one in August 2008, four in September 2008, nine in October 2008, and three in November 2008. (*See* Dkt. No. 45–6 ¶ 4; Dkt. No. 45–3 pp. 21–62. Six other fulfilled requests do not specify the date when they were submitted or fulfilled. *Id.* Plaintiff also had numerous requests for notary service completed. (*See* Dkt. No. 45–6 pp. 63–83).

FN9. *See* *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' ... and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account." (citation omitted). *See also* *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case").

Nothing in the record before this court indicates any malice on the part of defendant Hobbie. Even were she performing her duties as law librarian at a unsatisfactory level, plaintiff has submitted nothing to demonstrate defendant Hobbie was deliberately delaying or denying any of plaintiff's requests. Plaintiff has failed to establish an issue of fact material to his denial-of-access-to-courts claim as to defendant Hobbie. Defendants' motion for summary judgment should be granted and plaintiff's complaint should be dismissed in its entirety.

**VII. Qualified Immunity**

Defendants argue that they are entitled to qualified immunity, which protects government officials when performing their discretionary functions when "their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), modified by *Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 811, 172 L.Ed.2d 565 (2009) (holding that, "while the sequence set forth [in Saucier] is often appropriate, it should no longer be regarded as mandatory in all cases"). Defendants here did not violate a constitutional right, so the court need not address qualified immunity.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 45) be **GRANTED,** and the complaint be **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2011.

Cisson v. Middaugh
Not Reported in F.Supp.2d, 2011 WL 2579800 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.





H

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Jerome CISSON, Plaintiff,
v.
Daniel MIDDAUGH, Oneida County Sheriff; and Edna Hobbie, Oneida County Jail Law Librarian, Defendants.
No. 9:09–CV–260 (FJS/ATB).

June 27, 2011.
Jerome Cisson, Malone, NY, pro se.

Gorman, Waszkiewicz, Gorman & Schmitt, Bartle J. Gorman, Esq., Utica, NY, for Defendants.

**ORDER**

SCULLIN, Senior District Judge.

***1** Currently before the Court are Magistrate Judge Baxter's February 2, 2011 Report–Recommendation, *see* Dkt. No. 53, and Plaintiff's objections thereto, *see* Dkt. No. 54. Plaintiff generally objects to Magistrate Judge Baxter's recommendation that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's conspiracy claims, *see* Plaintiff's Objections at 4, and to Magistrate Judge Baxter's finding that Plaintiff failed to establish an issue of fact material to his denial-of-access-to-the-courts claim against Defendant Hobbie, *see id.* at 2–3. Plaintiff also objects to Magistrate Judge Baxter's finding that Defendant Middaugh was not personally involved in the alleged constitutional violations, *see id.,* specifically objecting to Magistrate Judge Baxter's finding that Plaintiff did not challenge Defendants' statement of facts, *see id.* at 1–2. Finally, Plaintiff objects based on his mistaken belief that Magistrate Judge Baxter found that Defendants were entitled to qualified immunity. *See id.* at 5.[FN1]

FN1. In his Report–Recommendation, Magistrate Judge Baxter addressed Defendants' argument that Plaintiff had not exhausted his administrative remedies and found that, although grievance procedures were available at the Oneida County Jail and Plaintiff was not deterred from using them, he had to resolve Plaintiff's allegation that he was threatened with retaliation for use of the grievance procedure drawing all reasonable inferences in Plaintiff's favor. *See* Report–Recommendation at 6–7. Applying this analysis, Magistrate Judge Baxter concluded that he could not find as a matter of law "that [P]laintiff was not threatened with retaliation for pursuing grievances[.]" *See id.* at 7. Therefore, he recommended that the Court deny Defendants' motion for summary judgment on this basis. *See id.* Defendants did not object to Magistrate Judge Baxter's findings or recommendation with regard to this issue.

Plaintiff commenced this civil rights action against Defendant Middaugh, Oneida County Sheriff, and Defendant Hobbie, Oneida County Jail Law Librarian. The gravamen of Plaintiff's amended complaint is that, while he was incarcerated in the Oneida County Jail in 2008, Defendants conspired to deprive him of "adequate access" to the courts and law library at Oneida County Jail. Specifically, Plaintiff asserts that, in February 2008, he informed Defendants that he did not have an attorney, was proceeding *pro se,* and "was entitled to adequate access to the law library." *See* Amended Complaint at ¶ 7. Plaintiff further contends that Defendant Hobbie's actions left him "unable to prepare and file meaningful legal documents" for his criminal trial and that Defendant Middaugh "failed to adequately supervise his subordinate defendant Hobbie [.]" *See id.* at ¶¶ 10–11. Moreover, Plaintiff claims that Defendant Hobbie "alone [could] not supply the demands for legal documents that is require[d] for the Imates [sic] here at this facility." *See* Dkt. No. 45–2 at 18. Finally, Plaintiff contends that, while he was at Oneida County Jail, he was unable to file suppression motions on time and was unable to meet his filing deadline for his motion to dismiss the indictment because the library did not notarize his documents on time, he could not mail his legal documents, and Defendant Hobbie

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

misplaced or otherwise lost his documents.

On April 26, 2010, Defendants filed a motion for summary judgment, which included a statement of undisputed material facts. *See* Dkt. No. 45. Plaintiff filed papers in opposition to Defendants' motion, *see* Dkt. No. 47, to which Defendants filed a reply, *see* Dkt. No. 49. On February 2, 2011, Magistrate Judge Baxter issued a Report–Recommendation, in which he recommended that the Court grant Defendants' motion and dismiss Plaintiff's complaint in its entirety. *See* Report–Recommendation at 17. Plaintiff filed timely objections to those recommendations, which are now ripe for the Court's review. *See* Dkt. No. 54.

***2** In reviewing a magistrate judge's report and recommendation, the district court "may accept, reject or modify, in whole or in part, [the magistrate judge's] findings or recommendations...." 28 U.S.C. § 636(b)(1)(C). The court conducts a *de novo* review of the portions of the magistrate judge's recommendations to which a party objects. *See* *Pizarro v. Bartlett,* 776 F.Supp. 815, 817 (S.D.N.Y.1991). " ' "If, however, the party makes only conclusory or general objections, or simply reiterates his original arguments, the Court reviews the Report and Recommendation only for clear error." ' " *Salmini v. Astrue,* No. 3:06–CV–458, 2009 WL 1794741, *1 (N.D.N.Y. June 23, 2009) (quoting [ *Farid v. Bouey,* 554 F.Supp.2d 301] at 306 [ (N.D.N.Y.2008) ] (quoting *McAllan v. Von Essen,* 517 F.Supp.2d 672, 679 (S.D.N.Y.2007))). Even if the parties file no objections, the court must ensure that the face of the record contains no clear error. *See* *Wilds v. United Parcel Serv., Inc.,* 262 F.Supp.2d 163, 169 (S.D.N.Y.2003) (quotation omitted).

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *See* *Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008). Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *See* *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See* *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998).

Additionally, a court must read a *pro se* plaintiff's pleadings liberally " 'to raise the strongest arguments that they suggest.' " *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nonetheless, a *pro se* plaintiff "must present admissible evidence from which a reasonable jury could find in his favor" because he cannot simply rely on the allegations in his complaint to defeat a motion for summary judgment. *Belpasso v. Port Auth. of N.Y. & N.J.,* 400 Fed. Appx. 600, 601 (2d Cir.2010) (citing *Champion v. Artuz,* 76 F.3d 483, 485 (2d Cir.1996)).

The Court has thoroughly reviewed Plaintiff's objections to Magistrate Judge Baxter's recommendations and, for a variety of reasons, finds them to be without merit. In most instances, Plaintiff's objections are conclusory and do no more than reiterate the arguments that he made in opposition to Defendants' motion for summary judgment. Moreover, with respect to the issue of qualified immunity, Plaintiff is mistaken about Magistrate Judge Baxter's recommendation. Nonetheless, despite the numerous deficiencies in Plaintiff's objections, the Court conducted a *de novo* review of Magistrate Judge Baxter's Report–Recommendation; and, having completed that review, the Court hereby

***3 ORDERS** that Magistrate Judge Baxter's February 2, 2011 Report–Recommendation is **ACCEPTED in its entirety** for the reasons stated therein; and the Court further

**ORDERS** that Defendants' motion for summary judgment is **GRANTED;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in favor of Defendants and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

N.D.N.Y.,2011.

Cisson v. Middaugh
Not Reported in F.Supp.2d, 2011 WL 2559568 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.





C

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Rasheen DAVIS, Plaintiff,

v.

Ms. TORRES, Mr. Harris, Ms. Freeman, and Mr. Preston, Defendants.

No. 10 Civ. 00308(NRB).

Aug. 29, 2011.

Rasheen Davis, Malone, NY, pro se.

Susan H. Odessky, Esq., Office of the Attorney General, State of New York, New York, NY, for Defendants.

**MEMORANDUM AND ORDER**

NAOMI REICE BUCHWALD, District Judge.

***1** *Pro se* plaintiff Rasheen Davis ("plaintiff" or "Davis"), currently an inmate at Upstate Correctional Facility, brings this action pursuant to 42 U.S.C. § 1983 against Officers Torres, Harris, Freeman, and Preston (collectively "defendants"), alleging violations of his constitutional rights while he was incarcerated at the Sing Sing Correctional Facility ("Sing Sing"). The defendants have moved to dismiss the complaint on the grounds that plaintiff failed to exhaust his administrative remedies prior to bringing this case.[FN1] For the reasons set forth below, the defendants' motion to dismiss is converted to a motion for summary judgment, and it is granted.

FN1. Plaintiff originally also named an inmate, Rasheed Helmet, as a defendant. It appears that Helmet was not served with the complaint and, in any event, he was terminated as a defendant in this case on May 21, 2010.

**BACKGROUND**

**I. Allegations in the Complaint**

In his Third Amended Complaint ("Compl."), plaintiff alleges that on April 7, 2009, while walking to his cell in Sing Sing, Officer Torres told him that he "still ha[dn't] learn[e]d his fucking lesson" and then allowed another inmate, Rasheed Helmet, into his cell. Plaintiff alleges that Helmet "put his hands on [plaintiff,]" and, as a result, plaintiff suffered two black eyes, was "red inside of [his] eye," and had "knots" in his forehead. Compl. at ¶ II.D. Plaintiff claims that he was not provided any medical treatment for his injuries (*id.* at ¶ III), and that the defendants violated his constitutional rights by denying him medical attention and failing to protect him from another inmate.

**II. Procedural History**

Plaintiff filed his original complaint in this case on January 14, 2010. He then filed an amended complaint on February 8, 2010, a second amended complaint on March 5, 2010, and a third amended complaint on May 21, 2010. Defendants filed their motion to dismiss on September 10, 2010.

We note that plaintiff has submitted numerous letters, affidavits, and other statements to this Court. As discussed further below, we have considered these submissions as part of the record.

**III. Defendants ' Arguments**

Defendants argue that plaintiff's complaint must be dismissed because "the complaint contains no allegations that plaintiff exhausted his administrative remedies under the requirements of the PLRA." Mem. of Law in Support of Defs.' Mot. to Dismiss ("Defs.' Mem."), at 6. In addition, defendants have submitted three affidavits in support of their motion.

The first affidavit is from Frank Robinson, Sing Sing's Inmate Grievance Program ("IGP") supervisor. Robinson states that he is responsible for receiving and maintaining grievances filed by inmates at Sing Sing, and that he has access to a grievance log which contains a record of all grievances filed. Declaration of Frank Robinson ("Robinson Decl.") at ¶¶ 1–2. Robinson searched for grievances filed at Sing Sing by plaintiff and found none. *Id.* at ¶ 3.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

The second affidavit is from Mark James, Attica Correctional Facility's IGP supervisor.[FN2] Declaration of Mark James ("James Decl."). In his affidavit, James states that he searched for grievances filed at Attica by plaintiff and found "no grievances regarding any incident that allegedly occurred during the time period from April 1, 2009 to May 31, 2009." *Id.* at ¶ 5.

> FN2. Plaintiff was incarcerated at Attica beginning on July 10, 2009. *See* James Decl. at ¶ 3.

***2** The third affidavit is from Jeffrey Hale, the Assistant Director of the IGP Program at DOCS. Declaration of Jeffrey Hale ("Hale Decl."). Hale is the custodian of the records maintained by the Central Office Review Committee ("CORC"), the institution that renders final administrative decisions under the IGP. *Id.* at ¶ 1. In his affidavit, Hale states that CORC maintains files of grievance appeals and that its "computer database contains records of all appeals received from the facility IGP Offices that were heard and decided by CORC since 1990." *Id.* at ¶ 2. Hale conducted a search of DOCS computer records relating to appeals to CORC and uncovered one appeal filed by plaintiff involving an unrelated incident that occurred on June 9, 2010. *Id.* at ¶ 5. Hale found no record of any appeal to CORC relating to the conduct at issue in this case. *See id.* at ¶ 6.

## DISCUSSION

### I. Legal Standard

#### A. Motion to Dismiss

When deciding a motion to dismiss for failure to state a claim pursuant to Federal Rule 12(b)(6), the Court must accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences in plaintiffs' favor. *Kassner v. 2nd Ave. Delicatessen, Inc.,* 496 F.3d 229, 237 (2d Cir.2007). A complaint must include "enough facts to state a claim for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 570 (2007). Where a plaintiff has not "nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Id.* This pleading standard applies in "all civil actions." *Ashcroft v. Iqbal,* ––– U.S. ––––, ––––, 129 S.Ct. 1937, 1953, 173 L.Ed.2d 868 (2009).

Where, as here, a complaint is filed by a *pro se* plaintiff, the complaint should be reviewed under a more lenient standard than that applied to "formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam). In other words, courts must interpret such pleadings "to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). Nevertheless, *pro se* plaintiffs remain subject to the general standard applicable to all civil complaints under the Supreme Court's decisions in *Twombly* and *Iqbal. See Schwamborn v. County of Nassau,* 348 F. App'x 634, 635 (2d Cir.2009).

#### B. Converting the Motion to a Motion for Summary Judgment

When matters outside the pleadings are presented to and not excluded by the Court on a motion to dismiss under Rule 12(b)(6), the Court must treat the motion as one for summary judgment under Rule 56. Fed.R.Civ.P. 12(d). The Court must provide all parties a "reasonable opportunity to present all the material that is pertinent to the motion." *Id.* When converting a motion to dismiss to a motion for summary judgment, "care should, of course, be taken by the district court to determine that the party against whom summary judgment is rendered has had a full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried, and that the party for whom summary judgment is rendered is entitled thereto as a matter of law." *Sahu v. Union Carbide Corp.,* 548 F.3d 59, 69–70 (2d Cir.2008) (quoting *First Financial Ins. Co. v. Allstate Interior Demolition Corp.,* 193 F.3d 109, 115 (2d Cir.1999)).

***3** Here, as noted above, the defendants have submitted three affidavits and plaintiff has submitted a variety of letters, affidavits and other documents. Thus, as the Court will consider the additional submissions, we will consider this motion as one for summary judgment under Rule 56, rather than a motion to dismiss under Rule 12(b)(6).[FN3]

> FN3. Defendants placed plaintiff on notice that their motion to dismiss could be converted to a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

motion for summary judgment by filing a notice pursuant to S.D.N.Y. Local Rule 12.1 on September 10, 2010 (Dkt. No. 22) ("You are warned that the Court may treat this motion as a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure."). Plaintiff made numerous additional submissions in response to defendants' motion.

**II. Analysis**

**A. Exhaustion Requirement**

The Prison Litigation Reform Act ("PLRA") requires a prisoner to exhaust all administrative remedies prior to commencing an action in federal court concerning prison conditions. *See* 42 U.S.C. § 1997(e) (2006) ("No action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."); *see also Porter v. Nussle,* 524 U.S. 516, 516 (2002). An inmate's failure to exhaust is an absolute bar to an action in federal court. *Neal v. Qoord,* 267 F.3d 11, 122 (2d Cir.2001). Exhaustion "is a matter of judicial administration in the sense that '[u]ntil the issue of exhaustion is resolved, the court cannot know whether it is to decide the case or the prison authorities are to [do so].' " *Messa v. Goord,* ––– F.3d ––––, 2011 WL 3086827, at *2 (2d Cir. July 26, 2011) (quoting *Pavey v. Conley,* 544 F.3d 739, 741 (7th Cir.2008)).

Sufficient exhaustion of administrative remedies generally requires full compliance with a prison program's procedural rules. *See Woodford v. Ngo,* 548 U.S. 81, 90–92, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). In this case, plaintiff was required to comply with the New York State Department of Correctional Services ("DOCS") three-step Inmate Grievance Program prior to filing his complaint. *Verley v. Wright,* No. 02 Civ 1182(PKC), 2007 WL 2822199, at *5–6 (S.D.N.Y. Sept. 27, 2007). This process requires an aggrieved inmate to: (1) file a grievance with the Inmate Grievance Resolution Committee ("IGRC"); (2) appeal, if he disagrees with the IGRC's decision, to the superintendent of the facility; and (3) seek review of the superintendent's decision, if it is adverse, with the Central Office Review Committee. 7 N.Y.C.R.R. § 701.5; *see also Espinal v. Goord,* 558 F.3d 119, 125 (2d Cir.2009). An inmate must file his complaint within twenty-one days of the alleged grievance. 7 N.Y.C.R.R. § 701.5(a)(1). An appeal to the superintendent must be submitted within seven days after receipt of the IGRC's written response to the grievance (*id.* at § 701.5(c)(1)), and an appeal to CORC must be submitted within seven days after receipt of the superintendent's written response to the grievance. *Id.* at § 701.5(c)(1)). Furthermore, absent any extension of time limits, matters not decided within the time limits "may be appealed to the next step." *Id.* at § 701.6(g)(2).

There are three ways in which a prisoner may overcome the exhaustion requirement of the PLRA: (1) he can show that administrative remedies were not actually "available" to him, (2) he can show that the defendants should be estopped from raising the plaintiff's failure to exhaust as an affirmative defense, or (3) he can show that special circumstances exist that excuse the plaintiff's non-compliance with official procedural requirements. *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004).[FN4]

FN4. We note that the Second Circuit has recently held that there is no right to a jury trial on factual disputes regarding an inmate's failure to exhaust administrative remedies as required by the PLRA. *Messa,* 2011 WL 3086827, at *2.

**B. Plaintiff's Attempts to File Grievances**

***4** As a preliminary matter, we note that in his complaint plaintiff states that he *did* file a grievance, and also that he *did not* file a grievance.[FN5] When asked by the *Pro Se* Office's Amended Complaint form what the result was of his grievance, plaintiff responded that he does "not know at all." Compl. at ¶ IV(E)(2). Furthermore, when asked what steps, if any, he took to appeal the decision on his grievance and to describe all efforts to appeal to the highest level of the grievance process, plaintiff did not respond.

FN5. When asked by the *Pro Se* Office's Amended Complaint form whether he filed a grievance in the facility where his claim arose (*i.e.* Sing Sing), plaintiff responded that he did not. When asked whether he filed a grievance

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

about the events described in the complaint at any other correctional facility, plaintiff again responded that he did not. But, when asked where he filed a grievance (if he did file a grievance), plaintiff responded that he filed a grievance at Sing Sing.

Even if we disregard plaintiff's statements that he did not file a grievance, either at Sing Sing or at another facility, nowhere in plaintiff's complaint does he state that he appealed to CORC, as is required under the IGP procedures. *See, e.g., Smith v. Knee,* 08 Civ. 11079(SAS), 2011 WL 1483924, at * 3 (S.D.N.Y. Apr. 18, 2011) ("[A]n inmate's claim is not exhausted until he appeals to CORC and receives a final decision regarding his grievance."). Instead, plaintiff alleges that "a grievance was filed in [sic] I have spoken to officer Mr. Harris about the incident ... [and] Officer Harris ... had me speak to [other sergeants] as well." Compl. at ¶ IV(F)(2). Plaintiff further alleges that he "put so many [grievances] inside of the I.G.R.C. Box," but that he never received an answer, and that he "wrote on a regular piece of paper [and] sent it to the superintendants in the commissioner's office." *Id.* at ¶ IV(G).

As a number of courts have held, such letters and verbal communications are insufficient to satisfy the exhaustion requirement under the PLRA. *See, e.g., Simon v. Campos,* 09 Civ. 6231(PKC), 2010 WL 1946871, at *6 (S.D.N.Y. May 10, 2010) (letter to facility superintendent and oral complaints insufficient to satisfy exhaustion requirement); *Magassouba v. Cross,* 08 Civ. 4560(RJH) (HBP), 2010 WL 1047662, at *8 (S.D.N.Y. Mar. 1, 2010) (same); *Harrison v. Goord,* 2009 WL 1605770, at *8 (S.D.N.Y. June 9, 2009) (verbal grievances and letters to the facility superintendent, commissioner of DOCS, and others insufficient to satisfy exhaustion requirement); *Lashley v. Artuz,* 01 Civ. 11542(SAS) 2004 WL 1192090, at *3 (S.D.N.Y. May 27, 2004) (noting that "[c]ourts have repeatedly held that complaint letters to the DOCS Commissioner or the facility Superintendent do not satisfy the PLRA's exhaustion requirements") (internal quotation marks omitted).

While plaintiff's complaint fails to allege that he satisfied the exhaustion requirement (and, in places, appears to concede that he has not) plaintiff has, as noted above, made numerous additional submissions to this Court concerning his attempts at filing grievances. Although many of plaintiff's submissions are difficult to follow, plaintiff has submitted a number of letters that were either sent from plaintiff to various prison officials, or sent from prison officials to plaintiff. Some of these letters were dated after plaintiff filed his complaint in this action, and thus are obviously insufficient to satisfy the required pre-complaint exhaustion.[FN6] The pre-complaint letters are:

FN6. *See, e,g., Smith,* 2011 WL 1483924, at *3 ("Because the plain language of section 1997e(a) states 'no action shall be brought,' an inmate must have exhausted his claims at the time the initial complaint was filed as "[s]ubsequent exhaustion after suit is filed ... is insufficient."); *Burgos v. Craig,* 307 Fed.Appx. 469, 470 (2d Cir.2008) ("[Exhaustion] must be completed before suit is filed, and completing the exhaustion requirements only after filing suit is insufficient.").

***5** • A July 23, 2009 letter from Cynthia R. Diaz at the State Commission of Correction responding to a letter from plaintiff and stating that "the issues you raised may be addressed through the Inmate Grievance Program."

• A November 16, 2009 letter from Erin M. Purdy, a Correctional Facility Specialist, responding to a letter from plaintiff to the State Commission of Correction. In the letter, Purdy informed plaintiff that his correspondence was being forwarded to his facility administration for review. It is unclear what plaintiff's correspondence addressed.

• A November 30, 2009 letter from Deputy Commission Lucien J. Leclaire, Jr. responding to a letter from plaintiff to DOCS Commissioner Brian Fischer concerning access to meals and law library services at Attica.

• A December 11, 2009 letter from Erin Purdy responding to a letter from plaintiff to the State Commission of Correction addressing allegations of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

staff misconduct and harassment.

• A January 13, 2010 letter from Karen Bellamy, Director of the Inmate Grievance Program, responding to a December 22, 2009 letter apparently from plaintiff to Commissioner Fischer, which addressed plaintiff's (unidentified) grievances.

None of these letters indicate that plaintiff satisfied any of the three steps of the IGP. Rather, as stated above, letters addressed to prison officials and the Commissioner of DOCS are insufficient to "compl[y] with [DOCS'] deadlines and other critical procedural rules," as is necessary for "proper exhaustion" under the PLRA. *Woodford,* 548 U.S. at 93. *See also* *Scott v. Gardner,* 287 F .Supp.2d 477, 488 (S.D.N.Y.2003) ("Letters of complaint, regardless of the addressee, are not part of the grievance process and do not satisfy the exhaustion requirement.").[FN7]

FN7. In addition, we note that the existence of these letters undermines plaintiff's theory that there is a systemic plot to intercept his mail and thwart his grievances.

**C. Excuse**

Since plaintiff did not exhaust his remedies prior to bringing this suit, we now consider whether he may overcome the exhaustion requirement of the PLRA by demonstrating: (1) that administrative remedies were not actually "available" to him, (2) that the defendants should be estopped from raising his failure to exhaust as an affirmative defense, or (3) that special circumstances exist that excuse his non-compliance with official procedural requirements. *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004).

**1. Availability**

The Second Circuit has stated that the "test for deciding whether the ordinary grievance procedures were available must be an objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Hemphill v. Humphrey,* 380 F.3d 680, 688 (2d Cir.2004) (internal quotation marks and citation omitted). "[T]hreats or other intimidation by prison officials may well deter a prisoner of ordinary firmness from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system, or to external structures of authority such as state or federal courts." *Id.*

***6** Here, plaintiff appears to argue that administrative remedies were unavailable to him because he was retaliated against for filing grievances. *See* Affidavit of Rasheen Davis (Nov. 4, 2010) (alleging that he was "be[aten] up" for filing grievances.) Plaintiff's contention that he continuously filed grievances [FN8] and sent letters to prison officials belies his claim that grievances were unavailable to him, or that he was deterred from filing them. *See, e.g., Snyder v. Whittier,* 09–1930–pr, 2011 WL 2600478, at *3 (2d Cir. July 1, 2011) (summary order) ("[Petitioner's] assertion that he feared retaliation in the first place ... is belied by his testimony that he complained ... within two hours of the assault.... Our conclusion is further underscored by the fact that [petitioner] complained to no less than four other individuals about the attack, between the time he disclosed details of the attack to [the officer], and the time when he finally attempted to file a formal grievance."); *Harrison v. Goord,* 07 Civ. 1806(HB), 2009 WL 1605770, at *5 (S.D.N.Y. June 9, 2009) (rejecting a claim that remedies were unavailable where petitioner "continued to file grievance after grievance"). Where plaintiff alleges that he submitted numerous grievances, he cannot also contend that he was meaningfully deterred from doing so. In addition, we note that it is not at all clear from plaintiff's submissions that any of the alleged retaliatory conduct occurred during the relevant time period after the April 2009 incident. Plaintiff appears to focus on events at the Attica correctional facility, to which he was transferred on July 10, 2009, three months after the incident at issue.

FN8. *See, e.g.,* Compl. at ¶ F.2 (alleging that plaintiff "put so many [grievances] inside of the I.G.R.C. Box," but received no answers).

Plaintiff also argues that administrative remedies were unavailable because his grievances were tampered with, or intercepted, by correction officers. *See, e.g.,* Affidavit of Rasheen Davis, Sept. 30, 2010 (Dkt. No 29); Letter from Plaintiff to Commissioner Brian Fisher (Feb. 10, 2010). In his complaint, plaintiff claims that he did not receive any response to the grievances he submitted because "these are

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

the strategies they are using [and] had been using for years ...” *Id.* Based on other submissions to the Court, it appears that the strategy to which plaintiff refers is one of officers allegedly intercepting grievances submitted by inmates. *See, e.g.,* Letter from Rasheen Davis to the Court (Oct. 25, 2010).

While we take such allegations seriously, there is no evidence that any grievances were actually filed, intercepted, or ignored. Plaintiff has produced a number of letters he sent to a variety of prison officials, and a number of responses from those officials-thus, some of plaintiff's mail has in fact reached its intended recipients. In addition, plaintiff has submitted one grievance he filed on an unrelated issue. But he has not produced a copy of any of the numerous grievances that he says he filed, nor has he produced a copy of any appeals to the Superintendent or CORC. As noted above, DOCS has no record of any grievances filed at either Sing Sing or Attica relating to the incident at issue, and no record of an appeal filed with CORC. Under such circumstances, there is not a sufficient basis in the record to find that administrative grievances were unavailable. *See, e.g., Curry v. Mazzuca,* 05 Civ. 1542(NRB), 2006 WL 250487, at *7 (S.D.N.Y. July 2, 2006) (rejecting plaintiff's claim that he should be excused from satisfying the exhaustion requirement on the grounds that he received no response to his grievance, where “there [was] no evidence whatsoever that such a grievance was actually filed with a grievance clerk or ignored by prison officials grievance”); *Veloz v. New York,* 339 F.Supp.2d 505, 516 (S.D.N.Y.2004) (holding that without evidence that grievances were filed, and without evidence “that any particular officer thwarted [plaintiff's] attempts to file[,] plaintiff's contention that the practice of destroying or misplacing grievances must have been the cause of his grievances being lost” is unsupported) (internal quotation marks and citation omitted); *Nunez v. Goord,* 172 F.Supp.2d 417, 429 (S.D.N.Y.2001) (finding that where defendants submitted evidence that there was no record of a grievance reaching the superintendent, plaintiff's allegations that, *inter alia,* his grievances were lost or destroyed, “stand alone and [are] unsupported”).[FN9]

FN9. As noted above, “an inmate's claim is not exhausted until he appeals to CORC and receives a final decision regarding his grievance.” *Smith,* 2011 WL 1483924, at * 3. Furthermore, “even assuming that [a plaintiff] filed the initial complaints that he claims to have filed, and never received a response, this does not excuse the failure to exhaust his remedies.” *Harrison,* 2009 WL 1505770, at *7. *See also Lashley,* 2004 WL 192090, at *2 *(* stating that “[e]ven where an inmate receives no response to his initial level grievance, he is still required to file an appeal in order to satisfy the exhaustion requirement”). Thus, even if plaintiff had filed timely grievances with the I.G.R.C. and appeals to the superintendent, we are still left with plaintiff's statement in his November 4, 2010 affidavit that he “just send [sic] [the grievances] to Ms. Karen Bellamy [director of the IGP] explaining why I have send [sic] it straight to her office,” (Aff. of Rasheen Davis, Nov. 4, 2010). Here, plaintiff appears to be referencing a September 3, 2010 letter that he sent to Bellamy, who sent a response letter back to plaintiff ten days later. Even if this correspondence could satisfy the third step of the grievance process, it was sent eight months after the filing of the complaint in this case, and is thus insufficient to satisfy the PLRA's exhaustion requirement.

**2. Estoppel**

***7** To the extent that plaintiff argues that the defendants intercepted his grievances and thus are estopped from raising the failure to exhaust as a defense, plaintiff has provided no evidence to support his claim that his grievances were intercepted other than his allegation that his grievances were not answered. A number of courts have found similar allegations insufficient to excuse a failure to exhaust. *See Bennett v. James,* 737 F.Supp.2d 219, 226 (S.D.N.Y.2010) (rejecting claim of estoppel where “[plaintiff] does not provide the Court with any evidence to support a finding that defendants acted to interfere with his ability to exhaust”); *Butler v. Martin,* 9:07–CV–521 (FJS), 2010 WL980421, at *5 (N.D.N .Y. Mar. 15, 2010) (stating that, “[e]ven if, as alleged, Plaintiff's grievances were discarded, Plaintiff offers no evidence that a particular officer discarded the grievances); *Harrison,* 2009 WL 1605770, at *7 (finding

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

plaintiff's allegation that his mail was tampered with insufficient to excuse his failure to exhaust, where plaintiff provided no evidence that his mail was ever opened with or tampered, or that defendants even had access to his mail); *Winston v. Woodward,* 05 Civ. 3385(RJS), 2008 WL 2263191, at *9 (S.D.N.Y. May 30, 2008) (finding that defendants were not estopped from asserting failure to exhaust as an affirmative defense where plaintiff did not provide any direct or substantial evidence to support his claim of mail tampering). Furthermore, there is no evidence to support a claim (to the extent that plaintiff makes one) that it was any of the defendants in this case who engaged in the alleged conduct.

**3. Special Circumstances**

The “special circumstances” exception for failure to exhaust has typically been applied “where plaintiffs acted pursuant to reasonable interpretations of the regulations, thus preventing exhaustion.” *Winston,* 2008 WL 2263191, at *10. Indeed, “[a]bsent an allegation by the inmate that his failure to exhaust was based on a reasonable, but erroneous interpretation of prison regulations, the special exception is generally inapplicable.” *McDowall v. Metropolitan Correction Center,* 08 Civ. 8239(BSJ), 2010 WL 649744, at *7 n. 4 (S.D.N.Y. Feb. 22, 2010) (collecting cases). Here, plaintiff has made no claim that special circumstances exist that excuse his non-compliance with official procedural requirements, and we are not aware of any.

**CONCLUSION**

For the reasons set forth above, the defendants are granted summary judgment and the complaint is dismissed.

S.D.N.Y.,2011.

Davis v. Torres

Not Reported in F.Supp.2d, 2011 WL 3918098 (S.D.N.Y.)

END OF DOCUMENT





C

Only the Westlaw citation is currently available.

United States District Court,

W.D. New York.

Efrain SUAREZ, Plaintiff,

v.

Sgt. KREMER, et. al., Defendants.

No. 03-CV-809.

Sept. 11, 2008.

Elizabeth D. Carlson, Hodgson Russ, LLP, Buffalo, NY, for Plaintiff.

George Michael Zimmermann, Office of the New York State Attorney General, Buffalo, NY, for Defendants.

ORDER

RICHARD J. ARCARA, Chief Judge.

***1** This case was referred to Magistrate Judge Hugh B. Scott, pursuant to 28 U.S.C. § 636(b)(1). On February 7, 2008, defendants filed a motion for summary judgment. On June 13, 2008, Magistrate Judge Scott filed a Report and Recommendation, recommending that defendant' motion for summary judgment be granted and that plaintiff's Supplemented Complaint be dismissed in its entirety.

Plaintiff filed objections to the Report and Recommendation on June 27, 20098. Defendants filed a response on July 14, 2008. Oral argument on the objections was held on August 8, 2008.

Pursuant to 28 U.S.C. § 636(b)(1), this Court must make a *de novo* determination of those portions of the Report and Recommendation to which objections have been made. Upon a *de novo* review of the Report and Recommendation, and after reviewing the submissions and hearing argument from the parties, the Court adopts Magistrate Scott's thorough and well-reasoned Report and Recommendation.

Accordingly, for the reasons set forth in Magistrate Judge Scott's Report and Recommendation, defendants' motion for summary judgment is granted and plaintiff's Supplemented Complaint is dismissed in its entirety. The Clerk of Court shall take all steps necessary to close the case.

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith, and therefore denies leave to appeal *in forma pauperis.* Further requests to proceed on appeal *in forma pauperis* must be filed with the United States Court of Appeals for the Second Circuit in accordance with the requirements of Rule 24 of the Federal Rules of Appellate Procedure.

SO ORDERED.

**Report & Recommendation**

HUGH B. SCOTT, United States Magistrate Judge.

Before the Court is the defendants' motion for summary judgment (Docket No. 67).[FN1]

> FN1. On October 30, 2006, this matter was sent to the District Court for a trial date inasmuch as all pretrial dates relating to discovery had passed and no motions had been filed. The Hon. Richard J. Arcara assigned counsel for the plaintiff and referred the matter back to the undersigned for further discovery. A scheduling order allowing for additional discovery and the filing of dispositive motions was entered. (Docket No. 62). The instant motion was filed pursuant to the scheduling order on February 7, 2008. Counsel for the plaintiff filed a response on April 9, 2008. (Docket Nos. 79-82).

**Background**

The plaintiff, Efrain Suarez ("Suarez") commenced this action against defendants Sgt. Kremer ("Kremer"), Lt. Eickson ("Erickson"), Correction Officer Christofaro ("Christofaro") and Corrections Officer Longwell

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

("Longwell") alleging that the defendants violated his civil rights pursuant to 42 U.S.C. § 1983. In his original complaint FN2, Suarez alleged that Erickson "rammed" his shoulder into Suarez, causing him to fall an injure his right shoulder (Docket No. 1 at page 5-5a). He asserts that Kremer has repeatedly sexually harassed him by saying Suarez's name "like a female;" by telling him that "somebody has to put his finger into your rectum and grab balls;" and that on one occasion during a pat frisk, Suarez alleged that Kremer placed his hands in Suarez's pocket and touched his genitals, and rubbed his chest up against Suarez's back. (Docket No. 1 at page 6 and Docket No. 12 at ¶ 5). As to Christofaro, Suarez alleged that Christofaro denied Suarez access to go to the messhall, and filed a false misbehavior report against him in retaliation for Suarez's filing of a grievance against Christofaro. (Docket No. 1 at "C. Third Claim"). Finally, in the Amended Complaint, Suarez asserts a variety of conduct against Longwell, such as refusal to allow him to take a shower, denying him access to the law library, and failing to protect him by calling him a "snitch." (Docket No. 12 at ¶ 5-13).

FN2. Suarez filed an Amended Complaint on June 10, 2004. (Docket No. 12). The allegations in the Amended Complaint are almost exclusively against Longwell, who was not named in the original complaint. There is no indication that Suarez intended to abandon his claims against the original defendants. At his December 13, 2005 Deposition, Suarez stated that he intended the Amended Complaint to assert "additional" claims. (See Transcript of Suarez Deposition at page 11 attached to Docket No. 69 [hereafter "the Suarez Deposition"] ). The Court has therefore treated the Amended Complaint as a supplement to the original and refers to the two documents collectively as the "Supplemented Complaint").

***2** The record reflects that Suarez filed seven grievances against the respective defendants in this case.

10/1/02 The plaintiff filed Grievance EL-24-116-02 against Kremer complaining that Kremer was harassing him. (Grievance EL-24-116-02 included in exhibits attached to Docket No. 1 following "B. Second Claim.")

1/28/03 The plaintiff filed Grievance EL-24-653-03 complaining of an "act of racism, discrimination, plot, complot, conspiracy; thus as a joint agreement to commit harass (sic) against me, in violation of Directive 4933" based upon the fact that he was denied a recreation hour while on keep-lock by Christofaro and another corrections officer identified only as "Berreter" (who is not a defendant in this action). (Grievance EL-24-653-03 included in exhibits attached to Docket No. 1 following "C. Third Claim.")

2/19/03 Suarez files Grievance EL-24-764-03 against Kremer complaining of on-going harassment by Kremer in that he allegedly whistles at Suarez as if he was a female. Suarez stated that he wants to be transferred to another facility and that a "plot, complot, conspiracy, discrimination and racism of all staff members" exists against him at the Elmira Correctional Facility. (Grievance EL-24-764-03 included in exhibits attached to Docket No. 1 following "B. Second Claim.")

3/15/03 Suarez files Grievance EL-24-846-03 against Erickson alleging that Erickson "pushed [him] against the bars." (Grievance EL-24-846-03 included in exhibits attached to Docket No. 1 following "A. First Claim.")

5/23/03 Suarez files Grievance EL-25-223-03 asserting on-going sexual harassment by Kremer, including the allegation that on May 22, 2003, Kremer "put [Suarez] against the wall to sexually harass me, touch me for my intimate part of my body." (Grievance EL-25-223-03 included in exhibits attached to Docket No. 1 following "B. Second Claim.")

11/20/03 Suarez files Grievance EL-25-858-03 alleging that he had a call out slip to go to the library, but when he went to his cell to get the call out slip, Longwell would not open the gate to let him get the call out slip, and therefore, he could not go to the library. (Docket No. 12, attached exhibits).

4/16/04 Suarez files Grievance EL-26-472-04 alleging on-going harassment and retaliation against him based upon the April 16, 2004 incident in which Longwell allegedly jeopardized his safety by calling Suarez a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

"snitch." (Docket No. 12, attached exhibits).

**Exhaustion**

Initially, the Court notes that in addition to those claims identified in the plaintiff's various grievances, Suarez has as asserted several more claims in his Supplemented Complaint and the documents attached. The defendants contend that these claims must be dismissed as unexhausted.

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), provides that "[n]o action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *Id.* It is well settled that the PLRA's exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002), *rev'g, Nussle v. Willette,* 224 F.3d 95 (2d Cir.2000). In enacting the PLRA, Congress intended to "reduce the quantity and improve the quality of prisoner suits" by affording prison officials an opportunity to deal with inmate complaints through internal processes. *Id.* at 534-25. The Act's "dominant concern [is] to promote administrative redress, filter out groundless claims, and foster better prepared litigation of claims aired in court." *Id.* at 528. The intent of the PLRA is to restrict inmate litigation where they had, but failed, to use all of their internal administrative remedies before commencing a federal civil rights action. *See Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001); *Evan v. Manos,* 336 F.Supp.2d 255, 258 (W.D.N.Y.2004) (Larimer, J.) Further, the statute requires a prisoner to exhaust the grievance procedures offered regardless of the type of relief they provide, since "one 'exhausts' processes, not forms of relief." *Booth v. Churner,* 532 U.S. 731, 739, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001) (exhaustion mandated even when the inmate sought monetary relief and the administrative process offered none); *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004). This exhaustion requirement extends to retaliation claims. *Lawrence v. Goord,* 304 F.3d 198 (2d. Cir.2002) ("retaliation claim fits within the category of 'inmate suits about prison life,' and therefore must be preceded by the exhaustion of state administrative remedies").

***3** The exhaustion requirement may be excused only when "(1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such as way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement." *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)). Absent extenuating circumstances, exhaustion of all administrative grievance remedies is required. Simply sending letters to a variety of prison officials will not suffice to satisfy the exhaustion requirement. In *Braham v. Clancy,* 425 F.3d 177, 183 (2d Cir.2005), the Second Circuit had held that an inmate exhausted his claims by providing enough information through informal avenues about his grievance to allow prison officials to take responsive measures. However, in *Macias v. Zenk,* 495 F.3d 37 (2d. Cir.2007) the Second Circuit expressly held that *Braham* did not survive the Supreme Court's decision in *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). In *Braham,* an inmate alleged that prison officials violated his Eighth Amendment rights by refusing to grant his request for a cell change. The district court dismissed the prisoner's lawsuit under the PLRA for failure to exhaust administrative remedies. On appeal, the prisoner admitted that he had never filed a formal administrative grievance, but argued that he had satisfied the PLRA's exhaustion requirement by submitting several inmate request forms and by complaining informally to prison staff during a disciplinary proceeding. The Second Circuit had remanded the case for the district court to consider whether the prisoner's inmate request forms or the complaints he made during the disciplinary proceeding "provided sufficient notice to the prison officials 'to allow [them] to take appropriate responsive measures.' " *Braham,* 425 F.3d. at 183. In *Macias,* the Second Circuit held that, in light of *Woodford,* notice alone is insufficient because "[t]he benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance" and "[t]he prison grievance system will not have such an opportunity unless the grievant complies with the system's critical procedural

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

rules." *Macias,* 495 F.3d. at 44, quoting *Woodford,* 548 U.S. at 95. See also *Boddie v. Bradley,* 228 Fed. Appx. 5 at *7 (2d. Cir.2007) (holding that simply sending informal letters directly to DOCS officials instead of submitting a complaint on an inmate grievance form, as required by DOCS regulations, does not satisfy the exhaustion requirement); *Henry v. Nassau County Correctional Facility,* 2008 WL 682590 (E.D.N.Y.2008) (Filing a grievance with an individual, however, is different from presenting your complaint in the prisoner grievance procedure and completely exhausting such complaint, all of which is required under the PLRA).

***4** Plaintiff has not presented any reason to the Court why he was unable to properly exhaust his claims utilizing the grievance process. The record reflects that an adequate inmate grievance procedure was available to the plaintiff and that he was aware of the program and took advantage of the process by filing grievances on numerous occasions. The defendants have asserted the failure to exhaust as a defense in this action (Docket No. 23 at ¶ 4). The plaintiff has pointed to no conduct which could be said to form the basis to find the defendants estopped from asserting the failure to exhaust or special circumstances excusing the plaintiff's failure to exhaust administrative remedies. The plaintiff has failed to exhaust his administrative remedies with respect to the claims not contained in the grievances noted above, and thus, these additional claims should be dismissed.

**Discussion**

With respect to his exhausted claims, it appears that the plaintiff asserts the allegations as direct claims of constitutional violations and as conduct in retaliation for his filing of various grievances. Thus, the claims are addressed separately as allegations of independent constitutional violations and as the basis of a claim of impermissible retaliation.

**Summary Judgment**

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Ford v. Reynolds,* 316 F.3d 351 (2nd Cir.2003); Fed.R.Civ.P. 56(c). The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists. In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant. *Ford,* 316 F.3d. at 354. "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.' " *Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1535 (2d Cir.1997) (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202, (1986)). While the moving party must demonstrate the absence of any genuine factual dispute, ( *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)), the party against whom summary judgment is sought, however, "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he non-moving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538(1986); *McCarthy v. American Intern. Group, Inc.,* 283 F.3d 121 (2d Cir.2002); *Marvel Characters v. Simon,* 310 F.3d 280, 285-86 (2d Cir.2002). However, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Nippon Fire & Marine Ins. Co., Ltd. v. Skyway Freight Systems, Inc.,* 235 F.3d 53 (2nd Cir.2000) quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

**Claims Against Erickson**

***5** Suarez alleges that on March 14, 2003, Erickson shouldered him. (Docket No. 1 at page 5; Docket No. 81 at page 4). His grievance, filed on March 15, 2003 asserts that Erickson "pushed [him] against the bars near the company shower." The plaintiff's allegations against Erickson appear to assert a claim of excessive force under the Eighth Amendment. The Eighth Amendment is violated by unnecessary and wanton inflictions of pain and suffering. *Whitley v. Albers,* 475 U.S. 312, 320, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). The test of whether prison officials have violated the Eighth Amendment by using excessive force is "whether force was applied in a good faith effort to maintain or restore discipline, or maliciously

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The Eighth Amendment is also violated by a prison official's " 'deliberate indifference' to a substantial risk of serious harm to an inmate." *Farmer v. Brennan,* 511 U.S. 825, 828, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). A claim arising under this theory "requir[es] a showing that the official was subjectively aware of the risk." *Id.*

To establish an excessive force claim, an inmate must satisfy both subjective and objective tests. *Hudson,* 503 U.S. at 7-8. To satisfy the subjective test, the inmate must show that the prison officials "had a 'wanton' state of mind when they were engaging in the alleged misconduct." *Davidson v. Flynn,* 32 F.3d 27, 30 (2d Cir.1994) (citing *Hudson,* 503 U.S. at 7). In analyzing whether such a showing has been made, courts may consider; "the need for the application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials' and 'any efforts made to temper the severity of a forceful response.' " *Hudson,* 503 U.S. at 7 (quoting *Whitley,* 475 U.S. at 321). To satisfy the objective test, the inmate must show that the force applied was "sufficiently serious" to establish a constitutional violation. *Farmer,* 511 U.S. at 834 (quoting *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). This inquiry is "context specific, turning upon 'contemporary standards of decency.' " *Griffin v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999) (quoting *Blyden v. Mancusi,* 186 F.3d 252, 263 (2d Cir.1999)). One of the factors to be considered is the nature and seriousness of any injury. See *Branham v. Meachum,* 77 F.3d 626, 630 (2d Cir.1996). Although the plaintiff need not prove a significant injury to make out an excessive force claim, "a de minimis use of force will rarely suffice to state a constitutional claim." *Griffin,* 93 F.3d at 92; *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993); *James v. Phillips,* 2008 WL 1700125 (S.D.N.Y.2008).

In the instant case, the plaintiff fails to meet his burden to establish the objective prong of above standard. Suarez filed a grievance claiming that on March 14, 2003, Erickson pushed him against bars near the company shower. (Docket No. 70, Bates No. 342). Erickson denied the allegations in a written statement, stating to the contrary that the plaintiff brushed into him and stated "excuse me." (Docket No. 70, Bates No. 336). The March 14, 2003 incident was investigated by the Superintendent; the Central Office Review Committee; and the Inspector General's Office ("IG") (Docket No. 70 at Bates Nos. 341, 333, 001-002) and all investigations found the plaintiff's allegations to be unsubstantiated and without merit. Further, it is undisputed that x-rays of the plaintiff's shoulder were taken after the March 14, 2003 incident and that Dr. G. Michael Maresca found that the discomfort in Suarez's shoulder was consistent with "calcific tendonitis" a condition which develops over a long period of time, not as a result of a recent blow. (Docket No. 70, at Bates Nos. 001; 0287; 0294).

***6** In any event, even if Erickson shoved Suarez as alleged by the plaintiff, the plaintiff has failed to set forth a claim of constitutional dimension. "Not every push or shove, even if it may later seem unnecessary in the peace of the judge's chambers, violates a prisoner's constitutional rights." *Hudson,* 503 U.S. at 9 (citation omitted). No reasonable jury could conclude that the degree of force used in this case was sufficiently serious to establish a constitutional violation. *James v. Phillips,* 2008 WL 1700125, at *4-*5 (S.D.N.Y.2008) (Notwithstanding no apparent need for the use of force of any kind; "there was nothing more than a shove of an inmate who was not then handcuffed;" swelling on chin and possible aggravation of prior knee injury not sufficient to allow reasonable jury to conclude that degree of force used was sufficiently serious to establish a constitutional violation.); *Headley v. Fisher,* 2008 WL 1990771 (S.D.N.Y.2008) (Plaintiff's claims that Simpson grabbed his shoulder, cursed in his face, slapped him twice and pushed him in his cell do not constitute "unnecessary and wanton infliction of pain" and do not demonstrate that Simpson acted maliciously and sadistically to cause harm rather than in a good faith effort to maintain or restore discipline); *Sprau v. Coughlin,* 997 F.Supp. 390, 394-395 (W.D.N.Y.1998) ("plaintiff alleges that [prison staff] grabbed him behind the neck and hit him several times across the neck and face and in the eye. The medical report completed after the incident notes a small bump under plaintiff's eye. Court finds that the conduct alleged here by plaintiff does not reach constitutional dimensions); *Brown v. Busch,* 954 F.Supp. 588, 597 (W.D.N.Y.1997) (finding that an officer's pushing, shoving, and striking of an inmate was a *de minimis* use of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

force); *DeArmas v. JayCox,* 1993 WL 37501, at *4 (S.D.N.Y.1993) *aff'd* 14 F.3d 591 (2d Cir.1993) (determining that an officer's punching and kicking of an inmate was a *de minimis* use of force). In the instant case, the plaintiff has failed, as a matter of law, to establish a claim of constitutional dimension in this regard.

**Claims against Kremer**

The primary claim alleged against Kremer is that Kremer touched Suarez inappropriately during a pat frisk on May 22, 2003. Kremer denies any such conduct. The record reflects that Kremer filed an inmate misbehavior report alleging that on May 22, 2003 at approximately 12:10 p.m., the plaintiff intentionally bumped into him in a stairwell. (Docket No. 71, at Bates No. 53). The next day, on May 23, 2003, Suarez filed an Inmate Grievance Complaint against Kremer characterizing the incident with Kremer on May 22, 2003 as follows: “Sergeant Kremer, put me up against the wall to sexually harass me, touch me for my intimate part of my body.” (Docket No. 71, at Bates No. 41). The defendants contend that Suarez was found guilty of the conduct alleged by Kremer at a Tier II disciplinary hearing and that a subsequent investigation by the IG found Suarez's complaint against Kremer to be unsubstantiated. (Docket No. 74 at 2-3). In any event, once again Suarez's allegations do not state a claim of constitutional dimension. “Sexual abuse may violate contemporary standards of decency and can cause severe physical and psychological harm. For this reason, there can be no doubt that severe or repetitive sexual abuse of an inmate by a prison officer can be ‘objectively, sufficiently serious' enough to constitute an Eighth Amendment violation.” *Boddie v. Schnieder,* 105 F.3d 857, 861 (2d. Cir.1997). However, in *Boddie,* the Second Circuit made it clear that not every allegation of sexual harassment is sufficient to articulate a claim of constitutional dimension. Indeed, in *Boddie,* the Second Circuit dismissed as inadequate a prisoner's claim that a female corrections officer made a possible pass at him, squeezed his hand, touched his penis, called him a “sexy black devil,” pressed her breasts against his chest, and pushed her vagina against his penis. *Boddie,* 105 F.3d 857, 859-861(“The isolated episodes of harassment and touching alleged by Boddie are despicable and, if true, they may potentially be the basis of state tort actions. But they do not involve a harm of federal constitutional proportions as defined by the Supreme Court.”); *Morales v. Mackalm,* 278 F.3d 126 (2d. Cir.2002) (“Because Morales' allegations do not even rise to the level of those made by the plaintiff in *Boddie,* they do not state a claim for sexual harassment in violation of the Eighth Amendment to the United States Constitution.”); *Wylie v. Bedford Hills Correctional Facility of New York,* 2008 WL 2009287 *2 (S.D.N.Y.2008) (While there can be no doubt that severe or repetitive sexual abuse of an inmate by a prison officer can constitute an Eighth Amendment violation, where the alleged conduct is limited to isolated episodes of harassment, and no single incident is severe, a plaintiff does not state a claim under the Eighth Amendment.); *Williams v. Fitch,* 2008 WL 1947024 *2 (W.D.N.Y.2008) (An Eighth Amendment claim under § 1983 will not lie, however, where an inmate alleges only minor, isolated incidents which are neither singly nor “cumulatively egregious in the harm they inflicted.”); *Davis v. Castleberry,* 364 F.Supp.2d 319, 321 (W.D.N.Y.2005) (allegation that corrections officer grabbed inmate's penis during pat frisk is insufficient to state constitutional claim); *Morrison v. Cortright,* 397 F.Supp.2d 424, 425 (W.D.N.Y.2005) (allegations that a corrections officer touched plaintiff's buttocks, and that another “rubbed up against plaintiff['s] buttocks with [the officer's] private part” during a strip search describe an isolated incident unaccompanied by physical injury, and therefore are not sufficiently serious to establish a constitutional claim); *Montero v. Crusie,* 153 F.Supp.2d 368, 373, 375 (S.D.N.Y.2001) (allegation that corrections officer squeezed inmate's genitalia during pat-frisks on several occasions does not show sufficiently serious deprivation to establish Eighth Amendment violation, particularly when inmate did not allege that he was physically injured by such conduct); *Nelson v. Michalko,* 35 F.Supp.2d 289, 293 (W.D.N.Y.1999) (allegation that inmate's anal area was touched by a metal detector during a search does not describe sufficiently serious conduct to raise an Eighth Amendment claim); *Williams v. Kane,* 1997 WL 527677 at *11 (S.D.N.Y.1997) (allegation that correctional officer put his hand down inmate's pants and fondled inmate's genitals during pat frisk fails to state constitutional claim).

***7** The alleged conduct by Kremer, if plaintiff's allegations [FN3] were accepted as true, is no more egregious than the conduct found to be insufficient to rise to the

level of a constitutional violation in *Boddie* and its progeny. Based on the above, the plaintiff's claim of sexual harassment as against Kremer should be dismissed.

> FN3. Other than the plaintiff's testimony, Suarez's allegations regarding the alleged conduct by Kremer are unsubstantiated in the record.

The plaintiff also asserts that Kremer verbally harassed him by saying Suarez's name "as if he was a female." Such allegations are insufficient to support a § 1983 claim. *Johnson v. Eggersdorf,* 8 Fed. Appx. 140, 143 (2d Cir.2001) (citing *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) ( "allegations of verbal harassment are insufficient to base a § 1983 claim if no specific injury is alleged.") *Hendricks v. Boltja,* 20 Fed. Appx. 34, 36 (2d Cir.2001) (holding that "verbal harassment was not actionable" in case where officer, inter alia, told inmate to "get [his] black ass out of the library" and threatened to "smash [his] head open"); *Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998) ("verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under ... § 1983"); *Jermosen v. Coughlin,* 878 F.Supp. 444, 449 (N.D.N.Y.1995) ("Although indefensible and unprofessional, verbal threats or abuse are not sufficient to state a constitutional violation cognizable under § 1983."); *Beckles v. Bennett,* 2008 WL 821827 (S.D.N.Y.2008) (alleged threatening remarks that Plaintiff was "getting no rec, only [defendant's] foot up [plaintiff's] behind" was insufficient to state § 1983 claim).

Finally, Suarez also asserts that on September 9, 2002, Kremer went into his cell and took his toilet paper. (Docket No. 1 at "B. Second Claim"; Docket No. 69, Deposition Transcript at page 40). Once again, the plaintiff's claim does not rise to a constitutional dimension. *Trammell v. Keane,* 338 F.3d 155, 161 (2d Cir., 2003) ("[d]eprivation of other toiletries for approximately two weeks-while perhaps uncomfortable-does not pose such an obvious risk to an inmate's health or safety to suggest that the defendants were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and [that they also drew] the inference."); *Davidson v. Murray,* 371 F.Supp.2d. 361 (W.D.N.Y.2005) (temporary denial of toilet paper not sufficient to state eighth amendment claim); *Harris v. Fleming,* 839 F.2d 1232, 1235 (7th cir.1988) (dismissing claim of convicted prisoner that lack of toilet paper for five days and lack of soap, toothpaste and toothbrush for ten days while confined to a filthy, roach-infested cell violated eighth amendment); *McNatt v. Unit Manager Parker,* 2000 WL 307000, at *4 (D.Conn.2000) (totality of conditions in restrictive housing unit, including ... no toilet paper for one day ... did not rise to level of eighth amendment violation); *Glland v. Owens,* 718 F.Supp. 665, 685 (W.D.Tenn.1989) ("[s]hort term deprivations of toilet paper, ... and the like do not rise to the level of a constitutional violation").

**Claims Against Christofaro & Longwell**

***8** Suarez asserts that both Christofaro and Longwell, separately, engaged in various conduct affecting the conditions of his confinement. To establish an Eighth Amendment claim based on prison conditions, the plaintiff must establish both subjective and objective elements. First, the plaintiff must show that the deprivation alleged by the prisoner must be in objective terms "sufficiently serious" such that the deprivation "den[ied] the minimal civilized measure of life's necessities"-the objective element. *Branham v. Meachum,* 77 F.3d 626, 630-31 (2d Cir.1996) (quoting *Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); see also *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (inmate must establish "substantial risk of serious harm")). Second, because "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment," the plaintiff must demonstrate that the responsible prison official had a sufficiently culpable state of mind amounting to at least deliberate indifference-the subjective element. *Farmer,* 511 U.S. at 834 (quoting *Wilson,* 501 U.S. at 298).

In his Complaint, Suarez asserts a number of claims against Christofaro: that on September 9, 2002, Christofaro prevented him receiving a food tray at lunch; that on September 15, 2002, Chistofaro did not allow him to go to mess hall for breakfast; that on October 17, 2002,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Christofaro filed a false misbehavior report against him [FN4]; that on December 5, 2002 and December 13, 2002, Christofaro deliberately kept him in lock-down and not fed. (Docket No. 1 at "C. Third Claim," pages 1 and 2).[FN5] The plaintiff has failed to demonstrate that he has exhausted any of these claims.[FN6] Similarly, the Supplemental Complaint includes various unexhausted allegations against Longwell. Suarez alleges that on May 26, 2003, Longwell came into his cell and disconnected the mechanism on the sink so that when he turned on the sink, his cell flooded; [FN7] locked him in the shower for 40 minutes on October 4, 2003; denied him a shower on October 21, 2003 and October 23, 2003, denied him access to the library on November 20, 2003; played with his cell gate on November 23, 2003; [FN8] failed to exchange his razor and allow him a shower on December 13, 2003; and called him a snitch on April 16, 2004. (Docket No. 12 at ¶¶ 5-13). Of these claims, Suarez filed a grievance only as to the alleged denial of access to the law library on November 20, 2003 (Grievance EL-25-858-03) and the incident in which Longwell purportedly called Suarez "a snitch" on April 16, 2004 (Grievance EL-26-472-04).

FN4. On October 17, 2002, Christofaro filed an Inmate Misbehavior Report against Suarez because Suarez "intentionally leaned into me with his right elbow and shoulder bumping me on my right shoulder enough to impede my forward progress." (Docket No. 73 at Bates No. 192). After a Tier III Hearing, Suarez was found guilty of the infraction. (Docket No. 73 at Bates No. 195).

FN5. At his deposition, Suarez testified that he did not know whose decision it was to keep him keeplocked. (See Suarez Deposition at page 65).

FN6. Although not alleged in the body of the Complaint, an exhibit to the Complaint reflects that Suarez filed a grievance against Christofaro on January 28, 2003 asserting that Christofaro and another Correction Officer identified as "Berreter" (who is not a defendant in this action) conspired to prevent him from going to recreation on that date. See Docket No. 1, Grievance EL-24-653-03 attached with exhibits following "C. Third Claim.").

FN7. Suarez testified that he did not see Longwell do this, but that a porter by the name "Rebel" told him that Longwell did it. (Suarez Deposition at page 70). Suarez acknowledges that he did not file a grievance as to this claim. (Suarez Deposition at page 73).

FN8. Suarez contends that Longwell "put a security" on the cell preventing it from locking for approximately one hour while he was out of his cell and only for about three or four minutes once he returned to his cell. The plaintiff does not articulate how he was harmed by the failure for his cell to lock for approximately one hour. (Suarez Deposition at page 84-85). Suarez acknowledges that he did not file a grievance with respect to this claim. (Suarez Deposition at page 85).

Christofaro and Longwell deny the allegations. In any event, even if the Court were to consider both the exhausted and unexhausted conduct alleged to be attributed to Christofaro and Longwell, the plaintiff's claims against these defendants do not rise to the level of a constitutional violation. *Dawes v. Walker,* 239 F.3d 489, 493 (2d Cir.2001) (a brief loss of privileges does not rise to constitutional dimension; without more, the allegation that a correction officer called inmate "an informant" or "a rat" does not rise to constitutional level); *Snyder v. McGinnis,* 2004 WL 1949472, at *11 (W.D.N.Y.2004) (granting a motion to dismiss because the denial of food on two occasions is *de minimis* and not actionable); *Lombardo v. Stone,* 2001 WL 940559 (S.D.N.Y.2001) (claim of denial of food for 24 hours found to be *de minimus* ); *Derrick Hamilton v. Conway,* 2008 WL 234216 (W.D.N.Y.2008) ( "Defendants denial of ... water for bathing to Plaintiff for 48 hours is *de minimus* and fails to rise to the level of a constitutional violation because briefly denying hygienic materials does not violate contemporary standards of decency."); *Ford v. Phillips,* 2007 WL 946703 (S.D.N.Y.2007) ("[A]s a matter of law, minor and temporary deprivations of property, showers and recreation do not violate the Eighth Amendment."); *Beckford v. Portuondo,* 151 F.Supp.2d 204, 210

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

(N.D.N.Y.2001) (holding that temporary denial of shower rights does not violate the Eighth Amendment); *Beckford v. Portuondo,* 151 F.Supp.2d 204, 210 (N.D.N.Y.2001) (holding denial of shower rights for one day does not violate the Eighth Amendment); *Chapple v. Coughlin,* 1996 WL 507323, at *2 (S.D.N.Y.1996) (denial of shower and recreation for three days did not amount to an Eighth Amendment violation); *Markiewicz v. Washington,* 175 F.3d 1020 (7th Cir.1999) (holding that prison official's refusal to allow a prisoner access to two showers did not state a claim of unconstitutional prison conditions); *Cosby v. Purkett,* 782 F.Supp. 1324, 1329 (E.D.Mo.1992) (holding that when a prisoner is allowed to shower once every seventy-two hours, the Eighth Amendment is not violated). *Wilkins v. Roper,* 843 F.Supp. 1327, 1328 (E.D. Missouri 1994) (isolated denial of food tray not a violation of Eighth Amendment); *Coleman v. Bartlett,* 165 F.3d 13 (2d. Cir.1998) (The deprivation of access to the law library, without a showing of resulting harm, is insufficient to state a claim for relief); *Jones v. Smith,* 784 F.2d 149, 151-52 (2d Cir.1986) (thirty-day denial of access to legal materials held *de minimis* ); A prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986).

***9** To the extent that the plaintiff claims the conditions of his confinement were constitutionally impermissible due to the conduct attributed to Christofaro and Longwell, summary judgment should be granted in favor of the defendants.

**Retaliation Claims**

The plaintiff asserts that much of the conduct asserted against the individual defendants was done in retaliation of his filing grievances against the defendants. It is well-established that prison officials may not retaliate against inmates for exercising their constitutional rights. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995). To survive summary judgment, "a plaintiff asserting First Amendment retaliation claims must demonstrate the existence of a question of fact that (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001); *Morales v. Mackalm,* 278 F.3d 126, 132 (2d Cir.2002); *Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir.2000); *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). Furthermore, a prisoner's retaliation claim must also be examined with "skepticism and particular care." *Colon,* 58 F.3d at 872. The Second Circuit has cautioned that retaliation claims by prisoners are "prone to abuse" as "[v]irtually every prisoner can assert such a claim as to every decision which he or she dislikes." *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983); *Dawes,* 239 F.3d 489, 491. Thus, a prisoner's claim of retaliation must be supported by specific and detailed factual allegations. ( *Colon,* 58 F.3d at 872; *Flaherty,* 713 F.2d at 13) and must demonstrate that challenged conduct was a substantial or motivating factor in adverse actions taken by the prison officials. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003). The alleged retaliation must be more than *de minimis;* that is, it must be sufficient to deter a similarly situated person of ordinary firmness from exercising his or her rights. *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003). Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation. *Dawes,* 239 F.3d at 492-493 citing: *Suppan v. Dadonna,* 203 F.3d 228, 235 (3d Cir.2000); see also *Thaddeus-X v. Blatter,* 175 F.3d 378, 398 (6th Cir.1999); *Crawford-El v. Britton,* 93 F.3d 813, 826 (D.C.Cir.1996) (en banc), rev'd on other grounds, 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998); *Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982). Otherwise, the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection. *Dawes,* 239 F.3d. 493, citing *Davidson v. Chestnut,* 193 F.3d 144, 150 (2d Cir.1999) (per curiam). This objective inquiry is "not static across contexts," but rather must be "tailored to the different circumstances in which retaliation claims arise." *Dawes,* 239 F.3d. at 493 citing *Thaddeus-X,* 175 F.3d at 398. "Prisoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a [ retaliatory] action taken against them is considered adverse." *Id.*

***10** Allegations of adverse actions alone, however, are insufficient to establish retaliation absent facts supporting an inference of a causal connection between the adverse actions and the protected conduct. See *Dawes,*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

239 F.3d at 492; *Diesel v. Town of Lewisboro,* 232 F.3d 92, 107 (2d Cir.2000). The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action. In determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, a number of factors may be considered, including: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation. See *Colon,* 58 F.3d at 872-73.

In the instant matter, Suarez's claims are conclusory, vague and amorphous. The plaintiff points to no specific incident from which the remaining alleged conduct from the defendants is alleged to emanate. The record reflects that Suarez has a poor disciplinary record and the plaintiff has not demonstrated that he has been vindicated in administrative hearings. As reflected in the plaintiff's deposition testimony, Suarez asserts only wholly conclusory and self-serving allegations of a conspiracy to retaliate against him. Upon being questioned regarding the alleged incident with Erickson on May 14, 2003 (Suarez Deposition at page 24), Suarez pointed to a misbehavior report against him dated November 30, 2001 filed by a Correction Officer identified as "CO Zelko". (Suarez Deposition at page 28). When asked how the two were related, Suarez gave the following testimony:

Q: And, are you saying now-are you saying this [the November 30, 2001 misbehavior report] has to do with the March 14, 2003 incident?

A: What are you saying?

Q: You pointed out to me this November 2001 misbehavior report.

A: Yes.

Q: What did that have to do with the March 14, 2003 incident?

A: Because Sgt. Erickson harass me in differing way. Every time I was working, I was cooking at mess hall.

Q: You are talking about something else now?

A: Yes. Can you move the page please. Look at that.

Q: Okay, the next page. The next date is a notice to you that, two of them, one of them dated January 24, 2001, the pink one. Is that the one you're talking about, or the white one.?

A: Either one. They gave me a lot.

Q: You have a lot of notices here, and these are notices to you about things like dirty cell, dirty bars, things about telling you that there are problems in your cell that you should clean up, right?

A: No. I got whole bunch of them.

Q: [They're] a whole bunch of misdemeanor notices, some of them where they found contraband in your cell?

A: Never. Never.

Q: Never found it?

A: No. No. I never ever in my stay here have contraband, drug use or weapon in my cell. Never ever.

***11** Q: All right, and so who wrote these various notices?

A: The CO, or the supervisor.

Q: Are you saying that Erickson wrote there?

A: I'm not saying Erickson. Erickson is the supervisor. Any time I make complaint, he uses it. He do it or people on his order to do what they want to do with me.

q: How do you know that he told other people to write these?

A: Because Dondon said-

Q: How do you spell that?

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

A: D-O-D-O-N.

Q: D-O-A-N-E maybe?

A: He was the deputy superintendent at that time.

Q: You complained to him?

A: About the situation. My family, they come to visit me. At that time, you know, I don't know how much time they delay. He waited two-hour-and-a-half for my family over there. There are too many incidents.

Q: Let me go back to these notices about contraband or the way your cell is maintained. You're saying that Erickson told these officers to write these up?

A: Excuse me, sir? I not say Erickson. I say Erickson is the supervisor of C Block.

Q: You're saying that therefore he's liable for what the other officers do because he was supervisor?

A: And I'm the person, I'm the person that make complaint before him about any situation, about seeing his people doing to me. If you're a supervisor one area to who, who are the people going to ask for something? It's you as the supervisor. It's because you are there.[FN9]

FN9. Claims of constitutional violation or retaliation cannot be asserted based upon vicarious conduct pursuant to the theory of *respondeat superior*. *Snyder v. McGinnis,* 2007 WL 3274691 (W.D.N.Y.2007) (Skretny, J.) (Furthermore, absent some evidence of personal involvement, [defendant] cannot be liable for the issuance of a false inmate misbehavior report based solely on a theory of *respondeat superior* ) citing *Wright v. Smith,* 21 F.3d 496, 501 (2d. Cir.1994).

Suarez Deposition at pages 30-33.

It is clear from the record that, although he has presented no evidence to support a finding of concerted action, Suarez asserts that every action taken by any correction officer against him constitutes conspiratorial retaliation. For example, among the unexhausted claims Suarez asserted against Longwell was a purported incident in which Longwell is alleged to have said to another correction officer: “This guy wrote a grievance against me” and “I don't give a shit.” When asked why he was suing about such a comment, Suarez responded:

Q: And, why is this something that you're suing about?

A: Well, why he came to talk like this.

Q: Because he talked like that?

A: Yes. It's harassment.

Q: That's harassment?

A: It's improper work. I mean, this was retaliation. Everything against me is retaliation.

Suarez Deposition at pages 85-86. The plaintiff further contended, again in a conclusory and unsubstantiated manner, that because he filed a lawsuit against people at Elmira, he has been harassed “[a]nywhere I go” (referring to employees at other correctional facilities). Suarez Deposition at page 95.

The plaintiff has failed to set forth a sufficient basis to establish a material question of fact as to the existence of conspiratorial “pattern of harassment and retaliation” (Docket No. 81 at page 1). In order to establish a § 1983 conspiracy claim, a plaintiff must demonstrate: (1) an agreement existed between two or more state actors to act in concert to inflict an unconstitutional injury on him; and (2) “an overt act [was] done in furtherance of that goal causing damages.” *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999); see also *Walker v. Jastremski,* 430 F.3d 560, 564 n. 5 (2d Cir.2005) (“conclusory or general allegations are insufficient to state a claim for conspiracy under § 1983”); *Headley v. Fisher,* 2008 WL 1990771 (S.D.N.Y.2008). “[C]omplaints containing only ‘conclusory,’ ‘vague,’ or ‘general allegations' of a conspiracy to deprive a person of constitutional rights will be dismissed.” *Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Cir.1977); *Allah v. Poole,* 506 F.Supp.2d. 174 (W.D.N.Y.2007) (conclusory allegations insufficient to maintain of conspiracy of defendants to retaliate against plaintiff); *Young v. Shipman,* 2007 WL 1064316, at *1 (D.Conn.2007) ( "The conspiracy claim is dismissed because plaintiff's vague, unsupported allegations of conspiracy are insufficient to withstand a motion for summary judgment"). It is well-settled that "[a] plaintiff is not required to list the place and date of defendants['] meetings and the summary of their conversations when he pleads conspiracy, [however] the pleadings must present facts tending to show agreement and concerted action." *Concepcion v. City of New York,* 2008 WL 2020363 at *3 (S.D.N.Y.2008) citing *McIntyre v. Longwood Central School Dist.,* 2008 WL 850263, at *11 (E.D.N.Y.2008). In the instant case, other than his own conclusory allegations, the plaintiff has presented no evidence on concerted activity by these defendants. Instead, the record reflects that the plaintiff has merely lumped all correctional officers together, vicariously attributing the conduct of one correctional officer to another.

***12** In any event, the allegations set forth in Suarez's exhausted claims are insufficient, as a matter of law, to constitute the "adverse action" necessary to support a claim of retaliation.[FN10] Conduct that is *de minimus* does not give rise to actionable retaliation. What is *de minimis* varies according to context. *Dawes,* 239 F.3d at 493 ("[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a [retaliatory] action taken against them is considered adverse") (alteration in original) (citing *Thaddeus-X v. Blatter,* 175 F.3d 378, 398 (6th Cir.1999)). Thus, in the prison context, not all harms constitute legally sufficient grounds for retaliation claims. See *Salahuddin v. Mead,* 2002 WL 1968329, at *4-5 (S.D.N.Y.2002) (citing cases). The conduct alleged in the exhausted claims includes being shoved by Erickson, an isolated inappropriate touching and verbal harassment by Kremer, denial of recreation on one occasion by Christofaro, denial of access to the law library on one occasion and being called a "snitch" by Longwell. This alleged conduct is not sufficient, as a matter of law, to deter an inmate of ordinary firmness, in the context of a prison setting, from exercising his First Amendment rights. See *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003) (sarcastic comments do not constitute retaliatory action); *Bartley v. Collins,* 2006 WL 1289256, at *6 (S.D.N.Y.2006) ("verbal threats such as 'we going to get you, you better drop the suit,' do not rise to the level of adverse action"); *Dawes,* 239 F.3d at 493 (concluding that an officer's references to plaintiff as a "rat" and an "informant," combined with plaintiff's conclusory allegations that the references exposed him to assault from other inmates, were insufficient to support a claim for retaliation); *Rivera v. Goord,* 119 F.Supp.2d 327, 340 (S.D.N.Y.2000) (dismissing retaliation claim against defendant who "shoved" an inmate on the ground that the harm was *de minimis* ); *Snyder v. McGinnis,* 2007 WL 3274691 (W.D.N.Y.2007) (alleged filing of false misbehavior report insufficient to support retaliation claim); *Ford v. Phillips,* 2007 WL 946703 (S.D.N.Y.2007) (Retaliation claim dismissed on the grounds that "as a matter of law, minor and temporary deprivations of property, showers and recreation do not violate the Eighth Amendment.").

FN10. Because the Court concludes that the plaintiff's allegations are insufficient to constitute adverse action necessary to maintain a retaliation claim, the Court does not make any findings as to whether the plaintiff has asserted a causal connection between the alleged conduct and any protected activity by the plaintiff.

Thus, the instant motion for summary judgment should be granted to the extent the plaintiff asserts claims of retaliation.

## Conclusion

Based on the above it is recommended that the motion for summary judgment be granted and that the plaintiff's Supplemented Complaint be dismissed in their entirety.

Pursuant to 28 USC § 636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within ten(10) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**Federal Rules of Civil Procedure, as well as WDNY Local Rule 72(a)(3).**

***13 FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT ORDER BY THE DISTRICT COURT ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.** *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *F.D.I.C. v. Hillcrest Associates,* 66 F.3d 566 (2d. Cir.1995); *Wesolak v. Canadair Ltd.,* 838 F.2d 55 (2d Cir.1988); see also 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and WDNY Local Rule 72(a)(3).

Please also note that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. See *Patterson-Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co.,* 840 F.2d 985 (1st Cir.1988).

Finally, the parties are reminded that, pursuant to WDNY Local Rule 72.3(a)(3), "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." ***Failure to comply with the provisions of Rule 72.3(a)(3) may result in the District Court's refusal to consider the objection.***

So Ordered.

W.D.N.Y.,2008.

Suarez v. Kremer
Not Reported in F.Supp.2d, 2008 WL 4239214 (W.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.





Only the Westlaw citation is currently available.

United States District Court,

W.D. New York.
Michelle ALBERTELLI, Plaintiff,
v.
MONROE COUNTY, Patrick O'Flynn, Sheriff, Monroe County; Gary Caiola, Undersheriff, Monroe County Sheriff's Department, Individually and in His Official Capacity; & Dr. Borris Schmigel, Individually and in His Official Capacity, and Robert Bilsky, Individually and in His Official Capacity, Defendants.
No. 09–CV–6039(MAT).

May 22, 2012.
Christina A. Agola, Brighton, NY, for Plaintiff.

Paul D. Fuller, Monroe County Law Department, Litigation Division, Rochester, NY, for Defendants.

**DECISION AND ORDER**

MICHAEL A. TELESCA, District Judge.

**I. Introduction**

***1** Plaintiff Michelle Albertelli ("Albertelli" or "Plaintiff"), represented by counsel, has filed the instant proceeding against the named Defendants charging them with, *inter alia,* violations of the Americans with Disabilities Act ("ADA"), the New York State Human Rights Law ("NYHRL"); and her rights to equal protection, substantive due process, and procedural due process under the United States Constitution. Defendants have filed their First Motion to Dismiss the Complaint (Dkt.# 14) to which Plaintiff has filed opposition papers (Dkt. # 15). For the reasons that follow, the Motion to Dismiss is granted in part and denied in part.

**II. Factual Background**

In the following factual recitation, the Court accepts as true all facts alleged in the complaint and draws all reasonable inferences in favor of the plaintiff. *E.g., Faulkner v. Beer,* 463 F.3d 130, 134 (2d Cir.2006) (citation omitted).

On July 15, 2004, Plaintiff was employed as a Deputy Sheriff at the Monroe County Jail (the Jail), responsible for, *inter alia,* guarding inmates and ensuring that order, discipline, safety, and security were maintained in the Jail. On that date, inmate Louis Delvalle ("Delvalle") and another inmate were involved in verbal altercation at the Jail. Delvalle was outside of his own cell, and the other inmate was inside a locked cell. Plaintiff asked Delvalle to go into his own cell and "lock in". When Delvalle did not immediately comply, Plaintiff took hold of his right arm, and another deputy took hold of Delvalle's left arm so as to escort him out of the cell block and into his own cell. Delvalle swung around suddenly, causing Plaintiff to lose her balance and fall to the floor, dislocating her left shoulder. Plaintiff characterizes the incident as a "violent attack", which Defendants dispute.

Beginning in July 2004, Plaintiff was paid benefits pursuant to New York State General Municipal Law § 207–c. She received these benefits for a period of over three years.

Plaintiff remained out of work until September 2008. During that time, she submitted to three independent medical examinations by Dr. Totero (September 2008), Dr. Auerbach (September 21, 2007), and Dr. Durning (May 8, 2008).

Plaintiff filed for disability retirement on October 31, 2008, as her private physician, Dr. Maloney, deemed her "totally disabled to work ... in large part because she only had use of one arm." Amended Complaint ("Am.Compl."), ¶ 18 (Dkt.# 2). She states that she "has been rendered lame to protect herself or others in the jail-house setting" because she "cannot carry a gun, pepper spray, or even handcuffs" and cannot "assist in the use of force continuum [.]" *Id.,* ¶¶ 20, 21. Due to what she describes as the "violent nature" of the July 15, 2004 "attack in the line of duty that rendered her disabled", Plaintiff "suffers from emotional issues, in particular, depression and anxiety." *Id.,* ¶ 22. She states she is limited

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

to the use of only her right arm. To this day, Plaintiff says, she remains under the care of a rehabilitation specialist and undergoes treatment for the condition in her left upper arm and shoulder.

***2** On October 31, 2008, the date she claims she filed for disability retirement, Defendants ordered her to return to duty on November 3, 2008, at 8 a.m., per in-house physician Dr. Shmigel's orders. Am. Compl., ¶ 26. Plaintiff alleges that the decision to return her to work was made by Undersheriff Gary Caiola ("Undersheriff Caiola"), who "has a pattern and practice of returning disabled [employees in the] Sheriff's Department back to work despite their inability to do so, and without conducting a hearing in violation of Plaintiff's due process rights to her section 207–c benefits." *Id.,* ¶ 27. Plaintiff alleges that Dr. Shmigel and Undersheriff Caiola acted under the directive of Risk Manager Robert J. Bilsky ("Bilsky") pursuant to a policy of cutting costs by returning disabled employees to work. *Id.,* ¶ 28.

"Mysteriously", on the same day that Plaintiff filed for disability retirement and was ordered to return to work, her physician, Dr. Maloney, "was compelled to *change* Plaintiff's diagnosis to read that Plaintiff '[m]ay return to work on 10/31/08' by Dr. Schmigel [sic] ." Am. Compl., ¶ 29 (emphasis in original). Plaintiff's Section 207–c disability benefits were terminated on an unspecified date in November 2008, and she was not afforded a hearing prior to the termination.

On November 24, 2008, Plaintiff sought an accommodation from Defendants to allow her to return to a position which, "at the bare minimum[,] would not require her to pass into the secured portion of the jail and there would be no inmate contact, that she would not utilize her left arm, and that these restrictions would be adhered to, and that she would not be involved in any situation that would place herself or others in danger." *Id.,* ¶ 33.

Plaintiff states that despite the fact she was deemed "unqualified" pursuant to New York law to assist in the use of force continuum, Defendants compelled Plaintiff to report to the Jail in uniform at the "Visits Lobby" front counter. *Id.,* ¶ 34. Plaintiff alleges that a position was available in "Staff Services" which would have removed Plaintiff from the inmate population, but it was never offered to her. *Id.,* ¶ 35.

Plaintiff returned to work at the "Visits Lobby" for a two-week period during which time she was subjected to three incidents in which the use of force was necessary. *Id.,* ¶ 36. Plaintiff describes only two incidents in her Amended Complaint. On December 6, 2008, an inmate entered the "Visits Lobby" front counter and became disruptive, knocking over jail property. *Id.,* ¶ 37. Plaintiff contacted 911 in vain while the inmate stood in close proximity to her, placing her in fear for her safety because she could not defend herself. On December 23, 2008, Plaintiff was confronted, while at work, with a situation in which a male was pointing a gun at a female. Plaintiff could not protect herself or the victim due to her disability which precluded her from carrying a service weapon.

***3** Plaintiff complained to her supervisors that she could not perform the essential functions of her job, and that she felt she was being placed in the untenable position of being forced to quit her job and forego her benefits. Plaintiff's supervisor allegedly took no actions to accommodate her known disabilities and responded, "[W]here do we draw the line?" Am. Compl., ¶ 42.

On December 31, 2008, Plaintiff met with Sheriff's Department Physician Dr. Shmigel who "informed Plaintiff that it was 'out of his hands,' and returned the Plaintiff to work." *Id.,* ¶ 43. Plaintiff's private physician contradicted Dr. Shmigel's finding that Plaintiff was able to return to work, and removed Plaintiff from work due to the failure of the County to accommodate her known disabilities or to comply with the job restrictions she had demanded (i.e., no use-of-force continuum).

On January 3, 2009, Plaintiff was served by Sheriff's Department deputies with a "Return to Work Order" threatening disciplinary action if she did not return to work. On January 5, 2009, Plaintiff's private physician rendered her "totally disabled" due to the Sheriff's Department's lack of adherence to her job restrictions. Dr. Shmigel allegedly continued to contact Plaintiff's doctor to persuade him to alter his medical opinion. Plaintiff's physician refused to take his calls.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Although Plaintiff's Section 207–c benefits were terminated in November 2008, Defendants served her with a notice on January 15, 2009, stating that the County "is seeking to terminate your GML–207–c benefits based upon your refusal to work a light duty assignment for which you have been deemed capable of working" and threatening further disciplinary action "as a result of [her] continued insubordination." Am. Comp., ¶ 49. Plaintiff's counsel advised the County that Plaintiff's Section 207–c benefits had already been terminated.

After being served with the original Complaint in this action, Undersheriff Caiola threatened Plaintiff on February 3, 2009, with insubordination if she did not return to work in her uniform. On February 5, 2009, Plaintiff's treating physician deemed Plaintiff totally disabled until reevaluation on March 12, 2009. The narrative in Plaintiff's Amended Complaint ends at that point.

Plaintiff filed three complaints with the Equal Employment Opportunity Commission ("EEOC"). The first, EEOC # 585–2009–00265, was filed on January 6, 2009, and named Undersheriff Caiola as an Aider and Abettor of violations of the ADA. The EEOC informed Plaintiff that it lacked jurisdiction to investigate her ADA charge because she was not a "qualified individual with a disability" based upon her statements that she "can no longer perform the essential functions of [her] position and that there is no accommodation that will enable [her] to perform the essential functions of a Deputy Sheriff." Def. Ex. A, Dkt. # 14–2. The EEOC issued a dismissal notice and right to sue letter. *Id.*

***4** In the second complaint, EEOC # 525–2009–00326, Plaintiff states that she previously filed an EEOC complaint on January 6, 2009, after which she was served on January 14, 2009 with papers ordering her to report to an Internal Affairs hearing, "in retaliation for having engaged in protected activity under the ADA." Def. Ex. B, Dkt. # 14–3. The EEOC forwarded Plaintiff's request for a right to sue letter to the Unites States Department of Justice. *Id.*

On April 1, 2009, Robert Bilsky, the Monroe County Risk Manager, stated that he was pleased to offer Plaintiff a temporary modified-duty assignment which would accommodate the restrictions her doctors deemed appropriate for her present medical condition. The position would include clerical work, answering phones, data entry, recordkeeping. Plaintiff stated that these "make-work" tasks led to feelings of "incompetency" and "worthlessness"-which were the basis for her third EEOC complaint, discussed below. The modified duty assignment was to continue until July 3, 2009, at which time she would be required to provide an update on her medical condition so that the Sheriff's Department could determine whether her work restrictions should be removed. Plaintiff admitted that she did not work from February 4, 2009, until March 2, 2009, because the Sheriff's Department did not meet her restrictions.

On April 8, 2009, Plaintiff was charged with two insubordination disciplinary actions-one being a violation of rules set forth in Undersheriff Caiola's letter dated February 3, 2009; and the second being her refusal to work in the position she was offered as an accommodation.

On May 13, 2009, Plaintiff alleges, Undersheriff Caiola gave her "an evil eye" until she looked away. On May 12, 2009, Investigator Pat Crow stared her down and gave her "an evil eye".

Plaintiff then filed her third complaint, EEOC # 525–2009–00729, against the Monroe County Sheriff's Department on May 13, 2009. She alleged that she was given the "evil eye" by Undersheriff Caiola and Investigator Crow, was assigned menial work that made her feel worthless, and was issued a memorandum stating she was insubordinate for not reporting to work because of her disability and in retaliation for filing a previous EEOC charge, # 525–2009–00265. The EEOC found that Plaintiff failed to report to work despite her employer's agreement to accommodate her restrictions, which was a non-discriminatory reason for disciplinary action. With regard to her complaints of feeling "worthless", the EEOC stated that her employer was not required to provide her preferred accommodation as long as it provided a reasonable accommodation that met her restrictions. With regard to the "evil eye" allegation, the EEOC found that it

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

was not severe or pervasive, and it did not rise to the level of a hostile work environment. In sum, the EEOC was unable to conclude that the information established a violation of federal law by the Sheriff's Department. The EEOC issued a Notice of Dismissal and a Right to Sue on April 20, 2010.

***5** Defendants state that Plaintiff is currently employed three days a week at Jail Administration and two days a week at Jail Fleet. Prior to that she was assigned to Jail Visitation, which she did not like. She was given a transfer to Booking, which she also did not like. She was transferred to Jail Monitor, which she did not like. According to Defendants, Plaintiff does not like her current assignment in Jail Fleet.

**III. Legal Principles Applicable to a Rule 12(b)(6) Motion to Dismiss**

Defendants' motion seeks dismissal of the complaint pursuant to Fed.R.Civ.P. ("Rule") 12(C). The standards applicable in deciding a motion to dismiss under Rule 12(b)(C) apply in the Rule 12(C) context:

> To sufficiently state a claim to relief and survive a 12(b)(6) motion, a complaint "does not need detailed factual allegations" but the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Mere "labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do." *Id.* Rather, there must be "enough facts to state a claim to relief that is plausible on its face."

*Id.* at 570; *see also* *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal citation and quotation marks omitted).

In deciding whether to grant a motion to dismiss, the court must accept as true all "well-pleaded factual allegations," *Iqbal,* 129 S.Ct. at 1950, and must consider "not only the assertions made within the four corners of the complaint itself, but also those contained in documents attached to the pleadings or in documents incorporated by reference." *Gregory v. Daly,* 243 F.3d 687, 690 (2d Cir.2001); *see* *Austin v. Ford Models, Inc.,* 149 F.3d 148, 152 (2d Cir.1998). In addition, the Court may consider documents that are in the plaintiff's possession or that the plaintiff knew of and relied on in bringing suit. *See* *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47–48 (2d Cir.1991).

**IV. Analysis**

**A. First Cause of Action: Violation of the ADA**

**1. Administrative Exhaustion**

Defendants argue that Plaintiff has failed to exhaust her ADA claim because the EEOC dismissed her complaint on the basis that it lacked jurisdiction to investigate the ADA charge because her "allegations did not involve a disability as defined by the [ADA]." EEOC Dismissal, Defendants' Exhibit ("Def.Ex.") A (quoted in Defendants' Memorandum of Law ("Def.Mem.") at 7 (Dkt. # 14–7)). Plaintiff asserts that she has complied with all relevant procedural conditions precedent to filing this action, but does not directly address whether she is required to exhaust administrative remedies under the ADA. *See* Pl. Mem. at 11 (stating that she need not have filed an EEOC charge prior to commencing an action under 42 U.S.C. § 1983; and that she did not need to name Dr. Shmigel, Bilsky, and Sheriff O'Flynn in the EEOC complaint because there is no individual liability under the ADA as a matter of law).[FN1]

> FN1. Notwithstanding this assertion, Plaintiff did name one individual in her EEOC complaint, Undersheriff Caiola.

***6** "Whether an ADA claim must first be presented to an administrative agency depends on which precise title of the ADA the claim invokes. Title I prohibits employers from discriminating against disabled employees, see 42 U.S.C. § 12112(a), while Title III forbids discrimination " 'on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

accommodations of any place of public accommodation,' *id.* § 12182(a)." *McInerney v. Rensselaer Polytechnic Inst.,* 505 F.3d 135, 138 (2d Cir.2005). Albertelli's claim is brought under Title I of the ADA, 42 U.S.C. § 12112(a), *see* Pl. Mem. at 8 (Dkt.# 15), and therefore exhaustion of administrative remedies is required, *McInerney,* 505 F.3d at 138 (citations omitted).

"[A] plaintiff claiming employment discrimination based upon disability pursuant to Title I of the ADA would be required to exhaust administrative remedies by filing a timely complaint with the EEOC, obtaining a right to sue letter, and commencing suit within 300 days." *Sworn v. Western N.Y. Childrens' Psychiatric Ctr.,* 269 F.Supp.2d 152, 158 n. 4 (W.D.N.Y.2003) (citing 42 U.S.C. § 12117 (applying Title VII administrative procedures to ADA claims); 42 U.S.C. § 2000e–5). Defendants argue that Plaintiff failed to exhaust her remedies with regard to her ADA claim because the EEOC dismissed her first complaint for lack of jurisdiction. However, as Defendants admit, the EEOC did provide Plaintiff with a right to sue letter in connection with her second complaint alleging a violation of the ADA as well as a claim of retaliation. *See* Def. Mem. at 3 (citing Def. Ex. B, EEOC # 525–2009–00326), and Plaintiff timely commenced suit in this Court. Therefore, the Court concludes that Plaintiff has adequately exhausted her administrative remedies with regard to her ADA claim.

**2. The ADA**

The ADA provides in relevant part as follows:

> No covered entity shall discriminate against a *qualified individual* with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a) (emphasis added). A plaintiff alleging employment discrimination under the ADA bears the initial burden of establishing a *prima facie* case. *Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 869 (2d Cir.1998) (citing *Wernick v. Federal Reserve Bank of N.Y.,* 91 F.3d 379, 383 (2d Cir.1996)). Albertelli's ADA claim is of the "failure to reasonably accommodate" variety, which requires that she demonstrate the following elements: (1) her employer is subject to the ADA; (2) she is an individual with a disability within the meaning of the ADA; (3) with or without reasonable accommodation, she could perform the essential functions of the job; and (4) the employer had notice of the employee's disability and failed to provide such accommodation. *E.g., Rodal v. Anesthesia Group of Onondaga, P.C.,* 369 F.3d 113, 118 (2d Cir.2004); *Lyons v. Legal Aid Society,* 68 F.3d 1512, 1515 (2d Cir.1995). Defendants argue that Plaintiff has failed to demonstrate that she fulfills any of the four requirements. *See* Defendants' Memorandum of Law ("Def.Mem.") at 7–13) (Dkt.# 14–7).

**a. Plaintiff is not a qualified individual with a disability.**

***7** "Title I of the ADA ... is only applicable to a 'qualified individual with a disability' which has been defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Bril v. Dean Witter, Discover & Co.,* 986 F.Supp. 171, 172–73 (S.D.N.Y.1997) (footnote omitted) (quoting 42 U.S.C. § 12111(8)) & *id.* n. 2 (citing *Kennedy v. Applause, Inc.,* 90 F.3d 1477, 1480–81 (9th Cir.1996) (citations omitted)). A plaintiff asserting an ADA claim bears the burden of proving that she is a qualified individual with a disability. *See Cleveland v. Policy Management Sys. Corp.,* 526 U.S. 795, 119 S.Ct. 1597, 1603, 143 L.Ed.2d 966 (1999). "Accordingly, where an individual claims that he/she is totally disabled and unable to perform any of the essential functions of his/her job, he/she is not a [qualified individual with a disability] under the ADA." *Muller v. First Unum Life Ins. Co.,* 90 F.Supp.2d 204, 208 (N.D.N.Y.2000) (citing *Violette v. International Bus. Machines Corp.,* 962 F.Supp. 446, 449 (D.Vt.1996), *aff'd,* 116 F.3d 466, 1997 WL 314750 (2d Cir.1997); other citation omitted).

Defendants argue that because Plaintiff has continuously sworn that she was completely disabled, she cannot demonstrate that she is disabled for purposes of the ADA. *See* EEOC Letter & Dismissal, 1/8/09, Def. Ex. A ("You have stated that you can no longer perform the essential function of your position and that there is no accommodation that will enable you to perform the essential functions of a Deputy Sheriff."); *see also* EEOC

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Charges, Def. Exs. B & C (Dkt. # 14). *See* *Bril v. Dean Witter, Discover & Co.,* 986 F.Supp. 171, 175 (S.D.N.Y.1997) (holding that plaintiff "who admittedly was totally disabled at the time her benefits were discontinued" was not a qualified individual with a disability and therefore, could not sue her employer under the ADA).

The Supreme Court has held that "statements made for the purpose of securing disability benefits, describing why the claimant is too disabled to work, do not necessarily bar the disabled individual from claiming in an ADA action that he can perform the essential functions of the job at issue." *Parker v. Columbia Pictures Indus. .,* 204 F.3d 326, 333 (2d Cir.2000) (citing *Cleveland v. Policy Mgmt. Sys. Corp.,* 526 U.S. 795, ––––, 119 S.Ct. at 1602, 143 L.Ed.2d 966). Where an ADA plaintiff has, for example, claimed total disability from working in a different forum, "the court must undertake a fact-specific analysis of whether the claims made in the [earlier] application directly contradict the allegations made in the ADA context." *Id.* (citing *Cleveland,* 526 U.S. at ––––, 119 S.Ct. at 1603). "Where a case involves an apparent conflict between the two sets of statements, the plaintiff must offer some explanation for the inconsistency." *Id.*

Here, Plaintiff has offered no such explanation for the inconsistencies of her statements regarding her level of disability. *See* *Potter v. Xerox Corp.,* No. 00–7470, 1 Fed. Appx. 34, *36, 2001 WL 15617, at ––––1 (2d Cir. Jan.5, 2001) (unpublished opn.) ("Potter has alternately stated-and the record supports-two contradicting propositions: 1) that he is totally disabled and thereby unable to perform any job; and 2) that he can perform any job provided his stress-related problems are resolved by placing him under a new supervisor. Neither proposition brings Potter within the reach of the ADA's protections."). Moreover, her assertion that she was totally disabled and unable to perform her job even *with* reasonable accommodations not made in a different forum or context, as in *Cleveland,* but instead was made in support of her ADA claim presented to the EEOC. *Contrast with* *Cleveland,* 526 U .S. at ––––, ––––, 119 S.Ct. at 1600, 1604 (although the plaintiff's SSDI forms stated at various points that she had "not been able to work since" her termination from her job, that she was "still disabled," and that she was "totally disabled," the Supreme Court accepted the plaintiff's assertion that these statements "were made in a forum which does not consider the effect that reasonable workplace accommodations would have on the ability to work", in contrast to the ADA, which was designed "to guarantee [disabled] individuals equal opportunity" to work by requiring that employers make accommodations where appropriate) (quotation to record omitted).

***8** Plaintiff's sworn averments preclude a finding that she is a qualified individual with a disability for purposes of the ADA. Her inability to establish this necessary element is fatal to her ADA claim. *See* *Muller v. First Unum Life Ins. Co.,* 90 F.Supp.2d 204, 208 (N.D.N.Y.2000) "[T]he amended complaint states that 'Muller remains unable to perform *each* of the material duties of his former regular occupation.' (emphasis in the original). Muller has never claimed that he is capable of working with or without a reasonable accommodation. Muller's failure to establish that he is a [qualified individual with a disability] is fatal to his ADA claim ."). Accordingly, the first cause of action alleging a violation of the ADA is dismissed.

**B. Second Cause of Action: The NYHRL Claim**

Plaintiff contends in her second cause of action that Undersheriff Caiola violated the NYHRL, N.Y. Exec. Law § 296.6, as an "aider and abettor". Executive Law § 296.6 provides that "[i]t shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of the acts forbidden under [the NYHRL], or to attempt to do so." N.Y. EXEC. LAW § 296.6. Defendants argue that Plaintiff failed to serve a timely notice of claim on the County of Monroe in compliance with New York General Municipal Law ("G.M.L.") § 50–e. Plaintiff claims that this argument is misplaced because her third cause of action is pursuant to the equal protection clause, and her fourth through sixth causes of action are pursuant to 42 U.S.C. § 1983. Therefore, Plaintiff argues, according to the Supremacy Clause of the United States Constitution, she did not need to comply with G.M.L. § 50–e.

Defendants also argue that because Monroe County, Sheriff O'Flynn, Dr. Shmigel, and Bilsky were not named

in any of the EEOC complaints or right to sue letters, the NYHRL claims as to them must be dismissed. Plaintiff argues that this is "nonsensical" because she seeks redress under 42 U.S.C. § 1983, and it is well-settled that there can be no individual liability under the ADA as a matter of law. Plaintiff has overlooked that she expressly pleaded a claim under the NYHRL in her second cause of action, and fails to address Defendants' arguments regarding the G.M.L. as applied to the NYHRL claim.

New York General Municipal Law § Section 50–e(1)(a) provides that "[i]n any case founded upon tort where a notice of claim is required by law as a condition precedent to the commencement of an action ... against a public corporation, ... the notice of claim shall ... be served ... within ninety days after the claim arises." N.Y. GENERAL MUNICIPAL LAW § 50–e. G.M.L. § 50–e(1)(b) also states that "[i]f an action or special proceeding is commenced against [an officer, appointee or employee of a public corporation], but not against the public corporation, service of the notice of claim upon the public corporation shall be required only if the corporation has a statutory obligation to indemnify such person under this chapter or any other provision of law." N.Y. GENERAL MUNICIPAL LAW § 50–e. "A public corporation has a statutory obligation to indemnify if the officer, appointee or employee was acting within the scope of his or her employment in committing the alleged tortious acts." *Smith v. Scott,* 294 A.D.2d 11, 19, 740 N.Y.S.2d 425 (2d Dept.2002).

***9** However, the applicability of G.M.L. § 50–e "is confined to tort claims for personal injury, wrongful death, or damage to property and not to torts generally." *Mills v. Monroe County,* 89 A.D.2d 776, 776, 453 N.Y.S.2d 486, 487 (4th Dept.1982) (citing N.Y. GENERAL MUNICIPAL LAW § 50–i(1) ("No action or special proceeding shall be prosecuted or maintained against a city, county, town, village, fire district or school district for personal injury, wrongful death or damage to real or personal property alleged to have been sustained by reason of the negligence or wrongful act ... unless ... a notice of claim shall have been made and served ..."). An action brought under the NYHRL, N.Y. Exec. Law § 296 "is not a tort claim which falls within the notice provisions of the General Municipal Law." *Mills,* 453 N.Y.S.2d at 487. Nonetheless, Albertelli's second cause of action must be dismissed for failure to comply with the applicable notice of claim requirement.

Section 52 of the New York County Law requires a notice of claim to be served, in compliance with G.M.L. § 50–e, upon a county in any "claim for damages arising at law or in equity, alleged to have been caused or sustained in whole or in part by or because of any misfeasance, omission of duty, negligence or wrongful act on the part of the county, its officers, agents, servants or employees ..." Plaintiff's action seeks money damages for the alleged wrongful acts of Monroe County and the Monroe County Sheriff's Department and its employees. Her conceded failure to file the requisite notice of claim within 90 days after her claim accrued bars her action. *See Mills,* 453 N.Y.S.2d at 487 (dismissing plaintiff's action for money damages alleging wrongful discharge (racial discrimination) from employment by defendant in violation of the NYHRL, N.Y. Exec. Law § 296 due to plaintiff's failure to file a timely notice of claim pursuant to G.M.L. § 50–e and N.Y. County Law § 52) (citations omitted). The second cause of action alleging a violation of the NYHRL accordingly is dismissed.

**C. Third Cause of Action: Equal Protection and Due Process**

Plaintiff asserts that Defendants violated her right to procedural due process under the Fourteenth Amendment by denying her benefits under G.M.L. § 207–c without a hearing. In addition, Plaintiff asserts in the Amended Complaint that "in particular" her rights under the Equal Protection Clause were violated by the deprivation of an administrative hearing. *Id.,* ¶ 69, 453 N.Y.S.2d 486.[FN2]

FN2. This citation refers to the second "¶ 69" on page 11 of the Amended Complaint.

Although Plaintiff's Amended Complaint contains allegations reciting the legal standard applicable to a *substantive* due process claim (as opposed to a *procedural* due process claim) (e.g., she claims that the deprivation of her due process rights was "egregious and shocking to the conscience", Am. Comp., ¶ 69), Plaintiff expressly states in her opposition papers that she is *not* asserting a substantive due process claim. Therefore, the Court analyzes Defendants' motion to dismiss in relation to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Plaintiff's equal protection and procedural due process claims.

**1. Equal Protection**

***10** The Equal Protection Clause requires that the government treat all similarly situated people alike. *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Although the Amended Complaint is far from clear on this point, it appears that Albertelli is claiming that the termination of her G.M.L. § 207–c z benefits without a hearing violated her right to equal protection of the laws. Such a claim would have to be based upon the "class of one" equal protection doctrine, which provides that a successful equal protection claim can be brought by a "class of one," "where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Analytical Diagnostic Labs, Inc. v. Kusel,* 626 F.3d 135, 140 (2d Cir.2010) (internal quotation marks omitted).

In 2008, the United States Supreme Court held that "the class-of-one theory of equal protection does not apply in the public employment context." *Engquist v. Oregon Dept. of Agr.,* 553 U.S. 591, 128 S.Ct. 2146, 170 L.Ed.2d 975 (2008). Here, Plaintiff is a public employee challenging a decision made by her employer, and *Engquist* controls. *See, e.g., Appel v. Spiridon,* 531 F.3d 138, 139–40 (2d Cir.2008) (*per curiam* ) (holding that, in light of *Engquist,* "the Equal Protection Clause does not apply to a public employee asserting a violation of the Clause based on a 'class of one' theory of liability"); *Gentile v. Nulty,* 769 F.Supp.2d 573, S.D.N.Y.2011) (dismissing, pursuant to *Engquist,* equal protection claim brought by police officer alleging erroneous decision by his employer that he was no longer eligible for G.M.L. § 207–c benefits). Plaintiff's third cause of action, to the extent it alleges an equal protection violation, is dismissed.

**2. Procedural Due Process**

"Pursuant to General Municipal Law § 207–c, municipalities meeting certain population criteria are directed to pay continued salary or wages to officers who sustain a disability in the course of their employment." *Park v. Kapica,* 8 N.Y.3d 302, 310, 832 N.Y.S.2d 885, 864 N.E.2d 1284 (2007). The continued receipt of G.M.L. § 207–c disability payments is "not absolute", and a "municipality is entitled to its own medical examination of its employee [.]" *Id.* (citing N.Y. GENERAL MUNICIPAL LAW § 207–c(1)). If the municipality's physician's opinion is that the officer can perform "specified types of light police duty," payment of the full amount of salary or wages may be discontinued should the officer refuse to return to work if a light-duty assignment "is available and offered to him". *Id.* (citing N.Y. GENERAL MUNICIPAL LAW § 207–c (3)).

The right of a disabled public employee to receive disability payments under G.M.L. § 207–c constitutes "a property interest giving rise to procedural due process protection, under the Fourteenth Amendment, before those benefits are terminated[.]" *Matter of Uniform Firefighters of Cohoes, Local 2562, IAFF, AFL–CIO v. City of Cohoes,* 94 N.Y.2d 686, 691, 709 N.Y.S.2d 481, 731 N.E.2d 137 (2000) (*"Uniform Firefighters of Cohoes"* ). Accordingly, the right to a "due process hearing is triggered when an officer on section 207–c status submits evidence from his treating physician supporting the officer's claim of 'continued total disability[.]' " *Park,* 8 N.Y.3d at 310, 832 N.Y.S.2d 885, 864 N.E.2d 1284 (quoting *Uniform Firefighters of Cohoes,* 94 N.Y.2d at 692, 709 N.Y.S.2d 481, 731 N.E.2d 137 (pursuant to the analogous provision G.M.L. § 207–a, firefighters who contest a light-duty determination are entitled to a due process hearing)).

***11** Although the Defendants entirely failed to address Plaintiff's procedural due process claim in their motion to dismiss, discussing only her equal protection and substantive due process claims, the Court concludes that Albertelli's complaint adequately pleads a cause of action alleging a procedural due process violation. Plaintiff alleges that her disability benefits issued pursuant to G .M.L. § 207–c were discontinued without her first receiving a hearing. Therefore, Defendants' motion to dismiss plaintiff's due process claim is denied.

**D. Fourth Cause of Action: Civil Rights Conspiracy**

Plaintiff contends in the Amended Complaint that Undersheriff Caiola, Dr. Shmigel, and Bilsky conspired to violate her civil rights in violation of 42 U.S.C. § 1983. As

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Defendants point out, the claim should be asserted under 42 U.S.C. § 1985, which specifically applies to alleged conspiracies. *E.g., Webb v. Goord,* 340 F.3d 105, 111 (2d Cir.2003).

In order to maintain an action under § 1985, "a plaintiff 'must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end.' " *Id.* (quoting *Romer v. Morgenthau,* 119 F.Supp.2d 346, 363 (S.D.N.Y.2000) (citations omitted)). Plaintiff alleges that Undersheriff Caiola, Dr. Shmigel, and unidentified "others" "procured through coercion and pressure the denial of Plaintiff's § 207–c benefits without a hearing upon the directive from ... Bilsky to return all disabled workers to work to save on costs"; "compelled Plaintiff back to work without compelling medical evidence, and disregarded the evidence of Plaintiff's treating physician and/or compelled Plaintiff's treating physician to alter his medical findings ...."; and "placed Plaintiff in a precarious position at work, forcing here to were a uniform in a jail setting with no ability to use any defensive measures to protect herself ...." Am. Compl., ¶¶ 75(A)-(C) (Dkt.# 2).

The Court concludes that Plaintiff has "not alleged, except in the most conclusory fashion, that any such meeting of the minds occurred among any or all of the defendants." *Webb,* 340 F.3d at 111. Her "conspiracy allegation must therefore fail." *Id.* (citing *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (dismissal of "conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights" is proper)); *see also Warren v. Fischl,* 33 F.Supp.2d 171, 177 (E.D.N.Y.1999) (finding plaintiff's allegation of conspiracy insufficient despite specific claims of conspiracy to alter tapes and create illegal search warrants, as there was no basis for the assertion that defendants actually conspired together to bring about these actions); *Hickey–McAllister v. British Airways,* 978 F.Supp. 133, 139 (E.D.N.Y.1997) (mere allegations that defendants' actions were committed "in furtherance of a conspiracy" were not enough, as "plaintiff has alleged no facts at all from which a meeting of the minds between [defendants] on a course of action intended to deprive plaintiff of her constitutional rights can be inferred") (citing *San Filippo v. United States Trust Co. of N.Y.,* 737 F.2d 246, 256 (2d Cir.1984)). Plaintiff's fourth cause of action accordingly is dismissed.

**E. Fifth Cause of Action: Supervisor's Liability**

***12** Plaintiff's fifth cause of action titled "42 U.S.C. § 1983 Supervisory Liability" is brought against Sheriff Patrick O'Flynn, whom she alleges allowed Undersheriff Caiola, Dr. Shmigel, and Bilsky, to "act[ ] with impunity in an environment in which they were not trained, supervised, or disciplined...." Am. Compl., ¶ 78 (Dkt.# 2). Defendants' memorandum of law does not specifically address the Fifth Cause of Action against Sheriff O'Flynn, but instead treats the Fifth Cause of Action as essentially duplicative of the Sixth Cause of Action alleging municipal liability against Monroe County. *See* Def. Mem. at 22–25 (Dkt.# 14–7). They are legally distinct, however.

Under section 1983 only a defendant who "personally 'subjects, or causes to be subjected' any person to the deprivation of any federal right will be held liable. Accordingly, 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Dove v. Fordham University,* 56 F.Supp.2d 330, 336 (S.D.N.Y.1999) (quoting *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986)).

Plaintiff's allegations against Sheriff O'Flynn appear to be based entirely on his position at the top of the chain-of-command. However, a "plaintiff cannot base liability solely on [the defendant]'s supervisory capacity or the fact that he held the highest position of authority" within the relevant governmental agency or department. *Burgess v. Morse,* 259 F.Supp.2d 240, 248 (W.D.N.Y.2003) (citing *inter alia, Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996) ("[A] defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority.") (citations omitted)).

The Amended Complaint alleges that Sheriff O'Flynn provided "grossly inadequate training, supervision and discipline" of Undersheriff Caiola, Dr. Shmigel, and Bilsky, which caused them to deprive Plaintiff of her "clearly established constitutional rights, including her right to be free from the deprivation of property without due process of law", *see* Am. Compl., ¶ 79; and that "no

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

reasonable police supervisor in 2009 would have believed that grossly negligent, reckless and deliberately indifferent supervision in the face of actual or constructive notice of misconduct by subordinates such as Bilsky, Caiola or Schmigel [sic] was lawful", *see id.,* ¶ 80. Other than these conclusory allegations, however, there is no factual basis established to demonstrate Sheriff O'Flynn's personal involvement in the alleged constitutional violations. The fifth cause of action accordingly is dismissed. *See Black,* 76 F.3d at 75 ("Since there was no indication in the present case that Coughlin had any role in the proceedings concerning Black, the dismissal of Black's claim against Coughlin was proper."); *Houghton v. Cardone,* 295 F.Supp.2d 268, 276 (W.D.N.Y.2003) (complaint alleging that defendant sheriff (1) failed to adequately train or supervise the officers; (2) knew about and tolerated the officers' allegedly unlawful behavior; and (3) "failed to institute a proper system of review and reprimand" of his deputies so as to prevent the types of unlawful acts alleged was too conclusory to establish defendant's personal involvement). Plaintiff's fifth cause of action accordingly is dismissed.

**F. Sixth Cause of Action: Municipal Liability**

***13** For her sixth cause of action, Plaintiff alleges that "[t]hrough the deliberate indifference of its final policy maker for the Monroe County Sheriff's Office, defendant Patrick O'Flynn, [sic] intentionally, maliciously, and with reckless disregard for and deliberate indifference to Plaintiff's rights, created and maintained an unconstitutional official custom, practice, or policy, by participating in the denial of due process upon the directive of Robert J. Bilsky, Risk Manager for the County of Monroe." Am. Compl ., ¶ 83 (Dkt.# 2). A municipality is subject to liability for damages under 42 U.S.C. § 1983 when an official municipal policy or custom contributes to a constitutional deprivation. *See Monell v. Department of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ("[W]hen execution of a government's policy or custom ... inflicts [an] injury ... the government as an entity is responsible under § 1983."). The "policy or custom" requirement "is intended simply to distinguish acts of the municipality from acts of its employees, in order that municipal liability be limited to conduct for which the municipality is actually responsible." *Dangler v. New York City Off Track Betting Corp.,* 193 F.3d 130, 142 (2d Cir.1999) (citing *Pembaur v. City of Cincinnati,* 475 U.S. 469, 478–80, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)). A plaintiff must establish that an identified municipal policy or practice was the "moving force [behind] the constitutional violation." *Monell,* 436 U.S. at 694.

Defendants contend that Plaintiff has "fail[ed] to plead, in any fashion, the existence of any municipal policy which caused Monroe County Employees to allegedly violate Plaintiff's constitutional rights." Def. Mem. at 22 (Dkt. # 14–7). Plaintiff argues in her opposition papers that her rights were deprived "not as a result of the enforcement of an unconstitutional official policy or ordinance, but by the unconstitutional application of a valid policy, or by a [municipal] employee's single tortious decision or course of action," Pl. Mem. at 15 (quoting *Amnesty Am. v. Town of West Hartland,* 361 F.3d 113, 126 (2d Cir.2004)). Plaintiff's Amended Complaint alleges that the constitutionally offensive policy was that of "returning disabled employees back to work without competent medical evidence in an attempt to compel them to quit their positions with the County, and depriving them of their property interest in [G.M.L.] § 207–c benefits without due process in the form of a hearing, and in returning otherwise disabled persons to work upon the directive of Robert J. Bilsky." Am. Compl ., ¶ 84.

Keeping in mind that the Court has not yet dismissed the procedural due process cause of action relating to the termination of Plaintiff's G.M.L. § 207–c benefits, the Court finds that the *Monell* allegations quoted above state "enough facts to state a claim to relief that is plausible on its face," *Twombly,* 550 U.S. at 570. They are therefore sufficient to avoid dismissal.

**IV. Conclusion**

***14** The first, second, fourth, and fifth causes of action are dismissed in their entirety for the reasons stated above. The third cause of action is dismissed to the extent that it alleges a violation of the equal protection clause. The allegations in support of the procedural due process claim in the third cause of action are sufficient to withstand a motion to dismiss, and, moreover, Defendants

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

did not address the due process cause of action in their motion. Finally, the allegations of municipal liability in the sixth cause of action are sufficient to withstand a motion to dismiss the complaint.

**V. Orders**

Accordingly, it is hereby

ORDERED that the first cause of action alleging a violation of the ADA is dismissed; and it is further

ORDERED that the second cause of action alleging a violation of the NYHRL is dismissed; and it is further

ORDERED that the third cause of action, to the extent it alleges a violation of the equal protection clause, is dismissed; and it is further

ORDERED that the third cause of action, to the extent it alleges a violation of procedural due process, may proceed; and it is further

ORDERED that the fourth cause of action alleging conspiracy under 42 U.S.C. § 1985 is dismissed; and it is further

ORDERED that the fifth cause of action alleging supervisor's liability is dismissed; and it is further

ORDERED that the sixth cause of action alleging municipal liability may proceed

**ALL OF THE ABOVE IS SO ORDERED.**

W.D.N.Y.,2012.

Albertelli v. Monroe County
Slip Copy, 2012 WL 1883355 (W.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.





C

United States District Court,
E.D. New York.
Anthony PRICE, Plaintiff,
v.
Sheriff Edward REILLY, Kim Edwards, RN III, Perry Intal, Mary Sullivan, RN, Dr. Benjamin Okonta, MD, and Nassau University Medical Center, Defendants.
**No. 07-CV-2634 (JFB)(ARL).**

March 8, 2010.

**Background:** Pro se inmate, who suffered from end stage renal disease requiring dialysis, filed § 1983 action against sheriff, nurse practitioner, physician, and medical center, alleging violations of the Eighth Amendment for defendants' failure to provide adequate medical care. Defendants moved for summary judgment.

**Holdings:** The District Court, Joseph F. Bianco, J., held that:
(1) there was no evidence that administrative remedy was available to inmate;
(2) prison medical staff's modification of inmate's medication dosage did not constitute deliberate indifference to his medical needs;
(3) prison's failure to provide food with inmate's medication was not sufficiently serious to satisfy objective prong of test for deliberate indifference to serious medical needs;
(4) medical staff did not act with culpable intent to consciously disregard inmate's serious medical needs;
(5) genuine issue of material fact as to whether prison medical staff was aware of, and consciously disregarded inmate's request for a kidney transplant test precluded summary judgment;
(6) genuine issue of material fact as to whether inmate's shoulder pain was a serious medical condition precluded summary judgment;
(7) sheriff was not liable under § 1983; but
(8) genuine issues of material fact precluded summary judgment on § 1983 liability of registered nurse and doctor.

Motion granted in part and denied in part.

West Headnotes

**[1] Federal Civil Procedure 170A 2547.1**

170A Federal Civil Procedure
170AXVII Judgment
170AXVII(C) Summary Judgment
170AXVII(C)3 Proceedings
170Ak2547 Hearing and Determination
170Ak2547.1 k. In general. Most Cited Cases

Generally, plaintiffs' failure to respond or contest facts set forth by defendants in their statement of facts, submitted in support of summary judgment, constitutes admission of those facts, and facts are accepted as undisputed under local rule. U.S.Dist.Ct.Rules S.D.N.Y., Civil Rule 56.1.

**[2] Federal Civil Procedure 170A 25**

170A Federal Civil Procedure
170AI In General
170AI(B) Rules of Court in General
170AI(B)1 In General
170Ak25 k. Local rules of District Courts. Most Cited Cases

District court has broad discretion to determine whether to overlook a party's failure to comply with local court rules.

**[3] Federal Civil Procedure 170A 2547.1**

170A Federal Civil Procedure
170AXVII Judgment
170AXVII(C) Summary Judgment
170AXVII(C)3 Proceedings
170Ak2547 Hearing and Determination
170Ak2547.1 k. In general. Most Cited

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Cases
District court, when analyzing motion for summary judgment by sheriff and medical personnel in inmate's pro se action alleging cruel and unusual punishment, would treat as admitted only those facts in defendants' statement of facts that were supported by admissible evidence and not controverted by other admissible evidence in the record, given that inmate was acting pro se, he failed to file and serve a response to defendant's statement, but he had identified arguments and factual assertions in statement with which he disagreed. U.S.C.A. Const.Amend. 8; U.S.Dist.Ct.Rules S.D.N.Y., Civil Rule 56.1.

**[4] Federal Civil Procedure 170A 657.5(1)**

170A Federal Civil Procedure
170AVII Pleadings and Motions
170AVII(A) Pleadings in General
170Ak654 Construction
170Ak657.5 Pro Se or Lay Pleadings
170Ak657.5(1) k. In general. Most Cited Cases
Court must construe pro se complaint broadly, and interpret it to raise the strongest arguments that it suggests.

**[5] Attorney and Client 45 62**

45 Attorney and Client
45II Retainer and Authority
45k62 k. Rights of litigants to act in person or by attorney. Most Cited Cases

**Federal Civil Procedure 170A 657.5(1)**

170A Federal Civil Procedure
170AVII Pleadings and Motions
170AVII(A) Pleadings in General
170Ak654 Construction
170Ak657.5 Pro Se or Lay Pleadings
170Ak657.5(1) k. In general. Most Cited Cases

**Federal Civil Procedure 170A 2546**

170A Federal Civil Procedure
170AXVII Judgment
170AXVII(C) Summary Judgment
170AXVII(C)3 Proceedings
170Ak2542 Evidence
170Ak2546 k. Weight and sufficiency.
Most Cited Cases
Though pro se litigant's pleadings and other submissions are afforded wide latitude, pro se party's conclusory assertions, completely unsupported by evidence, are not sufficient to defeat motion for summary judgment.

**[6] Civil Rights 78 1304**

78 Civil Rights
78III Federal Remedies in General
78k1304 k. Nature and elements of civil actions.
Most Cited Cases
To prevail on a claim under § 1983, a plaintiff must show: (1) deprivation of any rights, privileges, or immunities secured by the Constitution and its laws, (2) by a person acting under the color of state law. 42 U.S.C.A. § 1983.

**[7] Prisons 310 317**

310 Prisons
310II Prisoners and Inmates
310II(H) Proceedings
310k316 Exhaustion of Other Remedies
310k317 k. In general. Most Cited Cases
In order to determine if prisoner exhausted his administrative remedies prior to commencement of lawsuit, as required by PLRA, court must first establish from a legally sufficient source that an administrative remedy is applicable, and that the particular complaint does not fall within an exception. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

**[8] Prisons 310 313**

310 Prisons

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

310II Prisoners and Inmates
310II(H) Proceedings
310k307 Actions and Litigation
310k313 k. Trial. Most Cited Cases

Whether administrative remedy was available to prisoner in a particular prison or prison system, and whether such remedy was applicable to grievance underlying prisoner's suit, for purpose of PLRA's exhaustion requirement, are not questions of fact; rather, such issues either are, or inevitably contain, questions of law. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

**[9] Civil Rights 78 1319**

78 Civil Rights
78III Federal Remedies in General
78k1314 Adequacy, Availability, and Exhaustion of State or Local Remedies
78k1319 k. Criminal law enforcement; prisons. Most Cited Cases

Sheriff and prison medical staff provided no evidence that an administrative remedy was available to inmate who suffered from end state renal disease, and who sought, but did not receive, medical testing to determine if he was a candidate for kidney transplant, and thus inmate's § 1983 action alleging violations of Eighth Amendment would not be dismissed for his failure to exhaust administrative remedies under PLRA; defendants failed to establish procedural framework for grievance resolution at the prison or the availability of any administrative remedies for prisoner's situation. U.S.C.A. Const.Amend. 8; Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

**[10] Sentencing and Punishment 350H 1533**

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1533 k. Deliberate indifference in general. Most Cited Cases

Test for determining whether prison official's actions or omissions rise to level of "deliberate indifference" in violation of the Eighth Amendment, as will allow recovery by prisoner in federal civil rights action, is twofold: first, prisoner must demonstrate that he is incarcerated under conditions posing substantial risk of serious harm, and second, prisoner must demonstrate that defendant prison officials possessed sufficient culpable intent. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[11] Sentencing and Punishment 350H 1533**

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1533 k. Deliberate indifference in general. Most Cited Cases

Second prong of test for determining whether prison officials acted with deliberate indifference to rights of prisoners in violation of the Eighth Amendment, that of "culpable intent," in turn involves two-tier inquiry; specifically, prison official has sufficient culpable intent if he has knowledge that inmate faces substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate harm. U.S.C.A. Const.Amend. 8.

**[12] Sentencing and Punishment 350H 1546**

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1546 k. Medical care and treatment. Most Cited Cases

Mere fact that an inmate's underlying disease is a "serious medical condition" does not mean that prison staff's allegedly incorrect treatment of that condition automatically poses an "objectively serious health risk," in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8.

**[13] Prisons 310 192**

310 Prisons
310II Prisoners and Inmates
310II(D) Health and Medical Care
310k191 Particular Conditions and Treatments
310k192 k. In general. Most Cited Cases

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**Sentencing and Punishment 350H 1546**

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1546 k. Medical care and treatment. Most Cited Cases
Even though inmate's end stage renal disease requiring dialysis was serious medical condition, prison medical staff did not act with deliberate indifference to inmate's medical needs in violation of his Eighth Amendment rights by modifying his medication dosage, since reduction in medication levels posed no objectively serious health risk to inmate; only injury inmate suffered was an increase in phosphorous levels, which was correctable, and a slight rash. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[14] Prisons 310 192**

310 Prisons
310II Prisoners and Inmates
310II(D) Health and Medical Care
310k191 Particular Conditions and Treatments
310k192 k. In general. Most Cited Cases

**Sentencing and Punishment 350H 1546**

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1546 k. Medical care and treatment. Most Cited Cases
Even though inmate's prescriptions indicated that his medications for renal disease were to be taken with meals, prison officials' failure to provide food with the medication was not sufficiently serious to satisfy objective prong of test for deliberate indifference to inmate's serious medical needs, in violation of Eighth Amendment; inmate did not suffer any harm from taking medicine without food. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[15] Sentencing and Punishment 350H 1546**

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1546 k. Medical care and treatment. Most Cited Cases
An inmate's mere disagreement with prison officials' prescribed medication dosage is insufficient as a matter of law to establish officials' "deliberate indifference" to his medical needs, in violation of the Eighth Amendment. U.S.C.A. Const.Amend. 8.

**[16] Prisons 310 192**

310 Prisons
310II Prisoners and Inmates
310II(D) Health and Medical Care
310k191 Particular Conditions and Treatments
310k192 k. In general. Most Cited Cases

**Sentencing and Punishment 350H 1546**

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1546 k. Medical care and treatment. Most Cited Cases
Even though inmate disagreed with medical treatment he received at prison, medical staff did not act with culpable intent to consciously disregard inmate's serious medical needs, in violation of his Eighth Amendment rights, by adjusting the dosage levels of his prescription medication for renal disease; dosage inmate received adequately treated his condition, he suffered no injury from modification of dosage other than increased phosphorous levels, and officials changed dosage to correct those levels. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[17] Federal Civil Procedure 170A 2491.5**

170A Federal Civil Procedure
170AXVII Judgment
170AXVII(C) Summary Judgment
170AXVII(C)2 Particular Cases
170Ak2491.5 k. Civil rights cases in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

general. Most Cited Cases
Genuine issue of material fact as to whether prison medical staff was aware of, and consciously disregarded inmate's request for a kidney transplant test, precluded summary judgment in inmate's § 1983 action alleging officials' deliberate indifference to his medical needs, in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[18] Sentencing and Punishment 350H 1546**

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1546 k. Medical care and treatment. Most Cited Cases
An inmate's chronic pain can constitute a "serious medical condition" for purposes of claim of deliberate indifference to a serious medical need under the Eighth Amendment. U.S.C.A. Const.Amend. 8;.

**[19] Federal Civil Procedure 170A 2491.5**

170A Federal Civil Procedure
170AXVII Judgment
170AXVII(C) Summary Judgment
170AXVII(C)2 Particular Cases
170Ak2491.5 k. Civil rights cases in general. Most Cited Cases
Genuine issue of material fact as to whether inmate's shoulder pain was a serious medical condition, and whether prison medical staff acted with deliberate indifference by failing to prescribe pain medication or take x-rays, despite inmate's ongoing complaints, precluded summary judgment, in inmate's § 1983 Eighth Amendment claims against medical staff. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[20] Civil Rights 78 1355**

78 Civil Rights
78III Federal Remedies in General
78k1353 Liability of Public Officials
78k1355 k. Vicarious liability and respondeat superior in general; supervisory liability in general. Most Cited Cases
Supervisor liability in § 1983 action can be shown in one or more of the following ways: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring. 42 U.S.C.A. § 1983.

**[21] Civil Rights 78 1358**

78 Civil Rights
78III Federal Remedies in General
78k1353 Liability of Public Officials
78k1358 k. Criminal law enforcement; prisons. Most Cited Cases
Sheriff was not liable under § 1983 for alleged deliberate indifference to medical needs of inmate related to inmate's end stage renal disease or chronic shoulder pain; there was no showing that sheriff was personally involved in denying medical treatment to inmate, or that there was a custom or policy at prison of allowing alleged constitutional violations. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[22] Federal Civil Procedure 170A 2491.5**

170A Federal Civil Procedure
170AXVII Judgment
170AXVII(C) Summary Judgment
170AXVII(C)2 Particular Cases
170Ak2491.5 k. Civil rights cases in general. Most Cited Cases
Genuine issue of material fact as to whether registered nurse on prison medical staff was personally involved in prison's alleged failure to arrange for inmate's kidney transplant test precluded summary judgment in inmate's § 1983 action alleging officials' deliberate indifference to his medical needs, in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**[23] Civil Rights 78 1358**

78 Civil Rights
78III Federal Remedies in General
78k1353 Liability of Public Officials
78k1358 k. Criminal law enforcement; prisons. Most Cited Cases

If prison doctor denies medical treatment to an inmate, that doctor is "personally involved" in alleged constitutional violation for purposes of § 1983 liability. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[24] Federal Civil Procedure 170A 2491.5**

170A Federal Civil Procedure
170AXVII Judgment
170AXVII(C) Summary Judgment
170AXVII(C)2 Particular Cases
170Ak2491.5 k. Civil rights cases in general. Most Cited Cases

Genuine issue of material fact as to whether doctor denied medical treatment to inmate suffering from end stage renal disease, precluded summary judgment in inmate's § 1983 action alleging prison officials' deliberate indifference to his medical needs, in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

***347** Anthony Price, pro se.

Edward J. Troy, Law Office of Edward J. Troy, Greenlawn, NY, for the Defendants.

***348** MEMORANDUM AND ORDER

JOSEPH F. BIANCO, District Judge:

*Pro se* plaintiff Anthony Price (hereinafter "Price" or "plaintiff") alleges, pursuant to 42 U.S.C. § 1983, that Sheriff Edward Reilly, Kim Edwards, RN, Perry Intal, Mary Sullivan, RN, Dr. Benjamin Okonta, and Nassau University Medical Center (hereinafter "defendants") violated his Eighth Amendment rights by acting with deliberate indifference to his serious medical needs while plaintiff was incarcerated at the Nassau County Correctional Center (hereinafter "NCCC"). Specifically, plaintiff alleges that defendants: (1) prescribed an incorrect dosage of medication for his renal disease; (2) failed to get him tested for a kidney transplant list; and (3) failed to adequately treat him for shoulder pain. Defendants have moved for summary judgment on all of plaintiffs' claims. For the reasons set forth below, defendants' motion is granted in part and denied in part. Specifically, defendants' motion is granted with respect to plaintiff's claim regarding the dosage of his prescription medication and with respect to all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects.

I. FACTS

[1][2][3] The Court has taken the facts set forth below from the parties' depositions, affidavits, and exhibits, and from the defendants' Rule 56.1 statement of facts.[FN1] They are not findings of fact by the Court, but rather are assumed to be true for the purposes of deciding this motion. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party-here, the plaintiff. *See Capobianco v. City of New York,* 422 F.3d 47, 50 n. 1 (2d Cir.2005). Unless otherwise noted, where a party's 56.1 statement or deposition is cited, that fact is undisputed or the opposing party has pointed to no evidence in the record to contradict it.

FN1. The Court notes that plaintiff failed to file and serve a response to defendants' Local Rule 56.1 Statement of Facts in violation of Local Civil Rule 56.1. Generally, a "plaintiff['s] failure to respond or contest the facts set forth by the defendants in their Rule 56.1 statement as being undisputed constitutes an admission of those facts, and those facts are accepted as being undisputed." *Jessamy v. City of New Rochelle,* 292 F.Supp.2d 498, 504 (S.D.N.Y.2003) (quoting *NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.,* 262 F.Supp.2d 134, 139 (S.D.N.Y.2003)). However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (citations omitted); *see*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*also* *Giliani v. GNOC Corp.,* No. 04 Civ. 2935(ILG), 2006 WL 1120602, at *2 (E.D.N.Y. Apr. 26, 2006) (exercising court's discretion to overlook the parties' failure to submit statements pursuant to Local Civil Rule 56.1). In his opposition papers, plaintiff identifies defendants' arguments and factual assertions with which he disagrees. In the exercise of its broad discretion, and given plaintiff's *pro se* status, the Court will deem admitted only those facts in defendants' Rule 56.1 statement that are supported by admissible evidence and not controverted by other admissible evidence in the record. *See* *Jessamy,* 292 F.Supp.2d at 504-05. Furthermore, the Court has carefully reviewed all of the parties' submissions, including plaintiff's deposition, to determine if plaintiff has any evidence to support his claims.

A. Arrival at NCCC and Medication

Plaintiff was incarcerated in the Nassau County Correctional Center from January 7, 2007 to December 11, 2007. (Price Dep. at 6, 35.) Plaintiff has end stage renal disease and has been on dialysis since 2004 related to kidney failure. (*Id.* at 10; Defs.' 56.1 ¶ 2.) Plaintiff takes two daily medications, Renagel and PhosLo, for this condition. (Price Dep. at 10.) Before arriving***349** at the NCCC,[FN2] plaintiff was taking two 800 milligram pills of Renagel three times a day and two 667 milligram pills of PhosLo three times a day. (*Id.* at 12-13.)

FN2. Plaintiff was incarcerated at the Elmira correctional facility in 2005 and 2006. (Price Dep. at 7-8.)

When plaintiff arrived at the NCCC, he was interviewed by Perry Intal, a nurse practitioner in the medical intake department. (*Id.* at 21-22.) Plaintiff told Intal about his medical history, including that he was a dialysis patient and that he took medications. (*Id.* at 22.) Plaintiff was given a prescription for one 800 milligram pill of Renagel two times a day and one 667 milligram pill of PhosLo two times a day. (*Id.* at 23-24.) Two or three weeks later, plaintiff went to dialysis treatment and a blood test revealed high phosphorous levels. (*Id.* at 25-26.) As a result, plaintiff was given an increased dosage of medication. (*Id.* at 25-27.) Thereafter, plaintiff's phosphorous levels decreased and about one month later (*id.* at 30-31), his dosage was decreased to one 800 milligram pill of Renagel three times a day and two 667 milligram pills of PhosLo three times a day. (*Id.* at 31-33.) This was the dosage plaintiff received for the rest of his incarceration at the NCCC.[FN3] (*Id.* at 32-33.) Plaintiff believed that the dosage he was receiving was "wrong" and that it was "hurting" him. (*Id.* at 59-60.) However, the more plaintiff complained about the dosage hurting him, "the more it seemed like the people got aggravated." (*Id.* at 60.) In addition, plaintiff's prescriptions for Renagel and PhosLo indicate that the medications were to be taken with meals. (*See* Defs.' Ex. E.) Plaintiff alleges, however, that the medications were sometimes given to him without food or at times that interfered with his meals. (Price Dep. at 23, 60.)

FN3. Plaintiff testified that, at the time of his deposition, he was receiving two 800 milligram pills of Renagel three times a day and two 667 milligram pills of PhosLo three times a day at the Fishkill correctional facility. (Price Dep. at 11-12.)

Besides receiving medication, plaintiff also received dialysis treatment three times a week at the Nassau University Medical Center. (*Id.* at 30.) On some occasions, plaintiff refused dialysis treatment because he "was feeling good" and "wanted to take a break" from treatment. (*Id.* at 56.) Plaintiff's regular medical treatment at the hospital also included a blood test every 30 days. (*Id.* at 27-28, 30.)

B. Kidney Transplant Request

In February or March 2007, plaintiff spoke with a social worker named "Susan" about getting tested for a kidney transplant. (*Id.* at 76.) A test was required before an inmate could be placed on a waiting list for kidney transplants. (*Id.* at 80-81.) Only two hospitals in the area dealt with such matters: Stony Brook and a hospital in Westchester County. (*Id.* at 75-76.) Susan tried to contact Dr. Benjamin Okonta (hereinafter "Okonta") at Nassau University Medical Center in or about February or March

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

2007 (*id.* at 76-77), but Susan told plaintiff that Okonta did not get back to her.[FN4] (*Id.* at 65-66, 74-78.) Susan also submitted a letter to Okonta in July 2007, stating: "As per our conversation on 7/27/07, I am re-submitting for your review my request [for] your medical services on behalf of our renal dialysis pt., Anthony Price." (*Id.* at 77-78; Defs.' Ex. K.) Plaintiff never received a response from Okonta. (Price Dep. at 82.)

FN4. Plaintiff never interacted with Okonta except through Susan, the social worker. (Price Dep. at 73-74.)

Susan also submitted a letter to Nurse Mary Sullivan (hereinafter "Sullivan"), the ***350** day supervisor at the NCCC medical center, stating: "As per our telephone conversation, I am submitting in writing Anthony Price's request for referral and evaluation to a kidney transplant center ... Stonybrook Univ. Medical Ctr." (Def.'s Ex. K.) At some point in time, plaintiff was called down to the NCCC medical center and was told by Sullivan that defendants knew about plaintiff's request to get on the kidney transplant list but that they had "other priorities right now." (Price Dep. at 70.) Plaintiff believed Sullivan was referring to his other health issues. (*Id.* at 70.) Plaintiff did not ask when he would be tested for the kidney transplant list. (*Id.* at 71.)

On September 25, 2007, plaintiff filed a formal grievance regarding his request to be tested for the kidney transplant list.[FN5] (*Id.* at 85.) Plaintiff stated on his grievance form that he had "been waiting to take the test I need to take to get on the kidney transplant list" and that his social worker had told him that she had forwarded the paperwork to the jail, but could not get a response. (Defs.' Ex. F.) Plaintiff requested that he be "given the test to see if I'm a candidate for possibly a kidney transplant." (*Id.*) By interdepartmental memorandum dated September 27, 2007, the Inmate Grievance Coordinator informed plaintiff that the medical grievance "is being discussed with and turned over to the Health Services Administrator. The medical unit will evaluate you. A Grievance Unit Investigator will contact you at a later date to conduct an evaluation of your status and to closeout the paperwork." (*Id.*) In another memo dated October 5, 2007, defendant Kim Edwards,[FN6] informed plaintiff:

FN5. This was the only formal medical grievance filed by plaintiff. (Price Dep. at 85.)

FN6. Edwards never wrote medical orders for plaintiff or examined plaintiff. (Price Dep. at 61.) Plaintiff had no interaction with Edwards except her written response to plaintiff's grievance. (*Id.* at 67.)

The social worker can only inform you of treatment options that are available for your medical problem. If you are in need of a "test", documentation must be provided by the attending physician that is responsible for your renal treatment.

(*Id.*) Plaintiff interpreted this response from Edwards to mean that the matter was now in the hands of the medical department, and so he did not further proceed with the grievance and "did not feel it was necessary." (Pl.'s Opp. at 3.) [FN7] Therefore, plaintiff "signed off on the grievance," saying that he had "read it and accepted it." (Price Dep. at 88.)

FN7. Although plaintiff does not offer this explanation in his deposition, the Court construes the *pro se* plaintiff's sworn "verified rebuttal" to defendants' motion for summary judgment as an evidentiary submission. *See Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir.2004) ("[A] verified pleading, to the extent that it makes allegations on the basis of the plaintiff's personal knowledge, and not merely on information and belief, has the effect of an affidavit and may be relied on to oppose summary judgment."); *see also Hailey v. N.Y. City Transit Auth.,* 136 Fed.Appx. 406, 407-08 (2d Cir.2005) ("The rule favoring liberal construction of *pro se* submissions is especially applicable to civil rights claims.").

Plaintiff did not get the requested test during the remainder of his incarceration at the NCCC. (*Id.* at 90.) Defendants have submitted evidence that they made efforts to get plaintiff tested and, in fact, scheduled plaintiff for a test at Stony Brook University Hospital on November 29, 2007, but that the test had to be cancelled due to "unforeseen circumstances"; the test was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

re-scheduled for January 10, 2008. (Defs.' Ex. G, Reschke Aff. ¶¶ 6-7.) Plaintiff was not informed about any scheduled test (Pl.'s Opp. at 2), and he was ***351** transferred to a different facility in December 2007. (Price Dep. at 35; Reschke Aff. ¶ 7.)

C. Shoulder Pain

Plaintiff began complaining about shoulder pain to the medical department at the NCCC on January 17, 2007, stating that his right shoulder was "extremely hurting." (Price Dep. at 36; Defs.' Ex. E, Sick Call Request, Jan. 17, 2007.) Plaintiff had received treatment for shoulder pain in the past, including a shot of Cortisone while at the Elmira facility (Price Dep. at 38, 53-54; Defs.' Ex. E, Sick Call Request, Apr. 14, 2007.) After the January 17 complaint, plaintiff was seen a couple of days later and given medication to rub on his shoulder. (Price Dep. at 41.) The medication did not help with the discomfort, and so plaintiff complained again later in January. (*Id.* at 42-43.) Although defendants gave plaintiff Motrin and Naprosyn for the pain, no x-rays were taken for several months. (*Id.* at 44, 55; Defs.' Ex. H, Edwards Aff. ¶ 4.) The pain medication continued to be ineffective, and plaintiff continued to complain. (*See, e.g., id.* at 45, 51.) For instance, in June 2007, plaintiff complained that his right shoulder "hurts really bad." (Def.'s Ex. E, Sick Call Request, June 12, 2007.) Plaintiff never refused medication for his shoulder. (Price Dep. at 56.) When plaintiff eventually was given x-rays, in April and November 2007 (Edwards Aff. ¶ 4), plaintiff was told that nothing was wrong with his shoulder.[FN8] (Price Dep. at 44; *see also* Defs.' Ex. J, Discharge Summary, November 2007 ("Although no definite evidence of venous thrombosis is seen with Rt. upper extremity, short segment acute thrombosis cannot be reliably excluded, Ultrasound might provide additional information....").) Plaintiff states that, with respect to his right shoulder, he currently wears a brace for carpal tunnel syndrome, has a separated shoulder, and takes shots for the pain. (Pl.'s Opp. at 4.)

FN8. Plaintiff testified that he stopped complaining about his shoulder at some point because he was frustrated that defendants were not helping. (Price Dep. at 54-55.) There is evidence that plaintiff complained about his shoulder at least as late as June 2007, and again complained in November 2007, which resulted in the taking of additional x-rays. (*See* Def.'s Ex. E, Sick Call Request, June 21, 2007; Defs.' Ex. J.)

II. PROCEDURAL HISTORY

On June 28, 2007, plaintiff filed the initial complaint in this action. Plaintiff filed an amended complaint on August 20, 2007 alleging, pursuant to Section 1983, that defendants Sheriff Edward Reilly, Kim Edwards, Perry Intal, and Nassau University Medical Center violated his Eighth Amendment rights with respect to his medication dosage, kidney transplant request, and shoulder pain. On November 14, 2007, plaintiff filed another complaint in a separate action (No. 07-CV-4841) making substantially the same allegations and expanding on his allegations regarding the kidney transplant request. This complaint named Mary Sullivan and Dr. Benjamin Okonta, as well as the Nassau University Medical Center, as defendants. By Order dated July 11, 2008, the Court consolidated both actions (Nos. 07-CV2634 and 07-CV-4841) because the allegations in the two actions were "factually intertwined."

Defendants moved for summary judgment on May 29, 2009.[FN9] Plaintiff submitted***352** an opposition to the motion on August 3 and August 11, 2009. [FN10] Defendants replied on August 20, 2009. Plaintiff submitted a surreply on October 6, 2009. This matter is fully submitted.

FN9. Pursuant to Local Rule 56.1, defendants also served plaintiff with the requisite notice for *pro se* litigants opposing summary judgment motions. *See Irby v. N.Y. City Transit Auth.,* 262 F.3d 412, 414 (2d Cir.2001) ("And we remind the district courts of this circuit, as well as summary judgment movants, of the necessity that pro se litigants have actual notice, provided in an accessible manner, of the consequences of the pro se litigant's failure to comply with the requirements of Rule 56.").

FN10. Plaintiff submitted his two identical oppositions and a sur-reply to the instant motion not only in this action, but also in the now-consolidated action (No. 07-CV-4841). The

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Court has considered all of plaintiff's submissions in both actions in deciding the instant motion.

III. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Reiseck v. Universal Commc'ns of Miami, Inc.,* 591 F.3d 101, 104 (2d Cir.2010). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones,* 396 F.3d 53, 69 (2d Cir.2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir.2004); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party " 'must do more than simply show that there is some metaphysical doubt as to the material facts .... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*' " *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir.2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis in original)). As the Supreme Court stated in Anderson, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-50, 106 S.Ct. 2505 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48, 106 S.Ct. 2505 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth " 'concrete particulars' " showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir.1984) (quoting *SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978)). Accordingly, it is insufficient for a party opposing summary judgment " 'merely to assert a conclusion without supplying supporting arguments or facts.' " *BellSouth Telecomms., Inc. v. W.R. Grace & Co.,* 77 F.3d 603, 615 (2d Cir.1996) (quoting *Research Automation Corp.,* 585 F.2d at 33).

[4][5] Where the plaintiff is proceeding *pro se,* the Court must "construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." *Weixel v. Bd. of Educ. of the City of N.Y.,* 287 F.3d 138, 145-46 (2d Cir.2002) (alterations in original) (quoting *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000)). Though a *pro se* litigant's pleadings and other submissions are afforded wide latitude, a *pro se* party's conclusory assertions, completely unsupported ***353** by evidence, are not sufficient to defeat a motion for summary judgment. *Shah v. Kuwait Airways Corp.,* 653 F.Supp.2d 499, 502 (S.D.N.Y.2009) ("Even a *pro se* party, however, 'may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful.' " (quoting *Auguste v. N.Y. Presbyterian Med. Ctr.,* 593 F.Supp.2d 659, 663 (S.D.N.Y.2009))).

IV. DISCUSSION

[6] To prevail on a claim under Section 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws; (2) by a person acting under the color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993).

There is no dispute for purposes of this motion that defendants were acting under color of state law. The question presented, therefore, is whether defendants' alleged conduct deprived plaintiff of his Eighth Amendment rights. Plaintiff alleges that his Eighth Amendment rights were violated when defendants: (1) prescribed him an incorrect dosage of medication for his renal disease; (2) failed to get him tested for the kidney

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

transplant list; and (3) failed to adequately treat him for his shoulder pain. For the reasons set forth below, after drawing all reasonable inferences from the facts in favor of plaintiff, the Court concludes that defendants are entitled to summary judgment on plaintiff's claim regarding the dosage of his medication and on all of plaintiff's claims against Sheriff Reilly. Defendants' motion for summary judgment is denied in all other respects.

A. Exhaustion

As a threshold matter, defendants argue that plaintiff is barred from raising any Eighth Amendment claim with respect to his kidney transplant request because plaintiff has not exhausted his administrative remedies.[FN11] For the reasons set forth below, the Court disagrees and cannot conclude from this record that plaintiff failed to exhaust his administrative remedies.

FN11. Defendants raise exhaustion only with respect to plaintiff's kidney transplant request, and so the Court does not consider exhaustion with respect to plaintiff's other claims.

1. Legal Standard

The Prison Litigation Reform Act of 1995 ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "The PLRA exhaustion requirement 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' Prisoners must utilize the state's grievance procedures, regardless of whether the relief sought is offered through those procedures." *Espinal v. Goord,* 558 F.3d 119, 124 (2d Cir.2009) (quoting *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." *Woodford v. Ngo,* 548 U.S. 81, 90, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). Therefore, the exhaustion inquiry requires a court to "look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures." ***354***Espinal,* 558 F.3d at 124 (citing *Jones v. Bock,* 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) and *Woodford,* 548 U.S. at 88-90, 126 S.Ct. 2378).

Prior to *Woodford,* 548 U.S. 81, 126 S.Ct. 2378 (2006), the Second Circuit "recognized some nuances in the exhaustion requirement: (1) administrative remedies that are ostensibly 'available' may be unavailable as a practical matter, for instance, if the inmate has already obtained a favorable result in administrative proceedings but has no means of enforcing that result; (2) similarly, if prison officials inhibit the inmate's ability to seek administrative review, that behavior may equitably estop them from raising an exhaustion defense; (3) imperfect exhaustion may be justified in special circumstances, for instance if the inmate complied with his reasonable interpretation of unclear administrative regulations, or if the inmate reasonably believed he could raise a grievance in disciplinary proceedings and gave prison officials sufficient information to investigate the grievance." *Reynoso v. Swezey,* 238 Fed.Appx. 660, 662 (2d Cir.2007) (internal citations omitted); *see also Davis v. New York,* 311 Fed.Appx. 397, 399 (2d Cir.2009) (citing *Hemphill v. New York,* 380 F.3d 680, 686, 691 (2d Cir.2004)). However, the Second Circuit has not decided whether the above-discussed considerations apply post- *Woodford. See, e.g., Reynoso,* 238 Fed.Appx. at 662 ("Because we agree with the district court that [plaintiff] cannot prevail on any of these grounds, we have no occasion to decide whether *Woodford* has bearing on them."); *Ruggiero v. County of Orange,* 467 F.3d 170, 176 (2d Cir.2006) ("We need not determine what effect *Woodford* has on our case law in this area, however, because [plaintiff] could not have prevailed even under our pre- *Woodford* case law.").

As the Supreme Court has held, exhaustion is an affirmative defense: "We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *see also Key v. Toussaint,* 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) ("Failure to exhaust remedies under the PLRA is an affirmative defense, and thus the defendants have the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

burden of proving that [plaintiff's] retaliation claim has not been exhausted." (citations omitted)).

2. Application

Defendants argue that plaintiff did not appeal the resolution of his grievance request, i.e., the memo from Edwards dated October 5, 2007, stating that: "If you are in need of a 'test', documentation must be provided by the attending physician that is responsible for your renal treatment." (Defs.' Ex. F.) Therefore, defendants argue, plaintiff has failed to exhaust his administrative remedies under the PLRA. (Defs.' Br. at 25.) Plaintiff argues in response that he did not believe any further action on his grievance was "necessary" because the matter was put into the hands of the medical department. (Pl.'s Opp. at 3.) For the reasons discussed below, the Court concludes that, on this record, defendants have not met their burden of proving that plaintiff failed to exhaust his administrative remedies.

[7][8][9] As discussed above, the PLRA requires exhaustion only with respect to "such administrative remedies as are available." *See* 42 U.S.C. § 1997e(a). Therefore, in order to determine whether plaintiff exhausted his administrative remedies, the Court "must first establish from a legally sufficient source that an administrative remedy is applicable and that the particular complaint does not fall within an exception. Courts should be careful to look at the applicable set of grievance procedures,***355** whether city, state or federal." *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003); *see also Espinal,* 558 F.3d at 124 (holding that, when considering exhaustion, courts must "look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures" (citations omitted)). "Whether an administrative remedy was available to a prisoner in a particular prison or prison system, and whether such remedy was applicable to the grievance underlying the prisoner's suit, are not questions of fact. They are, or inevitably contain, questions of law." *See Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999). However, "the existence of the procedure may be a matter of fact." *Id.* at 114.

On the record before the Court on this motion, the Court is unable to establish from any legally sufficient source that an administrative remedy was available to plaintiff. Defendants have made no submissions to the Court regarding the applicable grievance procedures at the NCCC. *See, e.g., Abney v. County of Nassau,* 237 F.Supp.2d 278, 281 (E.D.N.Y.2002) (noting that the "Inmate Handbook" for the Nassau County Correctional Facility procedure was "annexed to Defendants' moving papers"). Specifically, defendants have not submitted any evidence, by affidavit or otherwise, that NCCC procedures offer a remedy to address the particular situation in this case.[FN12] Therefore, the Court cannot conclude from this record that plaintiff had an available administrative remedy that he failed to exhaust.

FN12. The Court notes that the October 5, 2007 memo from Edwards is unclear as to which party bore the responsibility of obtaining plaintiff's medical records. (Defs.' Ex. F.) Edwards explains in an affidavit that she advised plaintiff that "it would be necessary for his doctors to provide the selected facility with his records before a request for testing would be considered." (Edwards Aff. ¶ 2.) It is unclear whether plaintiff had access to these records or whether the prison would need to obtain them. Thus, there appears to be a factual question as to the implementation of this grievance resolution. A similar situation arose in *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004), in which the Second Circuit held that where a prisoner achieved favorable results in several grievance proceedings but alleged that prison officials failed to implement those decisions, that prisoner was without an administrative remedy and therefore had exhausted his claim for purposes of the PLRA. *See id.* at 667-68, 669 ("Where, as here, prison regulations do not provide a viable mechanism for appealing implementation failures, prisoners in [plaintiff's] situation have fully exhausted their available remedies."). The Court recognizes that *Abney,* 380 F.3d 663, was decided before *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), and that, as discussed above, the Second Circuit has not decided whether the various nuances to the exhaustion requirement apply post- *Woodford.* However, the Court need not decide the applicability of any such nuances to the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

exhaustion requirement because, as discussed above, defendants have failed to establish the procedural framework for grievance resolution at the NCCC and the availability of *any* administrative remedies.

> Although there may be administrative remedies for such a situation under the New York Department of Corrections regulations, *see* 7 N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5(c)(4) ("If a decision is not implemented within 45 days, the grievant may appeal to CORC citing lack of implementation as a mitigating circumstance."), it does not follow that the same procedure applies at the NCCC. *See, e.g., Abney v. County of Nassau,* 237 F.Supp.2d at 283 ("The flaw in Defendants' argument, however, is that the cases relied upon were all decided under the New York State administrative procedure-none were decided in the context of the procedure relied upon-the Nassau County Inmate Handbook procedure.").

B. Plaintiff's Claims of Deliberate Indifference

1. Legal Standard

"[D]eliberate indifference to serious medical needs of prisoners constitutes the ***356** 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment" and therefore "states a cause of action under § 1983." *Estelle v. Gamble,* 429 U.S. 97, 104-05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). As the Second Circuit has explained,

> [t]he Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. Moreover, under 42 U.S.C. § 1983, prison officials are liable for harm incurred by an inmate if the officials acted with "deliberate indifference" to the safety of the inmate. However, to state a cognizable section 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice.

*Hayes v. N.Y. City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996) (citations omitted). Within this framework, "[d]eliberate indifference to a prisoner's serious medical needs constitutes cruel and unusual punishment, in violation of the Eighth Amendment, as made applicable to the states through the Fourteenth Amendment." *Bellotto v. County of Orange,* 248 Fed.Appx. 232, 236 (2d Cir.2007). Thus, according to the Second Circuit,

> [d]efendants may be held liable under § 1983 if they ... exhibited deliberate indifference to a known injury, a known risk, or a specific duty, and their failure to perform the duty or act to ameliorate the risk or injury was a proximate cause of plaintiff's deprivation of rights under the Constitution. Deliberate indifference is found in the Eighth Amendment context when a prison supervisor knows of and disregards an excessive risk to inmate health or safety .... Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.

*Ortiz v. Goord,* 276 Fed.Appx. 97, 98 (2d Cir.2008) (citations and quotation marks omitted); *see also Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000) ("Deliberate indifference will exist when an official 'knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.' ") (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)); *Curry v. Kerik,* 163 F.Supp.2d 232, 237 (S.D.N.Y.2001) (" '[A]n official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' ") (quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks omitted)).

[10][11] In particular, the Second Circuit has set forth a two-part test for determining whether a prison official's actions or omissions rise to the level of deliberate indifference:

> The test for deliberate indifference is twofold. First, the plaintiff must demonstrate that he is incarcerated under conditions posing a substantial risk of serious harm.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

> Second, the plaintiff must demonstrate that the defendant prison officials possessed sufficient culpable intent. The second prong of the deliberate indifference test, culpable intent, in turn, involves a two-tier inquiry. Specifically, a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm.

***357** *Hayes,* 84 F.3d at 620 (internal citation omitted); *see also* *Phelps v. Kapnolas,* 308 F.3d 180, 185-86 (2d Cir.2002) (setting forth two-part deliberate indifference test).

In *Salahuddin v. Goord,* the Second Circuit set forth in detail the objective and subjective elements of a medical indifference claim. 467 F.3d 263 (2d Cir.2006). In particular, with respect to the first, objective element, the Second Circuit explained:

> The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious. Only deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. Determining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable care. Thus, prison officials who act reasonably [in response to an inmate-health risk] cannot be found liable under the Cruel and Unusual Punishments Clause, and, conversely, failing to take reasonable measures in response to a medical condition can lead to liability.
>
> Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner. For example, if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious. Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find [it] important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain. In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone. Thus, although we sometimes speak of a serious medical condition as the basis for an Eighth Amendment claim, such a condition is only one factor in determining whether a deprivation of adequate medical care is sufficiently grave to establish constitutional liability.

467 F.3d at 279-80 (citations and quotation marks omitted); *see also* *Jones v. Westchester County Dep't of Corr. Medical Dep't,* 557 F.Supp.2d 408, 413-14 (S.D.N.Y.2008).

With respect to the second, subjective component, the Second Circuit further explained:

> The second requirement for an Eighth Amendment violation is subjective: the charged official must act with a sufficiently culpable state of mind. In medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health. Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law. This mental state requires that the charged official act or fail to act while actually aware ***358** of a substantial risk that serious inmate harm will result. Although less blameworthy than harmful action taken intentionally and knowingly, action taken with reckless indifference is no less actionable. The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices. But recklessness

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent.

*Salahuddin,* 467 F.3d at 280 (citations and quotation marks omitted); *see also* *Jones,* 557 F.Supp.2d at 414. The Supreme Court has stressed that

in the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

*Estelle v. Gamble,* 429 U.S. 97, 105-06, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (internal citations omitted); *see also* *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) ("A showing of medical malpractice is therefore insufficient to support an Eighth Amendment claim unless the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces a conscious disregard of a substantial risk of serious harm." (internal quotations omitted)); *Harrison v. Barkley,* 219 F.3d 132, 139 (2d Cir.2000) (a medical practitioner who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not evince the culpability necessary for deliberate indifference).

2. Application

Plaintiff alleges that defendants violated his Eighth Amendment rights by: (1) prescribing an incorrect dosage of his renal disease medication; (2) failing to have him tested for the kidney transplant list; and (3) failing to properly treat his shoulder pain. The Court considers each claim in turn and, for the reasons discussed below, concludes that defendants are entitled to summary judgment on plaintiff's claim regarding his medication dosage and on all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects.

a. Medication Dosage

Defendants concede that plaintiff's kidney condition is serious (Defs.' Br. at 21), but argue that the dosage of Renagel and PhosLo prescribed for plaintiff did not result in any injury. Defendants also argue that, even if the dosage was incorrect, it was at most "an error in medical judgment." Finally, defendants argue that plaintiff cannot show deliberate indifference because defendants continually tested plaintiff and twice changed the dosage of his medication depending on his phosphorous levels. (Defs.' Br. at 22.) For the reasons set forth below, the Court agrees and concludes that no rational jury could find that defendants acted with deliberate indifference with respect to the prescription***359** of medication for plaintiff's renal disease.

i. Objective Prong

[12][13][14] Plaintiff has failed to present any evidence that the allegedly incorrect medication dosage posed an objectively serious risk to plaintiff's health. As a threshold matter, the mere fact that plaintiff's underlying renal disease is a serious medical condition does not mean that the allegedly incorrect treatment for that condition poses an objectively serious health risk. *See* *Smith v. Carpenter,* 316 F.3d 178, 186-87 (2d Cir.2003) ("As we noted in *Chance* [*v. Armstrong,* 143 F.3d 698 (2d Cir.1998) ], it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes."). Furthermore, plaintiff has failed to produce any evidence that his medication dosage at the NCCC caused him any objectively serious harm. Instead, plaintiff testified merely that the prescribed dosage was "wrong" and was "hurting" him.[FN13] (Price Dep. at 60.) Plaintiff's belief that the medication dosage was incorrect is insufficient to establish the objective prong of the deliberate indifference test.[FN14] *See* *Fox v. Fischer,* 242 Fed.Appx. 759, 760 (2d Cir.2007) ("[T]he fact that [plaintiff] was provided Claritin as a substitute for Allegra

fails to establish deliberate indifference to a serious medical need, because there is no allegation that the change in medication caused harm, if any, sufficiently serious to establish the objective prong of a deliberate indifference claim....”); *Reyes v. Gardener,* 93 Fed.Appx. 283, 285 (2d Cir.2004) ( “[Plaintiff] has offered no evidence ... showing that the prescribed medication regimen deviated from reasonable medical practice for the treatment of his condition.”). Although there is evidence that plaintiff's phosphorous levels increased when he was prescribed a lesser dosage of medication upon arriving at the NCCC (*see* Price Dep. ***360** at 23-26), that is not by itself enough to support a finding of an objectively serious condition.[FN15] *See* *Smith,* 316 F.3d at 188-89 (“Although [plaintiff] suffered from an admittedly serious underlying condition, he presented no evidence that the two alleged episodes of missed medication resulted in permanent or on-going harm to his health, nor did he present any evidence explaining why the absence of actual physical injury was not a relevant factor in assessing the severity of his medical need.”) (affirming denial of motion for new trial). Thus, plaintiff's medication dosage claim must fail because he cannot show that the complained-of dosage posed an objectively serious health risk.[FN16]

FN13. Plaintiff does not distinguish between the initial dosage he received at the NCCC and the later dosages he received, instead arguing generally that all of the dosages he received at the NCCC were incorrect.

FN14. Plaintiff's conclusory testimony that the dosage was “hurting” him also is insufficient to establish the objective prong of the deliberate indifference test. To the extent plaintiff claims that the medication caused him pain, there is no evidence in the record that plaintiff suffered from chronic pain or, indeed, any other objectively serious symptoms in connection with the medication dosage. Although not mentioned in plaintiff's deposition or in his opposition to the instant motion, plaintiff alleges in his amended complaint that the lesser dosage put him at risk of “itching” and “breaking of bones.” (Amended Complaint, No. 07-CV-2634, at 4.) There is evidence that plaintiff suffered from a rash and/or itching while at the NCCC and that plaintiff was told at one point that he had eczema. (*See* Price Dep. at 45-51.) However, there is no evidence to connect those symptoms with the medication dosage for his renal disease. (*See, e.g., id.* at 46 (“Q. Did anyone ever tell you what was causing a rash? A. I kept going to the-I had went to the dermatologist at Bellevue. To me, the doctor had an attitude like it ain't nothing wrong; like it was acne or something.”).) Furthermore, there is no evidence that the rash and/or itching was an objectively serious condition. *See* *Lewal v. Wiley,* 29 Fed.Appx. 26, 29 (2d Cir.2002) (affirming summary judgment and holding that plaintiff's alleged “persistent rash” was not a “serious medical condition”); *see also* *Benitez v. Ham,* No. 04-CV-1159, 2009 WL 3486379, at *11 (N.D.N.Y. Oct. 21, 2009) (“[T]he evidence shows that Plaintiff suffered from a severe body itch. While this condition was undoubtedly unpleasant, it simply does not rise to the level of an Eighth Amendment violation.”). In any event, even if plaintiff did suffer from an objectively serious condition because of the medication dosage, he cannot prove that defendants acted with a subjectively culpable state of mind, as discussed *infra.*

FN15. In any event, as discussed *infra,* defendants adjusted plaintiff's dosage in response to the increase in phosphorous levels, and there is no evidence from which a rational jury could conclude that defendants acted with deliberate indifference in prescribing plaintiff's medication.

FN16. Although he does not raise it in any of his pleadings or in his opposition to the instant motion, plaintiff testified at his deposition that he had to take the medication with meals but that sometimes he was given the medication without food or at times that interfered with his meals. (Price Dep. at 23, 60; Defs.' Ex. E.) The record is unclear as to how often this occurred. The Court assumes, as it must on this motion for summary judgment, that on some occasions plaintiff was given his medications not at meal times or at times that interfered with meals. However, plaintiff points to no evidence whatsoever of any harm caused by defendants' alleged conduct in this regard, and, therefore, no

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

rational jury could find that the provision of medication without food on some occasions was objectively serious. *See* *Gillard v. Kuykendall,* 295 Fed.Appx. 102, 103 (8th Cir.2008) (affirming summary judgment for defendants where defendants, on some occasions, "were late in giving [plaintiff] his medications and did not always administer them with meals as [plaintiff] apparently desired" where there was no evidence of any adverse consequences). Thus, any deliberate indifference claim based on these allegations would fail as well.

ii. Subjective Prong

[15][16] Plaintiff's claim with respect to his medication dosage also fails because plaintiff cannot show that defendants acted with subjectively culpable intent, i.e., that they were aware of, and consciously disregarded, plaintiff's serious medical needs. Plaintiff's claim is based on his assertion that the prescribed dosage was "wrong." However, mere disagreement with a prescribed medication dosage is insufficient as a matter of law to establish the subjective prong of deliberate indifference. *See* *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."); *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001) ("[D]isagreements over medications ... are not adequate grounds for a Section 1983 claim. Those issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment." (citing *Estelle,* 429 U.S. at 107, 97 S.Ct. 285)); *see also, e.g., Fuller v. Ranney,* No. 06-CV-0033, 2010 WL 597952, at *11 (W.D.N.Y. Feb. 17, 2010) ("Plaintiff's claim amounts to nothing more than a disagreement with the prescribed treatment he received and his insistence that he be prescribed certain medications. Without more, plaintiff's disagreement with the treatment he received does not rise to the level of a constitutional violation of his Eighth Amendment rights."); *Covington v. Westchester County Dep't of Corr.,* No. 06 Civ. 5369, 2010 WL 572125, at *6 (S.D.N.Y. Jan. 25, 2010) ("[Plaintiff's] claims that Defendants failed ***361** to change or increase his medication and counseling sessions amount to negligence claims at most, which is insufficient."); *Hamm v. Hatcher,* No. 05-CV-503, 2009 WL 1322357, at *8 (S.D.N.Y. May 5, 2009) ("Plaintiff's unfulfilled demand for a larger dosage of [the medication] represents a mere disagreement over the course of Plaintiff's treatment and is inconsistent with deliberate indifference ....").

The fact that defendants adjusted the dosage of plaintiff's medication in response to plaintiff's phosphorous levels (*see* Price Dep. at 25-27) is also inconsistent with deliberate indifference. *See* *Bellotto v. County of Orange,* 248 Fed.Appx. 232, 237 (2d Cir.2007) ("The record also shows that mental health professionals responded to [plaintiff's] concerns about his medications and adjusted his prescription as they believed necessary.") (affirming summary judgment for defendants); *see also* *Jolly v. Knudsen,* 205 F.3d 1094, 1097 (8th Cir.2000) ("[Defendant's] actions in this case cannot reasonably be said to reflect deliberate indifference. The only relevant evidence in the record indicates that [defendant's] actions were aimed at correcting perceived difficulties in [plaintiff's] dosage levels [in response to blood tests]."); *Fuller,* 2010 WL 597952, at *11 ("Moreover, a subsequent decision to prescribe plaintiff a certain medication does not indicate that the medication should have been prescribed earlier.").[FN17] Thus, there is no evidence in the record sufficient for a rational jury to find that defendants acted with deliberate indifference regarding the prescription dosage of plaintiff's renal disease medication.

FN17. To the extent plaintiff also argues that that defendants acted with deliberate indifference because he has received different prescriptions at different facilities, the Court rejects that argument as well. *See, e.g.,* *Cole v. Goord,* No. 04 Civ. 8906, 2009 WL 1181295, at *8 n. 9 (S.D.N.Y. Apr. 30, 2009) ("[Plaintiff's] reliance upon the fact that subsequent medical providers have provided him with a different course of medication or treatment ... does nothing to establish that [defendant] violated [plaintiff's] Eighth Amendment rights. Physicians can and do differ as to their determination of the appropriate treatment for a particular patient; that difference in opinion does not satisfy the requirements for a constitutional claim of deliberate indifference."

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

(citing *Estelle,* 429 U.S. at 97, 97 S.Ct. 285)).

In sum, based on the undisputed facts and drawing all reasonable inferences in plaintiff's favor, no rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's objectively serious health needs regarding his medication dosage. Accordingly, defendants' motion for summary judgment is granted with respect to this claim.

b. Kidney Transplant

[17] Defendants also argue that plaintiff cannot proceed with his deliberate indifference claim regarding his request to be tested for a kidney transplant. Defendants do not dispute the objective seriousness of plaintiff's underlying condition or the requested transplant, and instead argue only that defendants lacked subjective culpability. Specifically, defendants argue that they made reasonable efforts to get plaintiff tested. (Defs.' Br. at 23.) However, construing the facts in the light most favorable to plaintiff, a rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's serious medical needs.

Plaintiff began requesting a kidney transplant test as early as February or March 2007 and still had not received one by the time he left the NCCC in December 2007. (*See* Price Dep. at 76-77, 90.) Requests were sent on plaintiff's behalf to Dr. Okonta at the Nassau University Medical Center and to Nurse Mary Sullivan at ***362** the NCCC medical department. (*See* Defs.' Ex. K.) The record indicates that plaintiff received no response from Okonta. (*See* Price Dep. at 82.) When plaintiff asked Sullivan about the test, Sullivan told him that defendants had "other priorities right now." (Price Dep. at 70.) Even after plaintiff filed a formal grievance in September 2007, he still did not receive the requested test. (*See* Defs.' Ex. F.) On these facts, where there was a delay of at least nine months in arranging a kidney transplant test for plaintiff despite plaintiff's repeated requests, and where defendants do not dispute the necessity of the test, a rational jury could find that defendants acted with deliberate indifference to plaintiff's serious medical needs. *See* *Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000) (holding summary judgment inappropriate where there was evidence that, *inter alia,* plaintiff was delayed dental treatment for a cavity for one year); *Hathaway v. Coughlin,* 841 F.2d 48, 50-51 (2d Cir.1988) ("[Plaintiff's] affidavit in opposition to [defendants'] motion for summary judgment alleged that a delay of over two years in arranging surgery ... amounted to deliberate indifference to his serious medical needs. We believe this is a sufficient allegation to survive a motion for summary judgment under *Archer* [*v. Dutcher,* 733 F.2d 14 (2d Cir.1984) ] because it raises a factual dispute ...."); *see also* *Lloyd v. Lee,* 570 F.Supp.2d 556, 569 (S.D.N.Y.2008) ("A reasonable jury could infer deliberate indifference from the failure of the doctors to take further steps to see that [plaintiff] was given an MRI. The argument that the doctors here did not take [plaintiff's] condition seriously is plausible, given the length of the delays. Nine months went by after the MRI was first requested before the MRI was actually taken.").

Defendants point to evidence in the record that they were, in fact, attempting to get plaintiff tested throughout the time in question, but were unsuccessful in their efforts. (*See* Defs.' Br. at 23; Reschke Aff. ¶ 3.) However, defendants' proffered explanation for the delay, i.e., the difficulty of finding a hospital because of transportation and security concerns, raises questions of fact and does not, as a matter of law, absolve them of liability. *See* *Johnson v. Bowers,* 884 F.2d 1053, 1056 (8th Cir.1989) ("It is no excuse for [defendants] to urge that the responsibility for delay in surgery rests with [the hospital]."); *Williams v. Scully,* 552 F.Supp. 431, 432 (S.D.N.Y.1982) (denying summary judgment where plaintiff "was unable to obtain treatment ... for five and one half months, during which time he suffered considerable pain" despite defendants' "explanations for the inadequacy of [the prison's] dental program"), *cited approvingly in* *Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000). Thus, whether defendants' efforts were reasonable over the nine month period at issue is a question of fact for the jury.

In sum, on this record, drawing all reasonable inferences in plaintiff's favor, the Court concludes that a rational jury could find that defendants acted with deliberate indifference regarding plaintiff's request for a kidney transplant test. Accordingly, defendants' motion for summary judgment on this claim is denied.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

c. Shoulder

Defendants argue that summary judgment is warranted on the claim relating to the alleged shoulder injury because plaintiff's complained-of shoulder pain was not objectively serious and plaintiff has failed to show subjectively culpable intent by defendants. For the reasons set forth below, the Court disagrees and concludes that a rational jury could find that defendants acted with deliberate indifference ***363** regarding plaintiff's shoulder pain. Thus, summary judgment on this claim is denied.

i. Objective Prong

[18][19] Defendants argue that plaintiff cannot satisfy the objective element of the deliberate indifference test regarding his shoulder because plaintiff alleges only that he had pain in his shoulder and not that he had "a condition of urgency, one that might produce death, deterioration or extreme pain." (Defs.' Br. at 22.) However, plaintiff did complain to the medical department that his right shoulder was "extremely hurting." (Defs.' Ex. E, Sick Call Request, Jan. 17, 2007.) Furthermore, plaintiff states that he now has a separated shoulder and wears a brace for carpal tunnel syndrome. (Pl.'s Opp. at 4.) In any event, chronic pain can be a serious medical condition. *See Brock v. Wright,* 315 F.3d 158, 163 (2d Cir.2003) ("We will no more tolerate prison officials' deliberate indifference to the chronic pain of an inmate than we would a sentence that required the inmate to submit to such pain. We do not, therefore, require an inmate to demonstrate that he or she experiences pain that is at the limit of human ability to bear, nor do we require a showing that his or her condition will degenerate into a life-threatening one."); *Hathaway v. Coughlin,* 37 F.3d 63, 67 (2d Cir.1994); *see also Sereika v. Patel,* 411 F.Supp.2d 397, 406 (S.D.N.Y.2006) ( "[Plaintiff's] allegation that he experienced severe pain as a result of the alleged delay in treatment, together with his allegation that the alleged delay in treatment resulted in reduced mobility in his arm and shoulder, raise issues of fact as to whether his shoulder injury constitutes a sufficiently serious medical condition to satisfy the objective prong of the deliberate indifference standard.") (denying summary judgment). Thus, the Court cannot conclude at the summary judgment stage that plaintiff did not suffer from a serious medical condition.

ii. Subjective Prong

Defendants also argue that plaintiff cannot meet the subjective prong of the deliberate indifference test because plaintiff was seen repeatedly by the medical department and was given pain medication. (Defs.' Br. at 22.) Defendants also point to the fact that when x-rays were ultimately taken, they were negative.[FN18] However, construing the facts most favorably to plaintiff, a rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's serious medical needs. Plaintiff repeatedly complained to defendants over a period of several months, beginning in January 2007, about the pain in his shoulder (*see* Defs.' Ex. E), and further complained that the pain medication he was being given was ineffective. [FN19] (*See, e.g.,* Price Dep. at 45, 51.) In June 2007, for instance, plaintiff was still complaining that his right shoulder "hurts really bad," and that he had been "complaining of that for months." (Def.'s Ex. E, Sick Call Requests, June 12 and June 17, 2007.) Thus, it is uncontroverted that defendants were aware of plaintiff's alleged chronic shoulder pain.

FN18. The November 2007 x-ray records indicate that "short segment acute thrombosis cannot be reliably excluded, Ultrasound might provide additional information ...." (*See* Defs.' Ex. J, Discharge Summary, November 2007.) Defendants point to no evidence in the record that they followed up on that x-ray report.

FN19. Plaintiff also informed defendants that he had been given a Cortisone shot for his shoulder at his previous place of incarceration. (*See* Price Dep. at 38, 53-54; Defs.' Ex. E, Sick Call Request, Apr. 14, 2007.)

Despite plaintiff's complaints, however, plaintiff was not given an x-ray exam for several months (Price Dep. at 44; Def.'s ***364** Ex. J), and was not given any pain medication besides Motrin and Naprosyn. (Price Dep. at 55.) Although defendants argue that the treatment for plaintiff's shoulder pain was reasonable under the circumstances, there are factual questions in this case that preclude

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

summary judgment. *See Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ("Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case.") (reversing grant of motion to dismiss). Drawing all reasonable inferences from the facts in favor of plaintiff, a rational jury could find that defendants acted with deliberate indifference by not changing plaintiff's pain medication despite his continued complaints that it was ineffective, by failing to take x-rays for several months, and by failing to follow-up on a November 2007 x-ray report indicating that further tests might be needed (*see* Defs.' Ex. J, Discharge Summary, November 2007). *See Brock,* 315 F.3d at 167 ("It is not controverted that [defendant] was aware that [plaintiff] was suffering some pain from his scar. The defendants sought to cast doubt on the truthfulness of [plaintiff's] claims about the extent of the pain he was suffering and, also, to put into question DOCS' awareness of [plaintiff's] condition. But at most, defendants' arguments and evidence to these effects raise issues for a jury and do not justify summary judgment for them."); *Hathaway,* 37 F.3d at 68-69 (holding that, *inter alia,* two-year delay in surgery despite plaintiff's repeated complaints of pain could support finding of deliberate indifference). The fact that defendants offered some treatment in response to plaintiff's complaints does not as a matter of law establish that they had no subjectively culpable intent. *See Archer v. Dutcher,* 733 F.2d 14, 16 (2d Cir.1984) ("[Plaintiff] received extensive medical attention, and the records maintained by the prison officials and hospital do substantiate the conclusion that [defendants] provided [plaintiff] with comprehensive, if not doting, health care. Nonetheless, [plaintiff's] affidavit in opposition to the motion for summary judgment does raise material factual disputes, irrespective of their likely resolution.... [Plaintiff's assertions] do raise material factual issues. After all, if defendants did decide to delay emergency medical-aid-even for 'only' five hours-in order to make [plaintiff] suffer, surely a claim would be stated under *Estelle.*"). Specifically, given the factual disputes in this case, the Court cannot conclude as a matter of law that defendants did not act with deliberate indifference when they allegedly declined to change their treatment for plaintiff's shoulder pain despite repeated complaints over several months that the pain persisted. *See, e.g., Lloyd,* 570 F.Supp.2d at 569 ("[T]he amended complaint plausibly alleges that doctors knew that [plaintiff] was experiencing extreme pain and loss of mobility, knew that the course of treatment they prescribed was ineffective, and declined to do anything to attempt to improve [plaintiff's] situation besides re-submitting MRI request forms.... Had the doctors followed up on numerous requests for an MRI, the injury would have been discovered earlier, and some of the serious pain and discomfort that [plaintiff] experienced for more than a year could have been averted."). Thus, there are factual disputes that prevent summary judgment on defendants' subjective intent.

In sum, on this record, drawing all reasonable inferences from the facts in favor of plaintiff, a rational jury could find that defendants acted with deliberate indifference to plaintiff's shoulder pain. Accordingly, defendants' motion for summary judgment on this claim is denied.

***365** C. Individual Defendants

Defendants also move for summary judgment specifically with respect to plaintiff's claims against three of the individual defendants: Sheriff Edward Reilly (hereinafter "Reilly"), Edwards, and Okonta. For the reasons set forth below, the Court grants defendants' motion with respect to Reilly, and denies it with respect to Edwards and Okonta.

1. Legal Standard

[20] "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under Section 1983." *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citation and quotation marks omitted). In other words, "supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on respondeat superior." *Id.* Supervisor liability can be shown in one or more of the following ways: "(1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring." *Id.* at 145 (citation omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

2. Application

[21] Although plaintiff alleges in the complaint that Reilly was aware of plaintiff's condition and failed to assist,[FN20] there is no mention whatsoever of Reilly in plaintiff's deposition or in any of the parties' evidentiary submissions. Because there is no evidence in the record that Reilly was personally involved in any of the alleged constitutional violations or that there was a custom or policy of allowing such constitutional violations (and that Reilly allowed such custom or policy to continue), no rational jury could find Reilly liable for any of plaintiff's deliberate indifference claims. *See Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) ("[M]ere linkage in the prison chain of command is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim."); *see also Mastroianni v. Reilly,* 602 F.Supp.2d 425, 438-39 (E.D.N.Y.2009) ("[T]he plaintiff cannot establish that Sheriff Reilly was grossly negligent in failing to supervise subordinates because the medical care of inmates at the NCCC was delegated to the Nassau Health Care Corporation and plaintiff provides no evidence that Reilly was otherwise personally involved in his treatment."). Therefore, defendants' motion for summary judgment with respect to plaintiff's claims against Sheriff Reilly is granted.

FN20. Plaintiff actually refers in the complaint to "Sheriff Edwards," but the Court determines, liberally construing the complaint, that this allegation refers to Sheriff Reilly.

[22] With respect to plaintiff's claims against Edwards and Okonta, however, there are disputed issues of fact that preclude summary judgment. Defendants argue that Edwards was not personally involved in the alleged constitutional violations because she did not treat plaintiff and merely responded to his grievance request. (Defs.' Br. at 24-25.) However, plaintiff testified that, although Edwards never physically treated him, she "takes care of appointments and makes sure you get to certain specialists" and that "she was in a position to make sure that I get the adequate care that I needed." (Price Dep. at 61-62.) Plaintiff also testified that he submitted a grievance request to ***366** Edwards in order to be tested for the kidney transplant list, but that Edwards failed to get him on the list. (Price Dep. at 62-63.) Drawing all reasonable inferences in favor of plaintiff, a rational jury could find that Edwards was personally involved in the alleged constitutional violations because she was in a position to get plaintiff tested for the kidney transplant list and failed to do so. *See McKenna v. Wright,* 386 F.3d 432, 437-38 (2d Cir.2004) ("Although it is questionable whether an adjudicator's rejection of an administrative grievance would make him liable for the conduct complained of, [defendant] was properly retained in the lawsuit at this stage, not simply because he rejected the grievance, but because he is alleged, as Deputy Superintendent for Administration at [the prison], to have been responsible for the prison's medical program." (citation omitted)). Thus, plaintiff has presented sufficient evidence of Edwards's personal involvement in the alleged constitutional violations to raise a genuine issue of material fact as to whether Edwards is liable for the alleged Eighth Amendment violations.

[23][24] Defendants also argue that Okonta was not personally involved in the alleged constitutional violations because he did not actually treat plaintiff. (Defs.' Br. at 24-25.) This argument misses the mark. It is plaintiff's allegation that Okonta violated plaintiff's constitutional rights precisely by not treating him. Plaintiff has presented evidence that he received no response from Okonta regarding his requests to be tested for the kidney transplant list. Where a prison doctor denies medical treatment to an inmate, that doctor is personally involved in the alleged constitutional violation. *See McKenna,* 386 F.3d at 437 (finding "personal involvement" where medical defendants were alleged to have participated in the denial of treatment); *see also Chambers v. Wright,* No. 05 Civ. 9915, 2007 WL 4462181, at *3 (S.D.N.Y. Dec. 19, 2007) ("Prison doctors who have denied medical treatment to an inmate are 'personally involved' for the purposes of jurisdiction under § 1983." (citing *McKenna,* 386 F.3d at 437)). Although defendants argue that they were in fact making efforts to get plaintiff tested (Defs.' Br. at 25), the reasonableness of those efforts, as discussed above, is a factual question inappropriate for resolution on summary judgment.

In sum, defendants' motion for summary judgment on plaintiff's claims against Reilly is granted. Defendants' motion with respect to Edwards and Okonta is denied.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

V. CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part defendants' motion for summary judgment. Specifically, the Court grants defendants' motion with respect to plaintiff's claim regarding the dosage of his renal disease medication and with respect to all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects. The parties to this action shall participate in a telephone conference on Monday, April 5, 2010 at 3:30 p.m. At that time, counsel for defendants shall initiate the call and, with all parties on the line, contact Chambers at (631) 712-5670.

SO ORDERED.

E.D.N.Y.,2010.
Price v. Reilly
697 F.Supp.2d 344

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.





Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Karus LAFAVE, Plaintiff,
v.
CLINTON COUNTY, Defendants.
**No. CIV.9:00CV0744DNHGLS.**

April 3, 2002.

Karus Lafave, Plaintiff, Pro Se, Plattsburgh, for the Plaintiff.

Maynard, O'Connor Law Firm, Albany, Edwin J. Tobin, Jr., Esq., for the Defendants.

REPORT-RECOMMENDATION [FN1]

FN1. This matter was referred to the undersigned for Report-Recommendation by the Hon. David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and L.R. 72.3(c).

SHARPE, Magistrate J.

I. INTRODUCTION

***1** Plaintiff, *pro se,* Karus LaFave ("LaFave") originally filed this action in Clinton County Supreme Court. The defendant filed a Notice of Removal because the complaint presented a federal question concerning a violation of LaFave's Eighth Amendment rights (Dkt. No. 1). Currently before the court is the defendant's motion to dismiss made pursuant to Rule 12(b)(6) and in the alternative, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure (Dkt. No. 5). LaFave, in response, is requesting that the court deny the motion, excuse his inability to timely file several motions, and to permit the matter to be bought before a jury [FN2]. After reviewing LaFave's claims and for the reasons set forth below, the defendant's converted motion for summary judgment should be granted.

FN2. It should be noted that the date for dispositive motions was February 16, 2001. The defendant's motion to dismiss was filed on September 29, 2000. On January 9, 2001, this court converted the defendant's motion to dismiss to a motion for summary judgment, and gave LaFave a month to respond. On April 16, 2001, after three months and four extensions, LaFave finally responded.

II. BACKGROUND

LaFave brings this action under 42 U.S.C. § 1983 claiming that the defendant violated his civil rights under the Eighth Amendment [FN3]. He alleges that the defendant failed to provide adequate medical and dental care causing three different teeth to be extracted.

FN3. LaFave does not specifically state that the defendant violated his Eighth Amendment rights but this conclusion is appropriate after reviewing the complaint.

III. FACTS [FN4]

FN4. While the defendant provided the court with a "statement of material facts not in issue" and LaFave provided the court with "statement of material facts genuine in issue," neither provided the court with the exact nature of the facts.

Between January and July of 1999, LaFave, on several occasions, requested dental treatment because he was experiencing severe pain with three of his teeth. After being seen on several occasions by a Clinton County

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Correctional Facility ("Clinton") doctor, he was referred to a dentist. Initially, LaFave's mother had made an appointment for him to see a dentist, but he alleges that Nurse LaBarge ("LaBarge") did not permit him to be released to the dentist's office [FN5]. Subsequently, he was seen by Dr. Boule, D.D.S ., on two occasions for dental examinations and tooth extractions.

FN5. This appears to be in dispute because the medical records show that LaFave at first stated that his mother was going to make arrangements, but later requested that the facility provide a dentist.

## IV. DISCUSSION

### A. *Legal Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc .,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once this burden is met, it shifts to the opposing party who, through affidavits or otherwise, must show that there is a material factual issue for trial. Fed.R.Civ.P. 56(e); *see Smythe v. American Red Cross Blood Services Northeastern New York Region,* 797 F.Supp. 147, 151 (N.D.N.Y.1992).

Finally, when considering summary judgment motions, *pro se* parties are held to a less stringent standard than attorneys. *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); *Haines v. Kerner,* 404 U.S. 519, 520-21, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972). Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). With this standard in mind, the court now turns to the sufficiency of LaFave's claims.

### B. *Eighth Amendment Claims*

***2** LaFave alleges that his Eighth Amendment rights were violated when the defendant failed to provide adequate medical care for his dental condition. The Eighth Amendment does not mandate comfortable prisons, yet it does not tolerate inhumane prisons either, and the conditions of an inmate's confinement are subject to examination under the Eighth Amendment. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1975, 128 L.Ed.2d 811 (1994). Nevertheless, deprivations suffered by inmates as a result of their incarceration only become reprehensible to the Eighth Amendment when they deny the minimal civilized measure of life's necessities. *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991) (*quoting Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)).

Moreover, the Eighth Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency ..." against which penal measures must be evaluated. See *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d (1976). Repugnant to the Amendment are punishments hostile to the standards of decency that " 'mark the progress of a maturing society." ' *Id.* (*quoting Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion)). Also repugnant to the Amendment, are punishments that involve " 'unnecessary and wanton inflictions of pain." ' *Id.* at 103,97 S.Ct. at 290 (*quoting Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)).

In light of these elementary principles, a state has a constitutional obligation to provide inmates adequate medical care. See *West v. Atkins,* 487 U.S. 42, 54, 108 S.Ct. 2250, 2258, 101 L.Ed.2d 40 (1988). By virtue of their incarceration, inmates are utterly dependant upon prison authorities to treat their medical ills and are wholly powerless to help themselves if the state languishes in its obligation. *See Estelle,* 429 U.S. at 103, 97 S.Ct. at 290. The essence of an improper medical treatment claim lies in proof of "deliberate indifference to serious medical

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

needs." *Id.* at 104, 97 S.Ct. at 291. Deliberate indifference may be manifested by a prison doctor's response to an inmate's needs. *Id.* It may also be shown by a corrections officer denying or delaying an inmate's access to medical care or by intentionally interfering with an inmate's treatment. *Id.* at 104-105, 97 S.Ct. at 291.

The standard of deliberate indifference includes both subjective and objective components. The objective component requires the alleged deprivation to be sufficiently serious, while the subjective component requires the defendant to act with a sufficiently culpable state of mind. *See* *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). A prison official acts with deliberate indifference when he " 'knows of and disregards an excessive risk to inmate health or safety." ' *Id.* (*quoting* *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979). However, " 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." ' *Id.*

***3** However, an Eighth Amendment claim may be dismissed if there is no evidence that a defendant acted with deliberate indifference to a serious medical need. An inmate does not have a right to the treatment of his choice. *See* *Murphy v. Grabo,* 1998 WL 166840, at *4 (N.D.N.Y. April 9, 1998) (*citation omitted* ). Also, mere disagreement with the prescribed course of treatment does not always rise to the level of a constitutional claim. *See* *Chance,* 143 F.3d at 703. Moreover, prison officials have broad discretion to determine the nature and character of medical treatment which is provided to inmates. *See* *Murphy,* 1998 WL 166840, at *4 (*citation omitted* ).

While there is no exact definition of a "serious medical condition" in this circuit, the Second Circuit has indicated what injuries and medical conditions are serious enough to implicate the Eighth Amendment. *See* *Chance,* 143 F.3d at 702-703. In *Chance,* the Second Circuit held that an inmate complaining of a dental condition stated a serious medical need by showing that he suffered from great pain for six months. The inmate was also unable to chew food and lost several teeth. The Circuit also recognized that dental conditions, along with medical conditions, can vary in severity and may not all be severe. *Id.* at 702. The court acknowledged that while some injuries are not serious enough to violate a constitutional right, other very similar injuries can violate a constitutional right under different factual circumstances. *Id.*

The Second Circuit provided some of the factors to be considered when determining if a serious medical condition exists. *Id.* at 702-703. The court stated that " '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain" ' are highly relevant. *Id.* at 702-703 *(citation omitted* ). Moreover, when seeking to impose liability on a municipality, as LaFave does in this case, he must show that a municipal "policy" or "custom caused the deprivation." *Wimmer v. Suffolk County Police Dep't,* 176 F.3d 125, 137 (2d Cir.1999).

In this case, the defendant maintains that the medical staff was not deliberately indifferent to his serious medical needs. As a basis for their assertion, they provide LaFave's medical records and an affidavit from Dr. Viqar Qudsi [FN6], M.D, who treated LaFave while he was incarcerated at Clinton. The medical records show that he was repeatedly seen, and prescribed medication for his pain. In addition, the record shows that on various occasions, LaFave refused medication because "he was too lazy" to get out of bed when the nurse with the medication came to his cell (*Def. ['s] Ex. A, P. 4)* .

FN6. Dr. Qudsi is not a party to this action.

According to the documents provided, Dr. Qudsi, examined LaFave on January 13, 1999, after LaFave reported to LaBarge that he had a headache and discomfort in his bottom left molar (*Qudsi Aff., P. 2).* Dr. Qudsi noted that a cavity was present in his left lower molar. *Id.* He prescribed Tylenol as needed for the pain and 500 milligrams ("mg") of erythromycin twice daily to prevent bacteria and infection. *Id.* On January 18, 19, and 20, 1999, the medical records show that LaFave refused his erythromycin medication (*Def. ['s] Ex. B, P. 1).*

***4** Between January 20, and April 12, 1999, LaFave made no complaints concerning his alleged mouth pain. On

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

April 12, 1999, LaFave was examined by LaBarge due to a complaint of pain in his lower left molar (*Def. ['s] Ex. A, P. 4* ). Dr. Qudsi examined him again on April 14, 1999. *Id.* He noted a cavity with pulp decay and slight swelling with no discharge. *Id.* He noted an abscess in his left lower molar and again prescribed 500 mg erythromycin tablets twice daily and 600 mg of Motrin three times daily for ten days with instructions to see the dentist. *Id.* On the same day, LaBarge made an appointment for LaFave to see an outside dentist that provides dental service to facility inmates, Dr. Boule *(Qudsi Aff., P. 3).*

On May 3, 1999, LaBarge was informed by LaFave that his mother would be making a dental appointment with their own dentist and that the family would pay for the treatment (*Def. ['s] Ex. A, P. 4* ). On that same day, Superintendent Major Smith authorized an outside dental visit. *Id.* On May 12, 1999, he was seen by LaBarge for an unrelated injury and he complained about his lower left molar (*Def .['s] Ex. A, P. 5* ). At that time, LaFave requested that LaBarge schedule a new appointment with Dr. Boule because the family had changed their mind about paying an outside dentist. *Id.* LaBarge noted that he was eating candy and informed him of the deleterious effects of candy on his dental condition. *Id.* Thereafter, LaBarge scheduled him for the next available date which was June 24, 1999, at noon. *Id.*

On June 2, 1999, LaFave again requested sick call complaining for the first time about tooth pain in his upper right molar and his other lower left molar (*Def. ['s] Ex. A, P. 6* ). He claimed that both molars caused him discomfort and bothered him most at night. *Id.* LaFave confirmed that he had received treatment from Dr. Boule for his first lower left molar one week before. *Id.* The area of his prior extraction was clean and dry. *Id.* There was no abscess, infection, swelling, drainage or foul odor noted. *Id.* LaBarge recommended Tylenol as needed for any further tooth discomfort. *Id.*

On June 21, 1999, LaFave again requested a sick call and was seen by LaBarge (*Def. ['s] Ex. A, P. 6* ). No swelling, drainage or infection was observed. *Id.* However, LaBarge noted cavities in LaFave's lower left molar and right lower molars. *Id.* LaBarge made arrangements for Dr. Qudsi to further assess LaFave. *Id.* On June 23, 1999, Dr. Qudsi examined his right lower molar and noted cavitation with decay in that area (*Def. ['s] Ex. A, P. 7* ). In addition, he noted that LaFave had a cavity in his second left lower molar. *Id.* He prescribed 500 mg of erythromycin twice daily for 10 days and 600 mg of Motrin three times daily for 10 days, with instructions to see a dentist. *Id.*

On June 30, 1999, Officer Carroll reported that LaFave was again non-compliant with his medication regimen as he refused to get up to receive his medication (*Def. ['s] Ex. A, P. 8* ). On July 7, 1999, he again requested sick call complaining of a toothache in his lower right molar (*Def. ['s] Ex. A, P. 9* ). Again, LaFave was non-compliant as he had only taken his erythromycin for five days instead of the ten days prescribed. *Id.* During the examination, Dr. Qudsi informed LaFave that extraction of these teeth could be necessary if he did not respond to conservative treatment. *Id.* At that time, LaFave informed Dr. Qudsi that he was going to be transferred to another facility. *Id.* Dr. Qudsi advised LaFave to follow-up with a dentist when he arrived at the new facility. *Id.* Dr. Qudsi prescribed 500 mg Naproxin twice daily for thirty days with instructions to follow-up with him in two weeks if the pain increased. *Id.* The following day, LaFave requested sick call complaining to LaBarge that he had taken one dose of Naproxin and it was not relieving the pain. *Id.* He was advised that he needed to take more than one dose to allow the Naproxin to take effect. *Id.*

***5** On July 17, 1999, LaFave was again seen by Dr. Qudsi and he indicated that he did not believe he was benefitting from the prescribed course of conservative treatment with medication (*Def. ['s] Ex. A, P. 10* ). Subsequently, LaBarge made a dental appointment for him on July 23 [FN7], 1999, at 3:15 p.m. *Id.* On July 23, 1999, a second extraction was conducted. *Id.* On July 28, 1999, he was again seen by Dr. Qudsi, for an ulceration at the left angle of his mouth for which he prescribed bacitracin ointment. *Id.* At this time, LaFave continued to complain of tooth pain so he was prescribed 600 mg of Motrin three times daily. *Id.*

FN7. The medical records contain an error on the July 17, 1999, note which indicted that an appointment was set for June 23, 1999, however, it should have been recorded as July 23, 1999.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

On August 4, 1999, he was seen for feeling a sharp piece of bone residing in the area of his lower left molar (*Def. ['s] Ex. A, P. 11* ). Dr. Qudsi recommended observation and to follow-up with dental care if his condition continued. *Id.* The defendant maintains that given all of the documentation that he was seen when he requested to be seen and prescribed numerous medications, the medical staff was not deliberately indifferent to his serious medical needs. The defendant contends that at all times, professional and contentious dental and medical treatment were provided in regards to his various complaints.

In his response, LaFave disagrees alleging that the county had a custom or policy not to provide medical treatment to prisoners. However, LaFave does not allege in his complaint that the county had a "custom or policy" which deprived him of a right to adequate medical or dental care. In his response to the motion for summary judgment, for the first time, LaFave alleges that the county had a policy which deprived him of his rights. He maintains that his continued complaints of pain were ignored and although he was prescribed medication, it simply did not relieve his severe pain.

This court finds that the defendant was not deliberately indifferent to his serious dental and medical needs. Moreover, even if this court construed his complaint to state a viable claim against the county, LaFave has failed to show that the county provided inadequate medical and dental treatment. As previously stated, an inmate does not have the right to the treatment of his choice. The record shows that he was seen numerous times, and referred to a dentist on two occasions over a six month period. While LaFave argues that the dental appointments were untimely, the record shows that the initial delay occurred because he claimed that his mother was going to make the appointment but later changed her mind. In addition, the record demonstrates that he did not adhere to the prescribed medication regime. On various occasions, LaFave failed to get out of bed to obtain his medication in order to prevent infection in his mouth. Although it is apparent that LaFave disagreed with the treatment provided by Clinton, the record does not show that the defendant was deliberately indifferent to his serious medical needs. Accordingly, this court recommends that the defendant's motion for summary judgment should be granted.

***6** WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that the defendant's motion for summary judgment (Dkt. No. 5) be GRANTED in favor of the defendant in all respects; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2002.
Lafave v. Clinton County
Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.





Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York State Department of Correctional Services; Peter J. Lacy, Superintendent at Bare Hill Corr. Facility; Wendell Babbie, Acting Superintendent at Altona Corr. Facility; and John Doe, Corrections Officer at Bare Hill Corr. Facility, Defendants.
**No. 97-CV-1385 LEK DRH.**

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of New York, Albany, Eric D. Handelman, Esq., Asst. Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

***1** This matter comes before the Court following a Report-Recommendation filed on August 21, 1998 by the Honorable David R. Homer, Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern District of New York.

No objections to the Report-Recommendation have been raised. Furthermore, after examining the record, the Court has determined that the Report-Recommendation is not clearly erroneous. *See*Fed.R.Civ.P. 72(b), Advisory Committee Notes. Accordingly, the Court adopts the Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is GRANTED; and it is further

ORDERED that the complaint is dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m), and the action is therefore dismissed in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER [FN1]

FN1. This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of Correctional Services ("DOCS"), brought this pro se action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that while incarcerated in Bare Hill Correctional Facility ("Bare Hill") and Altona Correctional Facility ("Altona"), defendants violated his rights under the Eighth and Fourteenth Amendments.[FN2] In particular, plaintiff alleges that prison officials maintained overcrowded facilities resulting in physical and emotional injury to the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. *Id.* at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. *Id.* at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. *Id.* at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. *Id.* at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. *Id.* at ¶¶ 22, 27-28.

II. Motion to Dismiss

***2** When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Staron v. McDonald's Corp.,* 51 F.3d 353, 355 (2d Cir.1995) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

III. Discussion

A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Rhodes v. Chapman,* 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. *Farmer,* 511 U.S. at 837.

1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes,* 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir.1997)).

***3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare* *Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and* *Zolnowski v. County of Erie,* 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with* *Harris v. Murray,* 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer,* 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See* *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer,* 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See* *Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,*524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

***4** Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See* *Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware* that there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also* *Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See* *Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at *3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at *3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

IV. Failure to Complete Service

***5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.





H

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

D. South Carolina,
Florence Division.
Reginold Darnell HOOVER, Plaintiff,
v.
CCS CORRECT CARE SOLUTIONS, INC., Nurse Monica, C/O F. Aderson a/k/a Anderson, and Sgt. Clawson, Defendants.
C/A No. 4:09–1091–SB–TER.

July 7, 2010.
Reginold Darnell Hoover, Lexington, SC, pro se.

Roy Pearce Maybank, Maybank Law Firm, Charleston, SC, Daniel C. Plyler, William Henry Davidson, II, Davidson Morrison and Lindemann, Columbia, SC, for Defendants.

Report and Recommendation

THOMAS E. ROGERS, III, United States Magistrate Judge.

## *I. PROCEDURAL BACKGROUND*

***1** The plaintiff, Reginold Darnell Hoover, filed this action under 42 U.S.C. § 1983 [FN1] on April 27, 2009, alleging violations of his constitutional rights. During the time of the matters alleged in his complaint, plaintiff was housed at the Lexington County Detention Center (LCDC) as a pretrial detainee. Defendants Correct Care Solutions, Inc., and Nurse Monica ("defendants") filed a motion for summary judgment on November 16, 2009, along with a memorandum, affidavits, and exhibits in support of said motion. [FN2] (Doc. # 43). Because plaintiff is proceeding *pro se,* he was advised on or about November 17, 2009, pursuant to *Roseboro v. Garrison,* 528 F.2d 309 (4th Cir.1975), that a failure to respond to the defendants' motion for summary judgment could result in the dismissal of his complaint. The plaintiff failed to file a response.

> FN1. All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d), DSC. Because this is a dispositive motion, the report and recommendation is entered for review by the District Judge.

> FN2. A separate report and recommendation will be entered as to defendants Anderson and Clawson. Plaintiff filed a response to their motion for summary judgment.

An Order was issued on June 21, 2010, giving the plaintiff ten (10) days to file a response to said summary judgment or his case may be dismissed pursuant to Rule 41b of the Federal Rules of Civil Procedure. This Order was returned to the Clerk of Court's office *via* United States Postal Service on June 28, 2010, marked "Return to Sender." (Doc. # 51). Plaintiff failed to file a response.

## *II. DISCUSSION*

### A. *ARGUMENT OF PARTIES/ FACTUAL ALLEGATIONS*

The plaintiff alleges that his constitutional rights have been violated while housed at LCDC. Specifically, plaintiff alleges he was attacked by another inmate, knocked unconscious, received a broken jaw, and that Nurse Monica and defendant Anderson attended to his injuries immediately after the attack but that the medical care was deficient. Plaintiff alleges that the health care provided failed to examine and treat his injuries in an "orderly and timely manner" and complains that he did not receive an x-ray for several days after his injury and then it was several days before he received the results. (Complaint). Plaintiff seeks monetary damages.

### B. *STANDARD FOR SUMMARY JUDGMENT*

As previously stated, defendant and plaintiff have filed motions for summary judgment. A federal court must

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

liberally construe pleadings filed by *pro se* litigants, to allow them to fully develop potentially meritorious cases. *See* *Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972), and *Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). In considering a motion for summary judgment, the court's function is not to decide issues of fact, but to decide whether there is an issue of fact to be tried. The requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts which set forth a federal claim, *Weller v. Department of Social Services,* 901 F.2d 387 (4th Cir.1990), nor can the court assume the existence of a genuine issue of material fact where none exists. If none can be shown, the motion should be granted. Fed.R.Civ.P. 56(c). The movant has the burden of proving that a judgment on the pleadings is appropriate. Once the moving party makes this showing, however, the opposing party must respond to the motion with "specific facts showing that there is a genuine issue for trial." The opposing party may not rest on the mere assertions contained in the pleadings. Fed.R.Civ.P. 56(e) and *Celotex v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

***2** The Federal Rules of Civil Procedure encourage the entry of summary judgment where both parties have had ample opportunity to explore the merits of their cases and examination of the case makes it clear that one party has failed to establish the existence of an essential element in the case, on which that party will bear the burden of proof at trial. *See* Fed.R.Civ.P. 56(c). Where the movant can show a complete failure of proof concerning an essential element of the non-moving party's case, all other facts become immaterial because there can be "no genuine issue of material fact." In the *Celotex* case, the court held that defendants were "entitled to judgment as a matter of law" under Rule 56(c) because the plaintiff failed to make a sufficient showing on essential elements of his case with respect to which he has the burden of proof. *Celotex,* 477 U.S. at 322–323.

***C. RULE 41(B) DISMISSAL***

A complaint may be dismissed pursuant to Rule 41(b) of the Federal Rules of Civil Procedure for failure to prosecute and/or failure to comply with orders of the court. *Ballard v. Carlson,* 882 F.2d 93 (4th Cir.1989), *cert. denied* 493 U.S. 1084, 110 S.Ct. 1145, 107 L.Ed.2d 1049 (1990) and *Chandler Leasing Corp. v. Lopez,* 669 F.2d 919 (4th Cir.1982). In considering whether to dismiss an action pursuant to Rule 41(b), the court is required to consider four factors:

(1) the degree of Plaintiff's responsibility in failing to respond;

(2) the amount of prejudice to the Defendant;

(3) the history of the Plaintiff in proceeding in a dilatory manner; and,

(4) the existence of less drastic sanctions other than dismissal.

*Davis v. Williams,* 588 F.2d 69 (4th Cir.1978).

In the present case, the plaintiff is proceeding *pro se* so he is entirely responsible for his actions. It is solely through plaintiff's neglect, and not that of an attorney, that no responses have been filed. Plaintiff has not responded to defendants' motion for summary judgment, or the court's Orders requiring him to respond.

An Order was entered on May 12, 2009, authorizing service of process, granting the motion for *in forma pauperis,* and instructing plaintiff that he must always keep the court informed in writing of his address or his case may be dismissed for violating said order. (Docs.# 6). Plaintiff has failed to provide an updated address to the court. Thus, plaintiff has failed to comply with the Orders of this court.

The undersigned concludes the plaintiff has abandoned his lawsuit as to these Defendants. No other reasonable sanctions are available. Accordingly, it is recommended that this action be dismissed pursuant to Fed. R. Civ. Proc. 41(b) as to defendants Correct Care Solutions, Inc. and Nurse Monica.[FN3]

FN3. In the alternative, it is recommended that defendants' motion for summary judgment be granted with respect to medical indifference. Based on a review of plaintiff's own pleadings and the evidence submitted, the undersigned

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

finds that the plaintiff fails to show that defendants were deliberately indifferent to his medical needs.

To establish deliberate indifference, plaintiff must show treatment "so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness (citation omitted), ... nevertheless, mere negligence or malpractice does not violate the Eighth Amendment." *Miltier v. Beorn,896* F.2d 848, 851 (4th Cir.1990). Unless medical needs were serious or life threatening, and the defendant was deliberately and intentionally indifferent to those needs of which he was aware at the time, the plaintiff may not prevail. *Estelle, supra; Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Sosebee v. Murphy,* 797 F.2d 179 (4th Cir.1986).

Based on the pleadings, medical records, and affidavits, although plaintiff did not agree with the type of treatment or the timing of treatment he received, the fact is plaintiff was provided treatment. He states in his complaint that he was examined by Nurse Monica immediately following the attack. Plaintiff was seen in medical the next day for his jaw pain, received x-rays, was placed on a soft diet, was prescribed medication for pain, was referred to an oral surgeon based on the fact that x-rays revealed a non-displaced fracture of the right mandible, and underwent surgical repair of his fracture on April 2, 2009. (See affidavit and plaintiff's medical records, doc. # 43).

As previously stated, a disagreement as to the proper treatment to be received does not in and of itself state a constitutional violation. Negligent or incorrect medical treatment is not actionable under 42 U.S.C. § 1983. Based on the evidence presented, there has been no deliberate indifference shown to the overall medical needs of the plaintiff. For the above stated reasons, summary judgment should be granted in favor of defendants on this issue.

### *III. CONCLUSION*

As set out above, a review of the record indicates that the plaintiff's complaint should be dismissed for failure to prosecute as to defendants Correct Care Solutions and Nurse Monica. It is, therefore,

***3** RECOMMENDED that plaintiff's complaint be dismissed for failure to prosecute pursuant to Fed. R. Civ. Proc. 41(b) with prejudice as to these defendants.

D.S.C.,2010.

Hoover v. CCS Correct Care Solutions, Inc.
Not Reported in F.Supp.2d, 2010 WL 2985816 (D.S.C.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.





H

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

D. South Carolina,
Florence Division.
Reginold Darnell HOOVER, Plaintiff,
v.
CCS CORRECT CARE SOLUTIONS, INC., Nurse Monica, C/O F. Anderson a/k/a Anderson, and Sgt. Clawson, Defendants.
Civil Action No. 4:09–1091–SB.

July 26, 2010.
Reginold Darnell Hoover, Lexington, SC, pro se.

Roy Pearce Maybank, Maybank Law Firm, Charleston, SC, Daniel C. Plyler, William Henry Davidson, II, Davidson Morrison and Lindemann, Columbia, SC, for Defendants.

***ORDER***

SOL BLATT, JR., Senior District Judge.

***1** This matter is before the Court upon the Plaintiffs *pro se* complaint filed pursuant to 42 U.S.C. § 1983. By local rule, the matter was referred to a United States Magistrate Judge for preliminary determinations.

On October 16, 2010, Defendants Clawson and Anderson filed a motion for summary judgment. The Magistrate Judge issued an order pursuant to *Roseboro v. Garrison,* 528 F.2d 309 (4th Cir.1975), advising the Plaintiff of the summary judgment procedure and the possible consequences of failing to respond adequately to the motion. On November 3, 2009, the Plaintiff filed a response to the Defendants' motion.

Then, on November 16, 2009, Defendant CCS Correct Care Solutions, Inc. ("CCS") and Nurse Monica filed a motion for summary judgment. The Magistrate Judge issued another *Roseboro* order instructing the Plaintiff to respond to this motion. When the Plaintiff failed to respond, the Magistrate Judge entered an order on June 21, 2010, instructing the Plaintiff to respond to the motion within 10 days. The Plaintiff never filed a response to CCS's and Nurse Monica's motion.

On June 29, 2010, the Magistrate Judge issued a report and recommendation ("R & R") addressing the motion for summary judgment filed by Anderson and Clawson, recommending that the Court grant the motion. Then, on July 7, 2010, the Magistrate Judge issued a second R & R addressing CCS's and Nurse Monica's motion for summary judgment and recommending that the Court dismiss the Plaintiff's complaint as against CCS and Nurse Monica for failure to prosecute, pursuant to Rule 41(b) of the Federal Rules of Civil Procedure. Both the first R & R and the second R & R were returned to the Court as undeliverable and marked "not here." Apparently, the Plaintiff has failed to keep the Court updated of any change(s) in his address as he is required to do. Moreover, to date no objections to either R & R have been filed.

Absent timely objection from a dissatisfied party, a district court is not required to review, under a *de novo* or any other standard, a Magistrate Judge's factual or legal conclusions. *Thomas v. Am,* 474 U.S. 140, 150, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wells v. Shriner's Hosp.,* 109 F.3d 198, 201 (4th Cir.1997). Here, because the Plaintiff did not file any specific, written objections, the Court need not conduct a de novo review of any portion of either R & R. Accordingly, after review the Court hereby adopts the Magistrate Judge's first R & R (Entry 53) and second R & R (Entry 55) as the orders of this Court, and it is

**ORDERED** that the motion for summary judgment filed by Defendants Ciawson and Anderson (Entry 35) is granted, and the Plaintiff's complaint as against Defendants CCS and Nurse Monica is dismissed, without prejudice,[FN1] for failure to prosecute pursuant to Rule 41(b) of the Federal Rules of Civil Procedure. The motion

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

for summary judgment filed by CCS and Nurse Monica (Entry 43) is therefore deemed moot, and this matter is ended.

FN1. The Magistrate Judge recommended a "with prejudice" dismissal; however, in the interest of fairness to the *pro se* Plaintiff, the Court dismisses his complaint against Defendants CCS and Nurse Monica without prejudice.

***2 AND IT IS SO ORDERED.**

D.S.C.,2010.

Hoover v. CCS Correct Care Solutions, Inc.
Not Reported in F.Supp.2d, 2010 WL 2933792 (D.S.C.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.





C

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Joseph MARTIN, Plaintiff,
v.
Joseph TATRO and Eric Fuenfstuek, Defendants.
No. 04-CV-800.

Oct. 7, 2005.
Bradford C. Riendeau, Watertown, NY, for Plaintiff, Bradford C. Riendeau, of counsel.

Eliot Spitzer, Attorney General of the State of New York, The Capitol, Albany, New York, for Defendants, Megan M. Brown, of counsel.

DECISION & ORDER

MCAVOY, Senior J.

I. INTRODUCTION

***1** Plaintiff Joseph Martin commenced this action pursuant to 42 U.S.C. § 1983 asserting that Defendants Joseph Tatro and Eric Fuenfstuek, New York State Troopers, violated his constitutional rights when they entered his home without a warrant, arrested him without justification, and used excessive force during the arrest. *See* Compl., doc. # 1. Defendants have moved for summary judgment pursuant to FED. R. CIV. P. 56 contending that their actions were legally justified or, in the alternative, that they are entitled to qualified immunity. For the reasons that follow, the motion is granted.

II. STANDARD FOR SUMMARY JUDGMENT

It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, *see* *Tenenbaum v. Williams,* 193 F.3d 581, 592 (2d Cir.1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(C). An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). A party seeking summary judgment bears the burden of informing the Court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

If the movant is able to establish a *prima facie* basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in his favor. *Abramson v. Pataki,* 278 F.3d 93, 101 (2d Cir.2002). However, a party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994), or on conclusory allegations or unsubstantiated speculation. *Scotto v. Almenas,* 143 F.3d 105, 114 (2d. Cir.1998).

III. BACKGROUND

The following facts are either (1) accepted as true for purposes of this motion because Plaintiff has admitted certain facts through the responsive Local Rule 7.1 Statements, *see* N.D.N.Y.L.R. 7.1(a)(3); Def. L.R. 7.1 Stat., doc. # 11-6; Plt. L.R. 7.1 Stat., doc. # 13,[FN1] or, (2) accepted as true because Plaintiff has failed to provide sufficient evidence or argument for the Court to discount a properly supported fact. Those facts derived from the first category are set forth below without citation to the record; those facts derived from the second category are set forth below with citation to the record and, in some instances, a footnote explaining either the limitation that a fact is accepted for, or the reason the Court has accepted the fact.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN1. In Plaintiff's responsive Local Rule 7.1 Statement of Material Facts, he "agrees" with the factual propositions set forth in paragraphs 1, 3-13, 17-18, 21, and 27-57 of Defendants' Local Rule 7 .1 Statement of Material Facts, and, thus, the facts stated in these paragraphs are accepted as true.

***2** In mid-June 2001, Plaintiff began staying at a house in St. Regis Falls, New York ("the house") three days each week. The house, a two-story building that was otherwise unoccupied, belonged to Tom Fisher who resided in Clayton, New York (approximately 100 miles from St. Regis Falls).

At approximately 6:00 p.m. on July 12, 2001, Plaintiff returned to the house after work. When trying to enter, his key broke off in the exterior door's lock preventing Plaintiff from opening the door. Consequently, Plaintiff entered the house by climbing through an open window. In doing so, Plaintiff entered head first and fell forward, or pivoted, into the house. It was light out at the time Plaintiff climbed through the window. Shortly after entering the house, a neighbor came to Plaintiff's door and the two had a discussion about "a tree." Def. Ex. B (Martin Sup. Dep.), p. 1.[FN2] Plaintiff then cleaned up and left the house to get something to eat. After eating at a local establishment, he returned to the house shortly after nine O'clock and "entered the residence through the unlocked and wide open front door." *Id.*[FN3]

FN2. As discussed *infra,* on July 16, 2001, Plaintiff went to the New York State Barracks to complain about his treatment by the Defendant State Troopers that is the subject of this action. In making this complaint, Plaintiff gave a sworn "Supporting Deposition" which Defendants have attached as Ex. B to their summary judgment papers.

FN3. The facts indicate that Plaintiff could not get the broken key out of the lock before he left for dinner.

On July 12, 2001, Defendants Tatro and Fuenfstuek, New York State Police Troopers stationed at Troop B in Malone, New York, were both on duty and assigned to separate patrol cars. At some point that evening,[FN4] each Defendant received a report that a burglary was in progress at a residence on Duane Street in St. Regis Falls, New York; that the house was reported as unoccupied because the owner lived out of the area; and that an "identified witness" made a complaint that a male subject was seen entering the residence through a window. *See* Def. L.R. 7.1 Stat. ¶¶ 14-16.[FN5] Both Defendants proceeded to St. Regis Falls and arrived at the house in their patrol cars approximately fifteen to twenty minutes after each had received the "burglary in progress" report. *Id.*

FN4. The parties' Local Rules Statements do not contain the time that the reports were received. Both Troopers assert that they arrived at the Fisher residence fifteen to twenty minutes after they had been informed of the complaint. *See* Def. L.R. 7.1 Stat. ¶¶ 14-16. There is no dispute that the Troopers were outside the house with Plaintiff at approximately 11:00 P.M. It is unclear how long they were at the residence before entering, and how long they were inside it before they came outside with Plaintiff.

FN5. Plaintiff "objects" to these asserted facts, contending that the assertions amount to inadmissible hearsay that cannot be considered on this motion. While hearsay may not be used to support a motion for summary judgment, *Sarno v. Douglas EllimanGibbons & Ives, Inc.,* 183 F.3d 155, 160 (2d Cir.1999), it appears that the defendants offer this evidence to show their states of mind at the time they went to, and eventually entered, the Fisher residence. Inasmuch as the information that was known to the Troopers when they took their challenged-actions is a pivotal issue on this motion, *see Devenpeck v. Alford,*-U.S.-,-, 125 S.Ct. 588, 593 (2004)( "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.")(citing *Maryland v. Pringle,* 540 U.S. 366, 371 (2003)); *Minnesota v. Olson,* 495 U.S. 91, 100

(1990)(warrantless intrusion into a home may be justified by hot pursuit of a fleeing felon, imminent destruction of evidence, the need to prevent a suspect's escape, or the risk of danger to the police or to other persons inside or outside the dwelling); *Kerman v. City of New York,* 261 F.3d 229, 235 (2d Cir.2001)( "For Fourth Amendment purposes, the reasonableness of an officer's belief must be assessed in light of the particular circumstances confronting the officer at the time.")(citing *Graham v. Connor,* 490 U.S. 386, 397 (1989)), and inasmuch as Plaintiff has done nothing to dispel Defendants' properly supported assertions that they received these complaints, *see* *Rexnord Holdings, Inc.,* 21 F.3d at 525-26; *Scotto,* 143 F.3d at 114, the Court accepts these facts as true for purposes of this motion. However, the evidence will be considered only for the effect the information might have had on Defendants' respective states of mind at the time, or on the state of mind of a reasonable officer in the same situation.

Upon arriving, Defendants observed a Dodge pickup in the driveway and a light on upstairs in the house. Trooper Fuenfstuek checked the exterior of the house and found all the doors were secured. Defendant Tatro observed an open window, which he believed was consistent with the report that a male had been seen entering the house through a window. Tatro Dec. ¶ 13.[FN6] Defendants contend that, at this point in time, they believed they were responding to a burglary in progress call, that a felony was occurring inside the residence, and that there was an urgent need to take action. Tatro Dec. ¶¶ 10-11; Fuenfstuek Dec. ¶¶ 13-14. They further contend that they reasonably believed that no warrant was required for their entrance into the house because "exigent circumstances" existed. Tatro Dec. ¶¶ 10-11; Fuenfstuek Dec. ¶¶ 13-14.[FN7]

FN6. Plaintiff "objects" to this statement on hearsay grounds. *See* Plt. L.R. 7.1 Stat. ¶ 20. The asserted fact of finding an open window is not hearsay, and is accepted for purposes of this motion because Plaintiff has provided no evidence to contradict this fact. Similarly, Defendant Tatro's belief as to the evidentiary value of the open window is not hearsay and is seemingly offered (and accepted) only for the purpose of demonstrating Tatro's state of mind at the time.

FN7. Plaintiff "objects" to these "facts": (1) on hearsay grounds; (2) because "state of mind, belief and the reasonableness thereof are questions for the jury;" and (3) "the existence ... of exigent circumstances is a conclusion of law based upon the fact determination by the trier of facts." Plt. L.R. 7.1 Stat. ¶ 19. Again, the Court accepts these assertions for state of mind purposes.

Both Troopers entered the house through the open window and began loudly announcing their presence by calling "State Police," but received no response. Tatro Dec. ¶ 15; Fuenfstuek Dec. ¶ 16. The Troopers proceeded up the stairs toward the light on the second floor while they continued to announce their presence. Tatro Dec. ¶ 19; Fuenfstuek Dec. ¶ 18.[FN8]

FN8. Plaintiff "objects" to these last two "facts" on the grounds that Plaintiff testified that he was asleep and did not hear these announcements. *See* Pltf. L.R. 7.1 Stat. ¶¶ 22, 23 (citing Plaintiff's deposition transcript). The fact that Plaintiff was asleep and did not hear the Troopers announce their presence, or see them ascend the stairs, does not mean it did not occur. Further, the absence of any testimony refuting these asserted facts, especially in light of the fact that Plaintiff claims that he was sleeping in his bed and heard a voice say "we're here" but did not know where it came from (so he rolled over and went back to sleep), *see* Martin Dep., ex. A, pp. 27-28, is nothing more than an unsupported denial. *See* *Rexnord Holdings, Inc.,* 21 F.3d at 525-26; *Scotto,* 143 F.3d at 114.

***3** Plaintiff awoke to find Trooper Tatro standing by his bed. Def. Ex. A (Martin Dep.), pp. 27-28. Tatro helped Plaintiff out of bed and held Plaintiff by his left arm. Defendants asked Plaintiff if there was anyone else in the

house, and Tatro instructed Plaintiff to face the wall and put his hands over his head. When he did, Tatro raised Plaintiff's tee-shirt and asked if he had "anything under there." Tatro then asked Plaintiff where the light switch was, but Plaintiff did not know. Plaintiff saw Fuenfstuek holstering his weapon but does not know if Tatro had his weapon drawn or holstered.[FN9]

FN9. Both defendants asserted that, when they entered the building, they believed it was necessary to have their weapons unholstered and pointing towards the ground based on the nature of the call to which they were responding. Def. L.R. 7.1 Stat. ¶ 23; Tatro Dec. ¶¶ 16-17; Fuenfstuek Dec. ¶¶ 15, 17. Plaintiff "objects" to these assertions on the grounds of (1) hearsay and (2) that state of mind is for the trier of fact. Because the only material fact is whether Plaintiff knew the officers had their handguns drawn, and because he saw one officer with his handgun being re-holstered but does not know if the other officer had his gun out of its holster, it is irrelevant what the officers did in this regard when they entered the building.

Tatro asked to see Plaintiff's identification, which Plaintiff said was downstairs in the kitchen. Def. Ex. B, p. 2. Tatro instructed Plaintiff to proceed downstairs. Tatro escorted Plaintiff by holding Plaintiff's upper left arm with a very tight grip. However, as Plaintiff took the first step on the stairs, he stumbled and Tatro let go of Plaintiff's arm. While Tatro was accompanying Plaintiff down the stairs, Fuenfstuek checked in closets and other rooms upstairs, shouting that he found no weapons or other people in the house.

Once downstairs, Tatro asked Plaintiff questions about the amount of cash he had with him and why he had certain tools in the house. Tatro then asked Plaintiff to step outside. Plaintiff asked if he could put his boots on, although he did not know where they were. Fuenfstuek advised Plaintiff that there was a pair of boots in the bathroom, and Plaintiff put on these boots and went outside.

Once outside, Tatro asked for Plaintiff's license and registration. Plaintiff sat in his vehicle while Tatro checked Plaintiff's license information via the police radio. Tatro then asked Plaintiff if he knew his neighbors. Plaintiff indicated that he did. Tatro escorted Plaintiff to one of the neighbors' houses and knocked on the door, apparently to see if the neighbor could identify Plaintiff. It was approximately eleven o'clock in the evening. No one answered the door at the neighbor's house.

Tatro then returned with Plaintiff to the house and instructed Plaintiff to sit in the driver's side of Plaintiff's car. Tatro spoke with Fuenfstuek, and then Fuenfstuek left in his patrol car. Tatro told Plaintiff to have his landlord call the State Police or else Plaintiff would be "hearing from [them]." Plaintiff told Tatro: "You haven't been too bad, but I wish I could say the same for your partner."

On July 16, 2001, Plaintiff went to the New York State Police barracks to file a complaint regarding his treatment by Defendants on July 12th. The State Police took photographs of three bruises Plaintiff noticed on his body the day after the incident-one on the right hand side of his torso under his arm, and two on his upper left arm. *See* Def. Ex. B, p. 3. In his sworn Supporting Deposition given to the New York State Police on July 16, 2001, Plaintiff attests:

> I have no recollection of any specific incident that caused any of these bruises. Trooper Tatro did grip me by the left arm as he steered me toward the stairs. I do not recall feeling any pain that might have caused the bruising and don't know how they occurred.

***4** Def. Ex. B, p. 3.

Plaintiff still cannot attribute the bruise on the right hand side of his torso to any actions by either of the Defendants. When asked at his deposition how he got the bruises on his upper left arm, Plaintiff stated: "Purely speculation, I would say that's where Trooper Tatro had a hold of me." Ex. A, pp. 57-58, Ex. C.

## IV. DISCUSSION

### *A. Warrantless Entry*

The Fourth Amendment prohibits warrantless entries by police unless the entry is authorized by a valid exception to the warrant requirement. *See* *Minnesota v. Olson,* 495 U.S. 91, 100 (1990); *U.S. v. Deutsch,* 987 F.2d 878, 883(2d Cir.1993); [FN10] Absent a warrant, "police officers need ... probable cause plus exigent circumstances in order to make a lawful entry into a home." *Kirk v. Louisiana,* 536 U.S. 635, 636 (2002)(*per curiam* )(citing *Payton v. New York,* 445 U.S. 573 (1980)); *see* *Loria v. Gorman,* 306 F.3d 1271, 1283-84 (2d Cir.2002)(Police officer's "entry into [plaintiff's] home and seizure of him without a warrant violated a constitutional right unless justified by exigent circumstances."); *United States v. MacDonald,* 916 F.2d 766, 769 (2d Cir.1990)(*en banc* )(Although a warrantless search is *per se* unreasonable, it can be justified "where exigent circumstances demand that law enforcement agents act without delay."), *cert. denied,* 498 U.S. 1119 (1991).

FN10. In *Deutsch,* the Second Circuit considered whether police officers had improperly entered a suspect's home without a warrant to effectuate an arrest. The Circuit Court wrote:

> Law enforcement agents must conform their behavior to the requirements of the Constitution and normally may not enter anyone's property without a properly executed warrant. Absent exigent circumstances (certainly not present here), "the warrantless entry of law enforcement officers into the private home of a suspect, for the purpose of making an arrest supported by probable cause, is barred by the Fourth Amendment...." *United States v. Campbell,* 581 F.2d 22, 25 (2d Cir.1978) (citations omitted).

987 F.2d at 883.

In the instant case, based upon the uncontradicted evidence that (1) Defendants received a complaint from an "identified witness" that a burglary of an unoccupied building was in progress; (2) Defendants were told that the witness saw a male climbing through a window; and (3) upon arriving, Defendants observed (a) a truck in the driveway, (b) an open window, and (c) a light on in the house, there existed probable cause to believe that a crime was occurring inside the house. *See* *Devenpeck v. Alford,*-U.S.-,-, 125 S.Ct. 588, 593 (2004)("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.")(citing *Maryland v. Pringle,* 540 U.S. 366, 371 (2003)); *Calderola v. Calabrese,* 298 F.3d 156, 165 (2d Cir.2002)("[W]hen an average citizen tenders information to the police, the police should be permitted to assume that they are dealing with a credible person in the absence of special circumstances suggesting that might not be the case."); *Posr v. Court Officer Shield No. 207,* 180 F.3d 409, 414 (2d Cir.1999)(Probable cause exists when officers "have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime."); *Lee v. Sandberg,* 136 F.3d 94, 103 (2d Cir.1997)(Police may rely on information gained from witnesses or private citizens in forming their probable cause determination.); *Hotaling v. LaPlante,* 67 F.Supp.2d 517, 522 (N.D.N.Y.2001)(valid probable cause to arrest rested upon information supplied by an identified witness, and even though a further investigation by the Trooper would have led to a contradictory conclusion, Trooper's conduct was not unreasonable under the circumstances); *see also* *People v. Chandler,* 762 N.Y.S.2d 179, 180 (3rd Dept.2003); [FN11] *People v. Bero,* 526 N.Y.S.2d 979, 982 (2nd Dept.1988)("[T]he report of a named citizen [ ], combined with the officers' observations of an apartment containing the telltale signs of a recent burglary, sufficed to provide the officers with probable cause to believe that a burglary had been committed."). However, probable cause alone is insufficient to justify a warrantless intrusion into a home. "Absent exigent circumstances, the firm line at the entrance to the house may not reasonably be crossed without a warrant." *Kirk,* 536 U.S. at 636 (quoting *Payton,* 445 U.S. at 590).

FN11. In *Chandler,* the Third Department wrote:

> We find no merit in defendant's contention that the evidence against him was legally insufficient to support his conviction because the "building" from which he stole property

was not a "dwelling" (*see* Penal Law § 140.00[3] ). Viewing the evidence in a light most favorable to the People, there was most assuredly a valid line of reasoning and permissible inferences to support the jury's verdict convicting defendant of burglary in the second degree (*see* *People v. Bleakley,* 69 N.Y.2d 490, 495, 515 N.Y.S.2d 761, 508 N.E.2d 672 [1987] ). The undisputed evidence at trial reveals that the premises from which defendant removed the subject items was a one-family home in a residential neighborhood. Its owner testified that he had purchased the home 25 years earlier and had lived in it himself for many years while he worked in the area. In recent years, it was occupied by his son while he attended high school in the area and then during his college breaks. The home contained personal furnishings and had all utilities intact. There were curtains on the windows and items in the refrigerator. In describing the interior of the premises, one of the investigating officers testified that it was a "very lived-in type house, nothing out of the ordinary." Thus, although the home may have been unoccupied at the precise time of the burglary and was allegedly flea-infested and unsanitary, it still constituted a "dwelling" for purposes of the burglary statute as it was a "building which is usually occupied by a person lodging therein at night" (Penal Law § 140.00[3]; *see* *People v. Barney,* 99 N.Y.2d 367, 372, 756 N.Y .S.2d 132, 786 N.E.2d 31 [2003] ).

762 N.Y.S.2d at 180.

***5** "[T]he police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." *Welsh v. Wisconsin,* 466 U.S. 740, 749-750 (1984). Recognized exigent circumstances include hot pursuit of a fleeing felon, imminent destruction of evidence, the need to prevent a suspect's escape, or the risk of danger to the police or to other persons inside or outside the dwelling. *Minnesota v. Olson,* 495 U.S. at 100. The test for determining exigent circumstances is an objective one that turns on the totality of the circumstances confronting law enforcement agents in a particular case. *MacDonald,* 916 F.2d at 769.

Courts in the Second Circuit use the following factors as guides to determine whether exigent circumstances justifying a warrantless entry are present:

> (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause ... to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the peaceful circumstances of the entry.

*Loria,* 306 F.3d at 1284 (quoting *United States v. Fields,* 113 F.3d 313, 323 (2d Cir.1997)); *see* *MacDonald,* 916 F.2d at 769-770 (citing the same six factors). These factors are "not intended as an exhaustive canon, but as an illustrative sampling of the kinds of facts to be taken into account." *MacDonald,* 916 F.2d at 770.

Here, based upon the uncontested evidence, the first factor is in Defendants' favor. The officers had reason to believe that a burglary was occurring, and, therefore, had reason to believe that a violent felony offense was occurring inside the house. *See* *People v. Mason,* 248 A.D.2d 751, 754 (3rd Dept.1998)("Burglary in the second degree is classified as a violent felony offense (*see,* Penal Law § 70.02[1][b] ) punishable by an indeterminate sentence of up to 7 1/2 to 15 years and, therefore, is regarded as a very serious crime."). There is also a strong showing of probable cause such to satisfy the third factor in Defendants' favor. *Id.* Like in *Mason,* Defendants had reasons to believe that a male suspect had broken into the house and, upon inspection, found an open window consistent with that allegation. *See id.* 751-52.

Similarly, due to the fact that there was a truck in the driveway and a light on in a house reported to be unoccupied, there was sufficient reason to believe the burglary suspect was still in the house. Thus, the fourth

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

factor is also in Defendants' favor. Finally, Defendants' entry into the house was peaceful, and they announced their presence immediately upon entry. Therefore, the sixth factor is also in Defendants' favor. *Id.* at 755 ("Finally, the Deputies entered peacefully through the open back door and immediately announced their presence.").

***6** Nonetheless, on this motion for summary judgment on which the Court must resolve all facts and inferences in favor of the non-moving party, the Court cannot conclude that Defendants have satisfied the second and fifth factors. Regarding the second factor, there is no evidence tending to indicate that the suspect was armed. The question of whether the suspect is armed has been an important factor in many burglary/warrantless entry cases inasmuch as the courts have been willing to find exigent circumstances in light of the perceived need to protect other inhabitants in the buildings. *See People v. Pollard,* 761 N.Y.S.2d 154, 155 (1st Dept.2003); [FN12] *People v. Longboat,* 718 N.Y.S.2d 761, 762 (4th Dept.2000)("Based on the officer's uncontroverted testimony at the suppression hearing, the court properly determined that the entry into defendant's apartment was justified by exigent circumstances, *i.e.,* the perception that an injured person might be in the apartment."); *Mason,* 248 A.D.2d at 755 ("[W]e also find that defendant's flight from the police and forced predawn entry into the dwelling raised a reasonable inference that his presence inside posed a danger to any occupants."); *see also Loria,* 306 F.3d at 1285-86 ("Although the existence of probable cause and knowledge that the suspect is on the premises are important predicates to a finding that an entry was justified based on exigent circumstances, they are not sufficient to justify an entry where the crime involved is minor and there is no apparent potential for violence."). Here, the police were advised that the house was unoccupied at the time. This fact, taken in the light most favorable to Plaintiff, negated the possibility that a potential victim was in the house with the burglar. Further, there is insufficient evidence indicating that, absent a warrant, the suspect likely would have escaped or destroyed evidence. *See Bero,* 526 N.Y.S.2d at 983 . [FN13] Thus, the second and fifth factors must be resolved in Plaintiff's favor. *See People v. Hallman,* 667 N.Y.S.2d 23, 26 (1st Dept.1997)( "[E]xigency did not exist when police had no reasonable basis to conclude that the burglary suspect was armed, and his escape from the premises, undetected, was unlikely.") (citation omitted). Given this conclusion, and applying the heavy burden that the police must overcome to justify a warrantless entry into a home, the Court concludes that a reasonable fact finder could find that exigent circumstances did not exist such to excuse the warrant requirement. *See Abdella v. O'Toole,* 343 F.Supp.2d 129, 139 (D.Conn.2004). Thus, on this basis, the motion must be denied.

FN12. In *Pollard,* the First Department found sufficient exigent circumstances based upon the following:

> When the police arrived, they had probable cause to believe that defendant had attacked two people that same day while armed with a knife. When defendant's 13-year-old sister opened the door and appeared to be in an anxious state, they had reason to believe the possibly armed and dangerous defendant was inside the apartment with her and that any delay for the purpose of securing a warrant would have created an unreasonable risk.

761 N.Y.S.2d at 155 (citation omitted).

FN13. In *Bero,* the Second Department wrote:

> Although burglary involving a dwelling is classified as a violent felony offense (Penal Law § 70.02[1][b] ), the police had no reason to believe the suspects were armed. Consequently, a delay in arresting the suspects while a warrant was being obtained would not pose a greater danger to the arresting officers or the community. Furthermore, the items stolen from the premises were not readily capable of disposal, as in a situation involving drugs. Although it can be inferred that the stolen property was readily removable from the fact the suspects were observed carrying the stolen items in plastic shopping bags, it is unlikely that an attempt to remove the merchandise would have escaped the attention of a surveillance. The evidence in the record

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

> does not adequately explain why, upon securing the necessary information to prepare and secure a warrant, no attempt to obtain a warrant was made and no consideration was given to placing the apartments of Bero and Cruz under surveillance while an attempt to secure a warrant was being made. Nor does this case involve a true "hot pursuit", where a suspect attempts to defeat a proper arrest which has been set in motion in a public place by the expedient of escaping to a private place. Prior to knocking on the door of Bero's apartment, the officers did not possess a reasonable belief that Bero would escape if not swiftly apprehended or that evidence would be destroyed or removed. While officers have a right to pursue their investigation by seeking voluntary cooperation from a suspect, the exigency which ensued from knocking on the door was foreseeable. Under the circumstances of this case, the creation by the police of a foreseeable emergency does not exempt them from the warrant requirement. Consequently, the forcible entry into Bero's apartment was violative of his rights against an unreasonable search and seizure.
>
> 526 N.Y.S.2d at 983.

That being the case, however, the Court also finds that Defendants are entitled to qualified immunity on the illegal entry claim. The defense of qualified immunity "serves important interests in our political system," *Sound Aircraft Servs., Inc. v.. Town of East Hampton,* 192 F.3d 329, 334 (2d Cir.1999), ensuring that damages suits do not "unduly inhibit officials in the discharge of their duties" by burdening individual officers with "personal monetary liability and harassing litigation." *Anderson v. Creighton,* 483 U.S. 635, 638 (1987); *see* *Connell v. Signoracci,* 153 F.3d 74, 79 (2d Cir.1998).

> ***7** Qualified immunity "shields police officers acting in their official capacity from suits for damages under 42 U.S.C. § 1983, unless their actions violate clearly-established rights of which an objectively reasonable official would have known." *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999). Qualified immunity is thus a shield from *suit,* not simply liability. *Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)(quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)).

*Holeman v. City of New London,*-F.3d-,-, 2005 WL 2403746, at *2 (2d Cir., Sept. 30, 2005)(emphasis in original). For this reason, the Supreme Court has directed that "[w]here the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." *Saucier v. Katz,* 121 S.Ct. 2151, 2155-56 (2001).

"[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action ... assessed in light of the legal rules that were clearly established at the time it was taken." *Anderson,* 483 U.S. at 639 (internal quotation marks and citation omitted)

> Even where the plaintiff's federal rights and the scope of the official's permissible conduct are clearly established, the qualified immunity defense protects a government actor if it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act.

*Anthony v. City of New York,* 339 F.3d 129 (2d Cir.2003)(internal quotation marks and citations omitted). "[Q]ualified immunity serves to protect police from liability and suit when they are required to make on-the-spot judgments in tense circumstances," and officers are entitled to the defense unless the officers' judgment was so flawed that no reasonable officer would have made a similar choice. *See* *Lennon v. Miller,* 66 F.3d 416, 424-25 (2d Cir.1995).

While Plaintiff's right to be free from warrantless police intrusions into his residence without exigent circumstances was clearly established on July 12, 2001, and while Plaintiff's facts, assuming they are true, might amount to a violation of this clearly established right, reasonable police officers in New York, being confronted

with the facts known to Defendants at the time, could disagree as to the legality of entering the house without a warrant. There are numerous case in New York and elsewhere in which courts, applying the federal constitutional Fourth Amendment standard, have found exigent circumstances justifying entry into a house when the police have come upon what is believed to be a burglary in progress. *See People v. Peterkin,* 785 N.Y.S.2d 620, 622 (4th Dept.2004)("Here, the emergency exception to the warrant requirement applies because the police justifiably believed that they had interrupted a burglary or trespass in progress and that entry into the apartment was necessary to prevent the commission of a crime.")(citing cases); *People v. Martinez,* 700 N.Y.S.2d 434, 435 (1st Dept.1999); [FN14] *People v. McKnight,* 689 N.Y.S.2d 832, (4th Dept.1999)("While investigating a 911 report of a burglar alarm at an apartment building, police officers legally entered defendant's apartment and observed but did not seize two loaded automatic weapons as well as cocaine and scales. * * * Although a warrantless search and seizure generally is presumed to be unreasonable [ ], here the officers had reasonable grounds to believe that there was an emergency at the apartment requiring their immediate assistance for the protection of life or property; thus, the initial entry was not motivated by intent to arrest and seize evidence."); *United States v. Johnson,* 9 F.3d 506, 509-510 (6th Cir.1993)(citing cases); [FN15] *see also* Estrella., *Belief That Burglary Is in Progress or Has Recently Been Committed as Exigent Circumstance Justifying Warrantless Search of Premises,* 64 ALR 5th 637, §§ 3[a], [b], 4 [a] (1998)(citing cases); *Bilida v. McCleod,* 211 F.3d 166 (1st Cir.2000) (police officer who responded to silent alarm at residence was justified in making warrantless entry into backyard of residence to check for signs of burglary).

FN14. The Court in *Martinez* wrote:

> The court properly denied suppression of the physical evidence recovered from defendant's apartment, since the record supports an emergency basis for entry of that dwelling that led to the plain view discovery of evidence whose incriminating nature was readily apparent. The police responded to a report of a burglary and saw that the apartment door had been pried upon and left ajar. Accordingly, the police properly entered to look for possible perpetrators or victims.

700 N.Y.S.2d at 435.

FN15. In *Johnson,* the police received a call from a neighbor that a burglary was in progress and, upon investigating, found a broken window. The people inside the house did not respond to the officers' knocking and had to be ordered to approach the window. When they did, they could not produce identification or a key to open the door, and they lied about the presence of other people in the residence. The Sixth Circuit affirmed the district court's decision to deny suppression of evidence discovered after the police entered the residence, holding that:

> The circumstances confronting the officers justified their warrantless entry into the residence because "[i]t would defy reason to suppose that [the officers] had to secure a warrant before investigating, leaving the putative burglars free to complete their crime unmolested. It is only 'unreasonable' searches and seizures that the fourth amendment forbids." [ *United States v. Singer,* 687 F.2d 1135, 1144 (8th Cir.1982), *adopted in relevant part,* 710 F.2d 431 (8th Cir.1983) (*en banc* ) ].

F. 3d at 510. In reaching this decision, the Sixth Circuit noted:

> The Supreme Court has recognized only a few emergency circumstances excusing the need for a warrant, namely, hot pursuit of a fleeing felon, destruction of evidence, and fire on the premises. [ ]. Several of our sister circuits, however, have upheld warrantless searches conducted during burglary investigations under the rubric of exigent circumstances. For example, in *United States v. Valles-Valencia,* 811 F.2d 1232 (9th Cir.), *amended on other grounds,* 823 F.2d 381 (9th Cir.1987), the police responded to a report that strangers

were parked in front of a nearby house, the owners of which were on vacation. The strangers could not adequately explain their presence and a front window showed signs of being pried open. The police also smelled marijuana. Suspecting that a burglary was in progress, the police entered the house and discovered a variety of controlled substances. The Ninth Circuit upheld the search after finding that exigent circumstances justified the initial warrantless entry into the house. [ ] *Id.* at 1236[ ]. *See also* *Reardon v. Wroan,* 811 F.2d 1025, 1030 (7th Cir.1987) (case involving police officers' entry and search of a fraternity house in which court found that "[d]efendants were faced with a call reporting a burglary in progress during a time of year when [ ] students were on break and burglaries were known to occur more frequently. And when they arrived they found a single car in the driveway and the door to the residence unlocked. Therefore, ... we conclude based on these facts that the exigency requirement was satisfied as a matter of law."); *United States v. Singer,* 687 F .2d 1135, 1144 (8th Cir.1982), *adopted in relevant part,* 710 F.2d 431 (8th Cir.1983) (en banc) (upholding warrantless entry of residence where circumstances indicated burglary in progress); *United States v. Estese,* 479 F.2d 1273, 1274 (6th Cir.1973) (upholding warrantless search where police observed signs that apartment door had been pried open).

*Id.* at 509.

***8** Given the uncontroverted facts on this motion, reasonable officers could disagree whether, coming upon what appeared to be a burglary in progress, they had sufficient exigent circumstances to enter an unoccupied building [FN16] in order to stop the crime. *See* *Loria,* 306 F.3d at 1287 ("[Defendant police officer] is entitled to qualified immunity, however, if reasonable officers could disagree as to whether exigent circumstances were present."); *Koch v. Town of Brattleboro,* 287 F.3d 162, 169 (2d Cir.2002) (holding that a grant of summary judgment based on qualified immunity "was appropriate because the officers reasonably believed that exigent circumstances justified their entry"). Therefore, the Court finds both Defendants are entitled to qualified immunity on that much of Plaintiff's action asserting an illegal entry into his house.

FN16. It is also significant that Defendants believed, based upon an identified citizen's complaint, that the building in which the burglary was occurring was "unoccupied." This distinguishes this case from those unlawful entry cases where the police have cornered a suspect in his home and the decision facing the police was whether to (a) enter the home, or, (b) surround it and seek a warrant. Inasmuch a reasonable police officer would not believe that a burglar had a Fourth Amendment right to the sanctity of an unoccupied house, it would not have been clear to a reasonable officer that his conduct of entering the house to stop the crime was unlawful in the situation confronted. *See* *Ortega v. O'Connor,* 146 F.3d 1149, 1157-58 (9th Cir.1998) (considering "[f]irst" whether the § 1983 plaintiffs' "reasonable expectation of privacy in their private offices, desks, and file cabinets" was clearly established before proceeding to the second question of whether it was clearly established that the search was unreasonable); *People v. McGaha,* 533 N.Y.S.2d 931, 932 (2nd Dept.1988) (Burglary suspect, who occasionally spent night at wife's apartment and who on day of burglary had permission to be in apartment to care for child, was merely transient with no reasonable expectation of privacy in any room of apartment, and lacked standing to challenge search of apartment).

*B. Unlawful Arrest*

The Court turns next to Plaintiff's claim of an unlawful arrest. There can be no serious dispute that, on the instant record, Plaintiff has presented a material issue of fact as to whether he was arrested within the meaning of the Fourth Amendment when Defendants ousted him out of bed with their guns drawn, accompanied him

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

downstairs while holding his arm tightly, required him to produce identification, ordered him outside, brought him to a neighbor's house, and required him to wait in his car while they checked his vehicle information. *See County of Sacramento v. Lewis,* 523 U.S. 833, 844 (1998)(A Fourth Amendment seizure occurs "when there is a governmental termination of freedom of movement through means intentionally applied.")(interior quotation marks and citation omitted); *Tennessee v. Garner,* 471 U.S. 1 (1985)("Whenever an officer restrains the freedom of a person to walk away, he has seized the person."); *Terry v. Ohio,* 392 U.S. 1 (1968)(Whenever an individual is physically or constructively detained by a police officer in such a manner that a reasonable person would not feel he is free to leave, that individual has been "seized" or "arrested" within the meaning of the Fourth Amendment.).

The more pertinent question, however, is whether Defendants had probable cause for their actions. This is because the existence of probable cause to make an arrest negates an essential element of a false arrest claim. *Jocks v. Tavernier,* 316 F.3d 128, 135 (2d Cir.2003); *see Smith v. Edwards,* 175 F.3d 99, 105 (2d Cir.1999)("It is well established that appellant's Section 1983 claims against appellees for false arrest and false imprisonment must fail if the appellee-officers had probable cause to arrest him."); *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996)(probable cause is a complete defense to both federal and state law claims for false arrest and false imprisonment).

Probable cause exists when officers "have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Posr v. Court Officer Shield No. 207,* 180 F.3d 409, 414 (2d Cir.1999). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck,* 125 S.Ct. at 593; *see Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 128 (2d Cir.1997)(In evaluating the probable cause determination, the Court "consider[s] the facts available to the officer at the time of the arrest.")(citing *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 569 (2d Cir.1996)). The inquiry is an objective one and the subjective beliefs or motivations of the arresting officer are irrelevant. *Devenpeck,* 125 S.Ct. at 593-94; *Martinez v. Simonetti,* 202 F.3d 625, 633 (2d Cir.2000).

***9** "A probable cause determination does not require proof beyond a reasonable doubt; it is the mere probability of criminal activity, based on the totality of the circumstances, that satisfies the Fourth Amendment." *Hahn v. County of Otsego,* 820 F.Supp. 54, 55 (N.D.N.Y.1993), *aff'd,* 52 F.3d 310 (2d Cir.1995). "If policemen arrest a person on the basis of a private citizen's complaint that if true would justify the arrest, and they reasonably believe it is true, they cannot be held liable ... merely because it later turns out that the complaint was unfounded." *Lee v. Sandberg,* 136 F.3d 94, 103 (2d Cir.1997)(quotation marks and citation omitted)). "In fact, the eventual disposition of the criminal charges is irrelevant to the probable cause determination." *Hahn,* 820 F.Supp. at 55 (citing *Pierson v. Ray,* 386 U.S. 547, 555 (1967)).

Where the facts surrounding the arrest are uncontroverted, the determination as to whether probable cause existed may be made by the court as a matter of law. *Weyant,* 101 F.3d at 852. Even where factual disputes exist, a § 1983 claim may fail if the plaintiff's version of events is sufficient to establish probable cause to arrest. *Mistretta v. Prokesch,* 5 F.Supp.2d 128, 133 (E . D.N.Y.1998). However, where there are "genuine issues" as to any material facts surrounding the issue of probable cause such that it can be said that the question of probable cause is "predominately factual in nature," the determination should be made by a jury. *Murphy v. Lynn,* 118 F.3d 938, 947 (2d Cir.1997), *cert. denied,* 522 U.S. 1115 (1998).

In the instant case, the uncontroverted facts provided Defendants with sufficient probable cause to detain Plaintiff while they investigated the burglary allegation. As indicated, the facts were such that Defendants received a report from an identified citizen that a male had been seen climbing into the window of an unoccupied house. Upon arriving, they found a truck in the driveway, a light on inside the house, and an open window. Upon entering, they repeatedly announced their presence but received no response. These circumstances were indicative of a burglary in progress with the burglar attempting to evade

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

captured.

The fact that Plaintiff was found sleeping in bed did not negate the possibility that he was a burglar who was attempting to evade imminent arrest by feigning lawful presence in the house. *See* Mason, 248 A.D.2d at 751-752. FN17 Defendants' suspicions were also justifiably heightened by the fact that Plaintiff did not know where the light switch was, and did not know the telephone number of his landlord. Under the circumstances, Defendants were justified in detaining Plaintiff while they investigated the situation. Given the existence of probable cause, the false arrest claim must be dismissed.

> FN17. In *Mason,* the police were also confronted by a suspect who feigned sleep to avoid an arrest. In that case, following a police chase of defendant's automobile, an accident, and the fleeing of the defendant, the police followed the defendants' footprints in the snow to a nearby house.
>
> > [An officer] testified that, due to the signs of forced entry, he was concerned about a possible burglary and for the safety of anyone inside the dwelling. The Deputies entered, announced their presence and, hearing nothing, began to search.
> >
> > They followed a trail of water leading to a back bedroom where they found defendant lying face down on a bed. His pants and socks were wet as were his boots. Defendant stated that he had been lying in bed for approximately six hours. The Deputies observed that defendant had watery eyes, slurred speech, a strong smell of alcohol and was belligerent.
>
> 248 A.D.2d at 751-752. As it turns out, the house belonged to the woman who was found slumped over in the front seat of the car the police were chasing. *See id.* Plaintiff was arrested, and convicted, for, *inter alia,* felony driving while intoxicated.

Further, assuming *arguendo* that actual probable cause did not exist, arguable probable cause existed to detain Plaintiff while Defendants investigated. "Arguable probable cause exists 'if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." ' *Escalera v. Lunn,* 361 F.3d 737, 743 (2d Cir.2004)((quoting *Golino v. City of New Haven,* 950 F.2d 864, 870 (2d Cir.1991)). Given the facts and circumstances presented to Defendants, officers of reasonable competence could certainly disagree on whether the probable cause test was met to detain Plaintiff while they investigated the complaint. Therefore, the Defendants are entitled to qualified immunity on the false arrest claim.

*C. Excessive Force*

***10** Next, the Court turns to Plaintiff's claim of an unconstitutional use of force during his arrest. It is well settled that not every push or shove occurring during an arrest constitutes excessive force within the meaning of the Fourth Amendment. *See* *Graham v. O'Connor,* 490 U.S. 386, 396 (1989). Rather, the Supreme Court held in *Graham* that in determining whether the force used to effect a particular seizure is "reasonable' under the Fourth Amendment requires a careful balancing of numerous factors including the severity of the crime at issue, whether the person is attempting to flee or resist arrest, and whether the suspect possess a threat to the safety of the officers or others. *Graham,* 490 U.S. at 396. As the Supreme Court has stated:

> Because "police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation," the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective.

*Saucier,* 121 S.Ct. at 2158 (quoting and citing *Graham,* 490 U.S. at 396).

The Supreme Court has cautioned that the objective reasonableness standard cannot be viewed with the "20/20

vision of hindsight" in the calm of a judge's chambers. Instead, the fact-finder must accord deference to the judgment of a reasonable officer on the scene. *Graham,* 490 U.S. at 393, 396. The *Graham* standard holds that if an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed. *Saucier,* 121 S.Ct. at 2158. The reasonableness inquiry must be undertaken without regard to the underlying motives or intent of the police officers. *Graham,* 490 U.S. at 397; *Calamia v. City of New York,* 879 F.2d 1025, 1034-35 (2d Cir.1989). "If a plaintiff sustains an injury during an arrest, this is a relevant factor for the court in considering whether the force used was reasonable. However, reasonable force does not become unconstitutional merely because it caused the plaintiff serious injury." *Gonzalez v. City of New York,* 2000 WL 516682, at *4 (S.D.N.Y. March 7, 2000)(citing *Hudson v. McMillian,* 503 U.S. 1, 7 (1992)).

There is no evidence that Defendant Fuenfstuek did anything to cause Plaintiff any injury, or, at any time, inflict any force on Plaintiff. Further, there is no evidence upon which a reasonable jury could conclude that Defendant Fuenfstuek was aware of any constitutionally offensive force being inflicted upon Plaintiff by Defendant Tatro such to require Defendant Fuenfstuek to intervene. *See Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001)(an officer has a duty to intervene to prevent the unconstitutional acts of another officer occurring in his presence.). Indeed, the only evidence of any force applied by either Defendants was by Defendant Tatro in holding Plaintiff tightly by his arm while escorting him down the stairs. Plaintiff concedes that while this was occurring, Defendant Fuenfstuek was looking though the rooms and closets upstairs to see if any persons or weapons were present. Plaintiff asserted a few days after the incident that he "did not recall feeling any pain" on the night in question, so he necessarily did not yell out in pain or give any other indication that he was in pain by Tatro's grip such to put Fuenfstuek on notice that Plaintiff was being injured by Tatro. Accordingly, the excessive force claim against Defendant Fuenfstuek is dismissed.

***11** Turning to the claim against Defendant Tatro, the only injury attributable, in any manner, to Tatro's conduct are the two small bruises Plaintiff discovered on his upper arm. Assuming on this motion that these bruises were caused by Tatro's "very tight" grip, it is questionable whether the amount of forced used by Tatro in causing this injury was constitutionally offensive. As indicated, there is no evidence that Plaintiff was caused any pain by the grip, and he stated at the end of the evening that Defendant Tatro's conduct "wasn't too bad." Plaintiff's later assertion that the bruises were caused by Tarto's grip are, as he concedes, based upon nothing more than pure speculation.

Further, assuming that Tatro caused the bruising on Plaintiff's arm by holding Plaintiff, no reasonable fact finder could conclude that this use of force, under the circumstances, was unreasonable. At the time Plaintiff was being held by Tatro, Tatro had reasonable cause to believe that Plaintiff was a burglar caught in the act, and, thus, reasonable cause to believe that Plaintiff might flee. Still further, the uncontroverted evidence indicates that Tatro's grip was not so tight that Plaintiff could not get free as demonstrated by the fact that Plaintiff broke free from Tatro's grip when Plaintiff stumbled on the first step of the stairs. As indicated, Plaintiff has no memory of feeling any pain that evening, and he even told Tatro that his conduct was not too bad.

Finally, assuming *arguendo* that (1) Tatro caused the bruises on Plaintiff's arm, and, (2) the use of such force was constitutionally offensive under the circumstances, Tatro is entitled to qualified immunity for his conduct. *See Cowen v. Breen,* 352 F.3d 756, 761 (2d Cir.2003)(explaining the application of qualified immunity on excessive force claims). Under the circumstances confronting Defendant Tarto on July 12, 2001, it would not have been clear to a reasonable officer that his conduct of "very tightly" holding a burglary suspect's arm while escorting him through the house to find identification was unlawful in the situation confronted. *Id.*

V. CONCLUSION

Based upon the reasons set forth above, Defendants' motion for summary judgment is GRANTED and the action is DISMISSED.

IT IS SO ORDERED

N.D.N.Y.,2005.

Martin v. Tatro
Not Reported in F.Supp.2d, 2005 WL 2489905 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.





H

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Sean E. McMAHON, Plaintiff,
v.
Officer FURA, Officer Patti, Officer Summers, City of Syracuse, Defendants.
No. 5:10–CV–1063 (GHL).

Dec. 23, 2011.

Meggesto, Crossett & Valerino, LLP, James A. Meggesto, Esq., of Counsel, Syracuse, NY, for Plaintiff.

Mary Anne Doherty, Esq., Corporation Counsel for the City of Syracuse, James P. McGinty, Esq., Shannon T. O'Connor, Esq., of Counsel, Syracuse, NY, for Defendants.

***MEMORANDUM DECISION AND ORDER***[FN1]

FN1. This matter is before the Court by consent of both parties. (Dkt. No. 25.)

GEORGE H. LOWE, United States Magistrate Judge.

***1** In this action, Plaintiff Sean E. McMahon contends that Defendant City of Syracuse Officers Patti, Fura, and Summers [FN2] arrested him for violating an unconstitutional city ordinance and used excessive force in effectuating that arrest in violation of state and federal law. (Dkt. No. 1.) Currently pending before the Court is Defendants' motion for summary judgment. (Dkt. No. 33.) Plaintiff has opposed the motion. (Dkt.Nos.38–42.) Defendants have filed a reply. (Dkt. No. 45.) For the reasons discussed below, Defendants' motion is granted in part and denied in part.

FN2. Defendant Officers Carns, Cope, Novitsky, and Tassini were dismissed from this action with prejudice with Plaintiff's consent. (Dkt. No. 21 at 2.)

**I. FACTUAL AND PROCEDURAL SUMMARY**

The facts in this case are, unless specifically noted, undisputed.

On June 15, 2009, the Syracuse Police Department assigned four units from the Crime Reduction Team to the evening shift on the west side of the City of Syracuse, specifically the area of Tallman and Rich Streets. (Dkt. No. 33–14 ¶ 1; Dkt. No. 39 ¶ 1.) The Crime Reduction Team is comprised of two-man units assigned to an area of the city where there is a need for increased police presence due to high crime. (Dkt. No. 33–14 ¶ 2; Dkt. No. 39 ¶ 1.) The four Crime Reduction Team units patrolling the west side of the City of Syracuse on June 15, 2009, were unit 524 (Officers Fura and Summers), unit 525 (Officers Patti and Copes), unit 527 (Officers Murphy and Novitsky), and unit 528 (Officers Carns and Tassini). (Dkt. No. 33–14 ¶ 4; Dkt. No. 39 ¶ 1.)

Defendant Officer Patti and Officer Cope responded to a gambling complaint in the area of Onondaga Avenue and Rich Street.[FN3] (Dkt. No. 33–14 ¶ 5; Dkt. No. 39 ¶ 1.) After addressing the gambling complaint, Defendant Patti and Officer Cope sat in their police car and watched a crowd [FN4] of people on the sidewalk of Tallman and Rich Streets. (Dkt. No. 33–14 ¶ 6; Dkt. No. 39 p 2.) Officers Carns and Tassini also responded to the crowd gathered on Tallman Street. (Dkt. No. 33–14 ¶ 7; Dkt. No. 39 ¶ 2.) Defendant Patti observed that a member of the One Ten gang was among the crowd. [FN5] (Dkt. No. 33–14 ¶ 8; Dkt. No. 39 ¶ 2.) Plaintiff was with the group. (Dkt. No. 33–14 ¶ 4; Dkt. No. 39 ¶ 1.)

FN3. Defendants do not assert that this gambling complaint had any connection with Plaintiff or with the group of people with whom he was associating.

FN4. Plaintiff objects to the word “crowd.” Plaintiff states that the “term crowd is subjective at best, and in fact, there were only five (5) individuals standing on the sidewalk at the corner

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

of Tallman and Rich Streets ....“ (Dkt. No. 39 ¶ 2.)

FN5. Defendants do not assert that Plaintiff is a member of the One Ten gang.

Multiple units of the Crime Reduction Team approached the group gathered on the sidewalk on Tallman Street. (Dkt. No. 33–14 ¶ 9; Dkt. No. 39 ¶ 1.) When the officers approached the group, Plaintiff immediately started to run away. (Dkt. No. 33–14; Dkt. No. 39 ¶ 1.) Officer Cope, Officer Novitsky, and Defendant Patti chased Plaintiff, yelling at him to stop and that he was under arrest. (Dkt. No. 33–14 ¶ 13; Dkt. No. 39 ¶ 1.) Plaintiff ran from police [FN6] and the police chasing him on foot were five to six blocks behind. (Dkt. No. 33–14 ¶ 11; Dkt. No. 39 ¶ 3.) Plaintiff did not respond to the verbal commands to stop running. (Dkt. No. 33–14 ¶ 17; Dkt. No. 39 ¶ 1.)

FN6. Plaintiff admits that he “did, in fact, run” but asserts that “the allegation that he ran ‘from police’ is subjective.” (Dkt. No. 39 ¶ 3.)

Defendant Officers Summers and Fura were in their police car when they received a call over the radio about a foot pursuit. (Dkt. No. 33–14 ¶ 14; Dkt. No. 39 ¶ 1.) Defendants Summers and Fura saw a person running across Onondaga Street with police officers chasing behind him. (Dkt. No. 33–14 ¶ 15; Dkt. No. 39 ¶ 1.) Defendants Summers and Fura responded to the call. (Dkt. No. 33–14 ¶ 16; Dkt. No. 39 ¶ 1.)

***2** Plaintiff was running across the street with the officers chasing behind him when Defendants Summers and Fura turned their police car down Onondaga Street. (Dkt. No. 33–14 ¶ 18; Dkt. No. 39 ¶ 1.) Defendant Fura gave Plaintiff verbal commands to stop running from the police car.[FN7] (Dkt. No. 33–14 ¶ 19.) On Fitch Street, Defendant Fura attempted to pull the police car onto the sidewalk to block Plaintiff's path and make him stop, however Plaintiff ran around the car and continued to run.[FN8] (Dkt. No. 33–4 ¶ 20.)

FN7. Plaintiff denies this fact, citing to his deposition transcript. (Dkt. No. 39 ¶ 4.) The cited portion of the deposition transcript states: “Q: ... You said you don't have a clear recollection of what happened when ... the police came in contact with you; is that a fair statement? A: Yes.” (Dkt. No. 33–9 at 15:20–24.)

FN8. See note seven.

Defendants Fura and Summers exited their car and were able to catch Plaintiff. (Dkt. No. 33–14 ¶ 21; Dkt. No. 39 ¶ 1.) At his deposition, Defendant Fura testified that when he caught up with Plaintiff:

A: I grabbed the back of his shirt and attempted to pull him back. He pulled forward, at which time I delivered a strike to his right jaw area, and we both ended up falling to the ground, forward.

Q: And did you say anything to him?

A: I told him to put his hands behind his back. He was under arrest.

Q: What was he under arrest for, if you know?

A: At this time he was going to be under arrest for disorderly crowd.

Q: But you didn't know that at the time?

A: I didn't know specifically what the charge was.

Q: You told him he was under arrest, but you didn't know for what violation? Is that your testimony?

A: Correct.

(Dkt. No. 33–12 at 6:8–24.)

At his deposition, Defendant Summers testified that:

A: Officer Fura grabbed a hold of—got close to Mr. McMahon and grabbed a hold of him, and he pulled, and when he did, from what I can tell, I seen Mr. McMahon spin around and then go to the ground.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Q: You say you saw Officer Fura grab Mr. McMahon?

A: Well, his shirt. Clothing. Something of that nature. Because he pulled, and then he spun around. Like, he slipped out of his grasp or slips out of—but I just seen him spin around.

Q: Did he get grabbed from the front or from behind or from the side?

A: As I'm coming around the car—I coul[d]n't tell you. I know he was running. We were behind him, so it was either from the side, backside or something, because when he did, he went around like that, and he rolled into the—so I'd say it would have to be from the backside area.

Q: And Mr. McMahon ended up on the ground?

A: That's correct, sir.

Q: What action did you take then?

A: At that time I came around, and Officer Fura was trying to grab a hold of him. Mr. McMahon was pushing to get off the ground to get free again. He was advised to stop resisting and get on the ground and place his hands behind his back, at which time he didn't comply with that at all. I placed a strike to the shoulder blade to collapse the shoulder down to get on the ground so I can handcuff him. He continued to push off. I applied another strike. The strike hit the top of the shoulder, bounced off and cut his eyebrow.

Q: What happened next?

***3** A: At that point in time we were finally able to get him down on the ground and forcefully put his hands behind his back and get him cuffed, and that's when I noticed the weed in his hand, as I pulled his hand behind his back. I had to forcibly remove the marijuana from his hand.

Q: That was after he was handcuffed?

A: That was while he was handcuffed. Yes, sir.

(Dkt. No. 33–10 at 9:15–11:5.)

The unverified complaint, signed only by counsel, alleges that:

> Defendant Fura punched Plaintiff in the face with his right fist causing the Plaintiff to fall to his stomach. Due to the strike, Plaintiff fell and hit his head on the pavement and sustained numerous injuries on his face and hands. While still lying face [ ] down, Plaintiff tried to move, and Officer Summers struck him near his left eyebrow again causing Plaintiff to sustain injuries. Defendants claimed Plaintiff was trying to resist and therefore ... Defendant Fura and Defendant Summers punched Plaintiff again in his face and body. They then forcefully placed Plaintiff's arms behind his back and handcuffed him.

(Dkt. No. 1 ¶¶ 8–10.)

Despite the allegations in the unverified complaint, the evidence developed during discovery shows that Plaintiff does not recall the actual stop by police. (Dkt. No. 33–14 ¶ 22; Dkt. No. 39 ¶ 1.) Plaintiff remembers running from police and the sound of sirens behind him. (Dkt. No. 33–14 ¶ 23; Dkt. No. 39 ¶ 1.) At his deposition, Plaintiff testified that "the one officer in the car, he tried to cut me off as I'm running, and I believe he was trying to run me over ... All four of the wheels busted or sounded like four of the wheels busted, and then ... that's when I believe I was tased." (Dkt. No. 33–9 at 14:3–9.) At his 50–h hearing, Plaintiff testified "I just remember it felt like I was being electrocuted ... So I must have been tased by ... an officer ." (Dkt. No. 33–8 at 23:23–24:18.) At his deposition, Plaintiff testified that he believed he had been tased because his "whole body shut down," but that he does not remember when that happened. (Dkt. No. 33–9 at 17:9–15.) Plaintiff remembers hitting the ground but does not remember what happened to make him fall. (Dkt. No. 33–9 at 15:5–15.) That is all that Plaintiff recalls before waking up in the hospital. (Dkt. No. 33–14 ¶ 24; Dkt. No. 39 ¶ 1.) Plaintiff does not recall the contact that he had with police once they were able to catch up with him. (Dkt. No. 33–14 ¶ 25; Dkt. No. 39 ¶ 1.)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Neither Defendant Summers nor Defendant Fura was armed with a taser on June 15, 2009.[FN9] (Dkt. No. 33–14 ¶ 28; Dkt. No. 33–12 at 7:4–6.) Defendant Patti was armed with a taser, but testified at his deposition that he did not use it. (Dkt. No. 33–11 at 21:3–22:1 .) Defendant Fura arrested Plaintiff.[FN10] (Dkt. No. 33–14 ¶ 29.) Defendant Patti did not arrest Plaintiff.[FN11] (Dkt. No. 33–14 ¶ 30.)

FN9. See note seven.

FN10. See note seven.

FN11. See note seven.

Rural Metro took Plaintiff to the hospital. (Dkt. No. 33–14 ¶ 27; Dkt. No. 39 ¶ 1.) Plaintiff was released from the hospital at about 2:00 a.m. (Dkt. No. 33–8 at 27:19–21.) He got a ride home from a friend. *Id.* at 27:24–25. Plaintiff was never lodged in the Justice Center. *Id.* at 28:1–3.

***4** Plaintiff was issued appearance tickets for unlawful possession of marijuana, resisting arrest, and for violating the City of Syracuse's disorderly crowds ordinance.[FN12] (Dkt. No. 33–14 ¶ 31.)

FN12. Plaintiff admits that he was issued appearance tickets, but notes that he was charged with marijuana possession five minutes after being charged with the other two offenses. (Dkt. No. 39 ¶ 6 .)

The unverified complaint, signed only by counsel, alleges that "[t]he Honorable Vanessa Brogan dismissed all criminal charges against the plaintiff." (Dkt. No. 1 ¶ 17.) There is no evidence in the record before the Court either confirming or casting doubt on that assertion.

Plaintiff filed a notice of claim with the City of Syracuse on September 1, 2009. (Dkt. No. 33–5.) Plaintiff listed the nature of his claim as "[f]alse arrest, false imprisonment, excessive force, police brutality, violation of claimant's civil rights, and assault." *Id.*

Plaintiff filed his complaint in this Court on September 2, 2010. (Dkt. No. 1.) The complaint asserts the following causes of action: (1) a 42 U.S.C. § 1983 false arrest claim against Defendants Fura, Patti, and Summers; (2) a 42 U.S.C. § 1983 excessive force claim against Defendants Fura, Patti, and Summers; (3) a state law false imprisonment claim against Defendants Fura, Patti, and Summers; (4) a state law assault claim against Defendants Fura and Summers; (5) a state law negligence claim against Defendants Fura, Patti, and Summers; (6) a claim against the City of Syracuse regarding the constitutionality of Syracuse City Ordinance 16–2; (7) a *Monell* claim against the City of Syracuse regarding the hiring, supervising, and training of officers; and (8) a state law respondeat superior claim against the City of Syracuse. (Dkt. No. 1 ¶¶ 14, 18–37.) Plaintiff requests compensatory damages, punitive damages, attorney fees, costs, and "such other and further relief as may be just and proper under the circumstances, including but not limited to appropriate injunctive relief." *Id.* at 6.

Defendants moved to dismiss the complaint. (Dkt. No. 19.) Defendants argued that the complaint did not comply with Federal Rule of Civil Procedure 8(a)(2) because it set forth only conclusory allegations, that several officers should be dismissed because the complaint did not indicate that they were personally involved in the incident, and that any claims against the officers in their official capacities should be dismissed. *Id.* The Court denied Defendants' motion to dismiss on May 17, 2011, but dismissed the claims against Officers Carns, Cope, Novitsky, and Tassini with Plaintiff's consent. (Dkt. No. 21.)

Defendants now move for summary judgment. (Dkt. No. 33.) Plaintiff has opposed the motion. (Dkt.Nos.38–42.) Defendants have filed a reply. (Dkt. No. 45.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

56(a). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin,* 467 F.3d at 272–73. The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material [FN13] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008).

> FN13. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

**B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim**

***5** To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnise Gen. Transatlantique,* 405 F.2d 270, 273 (2d Cir.1968) (citations omitted); *accord, Katz v. Molic,* 128 F.R.D. 35, 37–38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

**III. ANALYSIS**

**A. Constitutionality of City Ordinance § 16–2**

Plaintiff was initially placed under arrest for violating Syracuse City Ordinance § 16–2, Disorderly Crowds. (Dkt. No. 33–12 at 6:8–24.) That ordinance states that "[p]ersons shall not collect in bodies or crowds in the streets or on the sidewalks for an unlawful purpose, or for any purpose to the annoyance or disturbance of citizens." The complaint alleges that the ordinance is unconstitutionally vague and unenforceable.[FN14] (Dkt. No.

1 ¶ 30.) Defendants' moving papers do not address this claim. (Dkt. No. 33–15.) Plaintiff's opposition papers focus largely on the issue. (Dkt. No. 42 at 3–5.) Defendants' reply papers address Plaintiff's arguments. (Dkt. No. 45–1 at 5–7.)

> FN14. The complaint does not allege that the ordinance is overbroad.

***6** Plaintiff argues that § 16–2 is unconstitutionally vague under *Coates v. City of Cincinnati,* 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971). (Dkt. No. 42 at 4–5.) In *Coates,* the Supreme Court examined a loitering ordinance that made it a criminal offense for "three or more persons to assemble on any of the sidewalks and there conduct themselves in a manner annoying to persons passing by." *Coates,* 402 U.S. at 611 (punctuation omitted). Three individuals convicted under the ordinance appealed to the Supreme Court, arguing that the ordinance was facially unconstitutional. *Id.* at 612. The Court agreed, finding the ordinance both unconstitutionally vague and unconstitutionally overbroad. The Court stated that the "ordinance is unconstitutionally vague because it subjects the exercise of the right of assembly to an unas[c]ertainable standard, and unconstitutionally broad because it authorizes the punishment of constitutionally protected conduct." *Id.* at 614. Regarding vagueness, the Court explained that:

> Conduct that annoys some people does not annoy others. Thus, the ordinance is vague, not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all. As a result, men of common intelligence must necessarily guess at its meaning.
>
> It is said that the ordinance ... encompass[es] many types of conduct clearly within the city's constitutional power to prohibit. And so, indeed, it is. The city is free to prevent people from blocking sidewalks, obstructing traffic, littering streets, committing assaults, or engaging in countless other forms of antisocial conduct. It can do so through the enactment and enforcement of ordinances directed with reasonable specificity toward the conduct to be prohibited. *It cannot constitutionally do so through the enactment and enforcement of an ordinance whose violation may entirely depend upon whether or not a policeman is annoyed.*

*Id.* at 614 (citations omitted) (emphasis added).

The Court also found that the statute was unconstitutional because it violated the constitutional right of free assembly and association. *Id.* at 615. The Court stated that:

> The First and Fourteenth Amendments do not permit a State to make criminal the exercise of the right of assembly simply because its exercise may be 'annoying' to some people If this were not the rule, the right of the people to gather in public places for social or political purposes would be continually subject to summary suspension through the good-faith enforcement of a prohibition against annoying conduct. And such a prohibition, in addition, contains an obvious invitation to discriminatory enforcement against those whose association together is 'annoying' because their ideas, their lifestyle, or their physical appearance is resented by the majority of their fellow citizens.

*Id.* at 615–616.

***7** Plaintiff argues that § 16–2 "is nearly identical to the ordinance that was declared unconstitutional in *Coates* ... The wording regarding the annoyance is similar and should be declared unconstitutional for the same reasons set forth and relied upon in *Coates."* (Dkt. No. 42 at 4–5.)

In their reply papers, Defendants argue that

> Plaintiff's reliance on *Coates* is misplaced. In *Coates,* the appellants had their convictions for violating an ordinance affirmed by the Supreme Court of Ohio. On appeal to the United States Supreme Court the issue before the court was whether the Cincinnati ordinance was constitutional on its face. Plaintiff argues that the Court in *Coates* held "that this ordinance was vague because conduct, which annoys some people, does not annoy others and therefore men of common intelligence would have to guess at the meaning of the ordinance." However, the holding in *Coates* was much narrower.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

The Court held that the ordinance was "unconstitutionally vague because it subjects the exercise of the right of assembly to an unascertainable standard, and unconstitutionally broad because it authorizes the punishment of constitutionally protected conduct." Here, Plaintiff is not seeking to overturn a conviction where he was exercising his First Amendment right to association or assembly.

More importantly, Section 16–2 of the Revised General Ordinances, General Prohibitions against disturbance of the public peace and quiet, explicitly states "persons shall not collect in bodies or crowds in the streets or on the sidewalks for any unlawful purpose, or for any purpose to the annoyance or disturbance of citizens." The use of the phrase "unlawful purpose" in the city of Syracuse's ordinance could easily fall under "antisocial conduct," which as the Court in *Coates* explicitly stated, "The city is free to prevent people from blocking sidewalks, obstructing traffic, littering streets, committing assaults, or engaging in other forms of antisocial conduct."

As such, Plaintiff's cases are not applicable to the present litigation. Plaintiff attempts to use cases centered on criminal conviction appeals to support his claims for civil liability on an unchallenged ordinance at the time of his arrest. Moreover, there is no evidence in the record that this ordinance was ever declared unconstitutional before Plaintiff's arrest.

(Dkt. No. 45–1 at 6–7.)

Defendants thus appear to argue that Plaintiff does not have standing to challenge the constitutionality of § 16–2 because he was not convicted of violating the ordinance. Defendants' argument is without merit. *See* *Naprstek v. City of Norwich,* 545 F.2d 815, 817 (2d Cir.1976) (minors and their parents had standing to challenge constitutionality of curfew ordinance which had been applied to and enforced against person under circumstances identical to those in which the plaintiffs found themselves at the time of bringing the action, even though none of the plaintiffs had been arrested or fined or threatened with arrest or a fine); *Chapin v. Town of Southampton,* 457 F.Supp. 1170, 1172 (E.D.N.Y.1978) (individual who had been arrested for nude sunbathing in violation of local ordinance had standing to challenge constitutionality of ordinance, even though charges had been dismissed). Here, Plaintiff was arrested for violating the ordinance. There is no indication in the record before the Court that the City of Syracuse intends to stop enforcing the ordinance. Therefore, Plaintiff has standing to challenge the ordinance.

***8** Defendants argue that § 16–2 is distinguishable from the ordinance discussed in *Coates* because it prohibits loitering for "an unlawful purpose." Section 16–2 would likely not be constitutionally infirm if it simply read "[p]ersons shall not collect in bodies or crowds in the streets or on the sidewalks for any unlawful purpose." However, the ordinance does not end there. It continues: *"or* for any purpose to the annoyance or disturbance of citizens." Thus, an individual may violate § 16–2 if he or she is perceived to have an annoying or disturbing purpose, even if everyone involved concedes that the purpose is lawful. The ordinance does not define what the terms "annoying" or "disturbing" mean. As the Supreme Court noted in *Coates,* what is unremarkable to one person may be annoying or disturbing to another. This is precisely the type of vagueness that the Supreme Court rejected as unconstitutional in *Coates.* Vague ordinances are subject to arbitrary and possibly discriminatory enforcement.

For these reasons, Defendants are not entitled to summary judgment of this claim. Plaintiff has not requested summary judgment on this claim. Therefore, the claim will proceed forward, possibly to be resolved through pretrial motions. The Court will conduct a telephone conference as soon as possible to discuss this issue and to schedule a trial date.

**B. 42 U.S.C. § 1983 Excessive Force Claim**

1. *Merits*

Plaintiff claims that Defendants Fura, Summers, and Patti violated his civil rights by subjecting him to excessive force.[FN15] (Dkt. No. 1 ¶¶ 14(c), 18–19.) Defendants move for summary judgment of this claim,[FN16] arguing that the force they used was objectively

reasonable under the circumstances. (Dkt. No. 33–15 at 11–12.) Plaintiff argues that (1) no force was reasonable under the circumstances because the officers arrested him for violating an unconstitutional ordinance; or (2) summary judgment is not appropriate because reasonableness is a question of fact. (Dkt. No. 42 at 8.)

FN15. The complaint does not use the phrase "excessive force," but asserts that the individual defendants violated Plaintiff's "rights under the Fourth and Fourteenth Amendments ... to be free from an unreasonable search and seizure of his person [resulting in] physical injuries to his person." (Dkt. No. 1 ¶ 14.) The Court has construed this as an excessive force claim.

FN16. Defendants address the merits of the excessive force claim despite stating that "the complaint does not reveal a cause of action for excessive force." (Dkt. No. 33–15 at 11.)

a. *Legal Standard*

"The Fourth Amendment protects individuals from the government's use of excessive force while detaining or arresting individuals." *Jones v. Parmley,* 465 F.3d 46, 61 (2d Cir.2006) (citing *Thomas v. Roach,* 165 F.3d 137, 143 (2d Cir.1999)). "When determining whether police officers have employed excessive force in the arrest context, the Supreme Court has instructed that courts should examine whether the use of force is objectively reasonable 'in light of the facts and circumstances confronting them, without regard to the officers' underlying intent or motivation.' " *Jones,* 465 F.3d at 61 (quoting *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)) (punctuation omitted). Among the most relevant facts and circumstances are (1) the severity of the crime allegedly committed; (2) the threat of danger to the officer and society; and (3) whether the suspect was resisting or attempting to evade arrest. *Thomas,* 165 F.3d at 143. Reasonableness is generally a question of fact. *See McKelvie v. Cooper,* 190 F.3d 58 (2d Cir.1999) (reversing magistrate judge's grant of summary judgment to officers of Fourth Amendment excessive force claim).

b. *Defendant Fura*

***9** In analyzing Plaintiff's excessive force claims, the Court is faced with a curious record because Plaintiff has no memory of his encounter with the police. Despite this oddity, the undisputed evidence shows that when Defendant Fura used force on Plaintiff, Plaintiff was suspected only of violating § 16–2. There is no evidence in the record that Defendant Fura believed that Plaintiff was armed or was otherwise a threat of danger to the officers or society. On the other hand, it is undisputed that Plaintiff ran away and did not stop when officers shouted at him. By his own testimony, Defendant Fura responded to Plaintiff's non-violent offense, lack of threat to the officers or society, and flight by grabbing Plaintiff and punching him in the jaw. (Dkt. No. 33–12 at 6:8–24.) A reasonable juror could find that Defendant Fura's actions were reasonable in light of Plaintiff's flight. Another reasonable juror could find that Defendant Fura's reaction was not reasonable in light of the minimal offense that Plaintiff had allegedly committed and the fact that Plaintiff was unarmed and had not threatened to hurt the officers or any other individuals. Thus, a question of triable fact exists as to whether Defendant Fura used excessive force.

c. *Defendant Summers*

Defendant Summers testified that when he arrived on the scene, Plaintiff was on the ground resisting Defendant Fura. (Dkt. No. 33–10 at 10:11–16.) When Plaintiff disregarded a verbal order to place his hands behind his back, Defendant Summers struck Plaintiff's shoulders twice, with one blow bouncing off of Plaintiff's shoulder and cutting his eyebrow. *Id.* at 10:16–21. As noted above, this is the only evidence in the record regarding the encounter between Defendant Summers and Plaintiff because Plaintiff does not remember the incident. A reasonable juror could not conclude that Defendant Summers acted unreasonably. Therefore, the excessive force claim against Defendant Summers is dismissed.

d. *Defendant Patti*

The complaint does not allege that Defendant Patti used any force against Plaintiff. (Dkt. No. 1.) Plaintiff's opposition papers do not discuss any use of force by Defendant Patti. (Dkt. No. 42.) Defendants assert that Defendant Patti "was not in any manner involved in the circumstances involved with Plaintiff's arrest." (Dkt. No.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

33–15 at 1.) The evidence before the Court shows that Defendant Patti, among others, chased Plaintiff, yelling at him to stop and that he was under arrest. (Dkt. No. 33–14 ¶ 13; Dkt. No. 39 ¶ 1.) Plaintiff testified at his 50–h hearing that "it felt like I was being electrocuted ... So I must have been tased by ... an officer" and at his deposition that he believed he had been tased because his whole body shut down, but that he does not remember when that happened. (Dkt. No. 33–8 at 23:23–24:18; Dkt. No. 33–9 at 17:9–15.) Defendant Patti testified at his deposition that he was armed with a taser but that he did not use it. (Dkt. No. 33–11 at 21:3–22:1.)

***10** This evidence is insufficient to raise a triable issue of fact that Defendant Patti used any force against Plaintiff because it is entirely dependent on Plaintiff's own extremely incomplete testimony. In general, of course, "[c]redibility determinations ... are jury functions, not those of a judge." *Anderson,* 477 U.S. at 255. *See also* *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."). There is, however, a "narrow exception" to the general rule that credibility determinations are not to be made on summary judgment. *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005); *Blake v. Race,* 487 F.Supp.2d 187, 202 (E.D.N.Y.2007). In *Jeffreys,* the Second Circuit held that in the "rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete," the court may appropriately conclude at the summary judgment stage that no reasonable jury would credit the plaintiff's testimony. *Jeffreys,* 426 F.3d at 554.

In *Jeffreys,* the plaintiff, who alleged that police officers beat him and threw him out a window, confessed on at least three occasions that he had jumped out of a third-story window rather than having been thrown. *Id.* at 552. The plaintiff did not publicly state that he had been thrown out of a window by police officers until *nine months* after the incident. *Id.* The plaintiff could not identify any of the individuals whom he alleged participated in the attack or describe their ethnicities, physical features, facial hair, weight, or clothing on the night in question. *Id.*

The *Jeffreys* exception is most applicable where the plaintiff's version of events is contradicted by defense testimony. In *Jeffreys,* for instance, one of the arresting officers declared that, contrary to the plaintiff's version of events, he was the only officer who entered the room where the plaintiff was allegedly beaten and that he saw the plaintiff jump out the open window. *Jeffreys,* 426 F.3d at 551–52.

Here, Plaintiff testified that he "must have" been tased by "an officer." This incomplete testimony is contradicted by testimony by Defendant Patti, the only defendant who was armed with a taser, that he did not use his taser. No reasonable juror could credit a claim that Defendant Patti used force on Plaintiff. Indeed, as noted above, it is not even clear that Plaintiff *alleges* that Defendant Patti used force. Therefore, the excessive force claim against Defendant Patti is dismissed.

2. *Qualified Immunity*

Defendants argue that even if the court finds that Defendant Fura used excessive force, he is entitled to qualified immunity. (Dkt. No. 33–15 at 12.)

The qualified immunity inquiry generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff, establish a constitutional violation"; and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Sira v. Morton,* 380 F.3d 57, 68–69 (2d Cir.2004) (citations omitted), *accord,* *Higazy v. Templeton,* 505 F.3d 161, 169, n. 8 (2d Cir.2007) (citations omitted).

***11** In determining the second issue (i.e., whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted), courts in the Second Circuit consider three factors: (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful. *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

(1992).

In the excessive force context "the question for the purposes of qualified immunity is whether a reasonable officer could have believed that the use of force was objectively reasonable in light of the circumstances." *Lennon v. Miller,* 66 F.3d 416, 425 (2d Cir.1995). In excessive force cases, then, the analysis "converge[s] on one question: Whether in the particular circumstances faced by the officer, a reasonable officer would believe that the force employed would be lawful." *Cowan v. Breen,* 352 F.3d 756, 764 n. 7 (2d Cir.2003) (citation omitted).

If the facts showed that Defendant Fura merely grabbed Plaintiff to stop him from running, or even that he pushed Plaintiff to stop his flight, the Court would have no difficulty concluding that Defendant Fura was entitled to qualified immunity. However, the Court is unable to conclude as a matter of law that a reasonable officer would believe that punching a fleeing, non-violent suspect in the jaw would be lawful. Therefore, the excessive force claim against Defendant Fura will proceed to trial.

**C. False Arrest Claim**

Plaintiff alleges that Defendants Summers, Fura, and Patti violated his Fourth Amendment rights by subjecting him to "an unreasonable search and seizure of his person" and the "loss of his physical liberty." (Dkt. No. 1 ¶ 14.) Defendants move for summary judgment of this claim. (Dkt. No. 33–15 at 9–10.)

The elements of a Fourth Amendment false arrest claim under 42 U.S.C. § 1983 are the same as those for a false arrest claim under New York law. *Kraft v. City of New York,* 696 F.Supp.2d 403, (S.D.N.Y.2010). "To state a claim for false arrest under New York law, a plaintiff must show that (1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged." *Savino v. City of New York,* 331 F.3d 63, 75 (2d Cir.2003) (punctuation and citation omitted). Where an officer has probable cause to arrest a plaintiff, the confinement is privileged. *Id.* at 76. The burden of showing that there was probable cause for the arrest is on the officer. *Id.*

Defendants argue that Plaintiff cannot establish that he was falsely arrested because he was not aware of his confinement. (Dkt. No. 33–15 at 9–10.) Plaintiff's opposition papers do not address this argument.[FN17] (Dkt. No. 42.) It is undisputed that Plaintiff lost consciousness before Defendant Fura arrested him and did not regain consciousness until he was in the hospital. (Dkt. No. 33–14 ¶ 24; Dkt. No. 39 ¶ 1.) Thus, Plaintiff was not conscious of the confinement. Therefore, Defendants' motion for summary judgment dismissing this claim is granted.

FN17. Regarding the false arrest claim, Plaintiff argues that Defendants did not have probable cause to arrest him because § 16–2 is unconstitutionally vague. (Dkt. No. 42 at 6.) Plaintiff's argument is without merit. *See Michigan v. DeFillippo,* 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979) ("Police are charged to enforce laws until and unless they are declared unconstitutional ... Society would be ill-served if police officers took it upon themselves to determine which laws are and which are not constitutionally entitled to enforcement.").

**D. City of Syracuse's Liability for Excessive Force and False Arrest**

***12** Plaintiff claims that the City of Syracuse is liable for any constitutional torts committed by the individual Defendants because it failed to exercise reasonable care in hiring its officers, inadequately supervised its officers, and inadequately trained its officers. (Dkt. No. 1 ¶¶ 32–34.) Defendants move for summary judgment of this claim. (Dkt. No. 33–15 at 14–16.) As Defendants correctly note (Dkt. No. 45–1 at 2), Plaintiff's opposition (Dkt. No. 42) does not address this argument.

In order "to hold a [municipality] liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to ... prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983). An "official policy or custom" can be shown in several ways: (1) a formal policy officially endorsed by the municipality;

(2) actions taken by government officials responsible for establishing municipal policies related to the particular deprivation in question; (3) a practice so consistent and widespread that it constitutes a custom or usage sufficient to impute constructive knowledge of the practice to policymaking officials; and (4) a failure by policymakers to train or supervise subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come in contact with the municipal employees. *Dorsett–Felicelli v. C'nty of Clinton,* 371 F.Supp.2d 183, 194 (N.D.N.Y.2005) (citing *Monell,* 436 U.S at 690, *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483–84, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), and *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)).

The record does not disclose any evidence that any official policy or custom of the City of Syracuse led to any deprivation of Plaintiff's constitutional rights. Therefore, Defendants' motion for summary judgment dismissing this claim is granted.

**E. State Law Claims**

1. *Negligence*

Plaintiff alleges that Defendants Patti, Fura, and Summers were negligent. (Dkt. No. 1 ¶¶ 25–27.) Defendants move for summary judgment of this claim, arguing that it is barred because Plaintiff did not mention negligence in the Notice of Claim he filed with the City of Syracuse. (Dkt. No. 33–15 at 13.) As Defendants correctly note (Dkt. No. 45–1 at 2), Plaintiff's opposition (Dkt. No. 42) does not address this argument.

New York General Municipal Law Section 50–e requires plaintiffs to submit a notice of claim to a municipality prior to bringing suit in court. The purpose of the claim requirement is to allow the defendant municipality to conduct a proper investigation and assess the merits of the claim. *Carhart v. Village of Hamilton,* 190 A.D.2d 973, 594 N.Y.S.2d 358 (3d Dept.1993). A theory of liability not mentioned in the notice of claim cannot be asserted later in litigation. *Olivera v. City of New York,* 270 A.D.2d 5, 704 N.Y.S.2d 42 (1st Dept.2000). Here, Plaintiff's notice of claim to the City of Syracuse mentions "[f]alse arrest, false imprisonment, excessive force, police brutality, violation of claimant's civil rights, and assault." (Dkt. No. 33–5.) It does not mention negligence. Therefore, Defendants' motion for summary judgment dismissing Plaintiff's negligence claim is granted.

2. *False Imprisonment*

***13** Plaintiff alleges that Defendants Patti, Fura, and Summers falsely imprisoned him. (Dkt. No. 1 ¶¶ 20–22.) For the same reasons discussed above regarding Plaintiff's constitutional false arrest claim, Defendants' motion for summary judgment dismissing this claim is granted.

3. *Assault*

Plaintiff alleges that Defendants Fura and Summers assaulted him. (Dkt. No. 1 ¶¶ 23–24.) Defendants move for summary judgment dismissing this claim, arguing that the officers used only necessary force and that, even if they used unreasonable force, they are entitled to qualified immunity. (Dkt. No. 33–15 at 11–12.)

"[T]he test for whether a plaintiff can maintain ... a cause of action against law enforcement officials [for assault and battery] is whether the force used was 'reasonable,' the exact same test as the one used to analyze a Fourth Amendment excessive force claim." *Hogan v. Franco,* 896 F.Supp. 1313, 1315 n. 2 (N.D.N.Y.1995). Here, as discussed above, there is a triable issue of fact as to whether Defendant Fura used reasonable force but the undisputed facts show that Defendant Summers used reasonable force. Thus, the undisputed facts raise a triable issue of fact that Defendant Fura assaulted Plaintiff. Additionally, for the reasons discussed above regarding Plaintiff's constitutional excessive force claim, the Court cannot find as a matter of law at this time that Defendant Fura is entitled to qualified immunity. *Jones,* 465 F.3d at 63. Therefore, Defendants' motion for summary judgment of Plaintiff's state law claim for assault is granted as to Defendant Summers but denied as to Defendant Fura.

4. *Respondeat Superior*

Plaintiff claims that the City of Syracuse is liable under the theory of *respondeat superior* for Defendant Fura's alleged assault of Plaintiff. (Dkt. No. 1 ¶¶ 36–37.)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Defendants do not address this claim in their motion for summary judgment, presumably relying on their substantive arguments regarding the individual Defendants to relieve the City of liability. Cities may be held vicariously liable for state law torts committed by police officers under a theory of *respondeat superior. See Williams v. City of White Plains,* 718 F.Supp.2d 374, 381 (S.D.N.Y.2010). Therefore, the *respondeat superior* claim against the City of Syracuse regarding Defendant Fura's alleged assault of Plaintiff will proceed to trial.

**ACCORDINGLY,** it is hereby

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 33) is ***GRANTED IN PART AND DENIED IN PART.*** The motion is granted as to all causes of action *except* (1) the claim against the City of Syracuse regarding the constitutionality of Ordinance § 16–2; (2) the excessive force claim against Defendant Fura; (3) the assault claim against Defendant Fura; and (4) the *respondeat superior* claim against the City of Syracuse regarding Defendant Fura's use of force. Those claims will proceed to trial; and it is further

***14 ORDERED** that a telephone conference be scheduled at the earliest possible convenience of the Court and the parties to schedule a trial date.

N.D.N.Y.,2011.

McMahon v. Fura
Slip Copy, 2011 WL 6739517 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.





Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Julio Isley SMITH, Plaintiff,
v.
Gary GREENE, Superintendent; John Doe, Prison Guard; and John Doe, Correctional Employee, Defendants.
No. 9:06–CV–0505 (GTS/ATB).

March 22, 2011.
Julio Isley Smith, Attica, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, James Seamon, Esq., Assistant Attorney General, Albany, NY, for Defendant.

***MEMORANDUM–DECISION and ORDER***

Hon. GLENN T. SUDDABY, District Judge.

***1** Currently before the Court, in this *pro se* prisoner civil rights action filed by Julio Isley Smith ("Plaintiff") against former Great Meadow Correctional Facility Superintendent Gary Greene ("Defendant") and two John Doe correctional employees, are the following: (1) Defendant Greene's motion for summary judgment (Dkt. No. 89); and (2) United States Magistrate Judge Andrew T. Baxter's Report–Recommendation recommending that Defendant's motion be granted in its entirety and that Plaintiff's Amended Complaint be dismissed (Dkt. No. 104). For the reasons set forth below, the Report–Recommendation is accepted and adopted in its entirety; Defendant's motion is granted; Plaintiff's claims against the two John Doe Defendants are *sua sponte* dismissed; and Plaintiff's Amended Complaint is dismissed in its entirety.

**I. RELEVANT BACKGROUND**

**A. Plaintiff's Claims**

Plaintiff filed his Amended Complaint in this action on December 12, 2006. (Dkt. No. 10.) Generally, construed with the utmost of liberality, Plaintiff's Amended Complaint alleges that, between approximately February 27, 2006, and March 16, 2006, while he was incarcerated at Great Meadow Correctional Facility ("Great Meadow C .F.") in Comstock, New York, the above-captioned Defendants violated his constitutional rights. (*See generally* Dkt. No. 10 [Plf.'s Am. Compl.].) More specifically, Plaintiff alleges, *inter alia,* that in February 2006 he filed a formal grievance with the New York State Inspector General ("NYSIG") after witnessing an alleged beating of a fellow Muslim prisoner named Cleo Wright. (*Id.*) Plaintiff further alleges that, as a result of filing this grievance, Defendant Greene retaliated against him, in violation of his First Amendment rights, by ordering his transfer to Auburn Correctional Facility ("Auburn C.F.") on March 16, 2006, the same day that state officials from the NYSIG's office arrived at Great Meadow C.F. to interview Plaintiff about his grievance. (*Id.*) Finally, Plaintiff alleges that the John Doe Defendants subjected him to excessive force, in violation of the Eighth Amendment. (*Id.*)

Familiarity with the factual allegations supporting these claims in Plaintiff's Amended Complaint is assumed in this Decision and Order, which is intended primarily for review by the parties. (*Id .*)

**B. Defendant Greene's Motion for Summary Judgment**

On September 24, 2010, Defendant Greene filed a motion for summary judgment seeking dismissal of all claims. (Dkt. No. 89.) Generally, in support of his motion for summary judgment, Defendant Greene argues as follows: (1) Plaintiff has failed to adduce admissible record evidence establishing that Defendant Greene was personally involved in Plaintiff's transfer to Auburn C.F.; (2) even assuming that Defendant Greene was personally involved in Plaintiff's transfer, Plaintiff has failed to adduce admissible record evidence establishing that the transfer was retaliatory in nature; (3) Plaintiff has failed to exhaust his administrative remedies with respect to his

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

claims; and (4) based on the current record, Defendant Greene is protected from liability as a matter of law by the doctrine of qualified immunity. (*Id.*)

***2** On November 18, 2010, after several extensions of time were granted by the Court, Plaintiff filed a response in opposition to Defendant Greene's motion. (Dkt. No. 98.) In his response, Plaintiff argues as follows: (1) Defendant Greene was personally involved in Plaintiff's transfer from Great Meadow C.F. to Auburn C.F.; (2) establishing a *prima facie* case is not necessary to prevail on a conspiracy claim under 48 U.S.C. § 1985; (3) there is no admissible record evidence establishing that Plaintiff was scheduled for transfer prior to the filing of his grievance; (4) Plaintiff failed to exhaust his administrative remedies with respect to his claims because he was threatened and intimidated by prison staff not to do so; and (4) because Plaintiff is suing Defendant Greene in his individual capacity, Defendant Greene is not entitled to qualified immunity. (*Id.*)

On November 24, 2010, Defendant Greene filed a reply to Defendant's response. (Dkt. No. 99.) In his reply, in addition to reiterating previously advanced arguments, Defendant argues that, because Plaintiff's conspiracy claim is beyond the scope of his Amended Complaint, it should be dismissed. (*Id.*)

On January 27, 2011, with permission of the Court, Plaintiff filed a sur-reply. (Dkt. No. 103.) In his sur-reply, Plaintiff argues as follows: (1) because he was not allowed a final opportunity to conduct discovery, the Court has made it impossible for him to (a) respond to Defendant's motion for summary judgment, and (b) establish that Defendant Greene conspired to deny him the right to free speech; (2) he failed to exhaust his administrative remedies because Auburn C.F. correctional officers threatened him, and therefore exhaustion is not a requirement for him to commence this action; (3) Defendant Greene's retaliation effectively chilled him from asserting his constitutional rights; (4) Defendant Greene is not entitled to qualified immunity; and (5) other Defendants were dismissed from this action prematurely. (*Id.*)

**C. Magistrate Judge Baxter's Report–Recommendation**

On February 1, 2011, Magistrate Judge Baxter issued a Report–Recommendation recommending that Defendant Greene's motion be granted and that Plaintiff's Amended Complaint be dismissed in its entirety, with prejudice. (Dkt. No. 104.) In support of his recommendation, Magistrate Judge Baxter found, *inter alia,* as follows: (1) Plaintiff failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Greene was personally involved in Plaintiff's transfer to Auburn C.F .; (2) Plaintiff's retaliation claim should be dismissed because (a) the record evidence establishes that he would have been transferred in March 2006 regardless of whether he complained to DOCS or the IG about the alleged assault on another inmate, and (b) the controlling law on the issue of whether an inmate's complaints about the treatment of another inmate are protected by the First Amendment was unclear in 2006, and therefore any DOCS employee personally involved in the decision to transfer Plaintiff would be protected from liability as a matter of law by the doctrine of qualified immunity; and (3) because the Court has granted Plaintiff numerous opportunities to engage in discovery, articulate and support his claims, and prepare his opposition to the pending motion, Plaintiff cannot, at this late stage, assert a cause of action for conspiracy. (*Id.*) Familiarity with the remaining grounds of Magistrate Judge Baxter's Report–Recommendation is assumed in this Decision and Order, which is intended primarily for review by the parties.

***3** On February 10, 2011, Plaintiff filed his Objections to the Report–Recommendation. (Dkt. No. 105.) In his Objections, Plaintiff argues as follows: (1) because the Court previously accepted his conspiracy claim, Magistrate Judge Baxter erred in failing to consider this claim; (2) Plaintiff has adduced record evidence from which a rational factfinder could conclude that he was transferred because of the complaint he filed; (3) the close proximity between the assault on inmate Wright and Plaintiff's transfer suggests that Defendants conspired to have Plaintiff transferred in order to cover up the "racial assault," and therefore Defendants are not entitled to qualified immunity; (4) because the Second Circuit has recognized that a supervisor who "knew of brutality or purposefully avoided finding out about it c[an] be held liable," Plaintiff's claims against Defendant Greene should not be dismissed; and (5) it is "clear law that prison officials may not retaliate against a prisoner for exercising

a constitutionally protected right," and that complaining about the treatment of another inmate constitutes constitutionally protected speech. (*Id.*)

## II. APPLICABLE LEGAL STANDARDS

### A. Standard of Review Governing a Report–Recommendation

When specific objections are made to a magistrate judge's report-recommendation, the Court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1)(C).[FN1] When only general objections are made a magistrate judge's report-recommendation, the Court reviews the report-recommendation for clear error or manifest injustice. *See Brown v. Peters,* 95–CV1641, 1997 WL 599355, at *2–3 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion,* 175 F.3d 1007 (2d Cir.1999).[FN2] Similarly, when a party makes no objection to a portion of a report-recommendation, the Court reviews that portion for clear error or manifest injustice. *See Batista v. Walker,* 94–CV–2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) [citations omitted]; Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition [citations omitted]. After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

FN1. On *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1)(C). However, a district court will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g ., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

FN2. *See also Vargas v. Keane,* 93–CV–7852, 1994 WL 693885, at *1 (S.D.N.Y. Dec. 12, 1994) ("[Petitioner's] general objection [that a] Report ... [did not] redress the constitutional violations [experienced by petitioner] ... is a general plea that the Report not be adopted ... [and] cannot be treated as an objection within the meaning of 28 U.S.C. § 636."), *aff'd,* 86 F .3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895 (1996).

### B. Standard Governing a Motion for Summary Judgment

Magistrate Judge Baxter correctly recited the legal standard governing a motion for summary judgment. (Dkt. No. 104.) As a result, this standard is incorporated by reference in this Decision and Order.

## III. ANALYSIS

As an initial matter, even when construed with the utmost of liberality, Plaintiff's Objections fail to specifically address Magistrate Judge Baxter's recommendations. Instead, Plaintiff's Objections simply reiterate the arguments Plaintiff presented in his prior papers to the Court. As a result, and for the reasons explained above in Part II.A. of this Decision and Order, the Court need review the Report–Recommendation for only clear error.

***4** After carefully reviewing all of the papers in this action, including Magistrate Judge Baxter's Report–Recommendation, and Plaintiff's Objections thereto, the Court concludes that Magistrate Judge Baxter's thorough Report–Recommendation is correct in all respects. (Dkt. No. 104 [Report–Recommendation].) Magistrate Judge Baxter employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. (*Id.*) As a result, the Court adopts the Report–Recommendation in its entirety for the reasons stated therein. The Court would add only four points.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

First, the Report–Recommendation would survive even a *de novo* review.

Second, Plaintiff is correct that a supervisory official may be held liable when he knows of an ongoing constitutional violation being carried out by his subordinates, yet fails to remedy the wrong. Plaintiff is also correct that prison officials may not retaliate against a prisoner for exercising a constitutionally protected right. However, Plaintiff is incorrect that, in 2006, it was clearly established that filing a complaint about the treatment of another inmate constituted constitutionally protected speech. (Dkt. No. 67, at 6–7 [collecting cases]; Dkt. No. 104, at 21–23 [collecting cases] .)

Third, in his Objections, Plaintiff overlooks the fact that, as Magistrate Judge Baxter pointed out in his Report–Recommendation, action taken for both retaliatory and non-retaliatory reasons does not give rise to a First Amendment claim. *See Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003). Here, the undisputed material facts establish that, regardless of whether Plaintiff complained about the alleged assault on inmate Wright, he would have been transferred in March 2006.

Fourth, the Court *sua sponte* dismisses Plaintiff's claims against the two John Doe Defendants without prejudice for failure to name and serve them, pursuant to Fed.R.Civ.P. 41(b), and/or Fed.R.Civ.P. 4(m). In concluding that Plaintiff's claims against these two individuals should be dismissed without prejudice pursuant to Fed.R.Civ.P. 41(b), the Court has carefully balanced the five factors that the Second Circuit has stated should be considered under the circumstances.[FN3] For example, the Court finds that the duration of Plaintiff's failure is more than four years, i.e., from the issuance of the United States District Judge Lawrence E. Kahn's Decision and Order of December 21, 2006 (Dkt. No. 12, at 2–3), to the present.[FN4] The Court finds that Plaintiff has received adequate notice that this failure to name and/or serve the John Doe Defendants would result in dismissal.[FN5] The Court finds that the John Doe Defendants, who have never been served or afforded the opportunity to conduct discovery in this matter, are likely to be prejudiced by a further delay.[FN6] The Court finds that the need to alleviate congestion on the Court's docket outweighs Plaintiff's right to receive a further chance to be heard in this matter.[FN7] The Court has considered all less-drastic sanctions and finds them to be inadequate or inappropriate under the circumstances.[FN8] Finally, in alternatively concluding that Plaintiff's claims against these two John Doe Defendants should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m), the Court notes that Plaintiff has not offered "good cause" for his failure to enable the Marshals Service to effect service on these two individuals.[FN9]

FN3. *See Shannon v. GE Co.,* 186 F.3d 186, 193 (2d Cir.1999) (affirming Fed.R.Civ.P. 41[b] dismissal of plaintiff's claims by U.S. District Court for Northern District of New York based on plaintiff's failure to prosecute the action) [citation and internal quotation marks omitted]; *see also Drake v. Norden Sys.,* 375 F.3d 248, 254 (2d Cir.2004) (articulating same standard in slightly different form); *accord, Ruzsa v. Rubenstein & Sendy Attys at Law,* No. 07–0089, 2008 WL 706693, at *1 (2d Cir. March 17, 2008).

FN4. *See Ruzsa v. Rubenstein & Sendy Attys at Law,* No. 07–0089, 2008 WL 706693, at * 1 (2d Cir. March 17, 2008) (dismissing action, in part because of plaintiff's seven-month delay during prosecution of action).

FN5. In part, this notice has come from the following: (1) District Judge Kahn's Decision and Order of December 21, 2006 (Dkt. No. 12, at 2–3); (2) United States Magistrate Judge Gustave J. Di Bianco's Report–Recommendation of December 26, 2007 (Dkt. No. 32, at 3, 8, 12–13); (3) United States Magistrate Judge Andrew T. Baxter's Report–Recommendation of February 3, 2010 (Dkt. No. 64, at 3, 5); (4) United States Magistrate Judge Andrew T. Baxter's Decision and Order of August 12, 2010 (Dkt. No. 84, at 2, 3, 11, 12); (5) United States Magistrate Judge Andrew T. Baxter's Decision and Order of February 1, 2011 (Dkt. No. 104, at 3, 6); and (6) Local Rule 41.2(a) of the Local

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Rules of Practice for this Court, which the Clerk's Office has provided to all correctional facilities in New York State.

FN6. *See, e.g., Geordiadis v. First Boston Corp.,* 167 F.R.D. 24, 25 (S.D.N.Y.1996) ("The passage of time always threatens difficulty as memories fade. Given the age of this case, that problem probably is severe already. The additional delay that plaintiff has caused here can only make matters worse.").

FN7. The Court notes that it is cases like this one that delay the resolution of other cases, and that contribute to the Second Circuit's dubious distinction as having (among the twelve circuits, including the D.C. Circuit) the longest median time to disposition for prisoner civil rights cases, between 2000 and 2005 (9.8 months, as compared to a national average of 5.7 months).

FN8. For example, the Court finds that granting Plaintiff another opportunity to amend his claims against these two individuals would be futile, given (1) his previous delay in attempting to amend those claims, and (2) the nature of his previously attempt to amend those claims.

FN9. *See Waldo v. Goord,* 97–CV–1385, 1998 WL 713809, at *5 (N.D.N.Y. Oct. 1, 1998) (Kahn, J.) (dismissing a claim under Fed. R. Civ. 4 [m] where pro se plaintiff failed to serve John Doe defendants during the year that elapsed between filing of complaint and issuance of order of dismissal by court); *Thomas v. Keane,* 99–CV–4302, 2001 WL 410095, at *1, 5 (S.D.N.Y. April 23, 2001) (dismissing claim under Fed. R. Civ. 4[m] where pro se plaintiff failed to serve John Doe defendants during the year that elapsed between filing of complaint and issuance of order of dismissal by court).

***5 ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Baxter's Report–Recommendation (Dkt. No. 104) is ***ACCEPTED*** and ***ADOPTED*** in its entirety; and it is further

**ORDERED** that Defendant Greene's motion for summary judgment (Dkt. No. 89) is ***GRANTED,*** and Plaintiff's claims against Defendant Greene are ***DISMISSED*** **with prejudice;** and it is further

**ORDERED** that Plaintiff's claims against the two John Doe Defendants are *sua sponte* ***DISMISSED*** **without prejudice** for failure to name and serve them, pursuant to Fed.R.Civ.P. 41(b), and/or Fed.R.Civ.P. 4(m); and it is further

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 10) is ***DISMISSED*** in its entirety.

N.D.N.Y.,2011.

Smith v. Greene
Not Reported in F.Supp.2d, 2011 WL 1097862 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.







Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Richard COLE, Plaintiff,
v.
Doctor Felicitas MIRAFLOR, Otisville Correctional Facility, Defendant.
No. 99 CIV 0977 RWS.

Feb. 19, 2001.
Nixon Peabody, LLP, Buffalo, By Allison P. Gioia, Esq., Of Counsel, for Plaintiff.

Honorable Eliot L. Spitzer, Attorney General of the State of New York, New York, By Stacy R. Sabatini, Assistant Attorney General, Of Counsel, for Defendant.

OPINION

SWEET, D.J.

***1** Plaintiff Richard Cole ("Cole") has moved for permission to file a Second Amended Complaint, pursuant to Federal Rule of Civil Procedure 15(a), and defendant Felicitas Miraflor, M.D. ("Miraflor") has cross-moved to dismiss the complaint on statute of limitations grounds, pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, the motion by Cole is granted, and the motion by Miraflor is denied.

*The Parties*

Cole was at all relevant times an inmate under the care and custody of the New York State Department of Corrections ("DOCs"). The facts underlying Cole's claim against Miraflor arose while Cole was incarcerated at Otisville Correctional Facility ("Otisville").

Miraflor was at all relevant times a treating physician of Cole's while he was incarcerated at Otisville.

*Prior Proceedings*

This action was initiated by the filing of a *pro se* complaint in the Southern District of New York on October 15, 1998, against Christopher Artuz ("Artuz"), Superintendent of the Green Haven Correctional Facility ("Green Haven") in Stormville, New York, Norman Selwin ("Selwin"), Medical Director at Green Haven, and Jane Doe ("Doe"), a doctor at Otisville (collectively, "Original Defendants").[FN1] The complaint alleged deliberate indifference to Cole's medical needs in violation of the Eighth Amendment and 42 U.S .C. § 1983, as well as deprivation of Cole's right to meaningful access to the courts in violation of the Constitution and 42 U.S.C. § 1983.

FN1. In this Court's previous opinion in this case, *Cole v. Artuz,* 97 Civ. 977, 2000 WL 760749, at *1 (S.D.N.Y. June 12, 2000), it is stated that Cole filed his complaint on February 2, 1999. This is the date reflected in the courthouse records. However, in connection with the instant motion Cole has submitted a copy of a *pro se* complaint with a partially obliterated date-stamp that appears to reflect receipt by the Pro Se Office for the Southern District of New York on October 15, 1998. Cole contends that this is the date he filed his complaint, and Miraflor assumes arguendo that this is the proper date. In addition, although it is the law of this circuit that a prisoner's complaint is deemed filed upon his handing of a complaint to prison officials, *see Dory v. Ryan,* 999 F.2d 679 (2d Cir.1993), which would presumably have occurred before October 15, 1998, Cole has not argued for application of an earlier date.

As against Doe, Cole alleged in his *pro se* complaint that, during the period of his incarceration at Otisville, which began when he was transferred to Otisville in November 1995 and continued until he was transferred from Otisville to Green Haven in or about January, 1997:

Plaintiff informed Jane Doe on repeated occasions that he had a serious back ailment. That having to climb up and jump down from a TOP BUNK was aggravating that injury. Defendant Doe refused to medically excuse

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

plaintiff from having to sleep in a top bunk, verify the ailment or provide appropriate medical treatment.

On or about April 29, 1999, the Original Defendants, represented by the Office of the Attorney General of the State of New York (the "New York Attorney General"), filed a motion to dismiss the complaint. On or about May 11, 1999, the Original Defendants requested that all discovery be stayed pending resolution of the motion to dismiss. The request was granted on May 13, 1999.

On September 3, 1999, Nixon Peabody LLP filed a notice of appearance and has since been acting as counsel for Cole in this action.

On September 14, 1999, counsel for Cole wrote to Assistant Attorney General Stacy Sabatini ("Sabatini"), counsel for the New York Attorney General in this case:

In light of the statements made in defendants' motion to dismiss concerning your representation of "[d]efendants Superintendent Christopher Artuz; Medical Director Norman Selwin, Green Haven Correctional Facility; and Otisville Correctional Facility," I write to request your assistance in identifying the Jane Doe defendant, a doctor or medical professional at Otisville Correctional Facility.

***2** On October 27, 1999, counsel for Cole requested his medical records.

On November 2, 1999, this Court denied the Original Defendants' motion to dismiss and granted Cole twenty days to file an amended complaint. On December 14, 1999, Cole filed an amended complaint.[FN2] On January 6, 2000, the Original Defendants filed a motion to dismiss the amended complaint.

FN2. For unknown reasons, Nixon Peabody did not receive a copy of this Court's November 2, 1999 order until after the twenty days had expired. Notwithstanding this confusion, the Court permitted Cole to serve and file an amended complaint.

Cole's medical records were received by his counsel on March 6, 2000.

In a letter to this Court dated April 11, 2000, counsel for Cole stated that Sabatini had not responded to the September 14, 1999, letter requesting assistance in identifying the Doe defendant.

On June 12, 2000, the Original Defendants' motion to dismiss the amended complaint was granted with respect to Selwin and Artuz, but denied with respect to Doe. *See Cole,* 2000 WL 760749, at *7.

Also on June 12, 2000, the stay of discovery was lifted. Ultimately, the discovery period was extended through October 12, 2000.

Immediately following receipt of the Court's June 12, 2000 decision and order, Cole's counsel again sought assistance from the New York Attorney General in identifying the Doe defendant. Having received no response, on July 20, 2000, a third-party subpoena was served on the Medical Director of the Otisville Correctional Facility. Sabatini, on behalf of the New York Attorney General, responded to the subpoena.

On July 25, 2000, counsel for Cole provided Cole's medical records from Otisville to the New York Attorney General, and on July 28, 2000, the New York Attorney General provided the names of the medical personnel who were among those individuals who treated Cole during his period of incarceration at Otisville. On August 28, 2000, in response to a request from Cole's counsel, Otisville provided pictures and descriptions of two Otisville medical professionals.

On or about September 14, 2000, a Second Amended Complaint was served identifying the Doe defendant as Miraflor and alleging deliberate indifference by Miraflor to Cole's serious medical needs, in violation of the Eighth Amendment. The specific factual allegations against Miraflor are identical to those made against Doe in the original *pro se* complaint, and continue to allege unconstitutional conduct for the period spanning November 1995 through in or about January 1997.

On September 25, 2000, Miraflor filed the instant motion to dismiss the Second Amended Complaint on

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

statute of limitations grounds. In a letter dated September 26, 2000, Cole requested permission to file the Second Amended Complaint, which letter was treated as a motion. Oral argument was heard on November 8, 2000, at which time the matter was marked fully submitted.

*Discussion*

I. *The Governing Legal Standards*

A. *The Standard Under Rule 12(b)(6)*

On a Rule 12(b)(6) motion to dismiss, the factual allegations of the complaint are presumed to be true and all factual inferences must be drawn in the plaintiffs' favor and against the defendants. *See Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974); *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989); *Dwyer v. Regan,* 777 F.2d 825, 828-29 (2d Cir.1985).

***3** Rule 12(b)(6) imposes a substantial burden of proof upon the moving party. A court may not dismiss a complaint unless the movant demonstrates if " 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." ' *H.J., Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 249-50 (1989) (citation omitted); *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984); *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

B. *The Applicable Statute Of Limitations*

There is no federal statute of limitations for § 1983 actions. Accordingly, a federal court must "borrow" the limitations period from the most appropriate or analogous state statue. *See Board of Regents v. Tomanio,* 446 U.S. 478, 483-84 (1980); *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 462 (1975). New York's three-year period for personal injury actions § 1983 actions in New York State. *See Owens v. Okure,* 488 U.S. 235, 249 (1989) (holding that New York's three-year statute of limitations for general personal injury actions applies to constitutional torts claims under § 1983); N.Y. C.P.L.R. § 214(5).

The date of accrual of a § 1983 claim, however, is governed by federal law. *See Morse v. University of Vermont,* 973 F.2d 122, 125 (2d Cir.1992). Such claims accrue when the plaintiff "knows or has reason to know of the injury which is the basis of his action." *Singleton v. City of New York,* 632 F.2d 185, 191 (2d Cir.1980).

II. *Cole's Naming Of Miraflor Does Not Relate Back*

Cole's claim accrued when he knew or had reason to know of his injury. Miraflor contends that this occurred when he was transferred to Otisville in November 1995, at which time he notified the Otisville medical staff that he had back pain and, according to the Second Amended Complaint, was denied proper care by Miraflor. The New York Attorney General contends that Cole's claim is time-barred because, based on a November 1995 accrual date, the three-year statute of limitations against Miraflor ran out in November 1998, yet Cole failed to name her until September 2000.

Cole contends that his Second Amended Complaint identifying Miraflor "relates back" to his original *pro se* complaint and, therefore, is timely under Federal Rule of Civil Procedure 15(c).[FN3]

> FN3. For purposes of his relation back argument, Cole agrees arguendo that his claim accrued in November 1995. However, as discussed below, he also raises an alternative, tolling argument.

Rule 15(c) provides that an amendment changing the name of a defendant relates back to the original pleading if the claims against the new party arise out of the same conduct or occurrence set forth in the original pleading, and, within 120 days of filing the original complaint, the new defendant (1) had received such notice of the action that he will not be prejudiced in maintaining his defense on the merits, Fed.R.Civ.P. 15(c)(3)(A), and (2) knew or should have known that, but for a mistake concerning the identity of the proper party the action would have been brought against him, Fed.R.Civ.P. 15(c)(3)(B). *See, e.g., Soto v. Brooklyn Corr. Facility,* 80 F.3d 34, 35 (2d Cir.1996).

***4** According to Miraflor, Cole's Second Amended Complaint does not relate back because Cole's inability to discover Miraflor's name before the running of the limitations period is not a "mistake," as that term was

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

defined by the Second Circuit in *Barrow v. Wethersfield Police Dep't,* 66 F.3d 466 (2d Cir.1995), *modified,* 74 F.3d 1366 (2d Cir.1996).

In *Barrow,* the Second Circuit held that a "mistake" in identifying a defendant occurs for purposes of Rule 15(c) when it is the result of "misnomer or misidentification," or when a plaintiff omits the individual defendant altogether in the erroneous belief that suing a government department will suffice. 66 F.3d at 469. However, the court stated, "the failure to identify individual defendants when the plaintiff knows that such defendants must be named cannot be characterized as a mistake." *Id.* at 470. The relation back doctrine did not apply in *Barrow* because, after having been directed by the court to name the individual officers whom he accused of violating his rights under § 1983, the plaintiff, after the deadline set by the court, filed an amended complaint in which he identified these defendants only as John Doe, and then amended his complaint to name the actual officers almost two years after the state of limitations had run. *See id.* at 476. Under these circumstances, the court held, there was no "mistake" within the meaning of Rule 15(c). *See id.* The *Barrow* rule was recently reaffirmed by the Second Circuit in *Malesko v. Correctional Servs. Corp.,* 229 F.3d 274, (2d Cir.2000) ("A plaintiff is not considered to have made ... a 'mistake" [within meaning of Rule 15(c) ], however, if the plaintiff knew that he was required to name an individual as a defendant but did not do so because he did not know the individual's identity.") (*citing Barrow,* 66 F.3d at 470).

In *Byrd v. Abate,* 964 F.Supp. 140, 145-46 (S.D.N.Y.1997), this Court distinguished *Barrow,* and applied the relation back doctrine to a plaintiff who initially sued John Doe defendants and then later, after the statute of limitations had run, named the actual defendants. It was noted that in *Barrow* the plaintiff disregarded an explicit direction from the court to obtain the officers' identities. *See id.* at 145. By contrast, in *Byrd,* the plaintiff "made a series of efforts to obtain the identity of the individual officer without prompting, and well before the end of the limitations period." *Id.* (Byrd's counsel first requested officer's name from Corporation Counsel for the City of New York nine months before statute of limitations expired). These circumstances warranted the conclusion that a "mistake" had been made for purposes of Rule 15(c) and, indeed, "[t]o hold that Rule 15(c) does not permit relation back in such circumstances would permit defense counsel to eliminate claims against any John Doe defendant merely by resisting discovery responses until the statute of limitations ended." *Id.* at 146; *see also Thomas v. Arevalo,* 95 Civ. 4704, 1998 WL 427623, at *15 (S.D.N.Y. July 28, 1998) (distinguishing *Barrow,* and applying relation back rule, because "in naming 'John Doe' defendants, plaintiff was merely following the Court's own directive ... [the] language [of the court's order] was imprecise and did not properly warn the *pro se* plaintiff of the consequences should be not be able to meet the requirements of Rule 15(c)(3) for any newly-added defendants").

***5** Here, Cole did not make a legal or factual mistake. He did not, for example, neglect to include an individual defendant based on the misconception that he was not required to do so. Indeed, he included an individual "Jane Doe" defendant in his original *pro se* complaint. Nor did he mistakenly name a different doctor than Miraflor. There is no dispute that the reason Cole did not name Miraflor is that he did not know her identity. This, standing alone, cannot support application of the relation back rule under the precedent in this circuit. *See Barrow,* 66 F.3d at 470.

Counsel for Cole has described how, once they became involved in September 1999, they made repeated efforts to identify the Doe defendant, and the protracted amount of time this process took. They also point to ways in which they contend the New York Attorney General was not as helpful as it might have been. In addition, it must be noted that discovery was stayed in this action from May 13, 1999, until June 12, 2000. The problem, however, is that by the time Cole's counsel appeared in this action-and indeed, by the time of the discovery stay-the three-year statute of limitations had already run if the claim accrued in November 1995. Nor has any evidence been offered as to efforts by Cole himself to identify the Doe defendant prior to November 1998. Unlike the plaintiffs in *Barrow,* Cole did not disregard an order by this Court directing him to identify the individual defendant. However, this case cannot be distinguished from *Barrow* on the ground that he was stymied in efforts

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

made before the limitations period expired to identify Miraflor, *see* *Byrd,* 964 F.Supp. at 145,[FN4] or was understandably confused by some directive of this court, *see* *Thomas,* 1998 WL 427623, at *15.[FN5]

FN4. For example, Cole's *pro se* complaint nowhere references attempts to identify the Doe defendant.

FN5. In this Court's previous opinion, the contention that the complaint should be dismissed for failing to identify the Doe defendant was rejected. *See Cole,* 2000 WL 760749, at *6. The issue at that juncture did not involve a statute of limitations argument. *See id.* Nonetheless, the wording of the decision might have confused a *pro se* plaintiff. However, Cole was no longer *pro se* at that time and, moreover, if his claim accrued on November 1995, the statute of limitations had expired long before.

Cole fails to address the issue of whether he made a "mistake" within the meaning of Rule 15(c), focusing instead on the other factors to be considered in the relation back analysis, namely, whether the underlying transactions are the same as in the underlying pleading, whether Miraflor was on notice or constructive notice, and whether Miraflor has been prejudiced. *See* *Soto,* 80 F .3d at 35 (setting forth factors). It is not necessary to address these issues, however, because his argument that the relation back doctrine applies fails for the reasons set forth above.

III. *Cole's Claim Was Tolled By The "Continuous Violation" Doctrine*

Cole contends that, even if the Second Amended Complaint does not relate back, his claim against Miraflor is timely based on the "continuous treatment" doctrine. According to Cole, pursuant to this doctrine, his claim against Miraflor did not accrue until in or about January 1997, when he was transferred out of Otisville and was therefore no longer under Miraflor's care.[FN6]

FN6. Cole also offers November 17, 1996, as the earliest possible date when his claim could have accrued under the "continuous treatment" rule. However, he offers no explanation for this date. In any case, because of the sequence of events, including in particular the stay of discovery, it is immaterial for purposes of this discussion whether the accrual date is November 17, 1996 or January 1997.

Cole's argument that the "continuous treatment" doctrine applies is misplaced. This doctrine is borrowed not from the law governing personal injury actions but, rather, from the law governing professional malpractice claims. *See, e.g.,* *Borgia v. City of New York,* 237 N.Y.S.2d 319 (N.Y.1962) (applying continuous treatment doctrine to medical malpractice claim); *see also* *West v. City of New York,* No. 88 Civ. 1801, 1992 WL 249966, at *5 (S.D.N.Y. Sept. 22, 1992) (citing various types of professional malpractice cases in which continuous treatment/representation doctrine applies under New York law). It is well-established, of course, that a claim for medical malpractice does not state a claim under § 1983. *See* *Cole,* 2000 WL 760749, at *6 (internal citation omitted). In *West,* the Honorable Charles S. Haight reasoned that the continuous treatment doctrine cannot apply to a § 1983 deliberate indifference claim because, first, "courts have carefully distinguished deliberate indifference from medical malpractice," and, second, "the Supreme Court has stated ... that the statute of limitations provisions of personal injury actions shall apply to all section 1983 cases." 1992 WL 249966, at *5 (*citing* *Owens,* 488 U.S. at 242). In addition, it must be noted that, given that a § 1983 is governed by the personal injury statute of limitations, the rationale underlying the continuous treatment doctrine is inapposite. *See* N.Y. C.P.L.R. § 214-a, Practice Commentary C214-a:2 (McKinney 1990) (rationale for continuous treatment doctrine is that patient may be deterred from bringing malpractice claim where there is continuous relationship of trust and confidence between patient and doctor); *cf.* N.Y. C.P.L.R. § 214, Practice Commentary C214:6 (McKinney 1990) (rationale for continuous representation doctrine, which tolls statute of limitations in attorney malpractice cases, is that client has right to place confidence in attorney's ability and good faith during course of representation).

***6** The doctrine Cole wishes to invoke is actually the "continuing violation" or "continuing harm" rule. It is

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

well-established that this rule applies in Title VII claims, which is a type of § 1983 action. *See* *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 765 (2d Cir.1998) (internal citations omitted) (statute of limitations period is extended for "all claims of discriminatory acts committed under an ongoing policy of discrimination"). Of course, Cole's claim is not brought under Title VII. However, while no decision within this circuit has been found in which this rule was applied to toll the statute of limitations for a deliberate indifference claim, the Second Circuit has recognized that the rule may apply in such a case. *See* *Pino v. Ryan,* 49 F.3d 51, 54 (affirming *sua sponte* dismissal of prisoner's deliberate indifference claim "where ... the injuries complained of occurred ... well outside the applicable three-year limitations period ... and plaintiff has alleged no facts indicating a continuous or ongoing violation of his constitutional rights"). Further support for this view is provided by the fact that in Title VII cases brought in New York, as in this case, the statute of limitations period is borrowed from the New York three-year rule governing personal injury cases. *See* *Morse v. University of Vermont,* 973 F.2d 122, 126 (2d Cir.1992).

Therefore, based on the continuing harm rule, Cole's claim against Miraflor accrued in or about January 1997.

At the time discovery was stayed, there were approximately eight months left to run on the statute of limitations if the harm continued through January 1997. The limitations period was equitably tolled during the stay of discovery. The stay was lifted on June 12, 2000, and on September 26, 2000, Cole requested permission to file a Second Amended Complaint identifying the Doe defendant, at which point approximately four more months had run on the statute of limitations. Therefore, the Second Amended Complaint was timely, and the motion to dismiss will be denied.[FN7]

FN7. The Second Amended Complaint would also be timely if the November 17, 1996 accrual date were used, since, based on that date, there were approximately six months left of the limitations period when discovery was stayed.

Finally, it is noted that the Second Amended Complaint includes Artuz and Selwin as defendants. Since the claims asserted against those defendants have been dismissed, before filing the complaint Cole is directed to amend the caption to reflect that the only defendant is Miraflor.

*Conclusion*

Therefore, for the reasons set forth above, the motion to file a Second Amended Complaint is granted, and the motion to dismiss the Second Amended Complaint is denied. A pretrial order shall be filed within sixty (60) days, and the action marked ready for trial.

It is so ordered.

S.D.N.Y.,2001.

Cole v. Miraflor

Not Reported in F.Supp.2d, 2001 WL 138765 (S.D.N.Y.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.